No. 24-10933-H

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

―――――――――――

TIFFANY WINGO, ET AL.,

*Plaintiffs/Appellants,*

v.

BRANSON HARRIS, ET AL.,

*Defendants/Appellees.*

―――――――――――

On Appeal from the United States District Court
for the Northern District of Georgia

Case No. 1:20-cv-03662-VMC
Hon. Victoria M. Calvert, District Judge

―――――――――――

## APPELLANTS' BRIEF

―――――――――――

Timothy J. Gardner
Georgia Bar No. 115430
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com

June 5, 2024

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

1. Beller, Marissa M. (Counsel for Defendants-Appellees);

2. Brown, Henrietta G. (Counsel for Plaintiffs-Appellants);

3. Bruce, Lauren (Counsel for Defendants-Appellees);

4. The Honorable Calvert, Victoria M., Judge, Northern District of Georgia (United States District Judge);

5. Cobb County Attorney's Office (Counsel for Defendants-Appellees);

6. Cobb County Sheriff's Office (Employer of Defendants-Appellees)

7. Choy, Sun S. (Counsel for Defendants-Appellees);

8. Cork, Charles (Counsel for Plaintiffs-Appellants);

9. Fields, Teri (Plaintiff-Appellant-Conservator of Estate of Kevil Wingo, Jr.);

10. Freeman Mathis & Gary, LLP (Law Firm of Counsel for Defendants-Appellees);

C-1 of 2

11. Gardner Trial Attorneys (Law Firm of Counsel for Plaintiffs-Appellants);

12. Gardner, Timothy J. (Counsel for Plaintiffs-Appellants);

13. Gordon, Charles (Defendant-Appellee);

14. Harris, Branson (Defendant-Appellee);

15. Jackson, Wesley C. (Counsel for Defendants-Appellees);

16. Marshall, Lynda (Defendant-Appellee);

17. Rowling, William H. Jr (Counsel for Defendants-Appellees);

18. Wilkerson, Paul (Defendant-Appellee);

19. Wingo, Tiffany (Plaintiff-Appellant);

20. Wingo, Kieara (Plaintiff-Appellant); and

21. Wingo, Erika (Plaintiff-Appellant).

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument. The issues of this case surrounding detainees' constitutional rights are of great importance in that the outcome of the Court's decision continues to establish precedent for law enforcement responsibility in jail settings. The outcome of this case will continue to establish the precedent that jail officers, as wards of detainees, must provide detainees adequate medical care. This fact is even more true where a detainee is experiencing a serious medical need, and the first line medical providers fail to provide adequate care.

The evidence in this case is voluminous consisting of numerous video recordings of the incident, audio and video recordings of witness interviews after the incident, photographs, depositions and policies and procedures. Due to the volume of evidence, oral arguments will limit statements in the record from being taken out of context in briefs and allow the Court to receive clarification as to the timeline of events and testimony proffered so the Court can ensure that the scope of jail officer responsibility is appropriately limited or expanded. The evidence in this case supports that a clear constitutional violation existed where Defendants were deliberately indifferent and caused Kevil Wingo, Sr.'s death. Oral argument will provide the parties with an opportunity to clarify their positions and direct the Court to specific evidence to support their positions.

i

## **TABLE OF CONTENTS**

Certificate of Interested Person and Corporate Disclosure Statement ................. C-1

Statement Regarding Oral Argument .........................................................................i

Table of Contents ..................................................................................................... ii

Table of Authorities ................................................................................................iv

Statement of Subject-Matter and Appellate Jurisdiction ...................................... viii

Statement of the Issues..............................................................................................1

Statement of the Case................................................................................................1

    A. Course of Proceedings and Dispositions Below .......................................1

    B. Statement of Facts .....................................................................................3

    C. Standard of Review for Each Issue ........................................................13

Summary of the Argument......................................................................................14

Argument and Citations of Authority

    I.     THE DISTRICT COURT ERRED RULING DEFENDANTS WERE ENTITLED TO QUALIFIED IMMUNITY BECAUSE NO CLEARLY ESTABLISHED CONSTITUTIONAL VIOLATION EXISTED FOR DEFENDANTS' ALLEGED FAILURE TO PROVIDE MR. WINGO ADEQUATE MEDICAL CARE............ 18

    II.    THE DISTRICT COURT ERRED IN EXCLUDING PLAINTIFFS' GENERAL SURGEON EXPERT'S TESTIMONY ON CAUSATION FINDING HIS TESTIMONY UNRELAIBE EVENTHOUGH DR. MYERS TESTIFIED NUMEROUS TIMES THAT MR. WINGO MOST PROBABLY WOULD HAVE SURVIVED IF HE PRESENTED TO THE EMERGENCY ROOM WITH VITALS… ...........................................................44

Conclusion ...............................................................................................................54

Certificate of Compliance ........................................................................56

Certificate of Service ..............................................................................57

# TABLE OF AUTHORITIES

## Cases

Allison v. McGhan Med. Corp.,
    184 F.3d 1311 (11th Cir. 1999) ...................................................................52, 53

Amnesty Int'l, USA v. Battle,
    559 F.3d 1170 (11th Cir. 2009) ......................................................................22

Ancata v. Prison Health Servs., Inc.,
    769 F.2d 700 (11th Cir. 1985) ...................................................................20, 41

Belcher v. City of Foley,
    30 F.3d 1390 (11th Cir. 1994) ........................................................................22

Brown v. Hughes,
    894 F.2d 1533 (11th Cir. 1990) .................................................................20, 41

Carswell v. Bay Cty.,
    854 F.2d 454 (11th Cir. 1988) ...................................................................20, 41

Clemons v. Dougherty Cty.,
    684 F.2d 1365 (11th Cir. 1982) ......................................................................13

Coffin v. Brandau,
    642 F.3d 999 (11th Cir. 2011) ........................................................................22

Danley v. Allen,
    540 F.3d 1298 (11th Cir. 2008) .............................................................20, 40, 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993).............................................................................52, 53, 54

Davies v. Israel,
    342 F. Supp. 3d 1302 (S.D. Fla. 2018).............................................................21

Estate of Patterson v. Fulton County-DeKalb Hosp. Auth.,
    233 Ga. App. 706 (1998) .................................................................................53

*Estelle v. Gamble,
    429 U.S. 97 (1976)............................................................................18, 19, 21

Farrow v. West,
    320 F.3d 1243 (11th Cir. 2003) ....................................................................40

*Foster v. Maloney,
    785 F. App'x 810 (11th Cir. 2019)................................. 14, 15, 20, 40, 41, 42

General Electric Co. v. Joiner,
    522 U.S. 136 (1997)......................................................................................14

Gilmore v. Hodges,
    738 F.3d 266 (11th Cir. 2013) ......................................................................23

Griffin v. Coffee Cty.,
    623 F. Supp. 3d 1365 (S.D. Ga 2022) ..........................................................46

Harris v. Coweta Cty.,
    21 F.3d 388 (11th Cir. 1994) ..................................................................20, 41

Holmes v. Kucynda,
    321 F.3d 1069 (11th Cir. 2003) ....................................................................21

Howell v. Evans,
    922 F.2d 712 (11th Cir. 1991) ................................................................20, 41

Knepfle v. J-Tech Corp.,
    48 F.4th 1282 (11th Cir. 2022) .....................................................................53

*Kumho Tire Co., Ltd. V. Carmichael,
    526 U.S. 137 (1999)......................................................................................52

Maiz v. Virani,
    253 F.3d 641 (11th Cir. 2001) ......................................................................52

Maurere v. Chayatte,
    173 Ga. App. 343 (1985) ..............................................................................53

McClish v. Nugent,
    483 F.3d 1231 (11th Cir. 2007) .......................................................22

*McElligott v. Foley,
    182 F.3d 1248 (11th Cir. 1999) ...........................................20, 21, 41

*Melton v. Abston,
    841 F.3d 1207 (11th Cir. 2016) ...........................14, 15, 21, 22, 23

Mercado v. City of Orlando,
    407 F.3d 1152 (11th Cir. 2005) .......................................................23

Moore v. Intuitive Surgical, Inc.,
    995 F.3d 839 (11th Cir. 2021) ...................................................52, 53

Mullenix v. Luna,
    577 U.S. 7, 12 (2015).......................................................................23

*Patel v. Lanier Cty, Ga.,
    969 F.3d 1173 (11th Cir. 2020) ...........................................20, 40, 42

Pearson v. Callahan,
    555 U.S. 223 (2009)........................................................................21

Priester v. City of Riviera Beach,
    208 F.3d 919 (11th Cir. 2000) .......................................................22

Rodgers v. Singletary,
    142 F.3d 1252 (11th Cir. 1998) ...................................................13

Ruiz-Troche v. Pepsi Cola.,
    161 F.3d 77 (1st Cir. 1998).............................................................53

Rutledge v. Alabama,
    724 F. App'x 731 (11th Cir.2018)...................................................21

U.S. v. Frazier,
    387 F.3d 1244 (11th Cir. 2004) ...................................................53

Vinyard v. Wilson,
   311 F.3d 1340 (11th Cir. 2002) .......................................................................23

**Statutes**

28 U.S.C. § 1291 ..................................................................................... vii

28 U.S.C. § 1331 ..................................................................................... vii

28 U.S.C. § 1367 ..................................................................................... vii

42 U.S.C. § 1983 ..................................................................................... vii

O.C.G.A. § 42-4-4................................................................................19

**Rules**

Fed. R. Evid. 702 ...................................................................................54

## <u>STATEMENT OF SUBJECT MATTER</u>
## <u>AND APPELLATE JURISDICTION</u>

This case asserts a violation of the Fourteenth Amendment under 42 U.S.C. §1983.  The district court had jurisdiction under 28 U.S.C. §§1331 and 1367.  This court has jurisdiction under 28 U.S.C. § 1291.

This is a direct appeal from the district court's order on February 26, 2024, granting Defendants' Motion for Summary Judgment and Motion to Exclude Plaintiffs' Expert Dr. Brian Myers. Doc. 227.  The district court entered final judgment in Defendants favor on February 27, 2024. Doc. 228.  Plaintiffs timely filed their notice of appeal on March 25, 2024.  Doc. 230.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in granting Defendants' Motion for Summary Judgment finding that Plaintiffs' civil rights claims alleging Defendants jail officers failed to provide adequate medical care were barred by qualified immunity because Defendants' conduct did not violate clearly established constitutional law?

2. In considering Plaintiffs' state law negligence claims against Deputy Paul Wilkerson, did the district court err in excluding Plaintiffs' general surgeon expert finding Plaintiffs' expert testimony unreliable as to causation and granting summary judgment to defendants based on this witness exclusion as Plaintiffs did not have any other medical expert to testify on causation?

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

It has been almost five years since Plaintiffs' decedent, Kevil Wingo, Sr., died on September 29, 2019, while briefly detained at the Cobb County Adult Detention Center (hereinafter referred to as "CCADC") at the young age of 36 years old leaving behind three young children.  Plaintiffs filed this civil rights/negligence lawsuit on September 3, 2020, based on, among other things, allegations of Defendants' deliberate indifference to Mr. Wingo's serious medical need by not providing him adequate medical care while he was detained at the

1

CCADC. Doc. 1. Plaintiffs alleged in their Complaint that Defendants violated Mr. Wingo's constitutional right to receive adequate medical care; were deliberately indifferent to Mr. Wingo's serious medical need; and were negligent in performing their duties causing Mr. Wingo's death. Doc. 1.

Extended discovery was conducted in this case including the taking the numerous fact and expert witness depositions. Since the filing of this case many of the initial defendants have been voluntarily dismissed for various reasons. Docs. 59, 128 and 192. The current Defendants remained in this lawsuit until the lower court summarily dismissed the case on February 26, 2024. Doc. 227.

On July 11, 2023, Plaintiffs filed a Motion for Partial Summary Judgment on Defendants' Apportionment of Fault to Non-Parties Defense and a Motion to Exclude Defendants' Expert James C. Upshaw Downs, M.D. Docs. 188 and 190. On July 12, 2023, Defendants filed the following: 1. Motion for Summary Judgment on all claims, 2. Motion to Exclude Testimony of Margo L. Fraiser, J.D., and 3. Motion to Exclude Testimony of Dr. Brian Myers and Mark Johnson. Docs. 196, 197 & 198. The parties responded and replied to all filed motions. Docs. 206, 207, 209, 214, 215, 219, 220, 223, 224, and 226). On October 2, 2023, all dispositive and Daubert motions were submitted to the lower court for consideration and ruling. On February 26, 2024, the district court ruled on all motions granting Defendants' Motion for Summary Judgment and Defendants'

Motion to Exclude Plaintiffs' Expert Dr. Brian Myers. Doc. 227. The district court did not consider and denied as moot Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs' Motion to Exclude Defendants' Expert James C. Upshaw Downs, M.D., and Defendants' Motion to Exclude Testimony of Margo L. Fraiser, J.D. Doc. 227. Plaintiffs now respectfully appeal the lower court's decision.

### B. Statement of Facts

Plaintiffs allege Defendants were deliberately indifferent to Mr. Wingo's serious medical needs resulting in his death at the CCADC on September 29, 2019. Doc. 166, Pg. 2.[1]  Plaintiffs further allege a state law claim that Defendant Deputy Paul Wilkerson was negligent in failing to follow Cobb County Sheriff's Office's (hereinafter referred to as "CCSO") policies and procedures and that his failure to perform the ministerial act of conducting 12–15-minute security rounds on Mr. Wingo's padded cell led to Mr. Wingo's death. Doc. 166, Pgs. 29-30.

Plaintiffs' decedent, Kevil Wingo, Sr. was booked as a detainee at the CCADC on September 24, 2019.  Doc. 166, Pg. 6.  Four days later, on September 28, 2019, around 11:50 p.m., Mr. Wingo was taken to the infirmary at the CCADC complaining of severe stomach pain, nausea, and vomiting. Appleby Dep. Doc. 191-1, Pgs. 5, 9. Burton Dep. Doc. 191-2, Pg. 13. Non-party medical providers

---

[1] All citations to the record rely on the document number and page number that appears in the header of each page generated by the district court's electronic filing system.

consisting of registered nurses, licensed practical nurses and technicians worked in the infirmary at the CCADC and were present in the infirmary while Mr. Wingo was housed there. Doc. 97. Mr. Wingo was taken to the infirmary in a wheelchair showing signs of pain and imbalance. Appleby Dep. Doc. 191-1, Pgs. 7, 9. When Mr. Wingo arrived at the infirmary he fell out of the wheelchair on the floor. Appleby Dep. Doc. 191-1, Pg 7.

Mr. Wingo was placed in a cell in the infirmary with three other detainees. McPhee Dep. Doc. 191-3, Pg. 41. Throughout the night and early morning hours of September 28-29, 2019, Mr. Wingo exhibited signs of pain and asked both the medical staff and CCSO deputies Britton McPhee and Lynda Marshall to go to the hospital. McPhee Dep. Doc. 191-3, Pg. 38; Marshall Dep. Doc. 191-4, Pgs. 35, 37.

The morning of September 29, 2019, between 7:27 a.m. and 7:32 a.m. Mr. Wingo is seen in the presence of Deputy Marshall fainting or losing his balance at least three times. Marshall Dep. Doc. 191-4, Pgs. 40-41; Electronic Media Exhibit (hereinafter referred to as "EME" -Infirmary Video View 1 Doc. 213, Pg. 2; EME-Marshall Internal Affairs Interview Audio Doc. 194, Pg. 2. After Mr. Wingo fainted or lost his balance the third time, Deputy Marshall opened Mr. Wingo's cell door and he fell to the ground in front of the cell. Marshall Dep. Doc. 191-4, Pg. 43; EME -Infirmary Video View 1 at 7:28 a.m. Doc. 213, Pg. 2; EME - Infirmary Video View 2 at 7:28 a.m. Doc. 213, Pg. 2.

Lieutenant Charles Gordon, who supervised security personnel in the infirmary, arrived in the infirmary when Mr. Wingo was on the floor in front of his cell.[2] Gordon Dep. Doc. 191-6, Pgs. 16-17; EME-Infirmary Video View 1 at 7:31 a.m. Doc. 213, Pg. 2; EME-Infirmary Video View 2 at 7:31 a.m. Doc. 213, Pg. 2. Mr. Wingo was on the floor in front of his cell for nine minutes asking to go to the hospital and was in obvious physical distress. Marshall Dep. Doc. 191-4, Pg. 54; Gordon Dep. Doc. 191-6, Pg. 26; EME -Infirmary Video View 1 Doc. 213, Pg. 2; EME-Infirmary Video View 2 at 7:31 a.m. though 7:41 a.m. Doc. 213, Pg. 2. Lt. Gordon stated that he saw Mr. Wingo fall over several times while he was on the floor but did not have medical attend to him. Gordon Dep. Doc. 191-6, Pgs. 26, 27, 29. He said that Mr. Wingo falling over concerned him, but he did not have medical evaluate him. Gordon Dep. Doc. 191-6, Pg. 29.

Infirmary Lab Technician, Tiffany Womack, began her shift in the CCADC infirmary at 6:00 a.m. and testified that Mr. Wingo became worse as she was there and was sweating, falling to the ground, and saying he could not breathe. Womack Dep. Doc. 211-6, Pg 22. Deputy Marshall also heard Mr. Wingo "hollering" a few times that he could not breathe and wanted to go to the hospital, and she responded "if you are speaking you are breathing" but did not provide him with any medical aid. Marshall Dep. Doc. 191-4, Pgs. 35, 37, 38. Mr. Wingo had been "hollering"

---

[2] Lieutenant Charles Gordon was a CCSO Sergeant when Mr. Wingo was detained at the CCADC and subsequently promoted to Lieutenant after the incident at issue.

that he could not breathe for at least an hour and a half before Deputy Marshall opened his cell door. Marshall Dep. Doc. 191-4, Pg. 38. Deputy Marshall claimed in her deposition that she advised the medical staff of Mr. Wingo's situation, but that fact is disputed through video and other deposition testimony. Marshall Dep. Doc. 191-4, Pg. 35; Visser Dep. Doc. 211-3, Pg. 60.; Doc. 221, Pg. 20. Tiffany Womack testified that up until the time she did her rounds prior to Mr. Wingo being sent to the padded cell he appeared to be in serious medical distress and that a lay person or anyone without medical training could clearly see that he was in medical distress. Womack Dep. Doc. 211-6, Pg. 27.

Instead of taking Mr. Wingo to the hospital, the CCSO personnel removed Mr. Wingo from the infirmary where he was showing signs of serious medical distress to the point where Lieutenant Gordon testified, he did not think Mr. Wingo even knew where he was. Gordon Dep. Doc. 191-6, Pgs. 21, 43; EME-Infirmary Video View 1 & 2 at 7:46 a.m. Doc. 213, Pg. 2. The jail officers removed Mr. Wingo from the infirmary and took him to an isolated padded cell because they claim that he was "messing around", "playing games" or causing a disturbance. Marshall Dep. Doc. 191-4, Pgs. 5, 47; EME-Marshall and Wilkerson Internal Phone Call Doc. 213, Pg. 2; EME-Marshall and Harris Internal Phone Call Doc. 213, Pg. 2. Lieutenant Gordon surprisingly testified that Mr. Wingo was moved to the padded cell because he was suicidal, although there is no other evidence in this

6

case to suggest that Mr. Wingo was suicidal. Gordon Dep. Doc. 191-6, Pgs. 41, 44, 47.

Defendant Deputy Marshall contacted Major Harris and told him that Mr. Wingo was detoxing, messing around and needed to be moved to a padded cell. EME-Marshall and Harris Internal Phone Call Doc. 213, Pg. 2.  Major Harris responded that if he "is detoxing" then he should be in the infirmary, but that he would come down. Harris Dep. Doc. 191-5, Pg. 24; EME-Marshall and Harris Internal Phone Call Doc. 213, Pg. 2.

Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. Marshall Dep. Doc. 191-4, Pg. 44. Deputy Marshall also testified that she knew detoxing could be a serious medical issue. Marshall Dep. Doc. 191-4, Pg. 45. Major Harris testified that he knew that someone could die from detoxing. Harris Dep. Doc. 191-5, Pg. 24. Lt. Charles Gordon testified that if someone was detoxing medical needed to see them. Gordon Dep. Doc. 191-6, Pg. 28. Deputy Paul Wilkerson knew that people could die from detoxing as other security personnel at the jail told him that. Wilkerson Dep. Doc. 191-7, Pg. 24.

Deputy Marshall then contacted Deputy Paul Wilkerson to inquire about padded cells in his unit and told him that she had an "idiot" over there playing

games who wanted to go to the hospital. Marshall Dep. Doc. 191-4, Pg. 47; Wilkerson Dep. Doc. 191-7, Pg. 34; EME- Marshall and Wilkerson Internal Phone Call Doc. 213, Pg. 2. Deputy Wilkerson responded to Marshall stating Mr. Wingo wanted to go to the hospital with "that's not going to happen" and told her he had a padded cell available for him. Wilkerson Dep. Doc. 191-7, Pg. 34-35; EME- Marshall and Wilkerson Internal Phone Call Doc. 213, Pg. 2.

After nine minutes on the ground, Lieutenant Gordon horse-collar grabbed Mr. Wingo and escorted him to chairs in the Infirmary. Gordon Dep. Doc. 191-6, Pg. 32; EME- Infirmary Video View 2 at 7:46 a.m. Doc. 213, Pg. 2. Lieutenant Gordon grabbed Mr. Wingo by his collar because he believed that Mr. Wingo was too unstable to walk on his own and thus needed to be held by his collar so that he did not fall while being escorted. Id. Lieutenant Gordon placed Mr. Wingo in a chair in the Infirmary and then again did not ask for any medical personnel to attend to Mr. Wingo.  Id. Cobb County Chief Deputy Sheriff, the second in command of the entire sheriff's office, Sonya Allen, testified that if the deputies and sergeants knew that Mr. Wingo could not walk on his own and was disoriented and didn't know where he was that would be concerning. Allen Dep. Doc. 211-8, Pgs. 43-44.

Major Harris arrived at the infirmary and spoke with Nurse Annaleen Visser who stated that Mr. Wingo was detoxing, trying to get to the hospital, drug seeking

and needed to be isolated. Harris Dep. Doc. 191-5, Pg. 20. Major Harris also did not see Mr. Wingo being loud, disruptive, acting out, belligerent or trying to harm himself. Harris Dep. Doc. 191-5, Pg. 30, 33.

Padded cells are reserved for individuals who are exhibiting signs of self-harm or are a threat to others – not for housing sick patients, detoxing or otherwise. Gordon Dep. Doc. 191-6, Pg. 38; CCSO Close Observation Policy Doc. 208-12, Pgs. 1-7. Deputy McPhee testified that detainees are placed in close observation cells usually because there is a threat of self-harm or they need to be more closely observed but usually there is a threat of self-harm. McPhee Dep. Doc. 191-3, Pg. 25. Sgt Guy Vanderbogart worked at the CCADC for 12 years and in that time, he had never seen someone placed in a close observation cell that did not threaten to hurt themselves. Vanderbogart Dep. Doc. 211-9, Pg. 14. Deputy Nasie Mejia testified that a detainee cannot be placed in a padded cell unless assessed by medical and their vitals are taken. Mejia Dep. Doc. 211-7, Pgs. 16-17. Prior to placing Mr. Wingo in the padded cell, Mr. Wingo was not assessed, and his vitals were not taken.

After seeing Mr. Wingo, Major Harris, with the assistance of Lieutenant Gordon handcuffed Mr. Wingo in the back and escorted him to a padded cell outside the infirmary in another area of the jail referred to as the infirmary extension but was not staffed and observed by medical on a regular basis. Gordon

Dep. Doc. 191-6, Pg. 35; EME- Infirmary Video View 1 at 7:45 a.m. Doc. 213, Pg.

2; EME- Infirmary Video View 2 at 7:45 a.m. Doc. 213, Pg. 2. Mr. Wingo was

losing his balance while walking and having difficulty ambulating. Gordon Dep.

Doc. 191-6, Pgs. 36, 39; EME- Infirmary Video View 1 at 7:46 Doc. 213, Pg. 2;

EME-Infirmary Video View 2 at 7:46 Doc. 213, Pg. 2; EME-Corridor Video at

7:46 a.m. through 7:47 a.m. Doc. 213, Pg. 2. Major Harris then decided to wheel

Mr. Wingo to the padded cell because he could not walk. Id.; Harris Dep. Doc.

191-5, Pg. 39. Mr. Wingo fell to the ground in front of the wheelchair when Major

Harris brought the wheelchair. Harris Dep. Doc. 191-5, Pg. 39; Gordon Dep. Doc.

191-6, Pg. 40; EME-Corridor Video at 7:46:01 a.m. Doc. 213, Pg. 2. Lieutenant

Gordon and Major Harris, with the assistance of another deputy, then picked up

Mr. Wingo off the ground and put him in the wheelchair. Gordon Dep. Doc. 191-6,

Pg. 40; Harris Dep. Doc. 191-5, Pg. 40; EME-Corridor Video at 7:46 a.m. Doc.

213, Pg. 2. Mr. Wingo sat in the wheelchair appearing lethargic and incoherent and

did not speak. Gordon Dep. Doc. 191-6, Pg. 40; Harris Dep. Doc. 191-5, Pg. 40;

EME-Corridor Video at 7:46 a.m. Doc. 213, Pg 2. Mr. Wingo was wheeled to the

padded cell with his foot dragging on the ground and making no sounds. Id.; Harris

Dep. Doc. 191-5, Pg. 44; EME-Corridor Video at 7:46 a.m. Doc. 213, Pg. 2; EME-

Outside Padded Cell Video at 7:48 a.m. Doc. 213, Pg. 2. Deputy Marshall was

jolly and laughing as Mr. Wingo was being taken to the padded cell. EME-

Infirmary Video View 2 at 7:45:30 through 7:46:45 Doc. 213, Pg. 2.

Mr. Wingo was wheeled inside the padded cell. Harris Dep. Doc. 191-5, Pg. 43; Gordon Dep. Doc. 191-6, Pg. 43; EME-Outside Padded Cell Video at 7:48 a.m. Doc. 213, Pg. 2. Lieutenant Gordon and Major Harris, with the assistance of another officer grabbed Mr. Wingo out of his wheelchair and put him on the ground in the padded cell. Gordon Dep. Doc. 191-6, Pg. 44; EME-Inside Padded Cell Video at 7:48 a.m. Doc. 213, Pg. 2. Mr. Wingo was not fighting or causing a disturbance and appeared in video evidence to be incoherent, unbalanced, lethargic, and semi-conscious. Harris Dep. Doc. 191-5, Pg. 45; EME- Inside Padded Cell Video at 7:48 a.m. through 7:50:04 a.m. Doc. 213, Pg. 2. Mr. Wingo was placed face down on a toilet grate in the padded cell and removed of his clothes by Lieutenant Gordon in the presence of Major Harris. Harris Dep. Doc. 191-5, Pg. 45; EME-Inside Padded Cell Video at 7:48 a.m. through 7:50 a.m. Doc. 213, Pg. 2. Major Harris then dropped a safety smock, commonly referred to as a suicide smock, on Mr. Wingo's naked body and left his cell. Harris Dep. Doc. 191-5, Pg. 46; EME-Inside Padded Cell Video at 7:49 a.m. Doc. 213, Pg. 2.

Despite video evidence to the contrary, Major Harris shockingly testified that Mr. Wingo appeared fine throughout his contact with Mr. Wingo. Harris Dep. Doc. 191-5, Pgs. 51-52. He also stated that Mr. Wingo never appeared to be in distress, and he was not concerned about Mr. Wingo. Harris Dep. Doc. 191-5, Pgs.

37, 52. Major Harris stated that he was the highest-ranking official in the jail at the time and that he could only send Mr. Wingo to the emergency room if "medical" said it was ok, regardless of Mr. Wingo's condition. Harris Dep. Doc. 191-5, Pg. 52. He also stated that if he had went to the cell and saw Mr. Wingo was dead and medical said not to call an ambulance, he would not have the authority to call an ambulance and would not have called one. Id. Contrary to the law and his constitutional responsibility, Major Harris stated that if medical does not provide medical care, then there is nothing he can do. Harris Dep. Doc. 191-5, Pg. 54.

Mr. Wingo appeared disoriented and confused in the padded cell. EME-Inside Padded Cell Video at 7:49 a.m. through 7:57 a.m. Doc. 213, Pg. 2. After a few minutes of what appeared to be involuntary movements by Mr. Wingo he was able to move to the corner of the padded cell where he sat. Id. He then made a few more of what appeared to be involuntary movements and from the video evidence in this case does not appear to have moved again. Id. After numerous failed mandatory security checks Mr. Wingo was eventually found unresponsive in his cell about an hour after being placed there. EME-Inside Padded Cell Video at 8:50 a.m. Doc. 213, Pg. 2; Wilkerson Dep. Doc. 191-7, Pg 50. The Cobb County Medical Examiner concluded that Mr. Wingo's cause of death was complications of perforated gastric ulcer with peritonitis. Doc. 209-26, Pg 1.

Plaintiffs disclosed General Surgeon Brian Myers as an expert on causation to opine that Mr. Wingo's death was avoidable and that his condition was easily surgically treated. Doc. 134, Pg. 4. Dr. Myers opinions were (1.) "[T]o a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would most likely survived." (2) "[T]he lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life." Doc. 209-27, Pgs. 1-6.

### C. Standard of Review for Each Issue

Issue 1: The Eleventh Circuit Appellate Court reviews grants of summary judgment de novo, reviewing all facts and reasonable inferences in the light most favorable to the nonmoving party and applying the same standard as the district court. See Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998). A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id.  If the record on summary judgment presents factual issues, the court must not decide them; rather, the court must deny the motion and proceed to trial. See Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1369 (11th Cir. 1982).  The Court should adopt Plaintiffs' version of the facts and draw all inferences in their favor.

Issue 2: The Eleventh Circuit Court of Appeals will review rulings on the admissibility of expert testimony for abuse of discretion.  See <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 138-139 (1997).  The district court's ruling should be reversed on appeal if the exclusion of evidence is manifestly erroneous. <u>Id</u>.

## **SUMMARY OF THE ARGUMENT**

The district court wrongfully held that Defendants were protected by qualified immunity in that there was no clear constitutional violation for their conduct.  The lower court ruled that there were no prior cases to put Defendants on notice that their conduct towards Mr. Wingo violated constitutional law.  This finding is incorrect.

First Mr. Wingo's signs and symptoms of a serious medical need were so dire and obvious that a lay person could recognize Mr. Wingo's need for medical care and thus an exact prior constitutional violation case was not necessary. <u>See Melton v. Abston,</u> 841 F.3d 1207, 1221 (11th Cir. 2016).  Second, there are cases that establish that jail officers must provide medical care to detainees with serious medical needs even if they are provided cursory medical care by on-site medical providers.  <u>See Foster v. Maloney</u>,  785 Fed Appx 810 (11th Cir. 2019)[3]; <u>Melton v.</u>

---

[3] <u>Foster</u> is an unpublished opinion but may be cited as persuasive authority. 11Cir.R. 36-2. <u>Foster</u> also clearly recognizes that when the injury occurred in that case, 2014, it was clearly established precedent in the Eleventh Circuit that there could be liability for jail officers where they fail to provide adequate medical care other than notifying medical personnel in the face of a plainly dire medical

14

Abston, 841 F.3d 1207, 1221 (11th Cir. 2016). These cases establish a clear violation of constitutional law for which the lower court stated does not exist.

As in Foster, *supra*, the video evidence of Mr. Wingo detained at the CCADC showed that Mr. Wingo exhibited signs of sweating, severe pain, imbalance, lethargy, incoherence, the inability to ambulate, remain conscious and/or stand. Plaintiffs also submitted numerous witnesses' deposition testimony describing Mr. Wingo's dire condition as described in Plaintiffs Statement of Facts, *supra*. Doc. 190-1; Doc. 209-1. The video and deposition evidence in this case clearly illustrates Mr. Wingo's condition was serious and that he needed immediate medical care. Confronted with Mr. Wingo's serious medical condition, the Defendants turned a blind eye and failed to provide Mr. Wingo adequate medical care and this failure clearly violated Mr. Wingo's established constitutional rights.

In considering Plaintiffs'-Appellants state law claims, the district court also erred in excluding Plaintiffs expert general surgeon, Dr. Brian Myers' testimony on causation and thereby granting Defendant Paul Wilkerson's Motion for Summary Judgment. The lower court wrongfully found that Dr. Myers' testimony was not reliable because Dr. Myers did not provide an exact percentage that Mr. Wingo would have survived had he received medical care at an exact moment just prior to

situation.

Mr. Wingo being transferred to Deputy Wilkerson's duty.

Dr. Myers' testimony reveals that he was not able to provide an exact percentage as to survivability based on Mr. Wingo's vitals because Mr. Wingo's vitals were not taken. Dr. Myers was thus left to leave his opinions to "most probably" because the evidence of vital signs was not available. Nonetheless, the lower court abused her discretion and manifestly erroneously held Dr. Myers' testimony to a higher standard of admissibility based off information that was not available and no expert or lay person could opine.

Dr. Myers' opinion has consistently been that as long as Mr. Wingo had vitals, he most probably would have survived. Doc. 209-1, Pgs. 29-30. He has been unwavering as to this position. Dr. Myers testified in his deposition that as long as Mr. Wingo arrived at the hospital with vitals, he most likely would have survived. Myers Dep. Doc. 211-2, Pgs. 28-29. Dr. Myers also testified that a 36 year old man with no comorbidities, like Mr. Wingo, had a 90% chance of survival at perforation onset under normal circumstances if he received medical care. Doc. 207, Pgs. 8-9; Myers Dep. Doc. 211-2, Pgs. 24, 26, 29-30. Dr. Myers testified that Mr. Wingo's mortality increased 2.5% every hour after perforation onset that he did not receive medical care. Myers Dep. Doc. 211-2, Pg. 24. Mr. Wingo's perforation began around 11:45 p.m. on September 28, 2019, and Mr. Wingo was transferred to Deputy Wilkerson's duty about eight hours later. Myers Dep. Doc.

211-2, Pg. 26; EME-Infirmary Video View 1 at 7:46 a.m. Doc. 213, Pg. 2. As such, Mr. Wingo's mortality rate had increased 20%, making his likelihood of survival at that point 70% in general.

In Mr. Wingo's case we do not know Mr. Wingo's vitals at all points before he died.  Mr. Wingo's last set of vitals were taken when he was admitted to the infirmary.  At that point Dr. Myers testified that Mr. Wingo had a 90% chance of survival.  Doc. 207, Pgs. 8-9; Myers Dep. Doc. 211-2, Pgs. 24, 26, 29-30. There is no evidence in this case that Mr. Wingo's vitals changed as Mr. Wingo's vitals were never taken again.

There is also no medical evidence to a reasonable degree of medical certainty that Mr. Wingo was in septic shock.  Myers Dep. Doc. 211-2, Pg. 25; Vega Dep. Doc. 191-8, Pg.14. The lower court should not have assumed the negative where such information was not available. The medical expert doctors in this case even testified that they could not testify to a reasonable degree of medical certainty that Mr. Wingo was in septic shock.  Myers Dep. Doc. 211-2, Pg. 25; Vega Dep. Doc. 191-8, Pg.14.

Dr. Myers testified that as long as Mr. Wingo had vitals in the E.R. he would have survived. Myers Dep. Doc. 211-2, Pg. 28. He based this opinion on his history and experience repairing hundreds of perforated ulcers. Myers Dep. Doc. 211-2, Pgs. 6-7, 9. The lower court abused her authority in excluding Dr. Myer's

testimony as unreliable. Dr. Myers' testimony was reliable, admissible and may be subject to cross examination. However, disagreement over his testimony should not equate to exclusion. Such a ruling would improperly place the judge, instead of the jury, as the trier of fact on this issue.

Had the lower court not improperly excluded Dr. Myers' testimony, Plaintiffs had sufficient evidence on causation to challenge Defendant Paul Wilkerson's Motion for Summary Judgment and thus that motion would have, or at least should have, been denied.

<u>**ARGUMENT AND CITATION OF AUTHORITY**</u>

I. **THE DISTRICT COURT ERRED RULING DEFENDANTS WERE ENTITLED TO QUALIFIED IMMUNITY BECAUSE NO CLEARLY ESTABLISHED CONSTITUTIONAL VIOLATION EXISTED FOR DEFENDANTS' ALLEGED FAILURE TO PROVIDE MR. WINGO ADEQUATE MEDICAL CARE.**

The State has a constitutional obligation under the Eighth and Fourteenth Amendments to provide adequate medical care to those it has incarcerated. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). A pretrial detainee must rely on jail authorities to treat his medical needs and if they fail to do so then the detainee's needs would not be met. <u>Id.</u> at 103. In addition, O.C.G.A. § 42–4–4 states that it is the duty of the sheriff and his deputies to provide prisoners with medical aid. The determination of whether a jail official has violated a jail detainee's Fourteenth Amendment right to receive adequate medical care depends on whether the jail

18

official was deliberately indifferent to the detainee's serious medical need and whether the jail official was protected by qualified immunity. See Estelle, 429 U.S. at 104 (1976).

The district court in this case did not rule whether the Defendants were deliberately indifferent to Mr. Wingo's serious medical need but instead found that even if they were, they were protected under the doctrine of qualified immunity.[4] The district court recognized that Mr. Wingo's symptoms **"were consistent with a critically serious medical need"**, but also found that Mr. Wingo's symptoms "were consistent with "a more routine, less critical situation such as detoxing." Doc. 227, Pgs. 29. **emphasis added**. In recognizing these symptoms, the court, in error, found that an "an officer does not act unreasonably by seeking input from and relying on, a medical professional who has not given the officer any reason to doubt the veracity of her medical assessment." Doc. 227, Pgs. 29-30.

The district court's analysis is flawed because the district court failed to recognize that it is the symptoms illustrating the serious medical need that must be addressed medically and not what ultimately caused the symptoms. There are many situations where a detainee may have a serious medical need and the exact

---

[4] As this Court's review is de novo, Plaintiffs-Appellants request that if this Court agrees that the district court's decision on qualified immunity was in error, that this Court also determine whether sufficient evidence has been presented to allow a jury determination on deliberate indifference as outlined in Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment. Doc. 209.

cause is unknown, i.e. heart attack, stroke, and even detoxing.  That does not mean jail officials can fail to respond even if first level medical providers who fail to evaluate the detainee state that the issue is not serious.  It is irrelevant whether the serious medical need was the result of detoxing or a perforated gastric ulcer - as in this case.   Regardless of the cause, the Eleventh circuit has found that the symptoms of lethargy, semi-unconsciousness, imbalance, inability to breathe, incoherence and inability to ambulate require medical attention and cannot be ignored. See Patel v. Lanier County Georgia, 969 F.3d 1173, 1190-1191 (2020); see also Foster v. Maloney,  785 F. App'x 810 (11th Cir. 2019); Danley v. Allen, 540 F.3d 1298, 1313 (11th Cir. 2008); McElligott v. Foley, 182 F.3d 1248, 1255–59 (11th Cir. 1999); Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir.1994); Howell v. Evans, 922 F.2d 712, 720 (11th Cir. 1991); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam); see also Carswell v. Bay Cty., 854 F.2d 454, 457 (11th Cir. 1988); see also Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985).

The district court ultimately found that "there was no clearly established law requiring Defendants to order the detention center's nursing staff to provide medical care or to hospitalize Mr. Wingo against the advice of the detention center's nursing staff." Doc. 227, Pg. 31. This decision does not align with the evidence in this case and conflicts with Eleventh Circuit precedent requiring jail

20

officials to act where only cursory medical treatment is provided. See Estelle, 429 U.S. 97 (1976); see also McElligott, 182 F.3d 1248, 1255–59 (11th Cir. 1999); Rutledge v. Alabama, 724 F. App'x 731, 735 (11th Cir. 2018); Davies v. Israel, 342 F. Supp. 3d 1302, 1308 (S.D. Fla. 2018).  The district court's ruling also fails to appreciate, as illustrated in Melton v. Abston, 841 F.3d 1207, 1220-1221 (11th Cir. 2016), that jail officials may be deliberately indifferent where the medical providers, who may also be deliberately indifferent, fail to provide adequate care and the jail officials rely on the medical teams' advice despite the detainee's obvious serious medical need. As illustrated in Melton, both the medical providers and jail officials can both be found to be deliberately indifferent in violation of the constitution.

Qualified immunity protects government officials sued in their individual capacities from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See 42 U.S.C. § 1983; see also Melton, 841 F.3d at 1220-1221 (11th Cir. 2016) quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009); see also Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994).  Qualified Immunity does not protect an official who knew or reasonably should have known that the action he took would violate the constitution.  See Melton, 841 F.3d at 1220-1221 (11th Cir. 2016) quoting Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003).

21

"A right is clearly established if a reasonable official would understand that his conduct violates that right." See Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). "The touchstone of the "clearly established" inquiry is whether the official had "fair warning" and notice that his conduct violated the constitutional right in question." Id. at 1013, 1015; see also McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007). "For the law to be clearly established, "case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law."" See Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000).  The Eleventh Circuit Court looks to the binding precedent set forth in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state (Georgia, here) to decide whether a right is clearly established. See Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir. 2009). However, **clearly established rights that were violated do not necessarily require a controlling case that is identical to the subject case, but the unlawfulness of the conduct must be apparent from the pre-existing law.** See Mullenix v. Luna, 577 U.S. 7, 12 (2015); see also Melton, 841 F.3d at 1221 (11th Cir. 2016); and Coffin, 642 F.3d at 1013(11th Cir. 2011) (en banc). **emphasis added**.

In <u>Melton</u>, this court stated that "A narrow exception to the rule requiring particularized case law exists" and "applies in situations where the official's conduct 'so obviously violates the constitution that prior case law is unnecessary.'" <u>Melton,</u> 841 F.3d at 1221 (11th  Cir. 2016) <u>citing</u> <u>Gilmore v. Hodges</u>, 738 F.3d 266, 279 (11th Cir. 2013) (<u>quoting</u> <u>Mercado</u> <u>v.</u> <u>City of Orlando</u>, 407 F.3d 1152, 1159 (11th Cir. 2005)). In <u>Melton</u>, this Court reversed the district court's summary judgment ruling, where the medical providers failed to treat a detainee's surgically repaired broken arm and the jail officials complied with that instruction despite the detainee's obvious need for medical attention.  In determining that plaintiffs had presented sufficient evidence of deliberate indifference and a constitutional violation for the case to go to a jury, this Court stated "A broad statement of legal principle announced in case law may be sufficient if it establishes the law 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  See <u>Melton,</u> 841 F.3d at 1221 (11th Cir. 2016) <u>citing</u> <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1351 (11th Cir. 2002). This Court further stated, "We likewise recognize the obvious-clarity exception where conduct is 'so bad that case law is not needed to establish that the conduct cannot be lawful.' <u>Id</u>.

As illustrated in Plaintiffs' Statement of Facts, *supra*, Mr. Wingo's serious medical need was obvious and dire to a lay person. The district court also

23

recognized that Mr. Wingo showed symptoms that "were consistent with a critically serious medical need". Doc. 227, Pg. 29. The Defendants' response to his medical need was so bad that an exact case identical to the facts in Mr. Wingo's situation is not needed to establish that Defendants' conduct was unlawful.

As stated in Plaintiffs' Statement of Facts and below, each of the Defendants' conduct individually showed deliberate indifference and was a clear violation of Mr. Wingo's constitutional right to receive adequate medical care:

### 1. Deputy Lynda Marshall

- Deputy Marshall heard Mr. Wingo "holler" a few times that he could not breathe and wanted to go to the hospital, and she responded if you are speaking you are breathing but did not provide him with any medical aid. Marshall Dep. Doc. 191-4, Pgs. 35, 37-38.

- Mr. Wingo had been hollering that he could not breathe for at least an hour and a half before Deputy Marshall opened his cell door and Mr. Wingo fell to the ground at around 7:30 a.m. Marshall Dep. Doc. 191-4, Pg. 38; EME Infirmary Video View 1 Doc. 213, Pg. 2.

- The morning of September 29, 2019, between 7:27 a.m. and 7:32 a.m. Mr. Wingo is seen in the presence of Deputy Marshall fainting or losing his balance at least three times. Marshall Dep. Doc. 191-4, Pgs. 40-41; EME-Infirmary Video View 1 Doc. 213, Pg. 2; EME-Marshall Internal Affairs

Interview Audio Doc. 194, Pg. 2.



EME- Infirmary Jail Video View 1 at 7:30:55 Doc. 213, Pg. 2.

- Defendant Deputy Marshall sought to move Mr. Wingo to an isolated padded cell calling him an "idiot" and saying that he was "playing games". Id.; EME-Marshall and Wilkerson Internal Phone Call Doc. 213, Pg. 2; EME- Marshall and Harris Internal Phone Call Doc. 213, Pg. 2.

- Deputy Marshall contacted Major Harris and dishonestly told him that she had been watching Mr. Wingo who claimed that he was falling but that he was messing around and needed to be moved to a padded cell. EME-Marshall and Harris Internal Phone Call Doc. 213, Pg. 2. There is no evidence in this case that Mr. Wingo was messing around, playing games, being aggressive, combative, or disruptive.

- Deputy Marshall was jolly and laughing as Mr. Wingo was being taken to the padded cell. EME-Infirmary Video View 2 at 7:45:30 – 7:46:45 Doc.

25

213, Pg. 2.



EME-Infirmary Video View 2 at 7:45:58 Doc. 213, Pg. 2.

- After Mr. Wingo was placed in the padded cell and Lieutenant Gordon returned to sit at the infirmary nurses' station, Deputy Marshall then made movements against the wall where Mr. Wingo originally fell outside his cell in front of Lt. Gordon and herself and pretended as though she was stumbling to the ground and laughing. EME-Infirmary Video View 1 at 7:57:24 a.m. Doc. 213, Pg. 2.

26



EME- Infirmary Video View 1 at 7:57:24
Doc. 213, Pg. 2.



EME-Infirmary Video View 2 at
7:57:24 at Doc. 213, Pg. 2.

### 2. **Lieutenant Charles Gordon**

- Lieutenant Gordon, who supervised security personnel in the infirmary, arrived when Mr. Wingo was on the floor in front of his cell and did nothing to assist him. Gordon Dep. Doc. 191-6, Pgs. 16-17; EME-Infirmary Video View 2 at 7:31 a.m. Doc. 213, Pg. 2.

- Mr. Wingo was on the floor in front of his cell for nine minutes in the presence of Deputy Marshall and Lt. Gordon and neither officer made any attempt to assist him. Marshall Dep. Doc. 191-4, Pg. 54; Gordon Dep. Doc. 191-6, Pg. 26; EME- Infirmary Video View 1 Doc. 213, Pg. 2; EME-

27

Infirmary Video View 2 at 7:31 a.m. through 7:41 a.m. Doc. 213, Pg. 2.



EME- Infirmary Video View 2 at
7:32:26 through 7:32:50 Doc. 213, Pg.
2.

- Lt. Gordon stated that he saw Mr. Wingo fall over several times while he
  was on the floor but did not have medical attend to him. Gordon Dep. Doc.
  191-6, Pgs. 26-27, 29. He said that Mr. Wingo falling over was concerning
  to him, but he did not have medical evaluate him. Gordon Dep. Doc. 191-6,
  Pg. 29.

- After nine minutes on the ground, Sergeant Gordon horse-collar grabbed
  Mr. Wingo and escorted him to chairs in the Infirmary. Gordon Dep. Doc.
  191-6, Pg. 32; EME-Infirmary Video View 2 at 7:46 a.m. Doc. 213, Pg. 2.



EME-Infirmary Video View 1 at 7:40:26 Doc. 213, Pg. 2.

- Sergeant Gordon testified that he horse-collar grabbed Mr. Wingo because he believed that Mr. Wingo was too unstable to walk on his own and thus needed to be held by his collar in this fashion so that he did not fall while being escorted. Id.

- Sergeant Gordon placed Mr. Wingo in a chair in the Infirmary and then again did not ask for any medical personnel to attend to Mr. Wingo despite it being obvious that Mr. Wingo needed medical attention. Gordon Dep. Doc. 191-6, Pg. 32; EME-Infirmary Video View 2 at 7:46 a.m. Doc. 213, Pg. 2.



EME- Infirmary Video View 2 at 7:41:04 Doc. 213, Pg. 2

- Lieutenant Gordon testified that he did not think Mr. Wingo even knew where he was. Gordon Dep. Doc. 191-6, Pgs. 21, 43; EME-Infirmary Video View 2 at 7:46 a.m. Doc. 213, Pg. 2.

- Mr. Wingo was unsteady upon being escorted to the padded cell that Lieutenant Gordon initially grabbed Mr. Wingo by his handcuffs allowing Mr. Wingo's body to lean/fall forward to escort him to the padded cell. EME-Infirmary Video View 1 at 7:46 a.m. Doc. 213, Pg. 2.

30

### 3.  **Major Branson Harris**

- Major Branson Harris, the watch commander and highest-ranking official in the jail on shift at the time, was made aware that Mr. Wingo wanted to go to the hospital. Harris Dep. Doc. 191-5, Pg. 20.

- Lynda Marshall called Major Harris to have Mr. Wingo removed from the infirmary and said he was just detoxing. EME-Marshall and Harris Internal Phone Call Doc. 213, Pg. 2. Major Harris responded that if Mr. Wingo "is detoxing" then he should be in the infirmary, but that he would come down. Harris Dep. Doc. 191-5, Pg. 24; EME-Marshall and Harris Internal Phone Call Doc. 213, Pg. 2.

- Major Harris arrived at the infirmary and spoke with Nurse Annaleen Visser who stated that Mr. Wingo was detoxing, trying to get to the hospital, drug seeking and needed to be isolated. Harris Dep. Doc. 191-5, Pg. 20. There is no evidence in this case that Mr. Wingo ever asked any jail or medical staff for any drugs.  Major Harris also never saw Mr. Wingo evaluated medically.

- Major Harris also did not see Mr. Wingo being loud, disruptive, acting out, belligerent or trying to harm himself, but nonetheless took him to a padded cell reserved for detainees who displayed tendencies to self-harm. Harris Dep. Doc. 191-5, Pgs. 30, 33.

31

- Major Harris was also aware of the criteria to place someone in a padded cell and that Mr. Wingo's behavior did not meet that criterion. Nonetheless, Major Harris decided to wheel Mr. Wingo to the padded cell because he was having difficulty walking. Id.; Harris Dep. Doc. 191-5, Pg. 39.

- The Watch Commander, Major Harris at the time, had to sign off on the Close Observation Form and approve placement in the padded cell. Vanderbogart Dep. Doc. 211-9, Pg. 6. This form is usually completed within 10-15 minutes after placing someone in a padded cell. Vanderbogart Dep. Doc. 211-9, Pgs. 6-7. The purpose of the form and placing it by deputy is so that the deputy knows why detainee is in there. Vanderbogart Dep. Doc. 211-9, Pg. 6. Major Harris never completed the form. Arguably because Major Harris knew Mr. Wingo did not belong in the padded cell in his condition.

- Mr. Wingo fell to the ground in front of the wheelchair when Major Harris brought the wheelchair. Harris Dep. Doc. 191-5, Pg. 39; Gordon Dep. Doc. 191-6, Pg. 40; EME-Corridor Video at 7:46:01 a.m. Doc. 213, Pg. 2.

32



EME-Corridor Video at 7:46:00 Doc. 213, Pg. 2.

- Sergeant Gordon and Major Harris, with the assistance of Deputy Mejia, then picked Mr. Wingo off the ground and placed him in the wheelchair. Gordon Dep. Doc. 191-6, Pg. 40; Harris Dep. Doc. 191-5, Doc. 40; EME-Corridor Video at 7:46 a.m. Doc. 213, Pg. 2.

- Despite the wheelchair being equipped with footrests, Mr. Wingo was wheeled to the padded cell with his foot dragging on the ground and making no sounds. Id; Harris Dep. Doc. 191-5, Pg. 44; EME-Corridor Video at 7:46 a.m. Doc. 213, Pg. 2; EME-Outside of Padded Cell Video at 7:48 a.m. Doc. 213, Pg. 2.

33



EME- Outside Padded Cell Video at 7:48:19 Doc. 213, Pg. 2.

- Sergeant Gordon and Major Harris, with the assistance of Deputy Nasie Mejia took Mr. Wingo out of his wheelchair and put him on the ground in the padded cell. Gordon Dep. Doc. 191-6, Pg. 44; EME-Inside Padded Cell Video at 7:48 a.m. Doc. 213, Pg. 2. Mr. Wingo was not fighting or causing a disturbance. Harris Dep. Doc. 191-5, Pg. 45; EME-Inside Padded Cell Video at 7:48 a.m. through 7:50:04 a.m. Doc. 213, Pg. 2.

- Mr. Wingo was placed face down on a toilet grate in the padded cell and removed of his clothes by Sergeant Gordon in the presence of Major Harris. Harris Dep. Doc. 191-5, Pgs. 44-45; EME- Inside Padded Cell Video at 7:48 a.m. through 7:50 a.m. Doc. 213, Pg. 2.

34



EME- Inside Padded Cell Video at 7:49:40 Doc. 213, Pg. 2.

- Major Harris then dropped a safety smock on Mr. Wingo's back and left his cell. Harris Dep. Doc. 191-5, Pg. 46; EME Inside Padded Cell Video at 7:49 a.m. Doc. 213, Pg. 2.

35

 

EME- Inside Padded Cell Video at 7:49:57 Doc. 213, Pg. 2.    EME- Inside Padded Cell Video at 7:50:06 Doc. 213, Pg. 2.



EME-Inside Padded Cell Video at 7:50:34 Doc. 213, Pg. 2.

- Mr. Wingo appeared almost lifeless and semi-conscious at that time.  EME-

36

Inside Padded Cell Video Doc. 213, Pg. 2.

Major Harris returned to Mr. Wingo's cell for a security check at 8:23 a.m. EME- Video of Inside and Outside Padded Cell Doc. 213, Pg. 2. Major Harris looked in Mr. Wingo's cell and Mr. Wingo was in the corner of the cell in an awkward position at that time. Id. Mr. Wingo appears to have not moved for at least 25 minutes. Id. Nonetheless, Major Harris completed his security check and left Mr. Wingo's cell now claiming in deposition testimony for the first time that he saw Mr. Wingo's chest rise and fall at that time. EME- Inside Padded Cell Video Doc. 213, Pg. 2; Harris Dep. Doc. 191-5, Pg. 50. Colonel Sanders, the top official at the jail, testified that Mr. Wingo's position in the cell required more investigation into his condition at that time. Sanders Dep. Doc. 211-5, Pg. 27.

### 4.  Deputy Paul Wilkerson

- Without knowing what, if anything, was wrong with Mr. Wingo, Deputy Wilkerson responded to Marshall stating Mr. Wingo wanted to go to the hospital with "that's not going to happen" and told her he had a padded cell available for him. Wilkerson Dep. Doc. 191-7, Pgs. 34-35; EME-Marshall and Wilkerson Internal Phone Call Doc. 213, Pg. 2.

- Deputy Wilkerson assisted Lieutenant Gordon and Major Harris place Mr. Wingo in the padded cell and saw his condition when he was placed in the cell. Wilkerson Dep. Doc. 191-7, Pg. 40; EME-Outside Padded Cell Video

at 7:47 Doc. 213, Pg. 2.

- Deputy Wilkerson was responsible for doing security rounds on Mr. Wingo's padded cell after he was placed there. Security Rounds were to be done every 12 minutes, but Deputy Wilkerson failed to conduct proper security rounds on Mr. Wingo in that he did not look inside his cell during security and welfare checks. Sanders Dep. Doc. 211-5, Pgs. 10-11; Wilkerson Dep. Doc. 191-7, Pg. 16; Harris Dep. Doc. 191-5, Pg. 16; Vanderbogart Dep. Doc. 211-9, Pg. 14.

- CCSO had established policies and procedures on how security rounds on close observations cell should be conducted. Doc. 208-12, Pgs. 1-7. A security round means that the deputy looks inside the cell, makes sure the detainees are alive and well and there are no issues, and then you scan the security bar. Vanderbogart Dep. Doc. 211-9, Pg. 13.

- Despite Mr. Wingo being placed on close observation and observing Mr. Wingo's labor state when entering the padded cell, Deputy Wilkerson did not conduct proper security rounds in that he failed to look in Mr. Wingo's cell. Deputy Wilkerson did his first security check at 8:02:20 and Mr. Wingo had not moved from when he was in a corner at 7:57 when he appeared to make his last movement. EMEs-Video of Inside and Outside Padded Cell Doc. 213, Pg. 2. Deputy Wilkerson did not look in Mr.

Wingo's cell. Id. Deputy Wilkerson did his second security check at 8:05:38 and Mr. Wingo had not moved from where he was earlier. EMEs-Video of Inside and Outside Padded Cell Doc. 213, Pg. 2. Deputy Wilkerson did not look in Mr. Wingo's cell. Id. Deputy Wilkerson did his third security check at 8:12 and Mr. Wingo had not moved. EMEs-Video of Inside and Outside Padded Cell Doc. 213, Pg. 2. Deputy Wilkerson did not look in Mr. Wingo's cell on any of these security rounds when it was obvious from video camera footage that Mr. Wingo was in serious medical distress.

- Deputy Wilkerson did another security check on Mr. Wingo at 8:48:00 a.m., looked inside Mr. Wingo's cell, saw him in the same position that he had been in for almost an hour and left Mr. Wingo's cell without any further investigation. EME-Outside Padded Cell Video at 8:48 a.m. Doc. 213, Pg. 2. Deputy Wilkerson did not open Mr. Wingo's cell or attempt to get his attention. Id. Deputy Wilkerson was called back to Mr. Wingo's cell again by Deputy Randy White deputy at 8:49:07 and was told to open the door and check on Mr. Wingo. White Dep. Doc. 211-4, Pg. 13. At that time, Deputy Wilkerson discovered that Mr. Wingo was nonresponsive. EME-Outside Padded Cell Video at 8:50 a.m. Doc. 213, Pg. 2.

- The video shows Deputy Wilkerson walking at a casual pace after he

39

discovered Mr. Wingo non-responsive so that he could get gloves. EME-Outside Padded Cell Video at 8:50:15 a.m. Doc. 213, Pg. 2. After Deputy Wilkerson retrieved the gloves a couple minutes later, Deputy Wilkerson touched Mr. Wingo. EME- Outside Padded Cell Video at 8:51:38 Doc. 213, Pg. 2. Another Deputy then came and attempted life saving measures on Mr. Wingo. EME-Outside Padded Cell Video at 8:52:33 Doc. 213, Pg. 2. Wilkerson did not call a code himself, but another deputy did. Wilkerson Dep. Doc. 191-7, Pg. 51.

The above evidence individually and collectively illustrates that Mr. Wingo had a serious medical need and Defendants were each deliberately indifferent to same. It further shows that Mr. Wingo's condition was so obviously dire that an identical factual case establishing the precedent for the Defendants clear constitutional violation is not necessary as Mr. Wingo's condition was so dire to a lay person that a medical response was required. See Farrow v. West, 320 F.3d 1243 (11th Cir. 2003). Nonetheless, there are numerous cases establishing a clear constitutional violation for the Defendants conduct in this case.

Contrary to the district court ruling and Defendants argument, the Eleventh Circuit precedent illustrates that the right to receive medical care has been clearly established. See Patel, 969 F.3d 1173, 1190-1191 (2020); see also Foster, 785 F. App'x 810 (11th Cir. 2019); Danley, 540 F.3d 1298, 1313 (11th Cir. 2008) ("when

jailers are aware of serious medical needs they may not ignore or provide grossly inadequate care"; McElligott, 182 F.3d 1248, 1255–59 (11th Cir. 1999) (Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances); Harris, 21 F.3d 388, 393 (11th Cir.1994) (It was clearly established that knowledge of the need for medical care and intentional refusal to provide the care constituted deliberate indifference); Howell, 922 F.2d 712, 720 (11th Cir. 1991) (law was clearly established that refusal to provide or a delay in providing medical treatment constitutes deliberate indifference and violates the prisoner's eighth amendment rights); Brown, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam) (delay in treating inmate's broken foot, no matter how brief, could render defendants liable for deliberate infliction of pain); see also Carswell v. Bay Cty., 854 F.2d 454, 457 (11th Cir. 1988) (holding that the failure to provide medical care in the face of a known, serious medical need constitutes deliberate indifference); see also Ancata, 769 F.2d 700, 704 (11th Cir. 1985) ("Knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.)

The Foster case, 785 F. App'x 810, is like Mr. Wingo's situation and illustrates how the Eleventh Circuit has previously found there is a clear violation of constitutional law where jail officials fail to act other than informing medical

personnel. In <u>Foster</u>, the Eleventh Circuit found that Plaintiff plead a clearly established violation of her constitutional right to receive medical care regardless of whether deputies claim medical professionals were involved in her care. In <u>Foster</u>, Plaintiff alleged that she was falling out, disoriented, experiencing slurred speech, limited control of her body, an inability to ambulate without assistance, shaking and sweating. <u>Id</u>. at 816. The Court found Plaintiff had presented sufficient claims that, if true, established her situation was so obviously dire that correctional officers may be held liable regardless of whether medical personnel are also aware of the situation. <u>Id</u>. at 816. The Court found that Plaintiff's right to receive medical care in the situation alleged was a clearly established violation of her constitutional right to receive medical care. <u>Id</u>.

Viewing the record in the light most favorable to Plaintiffs, there is sufficient evidence that Mr. Wingo had a serious medical need and should have received adequate medical care.[5] As illustrated above, Mr. Wingo had a serious

---

[5] Plaintiffs posit that the lower court did not consider the evidence in this case in the light most favorable to Plaintiffs as required on the consideration of a motion for summary judgment. The lower court in footnote 1 to her ruling commented that Plaintiffs responses to Defendants Statement of Facts were improper labeling the responses inappropriate and argumentative. Doc. 227, Pg. 2, n.1. Plaintiffs state that their responses were appropriate in that Defendants' statement of facts were not facts but mere recitals of self-serving deposition testimony taken out of context as disavowed in <u>Patel</u>. <u>Patel</u>, 969 F.3d 1173, Footnote 1 (2020). Furthermore, Defendants responded to Plaintiffs' Additional Statement of Facts objection to most facts, but the lower court took no issue with their objections.

medical need that was obvious and dire, and the Defendants failed to respond. Defendants' position that they relied on one irrational nurse's position are nonsensical considering Mr. Wingo's condition at the time. Defendants should have required Mr. Wingo to receive actual medical care and if the medical staff had refused to provide that care and/or unable to provide that care he should have been immediately sent to the emergency room. Such actions would have saved his young life.

Defendants cannot rest on qualified immunity where they witness the nurses fail to even medically evaluate a detainee or provide cursory care. Defendants can't rely on a nurse medical assessment where the nurse failed to assess the patient as in this case. Despite Mr. Wingo's obvious need for medical attention, Defendants watched the medical providers do nothing – they didn't even come close to him, talk to him, touch him or consider him. All basic behaviors that anyone would expect a medical team to provide.

Just because a nurse is in the room does not make a statement she provides

---

Finally, the lower court's "Background" of the case was taken primarily from Defendants Statement of Facts and did not summarize the evidence as a whole in a light most favorable to Plaintiffs, including Plaintiffs Additional Statement of Facts. There is also no reference in the record that the lower court viewed the video evidence of Mr. Wingo inside the CCADC that contradicts Defendants self-serving statements and clearly shows the Defendants' deliberate indifference that was clearly established violations of constitutional law.

an actual medical assessment, especially where she fails to do anything medically. Plaintiffs acknowledge that the Defendants are not medical providers. Nonetheless the jail officers have the ultimate responsibility to make sure that detainees receive medical care and cannot abscond that duty by placing them in a room with medical providers who obviously provide zero medical care where a detainee is obviously in medical distress. Contrary to Defendant Major Harris' testimony medical does not have the final say whether a detainee receives medical care, that decision is ultimately the sheriff's and his deputies. As a guardian would hopefully protect a ward or their child, a jail official has the responsibility to make sure that the detainee is protected and receives adequate medical care when he/she cannot for themselves.

## II.  THE DISTRICT COURT ERRED IN EXCLUDING PLAINTIFFS' GENERAL SURGEON EXPERT'S TESTIMONY ON CAUSATION FINDING HIS TESTIMONY UNRELAIBE EVENTHOUGH DR. MYERS TESTIFIED NUMEROUS TIMES THAT MR. WINGO MOST PROBABLY WOULD HAVE SURVIVED IF HE PRESENTED TO THE EMERGENCY ROOM WITH VITALS.

Plaintiffs disclosed General Surgeon Brian Myers as their causation expert to help the jury understand the medical issues involved and the ease of repairing perforated gastric ulcers. Doc. 134. Dr. Myers' opinions are: (1.) "[T]o a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would most likely survived." (2) "[T]he

lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life." Doc. 209-27, Pgs. 1-6.

Dr. Myers' opinions are not only reliable, but there is no other field of expertise or disclosed expert that could assist the jury in understanding the medical issues in this case better than Dr. Myers. For over twenty years, Dr. Myers has practiced general surgery. Myers Dep. Doc. 211-2, Pgs. 6-7. General surgeons, among other things, treat and correct perforated ulcers or gastric ulcers. Myers Dep. Doc. 211-2, Pg. 7. Dr. Myers treats patients with perforated ulcers approximately once a month. Myers Dep. Doc. 211-2, Pg. 8. Dr. Myers' opinions in this case are drawn from his wealth of experience, including surgical practice, and serving our armed forces as a 12-year Navy surgeon reservist. Myers Dep. Doc. 211-2, Pgs. 5, 7, 34.

Dr. Myers obtained his medical degree at Ohio State University College of Medicine in 1992. Myers Dep. Doc. 211-2, Pg. 6. He attended residency at Temple University from 1992 to 1998. Id. During his tenure at Temple University, he was a gastrointestinal research fellow. Myers Dep. Doc. 211-2, Pg. 7. He is board certified in general surgery by the General American Board of Surgery. Myers Dep. Doc. 211-2, Pg. 8. Dr. Myers is currently employed at Surgery South, PC as a surgeon and CEO. Myers Dep. Doc. 211-2, Pg. 11. His responsibilities are to perform surgeries and manage the staff that includes five

45

general surgeons. Myers Dep. Doc. 211-2, Pg. 11.

In formulating his opinion, Dr. Myers reviewed numerous materials including, but not limited to, Mr. Wingo's CCADC medical records, WellStar Hospital medical records and video recordings of Mr. Wingo inside the CCADC. Doc. 209-27, Pgs. 1-2. Dr. Myers' opinions are provided to a degree of reasonable medical certainty and/or probability which is admissible as reliable evidence in Georgia. See Griffin v. Coffee County, 623 F. Supp. 3d 1365, 1382 (S.D. Ga 2022)

Dr. Myers testified numerous times that Mr. Wingo **most probably** would have survived as long as he had vital signs that included heart rate, blood pressure and respiration. Myers Dep. Doc. 211-2, Pg. 4. Dr. Myers' testimony on probability unequivocally was as follows:

> Q. Okay. And you go on to say that if he had received reasonable emergency care, he would most likely have survived. What do you mean by most likely?
> A. **Most probably.**
> Q. Okay.
> A. If you get someone to me with vital signs, in the ER, they are **most likely** going to survive. So if you can get him to the emergency room with vital signs, he's **most likely** going to survive.
> Q. But most likely, you know, that-- you would agree with me that that denotes a certain probability, correct?
> A. Yes.
> Q. Is that quantifiable?
> A. I'm just going to have to stick with **most probably** he would survive because that's just my experience.
> Q. Would most probable mean greater than –

46

A.    **Greater than 50 percent**.

Myers Dep. Doc. 211-2, Pgs. 28-29., **emphasis added**.

Dr. Myers opines that reasonable emergency medical care in this case would

be taking Mr. Wingo to the emergency room:

Q.    Okay. So your conclusion, you say, "it's my professional opinion to a
      reasonable degree of medical certainty that had Kevil Wingo been
      provided reasonable emergency medical care, he would have most
      likely survived. Furthermore, it's my opinion the lack of appropriate
      emergency medical care, resulted in the loss of Kevil Wingo's life."
      What are the -- or what are the basis for that opinion?
A.    Everything that I've outlined to this point.
Q.    What do you mean when you say reasonable
      emergency medical care?
A.    That would be being brought to the emergency room for evaluation by
      an emergency room physician. Anyone in the community, that's
      what's going to happen.
Q.    And Mr. Wingo was in different parts of the jail, and seen by different
      people throughout the night, after his ulcer perforated , correct?
A.    Correct.
Q.    At what point would -- well, before I ask that -- reasonable emergency
      medical care, in your opinion in this case, is that he is taken to the
      ER?
A.    Yes.

Myers Dep. Doc. 211-2, Pg. 28.

Dr. Myer's testified that in general someone with a perforated ulcer in Mr.

Wingo's condition had a 90% chance of survival on perforation onset:

Q.    So what would -- based on that baseline, what was the mortality
      percentage at the -- at T0, moment of perforation?
A.    That's dependent upon the individuals other comorbidities and their
      physiological response. But all comers in someone, like Mr. Wingo,
      who is otherwise healthy he's got about a 90 percent mortality rate at

47

that point. So 90 percent chance he's going to survive if he get's proper care.

Q.    So that would be a ten percent mortality rate?

A.    Yes. At that point. In his scenario as opposed to someone who is 80 who has COPD, conditional heart failure, diabetes. They're going to start with a higher percentage. But someone who's otherwise healthy, it can be around ten percent at that point in time and then that number will grow.

Myers Dep. Doc. 211-2, Pg. 24.

Dr. Myers testified that in general the mortality rate for someone in Mr.

Wingo's condition increased from 10% mortality by 2.5% every hour after onset:

Q.    Are you aware of or do you know of any academic literature that would put a time frame or a scale on the mortality in terms of hours or time post-perforation?

A.    You're going to ask me to quote the document, but I have a memory of a document that said around 2.5 percent for every hour, it goes up.

Q.    So it goes up 2.5 percent every hour?

A.    Every hour. And I don't remember that article. I don't remember which one it was. This is just from my memory.

Q.    Was that an article that you read or consulted in preparation of your report?

A.    No. It's just in my memory.

Myers Dep. Doc. 211-2, Pg. 24.

The lower court took issue with Dr. Myers' testimony on the exact percentage that Mr. Wingo would have survived considering his vital signs at 7:45 a.m. Dr. Myers' was unable to respond to that very specific question when asked because Mr. Wingo's vitals were not taken at that time. As such he could not provide an exact percentage. However, based off the above testimony and 7:45 a.m. being approximately eight hours after perforation onset, Dr. Myer's general

48

testimony is that Mr. Wingo had a 70% chance of survival at that time. 2.5% multiplied by eight hours equals 20% increase in mortality from the 10% mortality Mr. Wingo sat at baseline.

During Dr. Myers' deposition, he was asked about Mr. Wingo's vital signs at different points and his chance of survivability considering those vital signs that were never taken due to his failure to receive medical care. Dr. Myers was unable, as anyone would be unable, to respond to those questions as vital signs were not available. As vital signs were not available, Dr. Myers had to rely on generalities for someone like Mr. Wingo who was young and had no comorbidities.

The line of questioning at Dr. Myers' deposition on Mr. Wingo's vital signs that were not taken, and survivability percentages is analogous to the line of expert qualification questioning in "My Cousin Vinny" where Vinny's fiancé, Mona Lisa Vito, was being questioned on her qualifications as an expert in automobiles about the correct ignition timing on a 1955 Bellaire Chevrolet with a 327 cubic engine and a 4-barrel carburetor. Ms. Vito was not able to answer the question – not because she did not know the answer but because, as Ms. Vito explained, "It's a trick question." Ms. Vito pointed out that she could not answer the question because the vehicle was not available that year in the profile questioned and thus the information did not exist. As in the above analogy, Dr. Myers cannot answer questions based off vital signs that do not exist. Dr. Myers can testify based off his

49

experience as a general surgeon and information that is actually available that "most probably" Mr. Wingo would have survived.

Dr. Myers testimony on exact percentages based on vitals that were not available was:

Q.    Okay. So lower than 50 percent mortality. But we have discussed earlier that the percentage risk of mortality, whether you can quantify that or not, it increases with each passing hour, correct?

A.    Correct.

Q.    Okay. Are you able to say if he ever passed the most likely to survive to most likely would not have survived line, at any point during -- or after his ulcer perforated, but while he was still at the Adult Detention Center.

A.    All I can say is, the literature says that he probably started at around ten percent mortality. When the vital signs reached the point where he's not going to likely survive, I don't know because they are not recorded.

Q.     And you have no way of putting a time on that based on your review of the record of 16 items listed in Exhibit 1?

A.    Not without more vital signs, no.

Q.    When was Mr. Wingo's precise time of death?

A.     I'd have to look at the records, but I believe it was 9:50 in the morning they declared him in the ER. I didn't put it in my records, in my report.

Q.    So without vitals taken after 12:36 a.m. – you understand he was moved from the infirmary to a solitary room around 7:45 a.m., correct?

A.    Correct.

Q.    Without vitals being taken at that time, are you able to say with any degree of medical certainty. what his survivability would have been at that point if someone called 911?

A.    I cannot.

Q.    Okay. And if you cannot say his survivability at that point, would you agree with me that your opinion that he would have most likely survived if he had been provided reasonable medical care, that

opinion doesn't apply to analyzing what his likelihood of surviving would have been at 7:45 a.m.?

A.    My statement doesn't bring into the issue of time, so I stand by what I said here.  If you want to have me opine on whether or not, at 7:45, if that was reasonable medical care or if he would have survived at that point, I can't say because I don't know what his vitals were at that point.

Q.    And that's the point I'm wondering is, you've said if he were provided reasonable medical care, he would have most likely survived. So my question to you -- or my point, you would agree with me that the decision to provide reasonable medical care which you've opined as going to the ER, that decision could have been made at any point after the ulcer perforated?

A.    Yes.

Myers Dep. Doc. 211-2, Pg. 29.

Dr. Myers finally concluded that that if Mr. Wingo arrived in the ER with vital signs, he most likely would have survived.

Q.    Okay.

A.    Once you lose the vital signs, as you saw in the emergency room, you're not going to bring him back.

Q.    Okay. Well, the point I'm trying to make – or the point I'm wondering what you think is, the statement that he would have most likely survived. That statement is not equally as true at 11:30 when his ulcer perforated as much as it is at 7:45 a.m. or later; is it?

A     My statement is true as it is. If you want to change my statement, then we can bring that into the new question. But as I've stated it's true. It doesn't become less truthful. If we want to change how -- how I've defined reasonable, then we can talk about that but as I've stated it, no, that's a true statement. You get him to me with vital signs, he's mostly going to survive. That's my experience.

Myers Dep. Doc. 211-2, Pgs. 29-30.

The lower court and Defendants contend that Dr. Myers is unable to state the exact time—hour and minute— Mr. Wingo would have survived if he had

51

received medical care based off vital signs because Dr. Myers does know what Mr. Wingo's vital signs were at that specific time. Doc. 198, Pgs. 7-8. Defendants' very own expert, Dr. Vega, states the exact same thing. Vega Dep. Doc. 191-8, Pg. 13. Defendants' expert also agreed that in general Mr. Wingo having no comorbidities listed in his autopsy report and at age 36 would have a good chance of surviving a perforated ulcer. Vega Dep. Doc. 191-8, Pg. 16.

Although Judges are the gatekeepers in determining the admissibility of expert testimony, a judge should not supplant the adversary system or the role of the jury. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596-597 (1993); see also Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001). For the sake of argument, even if Dr. Myers' testimony was disputable, vigorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof are the means to address that evidence – not exclusion of the testimony in its entirety. See Daubert, 506 U.S. at 596; Allison v. McGhan Med. Corp., 184 F.3d. 1311-1312 (11th Cir. 1999). The rejection of expert testimony is the exception rather than the rule. See Moore v. Intuitive Surgical, Inc., 995 F.3d 839, 850 (11th Cir. 2021).

Plaintiffs recognize that the party seeking to introduce the expert at trial bears the burden of establishing his qualifications, reliability, and helpfulness. See

Knepfle v. J-Tech Corp., 48 F.4th 1282, 1294 (11th Cir. 2022); see also Moore, 995 F.3d 839, 851 (11th Cir. 2021).  However, when the court scrutinizes the reliability and relevancy of expert testimony, there is a delicate balance between the court's role as gatekeeper and the jury's role as the ultimate factfinder. See Frazier, 387 F.3d at 1272. "Scientific knowledge is far afield from the normal expertise of judges, and they should proceed with caution lest they exceed their grasp." Daubert 509 U.S. at 599.  In this case, the court abused its discretion and supplanted the jury's role to determine causation – a decision which was manifestly erroneous.

The proponent of testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence it is reliable.  See Allison, 184 F.3d. at 1311-1312 (11th Cir. 1999).  Genuine disputes are those in which the evidence is that a reasonable jury could return a verdict for the non-movant.  Courts have found that an abuse of discretion occurs when under Daubert the admissibility bar is too high, as in this case. See Ruiz–Troche v. Pepsi Cola., 161 F.3d 77, 85 (1st Cir.1998).

Under Georgia law, plaintiff must present medical as well as nonmedical evidence to show causation.  See Estate of Patterson v. Fulton County-DeKalb Hosp. Auth. 233 Ga. App. 706 (1998). This evidence must be based on reasonable probability.  See also Maurere v. Chayatte, 173 Ga. App. 343 (1985).  Dr. Myers

can say unequivocally that if Mr. Wingo had vitals he most probably would have survived.

Defendants are free to question Dr. Myers about percentages of causation considering the evidence in the case that they hope undermine his conclusions – assuming they find any – but the mere possibility of contrary evidence does not warrant excluding Dr. Myer's testimony altogether. Dr. Myers based his opinions on his experience, education and training, none of which Defendants challenge. Dr. Myer's testimony is sufficiently reliable for the purposes of admissibility under <u>Daubert</u> and Rule 702.

## **<u>CONCLUSION</u>**

For the foregoing reasons, plaintiff appellants respectfully submit that the judgment below should be reversed.

Respectfully submitted this <u>5th</u> day of June, 2024.

/s/ Timothy J. Gardner
Timothy J. Gardner
Georgia Bar No. 115430
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone: 770.693.8202
tjg@gardnertrialattorneys.com

*Attorney for Appellants Tiffany Wingo, et al.*

54

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel certifies that this document complies with the 13,000 - word limitation of Fed. R. App. P. 32 (a) (7)(B)(i) because, excluding parts of the document exempted by Fed. R. App. P 32 (f), this document contains 12,103 words.

This document complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a) (6) because this document has been prepared in a proportionally speed typeface in 14-point Times New Roman font.  The brief was prepared using Microsoft Word.

Respectfully submitted this <u>5th</u>  day of June, 2024.


/s/ Timothy J. Gardner
Timothy J. Gardner
Georgia Bar No.  115430

Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com

55

## **CERTIFICATE OF SERVICE**

I certify that I have served the foregoing Appellants' Brief by electronically

filing with CM/ECF system, which will automatically electronically serve counsel

of record who are registered users of the Court's electronic filing system.

| | |
|---|---|
| Sun S. Choy | Lauren S. Bruce |
| Wesley C. Jackson | H. William Rowling, Jr. |
| Marisa M. Beller | Cobb County Attorneys Office |
| Freeman Mathis & Gary, LLP | 100 Cherokee Street, Suite 350 |
| 100 Galleria Parkway, Suite 1600 | Marietta, Georgia 30090 |
| Atlanta, Georgia 30339 | |

Respectfully submitted this 5th  day of June, 2024.


/s/ Timothy J. Gardner
Timothy J. Gardner
Georgia Bar No.  115430

Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com