**No. 24-10933-H**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

TIFFANY WINGO, ET AL.,

*Plaintiffs/Appellants,*

v.

BRANSON HARRIS, ET AL.,

*Defendants/Appellees.*

———————————

On Appeal from the United States District Court
for the Northern District of Georgia

Case No. 1:20-cv-03662-VMC
Hon. Victoria M. Calvert, District Judge

———————————

**APPELLANTS' APPENDIX VOLUME II**

———————————

Timothy J. Gardner
Georgia Bar No. 115430
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com

June 11, 2024

## INDEX OF APPENDIX

Docket/Tab #

### Volume I

District Court Docket Sheet ........................................................................A

Plaintiffs' Complaint ...................................................................................1

Gordon, Harris, and Wilkerson's Answer to Plaintiffs' Complaint ...................... 17

Plaintiffs' Third Amended Complaint… ...........................................……...166

Gordon, Harris, Marshall, McPhee, and Wilkerson's
Answer to Plaintiff's Third Amended Complaint .................................................175

Marshall's Deposition Transcript Excerpts ...................................................... 191-4

### Volume II

Harris' Deposition Transcript Excerpts ............................................................ 191-5

Gordon's Deposition Transcript Excerpts ........................................................ 191-6

Wilkerson's Deposition Transcript Excerpts.................................................... 191-7

Dr. Kenneth Vega's Deposition Transcript ...................................................... 191-8

Defendants' Brief in Support of Motion for Summary
Judgment. ........................................................................................ 196-1

Defendants' Motion to Exclude Testimony of Dr. Brian
Myers and Mark Johnson with Brief in Support.....................................................198

Plaintiffs' Response in Opposition to Defendants' Motion to
Exclude Testimony of Dr. Brian Myers and Mark Johnson..................................207

Plaintiffs' Response in Opposition to Defendants' Motion
for Summary Judgment……………………………………………... ......209

Dr. Brian Myers' Expert Report………………………………...…………209-27

## Volume III

Dr. Brian Myers' Deposition Transcript ............................................................ 211-2

Visser's Deposition Transcript Excerpts ............................................................ 211-3

Womack's Deposition Transcript Excerpts ........................................................ 211-6

Plaintiff's Notice of Filing EME (1 USB)—Exhibit 7: Infirmary
Video View 1; Exhibit 8: Marshall's Internal Affairs Interview
Audio; Exhibit 9: Infirmary Video View 2; Exhibit 11: Marshall
and Wilkerson's Internal Phone Call; Exhibit 12: Marshall
and Harris' Internal Phone Call; Exhibit 18: Corridor Video;
Exhibit 19: Outside Padded Cell Video; Exhibit 20: Inside
Padded Cell Video; Exhibit 22: Vanderbogart's Internal Affairs
Video Interview; and Exhibit 34: Wilkerson' Internal Affairs Video
Interview ...........................................................................................................212

Plaintiff's Notice of filing EME (1 USB)—Exhibit 6: Infirmary
Video View 1; Exhibit 7: Infirmary Video View 2; Exhibit 9:
Marshall and Harris' Internal Phone Call; Exhibit 12: Marshall
and Wilkerson's Internal Phone Call; Exhibit 14: Nurse Visser's
Internal Affairs Video Interview; Exhibit 15: Corridor Video;
Exhibit 16: Outside Padded Cell Video; and Exhibit 17: Inside
Padded Cell Video ...........................................................................................213

Plaintiffs' Amended Response and Objections to Defendant's
Statement of Undisputed Material Facts to Motion
for Summary Judgment...……………….................................................221

Defendants' Reply Brief to Plaintiff's Response in
Opposition to Defendants' Motion to Exclude
Dr. Brian Myers and Mark Johnson……………………... ..............................223

Defendants' Reply Brief to Plaintiff's Response
in Opposition to Defendants' Motion for Summary Judgment…………………..224

Volume IV

Defendants' Response to Plaintiffs' Additional Facts in Opposition
to Defendants' Motion for Summary Judgment……………………...………....225

Order Granting Defendants' Motion for Summary Judgment
and Motion to Exclude Testimony of Dr. Brian Myers, denying
Plaintiffs' Motion for Partial Summary Judgment, and denying
as moot Plaintiffs' Motion to Exclude Defendants' Expert
James C. Upshaw, Downs, M.D. …………………………...................................227

Judgment……………………………………………………………………....228

Notice of Appeal………………………………………………………...……230

Certificate of Service……………………………………………………………B

DOCKET 191-5

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 1 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 6 of 214
August 29, 2022

Page 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIFFANY WINGO as Administrator
of the Estate of KEVIL WINGO,
SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR.,
ANGEL CALLOWAY, as mother and
next friend of ERIKA WINGO,
surviving minor child of KEVIL
WINGO, SR., and FATIMA THOMAS,
as mother and next friend of
KEVIL WINGO, JR., surviving
minor child of KEVIL WINGO, Sr.,
          Plaintiffs,          CIVIL ACTION FILE
     vs.                       NO. 1:20-CV-03662-VMC
FORMER COBB COUNTY SHERIFF NEIL
WARREN, individually, FORMER
COBB COUNTY CHIEF DEPUTY SHERIFF
SONYA ALLEN, individually, MAJOR
BRANSON HARRIS, individually,
LIEUTENANT CHARLES GORDON,
individually, DEPUTY PAUL WILKERSON,
individually, DEPUTY BRITTON MCPHEE,
individually, DEPUTY LYNDA MARSHALL,
individually, JOHN DOES 1-10, and JANE
DOES 1-10,
          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -
          VIDEOTAPED DEPOSITION OF
               BRANSON HARRIS
              August 29, 2022
                 9:13 a.m.
            100 Galleria Parkway
                 Suite 1600
              Atlanta, Georgia
          Joel P. Moyer, CCR 2745

---

Page 2

1         APPEARANCES OF COUNSEL
2  On behalf of the Plaintiffs:
3     TIMOTHY J. GARDNER, Esquire
        Gardner Trial Attorneys, LLC
4       3100 Cumberland Boulevard
        Suite 1470
5       Atlanta, Georgia 30339-5939
        (770) 693-8202
6       tjg@gardnertrialattorneys.com
7  On behalf of the Defendants Major Branson Harris,
   Lieutenant Charles Gordon, Deputy Paul Wilkerson,
8  Deputy Britton McPhee, Deputy Lynda Marshall:
9     WESLEY C. JACKSON, Esquire
        KATHRYN M. WHITE, Esquire
10      Freeman Mathis & Gary, LLP
        100 Galleria Parkway
11      Suite 1600
        Atlanta, Georgia 30339
12      (770) 818-0000
        wjackson@fmglaw.com
13      kathryn.white@fmglaw.com
14 On behalf of the Defendants Former Sheriff Neil
   Warren and Former Chief Deputy Sheriff
15 Sonya Allen:
16    BRIAN R. DEMPSEY, Esquire
        Carothers & Mitchell LLC
17      1809 Buford Highway
        Buford, Georgia 30518
18      (770) 932-3552
        brian.dempsey@carmitch.com
19
   On behalf of the Defendants:
20
      LAUREN S. BRUCE, Esquire
21      Cobb County Attorney's Office
        100 Cherokee Street
22      Suite 350
        Marietta, Georgia 30090
23      (770) 528-4000
        lauren.bruce@cobbcounty.org
24
   Videographer:
25    Chelsea Diallo

---

Page 3

1            INDEX TO EXAMINATIONS
2  WITNESS: BRANSON HARRIS
3  EXAMINATION                            PAGE
4  By Mr. Gardner                           6
   By Mr. Jackson                          244
5
   FURTHER EXAMINATION
6
   By Mr. Gardner                          247
7
                  - - -
8
9            INDEX TO EXHIBITS
10 PLAINTIFF'S EXHIBITS                    PAGE
11 Exhibit 6  Flash drive with audio/video files  5
12 Exhibit 7  Request for Placement in Close  224
              Observation, blank
13
   Exhibit 8  Medical/Administrative Segregation  231
14            Housing Request Form, blank
15
16
17 (Exhibits 6, 7, and 8 were marked in a
18 prior deposition and therefore copies have not been
19 attached.)
20
21
22
23
24
25

---

Page 4

1         Deposition of BRANSON HARRIS
2              August 29, 2022
3         THE VIDEOGRAPHER:  We are on the
4  record.  Today's date is August 29th, 2022, and the
5  time is approximately 9:13 a.m.
6         This will be the videotaped deposition
7  of Branson Harris in the matter of Tiffany Wingo,
8  et al., versus former Cobb County Sheriff Neil
9  Warren, et al.
10        Will the attorneys present please state
11 their names and whom they represent.
12        MR. GARDNER:  Timothy Gardner for the
13 plaintiffs.
14        MR. JACKSON:  Wes Jackson for Defendant
15 Harris.
16        MR. DEMPSEY:  Brian Dempsey for Neil
17 Warren and Sonya Allen.
18        MS. BRUCE:  Lauren Bruce for
19 Defendants.
20        MS. WHITE:  Kathryn White for Defendant
21 Harris.
22        THE VIDEOGRAPHER:  Will the court
23 reporter please swear in the witness.
24               - - -
25               - - -

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris
August 29, 2022

---

Page 61

1    Q    Okay.  Would that be in your
2 instruction to the deputies at times, make sure you
3 do 12-minute rounds?
4    A    Yes.
5    Q    So was 12-minute rounds pretty much the
6 policy as to when -- how often to conduct security
7 rounds in close observation cells in 2019?
8         MR. JACKSON:  Object to form.  You can
9 answer.  You can answer.
10   A    I believe policy's 15.
11 BY MR. GARDNER:
12   Q    Okay.
13   A    Written policy's 15.
14   Q    Okay.  How about oral policy?
15        MR. JACKSON:  Object to form.  You can
16 answer.
17   A    They were done 12 minutes to make sure
18 they were done in -- within the 15 minutes.
19 BY MR. GARDNER:
20   Q    Okay.  Was it the custom and practice
21 to do security rounds on close observation cells
22 every 12 minutes?
23   A    Per policy, it was 15, but...
24   Q    Right.  But in 2009, was it the custom
25 and practice to do them every 12 minutes?

---

Page 62

1    A    In 2009?
2    Q    '19.
3    A    '19?  Yes.  We did them in - every 12
4 minutes.
5    Q    When you would do a security round in
6 the close -- wait.  Are you familiar with how to do
7 a security round in a close observation cell?
8    A    Yes.
9    Q    Okay.  And you know the correct and the
10 wrong way to do it?
11   A    Yes.
12   Q    Okay.  And you've had conversations
13 with, I'm assuming, lieutenants and sergeants and
14 deputies regarding how to properly do a security
15 round in close observation?
16   A    I don't recall having any
17 conversations.
18   Q    Okay.
19   A    But no.
20   Q    But you were aware of the rules on how
21 a lieutenant, a sergeant, a deputy, and a major for
22 that sake should do a security round?
23   A    Yes.
24   Q    Okay.  And when I say "do a security
25 round," I mean in close observations.

---

Page 63

1    A    Yes.
2    Q    Right.  Is the security round you do in
3 close observation different than a hourly security
4 round as far as what you look for?
5    A    No.  It's basically the same.
6    Q    Okay.  When you do a security round for
7 a close observation cell, what do -- what do you --
8 what do you do?
9    A    I'm not sure I understand.
10   Q    Okay.  When you -- it's my
11 understanding that when you do a security round in
12 a close observation cell, you have to scan
13 something next to the cell?
14   A    Yes.
15   Q    And before you scan it, it's my
16 understanding you have to look in the cell?
17   A    Yes.
18   Q    I've had the luxury of deposing
19 Sergeant Gordon.  Do you know who Sergeant Charles
20 Gordon is?
21   A    Yes.
22   Q    Okay.  Did you know him when you were
23 at the sheriff's office?
24   A    Yes.
25   Q    And did he work underneath you?

---

Page 64

1    A    Yes.
2    Q    All right.  And it was his
3 responsibility to supervise deputies; correct?
4    A    Yes.
5    Q    So I've deposed -- did you know I
6 deposed Sergeant Gordon?
7    A    Yes.
8    Q    I deposed him on Friday, and he talked
9 to me about how security rounds are supposed to
10 work, and he told me that you go up to the cell and
11 you look into it.  Is that your understanding?
12   A    Yeah.
13        MR. JACKSON:  Object to form.  You can
14 answer.
15   A    Yes.
16 BY MR. GARDNER:
17   Q    All right.  And then he also explained
18 that you look for some movement of an inmate.  Is
19 that the way that you understand it?
20        MR. JACKSON:  Object to form.  You can
21 answer.
22   A    Not necessarily.  You wouldn't always
23 see someone move.
24 BY MR. GARDNER:
25   Q    Okay.  But do you look for movement of

---

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 20 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 8 of 214
Branson Harris
August 29, 2022

Page 77

1  sergeant.
2      Q      And what's the point of contacting the
3  sergeant if I'm assuming the security personnel did
4  not see them moving in the padded cell?
5      A      So they can open the door and
6  physically check the inmate.
7      Q      Before -- so if a security personnel
8  approaches the closest observation cell and they
9  don't see an inmate moving, should they attempt to
10  get an audible response before they open the door,
11  or should they just open the door if they don't see
12  them moving?
13      A      They should try to get an audible
14  response.
15      Q      Okay.  So the first step would be you
16  try to see if they're moving.  If you can't see --
17  they're not moving, you try to get an audible
18  response would be the second step.  Then after
19  that, then you would contact the sergeant to open
20  the door?
21      A      Yes.
22      MR. GARDNER:  I think we're at a good
23  break point.
24      MR. JACKSON:  Okay.
25      MR. DEMPSEY:  That's good.

Page 78

1      THE VIDEOGRAPHER:  Going off the
2  record.  The time is 10:48 a.m.
3      (Proceedings in recess, 10:48 a.m. to
4      10:55 a.m.)
5      THE VIDEOGRAPHER:  We're now back on
6  the record at 10:55 a.m.
7  BY MR. GARDNER:
8      Q      Major Harris, I'm going to talk to you
9  about Kevil Wingo a little bit.  Okay?  Do you
10  remember Kevil Wingo?
11      A      Yes.
12      Q      What do you remember about him?
13      A      I remember the incident --
14      Q      Okay.
15      A      -- involving him.
16      Q      Yes.  Any other recollections of him
17  outside of that incident?
18      A      No.
19      Q      Was that the first time you ever had
20  any contact with him, was on the incident day?
21      A      To my knowledge, yes.
22      Q      Okay.  You don't recall him in any
23  other locations in the jail?
24      A      No.
25      Q      Okay.  What do you remember about

Page 79

1  Mr. Wingo in that incident?
2      A      Just in general.
3      Q      Yes, please.
4      A      The incident.
5      Q      Oh.  If you could tell me in general
6  what you remember, like --
7      A      I remember being called down to the
8  infirmary about him.
9      Q      And what -- what -- after that do you
10  have any memories or --
11      A      I remember the -- being called over to
12  the infirmary concerning him, that he was being --
13  apparently threatening the cell that he was in, so
14  they had pulled him out.  When I got there, they
15  had pulled him out, or he is sitting out in the
16  infirmary in the open area.
17      Q      Okay.  What else do you remember?
18      A      I remember when I got there I went over
19  and had a conversation with Nurse Visser about --
20  about Mr. Wingo.  She told me he was detoxing and
21  he was trying to get to the hospital -- he was drug
22  seeking is the term that she used -- and that he
23  needed to be isolated in a cell by himself.
24      Q      What else do you remember?
25      A      So the infirmary was full.  The only

Page 80

1  padded cell we had there had another inmate inside
2  it.  So I asked her, you know, where we should
3  place him as far as medically or otherwise, and she
4  said he needed to be isolated in a cell by himself.
5      And so the only cell I had was the
6  infirmary extension, the isolation cell.
7      Q      Any other memories?
8      A      Just moving him, transporting or
9  assisting transporting him to the infirmary
10  extension and placing him in the cell.
11      Q      Anything else?
12      A      I do recall asking Nurse Visser if he
13  had been medically cleared, if he needed to be
14  checked.  She told me no.  And then we proceeded to
15  move him, physically move him, to the -- to the
16  cell.
17      Q      Any other memories?
18      A      Placed him in the cell.  That was --
19  that was basically it.
20      Q      And that's it?
21      A      As far as -- you want me to go through
22  the rest of the day?  Or, I mean, I --
23      Q      No, no.  As far as up to him getting
24  into the extension cell, is that the extent of
25  what -- your memory generally?

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                                    August 29, 2022

Page 93

```
 1        (A voice recording was played.)
 2  BY MR. GARDNER:
 3        Q     Did you hear her tell you that -- she
 4  said that "He's playing like he's falling"?
 5        A     Yes.
 6        Q     Okay.  Did you hear her say that "But
 7  he's not, and I've watched him"?
 8        A     Yes.
 9        Q     And that was in relation to him
10  falling; correct?
11        A     Yes.
12        Q     All right.  So Deputy Marshall told you
13  that "he's playing like he's falling, but he's not,
14  because I'm watching him"?
15        A     Yes.
16        Q     And that was your understanding of the
17  situation that you were getting into when you
18  walked down to the infirmary?
19        A     Yes.
20        Q     Okay.  Did Marshall tell you that he
21  was detoxing?
22        A     Yes.
23        Q     And did Deputy Marshall tell you -- and
24  then did you respond to Deputy Marshall, "Well, if
25  he's detoxing, then he should probably be in the
```

Page 94

```
 1  infirmary"?
 2        A     Yes.
 3        Q     And why did you say that?
 4        A     I assumed he needed to be watched
 5  close -- closely if he was detoxing.
 6        Q     Why does he need to be watched closely
 7  if he's detoxing?
 8        A     Because the medical -- the infirmary is
 9  the medical section.  And if you're -- you're
10  detoxing, I would assume you'd need to be watched
11  by medical.
12        Q     Why do you need to be watched by
13  medical when you're detoxing?
14        A     That was just generally the way -- the
15  way we did it.
16        Q     Is there a reason that you-all did it
17  that way, that you watched people when they were
18  detoxing?
19        A     I mean, I wouldn't know by looking at
20  him if he was detoxing.
21        Q     Okay.
22        A     But in general, they stayed in the
23  infirmary or under medical, medical's eyes.
24        Q     Is -- did you -- in 2019 did you have
25  an understanding that an individual could have
```

Page 95

```
 1  adverse reactions when they're detoxing?
 2        A     Yes.
 3        Q     Did you have an understanding in 2019
 4  that detoxing could develop into a life-threatening
 5  situation?
 6        A     I -- I don't know.  I'm not medically
 7  trained to recognize the symptoms of that, but...
 8        Q     So in 2019 did you know that someone
 9  could die from detoxing?
10        A     Yes.
11        Q     Okay.  Did Deputy Marshall tell you
12  that Mr. Wingo was playing around?
13        A     Yes.
14        Q     And then did you ask her, "Well, is he
15  giving you-all trouble?"
16        A     Yes.
17        Q     And why did you ask her that?
18        A     If he was -- if he was being
19  belligerent or not cooperating with the deputies.
20        Q     Why did that matter?
21        A     That's just something -- if he was
22  being cooperative -- I just wanted to know if he
23  was fighting or resisting deputies.
24        Q     Okay.  And why were you trying to
25  process that at the time?
```

Page 96

```
 1        A     Just to see what the situation -- the
 2  overall situation was.
 3        Q     Okay.  Did it appear as though they
 4  were trying to find out -- get approval from you
 5  whether to place him in close observations?
 6        A     That's what it sounded like.
 7        Q     Okay.  Now, Marshall told you that
 8  there were a couple of rooms outside the double
 9  doors, but she couldn't see him in those rooms; is
10  that correct?
11        A     Yes.
12        Q     Okay.  And those were cells; correct?
13        A     I believe what she was referring to is
14  the infirmary yard which is like a exercise area
15  that was down at the very end of the infirmary.
16  And from where the deputies were, you couldn't see
17  into that room.
18        Q     Okay.
19        A     So we generally did not use it to house
20  inmates.
21        Q     Okay.  But you would use it to house
22  inmates?
23        A     No.
24        Q     No.  So you never used those rooms?
25        A     Not that I recall.
```

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 30 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 10 of 214
August 29, 2022

Page 117

```
1   think that Mr. Wingo was suicidal?
2        A     No.
3        Q     At any point that morning, did
4   Mr. Wingo display any signs or behavior to you that
5   he was attempting to harm himself?
6        A     No.
7        Q     All right.  When Nurse Visser -- did
8   Nurse Visser tell you that Mr. Wingo was drug
9   seeking?
10       A     Yes.
11       Q     Okay.  And when she told you he was
12  drug seeking, did you ask her why -- what she meant
13  by that?
14       A     No.
15       Q     When Nurse Visser told you that
16  Mr. Wingo was drug seeking, did you ask her
17  specifically what he did to make her think that he
18  was drug seeking?
19       A     No.
20       Q     When Nurse Visser told you that
21  Mr. Wingo wanted to go to the ER, did you ask her
22  why he wanted to go to the ER?
23       A     She told me he was drug seeking.
24       Q     Okay.  I understand that.  And when she
25  told you he was drug seeking, did you ask her, did
```

Page 118

```
1   he make any other complaints to you that he wants
2   to go to the ER for?
3        A     No.
4        Q     Did you ask Nurse Visser what Mr. Wingo
5   was doing that may have indicated that he was drug
6   seeking?
7        A     No.
8        Q     When you spoke to Nurse Visser, did you
9   ask her if she physically examined him?
10       A     I asked her if he had been medically
11  cleared.
12       Q     Okay.  And did ask you her did she
13  physically examine him?
14       A     No.
15       Q     Did you ask her if any of the medical
16  staff physically examined him?
17       A     No.
18       Q     Did Nurse Visser tell you that she
19  physically examined him?
20       A     No.
21       Q     Did Nurse Visser tell you that any of
22  the medical staff had physically examined him?
23       A     No.
24       Q     Did Nurse Visser tell you that -- when
25  you had that conversation with her for 40 seconds,
```

Page 119

```
1   did she tell you that Mr. Wingo was acting out?
2        A     No.
3        Q     Okay.  And when you spoke to Nurse
4   Visser when you first came down to the infirmary,
5   did she tell you that Mr. Wingo was having problems
6   with other inmates?
7        A     Deputy Marshall told me that.
8        Q     Okay.  Did Nurse Visser tell you that?
9        A     No.
10       Q     When Deputy -- and you say Deputy
11  Marshall told you that Mr. Inmate [sic] was having
12  problems with other inmates.  Is that the phone
13  call that we listened to?
14       A     Yes.
15       Q     Okay.  Outside of that phone call, did
16  she tell you that he was having problems with other
17  inmates?
18       A     Not that I recall.
19       Q     Okay.  Did Deputy Marshall tell you
20  specifically what problems Mr. Wingo was having
21  with other inmates?
22       A     No.
23       Q     Did she tell you that he was having
24  some issues with the other cell mates?
25       A     On the phone call, yes.
```

Page 120

```
1        Q     Okay.  Did she ever elaborate on that
2   and tell you like the specific issues he was having
3   with other cell mates?
4        A     No.
5        Q     Now, when Nurse Visser told you
6   Mr. Wingo needed to be in a cell by himself because
7   he wanted to go to the ER, is what she told you,
8   and he was drug seeking, why did she say he needed
9   to be in a cell by himself because of that?
10       A     I don't know.  She just said he needed
11  to be on close observation.
12       Q     So based on what you just told me, you
13  said that she told you that he was in the ER -- he
14  wanted to go to the ER and that he was drug seeking
15  and that he wanted to be close -- that he needed to
16  be on close observations, did you ask her, well,
17  what is it about his behavior that he needs to be
18  in close observations?
19       A     No.
20       Q     Okay.  Now, the infirmary houses
21  inmates that are detoxing; correct?
22       A     Yes.
23       Q     And they've been doing that for many
24  years; correct?
25       A     Yes.
```

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 33 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933      Document: 31-2      Date Filed: 06/11/2024      Page: 11 of 214
Branson Harris                                                           August 29, 2022

Page 129

```
 1      A      Yes.
 2      Q      Would that have been difficult for you
 3 to contact someone and tell them to do that?
 4      A      It may have been a little difficult
 5 being that was a weekend.
 6      Q      Okay.
 7      A      There wasn't -- it was kind of a
 8 skeleton-type crew, but...
 9      Q      But you didn't contact anyone and tell
10 them to come play five minutes before you went down
11 there; correct?
12      A      No.
13      Q      Could you -- when you went down to the
14 infirmary, could you get a feel for the infirmary's
15 staff's attitude towards Mr. Wingo at that time?
16      A      No.
17      Q      You couldn't tell if they appeared to
18 be annoyed with him?
19      A      No.
20      Q      Did Nurse Visser appear to be annoyed
21 with him?
22      A      Somewhat.
23      Q      Did you ask her why she was so annoyed
24 with him?
25             MR. JACKSON:  Object to form.  You can
```

Page 130

```
 1 answer.
 2      A      No.
 3 BY MR. GARDNER:
 4      Q      Were you concerned about the feeling
 5 that Nurse Visser may be annoyed with Mr. Wingo?
 6      A      No.
 7      Q      Now, when you came down to the
 8 infirmary, I guess you were able to see Mr. Wingo.
 9 Eventually, you saw someone that was identified as
10 Mr. Wingo?
11      A      Yes.
12      Q      All right.  And he was sitting in the
13 chair?
14      A      Yes.
15      Q      How was his behavior when he sitting in
16 the chair?
17      A      He was -- he was just sitting in the
18 chair.
19      Q      Was he acting out?
20      A      No.
21      Q      Did he appear to be disruptive?
22      A      No.
23      Q      Was he loud?
24      A      Not that I recall.
25      Q      Was he belligerent?
```

Page 131

```
 1      A      No.
 2      Q      Did he appear to be in pain?
 3      A      I couldn't determine that.  I don't
 4 know.
 5      Q      Have you seen people in pain before?
 6      A      Yes.
 7      Q      And do you think you can identify when
 8 people are -- appear to be in pain?
 9      A      Yeah.
10      Q      Okay.  Did Mr. Wingo appear to be in
11 pain?
12      A      No.
13      Q      Was Mr. Wingo grimacing at all when he
14 was sitting in the chair that you observed?
15      A      Not that I observed.  I don't know.
16      Q      Was Mr. Wingo able to stand up on his
17 own?
18      A      As I recall, yes, at first.
19      Q      Okay.
20      A      Yes.
21      Q      Was he able to place his hands by --
22 behind his back on his own?
23      A      I don't recall.
24      Q      Was Mr. Wingo able to talk when you
25 came down to the infirmary?
```

Page 132

```
 1      A      I never spoke to him.
 2      Q      Okay.  So you don't know if he was able
 3 to speak at all?
 4      A      No, I don't.
 5      Q      Did you ever speak to him at all that
 6 morning?
 7      A      No.
 8      Q      Did Mr. Wingo ever say anything to you
 9 that morning?
10      A      No.
11      Q      Did you ask Mr. Wingo any questions at
12 all that morning?
13      A      No.
14      Q      What was Mr. Wingo wearing when you --
15 when you went down to the infirmary?
16      A      I believe it was a jail uniform.
17      Q      A blue jumpsuit?
18      A      I believe so, yes.
19      Q      Well, if we look at the camera --
20      A      Yes.
21      Q      -- does that appear to be a blue
22 jumpsuit?
23      A      He's here?
24      Q      Yeah.
25      A      Yes.
```

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                                         August 29, 2022

---

Page 145

1  if he didn't escort him in that fashion?
2       A     No.
3       Q     Did Sergeant Gordon tell you that he
4  had put Mr. Wingo in the chair because he couldn't
5  stand up on his own?
6       A     No.
7       Q     Did Sergeant Gordon tell you whether he
8  interviewed any of Mr. Wingo's cell mates?
9       A     No.
10      Q     Did Sergeant Gordon tell you that he
11 saw Mr. Wingo fighting with inmates?
12      A     No.
13      Q     Did Sergeant Gordon tell you that
14 Mr. Wingo was suicidal?
15      A     No.
16      Q     Is there anything Sergeant Gordon could
17 have told you that would have altered your decision
18 to place Mr. Wingo in close observation knowing
19 that medical had said he was clear?
20      Q     Did you see Mr. Wingo being disorderly
21      Q     Did you see Mr. Wingo being disorderly
22 at all?
23      A     No.
24      Q     And did you see him fighting with
25 inmates?

---

Page 146

1       A     No.
2       Q     Did Mr. -- when you were in the
3  infirmary or the entire morning that you saw
4  Mr. Wingo, did he appear to be in a condition that
5  he could have actually fought someone?
6       A     I don't -- I don't know.
7       Q     All right.  So did you observe
8  Mr. Wingo that morning?
9       A     For a -- for a brief time, yeah.
10      Q     Okay.  But you observed him in the
11 infirmary; correct?
12      A     Yes.
13      Q     And then you observed him when you
14 walked him to the pad; correct?
15      A     Correct.
16      Q     And then you observed him as you placed
17 him in the pad?
18      A     Yes.
19      Q     And you were able to see what his
20 appearance was like during that period of time?
21      A     Yes.
22      Q     And you were able to assess his
23 appearance?
24      A     Yes.
25      Q     Okay.  Throughout that entire time from

---

Page 147

1  the time you transported Mr. Wingo from the
2  infirmary to the infirmary pad, did he appear to be
3  in a condition where he could have actually fought
4  someone?
5       A     I don't know.
6       Q     Okay.  So possibly?
7       A     Possibly.
8       Q     Okay.  Did you think Mr. Wingo was
9  faking?
10      A     I didn't make an assessment if he was
11 faking or not.
12      Q     And did you think Mr. Wingo was playing
13 games?
14      A     I don't know.
15      Q     Okay.  Did you ever see Mr. Wingo fall
16 to the ground before you left the infirmary?
17      A     I don't believe so.
18      Q     Okay.  At any point that morning, were
19 you concerned about Mr. Wingo's medical condition?
20      A     No.
21      Q     Now, when you-all left the infirmary,
22 Mr. Wingo was restrained?
23      A     Yes.
24      Q     Okay.  And you put handcuffs -- you-all
25 put handcuffs on him?

---

Page 148

1       A     Some -- someone did, yes.
2       Q     Okay.  You and Sergeant Gordon put
3  handcuffs on Mr. Wingo?
4       A     I don't know.
5       Q     Okay.  I'm going to just show you a
6  little bit of the video.
7       A     Okay.
8       Q     All right.  Starting at 7:44:34 after
9  you spoke to Nurse Visser.
10            It appears you're putting gloves on
11 right now?
12      A     Yes.
13      Q     Okay.  And what is that for?
14      A     Anytime that we were going to handle --
15 well, "handle" is not the right word -- but to
16 touch an inmate or -- that we would always put
17 gloves on, protective gloves.
18      Q     And what is Sergeant Gordon doing right
19 now?  Do you know?
20      A     Looks like he's lifting him to his
21 feet.
22      Q     Okay.  And what was the purpose of him
23 lifting him to his feet?
24      A     I'm assuming that we're getting ready
25 to transport him here.

---

Case 1:20-cv-03662-VMC Document 191-5 Filed 07/11/23 Page 39 of 85
USCA11 Case: 24-10933 Document: 31-2 Date Filed: 06/11/2024 Page: 13 of 214

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                              August 29, 2022

Page 153

1    A    I don't remember. I'd have to look at
2  the video.
3    Q    Fair enough. But you were able to
4  observe the situation at the time?
5    A    Yes.
6    Q    Okay. Did you see when Sergeant Gordon
7  picked Mr. Wingo up out of the chair that Mr. Wingo
8  stumbled somewhat?
9    A    He seemed to.
10   Q    Okay. Would that have affected your
11 assessment whether to place him in close
12 observations?
13   A    No.
14   Q    Did you know why he was stumbling?
15   A    No.
16   Q    Did you ask him why he was stumbling?
17   A    No.
18   Q    When Mr. Wingo stumbled out of the
19 chair, did he appear to be in pain?
20   A    I didn't -- I didn't assess.
21   Q    Okay. When Mr. Wingo stumbled out of
22 the chair, did he appear to be oriented? Like did
23 he know where he was?
24   A    I don't know.
25   Q    Okay. When you-all left the infirmary,

Page 154

1  was Mr. Wingo having difficulty walking?
2    A    I believe at some point, yes.
3    Q    Okay. Was he having difficulty walking
4  before you left the infirmary doors?
5    A    Yes.
6    Q    Okay. You helped walk Mr. Wingo to the
7  pad; correct?
8    A    Yes.
9    Q    All right. But you weren't able to
10 walk him all the way to the pad, were you?
11   A    I don't believe so.
12   Q    When you left the infirmary, did you
13 have the intention to place Mr. Wingo in a
14 wheelchair and take him over to the pad, or did you
15 plan to walk him to the pad?
16   A    I believe we put him a wheelchair.
17   Q    But was that the plan when you left the
18 infirmary? Were you going to leave there and put
19 him in a wheelchair, or did you -- did other events
20 develop that you decided to put him in a
21 wheelchair?
22   A    Other events developed.
23   Q    When Mr. Wingo walked before you put
24 him in the wheelchair, was he able to walk at a
25 normal pace?

Page 155

1    A    No.
2    Q    Was Mr. Wingo stumbling as he was
3  walking?
4    A    Somewhat.
5    Q    Okay. Now, at some point you put
6  Mr. Wingo in a wheelchair; correct?
7    A    Yes.
8    Q    Why did you put him in a wheelchair?
9    A    So he didn't fall and hurt himself.
10   Q    Okay. Did Mr. Wingo fall before you
11 put him in the wheelchair?
12   A    No.
13   Q    Did Mr. Wingo fall in front of the
14 wheelchair?
15   A    I don't -- I don't know.
16   Q    I'm going to show you another video,
17 which is IPC 037 Corridor L1342. The video is time
18 stamped starting at 7:45. We'll watch it from
19 there.
20        So the video is now at 7:45:40. Do you
21 see that video?
22   A    Yes.
23   Q    Do you see Mr. Wingo walking in that
24 video?
25   A    Yes.

Page 156

1    Q    Are you with Mr. Wingo?
2    A    Yes.
3    Q    Did you just go grab the wheelchair for
4  him?
5    A    Yes.
6    Q    And then you brought it to Mr. Wingo?
7    A    Yes.
8    Q    And that's outside the infirmary;
9  correct?
10   A    No. It's still inside the infirmary.
11   Q    Did you see Mr. Wingo fall to the
12 ground there in front of the wheelchair? I can
13 rewind it.
14   A    Yeah --
15   Q    I think you might have --
16   A    -- if you would.
17   Q    And there at 7:46:01, do you see
18 Mr. Wingo on the ground in front of the wheelchair?
19   A    Yes.
20   Q    Did he fall to the ground?
21   A    He seemed to.
22   Q    Did he purposely push himself to the
23 ground?
24   A    I don't know.
25   Q    Did it take three of you-all to put him

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris
August 29, 2022

Page 157

```
 1   back in the chair?
 2       A      I'd have to look at it again.  I
 3   don't --
 4       Q      I'll rewind it.  Is this when you-all
 5   put Mr. Wingo back in the chair?
 6       A      Yes.
 7       Q      Is that you, Sergeant Gordon, and
 8   someone else putting him back in the chair?
 9       A      Yes.
10       Q      So it took three of you-all to put him
11   back in the chair?
12       A      Yes.
13       Q      Who is the other person that came when
14   you put Mr. Wingo in the wheelchair?
15       A      I believe it was Deputy Mejia.
16       Q      Was Mr. Wingo fighting you as you were
17   putting him in the wheelchair?
18       A      No.
19       Q      Was he yelling at you?
20       A      No.
21       Q      Was he screaming?
22       A      No.
23       Q      When you -- before you put him in the
24   wheelchair, did you ask him, Mr. Wingo, why did you
25   fall?
```

Page 158

```
 1       A      No.
 2       Q      Did you ask him what was wrong with him
 3   that made him fall?
 4       A      No.
 5       Q      Did you ask him if he had tripped?
 6       A      No.
 7       Q      Were you concerned at all about why he
 8   fell?
 9       A      No.
10       Q      Why did it take three of you-all to put
11   Mr. Wingo back in the wheelchair?
12       A      I don't remember.
13       Q      When Mr. Wingo fell in front of the
14   wheelchair, did you ask Mr. Wingo if he was able to
15   walk on his own?
16       A      No.
17       Q      Before you grabbed the wheelchair, did
18   you ask Mr. Wingo, hey, why are you walking so
19   slow?
20       A      No.
21       Q      Before you grabbed the wheelchair, did
22   you ask Mr. Wingo if he was capable of walking on
23   his own?
24       A      I don't think so.
25       Q      Is there anything about Mr. Wingo
```

Page 159

```
 1   falling in front of that wheelchair that would have
 2   changed your assessment as to whether Mr. Wingo
 3   should have been placed in a padded cell?
 4       A      No.
 5       Q      Was Mr. Wingo talking to you at all
 6   when you put him in the wheelchair?
 7       A      No.
 8          MR. GARDNER:  Yes.  Oh, you need to go
 9   off the record?
10          THE VIDEOGRAPHER:  Want to go off?
11          MR. GARDNER:  No.
12          THE VIDEOGRAPHER:  Okay.
13   BY MR. GARDNER:
14       Q      I'll show you another video that we
15   received in response to an open records request
16   from the Cobb County Sheriff's Office that was
17   certified by Lauren -- I mean, their office.
18          And this is DVS 188, infirmary
19   extension HC 16, 17, and 18.  And this video starts
20   about 7:40.  Is that the video -- security video
21   outside the close observation pad that Mr. Wingo
22   was placed in?
23       A      Yes.
24       Q      And he was placed in Number 18;
25   correct?
```

Page 160

```
 1       A      I don't recall, but...
 2       Q      Okay.  Well, there's close observation
 3   Pads 16 and 17 there as well; right?
 4       A      No.  16 is not a close observation --
 5       Q      Oh, okay.
 6       A      -- cell.
 7       Q      That's another cell though; correct?
 8       A      Yes.
 9       Q      Do you know if anyone was in there that
10   evening --
11       A      I don't know.
12       Q      -- that morning?  Sorry.
13       A      I don't know.
14       Q      Okay.  And how about 17?  Is that a
15   close observation cell?
16       A      I believe so.  It's a close observation
17   cell, but it's not a padded cell.
18       Q      Okay.  Do you know if anyone was in
19   there?
20       A      I don't know.
21       Q      Could Mr. Wingo have been placed in
22   just a close observation cell as opposed to a
23   padded cell, or did he have to be placed in a
24   padded cell?
25       A      I was told by medical a padded cell.
```

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                                    August 29, 2022

Page 169

1  wheelchair; right?
2      A       Yes.
3      Q       But you're grabbing the wheelchair for
4  him; correct?
5      A       Yes.
6      Q       It's now 7:46:38.  And that's
7  through -- that's showing the video through Cell
8  14; correct?
9      A       That's it.  It's in front of the
10  infirmary.
11     Q       Infirmary.  At any point there, did you
12  see anyone try to lower foot pads on the
13  wheelchair?
14     A       No.
15     Q       All right.  Does that help refresh your
16  recollection whether anyone attempted to lower the
17  foot pads on the wheelchair for Mr. Wingo?
18     A       Yes.
19     Q       So did anyone ever attempt to lower
20  those foot pads for him?
21     A       Not that I saw.
22     Q       I'm going to go back to DVS 188 which
23  is a video outside the pad.  Okay.  I'll take us
24  back to 7:48:20.
25             Looks like Deputy Mejia is wheeling

Page 170

1  Mr. Wingo inside of the pad; is that correct?
2      A       Yes.
3      Q       Do you-all typically wheel inmates
4  inside of a pad?
5      A       I mean, it has been done, yes.
6      Q       Is that typical?
7      A       It's happened several times, yeah.  I
8  don't know if typical, but...
9      Q       Is there a reason that Mr. Wingo didn't
10  walk into the pad?
11     A       No.
12     Q       When you-all were outside of the pad,
13  did anyone ask Mr. Wingo to get up and walk inside
14  the pad?
15     A       I don't remember.
16     Q       Okay.  Did you-all have a conversation
17  regarding whether Mr. Wingo was able the walk
18  inside the pad?
19     A       I don't remember.
20     Q       Do you know who made the decision to
21  wheel them in there?
22     A       No.
23     Q       Do you know if Mr. Wingo was able to
24  walk into the pad on his own?
25     A       I don't know.

Page 171

1      Q       You had no assessment as to whether he
2  could or not?
3      A       I don't remember --
4      Q       Okay.
5      A       -- if we asked him to or -- or not.
6      Q       Yeah.  But outside of asking him, just
7  from observing him, do you think that he was able
8  to walk in there himself?
9      A       I don't know.
10     Q       Did Sergeant Gordon tell you that he
11  didn't think he was able to walk into that pad on
12  his own?
13     A       No.
14     Q       When you-all wheeled Mr. Wingo into
15  that pad, was he awake?
16     A       He appeared to be.
17     Q       Okay.  Was he moving around?
18     A       I don't -- I don't remember.
19     Q       Was he alive?
20     A       Yes.
21     Q       How do you know he was alive?
22     A       He -- he was moving at some point.  I
23  don't know.
24     Q       Okay.  But when you wheeled him in the
25  pad, did you know if he was alive at that point?

Page 172

1      A       I'm assuming he was.
2      Q       Okay.  Why are you assuming that?
3      A       Because he was still moving and he was
4  holding himself up in the chair.
5      Q       But you don't know for a fact if he was
6  alive or not right there?
7      A       No.
8      Q       What was Mr. Wingo's appearance to you
9  outside of that cell?
10     A       Just sitting, slumped.
11     Q       Did you observe him for any period of
12  time outside of that cell?
13     A       Just for the short time that we brought
14  him over there.
15     Q       So a few seconds outside the cell?
16     A       Yes.
17     Q       When Mr. Wingo was sitting slumped over
18  with his feet on the ground outside of the padded
19  cell Number 18, did you ask him if he was in pain?
20     A       No.
21     Q       When you were outside of the padded
22  cell that Mr. Wingo was placed in, were you
23  concerned about any mobility issues for him?
24     A       No.
25     Q       If Mr. Wingo was unable to walk on his

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 44 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 16 of 214
Branson Harris                                                        August 29, 2022

Page 173

1  own to get into that cell, would that have
2  concerned you?
3      A    No.
4      Q    Okay.  If Mr. Wingo was unable to walk
5  to get into that cell, would that have influenced
6  your decision whether or not to place him in the
7  close observation cell?
8      A    No.
9      Q    And if Mr. Wingo was unable to walk to
10 get into that cell, would you have contacted
11 medical to say, hey, you need to come look at him
12 again?
13     A    No.
14     Q    Did you see Mr. Wingo's foot dragging
15 on the floor?
16     A    Yes.
17     Q    So as he was wheeled into that cell,
18 his foot was dragging on the floor; correct?
19     A    Yes.
20     Q    Now, there is a video inside of that
21 padded cell also; right?
22     A    I believe so, yeah.
23     Q    Now I'm showing you what has previously
24 been provided to us as DVS 182, infirmary extension
25 Pad 18A.  Is that a video of the inside of the

Page 174

1  pad -- padded cell that Mr. Wingo was in?
2      A    It's the -- it's a picture of inside of
3  a cell.
4      Q    Okay.  Is that the video of it?
5      A    Yes.  Yes.
6      Q    And it started at 7:45; correct?
7      A    Yes.
8      Q    And it's running.  And this is on
9  September 29th, 2019; right?
10     A    Yes.
11     Q    Now, there's a grate or something on
12 the floor there.  What -- what is that?
13     A    That's for the inmates in there to use
14 the restroom.
15     Q    To urinate?
16     A    Yes.
17     Q    And to have bowel movements?
18     A    Yes.
19     Q    And that's where they do it inside that
20 cell; correct?
21     A    Yes.
22     Q    So essentially, it's a toilet?
23     A    Yes.
24     Q    And then there's padding all along that
25 cell?

Page 175

1      A    Yes.
2      Q    And there's padding on the ground?
3      A    Yes.
4      Q    So the entire thing is padded?
5      A    Yes.
6      Q    And what is that for?
7      A    So the inmate won't harm themselves or
8  hurt themselves.
9      Q    Is the door padded as well?
10     A    Yes.
11     Q    Okay.  So everything in here is padded?
12     A    Yes.
13     Q    And why is there not a toilet in there
14 for the inmate to use the restroom?
15     A    I don't -- I don't know.
16     Q    Okay.  You have no idea why a toilet's
17 not in there?
18     A    I'm assuming it's because they -- they
19 could hurt themselves with a metal toilet in there.
20     Q    Okay.  And so that's why they have the
21 grate at the bottom?
22     A    Yes.
23     Q    So that's a protective toilet?
24     A    Yes.
25     Q    Okay.  We'll watch it from here.

Page 176

1          MR. JACKSON:  We've been going for
2  about an hour and a half.
3          MR. GARDNER:  Almost through with this
4  part.
5          MR. JACKSON:  Okay.
6          MR. GARDNER:  I think it will help us
7  all get through it --
8          MR. JACKSON:  No.  Let's do it.
9          MR. GARDNER:  -- and then something
10 else.
11 BY MR. GARDNER:
12     Q    Okay.  So at 7:48:02 on September 29,
13 you-all are wheeling Mr. Wingo inside the cell;
14 correct?
15     A    Yes.
16     Q    And Mr. Wingo is inside the cell?
17     A    Yes.
18     Q    Now, at that point did you-all ask
19 Mr. Wingo to get out of the wheelchair?
20     A    I don't recall.
21     Q    And how is his body positioned in the
22 wheelchair at 7:48:12?
23     A    It's kind of slumped over.
24     Q    Okay.  And how are his feet on the
25 floor?

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                                          August 29, 2022

---

Page 177

1     A      I -- I can't see his feet.
2     Q      Okay.  How about his legs?  Do they
3  appear to be upright?
4     A      Yes.
5     Q      They do.  Okay.  What happens after
6  this point?  Do you-all take Mr. Wingo out of the
7  wheelchair?
8     A      Yes.
9     Q      Did you ask him to get out of the
10 wheelchair on his own first?
11    A      I don't remember.
12    Q      Okay.  Did anyone ask Mr. Wingo to get
13 out of the wheelchair on his own?
14    A      I don't remember.
15    Q      Is that something you would normally
16 do, is say, hey, okay, get out of the wheelchair.
17 You're here?
18    A      Yes.
19    Q      How would that normally be handled if
20 someone couldn't get out of the wheelchair?  Like
21 if someone could get out of the wheelchair
22 themselves, what would you-all normally do?
23    A      If he stood up on his own?
24    Q      Yeah.
25    A      Is that what you're asking?

---

Page 178

1     Q      Yeah.
2     A      Then he would stand up over -- we'd
3  have him face away from us.  We would leave his
4  smock, his blanket, mattress on there.  And then we
5  would leave.
6     Q      Okay.  So normally, would you ask the
7  inmate to get out of the wheelchair?
8     A      Yes.
9     Q      Okay.  Would you normally have to pull
10 the inmate out of the wheelchair?
11    A      It's happened.
12    Q      Okay.
13    A      I mean...
14    Q      But is that something that you normally
15 have to do?
16    A      No.
17    Q      Okay.  Is it fair to say that you have
18 to pull them out of the wheelchair when they don't
19 get out on their own?
20    A      That's happened.
21    Q      Okay.  Is that a fair statement though,
22 that you have to pull them out of the wheelchair
23 when they -- when they either refuse to get out on
24 their own or they just don't get out on their own?
25    A      Yes.

---

Page 179

1     Q      Okay.  So at 7:48:19, you-all pull
2  Mr. Wingo out of the wheelchair; correct?
3     A      Yes.
4     Q      And then you-all place him on the
5  toilet?
6     A      We place him over it, yes.
7     Q      Yes.  He's laying over the toilet;
8  correct?
9     A      Yes.
10    Q      All right.  And then Deputy Mejia takes
11 his handcuffs off?
12    A      Yes.
13    Q      Is Mr. Wingo resisting having his
14 handcuffs taken off at that time?
15    A      It doesn't appear so.
16    Q      Do you know if he's in pain at that
17 point?
18    A      I don't know.
19    Q      Did you hear him say he was in pain?
20    A      I don't remember.
21    Q      Did you hear him say anything?
22    A      Not that I remember.
23    Q      What is Sergeant Gordon doing now?
24    A      I don't know.
25    Q      Is Mr. Wingo kicking you-all?

---

Page 180

1     A      He was moving.  I don't know if he was
2  attempting to kick or not.  I don't know.
3     Q      Was he threatening to kick you-all at
4  that point?
5     A      Verbally?
6     Q      Yes.
7     A      No.
8     Q      Was he moving in a way that you-all
9  feared that he was attempting to kick you?
10    A      I don't know.
11    Q      Okay.  Were any of you -- were you
12 scared for your safety at this time?
13    A      No.
14    Q      Did Mr. Wingo display any signs or
15 behavior to you while he was inside the padded cell
16 that he was going to harm you?
17    A      No.
18    Q      Did he display any signs or behavior
19 that he was going to hurt anyone else?
20    A      No.
21    Q      And when Mr. Wingo was inside that
22 padded cell, did he display any signs or behavior
23 that he was going to hurt himself?
24    A      No.
25    Q      Okay.  Was Mr. Wingo combative while he

---

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 46 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 18 of 214
Branson Harris                                                              August 29, 2022

Page 181

1  was inside that padded cell?
2      A      Not that I remember.
3      Q      Okay.  Was he asking to go to the
4  hospital?
5      A      I don't remember.
6      Q      When Mr. Wingo was inside that padded
7  cell, did he appear to be drug seeking?
8      A      I don't -- I don't know what that looks
9  like per se.
10     Q      What are they doing now at 7:49:35?
11     A      Looks like they're attempting to take
12 his uniform off.
13     Q      Okay.  And was Mr. Wingo being
14 combative at that time?
15     A      No.
16     Q      Were they able to get his uniform off
17 him?
18     A      Yes.
19     Q      And was Mr. Wingo naked?
20     A      Yes.
21     Q      And what is that you just placed on his
22 back at 7:49:58?
23     A      That's just the smock, the covering.
24     Q      The suicide smock?
25     A      It's close observation.  Yes.

Page 182

1      Q      But it's also referred to as a suicide
2  smock?
3      A      I've never heard it --
4      Q      You haven't?
5      A      -- referred to as that.
6      Q      Okay.  Always just a close observation
7  smock?
8      A      Yeah.
9      Q      All right.
10     A      Or just a smock.
11     Q      All right.  Then at that 7:50:02,
12 you-all are leaving Mr. Wingo's cell?
13     A      Yes.
14     Q      All right.  Did you ask Mr. Wingo to
15 put on that suicide smock as you left -- or
16 sorry -- close observation smock as you left the
17 cell?
18     A      I don't -- I don't remember.
19     Q      Did anyone ask him to put that smock
20 on?
21     A      I don't remember.
22     Q      Okay.  Is there a reason why you laid
23 it on -- on his back?
24     A      I can only assume that he wouldn't put
25 it on or --

Page 183

1      Q      Okay.
2      A      -- had no interest in putting it on,
3  so...
4      Q      So you placed that close observation
5  smock on Mr. Wingo's back as he laid there naked on
6  that toilet because you assume that he showed
7  either no interest of being put -- putting that on
8  or he refused to?
9      A      Yes.
10     Q      Do you know why Mr. Wingo was waving
11 his arms on the ground as you left the cell at
12 7:50:10?
13     A      I don't know.
14     Q      Okay.  Did you ask him was he okay when
15 you left him in that close observation cell?
16     A      No.
17     Q      Did you observe him for period -- any
18 period of time as you left him in that close
19 observation cell?
20     A      No.
21     Q      Did any of you-all that placed him in
22 that close observation cell observe him for any
23 period of time?
24            MR. JACKSON:  Object to form.  You can
25 answer.

Page 184

1      A      Not that I remember.
2            MR. GARDNER:  Okay.  I think this is a
3  good stopping point.
4            MR. JACKSON:  All right.
5            THE VIDEOGRAPHER:  All right.  Going
6  off the record.  The time is 12:47 p.m.
7            (Proceedings in recess, 12:47 p.m. to
8            1:41 p.m.)
9            THE VIDEOGRAPHER:  We are back on the
10 record.  The time is now 1:41 p.m.
11 BY MR. GARDNER:
12     Q      I'm going to go back to that video of
13 the DVS 182 in the infirmary extension Pad 18.
14            Now, you said that -- Major Harris, you
15 said that when you-all put Mr. Wingo in the padded
16 cell, you also took a blanket for him?
17     A      Yes.
18     Q      What color was the blanket?
19     A      Sorry.  Green.
20     Q      It's green.  Okay.  So it's the same
21 color as the close observation smock?
22     A      Yes.
23     Q      All right.  Could you tell if that was
24 placed in there for him?
25     A      I didn't.  I couldn't tell.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                                              August 29, 2022

---

Page 197

1  padded cell, is that you?
2       A       Yes.
3       Q       And that's on the date of -- on
4  September 29, 2019; correct?
5       A       Yes.
6       Q       And that's about 30 minutes or so after
7  you-all left Mr. Wingo's cell; correct?
8       A       Yes.
9       Q       Do you know where Mr. Wingo was
10 positioned in the cell at that time?
11      A       I don't remember.
12      Q       Okay.  I'm going play it from 8:27:28.
13              Now, did you just scan Mr. Wingo's
14 cell?
15      A       Yes.
16      Q       Okay.  And that was a security check;
17 correct?
18      A       Yes.
19      Q       Okay.  And at 8:23:41, is that you
20 looking inside of Mr. Wingo's cell?
21      A       Yes.
22      Q       Okay.  And is that how you do a
23 security check?
24      A       Yes.
25      Q       And were you looking in there to make

---

Page 198

1  sure he was okay?
2       A       Yes.
3       Q       And as you looked in the cell, did you
4  see Mr. Wingo move?
5       A       I don't remember.
6       Q       And at 8:23:52, is that Deputy
7  Wilkerson also looking inside the cell?
8       A       Yes.
9       Q       And did you or Deputy Wilkerson see
10 Mr. Wingo move?
11      A       I don't -- I don't remember.
12      Q       Okay.
13      A       I assume I did, or I wouldn't have
14 walked away.
15      Q       Okay.  And so when you looked in the
16 cell at 8:23, you've seen him move, or you wouldn't
17 have walked away and completed your security check?
18      A       Right.
19      Q       Show you another video.  I'm going to
20 play this video from 8 minutes and 22 -- 8
21 minutes -- I'm sorry -- at 8:22.  Okay?  We're
22 playing from there.
23              And this is inside of the infirmary
24 extension pad; correct?
25      A       Yes.

---

Page 199

1       Q       And about a minute later you come and
2  you do your security round; correct?
3       A       Yes.
4       Q       Is Mr. Wingo moving in the -- inside
5  the padded cell at this time?
6       A       I can't tell.  No, I don't think so.
7       Q       Okay.  And as I play this from 8:22:40,
8  if you ever see Mr. Wingo move, say something to
9  me.  Okay?
10      A       Okay.
11      Q       So it's now 8:25.  At any point did you
12 see Mr. Wingo move in that video?
13      A       No.
14      Q       Are you-all still out in front of
15 Mr. Wingo's cell at that time?
16      A       What time was it you said?
17      Q       8:25.  You did your security scan at
18 8:23.  I'll just --
19      A       Okay.
20      Q       -- show it to you again.
21              So from 8 -- as we looked in the cell
22 from 8:22 to 8:25, you never saw Mr. Wingo move;
23 correct?
24      A       No.
25      Q       So it's now 8:24 outside of Mr. Wingo's

---

Page 200

1  cell.  Are you-all outside of his cell still?
2       A       I don't know.
3       Q       Do you see yourself outside of his
4  cell?
5       A       No.
6       Q       So are you outside of his cell?
7       A       No.
8       Q       Okay.  So is it fair to say that you
9  did not see Mr. Wingo move from 8:22 through 8:25?
10      A       I must have seen his chest rise or
11 something because I wouldn't have -- I wouldn't
12 have walked away if I had not seen something.
13      Q       Okay.  And we looked in the video.  Did
14 you see his chest rise?
15      A       I couldn't tell.
16      Q       Okay.  So you can't tell from the video
17 whether you saw his chest rise or not?
18      A       No.
19      Q       But you're saying that when you were --
20 when you did the security check at 8:23, you had to
21 have seen his chest rise?
22      A       Yes.
23      Q       All right.  Because you would not have
24 left there if you had not seen his chest rise?
25      A       Right.

---

Case 1:20-cv-03662-VMC  Document 191-5  Filed 07/11/23  Page 51 of 85
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933    Document: 31-2    Date Filed: 06/11/2024    Page: 29 of 214
Branson Harris                                                                    August 29, 2022

Page 201

1    Q      All right.  So it's your testimony that
2 when you did the security check at 8:23, Mr. Wingo
3 was alive?
4    A      Yes.
5    Q      Okay.  Did you talk to Deputy Wilkerson
6 as you were outside of his cell doing that security
7 check?
8    A      It looked like I said something to him.
9 I don't recall what.
10   Q      Okay.  What did you talk to him about?
11   A      I don't know.
12   Q      Okay.  Do you remember anything that
13 Deputy Wilkerson said to you at that point?
14   A      No.
15   Q      I want to ask you a question about when
16 Mr. Wingo was inside that cell and you-all took off
17 his restraints.  Were you concerned that he was
18 going to hit or punch you when the restraints were
19 being moved?
20   A      I don't remember thinking that.
21   Q      And while you were inside the padded
22 cell putting Mr. Wingo in the cell, do you recall
23 anyone ever giving him a warning not to kick
24 you-all?
25   A      I don't remember.

Page 202

1    Q      Now, as security staff at the jail,
2 it's your responsibility to make sure that the
3 inmates are safe; correct?
4    A      Yes.
5    Q      All right.  And you want to make sure
6 the inmates don't harm themselves?
7    A      Yes.
8    Q      And that no one else harms them?
9    A      Yes.
10   Q      And that they have the medical needs
11 met?
12   A      Yes.
13   Q      And as they are detained within the
14 detention center, essentially, the security
15 personnel becomes their guardian?
16   A      Yes.
17   Q      And as their guardian, the security
18 personnel, it's your responsibility to look out for
19 their welfare at that time; correct?
20   A      Yes.
21   Q      Now, if Mr. Wingo wanted to go to the
22 hospital that morning, he couldn't just make that
23 decision himself, could he?
24   A      No.
25   Q      It had to be approved by someone;

Page 203

1 correct?
2    A      Yes.
3    Q      Did you have the authority to call an
4 ambulance for him?
5    A      No.
6    Q      Who had the authority to call an
7 ambulance for him?
8    A      Medical.
9    Q      Okay.  Only medical can call an
10 ambulance for an inmate?
11   A      Yes.
12   Q      Okay.  So no matter what was happening
13 with Mr. Wingo, as the watch commander, you did not
14 have the authority to call an ambulance for him?
15   A      No.
16   Q      All right.  Were you able to call a
17 code for him if necessary?
18   A      Yes.
19   Q      If Mr. Wingo was in his cell bleeding
20 to death, would you have the authority to contact
21 an ambulance for him?
22   A      No.  I would contact medical.
23   Q      Okay.  And if medical had said he
24 didn't need to go to the hospital, would you still
25 call an ambulance for him, or would you just accept

Page 204

1 that statement from them?
2    A      I would accept medical's statement.
3    Q      Okay.  At any time that you had contact
4 with Mr. Wingo, did you demand that medical
5 reevaluate him?
6    A      No.
7    Q      So when Mr. Wingo fell in front of that
8 wheelchair, you didn't demand that medical come and
9 evaluate him again?
10   A      No.
11   Q      And when you placed Mr. Wingo in the
12 cell, you didn't demand that medical come and
13 evaluate him again either?
14   A      No.
15   Q      When he was in the padded cell, at any
16 point did you think he needed to be evaluated by
17 medical?
18   A      No.
19   Q      At any point did you ever think
20 Mr. Wingo was suffering from a medical emergency?
21   A      No.
22   Q      So throughout your contact with
23 Mr. Wingo, you thought he was fine?
24   A      Yes.
25   Q      Okay.  At any point that you saw

Case 1:20-cv-03662-VMC   Document 191-5   Filed 07/11/23   Page 52 of 85

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris

USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 21 of 214

August 29, 2022

---

**Page 205**

1  Mr. Wingo that evening, did you ever think that
2  Mr. Wingo was in distress -- that morning? Sorry.
3      A    No.
4      Q    So as the watch commander of the jail
5  that evening, were you the highest ranking person
6  in the jail, security personnel --
7      A    That morning?
8      Q    -- that morning? Sorry. That morning.
9      A    Yes.
10     Q    Okay. So that morning as the watch
11 commander, you were the highest ranking person in
12 the cell -- I mean, in the jail?
13     A    Yes.
14     Q    And as the highest ranking person in
15 the jail that morning, you did not have the
16 authority to call an ambulance for him?
17     A    No.
18     Q    And as the highest ranking security
19 personnel in the jail that morning, you could only
20 send him to the emergency room if medical said it
21 was okay?
22     A    Yes.
23     Q    And that's regardless of Mr. Wingo's
24 condition?
25     A    Yes.

---

**Page 206**

1      Q    All right. So if you had went into the
2  cell and saw Mr. Wingo was dead and you contacted
3  medical and they said, we don't need to call an
4  ambulance, you wouldn't have the authority to call
5  an ambulance?
6      A    No.
7      Q    And you would not have called an
8  ambulance?
9      A    No.
10     Q    Now, if we -- as we watched all that
11 video of your interactions with Mr. -- Sergeant
12 Gordon and Nurse Visser and Deputy Marshall, Deputy
13 Wilkerson, Deputy Mejia, did you remember any
14 conversations that you had with them that you
15 haven't told me about?
16     A    No.
17     Q    Did you talk to Sergeant Vanderbogart
18 that evening -- that morning? Sorry. I keep...
19     A    I believe at some point I did.
20     Q    What did you talk to him about?
21     A    I think it was after the code was
22 called, the code blue was called. I assigned him
23 to be the scribe at the scene.
24     Q    Had you ever talked to him before the
25 code blue was called that you recall?

---

**Page 207**

1      A    Not that I recall.
2      Q    All right. Do you know if Sergeant
3  Vanderbogart ever went and looked inside
4  Mr. Wingo's cell before the code was called?
5      A    I don't know.
6      Q    I'm going to start at 8:33:07, the same
7  video outside of Mr. Wingo's cell.
8           8:33:10, do you see Sergeant
9  Vanderbogart in that video?
10     A    Yes.
11     Q    Okay. And is he looking inside of
12 Mr. Wingo's cell?
13     A    Yes.
14     Q    I'm going to play it from there.
15          Did you see Sergeant Vanderbogart look
16 a couple of time in Mr. Wingo's cell at that time?
17     A    Yes.
18     Q    And at 8:33:20, is that Deputy
19 Wilkerson looking in Mr. Wingo's cell as well?
20     A    Yes.
21     Q    Or at Mr. Wingo's cell, I should say.
22     A    Yes.
23     Q    Did he just scan his security device?
24     A    It looked as though he did.
25     Q    Did he scan it before he looked in the

---

**Page 208**

1  cell?
2      A    Yes.
3      Q    Should you scan the security device
4  before or after you've checked on the inmate in a
5  padded cell?
6      A    After.
7      Q    So him scanning that device before he
8  actually checked on Mr. Wingo, would that be a
9  violation of Cobb County Sheriff's Office policy
10 and procedure?
11     A    I'm not sure if it's a violation of
12 policy if you scan it before or after.
13     Q    Okay. Why would that not be a
14 violation of Cobb County's policies and procedure
15 if the scan is to reflect that you've looked inside
16 the cell and saw that the inmate was okay before
17 you scanned it? Why would that not be a violation?
18     A    I'm not sure if -- it may be. I'm not
19 sure about the -- about that.
20     Q    Okay. You're not sure about that part
21 of the policy?
22     A    Right.
23     Q    Okay. I'm going to play it.
24          Now, it appears that Sergeant
25 Vanderbogart and Deputy Wilkerson just had a

---

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Branson Harris                                                    August 29, 2022

---

Page 213

1  8:32.  I'm going to play it through 8:35, and if
2  you ever see Mr. Wingo move, let me know, please.
3        It's now 8:35.  Did you ever see
4  Mr. Wingo move inside that cell?
5        A     No.
6        Q     Okay.  As the highest ranking security
7  person at the jail that shift, is it your
8  responsibility to make sure that the inmates
9  receive adequate medical care?
10       A     No.  It's medical's.
11       Q     Is it the sheriff's responsibility to
12 make sure that the inmates receive adequate medical
13 care?
14       A     I don't know.
15       Q     When you were the watch commander, have
16 you been delegated the responsibility to make sure
17 inmates receive medical care by the sheriff?
18       A     I'm not sure what --
19       Q     Okay.
20       A     -- you're asking.
21       Q     That was a poorly worded question
22 probably.
23             When -- as the watch commander, did the
24 sheriff delegate you, as the highest ranking
25 security person in the jail over the shift, as the

---

Page 214

1  person who's responsible to make sure the inmates
2  receive medical care if they need it?
3        A     No.  It's medical.
4        Q     So as the highest ranking security
5  person at the jail in September of 2019 or
6  September 29th, 2019, you had no responsibility to
7  make sure that the inmates received adequate
8  medical care?
9        A     No.
10       Q     Did you have any responsibility on that
11 day that the inmates receive any medical care at
12 all?
13       A     No.
14       Q     So if an inmate goes to medical and
15 medical doesn't do anything, as the highest ranking
16 security person at the jail in September of 2019,
17 what would you do?
18       A     There's nothing I can do.
19       Q     So it's just outside of your hands at
20 that time?
21       A     Right.
22       Q     Okay.  So if medical decides they're
23 not going to care for someone, they're not going to
24 do anything for them regardless if they need
25 medical treatment or not, there's nothing you can

---

Page 215

1  do?
2        A     I'm not medically trained, so I can't
3  say if they do or they don't.  That's why I have
4  medical there.
5        Q     I understand.  And so if they don't do
6  something even though the inmate may have needed
7  medical care, there's nothing you can do about it?
8        A     No.
9        Q     So there's no check on the system to
10 make sure that medical's doing their jobs?
11       A     I'm not sure how to answer that.  Not
12 by me, no.  I know medical has supervisors or
13 their -- I don't know what their hierarchy is --
14       Q     Okay.
15       A     -- but...
16       Q     Let's talk about the hierarchy a little
17 bit on September 29, 2019, in the infirmary.
18 There's a charge nurse there; correct?
19       A     Yes.
20       Q     All right.  And when you went down
21 there, there wasn't a doctor down there, was there?
22       A     I don't believe so.
23       Q     Okay.  So would the charge nurse be the
24 highest person in the infirmary at that time?
25       A     I believe so.  I'm not a hundred

---

Page 216

1  percent sure of that, no.
2        Q     All right.  Did you know what the
3  hierarchy of the infirmary staff was on September
4  29th, 2019?
5        A     No.
6        Q     Okay.  Did you know who -- if there was
7  anyone you could have contacted within medical if
8  medical wasn't doing their job on September 29th,
9  2019?
10       A     No.
11       Q     Okay.  Now, when you became a major,
12 did you have to take a course to become a major?
13       A     No.
14       Q     Did you receive any special training to
15 become a major?
16       A     No.
17       Q     Did you have to complete any
18 certifications to become a major?
19       A     No.
20       Q     Did you have to have any medical
21 training to become a major?
22       A     No.
23       Q     Okay.  How did you learn how to do your
24 job as a major?
25       A     Just based on experience in my other

---

DOCKET 191-6

Case 1:20-cv-03662-VMC   Document 191-6   Filed 07/11/23   Page 1 of 90
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933     Document: 31-2     Date Filed: 06/11/2024     Page: 24 of 214
Lieutenant Charles Gordon                                                    August 26, 2022

Page 2

```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF GEORGIA
                 ATLANTA DIVISION
TIFFANY WINGO as Administrator
of the Estate of KEVIL WINGO,
SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR.,
ANGEL CALLOWAY, as mother and
next friend of ERIKA WINGO,
surviving minor child of KEVIL
WINGO, SR., and FATIMA THOMAS,
as mother and next friend of
KEVIL WINGO, JR., surviving
minor child of KEVIL WINGO, Sr.,
        Plaintiffs,           CIVIL ACTION FILE
      vs.                     NO. 1:20-CV-03662-VMC
FORMER COBB COUNTY SHERIFF NEIL
WARREN, individually, FORMER
COBB COUNTY CHIEF DEPUTY SHERIFF
SONYA ALLEN, individually, MAJOR
BRANSON HARRIS, individually,
LIEUTENANT CHARLES GORDON,
individually, DEPUTY PAUL WILKERSON,
individually, DEPUTY BRITTON MCPHEE,
individually, DEPUTY LYNDA MARSHALL,
individually, JOHN DOES 1-10, and JANE
DOES 1-10,
        Defendants.
---------------------------
        VIDEOTAPED DEPOSITION OF
        LIEUTENANT CHARLES GORDON
            August 26, 2022
              9:00 a.m.
         100 Galleria Parkway
             Suite 1600
            Atlanta, Georgia
        Joel P. Moyer, CCR 2745
```

Page 2

```
 1           APPEARANCES OF COUNSEL
 2  On behalf of the Plaintiffs:
 3      TIMOTHY J. GARDNER, Esquire
        Gardner Trial Attorneys, LLC
 4      3100 Cumberland Boulevard
        Suite 1470
 5      Atlanta, Georgia 30339-5939
        (770) 693-8202
 6      tjg@gardnertrialattorneys.com
 7  On behalf of the Defendants Major Branson Harris,
    Lieutenant Charles Gordon, Deputy Paul Wilkerson,
 8  Deputy Britton McPhee, Deputy Lynda Marshall:
 9      WESLEY C. JACKSON, Esquire
        KATHRYN M. WHITE, Esquire
10      Freeman Mathis & Gary, LLP
        100 Galleria Parkway
11      Suite 1600
        Atlanta, Georgia 30339
12      (770) 818-0000
        wjackson@fmglaw.com
13      kathryn.white@fmglaw.com
14  On behalf of the Defendants Former Sheriff Neil
    Warren, and Former Chief Deputy Sheriff
15  Sonya Allen:
16      BRIAN R. DEMPSEY, Esquire
        Carothers & Mitchell LLC
17      1809 Buford Highway
        Buford, Georgia 30518
18      (770) 932-3552
        brian.dempsey@carmitch.com
19
    Videographer:
20
        DeJuan Boyd
21
22
23
24
25
```

Page 3

```
 1       INDEX TO EXAMINATIONS
 2  WITNESS:  LIEUTENANT CHARLES GORDON
 3  EXAMINATION                          PAGE
 4  By Mr. Gardner                          6
    By Mr. Dempsey                        260
 5
    FURTHER EXAMINATION
 6
    By Mr. Gardner                        262
 7
 8              - - -
 9       INDEX TO PREVIOUSLY MARKED EXHIBITS
    PLAINTIFF'S EXHIBITS                  PAGE
10
    Exhibit 1   Cobb County Sheriff's Office   41
11              Command Staff Organizational
                Chart, September 2019
12
    Exhibit 3   2-03-07.00 Mental Health Care /  249
13              Close Observation
14  Exhibit 4   2-06-04.00 Emergency Medical Care  249
15
16          INDEX TO EXHIBITS
17  PLAINTIFF'S EXHIBITS                  PAGE
18  Exhibit 6   Flash drive with audio/video files  69
19  Exhibit 7   Request for Placement in Close   220
                Observation, blank
20
    Exhibit 8   Medical/Administrative Segregation  220
21              Housing Request Form, blank
22  Exhibit 9   Notification of Segregation form,  223
                blank
23
24  (Continued on next page)
25
```

Page 4

```
 1  Exhibit 10  Offender Management System excerpt  224
                for Kevil Wingo
 2
    Exhibit 11  Incident Summary                  234
 3
    Exhibit 12  2-10-05.00 Medical Emergencies    257
 4
    Exhibit 13  2-03-04.00 Disciplinary           258
 5              Segregation and Inmate Discipline
 6
 7  (Plaintiff's Exhibit 1, 3, and 4 were marked in a
 8  prior deposition and therefore copies have not been
 9  attached.)
10
11  (Original Exhibits 6 through 13 have been attached
12  to the original transcript.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                        August 26, 2022

---

Page 61

1  I worked for her for several years.  I guess I --
2  not to where you're saying with dinner and all of
3  that, not like that.  I mean, but I -- I knew her.
4      Q      Did you hang out ever like, you know,
5  with families, get-togethers --
6      A      Oh, no.
7      Q      -- anything like that?
8      A      No, no.
9      Q      No?
10     A      No, huh-uh.
11     Q      Okay.  How about with lieutenants?  No.
12 I'm sorry.  The major.  No.  My bad.
13            The colonel at the time, did you ever
14 hang out with him personally?
15     A      Did -- no.
16     Q      No.  Okay.  How about Major Harris?
17 Did you ever hang out with him outside of work?
18     A      We had a shift event once where all of
19 the sergeants and the lieutenants got together.  We
20 went bowling once.  But were we friends?  Is
21 that -- no.
22     Q      Right.
23     A      (Shakes head negatively.)
24     Q      No.  Did you dislike him for any
25 reason?

Page 62

1      A      No.  I had -- I thought -- no.  I
2  thought he was an all right person.
3      Q      Okay.  How about Sheriff Warren?  Did
4  you agree with how he managed the jail?
5      A      I had so little -- I didn't have a
6  problem with how he -- I -- I thought he was fine.
7  I mean...
8      Q      Okay.
9      A      Yeah.
10     Q      How about Sonya Allen?  Did you agree
11 with how she managed the jail?
12     A      I agree with the way she managed the
13 jail.
14     Q      Now, when you were a deputy and a
15 detention officer, would you also work in the
16 infirmary?
17     A      I'm sure I have.  I -- it's -- that's
18 been so long ago, I can't remember, to be honest,
19 to answer your question honestly.
20     Q      Yeah.
21     A      I would like to say just through the
22 way things are, I'm sure I have, but I don't
23 remember.  That's been a long, long time ago.
24     Q      Now, the deputies rotate in and out of
25 the infirmary --

Page 63

1      A      Yes.
2      Q      -- as well; correct?
3      A      Yes.
4      Q      Depending on the assignments?
5      A      Yes.
6      Q      Has it always been like that?
7      A      Yes.
8      Q      Do they have to have any training
9  before they can work in the infirmary?
10     A      No, no particular training.  It's just
11 an assignment, if -- if that makes sense.
12     Q      Okay.
13     A      Like you're assigned here today or this
14 week.  You can be assigned to another place the
15 next week.
16     Q      Do you have to have any training to
17 work -- as a sergeant to work in the infirmary?
18     A      Any specific trainings?
19     Q      Yes.
20     A      No.
21     Q      All right.  Did you ever -- have you
22 ever done any our conducted any trainings yourself?
23     A      No.
24            MR. GARDNER:  I think now is a good
25 time for a break.

Page 64

1            MR. JACKSON:  Okay.
2            MR. GARDNER:  Let's go off.
3            THE VIDEOGRAPHER:  Going off the
4  record.  The time now is 10:16.
5        (Proceedings in recess, 10:16 a.m. to
6        10:27 a.m.)
7            THE VIDEOGRAPHER:  We are back on the
8  record.  The time now is 10:27.
9  BY MR. GARDNER:
10     Q      So, Lieutenant Gordon, I want to talk
11 to you about your experience with Kevil Wingo on
12 September 29.  Do you recall the -- your contacts
13 with Mr. Wingo?
14     A      In the infirmary?  Yes.
15     Q      Yeah.  Do you remember him?
16     A      Do I remember the day that the
17 situation happened?
18     Q      Yes.
19     A      Yes.
20     Q      Well, what do you remember generally?
21     A      I remember being called down to the
22 infirmary by Deputy Marshall, and she was telling
23 me that there was something going on.  And when I
24 arrived, she told me that there was an issue with
25 Inmate Wingo.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                                    August 26, 2022

Page 65

1           And when I -- I believe Inmate Wingo
2   was outside of his door on -- I think he was on the
3   ground.  And when I engaged in our conversation, I
4   was trying to ask him what was going on, and I
5   think -- I believe he told me someone had just
6   tried to hit him.
7       Q       Anything else you remember?
8       A       I remember asking the nurse what was
9   going on with him and I also -- and I'm trying to
10  remember from the incident asking was -- I believe
11  I asked the nurse was this guy medically okay.
12  And, yeah, I remember her telling me he was -- he
13  was fine medically.
14      Q       Anything else?
15      A       After I was called down?
16          I'm sorry.  I'm just trying to -- I do
17  remember calling and asking the deputy to call the
18  major to come down so we could assess the
19  situation.  And I remember him going over to the
20  nurse, talking to her about Inmate Wingo.
21          And other than him saying that the guy
22  was -- he didn't understand why the guy -- or he
23  couldn't believe why the guy was trying to hit him,
24  I remember not really being able to understand, him
25  not being clear on what else he was telling me.

Page 66

1       Q       Okay.  Do you remember anything else
2   about your contacts with Mr. Wingo?
3       A       Not right offhand, no.  I remember
4   trying to help him up into a chair, trying to get
5   him into a chair.  Just right offhand, that's all I
6   remember.
7       Q       Okay.  Do you remember him ever leaving
8   the infirmary?
9       A       I do.
10      Q       Okay.  Were you involved in that part?
11      A       Yes.  I wanted to know what the nurse
12  thinks we should do with him, and she was saying
13  she believed he needed to be in -- needed to be
14  placed in -- on a suicide watch.  And I remember
15  that there were not any spaces in the infirmary, so
16  we moved him over to the extension pad.
17      Q       Okay.  What else do you remember about
18  him being taken out of the infirmary?
19      A       We had to -- I remember him not for
20  whatever -- for some reason, we had to use a
21  wheelchair because we couldn't get him to walk over
22  there.  So we used a wheelchair to get him from the
23  infirmary to the infirmary pad.
24      Q       Who is "we"?
25      A       It was me -- a deputy came to assist

Page 67

1   us, a Deputy Mejia.
2       Q       Yes.
3       A       And the major, Major -- the major on
4   the shift, Harris.  I'm sorry.  Major Harris,
5   myself, and Deputy Mejia.  Every -- from my -- my
6   memory is correct, it was the three of us.
7       Q       Okay.  And the three of you-all took
8   him from the infirmary to where?
9       A       To the extension pad.
10      Q       What's the extension pad?
11      A       The extension pad is a place we place
12  people when -- generally if they're -- we think
13  they could be suicidal or we're -- we use it as a
14  safety place to place people when they could be in
15  a combative situation or a situation where they're
16  going to hurt themselves.
17      Q       Do you remember anything else about
18  transferring him to the extension pad?
19      A       Not right offhand.  I said we moved him
20  with a wheelchair?
21      Q       Yes.
22      A       Okay.
23      Q       Do you remember anything about putting
24  him in the extension pad?
25      A       We placed him from the wheelchair and

Page 68

1   laid him down on the extension pad floor.
2       Q       Anything else you remember about that?
3       A       When you put a person in the pad, you
4   have to remove their clothing and give them a
5   safety blanket -- we call it a safety smock --
6   because you aren't allowed to have clothes on in
7   the pad because you might harm yourself.
8       Q       Anything else you can recall about
9   that?
10      A       Not right offhand, no.
11      Q       After you placed him in the extension
12  pad, did you ever go and see him again?
13      A       Yes.  I was -- I believe I was called
14  over because he had a medical emergency where he
15  was having problems breathing.
16      Q       And between the time that you were
17  called over because he was having trouble breathing
18  and the time that you put him in the pad, did you
19  see him in between that time at all?
20      A       I do not recall seeing him in between
21  those times.
22      Q       Now, when you first came down to the
23  infirmary, do you recall what time it was?
24      A       I do not.
25      Q       Does around 7:31 sound right to you?

Tiffany Wingo, et al, vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                          August 26, 2022

---

Page 81

1   told you about why he was aggravating them?

2        A       The only thing that sticks out in my

3   mind, I believe one of the guys said he sat on his

4   bunk or something like -- and I'm still not -- I

5   believe that sticks in my mind, that one of the

6   guys said he did something to his bunk, whether

7   it's --

8        Q       And they told you that?

9        A       I don't remember if the inmates told me

10  that or -- I believe it might have been Deputy

11  Marshall --

12       Q       Okay.

13       A       -- that told me that.

14       Q       Now, I know that you came down around

15  7:31:21 and the door was closed at 7:32.  Did you

16  talk to any of those inmates before you closed the

17  door?

18       A       I don't think so.

19       Q       Okay.  Did you talk to any of those

20  inmates after you closed the door?

21       A       I don't think so.

22       Q       Okay.  Did you talk to any of those

23  inmates at all that morning?

24       A       I don't remember talking to any of

25  them.

---

Page 82

1        Q       When you approached Mr. Wingo and saw

2   him laying on the floor, was -- did he appear to be

3   in pain?

4        A       I don't remember if I thought he was in

5   pain or kind of just disoriented, so I -- I believe

6   I just -- I'm just -- I think I believe he was

7   disoriented.

8        Q       Okay.  But you didn't think he was in

9   pain at the time?

10       A       I don't think I did.

11       Q       And when you say he was disoriented,

12  how was he behaving that made you think he was

13  disoriented?

14       A       So I remember initially I asked him

15  what was wrong, and I think I remember him saying

16  one of the guys tried to hit him or he didn't know

17  why the guy tried to hit him.  But after that, it

18  just seemed like his conversation was not clear, or

19  he -- he wasn't expressing himself where I could

20  understand what was -- what was -- what was wrong

21  or what was going on.

22       Q       Okay.  When you say he wasn't

23  expressing himself in a way that you could

24  understand, how was he expressing himself that made

25  it difficult for you to understand him?

---

Page 83

1        A       He just wasn't being like -- it was --

2   I believe it was clear when he said he didn't know

3   why one of the guys was -- had tried to -- to hit

4   him.  But then he just was kind of like -- he

5   didn't say anything that was clear anymore.

6   Just -- it just wasn't anything -- he wouldn't tell

7   me anything else.

8        Q       Was he mumbling?

9        A       I believe he was mumbling.

10       Q       Okay.  Was he screaming?

11       A       I don't think he was screaming.

12       Q       Was he loud when you first observed

13  him?

14       A       I can't remember if he was loud.  I

15  don't -- nothing sticks in my mind that he was

16  loud.

17       Q       Did he tell you that he wanted to go to

18  the hospital?

19       A       I don't remember him telling me he

20  wanted to go to the hospital.

21       Q       Okay.  Did you talk to Deputy Marshall

22  at all about what she observed of Mr. Wingo before

23  you came down?

24       A       No.  She just asked me to come down.

25       Q       Okay.

---

Page 84

1        A       And that's --

2        Q       And when you came down, did you have a

3   conversation with her about what she observed

4   before you got there?

5        A       When I came down --

6        Q       Yes, sir.

7        A       -- to talk to her?  I think I remember

8   asking her what was going on with this guy.  And

9   what our conversation was, I don't remember what

10  she told me.  I -- I don't remember what she told

11  me.

12       Q       Did you ask her about any of her

13  contacts she had with Mr. Wingo before you arrived?

14       A       I don't remember.

15       Q       Okay.  Do you recall her telling you

16  anything about her contacts with Mr. Wingo before

17  you arrived?

18       A       I don't remember.

19       Q       And do you recall Deputy

20  Marshall telling you about any observations she had

21  of Mr. Wingo before you arrived?

22       A       All I can vaguely remember is her

23  telling me these other inmates didn't want him in

24  there anymore.

25       Q       Okay.  Other than Deputy Marshall

---

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                    August 26, 2022

Page 101

1  knew there wasn't a room in the infirmary and he
2  had to go to a padded cell, it -- generally, the
3  watch commander assists the major.  The lieutenant
4  would have made that -- that call.
5              So I needed to have him there to
6  reaffirm that that's what we were going to do.
7       Q      Aren't all those suicide watch cells
8  padded?
9       A      No.
10      Q      There are some suicide cells that are
11 not padded?
12      A      No.  Right.
13      Q      Okay.  What's the difference between a
14 suicide cell that's not padded and one that is
15 padded?
16      A      An unpadded suicide, it's just a cell
17 where we place a group of -- a group of people that
18 are saying they may harm themselves together where
19 a deputy is sitting right here and can see them.
20 Generally, these rooms are suicide rooms.
21      Q      Okay.  How long was Mr. Wingo on the
22 floor before you helped him get on the chair?
23      A      On the floor when I arrived?  I only
24 know when --
25      Q      Yes.  How long was he laying on the

Page 102

1  floor -- or on the floor?
2       A      I would -- just guessing, maybe four or
3  five minutes.  I'm not -- I'm not a hundred percent
4  sure.
5       Q      Okay.  So I have you -- we already know
6  you got down there around 7:31:21 or somewhere of
7  that nature; correct?
8       A      Yes.
9       Q      All right.  And I'm just going to move
10 ahead a couple of minutes, and now we're at
11 7:36:14.  Is Mr. Wingo still on the floor?
12      A      Yes.
13      Q      And now I'll move to 7:38:41.  Is
14 Mr. Wingo still on the floor then?
15      A      Yes.
16      Q      I'll move to 7:39 -- can't really see.
17 What's that? -- 15.  Is Mr. Wingo still on the
18 floor then?
19      A      Yes.
20      Q      And how about at 7:40?  Is that when
21 you got Mr. Wingo off the floor?
22      A      I'm still standing over there, so I
23 guess I'm trying to --
24      Q      Would you like me to show you a
25 different angle?

Page 103

1       A      Yes, please.
2       Q      Okay.  I'm now showing you the camera
3  angle from the other view.  I think it's IPC 35.
4  And let's look at this for a minute here.
5              At some point Mr. Wingo sits up from
6  his -- lying on the floor, it appears;
7  correct?
8       A      Yes.
9       Q      What was he -- what did you observe as
10 he sat up?
11      A      I just observed him sitting up.
12      Q      Okay.  Were you watching him?
13      A      Yes.  I believe I was watching him,
14 yes.
15      Q      Did you see him just fall over?  Like
16 in the video that we just looked at right now from
17 7:35:33, did you just see him just fall over while
18 he was sitting down?  Would you like me to play it
19 again?
20      A      Yes.
21      Q      Okay.  Okay.  Let's just play it from
22 7:34:37 with -- from the view of IPC Camera 35.  Is
23 that when Mr. Wingo sat up from the floor, first
24 sat up?
25      A      Like according to the video, yes.  I'm

Page 104

1  looking at the video.
2       Q      So that's the first time he sat up from
3  laying on the floor from looking at the video?
4  Would you like it to watch it from 7:31 to 7:35?
5  We can do that.
6       A      Yes.
7       Q      It might be helpful to you.  All right.
8              So this is 7:32.  Is he laying on the
9  floor then?
10      A      Yes.
11      Q      Okay.  And he hadn't sat up before
12 then; correct?
13      A      Not to my knowledge.
14      Q      Okay.  Let's go back to the time when
15 you walked in them.
16              Shoot.
17              There.  That's you walking in; right?
18      A      Yes.
19      Q      7:31:21.  All right.  Let's watch it
20 from there.
21              And we can see Mr. Wingo's knees, it
22 look like, in that view; correct?
23      A      Yes.
24      Q      So to watch the video right now, is
25 that the first time Mr. Wingo got up right there,

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                        August 26, 2022

Page 105

1    is at 7:33:20?
2         A     Yes.
3         Q     That's it?
4         A     Yes.
5         Q     Okay.  Do you know why he got up at
6    that point?
7         A     I do not.
8         Q     Okay.  Let's continue to watch it.
9              At that point Deputy Marshall hands you
10   something.  What is she handing you at 7:33:34?
11        A     I believe some gloves.
12        Q     Did she also hand you some restraints?
13        A     Yes.
14        Q     And those are handcuffs; right?
15        A     Yes.
16        Q     And what are those handcuffs for?
17        A     Like if you're going to move a person.
18        Q     Okay.  And so it's 7:33.  Had you made
19   the decision that you were going to move Mr. Wingo,
20   7:33:53, when you were holding the handcuffs?
21        A     I think I was getting -- I was getting
22   ready to get a confirmation from the major.
23        Q     Okay.  But you hadn't made the decision
24   yourself that you thought it was okay to move him?
25              MR. JACKSON:  Object to the form.  You

Page 106

1    can answer.
2         A     I'm sorry.  You said had I made the
3    decision?
4    BY MR. GARDNER:
5         Q     Like personally, your decision, you had
6    believed that it was okay to move him at that time?
7         A     Yes.
8         Q     All right.  And so where did Deputy
9    Marshall go at that time, at that point?
10        A     I think I told -- the glove that she
11   gave me, I believe they weren't big enough, and I
12   asked her to give me some bigger gloves.  I think
13   that's what I did.
14        Q     Okay.  And then where does she go when
15   she left you there?
16        A     I believe she was going to call the
17   major again to tell him I needed him around here
18   now.
19        Q     Okay.  Did you know at that point where
20   you were going to move Mr. Wingo?
21        A     No, I don't think I did.
22        Q     But you knew you were moving him to a
23   padded cell?
24        A     I knew that was my only option if he
25   said it was okay.

Page 107

1         Q     Okay.  So as Mr. Wingo was sitting up,
2    was he making any gestures, or was he moving his
3    hands?  What was he doing as he was sitting up?
4         A     I --
5         Q     Did you see him fall to the ground
6    right there at 7:35:30?
7         A     I just saw him fall on the video, yes.
8         Q     Yes.  Okay.
9         A     Yes.
10        Q     Did you see that while you were out --
11   while you were standing there, it looks like you're
12   right in front of him.
13        A     I -- by me not -- I -- I -- he was in
14   the front of me.  I don't know if I was looking
15   away or if -- so looking at the video, I saw him
16   fall.  But when I was standing there, I don't -- I
17   guess I was looking at it.  I'm not sure.
18        Q     Okay.  And did you see him fall over to
19   the side again at 7:36:10?
20        A     I did.
21        Q     Okay.  And you saw that at the time?
22   Because it looks like you just looked over towards
23   him; correct?
24        A     I believe I saw it that time, yes.
25        Q     Did that concern you at all?

Page 108

1         A     I think it did.
2         Q     Okay.  Did it concern you enough to
3    where you told medical, are you sure he's medical
4    clear -- medically clear?
5         A     I believe I did ask her if he was
6    medically clear.
7         Q     Did you ask her again or only when you
8    first went down there?
9              Did you see him just fall over again?
10        A     Yes.
11        Q     Okay.  And did you ask medical again
12   after he fell over, is he medically -- are you sure
13   he's medically clear?
14        A     I remember asking her more than once,
15   if that's your question.
16        Q     Okay.  How many times did you ask
17   medical if Mr. Wingo was medically clear?
18        A     I believe -- I believe I asked about --
19   I know at least two times.
20        Q     Okay.  So at least twice?
21        A     Yes.
22        Q     At what point of you being down there
23   did you ask medical if he was medically clear?
24        A     When I initially went down there.
25        Q     Okay.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                                    August 26, 2022

Page 109

1    A      And about one of the times where he --
2  you know, he fell over.
3    Q      Okay.  Any other times you asked them
4  that?
5    A      I remember twice.  I really want to say
6  three times, but I'm not a hundred percent sure if
7  it was three times.  I know it was twice.
8    Q      Who was around you when you asked that?
9    A      I don't remember.
10    Q      Okay.  Was Deputy Marshall around when
11  you asked medical if he was medically clear?
12    A      I don't remember.  She was probably in
13  the vicinity, but I don't remember where she -- she
14  exactly was.
15    Q      Okay.  And every time you asked them if
16  he medically clear, the response was yes?
17    A      Yes.
18    Q      What did you think was going on with
19  him as he sat there on the floor?
20    A      I think I remember the nurse saying he
21  was detoxing, so I just thought he was going
22  through some form of detox.
23    Q      Have you seen inmates go through detox
24  before at the sheriff's office?
25    A      Yes.

Page 110

1    Q      And how do they appear when you see
2  them going through detox?
3    A      Just different people, they're all
4  different.  Some people will like -- you know, very
5  agitated, move around.  Others will yell.  Some
6  will beat on the walls, like just different --
7  different reactions, different people.
8    Q      And what's your experience as far as
9  watching detox patients in general -- have you ever
10  seen detoxing patients in general population?
11    A      Generally, we try to, you know, keep
12  them in medical.  But if they're -- if they do make
13  it to a pod like when they initially come in and we
14  feel like they're detoxing, they'll -- are you
15  asking me how they're -- they just kind of act in
16  different ways.
17         Some will be really jittery.  Others
18  will yell.  They'll do different things.  So
19  it's -- it's a variance.
20    Q      You've seen them in general population
21  do those different things?
22    A      Yes.
23    Q      Okay.
24    A      And then we'll get them to medical.
25    Q      When people are detoxing, are they

Page 111

1  normally in the infirmary?
2    A      Yes.
3    Q      Okay.  Have you ever seen inmates go to
4  the infirmary for detoxing and then get released to
5  general population and then start detoxing again?
6    A      Yeah.  Usually -- not usually.
7  Sometimes in those situations when they get to
8  the -- get to regular population, they don't like
9  it there, and they'll -- they'll end back up in the
10  infirmary.
11    Q      But that's -- when you say they don't
12  like it there, what do you mean by that?
13    A      They -- they usually want to get to a
14  medical -- down to medical where they can get
15  something to ease their pain.
16    Q      Okay.  Have you seen people leave
17  detoxing in the infirmary where they were okay and
18  then have to go back to the infirmary because they
19  started detoxing?
20    A      Yes.
21    Q      Okay.  You've seen that yourself?
22    A      Yes.
23    Q      Okay.  Have you received any formal
24  training in identifying people that are detoxing?
25    A      No.

Page 112

1    Q      Okay.  Have you received any formal
2  training on what symptoms to look out for someone
3  that's detoxing?
4    A      No.
5    Q      Okay.  Have you received any training
6  with respect to the hazards of detoxing?
7    A      No.
8    Q      Do you have any knowledge with respect
9  to the hazards of detoxing?
10    A      No.
11    Q      Do you know if detoxing can be a
12  medical condition?
13    A      No.  Formally, no.
14    Q      Okay.  Do you know that if someone is
15  detoxing could require immediate emergency help?
16    A      Do I know that?
17    Q      Right.
18    A      No.
19    Q      Okay.  Would you -- do you -- would you
20  consider detoxing could be a situation where
21  someone's experiencing a medical emergency?
22    A      Do I consider detoxing where I would --
23  I think if a person -- in my opinion to what I
24  perceive as detoxing, I think I would need to get a
25  medical person to see them.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                    August 26, 2022

Page 113

1    Q      Okay.  Do you know that if someone's
2 detoxing, it can kill them?
3    A      I do not know the severity of what
4 detoxing causes.
5    Q      Okay.  Back to the video.
6           Did you see Mr. Wingo just fall over
7 again at 7:37:49?
8    A      I was looking over at --
9    Q      Oh, okay.  Let me rewind it for you.
10          So we'll watch it -- we're at 7:37:01,
11 and we'll just watch it from there.  Just pay
12 attention to when it gets to 7:37:49.
13          Did you see Mr. Wingo just fall over --
14   A      Yes.
15   Q      -- at 7:37:49?
16   A      Yes.
17   Q      Okay.  And what were your thoughts when
18 he fell over in front of you at 7:37:49 that time?
19   A      I believe that was the time that I
20 asked the nurse was he medically okay the second
21 time.  I think that that was the time that I asked.
22   Q      Well, this is like the third or fourth
23 time.  This isn't the second time.
24   A      Oh, okay.  So at that point I -- if I
25 had already -- like I said, when he fell the

Page 114

1 first -- I don't remember what my thoughts were, to
2 be honest.
3    Q      All right.  How many times did you
4 watch him fall over as he was attempting to sit
5 down?
6    A      I don't remember.
7    Q      But from looking at it, we know it was
8 at least more than three; correct?
9    A      From looking at the video.
10   Q      Okay.  When Mr. Wingo fell down, did
11 you attempt to help him up right there?
12   A      No.
13   Q      At that point when Mr. Wingo fell down
14 again for at least the third time, did you ask
15 medical to come over and evaluate him?
16   A      I don't remember if I asked her or not.
17   Q      You may have asked one of the medical
18 staff to come over and evaluate him at that time?
19   A      I could have, and -- and they -- and
20 we're -- I'm going on speculation.  And one of them
21 said that they didn't need to.
22   Q      Okay.  So they didn't comply with your
23 request to come over and evaluate him, if you asked
24 them that?
25   A      Right.

Page 115

1    Q      But you don't know if you asked them
2 that?
3    A      Correct.
4    Q      Okay.  But looking at the video, you
5 think you might have?
6    A      I think I might have.
7    Q      Okay.  And what about this video makes
8 you think that you may have asked medical to come
9 and evaluate him at that time?
10   A      Just through years of experience,
11 that's generally what I would have done.
12   Q      And why would you have done it at that
13 point?
14   A      Because he fell over more than, like
15 you said, a couple of times.
16   Q      And was that concerning to you?
17   A      I -- I'm pretty sure it was.
18   Q      Why was that concerning to you?
19   A      Because he fell over more than twice.
20   Q      And what does that indicate to you?
21   A      That for whatever reason he doesn't
22 want -- he doesn't want to or he can't sit up.
23   Q      Did he look like he was purposely
24 falling over?
25   A      I can't remember from -- if he was or

Page 116

1 if he wasn't.
2    Q      Did you think he was faking?
3    A      I don't remember what my mindset was on
4 that particular day.
5    Q      Okay.  At any point that day, did you
6 think Mr. Wingo was faking his behaviors?
7    A      Again, I can't remember if I thought he
8 was faking or not on that day.
9    Q      You may have thought he was faking?
10   A      I -- I can't answer that because I
11 don't remember what my mindset was that day.
12   Q      Why is it that you can't remember what
13 your mindset was that day?
14   A      It's -- it's been a while ago.  I -- I
15 have had inmates that I thought may have been
16 faking a situation, but I just don't remember if --
17 if this was one.  I know initially when I asked
18 medical to check him the first time and they -- she
19 said he was okay.
20          And then when he fell again, I asked
21 again.  So I -- I know I wanted medical to check
22 him.
23   Q      You wanted medical to check Mr. Wingo?
24   A      Yes.
25   Q      Okay.  And when you say you wanted

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon

August 26, 2022

Page 125

1    A    While he was leaning over, I felt I
2  could hold him from the back of his shirt --
3    Q    Right.
4    A    -- to get him in the chair.
5    Q    Did you think Mr. Wingo was a threat to
6  you at that time?
7    A    No.
8    Q    Did you think he was going to harm you
9  at that time?
10   A    No.
11   Q    Were you scared for any reason?
12   A    No.
13   Q    And --
14   A    Well --
15   Q    Yeah.
16   A    -- I was scared that he possibly would
17  fall over.  You mean scared for my safety?
18   Q    Yes, sir.
19   A    No, I was not.
20   Q    At any time you had contact with
21  Mr. Wingo, were you ever -- ever fearful for your
22  safety?
23   A    No, I was not.
24   Q    So right there at 7:40:29, you put him
25  in the chair; correct?

Page 126

1    A    Yes.
2    Q    I'm going to switch views now.
3       So now we're looking at the other view
4  of the nurses station from IPC Camera 36, and this
5  is at 7:40 looks like 20 when you have Mr. Wingo --
6  you're transferring him to the chair; is that
7  correct?
8    A    Yes.
9    Q    Was he able to walk on his own?  Did
10  you just see him walk to the chair?
11   A    Yeah.  I saw him walk to the chair
12  while I was holding his shirt.
13   Q    All right.  Was he -- did he appear to
14  you that he could walk on his own when you sent him
15  from the wall to the chair?
16   A    I -- I -- I didn't remember feeling like
17  he was balanced, so I wanted to help him to the
18  chair.
19   Q    Okay.  So you felt like he was not
20  balanced at that time?
21   A    Right.  Correct.
22   Q    And so with him not being balanced, you
23  felt that he couldn't walk to the chair on his own?
24   A    Correct.
25   Q    Okay.  And that's why you grabbed him

Page 127

1  by the shirt and put him in the chair?
2    A    Yes.
3    Q    Okay.  Was it possible for you to grab
4  his shoulders or hold -- put his arm over you to
5  put him in the chair?
6    A    I felt that was the quickest, easiest
7  way at the time.
8    Q    So -- but was it possible for you to
9  have put his arm around you and to take him over to
10  the chair?
11   A    I guess that was a possibility.
12   Q    Were there other ways that you could
13  have helped him transfer from the wall to the chair
14  other than grabbing the back of his shirt and
15  putting him in the chair?
16   A    I'm sure there were a lot of different
17  ways, but at the time I felt like that was the
18  quickest, best way.
19   Q    Okay.  Have you had other experiences
20  with inmates where you've had to help them because
21  they were imbalanced?
22   A    Yes.
23   Q    And is that how you typically help an
24  inmate who's imbalanced, is you would just grab a
25  part of their clothing?

Page 128

1    A    Different -- sometimes that way,
2  sometime other ways.  It's no specific way.
3    Q    Have you been around anyone else in
4  life that's not an inmate that you've seen them
5  imbalanced?
6    A    Yeah, I'm sure I have.
7    Q    Have you ever had to assist anyone
8  outside of an inmate in your life that's been
9  imbalanced?
10   A    Yes.
11   Q    And is that typically how you would
12  assist those people outside of inmates, that you
13  would just grab an article of their clothing to
14  help them?
15   A    Just depends on the situation.
16   Q    So there have been experiences outside
17  of your professional life where you've helped
18  someone imbalanced and you grab the article of
19  clothing to keep them up?
20   A    Yes.
21   Q    You recall that right now as we sit
22  here?
23   A    Yeah, I know a couple of times.  My son
24  plays football, and I've -- I know on a couple of
25  occasions I've held or helped one of his -- him or

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                    August 26, 2022

---

Page 137

1    Q    Okay.  So you recall telling Major
2  Branson that you were concerned about Mr. Wingo's
3  condition as you were observing him?
4    A    I recall saying something pretty
5  similar to that, yes.
6    Q    And how did he respond to that when you
7  told him you were concerned about his condition?
8    A    I believe that's when he went over to
9  talk to Nurse -- I think that's when he went over
10 to talk to Nurse Visser.
11   Q    How long did he talk to Nurse Visser?
12   A    I don't remember.
13   Q    So let's play the video again.
14        So it looks like he's going over there
15 at 7:43:41.  Does that look right to you?
16   A    Yes.
17   Q    Can you hear his conversation with
18 Nurse Visser at that time?
19   A    I cannot.
20   Q    And do you know what he's -- what he
21 said to Nurse Visser at that time and what she said
22 to him?
23   A    I do not.  I couldn't hear what they
24 were saying.
25   Q    So you don't know if they were talking

---

Page 138

1  about Mr. Wingo at all?
2    A    I do not.
3    Q    As they're sitting right there, they
4  could have been talking about sports last week;
5  correct?
6    A    Yes.  I couldn't hear what they were
7  talking about.
8    Q    And so at 7:43:22, is he now leaving
9  Nurse Visser?
10   A    Yes.
11   Q    And he's no longer communicating with
12 her?
13   A    He's no longer communicating with her.
14   Q    So that would mean that he spoke to her
15 for about 40 seconds.  Does that sound about right
16 to you?
17   A    Yes.
18   Q    And so when Major Branson came down, he
19 talked to you, and then he went to talk to Nurse
20 Visser for about 40 seconds; correct?
21   A    Yes.
22   Q    At this point he had been down in the
23 infirmary for about a couple of minutes; correct?
24   A    Yes.
25   Q    When he left Nurse Visser, what was his

---

Page 139

1  instructions, or what did he say to you?
2    A    I think we decide -- he was saying we
3  were going to take Mr. Wingo to the padded cell.
4    Q    So at that point he had said, you're
5  going to take him to the padded cell.  He had
6  approved taking him to the padded cell?
7    A    Yes.
8    Q    Okay.  So at 7:44:29, Major Branson had
9  approved your recommendation as well to take him to
10 the padded cell?
11   A    Yes.
12   Q    And at this point at 7:44:32, what are
13 you doing with Mr. Wingo?
14   A    About to help get him up to walk him to
15 the padded cell.
16   Q    Okay.  And what are you reaching for in
17 your pants?
18   A    I would imagine it was handcuffs --
19   Q    Okay.
20   A    -- because you have to transport people
21 with handcuffs.
22   Q    So it's the policy of the jail that
23 whenever someone's transported, they have to have
24 handcuffs on?
25   A    They have to be restrained with

---

Page 140

1  handcuffs or -- yes.
2    Q    And that's what you're doing with
3  Mr. Wingo here at 7:45?
4    A    I think so, yes.
5    Q    And you can watch it for a minute.
6    A    Yes.  I see I have the --
7    Q    And did you just pull his arm up there?
8    A    Yes, to --
9    Q    Was he unable to move his arm behind
10 him back -- his back himself at that point at
11 7:45:17?
12   A    I was -- that was just the way I was
13 putting his cuffs on.  I don't know.
14   Q    Did you ask him to place his hands
15 behind his back so that he could be transported?
16   A    I think I did.
17   Q    And did he comply with that?
18   A    I can't remember.  I don't remember him
19 being combative.
20   Q    Did he comply though and put his hands
21 behind his back on his own?
22   A    I think so.
23   Q    Okay.  Let's watch it again.
24        So at this point at 7:45, you're
25 putting the handcuff on him; correct?

---

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                    August 26, 2022

Page 141

```
1    A    Yes.
2    Q    And this is when you were telling him
3  to put his hands behind his back and stand up?
4    A    Yes.
5    Q    Did you have to help him up?
6    A    Yes.
7    Q    Did you have to pull his arm?
8    A    No.  I think it was just holding his
9  cuff, and that's where it --
10   Q    Is Major --
11   A    That's the way it looks.
12   Q    -- Branson's hand also reached out at
13 that point?
14   A    I think he's just -- I couldn't tell.
15 I was stand --
16   Q    Let's rewind it again.  I just want you
17 to tell me if you can see Major Branson helping him
18 get his arm behind his back as well.
19        Do you see there's Marshall there at
20 7:44:53?
21   A    Yes.
22   Q    Is -- is she telling a joke or
23 something at this point?
24   A    I don't know.
25   Q    Okay.  Do you know what she's laughing
```

Page 142

```
1  about?
2    A    I don't know.
3    Q    Or what Major Harris is laughing about?
4    A    I don't know what they're saying.
5    Q    Okay.  So Major Harris comes over by
6  you and Mr. Wingo at around 7:45?
7    A    Yes.
8    Q    Do you see him there --
9    A    Yes.
10   Q    -- where he just put his hand on
11 Mr. Wingo to help you --
12   A    Yes.
13   Q    -- handcuff him?
14   A    Yes.
15   Q    All right.  So Major Harris helped you
16 get Mr. Wingo's hands behind his back so you can
17 handcuff him; correct?
18   A    Yes.
19   Q    And then you grabbed Mr. Wingo by the
20 handcuffs; correct?
21   A    Yes.
22   Q    And that's because Mr. Wingo was unable
23 to stand up and walk on his own; correct?
24   A    Yes.
25   Q    And so you escorted him from the
```

Page 143

```
1  infirmary to -- by holding him by his handcuffs?
2    A    Yes.
3    Q    And was Mr. Wingo able to walk on his
4  own at that time?
5    A    I believe he was a little shaky on his
6  legs, so we got a wheelchair.
7    Q    Okay.  Now I want to show you a
8  different view.  I'm going to go back to camera
9  angle IPC 35.
10        Okay.  We're now looking at angle --
11 the other angle from 7:45.  Is that Major Branson
12 and you handcuffing Mr. Wingo; correct?
13   A    Yes.
14   Q    And at 7:45:25, you hold him by his
15 handcuffs, the middle of his handcuffs; correct,
16 the chains?
17   A    I think so.
18   Q    And that's how you continuously held
19 him; correct?
20   A    Yes.  No.  I have --
21   Q    Did you see Mr. Wingo stumble right
22 there before you got to the door?  I'm going to
23 rewind that for you.
24        MR. JACKSON:  And you had -- you were
25 saying something.
```

Page 144

```
1    A    Yeah.  I think I --
2  BY MR. GARDNER:
3    Q    Oh, let me pause it.
4    A    Okay.  I think I was holding his cuffs
5  and his wrists and the side of his wrists.  Like so
6  one hand was on the cuffs, and the other one was on
7  the wrist while I was guiding him.
8    Q    And -- okay.  What was the reason for
9  that?
10   A    Just to try to keep him standing
11 secure.
12   Q    Okay.  Is that how you always transport
13 inmates, is you hold them by the handcuffs, or do
14 they walk on their own?
15   A    Just depends on the situation.  I mean,
16 each situation dictates.  There's no one particular
17 way to guide them.
18   Q    So it wouldn't be unusual for you to
19 hold an inmate by his handcuffs?
20   A    No.
21   Q    Okay.  I just want to watch -- I want
22 you to watch as Mr. Wingo walks to the door.
23        Was Mr. Wingo having difficulty gaining
24 his balance right then at 7:45:32?
25   A    I think so, yes.
```

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                                     August 26, 2022

---

Page 149

1    Q      Okay.  What are the reasons that you
2   can place someone in close observation?
3    A      If -- like if the person is in danger
4   of harming themselves.  And that's basically going
5   to be the main reason, if there's -- in jeopardy of
6   harming themselves.
7    Q      Any other reasons that you're aware of
8   as a supervisor?
9    A      If a person -- that still would be
10  harming themselves.
11          If a person has become extremely
12  combative to officers or other inmates, we will put
13  them in a padded cell to -- until, you know, they
14  were calm enough to put them back in population.
15  But other than that, everything else would be
16  medical or mental.
17   Q      Okay.  So the reasons that you can put
18  someone in a close observation cell is they are a
19  harm to themselves?
20   A      Yes.
21   Q      Or they've been become extremely
22  combative to officers and other inmates?
23   A      Yes.
24   Q      And those are the only reasons?
25   A      That I can recall right offhand, yes.

---

Page 150

1    Q      Okay.  As you observed Mr. Wingo from
2   7:31 until about 7:45 when you-all took him to the
3   padded cell, did you ever see him attempt to hurt
4   himself?
5    A      No.
6    Q      Okay.  Did any of the medical staff
7   tell you that he was attempting to hurt himself?
8    A      They didn't tell me that, no.
9    Q      Okay.  Did Deputy Marshall tell you
10  that she saw him trying to hurt himself?
11   A      I don't recall her telling me that, no.
12   Q      Okay.  Did anyone ever tell you that
13  they saw him trying to hurt himself?
14   A      No.
15   Q      Did anyone ever tell you that he had
16  became extremely combative to officers or other
17  inmates?
18   A      No.  No.  No.  No.
19   Q      Okay.  So if he had never attempted to
20  hurt himself and he wasn't extremely combative to
21  other inmates, what was the reason for taking him
22  over there?
23   A      So in order to say a person can be
24  placed on suicide watch, there -- there's something
25  called a marked change of behavior, meaning you

---

Page 151

1   have a marked change of behavior which means at
2   some point you -- your behavior shows that you
3   might harm yourself.
4           So that was one of the reasons that the
5   medical staff, I believe, said we need to take him
6   over there.
7    Q      What is a marked change of behavior?
8    A      If you appear to be not acting what we
9   perceive as a normal -- as normal behavior.  And
10  normal is subjective to the person, but I guess it
11  could have been perceived that he wasn't clear in
12  his, you know, in his verbiage, so that could have
13  been perceived as a marked change of behavior.
14   Q      Did you ask any of the medical staff
15  what his change of behavior was that made them feel
16  that he should be placed on suicide watch?
17   A      I did not.
18   Q      Did you ever hear Major Harris ask the
19  medical staff what change of behavior he exhibited
20  that may have indicated he should be on suicide
21  watch?
22   A      No, I didn't ask Major Harris, and I
23  couldn't hear what him and the nurse were talking
24  about.  So, no --
25   Q      Right.

---

Page 152

1    A      -- I did not.
2    Q      Did you ever ask Deputy Marshall what
3   the change of behavior was that he needed to be put
4   on suicide watch?
5    A      I did not.
6    Q      Okay.  Did Deputy Marshall ever tell
7   you that she thought he was just messing around?
8    A      Did she -- no, she did not tell me
9   that.  No, she didn't tell me that.
10   Q      All right.  Did she ever tell you that
11  she thought he was playing games?
12   A      No, she did not.  She didn't tell me
13  that, no.
14   Q      Did you think he was messing around?
15   A      Meaning do I think he was -- no, I
16  don't think he was messing around.
17   Q      Did you think he was playing games?
18   A      No.
19   Q      Did the medical staff appear to be
20  annoyed with him before you took him to the padded
21  cell?
22   A      I was actually more focused on -- I
23  don't know.  I was more focused on him.
24   Q      Okay.
25   A      No.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                          August 26, 2022

Page 153

1    Q     So you didn't really observe the
2  medical staff?
3        A    No.  Other than asking the nurse if he
4  was okay medically, I was just trying to kind of
5  pay my attentions to him.
6        Q    Now, when you picked up Mr. Wingo from
7  the chair and put him in handcuffs, you decided to
8  handcuff him from the back; correct?
9        A    Yes.
10       Q    Or put his arms behind his back.  Is
11 that the only way that you can transport someone,
12 is with their arms behind their back?
13       A    Generally, it's our practice to if --
14 to -- if we're going to transport a person in
15 handcuffs, it's behind back or in waist chains if
16 they're available.
17       Q    And did Mr. Wingo have on waist chains,
18 or was it --
19       A    No.
20       Q    -- handcuffs?
21       A    Handcuffs.
22       Q    When you left the infirmary, was
23 Mr. Wingo walking at a normal pace?
24       A    Well, we had -- before we put him in
25 the wheelchair?

Page 154

1    Q     Yes.
2        A    No.
3        Q    At what point did you put Mr. Wingo in
4  a wheelchair?
5        A    After a few steps when it didn't seem
6  like it would have been safe or easy to let him
7  walk by hisself -- by himself.
8        Q    So you were concerned for his safety in
9  walking by himself?
10       A    Yes.
11       Q    What about his safety were you
12 concerned with?
13       A    I didn't want him to fall over and, you
14 know, possibly hit his head or anything like that.
15       Q    Did you have any understanding as to
16 why he was so imbalanced?
17       A    I did not.
18       Q    And did you ask the medical staff why
19 he was so imbalanced?
20       A    I did -- I heard the nurse say that he
21 was detoxing, so I thought that might have had
22 something to do with his being imbalanced.
23       Q    Okay.  Is detoxing a medical condition?
24            MR. JACKSON:  Objection as asked and
25 answered.  But --

Page 155

1            MR. GARDNER:  Okay.
2            MR. JACKSON:  -- you can answer.
3        A    I don't -- I don't know.  I can't give
4  a good answer for that.
5  BY MR. GARDNER:
6        Q    Where did you get the wheelchair from?
7        A    There was one in the infirmary.
8        Q    So you went back to the infirmary to
9  get the wheelchair?
10       A    No.  He was -- we put him in the
11 wheelchair in the infirmary.
12       Q    So in the hallway outside the infirmary
13 on the --
14       A    No.
15       Q    -- way to the padded cell?
16       A    No.  It was in the infirmary.  Like if
17 you watch your --
18       Q    Right here.  I'll just show it to you.
19 And here we're looking at -- looks like IPC 037,
20 which is the corridor.  What is this area right
21 here that we're looking at?
22       A    That's the hall to the infirmary.
23       Q    That's the hall to the infirmary?
24       A    Well, yeah, if you walk through there,
25 you go to the infirmary.

Page 156

1    Q     You walk through here to get to the
2  infirmary?
3        A    Well, that is actually the infirmary.
4  That's just -- like this is where he was.  So if
5  you walk out this way, this is how you get out of
6  the infirmary or go in.  But this is the infirmary.
7  See like that says 4, 5, 6, where he was in 8.
8        Q    Okay.  Okay.  So these are other cells
9  in the --
10       A    Yes.
11       Q    -- infirmary.  Okay.
12       A    And that's the wheelchair right there.
13       Q    That's not 14?  That's 4?
14       A    14, yes.  I'm sorry.
15       Q    Okay.  And that will be 13?  So these
16 are just additional cells --
17       A    Yes.
18       Q    -- outside the infirmary, or this is in
19 the infirmary?
20       A    It's in the infirmary.
21       Q    That's in -- okay.
22       A    In the infirmary.
23       Q    We'll watch it.
24            It's now at 7:45:18 on this video.  The
25 date is September 29, 2019; correct?

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Case 1:20-cv-03662-VMC   Document 191-6   Filed 07/11/23   Page 40 of 90

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon

USCA11 Case: 24-10933     Document: 31-2     Date Filed: 06/11/2024     Page: 37 of 214

August 26, 2022

Page 157

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | That's what you see here? |
| 3 | A | Yes, yes. |
| 4 | Q | Let me ask you another question real |
| 5 | | quick about the other videos that I've shown you, |
| 6 | | from both of those different views in the |
| 7 | | infirmary.  That was you in those videos; correct? |
| 8 | A | Yes. |
| 9 | Q | You don't dispute that was you? |
| 10 | A | No, I don't dispute. |
| 11 | Q | And you don't -- that was you on |
| 12 | | September 29th at the times marked on that video; |
| 13 | | correct? |
| 14 | A | Yes. |
| 15 | Q | All right.  You don't dispute that; |
| 16 | | right? |
| 17 | A | No, I don't. |
| 18 | Q | Is that Mr. Wingo there walking at the |
| 19 | | top at 7:45:39? |
| 20 | A | Yes. |
| 21 | Q | Did he stumble there at 7:45:42? |
| 22 | A | Yes. |
| 23 | Q | Is both -- let me pause that. |
| 24 | | So at 7:45:49, did both you and Major |
| 25 | | Harris have to hold him up for him to walk? |

Page 158

| | | |
|---|---|---|
| 1 | A | I believe we did.  I -- I... |
| 2 | Q | You want to look at it again? |
| 3 | A | Yes. |
| 4 | Q | Okay.  So we're now at 7:45:41.  Is |
| 5 | | that you and Major Harris holding him up there? |
| 6 | A | I -- right here? |
| 7 | Q | Yeah.  Is that Major Harris grabbing -- |
| 8 | A | Yes. |
| 9 | Q | -- the wheelchair? |
| 10 | A | Yes, yes. |
| 11 | Q | And was that Major Harris helping hold |
| 12 | | him up as you walked Mr. Wingo? |
| 13 | A | Yes. |
| 14 | Q | Okay.  And who is this gentleman in the |
| 15 | | video here at 7:45:59? |
| 16 | A | That's a deputy, Deputy Mejia. |
| 17 | Q | Okay.  I'm going to rewind this for a |
| 18 | | little bit just so we can get that other -- I'm |
| 19 | | going to start at 7:45:46, and then I'll ask you |
| 20 | | some questions about it. |
| 21 | | So Major Harris here is grabbing the |
| 22 | | wheelchair; correct? |
| 23 | A | Yes. |
| 24 | Q | Did you see Mr. Wingo fall there at |
| 25 | | 7:46:01? |

Page 159

| | | |
|---|---|---|
| 1 | A | Can you rewind it? |
| 2 | Q | **Yes.** |
| 3 | A | Okay. |
| 4 | Q | **Did Mr. Wingo just fall --** |
| 5 | A | Yes. |
| 6 | Q | **-- in front of the wheelchair --** |
| 7 | A | Yes. |
| 8 | Q | **-- at 7:46:01?** |
| 9 | A | Yes. |
| 10 | Q | And did you get him back into the |
| 11 | | wheelchair?  Were you able -- do you recall if you |
| 12 | | were able to get him back in the wheelchair? |
| 13 | A | No, I don't recall. |
| 14 | Q | **Okay.** |
| 15 | | That's why I was looking at this part. |
| 16 | Q | Is that Major Harris helping him get |
| 17 | | up? |
| 18 | A | Yes. |
| 19 | Q | And that's you grabbing him by the |
| 20 | | shirt, helping him get up? |
| 21 | A | Yes. |
| 22 | Q | And that's Deputy Mejia also helping |
| 23 | | him get up? |
| 24 | A | Yes. |
| 25 | Q | So all three of you had to get him off |

Page 160

| | | |
|---|---|---|
| 1 | | the floor and into the wheelchair? |
| 2 | A | Yes. |
| 3 | Q | Was Mr. Wingo saying anything to you as |
| 4 | | he fell to the ground? |
| 5 | A | I don't remember him saying anything. |
| 6 | Q | Do you remember if he said anything to |
| 7 | | you as you transported him from this hallway to the |
| 8 | | padded cell? |
| 9 | A | I do not remember. |
| 10 | Q | What was Mr. Wingo's condition like |
| 11 | | before you put him in the wheelchair right outside |
| 12 | | the infirmary? |
| 13 | A | Well, looking at the video, he -- he |
| 14 | | wasn't readily walking, so we had to put him in a |
| 15 | | wheelchair. |
| 16 | Q | All right.  Did he appear to be in |
| 17 | | pain? |
| 18 | A | I can't remember.  But looking at the |
| 19 | | video, he wasn't walking to the wheelchair. |
| 20 | Q | Okay. |
| 21 | A | But as far as going back to that date, |
| 22 | | I don't remember. |
| 23 | Q | Did he appear to be able to control his |
| 24 | | own movements? |
| 25 | A | He wasn't -- I believe I felt -- I |

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                        August 26, 2022

---

Page 161

1  didn't feel comfortable not transporting him
2  without a wheelchair.
3      Q     Okay.  But did he look like he could
4  control his own movements if he wanted to?
5      A     I don't think so.
6      Q     Okay.  When Mr. Wingo fell out of his
7  wheelchair, did you ask him what was going on with
8  him then?
9      A     I don't remember asking him that.
10     Q     Okay.  Did you ask him if he was able
11 to walk at that point?
12     A     I don't think so, and I don't think I
13 would have asked because I wasn't comfortable with
14 him walking.
15     Q     Okay.  Did you ask him why he fell at
16 that point?
17     A     I did not.
18     Q     Was Mr. able -- was Mr. Wingo able to
19 talk to you when he fell in front of the
20 wheelchair?
21     A     I don't remember him talking.
22     Q     Do you know if he was able to or not?
23     A     I don't know.
24     Q     Was Mr. Wingo talking at all when you
25 put him in a wheelchair?

---

Page 162

1      A     I don't think so.
2      Q     Now, I saw you had some things in your
3  hand when you were taking Mr. Wingo through this
4  corridor.  What did you have in your hand?
5      A     It's a smock.  When you take a person
6  to a padded cell, you take off their clothes, and
7  that's what you put on them.  I say it's called a
8  safety smock, if that's --
9      Q     Okay.  So you were carrying a safety
10 smock?
11     A     Yes.
12     Q     Were you carrying anything else?
13     A     I don't -- I don't -- no, I don't think
14 so.
15     Q     Okay.  When Mr. Wingo fell to the
16 ground in front of Major Harris, did Major Harris
17 ask you why is this guy falling?
18     A     I don't think so.
19     Q     Did Major Harris express any concern to
20 you about the fact that he had just fell?
21     A     I don't remember.
22     Q     Did Major Harris say anything to you
23 about the fact that he just fell?
24     A     I don't remember him saying anything.
25     Q     Do you remember any conversations that

---

Page 163

1  you and Major Harris had in that corridor?
2      A     No.
3      Q     When Mr. Wingo fell in front of the
4  wheelchair, did you and Major Harris discuss
5  sending him back in medical to be evaluated?
6      A     No.
7      Q     And when Mr. Wingo fell in front of
8  that corridor, did you think Mr. Wingo needed
9  medical attention -- when he fell in front of the
10 wheelchair?  Sorry.
11     A     I don't remember what my thoughts were
12 right then.
13     Q     But you didn't take him back to the
14 infirmary at that point to get medical attention,
15 did you?
16     A     I did not.
17     Q     And you didn't have Major Harris sit
18 with him for a minute and go back to the infirmary
19 and grab one of the medical people, did you?
20     A     I did not.
21     Q     Did Major Harris ask you to go back to
22 the infirmary at that point when he fell in front
23 of the wheelchair to grab some medical staff?
24     A     He did not.
25     Q     Was anyone concerned that he may have

---

Page 164

1  hurt himself when he fell in front of that
2  wheelchair?
3      A     I don't remember any of us saying
4  anything about it.
5      Q     Did you ever see Major Harris have any
6  conversations with Mr. Wingo?
7      A     Not that I recall.
8      Q     Now, was the padded cell the only cell
9  that Mr. Wingo could have been placed in?
10     A     That was the only cell that we had
11 available at the time for a suicidal -- a person
12 that we perceived to maybe being harmful to
13 themselves.
14     Q     Okay.  Could Mr. Wingo have just been
15 put in a different cell by himself that wasn't
16 padded?
17     A     Well, as far as the cells that we had
18 in medical for those type individuals, we didn't
19 have any space, and the padded cell was the only
20 other option.
21     MR. GARDNER:  The one I want to show
22 you I don't think is on there.  Let's see here.
23 I'll add this other video.  It's -- I'll tell you
24 what it is in a minute, and we'll add it to that,
25 and it will be a part of the exhibit into the

---

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                    August 26, 2022

Page 169

1      A      Yes, with all of the suicide cells
2 being full.
3      Q      Okay.  I'll just skip ahead a little
4 bit.  Whoops.
5             These videos do have the time.  We'll
6 just watch it from here at 7:46:05.  Again, this is
7 the extension area; correct?
8      A      Yes.
9      Q      And this is outside of the padded cell
10 that you placed Mr. Wingo in?
11     A      Yes.
12     Q      Now, when you say Mr. Wingo was
13 disoriented, do you think that he knew where he was
14 at the time?
15     A      I don't know.  I -- I don't think he
16 was -- his thoughts were extremely clear, but I
17 don't know if he knew he was in jail or not.
18     Q      Now, at 7:48:09 is that you-all
19 wheeling Mr. Wingo?
20     A      Yes.
21     Q      And you're wheeling him to the padded
22 cell?
23     A      Yes.
24     Q      I'm going to pause it.  What was his
25 condition like in the wheelchair at that moment at

Page 170

1 7:48:18?
2      A      He was just sitting there and kind of
3 just not really being just responsive, like as far
4 as he wasn't saying anything or anything.  He
5 wasn't talking to us.  He was just kind of sitting
6 in the chair.
7      Q      Okay.  Was he able to lift his legs off
8 the ground?
9      A      I'm not sure if he could or not.
10     Q      Is there anything that concerned you
11 about his posture in the wheelchair before you put
12 him in the cell -- or before you placed him in the
13 cell?
14     A      No.  I don't remember feeling -- I
15 don't remember feeling any more -- my concerns
16 medically started in the infirmary, so I don't
17 think anything in my mind changed, if --
18     Q      And when you say your concerns started
19 in medical, you mean your concern for him
20 started -- his medical condition started in the
21 infirmary?
22     A      Yes.
23     Q      And you still had concerns for his
24 medical condition when you placed him in the padded
25 cell?

Page 171

1      A      The same as I did in the infirmary when
2 I asked the nurse was he --
3      Q      Medically --
4      A      -- medically fine, yes.
5      Q      Did you-all ask him to get out of the
6 chair to walk into the padded cell?
7      A      I don't remember.
8      Q      Was he awake at this time?
9      A      I -- I'm not sure.  I don't remember
10 without like looking at his -- his eyes.  I mean,
11 I'm not sure.
12     Q      Was he able to walk in the cell?
13     A      I don't think so.
14     Q      Did -- he didn't walk in the cell, did
15 he?
16     A      No.
17     Q      You-all wheeled him in the cell?
18     A      Yes.
19     Q      Is that typically how you place an
20 inmate in a padded cell, is you wheel them in
21 there?
22     A      Sometimes.  It just depends on their
23 behavior and how cooperative they're being with us.
24     Q      Did you speak to Mr. Wingo before you
25 placed him in the padded cell as you were outside

Page 172

1 the cell that you were about to place him in?
2      A      I don't remember speaking to him.
3      Q      Did Major Harris speak to him before he
4 was placed inside that padded cell?
5      A      I don't remember him speaking to him.
6      Q      When Mr. Wingo was outside the padded
7 cell and the door was open, did you-all observe him
8 for any period of time?
9      A      Before putting him in the padded cell?
10     Q      Yes.
11     A      No.
12     Q      And when he was outside that padded
13 cell, did you ask him if he was okay?
14     A      I don't recall.
15     Q      And did you ask him if he was in any
16 pain when he was outside of that cell?
17     A      I don't recall.
18     Q      So at this point Deputy Mejia is
19 wheeling him into the cell backwards?
20     A      Yes.
21     Q      And then Major Harris goes into the
22 cell with him?
23     A      Yes.
24     Q      And then you go in as well?
25     A      Yes.

Case 1:20-cv-03662-VMC  Document 191-6  Filed 07/11/23  Page 44 of 90
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
USCA11 Case: 24-10933  Document: 31-2  Date Filed: 06/11/2024  Page: 49 of 214
Lieutenant Charles Gordon                                      August 26, 2022

Page 173

1    Q     What's happening inside the cell at
2  this point?  Let me stop you there.  Sorry about
3  that.
4          Right there at 7:48:40, who is that
5  walking up to the cell?
6    A     Deputy Wilkerson.
7    Q     And is that right when you-all put
8  Mr. Wingo in the cell?
9    A     Yes.
10   Q     So Deputy Wilkerson was there when
11 you-all immediately put Mr. Wingo in the cell?
12   A     Yes.
13   Q     Who is Deputy Wilkerson?
14   A     He's the deputy that was assigned -- I
15 believe assigned to the area that day.
16   Q     All right.  Do you know him personally?
17   A     I know him from working on the shift,
18 yes.
19   Q     Is he still at the jail now?
20   A     No, no.  He's no longer with the
21 sheriff's office.
22   Q     Do you know where he is now?
23   A     I have no idea.  He -- he no longer
24 works with us, though.
25   Q     Were you his supervisor?

Page 174

1    A     That day, yes.
2    Q     Okay.  Do you know why he's no longer
3  with the sheriff's office?
4    A     I -- I think he resigned.  I'm -- I'm
5  pretty sure he resigned.
6    Q     Why are you pretty sure about that?
7    A     I don't remember -- it seems as --
8  vaguely I remember somebody telling me, and I don't
9  know the person, that he -- he was leaving the
10 sheriff's office.  I don't think it was because of
11 like being fired or anything, if that's what you're
12 asking.  I think he just resigned to go somewhere
13 else.
14   Q     Back to this.  So when you went back --
15 when you went into the cell and Wilkerson is
16 holding the cell door, what are you doing inside
17 the cell?
18   A     I think I was kind of just standing
19 there to assist with whatever needed to be done.
20 When you go in a padded cell, you have to, of
21 course, take the handcuffs off and then undress the
22 person.  So I think I was just assisting him with
23 that.
24   Q     Okay.  So when you take someone to a
25 padded cell, you have to take the handcuffs off;

Page 175

1  correct?
2    A     Yes.
3    Q     How do you take the handcuffs off?
4    A     With a handcuff key.
5    Q     But, I mean, do they have to be
6  standing up for that, or do you just take them off
7  any way you can?
8    A     Anywhere you can.
9    Q     Okay.  How about how do you remove
10 their clothes?
11   A     You -- if they -- if they won't take
12 their clothes off or they're unable to take their
13 clothes off, you have to take them off or assist
14 them in taking them off or take them off for them.
15   Q     Did you ask Mr. Wingo to take off his
16 clothes?
17   A     I don't remember what we -- I don't
18 know if we asked him if he would take them off or
19 could take them off.  I remember us -- I remember
20 me taking something -- we had to remove his
21 clothes.  I don't remember how -- who asked him if
22 he could take his clothes off.
23   Q     Why did you have to take his clothes
24 off?
25   A     When you're in a padded cell, you have

Page 176

1  to have your clothes taken off for safety purposes
2  so you don't use anything to harm yourself.  That's
3  why we give you a safety smock.
4    Q     So you take someone's clothes off in
5  the padded cell because you're concerned they may
6  use those clothes to harm themselves?
7    A     Yes.
8    Q     Okay.  Any other rules for when you
9  place them in a padded cell other -- outside of
10 taking their clothes off and taking the handcuffs?
11 Anything else you have to do?
12   A     We -- we offer them like water just so
13 they'll have something to drink in there, you know.
14   Q     So typically, you put people in a
15 padded cell because you're concerned that they're a
16 harm to themselves?
17   A     Yes.
18   Q     Meaning they're suicidal?
19   A     Yes.
20   Q     And that's why Mr. Wingo went into the
21 padded cell, because you -- they were concerned
22 that he was suicidal?
23   A     That his -- his change of behavior
24 could possibly turn into him harming himself.
25   Q     Okay.  Do you believe that self-harm is

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Lieutenant Charles Gordon                                    August 26, 2022

---

Page 185

1  left, did he threaten to harm himself?
2      A    Did he -- I'm sorry?
3      Q    Did he threaten to harm himself?
4      A    No.
5      Q    Did you ever hear Mr. Wingo tell you
6  that he was going to hurt himself?
7      A    No.
8      Q    Did you ever see Mr. Wingo display any
9  erratic behavior?
10     A    Erratic behavior?
11     Q    Yes.
12     A    Meaning did he like jump around or
13  anything like that or --
14     Q    Unusual, odd.
15     A    When I -- in the infirmary -- you
16  aren't talking about when I said I couldn't
17  understand what he was saying?
18     Q    At any point throughout that evening or
19  morning, did you ever see Mr. Wingo display erratic
20  behavior?
21     A    I mean, I don't think his behavior was
22  normal.  Like I guess I'm not understanding the
23  question.
24     Q    Was he unusual to you?
25     A    Yes, I feel like he was unusual.

---

Page 186

1      Q    And the reason you feel like he was
2  unusual was what?
3      A    When I initially started to talk to
4  him, you know, after he told me the guy was trying
5  to -- he didn't know why the guy was trying to hit
6  him, he -- then he -- he started being unclear on
7  stuff that he was saying.
8      Q    When you left Mr. Wingo's cell, in the
9  padded cell, where did you go?
10     A    I don't remember.
11     Q    Did any of the security staff say that
12  medical should come over and watch him while he's
13  in that padded cell?
14     A    If medical should come over --
15     Q    Right.
16     A    -- and watch him while he -- no, I
17  don't think so.
18     Q    If someone is actively trying to harm
19  themselves, what is the jail policy with respect to
20  the inmate?
21     A    To watch them every -- to check on him,
22  go over to check his cell every 15 minutes.
23     Q    Okay.  They don't have a policy where
24  he should be watched at all times?
25     A    No.  It's -- we do 15-minute checks on

---

Page 187

1  them.
2      Q    After you left the cell, you did come
3  back in the area of the extension Cell 18 where
4  Mr. Wingo was, didn't you?
5      A    I think after he had -- there was a
6  medical -- like a medical situation, I think I went
7  back over then.
8      Q    Before you-all left the cell, did you
9  tell Mr. Wingo to put on his suicide smock?
10     A    I don't remember.
11     Q    Now, this cell is being monitored while
12  Mr. Wingo is in there right now; correct?
13     A    Yes.
14     Q    So someone can see his behavior as he's
15  in there right now at 7:54:44?
16     A    There's -- yes, there is a camera.
17     Q    And --
18     A    Yes.
19     Q    -- is someone responsible for watching
20  that camera?
21     A    Well, at all times?
22     Q    Yes.
23     A    The policy is that he's checked every
24  15 minutes.  So as far as having one dedicated
25  person to watching the camera, no, there's not a

---

Page 188

1  dedicated person at every minute to watch the
2  camera.  But there is a 15-minute check to be done
3  on the person.
4      Q    Because I know ultimately I think it
5  was Deputy White that discovered he -- thought he
6  wasn't moving --
7      A    Yes.
8      Q    -- in his cell.  Deputy White was
9  working in the command center at the time?
10     A    Yes.
11     Q    And wasn't it part of his
12  responsibility to watch the camera?
13     A    Watch the cameras that are in those --
14  that area.
15     Q    All the cameras?
16     A    Yes.
17     Q    Okay.  Including the camera that Mr. --
18     A    Yes.
19     Q    -- the cell that Mr. Wingo was in?
20     A    Yes.
21     Q    Did you-all contact Deputy White after
22  you put him in the cell and say, hey, keep a close
23  eye on Mr. Wingo?
24     A    I don't remember if he was told that,
25  but, I mean, it wouldn't have been a stretch.

---

# DOCKET 191-7

Case 1:20-cv-03662-VMC   Document 191-7   Filed 07/11/23   Page 1 of 80
Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                    September 14, 2022
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 43 of 214

Page 2

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
                    ATLANTA DIVISION
TIFFANY WINGO as Administrator
of the Estate of KEVIL WINGO,
SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR.,
ANGEL CALLOWAY, as mother and
next friend of ERIKA WINGO,
surviving minor child of KEVIL
WINGO, SR., and FATIMA THOMAS,
as mother and next friend of
KEVIL WINGO, JR., surviving
minor child of KEVIL WINGO, Sr.,
        Plaintiffs,          CIVIL ACTION FILE
    vs.                      NO. 1:20-CV-03662-VMC
FORMER COBB COUNTY SHERIFF NEIL
WARREN, individually, FORMER
COBB COUNTY CHIEF DEPUTY SHERIFF
SONYA ALLEN, individually, MAJOR
BRANSON HARRIS, individually,
LIEUTENANT  CHARLES GORDON,
individually, DEPUTY PAUL WILKERSON,
individually, DEPUTY BRITTON MCPHEE,
individually, DEPUTY LYNDA MARSHALL,
individually, JOHN DOES 1-10, and JANE
DOES 1-10,
        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
         VIDEOTAPED DEPOSITION OF
           DEPUTY PAUL WILKERSON
            September 14, 2022
                9:08 a.m.
            100 Galleria Parkway
                Suite 1600
              Atlanta, Georgia
           Joel P. Moyer, CCR 2745
```

```
                                              Page 2
 1                  APPEARANCES OF COUNSEL
 2  On behalf of the Plaintiffs:
 3     TIMOTHY J. GARDNER, Esquire
       Gardner Trial Attorneys, LLC
 4     3100 Cumberland Boulevard
       Suite 1470
 5     Atlanta, Georgia 30339-5939
       (770) 693-8202
 6     tjg@gardnertrialattorneys.com
 7  On behalf of the Defendants Major Branson Harris,
    Lieutenant Charles Gordon, Deputy Paul Wilkerson,
 8  Deputy Britton McPhee, Deputy Lynda Marshall:
 9     WESLEY C. JACKSON, Esquire
       KATHRYN M. WHITE, Esquire
10     Freeman Mathis & Gary, LLP
       100 Galleria Parkway
11     Suite 1600
       Atlanta, Georgia 30339
12     (770) 818-0000
       wjackson@fmglaw.com
13     kathryn.white@fmglaw.com
14  On behalf of the Defendants Former Sheriff Neil
    Warren, and Former Chief Deputy Sheriff
15  Sonya Allen:
16     BRIAN R. DEMPSEY, Esquire
       Carothers & Mitchell, LLC
17     1809 Buford Highway
       Buford, Georgia 30518
18     (770) 932-3552
       brian.dempsey@carmitch.com
19
    Videographer:
20
       Winston Nguyen
21
22
23
24
25
```

```
                                              Page 3
 1              INDEX TO EXAMINATIONS
 2  WITNESS:  DEPUTY PAUL WILKERSON
 3  EXAMINATION                              PAGE
 4  By Mr. Gardner                              5
 5                    - - -
 6        INDEX TO PREVIOUSLY MARKED EXHIBITS
 7  PLAINTIFF'S EXHIBITS                      PAGE
 8
    Exhibit 3   2-03-07.00 Mental Health Care /  103
 9              Close Observation
10  Exhibit 7   Request for Placement in Close   107
                Observation, blank
11
    Exhibit 8   Medical/Administrative Segregation 108
12              Housing Request Form, blank
13  Exhibit 11  Incident Summary                 231
14              INDEX TO EXHIBITS
15  PLAINTIFF'S EXHIBITS                      PAGE
16  Exhibit 14  Cobb County Sheriff's Office     120
                Infirmary Security Round time
17              sheet, 9-29-2019
18
19  (Plaintiff's Exhibit 3, 7, 8, and 11 were marked in
20  prior depositions and therefore copies have not
21  been attached.)
22  (Original Exhibit 14 has been attached to the
23  original transcript.)
24
25
```

```
                                              Page 4
 1  Videotaped Deposition of DEPUTY PAUL WILKERSON
 2        September 14, 2022
 3        THE VIDEOGRAPHER:  All right.  We are
 4  on the record.  Today's date is September 14, 2022.
 5  The time is approximately 9:08 a.m.
 6        This will be the videotaped deposition
 7  of Paul Wilkerson.  Will the attorney present
 8  please state their name and whom they represent.
 9        MR. GARDNER:  Timothy Gardner for the
10  plaintiffs.
11        MR. JACKSON:  Wes Jackson for Defendant
12  Paul Wilkerson and Lynda Marshall, Branson Harris,
13  Britton McPhee, and --
14        MR. GARDNER:  Charles Gordon.
15        MR. JACKSON:  -- Charles Gordon.  Thank
16  you.
17        MS. WHITE:  Kathryn White for all of
18  the same defendants as Wes Jackson.
19        MR. DEMPSEY:  Brian Dempsey for Neil
20  Warren, Sonya Allen.
21        THE VIDEOGRAPHER:  And will the court
22  reporter please swear in the witness.
23        (Whereupon the witness was sworn.)
24        MR. JACKSON:  And, Paul, let's take
25  that microphone and pin it to your shirt, about
```

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                    September 14, 2022

---

Page 57

1     A     No.
2     Q     Okay.  Security rounds were different
3  for the different cells?
4     A     Yes.
5     Q     How were the security rounds different
6  for the different types of cells?
7     A     Well, if somebody was in the pad or the
8  close observation cells, those rounds would be
9  conducted quarterly.
10    Q     When you say "quarterly," what do you
11 mean by that?
12    A     Every 15 minutes.  I meant every 15
13 minutes.
14    Q     Anything else different about them?
15    A     Had to keep a closer eye on them to
16 ensure -- those cells were usually used for people
17 that were suicidal, so keep a close eye on them.
18    Q     When you say "keep a closer eye," what
19 do you mean by that?
20    A     Well, the security rounds for those
21 were required every 15 minutes just to ensure they
22 were still breathing and alive and not trying to
23 harm themselves type of thing.
24    Q     So you would look in the cell to make
25 sure those things weren't happening?

---

Page 58

1     A     Yes.
2     Q     How about the cells for people with
3  physical disabilities?  Were those security rounds
4  done any differently --
5     A     No.
6     Q     -- than the hourly?
7     A     No.
8     Q     How about for the closed-air cell?  Was
9  the security round there done any differently than
10 the hourly infirmary security round?
11    A     No.
12    Q     Do you have any certifications or did
13 you have any certifications while you were with the
14 Cobb County Sheriff's Office?
15    A     No.
16    Q     Do you have any now?
17    A     What do you mean by "certifications"?
18    Q     Like any special certifications.  I've
19 learned about different types of certifications.
20 Like in deescalation, you can receive a
21 certification for that.  Are you familiar with
22 that?
23    A     No, I'm not.
24    Q     Deescalation techniques?
25    A     We learned basic deescalation, but I

---

Page 59

1  don't know -- I've never heard of a certification
2  in that.
3     Q     Okay.  So you -- do you have any
4  special certifications outside of the basic law
5  enforcement training --
6     A     I do not.
7     Q     -- completion?  No?
8     A     No.
9     Q     All right.  Now, when we talked about
10 the extension, you said that you were trained on
11 the different categories in segregation of inmates
12 in the extension.  Do you remember that, us talking
13 about that?
14    A     Yes.
15    Q     All right.  What did you -- what were
16 you trained on the different categories in
17 segregation of inmates in the extension?
18    A     Basically, certain inmates would have
19 to be if they -- if they would have to be separated
20 from a different type due to either injury or
21 behavior.
22    Q     So what were those different
23 categorizations or separate -- or segregation?
24    A     It varies.  I mean, sometimes it was
25 due to behavior.  Sometimes it was due to prolonged

---

Page 60

1  injury for their being housed over there.
2     Q     And that was for any of the cells in
3  the extension or -- yeah.  Was that for any of the
4  cells in the extension?
5     A     Yeah.
6     Q     So I know you told me there were I
7  think two padded cells in the extension?
8     A     Yes.
9     Q     Would those be considered close
10 observation cells?
11    A     Yes.
12    Q     And then you told me about a larger
13 cell that could house multiple inmates?
14    A     Most of the cells in the extension
15 could house multiple inmates in there.
16    Q     Okay.  Were the -- were multiple --
17 were all the cells in the extension close
18 observation cells?
19    A     No.
20    Q     Okay.  How many were close observation
21 cells in the extension?
22    A     Two.
23    Q     Were those the two padded cells?
24    A     Yes.
25    Q     The other cells, what were they used

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                          September 14, 2022

Page 89

1 identifying an inmate in medical distress was to
2 identify if they were unconscious, recognize that
3 they're having seizures, basic first aid, and what
4 else?
5      A     That's pretty much it.
6      Q     Do you recall when you received the
7 training on how to identify if an inmate was in
8 medical distress?
9      A     When you say "medical distress," what
10 all do you mean by that?
11     Q     I guess what you mean, whether they're
12 unconscious, recognize whether they're having
13 seizures, basic first aid.
14           MR. JACKSON:  Object to form.  You can
15 answer.
16     A     In jail training.
17 BY MR. GARDNER:
18     Q     Are you aware of any policies and
19 procedures at the jail that identify when an inmate
20 is in medical distress?
21     A     At this time I can't recall exact
22 wording, but, yes, there is policies and procedures
23 in place for that.
24     Q     Have you ever seen an inmate at the
25 jail having a medical emergency?

Page 90

1      A     Yes.
2      Q     How many times?
3      A     I cannot recall.
4      Q     More than once?
5      A     Yes.
6      Q     More than five times?
7      A     Yes.
8      Q     What type of medical emergencies have
9 you witnessed at the jail?
10     A     I've witnessed having seizures.  I've
11 witnessed inmates falling down and experiencing
12 possible head concussions possibly by nature of the
13 fall.  I've witnessed inmates with injuries where
14 they're bleeding.
15     Q     Any other medical emergencies you
16 witnessed?
17     A     And having breathing issues.
18     Q     Anything else?
19     A     Not that I can recall.
20     Q     Okay.  Now, these medical emergencies
21 that you witnessed, was that before September of
22 2019 or after?
23     A     Most of them were -- most of them were
24 probably after.
25     Q     Okay.  Did you ever witness any medical

Page 91

1 emergencies before September of 2019?
2      A     Possibly, but I cannot recall dates and
3 times.
4      Q     Okay.  Did you ever witness an inmate
5 having breathing problems before September of 2019?
6      A     I'm not sure.
7      Q     Did you ever receive any training on
8 when to identify whether an inmate is having a
9 medical emergency?
10     A     Just very basic.  The bottom line is to
11 call a code and get medical staff up there as soon
12 as possible.
13     Q     Would you agree that a medical
14 emergency includes serious breathing problems?
15     A     Yes.
16     Q     Would you agree that a medical
17 emergency includes unconsciousness?
18     A     Yes.
19     Q     Would you agree that a medical
20 emergency includes if someone fainted?
21     A     Yes.
22     Q     Would you agree that a medical
23 emergency includes if someone had chest pains?
24     A     Yes.
25     Q     Would you agree that a medical

Page 92

1 emergency includes if someone has severe pain?
2      A     Yes.
3      Q     What do you do if someone's having a
4 medical emergency?
5      A     Call a code, try to get medical up
6 there.
7      Q     Do you render first aid?
8      A     If possible, yes.
9      Q     And when you say "if possible," what do
10 you mean by that?
11     A     Well, in the case of someone having a
12 seizure, there's not much that I can do.  So we try
13 to make sure the inmate's -- because you -- due to
14 the nature of the shaking body, so to keep them
15 from bashing his head, we'll try to put something
16 underneath his head to cushion it and try to hold
17 him in place a little bit to lessen the shocking
18 until medical staff can get up there and get them
19 on a stretcher.
20     Q     What if someone's unconscious?  Do you
21 do any first aid?
22     A     Basic stuff is, you know, check for a
23 pulse, check to see if he's breathing, render CPR
24 if needed, but, you know, while -- doing all that
25 while waiting for medical staff to respond.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                             September 14, 2022

| | | | Page 129 |
|---|---|---|---|
| 1 | A | No. | |

1    A    No.
2    Q    Do you know how Mr. Wingo got to the
3  infirmary extension or the padded cell?
4    A    When you say how he got there?
5    Q    I guess what led him to being housed in
6  the padded cell.
7    A    I really don't know.  I just know I
8  received a phone call from the deputy in the
9  infirmary stating that he needed to be moved from
10 there to the extension.
11   Q    And what deputy contacted you?
12   A    A Deputy Marshall.
13   Q    Is that Lyn Marshall?
14   A    I believe so.
15   Q    A woman?
16   A    It was a woman, yes.
17   Q    Okay.  Had you ever worked with Deputy
18 Marshall prior to that date?
19   A    Yes.
20   Q    And do you recall what time of day she
21 contacted you?
22   A    It was in the morning.  I don't recall
23 the exact date -- I mean, I know it's written down,
24 so -- but I don't recall the time though.
25   Q    Was it between 7:30 a.m. and 8:00 a.m.?

Page 130

1    A    I think so.
2    Q    Okay.  Where were you when she called
3  you?
4    A    I was at the deputy desk.
5    Q    And where -- the deputy desk where?
6    A    In the extension.
7    Q    Okay.  And do you know where she was
8  when she called you?
9    A    No.  She called me from the infirmary.
10 That's all I know.
11   Q    Okay.  And what did she say to you, and
12 what did you say to her?
13   A    I can't recall the exact conversation,
14 but she had called asking if I had any of the
15 padded cells open.  She mentioned that there was
16 one in the infirmary who was playing games, trying
17 to go to the hospital.  I think she also said
18 something along the lines of bothering the other
19 inmates in the cell.
20   Q    Anything else she told you?
21   A    No.  I can't recall anything that was
22 said.
23   Q    Okay.  Did she tell you he was
24 detoxing?
25   A    She did not, no.

Page 131

1    Q    Okay.
2    A    Or I don't remember if she did.  She
3  might have.  I'm not sure.
4    Q    I'm going to play that jail phone call
5  for you.  Okay?  Have you heard it before?
6    A    Yes.
7    Q    How long ago did you hear it?
8    A    I heard it a little over -- yesterday
9  with --
10   Q    Yesterday?
11   A    Yeah.
12   Q    But you can't recall it as we sit here
13 today?
14   A    Well, I can't recall the exact
15 conversation that was expressed between us.  But,
16 yeah, I did hear it briefly.
17   Q    Okay.  Did she ask you if you had a pad
18 open?
19   A    Yes, she did.
20   Q    And did you respond to her, "Officially
21 no"?
22   A    Yes.
23   Q    What does that mean, "officially no"?
24   A    In terms of me working extension that
25 day, you know, the extension was pretty full up to

Page 132

1  that point, so we were -- it's kind of a -- I won't
2  say "joke" per se, but a little bit of -- almost
3  like that incident because the question was asking
4  is it open, can we bring someone else to you.
5       But normally, you know, it was just a
6  little bit of joking matter that, you know, no,
7  not -- I'm not taking any other people housing in
8  there, but -- that's about it.
9    Q    So "officially no" is just a joke?
10   A    Yes.
11   Q    Okay.  And when you said "technically
12 yes," what did that mean?
13   A    That physically there -- I had an empty
14 cell.
15   Q    So there were empty padded cells when
16 she contacted you?
17   A    Yes.
18   Q    And was one of those cells, padded
19 cells, Cell 18?
20   A    Yes.
21   Q    And was the other one Cell 20?
22   A    Yes.
23   Q    And they were both empty at the time?
24   A    I don't know if they were both empty.
25 I know 18 was.  I don't know if 20 was or not.  I

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                      September 14, 2022

Page 133

1  don't remember actually if it was or not.
2       Q     Do you recall if they brought someone
3  else into 20 later that evening?
4       A     I do not recall.
5       Q     Did she tell you that it was -- that
6  she had planned on bringing Mr. Wingo over?
7       A     Yes, she did.
8       Q     And did you say that that name sounded
9  familiar to you?
10      A     Yes.  I remember when I heard the video
11 last night.  I did say that, yes.
12      Q     Okay.  And why did Mr. Wingo's name
13 sound familiar to you?
14      A     At this point in time, I can't recall.
15 I mean, it's possible that his name could have came
16 up in passing, but I don't really recall at this
17 point in time.  I didn't have any history with him
18 before that.
19      Q     Do you recall if she told you that she
20 had an idiot over there playing games?
21      A     Yes.
22      Q     Do you know what she meant by "idiot"?
23      A     Usually, that would mean to one who's
24 behaving erratically or disturbing the peace,
25 causing problems, playing games.

Page 134

1       Q     What does "playing games" mean?
2       A     Some -- we would deal with occasionally
3  some inmates would fake medical emergencies just to
4  get staff to respond appropriately.
5       Q     So when she told you that she had an
6  idiot over there playing games, were you under the
7  belief that Mr. Wingo had been behaving erratically
8  or faking a medical emergency?
9       A     Something along those lines, yes.  I
10 wasn't sure exactly, but that was my assumption
11 based on what I was told from her, yes.
12      Q     Okay.  Did she tell you that he was
13 playing around?
14      A     I don't know if she used the word
15 "playing games or "playing around," but I know she
16 said something along the lines of playing, yes.
17      Q     Did you ask her who the counselor was?
18      A     I did, yes.
19      Q     Why did you ask her who the counselor
20 was?
21      A     Because normally when we put someone in
22 the pad or in close observation, we try to run it
23 by a counselor.  Or in some cases if an inmate is
24 housed in the infirmary or the extension before,
25 since medical staff and then counselors are right

Page 135

1  there, we'll try to get the counselor to go speak
2  to the inmate first before any actions or
3  determination is made and then let the counselor
4  make that decision what they deem is best to do.
5       Q     And that's the normal protocol?
6       A     I wouldn't necessarily say it's the
7  normal protocol.  But if they're housed over there
8  since they're -- since those two areas are for
9  basically close, direct observation, that's usually
10 what we would try to do.
11      Q     So what -- you're saying that the best
12 practice would be that you would contact the
13 counselor first to make an assessment as to whether
14 the inmate should be in the padded cell?
15            MR. JACKSON:  Object to form.  You can
16 answer.
17      A     If possible, yes.  We're not trying to
18 just throw people in there for no apparent reason
19 whatsoever.
20 BY MR. GARDNER:
21      Q     So you would try to contact the
22 counselor first if one was available?
23      A     Yes.
24      Q     And what type of counselor?
25      A     One of the mental health counselors.

Page 136

1       Q     Why a mental health counselor before --
2  why would you need to consult a mental health
3  counselor before you place an inmate in the padded
4  cell?
5            MR. JACKSON:  Object to form.  You can
6  answer.
7       A     In some cases, I mean, inmates act out
8  for various reasons, whether they're playing games
9  or whether they have an issue that's going on.  The
10 mental health counselors are trained in being able
11 to talk to people and respond to different
12 situations that we as security staff are not.
13            So my question of asking that is, well,
14 can a counselor talk to the inmate, see what's
15 going on, see if an issue can be resolved,
16 something along those lines.
17 BY MR. GARDNER:
18      Q     Is she -- did Deputy Marshall tell you
19 during that phone conversation that Mr. Wingo was
20 trying to get to the hospital?
21      A     I believe -- I believe she did during
22 that conversation.
23      Q     All right.  Did you tell her that
24 that's not going to happen?
25      A     Yes, I did say the words.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                    September 14, 2022

---

Page 153

1   Q      If Mr. Wingo was complaining that he
2  could not breathe, is that something you would have
3  liked to have known?
4   A      Yes.
5   Q      Would that have affected how you
6  monitored him?
7   A      Yes.
8   Q      When you saw Mr. Wingo in the padded
9  cell, did he appear to be in medical distress?
10   A      I could not tell.
11   Q      Okay.  When you saw Mr. Wingo in the
12  padded cell, did he appear to be in any form of
13  distress?
14   A      I'm not really sure.  I mean, he was
15  just laying down was all I could tell.
16   Q      How was he placed in the padded cell?
17   A      I don't -- I know the three placed him
18  in there.  I'm not sure how they did it.  I think
19  he was placed on his stomach inside the cell.
20   Q      Was Mr. Wingo able to get out of the
21  wheelchair on his own?
22   A      I do not know.
23   Q      Is there a reason you don't know that?
24   A      Because I saw the three deputies lift
25  him up out of the wheelchair.

---

Page 154

1   Q      Okay.  Did you hear any of the deputies
2  ask him to get out of the wheelchair before they
3  lifted him up?
4   A      I do not recall.
5   Q      Did you hear any of the deputies tell
6  Mr. Wingo to stand up while he was in the padded
7  cell?
8   A      I don't recall.
9   Q      Now, the deputies -- Mr. Wingo was
10  handcuffed when he came into the padded cell;
11  correct?
12   A      To be honest, I can't remember that.
13  Normally, it's standard procedure to handcuff an
14  inmate before we move them, so I assume that he
15  was, but I can't recall specific details if he was
16  or not.
17   Q      Okay.  So you just don't remember?
18   A      That's correct.
19   Q      All right.  You've seen video of
20  Mr. Wingo placed in the padded cell?
21   A      I've seen it before, a while back, yes.
22   Q      Not recently though?
23   A      No.
24   Q      Was Mr. Wingo acting squirrely at all
25  to you when he was placed in the padded cell?

---

Page 155

1        MR. JACKSON:  Object to form.  You can
2  answer.
3   A      What do you mean by "squirrely"?
4  BY MR. GARDNER:
5   Q      What do you understand "squirrely" to
6  mean?
7   A      I'm not really sure.
8   Q      Okay.  The reason I use that word is
9  I've actually listened to your internal affairs
10  interviews and your interviews with the
11  investigators.
12   A      Okay.
13   Q      And you describe Mr. Wingo as acting
14  squirrely.  Do you recall that conversation with
15  them?
16   A      I do not.
17   Q      And if you used the word "squirrely,"
18  that wouldn't mean anything?
19   A      Right now it would not.  I don't know
20  at the time, if I did say it, what I was thinking
21  at that time.  I can't recall.
22   Q      Okay.  So just in general the word
23  "squirrely" doesn't have any particular meaning to
24  you?
25   A      No.

---

Page 156

1   Q      Does it mean abnormal?
2   A      Not really, no.
3   Q      When Mr. Wingo was brought into the
4  padded cell, did you have the impression that he
5  was resisting the deputies that brought him in
6  there?
7   A      I had a impression of concern mainly
8  because, again, he's brought in by three deputies,
9  one of them being a major, which is out of the norm
10  for a major to escort with two additional deputies
11  unless there is an issue.
12   Q      All right.  And so did you have an
13  impression that he was resisting?
14   A      That could have been a possible issue,
15  yes.
16   Q      Did one of the deputies have to warn
17  Mr. Wingo not to kick him?
18   A      I -- I think I remember hearing one of
19  them say that.
20   Q      Which one warned him not to kick them?
21   A      I'm not sure.  It might have been
22  Sergeant Gordon, but I'm not sure.
23   Q      Did Mr. Wingo appear to be in any
24  condition to kick anyone when he was placed in the
25  padded cell?

---

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                        September 14, 2022

Page 193

1    there at 8:33:30; correct?  Like you're no longer
2    there?
3         A    Yes.
4         Q    And so your next 12-minute security
5    round would have been around 8:45?
6         A    Yes.
7         Q    I'm just going to go to 8:45.  So it's
8    8:45.  Are you doing a security check right now?
9         A    No.
10        Q    It's now 8:47:56.  Is that you
11   approaching Mr. Wingo's cell?
12        A    Yes.
13        Q    Was that your next security check?
14        A    It looks that way.
15        Q    Okay.  So you didn't -- that's a little
16   bit more than 12 minutes; correct?
17        A    Yes.
18        Q    That's almost about 15 minutes; right?
19        A    Yes.
20        Q    And that's outside the 12-minute window
21   that you-all did as practiced; correct?
22        A    Yes.
23        Q    And at that time you're looking in
24   Mr. Wingo's cell?
25        A    Yes.

Page 194

1         Q    And you also knocked on the window?
2         A    I don't recall if I did or not.
3         Q    Here.  I'll replay it for you.  So
4    you're knocking on the window; correct --
5         A    Okay.
6         Q    -- at 8:48?
7         A    Yes.
8         Q    And then you walked away; correct?
9         A    Yes.
10        Q    So at that time, you had knocked on the
11   window and you looked inside the cell; correct?
12        A    Yes.
13        Q    And was Mr. Wingo okay at that time?
14        A    I assume so.  I'm not sure.
15        Q    Well, did you open the door at that
16   time?
17        A    I did not.
18        Q    If you didn't open the door, would that
19   indicate that your security check was accurate and
20   that he was alive and well?
21        A    Yes.
22        Q    So when you knocked on the door, was he
23   responsive to you knocking on the door at that
24   time?
25        A    Unfortunately, I don't recall.

Page 195

1         Q    Okay.  Were you able to see that he was
2    alive and well at that time?
3         A    If he was, I would have been able to --
4    I should have been able to see because I did look
5    in there, yes.
6         Q    Okay.  So the fact that you did your
7    security check and you walked away, does that
8    indicate that he was alive and well at that time?
9         A    Yes.
10        Q    And that would mean that at 8:48 when
11   you did that security check that you saw a rise and
12   fall in his chest?
13        A    Or something -- some kind of movement.
14        Q    Okay.  So you just saw him move, or you
15   saw a rise and fall of his chest?
16        A    Yes.
17        Q    You wouldn't have left there if you
18   hadn't seen that; correct?
19        A    Correct.
20        Q    I'm just going to play it from that
21   point.
22             So at 8:49:07, it looks like you came
23   back to Mr. Wingo's cell.  Do you see that?
24        A    Yes.
25        Q    Why is it that you came back about a

Page 196

1    minute and ten seconds later?
2         A    I'm not really sure.  Possibly, I
3    didn't get a response when I first checked, so I
4    came back to check again.  I'm not sure.
5         Q    Okay.  So when you first checked at
6    about a minute and ten seconds later -- earlier,
7    you may not have gotten a response, and so you came
8    back to check again?
9         A    Yes.
10        Q    And so you just let a minute and ten
11   seconds go by without starting any life-saving
12   measures or calling a code?
13        A    I couldn't -- a determination could not
14   be made at that time yet.
15        Q    What -- at what time?
16        A    If life-saving measures needed to be
17   started.
18        Q    So if you see -- if you're doing a
19   security round on an inmate and you can't tell if
20   they're responsive, should you leave the cell, or
21   should you stay there until you can confirm whether
22   they're responsive and then attempt life-saving
23   measures if necessary?
24             MR. JACKSON:  Object to form.  You can
25   answer.

Tiffany Wingo, et al. vs Former Cobb County Sheriff Neil Warren, et al.
Deputy Paul Wilkerson                                                    September 14, 2022

Page 197

1      A      In this instance, I'm going to assume
2 that I was completing a full round.  So I didn't
3 leave there as in to leave and not give him any
4 attention.  I was checking on the other, and then I
5 came back because that's what this looks like.  And
6 that's why it would have came back in the short
7 amount of time.
8 BY MR. GARDNER:
9      Q      Would you agree with me that Cobb
10 County Sheriff's Office policies and procedures
11 state that you are to give medical emergencies
12 priority over any other routine tasks?
13     A      Yes.
14     Q      And so if an inmate is unresponsive,
15 wouldn't that take priority over any other task
16 that you have?
17     A      If it was determined that he's
18 unresponsive, yes.
19     Q      Okay.  Well, you would agree that you
20 shouldn't do the security check scan until it's
21 been determined that they're responsive or not;
22 correct?
23     A      It should be in conjunction with.
24     Q      Okay.  And it shouldn't be done until
25 after you've determined whether they're responsive?

Page 198

1      A      For the most part, yes.
2      Q      So when you come back at 8:49:10, what
3 are you doing?
4      A      Checking for responsiveness, it looks
5 like.
6      Q      Did anyone tell you to go back at that
7 time?
8      A      I don't recall.
9      Q      Do you recall if Deputy White contacted
10 you regarding Mr. Wingo?
11     A      I know he -- I was working with him at
12 that time.  It's possible we had a conversation.
13     Q      Do you know if he told you to go back
14 and look at Mr. Wingo's cell?
15     A      I do not recall.
16     Q      Okay.  I'm just going to play it from
17 that point.
18            So at this point, you're banging on
19 Mr. Wingo's cell?
20     A      (No response.)
21     Q      Is that a yes?
22     A      Yes.
23     Q      And what are you looking for at this
24 time?
25     A      To see if he would move.

Page 199

1      Q      Okay.  Did you look to see if his chest
2 is rising and falling?
3      A      I was looking for that, yes.
4      Q      Were you able to see it at that time?
5      A      I don't know.  It looks like I'm
6 asking -- waiting for him to open to door, so I
7 would assume that I didn't see it.
8      Q      Okay.  And at this point, what are you
9 doing at 8:50?
10     A      Opening the door to see if I can get a
11 closer look at him.
12     Q      And when you opened the door, could you
13 see if he was responsive?
14     A      He didn't appear to be responsive.
15     Q      And why did you leave his cell if he
16 appeared to not be responsive at that time?
17     A      To get gloves.
18     Q      And what did you go get gloves for?
19     A      For my own safety as well as for his.
20     Q      And did you walk to go get those
21 gloves, or did you run to go get those gloves?
22     A      I assume I was walking.  I don't know.
23     Q      Were you concerned about Mr. Wingo's
24 welfare at that time?
25     A      No.

Page 200

1      Q      Were you concerned whether he was alive
2 at that time?
3      A      Yes, but I did not make the
4 determination that he was possibly not alive.
5      Q      I'm just going to play it from that
6 point.
7            So is that you approaching his cell
8 back there at 8:51:16?
9      A      Yes.
10     Q      And you were putting on the gloves?
11     A      Yes.
12     Q      Are you moving with haste at that
13 point?
14     A      No.
15     Q      Now, a moment ago you said you were not
16 concerned about Mr. Wingo's welfare when you left
17 his cell.  So when you left his cell, you saw that
18 he was unresponsive and not moving, but that didn't
19 give you any concern for his welfare?
20            MR. JACKSON:  Object to form.  You can
21 answer.
22     A      Well, obviously, it did somewhat.
23 That's why I went to go get gloves and go back to
24 his cell.
25 BY MR. GARDNER:

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

DOCKET 191-8

Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 1 of 42
Tiffany Wingo, et al, vs Major Branson Harris, et al,
USCA11 Case: 24-10633   Document 31-2   Date Filed: 06/11/2024   Page: 52 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

**Page 2**

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION

TIFFANY WINGO as
Administrator of the Estate
of KEVIL WINGO, SR., KIEARA
WINGO, as surviving child of      CIVIL ACTION FILE
KEVIL WINGO, SR., ERIKA           NO. 1:20-CV-03662-VMC
WINGO, surviving child of
KEVIL WINGO, SR., and TERI
FIELDS, ESQ., Conservator of
KEVIL WINGO, JR., surviving
minor child of KEVIL WINGO,
SR.,
        Plaintiffs,
v.
MAJOR BRANSON HARRIS,
individually, LIEUTENANT
CHARLES GORDON, individually,
DEPUTY PAUL WILKERSON,
individually, DEPUTY BRITTON
MCPHEE, individually, DEPUTY
LYNDA MARSHALL, individually,
JOHN DOES 1-10, and JANE
DOES 1-10.
        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~
                  DEPOSITION OF
      KENNETH J. VEGA, MD, MHA, FACP, AGAF, FACG
                  May 18, 2023
                   1:33 p.m.
               338 Telfair Street
                Augusta, Georgia
             Danny Newman, CVR, CCR
```

| | |
|---|---|
| 1 | APPEARANCES OF COUNSEL |
| 2 | On behalf of the Plaintiffs: |
| 3 | TIMOTHY J. GARDNER, Esquire |
| | Gardner Trial Attorneys, LLC |
| 4 | 3100 Cumberland Boulevard |
| | Suite 1470 |
| 5 | Atlanta, Georgia 30339 |
| | (770) 693-8202 |
| 6 | (404) 393-9838 (Fax) |
| | tjg@gardnertrialattorneys.com |
| 7 | |
| 8 | On behalf of the Defendants: |
| 9 | WESLEY C. JACKSON, Esquire |
| | Freeman Mathis & Gary, LLP |
| 10 | 100 Galleria Parkway |
| | Suite 1600 |
| 11 | Atlanta, Georgia 30339 |
| | (770) 818-0000 |
| 12 | (770) 937-9960 (Fax) |
| | wjackson@fmglaw.com |
| 13 | |
| 14 | |
| | - - - |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 3**

```
                INDEX TO EXAMINATION
3   WITNESS:  KENNETH J. VEGA, MD, MHA, FACP, AGAF, FACG
4
                                                 Page
5   Examination by Mr. Gardner:                    04
6
                      - - -
7
                INDEX TO EXHIBITS
8
    Plaintiffs' Exhibits    Description         Page
9
    Exhibit 1       Notice, Opinions, CV        11
10
    Exhibit 2       Invoice for Services        18
11
    Exhibit 3       Gastroduodenal Article      33
12
    Exhibit 4       Photograph                 107
13
    Exhibit 5       Photograph                 108
14
    Exhibit 6       Photograph                 109
15
    Exhibit 7       Photograph                 109
16
17  (Original Plaintiffs' Exhibits were attached to the original
    transcript.)
18
19
20
21
22
23
24
25
```

**Page 4**

| | |
|---|---|
| 1 | KENNETH J. VEGA, MD, MHA, FACP, AGAF, FACG, |
| 2 | having been first duly sworn, was examined and testified |
| 3 | as follows: |
| 4 | EXAMINATION |
| 5 | BY MR. GARDNER: |
| 6 | Q  And can you state your name for the |
| 7 | record. |
| 8 | A  Sure.  Kenneth J. Vega, MD -- |
| 9 | Q  Okay. |
| 10 | A  -- MHA. |
| 11 | Q  I'm sorry? |
| 12 | A  MHA.  I have a master's in health |
| 13 | administration. |
| 14 | Q  Oh, okay.  I saw that on your CV. |
| 15 | A  Uh-huh. |
| 16 | Q  And you just got that recently there, |
| 17 | in 2022; right? |
| 18 | A  Correct. |
| 19 | Q  Okay.  Just a moment ago, you just gave |
| 20 | me a couple of uh-huhs and huh-uhs. |
| 21 | A  Yes. |
| 22 | Q  I understood you perfectly fine, but |
| 23 | because everything we say is being taken down today, |
| 24 | it's very important that all of your answers to my |
| 25 | questions be out loud, meaning audible.  So if your |

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                    May 18, 2023

---

Page 5

```
 1   answer is yes, just say yes.  If it's no, say no.  I
 2   understand what you say when you nod your head and use
 3   gestures, and I also understand what you say when you
 4   say uh-huh or huh-uh.  But nonetheless if you do that, I
 5   may say is that a yes.  Not to be rude or offensive.
 6   It's just to make sure that your answers are on the
 7   record properly.  Okay?  Because we don't want any
 8   mistakes and it makes everything a lot easier.
 9              There's a transcript that's going to be
10   created at the end of this deposition, sometime in the
11   next ten days or so.  And you'll have an opportunity to
12   review that transcript, if you'd like, and see if there
13   are any basically grammatical-type errors in that
14   transcript; and if there are, you'll be able to correct
15   those.  Or you can waive that right.  And that's
16   something you and Mr. Jackson can decide.  And then
17   whatever the court reporter types, that's pretty much
18   going to be the record of this proceeding.  Okay?
19        A     Yes.
20              MR. GARDNER:  And I guess you guys will
21        decide at the end, or do you want to decide now?
22              MR. JACKSON:  We'll probably decide at
23        the end.
24              MR. GARDNER:  All right.
25   ///
```

---

Page 6

```
 1   BY MR. GARDNER:
 2        Q     That being the case, I'm going to -- I
 3   don't think this deposition is going to be horribly
 4   long.  I don't think you have a lot of opinions in this
 5   case.  From your report it looks like you essentially
 6   have one opinion.  Is that your understanding as well?
 7        A     Yes.
 8        Q     And so we'll kind of go through that.
 9              I'm going to talk little bit about your
10   background.  It's pretty impressive.  You lived in a lot
11   of different places, and you've done a lot of different
12   things, and you've written a lot of different articles.
13   You served this country many times.  And I sincerely
14   appreciate everything you've done and everything that
15   you continue to do.  But nonetheless we're going to talk
16   about that background some, and after that we'll kind of
17   get into the medical issues in this case and talk to you
18   about that.  Okay?
19        A     Yes.
20        Q     I'm going to ask you some questions.
21   You'll respond to those questions.  I ask that you wait
22   until I fully ask the question before you respond to the
23   question, and then I'll wait until you respond to the
24   question before I ask you another question.  Even if we
25   both know where each other is going, it makes it very
```

---

Page 7

```
 1   difficult for the court reporter to take us both down at
 2   the same time.  And so try not to, like, interrupt a
 3   question, and I'll try not to interrupt the answer.
 4   That way I can fully ask the question.  It's on the
 5   transcript with a fully asked question.  And then your
 6   answer is on the transcript with a fully -- with an
 7   answer that's fully responsive to the question.
 8              Fair enough?
 9        A     Yes.
10        Q     Let me see here.  I already told you
11   about breaks.  If you need to take one, just let us
12   know, anytime, any reason.  You don't even need to tell
13   us the reason.  If you need a break, just say, I need a
14   break, and we'll accommodate that.  Okay?  The only
15   thing I ask, if there's a question pending, that you
16   respond to that question before we take the break, and
17   then we'll come in and continue the deposition.
18              All right?
19        A     Yes.
20        Q     And I'll try to get you out of here as
21   soon as possible.  Let's see.  Is that my checklist?  I
22   think I covered everything.  If something else comes to
23   me, I'll let you know, but that's pretty much -- have
24   you ever had your deposition taken before?
25        A     Yes.
```

---

Page 8

```
 1        Q     How many times?
 2        A     Three or four.
 3        Q     Okay.  So you're somewhat familiar with
 4   this process?
 5        A     Done it three or four times.
 6        Q     Okay.  Have all of those been in your
 7   capacity as an expert witness?
 8        A     Correct.
 9        Q     Okay.
10        A     Well, actually, no.  Once as a defendant.
11        Q     Once as a defendant.  Okay.
12              And once as a defendant and then three or
13   four other times as an expert?
14        A     Correct.
15        Q     All right.  Where were those cased that
16   you were an expert?
17        A     One was in Arkansas, and I think the
18   other two were in Texas.
19        Q     Okay.
20        A     If there was a -- I don't remember a
21   fourth one outside of those two states.
22        Q     Okay.  I think I've seen the two in
23   Texas.  I'm not familiar with the one in Arkansas.  One
24   of yours in Texas involved a perforated -- some type of
25   perforation, I believe.  Do you remember that?
```

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

| | | Page 9 |
|---|---|---|
| 1 | A | Possibly it did, yes. |
| 2 | Q | Yeah, you just -- you don't remember? |
| 3 | A | It's a while ago. |
| 4 | Q | Okay. |
| 5 | A | So I don't know all the details of that. |
| 6 | Q | Do you recall ever testifying as an |
| 7 | expert in a case that involved any type of perforation? |
| 8 | A | No. I've never testified in court. |
| 9 | Q | What we're doing right now, you're |
| 10 | actually testifying. |
| 11 | A | I see. |
| 12 | Q | So this is testimony. It's a -- |
| 13 | A | Perforation, I guess if you're talking |
| 14 | about perforation, that it's colon perforation as well |
| 15 | as perforation during ERCP. |
| 16 | Q | Okay. Have you ever been retained as an |
| 17 | expert in a case involving a perforated ulcer? |
| 18 | A | No, I have not. |
| 19 | Q | Okay. So this is your first time? |
| 20 | A | Correct. |
| 21 | Q | All right. Did you ever get our |
| 22 | subpoena? |
| 23 | A | I don't know. |
| 24 | | MR. JACKSON: We coordinated that, with |
| 25 | the documents, with Candice. |

| | | Page 10 |
|---|---|---|
| 1 | | THE WITNESS: Yes. Probably -- I must |
| 2 | have. |
| 3 | BY MR. GARDNER: |
| 4 | Q | Okay. All right. We were trying to send |
| 5 | it to you at your home, but I think you -- you have dual |
| 6 | residences? |
| 7 | A | I have multiple homes. |
| 8 | Q | Okay. How many different states do you |
| 9 | have homes in? |
| 10 | A | Two. |
| 11 | Q | Is that Florida and Georgia? |
| 12 | A | Correct. |
| 13 | Q | And is your Florida address the address |
| 14 | that you have on your CV? |
| 15 | A | Correct. |
| 16 | Q | Okay. How about your Georgia address: |
| 17 | What's that? |
| 18 | A | 5015 Congressional Drive, Martinez, |
| 19 | Georgia 30907. |
| 20 | Q | How far is that from here? |
| 21 | A | Give or take, 10, 12 miles. |
| 22 | Q | Okay. Have you lived there since you've |
| 23 | been in Georgia? |
| 24 | A | No, I have not. |
| 25 | Q | Okay. How long have you lived there? |

| | | Page 11 |
|---|---|---|
| 1 | A | It will be five years in August of this |
| 2 | year. |
| 3 | Q | When did you come to Georgia? |
| 4 | A | April 2018. |
| 5 | Q | And where did you live before you came to |
| 6 | Georgia? |
| 7 | A | 209 Oceanwalk Drive South, Atlantic |
| 8 | Beach, Florida. |
| 9 | Q | Oh, it would be in Florida. Right. I |
| 10 | went through your CV. Just trying to explain things so |
| 11 | I don't have to re-ask you questions about your CV. |
| 12 | | Is your CV up to date? |
| 13 | A | Correct. |
| 14 | Q | Okay. Let's go ahead and take a look at |
| 15 | that. Do you got it right there? |
| 16 | A | Yeah. |
| 17 | Q | All right. I'm going to make that an |
| 18 | exhibit to the deposition. |
| 19 | | (Plaintiffs' Exhibit 1 was marked for |
| 20 | | identification.) |
| 21 | BY MR. GARDNER: |
| 22 | Q | Okay. I'm showing you what we marked as |
| 23 | Plaintiffs' Exhibit 1, and those are the defendants' |
| 24 | expert disclosure of yourself in this case. On, like, |
| 25 | page 5 is your CV. That CV that I've just shown you is |

| | | Page 12 |
|---|---|---|
| 1 | the most up-to-date one that you have? |
| 2 | A | Actually, no, because it's before I |
| 3 | graduated from the master's in health administration. |
| 4 | Q | Okay. |
| 5 | A | But I do have a new one that I can get |
| 6 | you. |
| 7 | Q | Other than the -- your graduation in |
| 8 | healthcare, your master's in administration -- |
| 9 | healthcare administration, is there anything else that |
| 10 | needs to be added to that CV? |
| 11 | A | Some publications, abstract submissions. |
| 12 | Q | How many of those have you done since |
| 13 | this CV? |
| 14 | A | Four. Soon to come and soon -- soon to |
| 15 | be added to that. But we have a big meeting coming up |
| 16 | at the end of -- a submission deadline at the beginning |
| 17 | of June. |
| 18 | Q | Okay. |
| 19 | A | So that's when I'll probably be updating |
| 20 | with another ten or so. |
| 21 | Q | Wow. Ten abstracts? |
| 22 | A | Correct. |
| 23 | Q | Okay. What's an abstract? |
| 24 | A | An abstract is a summary of research |
| 25 | that's done or a presentation of a case report that |

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                        May 18, 2023

Page 13

1  could be interesting for those that decide what gets
2  presented at national meetings.
3         Q      Very good.
4                And do any of those abstracts that are
5  not included on the CV involve perforated ulcers?
6         A      No.
7         Q      Okay.  And so none of those abstracts
8  that are not included in this CV also don't deal with
9  the surgical repair of a perforated ulcer?
10        A      That's correct.
11        Q      Okay.  Now, when I look at your CV, I see
12  you lived in New Jersey, New York, New Mexico, Florida,
13  Oklahoma, Colorado, and Georgia.
14        A      I worked in those locations.
15        Q      Okay.  You didn't live in those
16  locations?
17        A      Correct.
18        Q      All right.  Did you ever live in New
19  Jersey?
20        A      No.  Well, actually that's not true.  In
21  college.
22        Q      And how about New York:  Did you ever
23  live in New York?
24        A      Yes.
25        Q      Yeah.  Okay.  New Mexico?

Page 14

1         A      Yes.
2         Q      Okay.  We are into Florida.  Oklahoma?
3         A      Yes.
4         Q      Colorado?
5         A      Yes.
6         Q      And Georgia?
7         A      Correct.
8         Q      Very good.  All right.
9                How did you get involved in this case?
10        A      I was reached out to.
11        Q      Who reached out to you?
12        A      A physician expert.
13        Q      Okay.  Is that Dr. Nudelman?
14        A      Correct.
15        Q      All right.  He's in Georgia?
16        A      Correct.
17        Q      In Marietta?
18        A      Somewhere in the Atlanta area.
19        Q      Okay.  Is it Mitchell Nudelman?
20        A      Correct.
21        Q      How do you know Dr. Nudelman?
22        A      Again, he reached out to me, asking about
23  this case.  I did not know him before that.
24        Q      Okay.  So you never knew him before that?
25        A      That's correct.

Page 15

1         Q      You're not a part of any registry of
2  physicians that he contacts with --
3         A      No.
4         Q      -- respect to expert witness testifying?
5         A      No.
6         Q      Okay.  So he just found you out of the
7  blue?
8         A      Correct.
9         Q      All right.  I'll talk to you a little bit
10  more about him later on.  So when he contacted you, what
11  did he say?
12        A      Asking if I was interested in reviewing a
13  case.
14        Q      Fair enough.  And did he tell you what
15  the case was about?
16        A      In some small detail.  Regarding a person
17  that was incarcerated who died during his stay in the
18  service of the City, I would imagine, and it involved a
19  perforated ulcer.
20        Q      Okay.  And that was pretty much the
21  extent of your conversation?
22        A      That I recall.
23        Q      All right.  Did you talk to him any other
24  times?
25        A      Yes.

Page 16

1         Q      How many other times?
2         A      Three or four.
3         Q      All related to this case?
4         A      Yes.
5         Q      And when you talked to him on the other
6  three or four occasions, what did you-all talk about?
7         A      The case.
8         Q      Do you recall any of those conversations
9  specifically or when they were?
10        A      I couldn't give you dates and times for
11  them, no, right now.
12        Q      Okay.
13        A      We talked about what I -- what I need to
14  review, whether I had questions of -- had an ability to
15  see the documents that he provided to me.
16        Q      Fair enough.  And did he tell you what
17  you needed to review, or you told him what you needed to
18  review?
19        A      No.  He provided information for me to
20  review.  I asked for anything possible to review.
21        Q      And what type of information did he
22  provide you?
23        A      I believe I saw videos.  We reviewed an
24  autopsy report.  Medical records from the center that he
25  was at.

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

Page 17

1    Q    The things you've identified in your
2 report?
3    A    Correct.
4    Q    Okay.
5    A    Yes.
6    Q    That way you don't have to --
7    A    Yeah, absolutely.
8    Q    You were provided all the materials that
9 you've identified in your report?
10   A    That is correct.
11   Q    I think your report -- do you mind if I
12 touch this?
13   A    No.  Go ahead.
14   Q    It's three pages; correct?
15   A    Correct.
16   Q    It's part of Plaintiffs' Exhibit 1?
17   A    Yes.
18   Q    And under "records reviewed" in your
19 report, these are all the records that you reviewed?
20   A    That is correct.
21   Q    Anything in addition to this?
22   A    No.
23   Q    All right.  And you looked at all this
24 stuff?
25   A    Uh-huh.

Page 18

1    Q    Very good.
2         Did you have any telephone conversations
3 with Dr. Nudelman after you completed your review?
4    A    Just timing with regard to the
5 deposition.
6    Q    Okay.  But nothing in relation to your
7 review?
8    A    No.
9    Q    You didn't offer him any opinions or
10 anything like that?
11   A    Not -- not by phone.
12   Q    Just through the report?
13   A    Correct.
14   Q    Okay.  When did Dr. Nudelman first
15 contact you?
16   A    I don't have that date in front of me,
17 sir.
18   Q    Okay.  Roughly.
19   A    It was by email, so I don't have that
20 date in front of me.  I can't answer that question.
21        (Plaintiffs' Exhibit 2 was marked for
22        identification.)
23 BY MR. GARDNER:
24   Q    Okay.  I'm going to show you what we've
25 marked as Plaintiffs' Exhibit 2.  Those are documents

Page 19

1 that were provided to us in response to the subpoena
2 that we sent you asking for all of your invoices in
3 relation to this case.
4    A    Okay.
5    Q    When you spoke with Dr. Nudelman, did you
6 charge for your time?
7    A    Yes.
8    Q    Okay.  And so when I look at these
9 documents, I see a retainer fee for file review on
10 4/12/2022.
11   A    Correct.
12   Q    Would that be the first time that you
13 were contacted regarding this case?
14   A    Probably sometime before that, but just a
15 few days before that.
16   Q    Around that time?
17   A    Yes.
18   Q    Okay.  How long after you were retained
19 in -- let me -- strike that.  So you were retained in
20 April of 2022?
21   A    I would imagine either the beginning of
22 April or the end of March sometime.
23   Q    Okay.  How long after you were retained
24 did you actually get the documents to review?
25   A    I don't know that date off the top of my

Page 20

1 head, sir.
2    Q    Okay.  When I look at the next page of
3 your invoice -- 9/2/2022?
4    A    Yes.
5    Q    -- it looks as though you reviewed
6 audio/visual recordings, 21 total items.  Yes?
7    A    Yes.  I'm sorry.
8    Q    No, you're doing great.  And that was in
9 July through August of 2022?
10   A    That's correct.
11   Q    Okay.  And then you had a phone call with
12 defense counsel in August of 2022?
13   A    That's correct.
14   Q    And that invoice is for ten and a half
15 hours?
16   A    Correct.
17   Q    And so you had all the materials before
18 you reviewed them, naturally?
19   A    Correct.
20   Q    Okay.
21   A    I just don't know when I got them.  I
22 can't give you a date.
23   Q    Okay.  But you know you reviewed them at
24 the time and --
25   A    Yes.

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

Page 21

1      Q      -- identified this invoice?
2      A      Yes.  That's correct.
3             MR. JACKSON:  Just remember to let him
4      finish his question before you answer.  Even
5      though you know what he's going to say, just let
6      him finish it up.
7             THE WITNESS:  Sorry.
8             MR. JACKSON:  That's okay.
9  BY MR. GARDNER:
10     Q      Now, your report, is that your first
11     draft of your report?
12     A      Yes.
13     Q      Okay.  And so there weren't any revisions
14     or anything made to it?
15     A      No.
16     Q      Okay.  All right.  Do you know when you
17     were asked to draft a report?
18     A      I would imagine sometime in March of '23.
19     Q      Because on the next page, I've got
20     the invoice from 5/16/23, and it says that you prepared
21     and revised a report, April 8th to April 20th, 2023.
22     Right?
23     A      Right.
24     Q      So you would have been asked in March to
25     do it, and then you prepared it in --

Page 22

1      A      Correct.
2      Q      -- April?
3      A      Correct.
4      Q      Okay.  I'm going to go ahead -- let's
5      take a look at your CV real quick.  It's quite
6      extensive; that's for sure.  How do you keep track of
7      all this?
8      A      You update it in real time.
9      Q      Yeah.  So every time you do something,
10     you go in your computer and you put it in there?  I
11     should do that on my parenting, so when my kids tell me
12     I do nothing, I can show them what I've been doing.
13     Like missing my six-year-old's graduation today.
14     A      Oh, no.
15     Q      No, that's fine.  He says he'll tell me
16     all about it.
17            So let's take a look at your CV here.
18     A      Oh, I know what's in there.
19     Q      You know what's in there?  All right.
20     Very good.  You've probably looked at it a hundred
21     times.  All right.  I'm going to skip the -- it's a
22     bunch of education.  I understand all that.  The
23     research that you did, does any of that research involve
24     perforated ulcers?
25     A      No, it does not.

Page 23

1      Q      Okay.  Or the treatment or management of
2      perforated ulcers?
3      A      Research, no.
4      Q      Okay.  Teaching appointments.  You taught
5      all over the place.
6      A      That's true.
7      Q      What's the reason for that?  Why do you
8      teach at so many different places?
9      A      Opportunity.
10     Q      Okay.
11     A      When you get a chance to progress your
12     career, you move from place to place for that reason.
13     Q      For that -- okay.  So in a couple of
14     years, you could be in Kansas, for all we know.
15     A      Not if I can help it; but if the
16     Godfather gives me an offer that I can't refuse, I'll
17     take it.
18     Q      Okay.  But as of right now, it's your
19     intention to kind of stay where you are now?
20     A      Correct.
21     Q      And that's the Medical College of
22     Georgia?
23     A      Correct.
24     Q      And you've been there since 2018?
25     A      April.

Page 24

1      Q      April of 2018?
2      A      Correct.
3      Q      Right.  And these teaching appointments,
4      do any of these involve teaching perforated ulcers?
5      A      Yes.  All of them.
6      Q      All of them?  Okay.  And when you say you
7      teach about perforated ulcers, who do you teach?
8      A      Gastroenterology fellows, medical
9      residents.
10     Q      All right.
11     A      Medical students.
12     Q      And what do you teach them?  Like not all
13     of it, but generally, like, what do you teach them
14     about?
15     A      We teach them how to recognize somebody
16     that could be presenting with signs of a perforated
17     ulcer.
18     Q      Okay.
19     A      Or a gastric ulcer that has the
20     opportunity to perforate.  And how you manage that,
21     either endoscopically or medically.
22     Q      Okay.  Medically meaning pharmaceuticals?
23     A      Medications.
24     Q      Medications.  And endoscopically is when
25     you --

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 7 of 42
USCA11 Case: 24-10853   Document: 31-2   Date Filed: 06/11/2024   Page: 58 of 214
Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

Page 25

1   A      Put a scope in.
2   Q      -- put something in the esophagus and you
3   look around?
4   A      Not their esophagus; inside their
5   stomach.
6   Q      Stomach.
7   A      We're talking about gastric ulcers, so
8   we're talking about the stomach.
9   Q      Yeah.  That sounds painful.
10  A      (Witness shakes his head.)
11  Q      No?
12  A      Not at all.
13  Q      Are they under an anesthesia for that?
14  A      Most of the time, yes.
15  Q      Oh, okay.
16  A      I've had the procedure done unsedated,
17  though.
18  Q      Okay.  And -- wow.  You yourself?
19  A      Correct.
20  Q      Just to see what it feels like?
21  A      No.  Because I had a problem.
22  Q      Oh, okay.  Did you teach them about how
23  to repair a perforated ulcer?
24  A      I'm not a surgeon, so, no, I did not tell
25  them how to repair it.

Page 26

1   Q      Okay.  Would that be outside the scope of
2   your knowledge?
3   A      Yes.
4   Q      With respect to how to repair a
5   perforated ulcer?
6   A      Yes.
7   Q      So once an ulcer perforates, that's
8   somewhat out of your purview?
9   A      Correct.
10  Q      That's when a general surgeon steps in?
11  A      General surgeon, an upper GI intestinal
12  surgeon.  So a foregut surgeon would be able to do that
13  as well.
14         THE COURT REPORTER:  A what kind of
15  surgeon?
16         THE WITNESS:  Foregut, f-o-r-e-g-u-t.
17  BY MR. GARDNER:
18  Q      Okay.  We're not going to understand all
19  the terminology.  Sometimes we may ask you again.  Just
20  like if we started talking legalese, you might get lost
21  too.  You know what I'm saying.  It's the same deal.
22         So it's fair to say you've never repaired
23  a perforated ulcer?
24  A      No, I have not.
25  Q      Do you know how to repair a perforated

Page 27

1   ulcer?
2   A      No, I do not.
3   Q      All right.  Have you ever seen a
4   perforated ulcer repaired?
5   A      Yes; as a medical student.
6   Q      Okay.  Outside of medical school?
7   A      No.
8   Q      Okay.  So you've never managed a patient
9   that just had a perforated ulcer repaired?
10  A      I'm trying to understand what you're
11  getting at.
12  Q      All right.  Let me try to ask it better.
13  Because you probably have after the fact.  I'm sure
14  you've seen patients who have had perforated ulcers
15  repaired by a surgeon, have you not?
16  A      Yes.
17  Q      But you've never been involved in post-
18  surgically -- like at the hospital with them right after
19  they've had a perforated ulcer?
20  A      Yes.
21  Q      You have?  Okay.  And what was your role
22  in those experiences?
23  A      As a consulting gastroenterologist.
24  Q      Okay.  And how would that work?  How
25  would you --

Page 28

1   A      Well, we provide the surgeons advice on
2   medication management to try to make sure that their
3   repair goes well.
4   Q      Okay.
5   A      We also see the patients prior.  If they
6   come to the ER with abdominal pain and we think they
7   have, based on exam and other findings, a perforated
8   ulcer, a chance for a perforated ulcer, then we would
9   have them contact the surgeon.  So we'd be involved in
10  the care prior to, not during the operation itself, but
11  then in the postoperative care.
12  Q      Okay.  So if someone came to the ER and
13  the emergency room physician suspected that they had a
14  perforated ulcer, would they contact you first, or would
15  they call the general surgeon?
16  A      It depends on what the patient's exam
17  shows.
18  Q      Okay.  So if the exam showed something
19  pretty severe, would they immediately just contact the
20  general surgeon?
21  A      Yes.
22  Q      Okay.  All right.  Did you volunteer for
23  all of your tours of duty in --
24  A      No.  Uncle Sam called.
25  Q      Oh, did he?  Okay.  Because you were in

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

Page 29

```
1    the Reserves --
2        A      Correct.
3        Q      -- for a long time, though.
4        A      24 years.
5        Q      24 years.  You volunteered for the
6    Reserves; right?
7        A      Yes.
8        Q      And then re -- did you have to reenlist
9    for the --
10       A      Yes.
11       Q      -- Reserves?
12              And so as you were enlisted, then they
13   would contact you and say, We need you over in Iraq?
14       A      Well, actually what we would do is show
15   up for our monthly duty and our summer duty as well as a
16   Reservist.  And then when -- with Operation Iraqi
17   Freedom, when they needed Reserve personnel, medical
18   personnel, to help take care of people in that
19   environment, that's when they'd call us for -- rotation
20   is called "boots on the ground," 90 days in theater,
21   essentially 120 days away from home.
22       Q      Wow.  Okay.  So you did three tours of
23   that?
24       A      Correct.
25       Q      Three 120-day tours?
```

Page 30

```
1        A      Correct.
2        Q      Let's go to your research, original
3    research articles in referred journals.  Do any of these
4    articles deal with perforated ulcers?
5        A      I don't believe so.
6        Q      Okay.  You're pretty familiar with
7    everything that's in there?
8        A      Uh-huh.
9        Q      Save you some time.
10       A      There might be one -- there might be a
11   case or two, but I don't believe so.
12       Q      Okay.  None of them deal with the repair
13   of a perforated ulcer?
14       A      Yes.  That's correct.
15       Q      Or the mortality rates associated with
16   perforated ulcers?
17       A      Yes.  That's correct.
18       Q      None of them deal with that?
19       A      None of them that, yes.
20       Q      You've written a lot over the years.
21       A      Not as many some of my colleagues.
22       Q      Oh, really?  Wow.
23       A      But more than most.  I think that's fair
24   to say.
25       Q      And then chapter and books.  That looks
```

Page 31

```
1    like -- just one chapter?
2        A      Correct.
3        Q      Okay.  Does that chapter deal with
4    perforated ulcers or the repair of perforated ulcers?
5        A      No, it does not.
6        Q      And then published scientific reviews and
7    editorials, a few of those.  Same question:  Do any of
8    those involve perforated ulcers --
9        A      No.
10       Q      -- or the repair of perforated ulcers?
11       A      No, they do not.
12       Q      How about in the peer-reviewed
13   educational publication?  Does that deal with perforated
14   ulcers?
15       A      No.
16       Q      How about the abstracts?  How long does
17   it take to write an abstract?
18       A      I'm doing it now.  Usually -- depending
19   on what the project is, it could be very easy because
20   you do a lot of it beforehand, and then I add the data
21   to it afterwards.  So it varies.  I can't give you an
22   exact expressed number or a simple-rule number to that
23   question.
24       Q      Because you have to do all the research
25   first?
```

Page 32

```
1        A      Correct.
2        Q      It's almost like for us writing a brief
3    probably.
4        A      I would suspect so.
5        Q      We do the research, and then we write
6    what the law is and our interpretation of the law.
7        A      Well, we don't -- we don't get a chance
8    to interpret the data.  The data is the data.
9        Q      Okay.  So you write about the data --
10       A      Correct.
11       Q      -- and your opinions about the data?
12       A      We write what the data shows and the
13   indications of that data going forward.
14       Q      Okay.  So that's essentially what an
15   abstract is?
16       A      Uh-huh.
17       Q      Okay.  Any of these abstracts deal with
18   perforated ulcers?
19       A      I do not believe so.
20       Q      Okay.  Or the repair of a perforated
21   ulcer?
22       A      No.
23       Q      Now, you did produce an article to us
24   that I've read, and I'll mark this as Plaintiffs'
25   Exhibit 3.
```

Elizabeth Gallo
COURT REPORTING, LLC

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

Page 33

```
1              (Plaintiffs' Exhibit 3 was marked for
2        identification.)
3   BY MR. GARDNER:
4        Q        Why did you produce that article to us?
5        A        Because I think it's pertinent to the
6   case.
7        Q        Okay.  Had you already read that article
8   before you got involved in this case?
9        A        No.  I got it afterwards.
10       Q        Okay.  You went to go find it?
11       A        Uh-huh.
12       Q        Yes?
13       A        Yes.  I'm sorry.
14       Q        No, you're doing great.  And this article
15  was from the Scandinavian Journal of Surgery?
16       A        Yes.
17                Is that something that you refer to from
18  time to time?
19       A        Yes.
20                Would you consider it to be
21  authoritative?
22       A        Yes.
23                And this is something that
24  gastroenterologists in general will go and look at from
25  time to time to have a better understanding as to
```

Page 34

```
1   gastroenterology?
2        A        Well, a better understanding of
3   management of the subject mentioned.
4        Q        Okay.  Management of gastrointestinal
5   issues?
6        A        Gastroduodenal perforations, as it says
7   in the document.
8        Q        Right.  But, I mean, the journal in
9   itself, the Scandinavian Journal of Surgery, that would
10  be a journal that you all would refer to from time to
11  time?
12       A        Yes.
13       Q        All right.  And is it widely accepted as
14  authoritative within your community?
15       A        It's peer reviewed, yes.
16       Q        Yeah.  Okay.  So you said you went to go
17  find that article.  Why did you go and find that
18  article?
19       A        In order to make sure I had the most
20  up-to-date knowledge when reviewing the information on
21  the case.
22       Q        Okay.  And when you say the most
23  up-to-date knowledge, what type of -- what type of
24  knowledge did you need to update yourself on?
25       A        Surgical management.
```

Page 35

```
1        Q        All right.  When was the last time you
2   looked at the surgical management of a perforated ulcer
3   before you got retained in this case?
4        A        I'd say probably a year or two ago at one
5   of our national meetings.
6        Q        All right.  And was that just a topic
7   that was discussed at one of the national meetings?
8        A        Correct.
9        Q        Is that a topic that's periodically
10  discussed at national meetings?
11       A        Yes.
12       Q        Okay.  So outside of your national
13  meetings and pulling this article in relation to this
14  case, is reviewing the surgical management of a
15  perforated ulcer part of your everyday practice?
16       A        It can be.
17       Q        Okay.  How so?
18       A        Informing our patients on their options.
19       Q        Okay.  And when you say their options, do
20  you mean with respect to the management of an ulcer?
21       A        The management of an ulcer, yes.
22       Q        Okay.  And how to, I guess, treat that
23  ulcer?
24       A        Well, how to recognize signs.  For
25  example, if you see someone in the hospital, if they
```

Page 36

```
1   have an ulcer and you're worried about it perforating,
2   because there's endoscopic findings that suggest that,
3   you want them to be aware of what alarm features to
4   notice about and when to come back to us so that we can
5   manage that appropriately.
6        Q        Okay.  Do you tell them if you feel like
7   a -- let's see -- sudden pain in your stomach that's
8   extremely painful, to go straight to the hospital?
9        A        Something like that.
10       Q        Okay.  And you tell them if you have that
11  feeling, that that could be a perforated -- your ulcer
12  could have perforated?
13       A        Possibly.
14       Q        All right.  That's one of the signs of a
15  perforated ulcer, isn't it?
16       A        Abdominal pain.
17       Q        Sudden abdominal pain?
18       A        Uh-huh.
19       Q        Yes?
20       A        Yes.
21       Q        All right.
22       A        I'm sorry.
23       Q        You're doing great.
24                Let me ask you this:  Everything in your
25  CV is true and accurate; right?
```

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                    May 18, 2023

Page 37

1    A      Absolutely.
2    Q      Okay.  Is there anything in your CV
3  that's not correct?
4    A      No.
5    Q      Okay.  Now, I'm now at the current grant
6  and contract funding.  What is that exactly?
7    A      That's current research that I'm doing
8  either based on industry-sponsored work; it could be
9  federally funded research, investigating or initiating
10  protocols.  That's what that is.
11    Q      That's outstanding.
12           How long have you been doing that?
13    A      1998 was the first time.
14    Q      Okay.  So since 1998 you've been doing
15  funded research, I guess --
16    A      Of some sort, yes.
17    Q      Of some sort.  That's one way to say it.
18  Does any of this research involve perforated ulcers?
19    A      No, it does not.
20    Q      Okay.  Has any of your grant research
21  ever involved perforated ulcers?
22    A      No.
23    Q      Okay.  How about your lectures?  Any of
24  those involve perforated ulcers or the management of a
25  perforated ulcer?

Page 38

1    A      No.
2    Q      A moment ago you had told me that at
3  times you would go and -- or I guess as part of your
4  day-to-day practice, you would look into the surgical
5  options for a perforated ulcer?
6    A      What you do is, you look -- for your
7  patients, you will actually look at and discuss all
8  options with them.  You want to have them have an
9  educated conversation when you refer somebody to a
10  surgeon for that.  And it'll inform that on some basis,
11  not as much as the surgeon with -- with -- because of
12  your lack of knowledge, but you'll give them some
13  assessment that, Hey, you may need an operation; this is
14  what you want to look out for.
15    Q      Okay.  So patients usually come to you
16  when they have some type of ulcer?
17    A      Not necessarily, but they could.
18    Q      Okay.  They come to you for some type of
19  gastrointestinal issue and sometimes suspect that they
20  may have an ulcer?
21    A      That's correct.
22    Q      And then they come to you for the
23  management of that ulcer?
24    A      They come to me for the management of
25  their issue.  Sometimes it's for management of ulcers

Page 39

1  that they have.  Sometimes it's for management of ulcers
2  after they've had an episode of bleeding, for instance.
3    Q      Okay.  But it's my understanding that
4  ulcers develop from some type of bacteria within your
5  gastrointestinal body?
6    A      Correct.
7    Q      And so how do you confirm whether someone
8  has an ulcer or not?
9    A      You do endoscopy.
10    Q      All right.  Is that the golden rule, the
11  gold standard, is to do --
12    A      Yes.  Now it is.
13    Q      Endoscopic?
14    A      Endoscopy.
15    Q      Endoscopy.  To determine whether someone
16  has a perforated ulcer?
17    A      Correct.
18    Q      All right.
19    A      No, no --
20    Q      No, not perforated.  Sorry.
21    A      I'm not scoping somebody that has a
22  perforated ulcer.
23    Q      Endoscopic.
24    A      Endoscopy --
25    Q      Endoscopy could cause a perforation

Page 40

1  potentially?
2    A      No.  It'll worsen one.
3    Q      It will worsen one.  Okay.
4           Is that a risk, though, that an endoscopy
5  could cause a perforation as well?
6    A      There is a risk.  It's fairly low.  It's
7  about once every 2500 procedures.
8    Q      Oh, okay.  So it's pretty safe?
9    A      Yes.
10    Q      How long does it last?  How long does it
11  take?
12    A      It depends on the operator driving the
13  endoscope, but a normal endoscopy can last four minutes
14  from when you start till when you finish.
15    Q      Okay.  Not too bad.
16    A      And depending on what you find, it can be
17  obviously longer.
18    Q      Okay.  So once you've confirmed that
19  someone has an ulcer, what would you explain to them?
20    A      So you have an ulcer.  You would actually
21  take biopsies to look for the infection that we
22  mentioned earlier, see if the infection is there.  If
23  the infection is there, you could treat that, and then
24  you give acid-blocking medication to allow for healing
25  of the ulcers.  For people of our age -- over 50, I'm

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                     May 18, 2023

---

Page 41

1  going to assume -- you would then -- we do the endoscopy
2  in about six to eight weeks to make sure that the ulcer
3  has at least healed greater than 50 percent.
4        Q       Okay.
5        A       Because then if it hasn't, you have to be
6  worried about could that ulcer be a malignancy.
7        Q       Okay.  And so if someone is already
8  perforated, you wouldn't do an endoscopy?
9        A       That's correct.
10       Q       How would you know if they already
11 perforated it?
12       A       Physical exam and imaging.
13       Q       Okay.  So you would do like CT scans?
14       A       Uh-huh.  Yes.
15       Q       And x-rays?
16       A       Yes.  Well, a CT scan would be better.
17 And x-ray could be done initially.  And then you would
18 see free air, because that would be air in the abdominal
19 cavity below the diaphragm that you'd see, and then
20 you'd do a CAT scan to sort of hone in on the area
21 involved.
22       Q       Okay.  And that helps you decide how you
23 manage the perforation?
24       A       It would help any physician --
25       Q       Okay.

---

Page 42

1        A       -- that would see that circumstance
2  decide who to call going forward.
3        Q       So if you see that someone has a
4  perforated ulcer, what's the next step?
5        A       If you know that they have a perforation,
6  call the surgeon.
7        Q       Okay.
8        A       They need an operation.
9        Q       So once you see that they have a
10 perforation, then you have to get another specialist
11 involved?
12       A       That's correct.
13       Q       And so then you contact a surgeon?
14       A       Correct.
15       Q       Why do you have to contact a surgeon at
16 that point?
17       A       To close the hole.
18       Q       Okay.  What do you tell the patient
19 that -- after you discover the perforation?  Like what
20 would be -- how would you explain that to them?
21       A       Say, There's a -- there's a hole in your
22 stomach, perforation in your stomach, that needs to be
23 closed and needs to be closed urgently; you're going to
24 be seeing a surgeon.  Most of the time I will tell the
25 patient, I've actually called the surgeon and made them

---

Page 43

1  aware of your circumstances; do not be surprised if you
2  see them very quickly.  And then they'll decide when and
3  if -- more like when -- they've got to take you to the
4  OR to try to close that hole.
5        Q       Would that be like the same day?  Would
6  the surgeon have to see them that day?  Is it that
7  emergent or --
8        A       Oh, that -- yes.
9        Q       Okay.
10       A       Yes.
11       Q       So they have to get there as soon as
12 possible?
13       A       As quickly as possible, yes.
14       Q       Okay.  Has anyone ever come to you for
15 treatment and they've already had a perforated ulcer?
16       A       Yes.
17       Q       Okay.  And when they've come to you and
18 they've already had a perforated ulcer, you've
19 immediately gotten a surgeon involved?
20       A       Yes.
21       Q       Okay.  Have you ever attempted to repair
22 or treat a perforated ulcer yourself?
23       A       No.  I'm not a surgeon.
24       Q       Okay.  Are there -- I'm just curious.
25 Are there medications that can be used to manage

---

Page 44

1  perforated ulcers?
2        A       No.
3        Q       Okay.
4        A       You got to close the hole.
5        Q       All right.  So the article that you
6  provided me, that doesn't deal with how to medically --
7  or how to manage a perforated ulcer with medication?
8        A       No.  You can't manage a perforated ulcer
9  with medication.
10       Q       Okay.
11       A       You can use it as an adjunct, but you do
12 not -- that's not the primary therapy that you would use
13 for a perforated gastric ulcer.  It would be surgery.
14 And you use medication to reduce stomach-acid production
15 to allow for things to heal after the operation.  That's
16 where the medical part comes in.
17       Q       So if someone has a perforated ulcer,
18 they have to have surgery?
19       A       Yes.
20       Q       Okay.  There's just no way around it.
21 Is that -- is that --
22       A       Yes.
23       Q       -- true?  Okay.
24       A       Yes.
25       Q       And it's my understanding -- I'm not a

---

Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 12 of 42

Tiffany Wingo, et al. vs Major Branson Harris, et al.
USCA11 Case: 24-10633   Document: 21-2   Date Filed: 06/11/2024   Page: 63 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                              May 18, 2023

Page 45

```
1   doctor or even good in science.  But there's two ways to
2   do that type of surgery.  It's either open surgery or
3   laparoscopic surgery.  Do you know?
4        A       I'm not a surgeon, but those would be the
5   two modalities I would think they'd use.
6        Q       All right.  Those are the two that you've
7   heard of before?
8        A       Correct.
9        Q       But you don't know how to do either one?
10       A       No, I do not.
11       Q       All right.  You've never been involved in
12   either one?
13       A       No, I have not.
14       Q       Okay.  And so we're here today regarding
15   a situation that involved a Kevil Wingo.  He had a
16   perforated ulcer.  And his perforated -- or he -- I
17   should say he passed away in September 2019.
18               How does your testimony assist us in
19   understanding what happened to him?
20       A       I'm not sure I understand your question.
21       Q       Okay.  I guess I'm -- you're a
22   gastroenterologist.  Mr. Wingo had a perforated ulcer
23   that was ultimately repaired -- not repaired -- by a --
24   by a surgeon.  And I'm just trying to understand, as a
25   gastroenterologist, what information do you have that
```

Page 46

```
1   could assist a trier of fact of understanding more about
2   his condition?
3        A       I still don't understand what you're
4   trying to get at.
5        Q       Okay.  Well, maybe it's best if I just
6   look at your opinions.  Do you want to just -- do you
7   want to do that?
8        A       Sure.
9        Q       What are your opinions in this case?
10       A       He had -- he had abdominal pain.  It
11   seemed to me like the nursing staff -- or this medical
12   staff at the facility he was at did not take his
13   complaints seriously and assumed another set of
14   circumstances, which led them to ignore and not perform
15   physical exams or other things that you would do that
16   would potentially give you a hint that he would have --
17   that he was having some abdominal distress related to an
18   ulceration.
19       Q       When I look at your opinion, it says:
20   Mr. Wingo had developed complications from his
21   perforated ulcers that included peritonitis and an
22   evolving sepsis, that led to septic shock and ultimately
23   his death.
24       A       Correct.
25       Q       That's one of your opinions?
```

Page 47

```
1        A       Yes.
2        Q       Your second opinion is:  Given the
3   multitude of factors, many of which are unknowable, that
4   contribute to the timing of when a similarly situated
5   patient might die, the likelihood of his survival at any
6   particular point is not able to be determined.  The
7   absence of vital signs in the time period prior to his
8   death makes any such prediction particularly unreliable,
9   as there is no objective medical evidence of when he
10   began to decline.  That's your second opinion?
11       A       That's correct.
12       Q       And then your third opinion:  For
13   example, even if an ambulance was called at about
14   7:45 a.m., the chance that he would have survived septic
15   shock is very low.  There is no way to reasonably
16   predict, under those circumstances, if he would have
17   survived.
18       A       That's correct.
19       Q       Are those all of your opinions in this
20   case?
21       A       Yes.
22       Q       Are there any opinions outside of the
23   three I just referenced?
24       A       No.
25       Q       All right.  Let's talk about your first
```

Page 48

```
1   opinion, then.  So you're saying that he developed
2   complications from a perforated gastric ulcer that
3   included peritonitis and had an evolving sepsis that led
4   to septic shock and ultimately his death.
5               How do you know that he had sepsis?
6        A       You knew that from the autopsy report.
7        Q       Okay.  What does sepsis mean?
8        A       A systemic infection.
9        Q       How do you identify a systemic infection?
10       A       You can identify it in multiple ways.  In
11   Mr. Wingo's case, he had evidence of sepsis on his
12   autopsy, with the contents of the -- of his peritoneal
13   cavity when it was inspected.  If you were to do blood
14   tests, you could also see an elevated white blood count.
15   That was not available in this circumstance.
16       Q       So the two ways to identify sepsis is
17   either through autopsy, kind of after the fact, or
18   through blood tests?
19       A       Blood tests as well as vital signs.
20   People with sepsis generally will have a lower blood
21   pressure, high heart rate, things of that sort.  Without
22   those information -- without that information, you
23   wouldn't know how severe or when he moved into that
24   state.
25       Q       Okay.  What is peritonitis?
```

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG

May 18, 2023

Page 49

1      A      Inflammation of the abdominal cavity, the
2  supporting structures of the abdominal organs.
3      Q      Now, you read Dr. Myers' report?
4      A      Yes.
5      Q      All right.  You know he's a general
6  surgeon?
7      A      Yes.
8      Q      He pretty much has the same opinion you
9  do with respect to the first opinion, I think.  Correct?
10     A      I think so.
11     Q      Yeah.  Are you critical of anything in
12 his report?
13     A      No.
14     Q      Okay.
15     MR. JACKSON:  Let me -- can I clarify.
16     Do you understand the difference between
17     his report and his deposition testimony?
18     THE WITNESS:  Yes.
19     MR. JACKSON:  Okay.
20 BY MR. GARDNER:
21     Q      Are you critical of anything in his
22 report?
23     A      Not that I can -- not that I can
24 remember.
25     Q      Okay.  Are you critical of anything in

Page 50

1  his deposition testimony?
2      A      Not that I can remember.
3      Q      Okay.  Your second opinion was:  Given
4  the multitude of factors, which are unknowable, that
5  contribute to the timing of when a similarly situated
6  patient might die, the likelihood of his survival at any
7  particular point is not able to be determined.
8      What does that mean?
9      A      That means without knowing when his vital
10 signs changed, when his abdominal exam changed, when you
11 drew -- if you happened to draw a blood test, when his
12 white count began to go up, you couldn't tell.
13     Q      Okay.  You can't tell what?
14     A      You can't tell how he's going to do.
15     Q      Okay.  So he might have survived?
16     A      I can't say that.
17     Q      Well, you don't -- you can't say that he
18 was going to die either; right?
19     A      It's unknowable.
20     Q      So the adverse of that is, he might have
21 survived; right?
22     A      If you knew that information, possibly.
23     Q      Right.  If you knew what information?
24     A      The information I just mentioned.
25     Q      Like what?

Page 51

1      A      Exam, white count, and vital signs.
2      Q      Okay.  And so then you would be able to
3  tell the likelihood of survivability?
4      A      You'd have a better idea of where he was
5  at and what interventions could be done and how fast to
6  try to remedy the situation.
7      Q      Okay.  What is the mortality rate for
8  someone that has a perforated ulcer repaired?
9      A      Depends on when you see them.
10     Q      Okay.  So generally what is the mortality
11 rate?
12     A      I believe it's -- it's in -- it's in this
13 article, and I believe it's somewhere in the realm of
14 5 to 10 percent, but treated appropriately.
15     Q      Okay.  So normally someone with a
16 perforated ulcer has a 5 to 10 percent mortality rate if
17 treated?
18     A      Well, it depends on also what other
19 illnesses they have.  So, for example, someone who is
20 healthy who maybe only has high blood pressure would
21 be -- would have a higher -- would have a lower rate of
22 mortality.  Someone who has got cardiac disease, lung
23 disease, poorly controlled diabetes, that rate would be
24 higher.
25     Q      Would that be like comorbidities?

Page 52

1      A      Correct.  Yes.
2      Q      Okay.  Are you aware of any comorbidities
3  that Mr. Wingo had?
4      A      Other than drug use, no.
5      Q      The suspected drug use?
6      A      Yes.
7      Q      Okay.  And what would be the mortality
8  rate for someone like Mr. Wingo?
9      A      I would expect it to be fairly low.
10     Q      Okay.  Like what?
11     A      On the lower end of the number I gave
12 you, 5 percent, if found in the right time, in the right
13 setting, with the right intervention.
14     Q      Okay.  With intervention it was a 5 to
15 10 percent mortality rate?
16     A      Correct.
17     Q      All right.  Now, your last opinion is:
18 Even if an ambulance was called at or about 745 a.m.,
19 the chance that he would have survived septic shock is
20 very low.  That's your opinion; right?
21     A      Yes.
22     Q      Do you know if he was in septic shock at
23 7:45 a.m.?
24     A      Based on his autopsy, yes.
25     Q      Okay.  How do you know that based on his

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG

May 18, 2023

Page 53

1  autopsy?
2       A       Again, peritonitis and what they -- what
3  they report on the autopsy.
4       Q       You could have peritonitis and not be in
5  septic shock, though; correct?
6       A       It's fairly rare.  You're on the way to
7  that if you have it.  With what data described in the
8  autopsy report, I would expect them to be in septic
9  shock.
10      Q       Right.  But you don't know if he was in
11 septic shock at 7:45?
12      A       Do I know absolutely?  No.
13      Q       No one knows.
14      A       No one knows.  Nothing is certain.
15      Q       No one knows if he was in septic shock
16 at 7:45?
17      A       I think -- I think I have an educated --
18 I won't say -- I won't say educated guess, but
19 clinical -- clinical acumen, I think, would suggest that
20 based on the autopsy findings and his behavior before --
21 before his passing unfortunately, that he was in septic
22 shock.
23      Q       But you can't say to a reasonable degree
24 of medical certainty that he was in septic shock at
25 7:45 a.m.?

Page 54

1       A       That's correct.
2       Q       And, again, because you can't say to a
3  reasonable degree of medical certainty that he was in
4  septic shock, there is no way to reasonably predict if
5  he would have survived at that point?
6       A       Based on his autopsy, I believe he was in
7  septic shock.
8       Q       Right.  But -- like I said, but to a
9  reasonable degree of medical certainty, you can't say
10 that?
11      A       I would feel comfortable saying that
12 actually.
13      Q       You're actually comfortable -- not -- not
14 comfortable.  Can you say -- without examining him,
15 having his vitals checked, any blood test, looking at
16 him, seeing him, touching him, feeling him, talking to
17 him, can you say to a reasonable degree of medical
18 certainty at 7:45 a.m. he was in septic shock?
19      A       Based on his autopsy report.
20      Q       Okay.  What about his autopsy report
21 allows for you to deduce at 7:45 he was --
22      A       The degree of peritonitis he had.  That
23 was ongoing.  That just didn't start at 7:45.  That
24 started, I suspect, well before 7:45.
25      Q       What time did it start?

Page 55

1       A       I don't -- that, I can't tell you.
2       Q       So how do you know it started before
3  7:45?
4       A       I don't.
5       Q       Right.  And so the peritonitis could have
6  started after 7:45?
7       A       No.  It doesn't happen that way.
8       Q       Why do you say that?
9       A       Because the body shuts down.  If the man
10 dies, you don't have any further development of
11 peritonitis.  What's there is there.
12      Q       He was declared dead at 9:26 in the
13 morning.
14      A       Correct.
15      Q       Which is also a couple of hours after
16 7:45 --
17      A       Right.
18      Q       -- right?  And so there was a chance that
19 he could have survived at 7:45?
20      A       I don't know that.
21      Q       Okay.  Would a surgeon know that?
22      A       I don't think he would know that at the
23 time either.
24      Q       Meaning that you don't know if he would
25 have lived or died?

Page 56

1       A       Correct.
2       Q       All right.  So he possibly could have
3  lived?
4       A       Very unlikely.
5       Q       Well, if you say very unlikely, I mean,
6  that's odd to me.  What is the probability that he would
7  have died if he was taken to the hospital?
8       A       I can't give you a number.  If you want a
9  number, I can't give you that.
10      Q       Who can?
11      A       I don't think anyone can.
12      Q       All right.  So you don't know if he would
13 have lived or died?
14      A       I don't know.  But in clinical
15 experience, in that circumstance, it would be very
16 unlikely that someone in his circumstance, with his
17 situation, and the autopsy findings, would live.
18      Q       How about surgical experience?  You don't
19 have any surgical --
20      A       I don't.
21      Q       -- experience; right?  And you've never
22 had to -- have you ever performed -- done surgery on
23 someone who's had a perforated ulcer that was in septic
24 shock?
25      A       No, I have not.

Tiffany Wingo, et al, vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

---

Page 57

```
 1      Q       Okay.  Would you defer to a general
 2  surgeon with respect to the mortality rate of doing a
 3  surgery on a perforated ulcer of someone who's in septic
 4  shock?
 5      A       Yes.
 6      Q       Okay.  Would they be in a better position
 7  to say what the mortality rate was for operating on
 8  someone in septic shock who had a perforated ulcer?
 9      A       Yes.
10      Q       All right.  Would that be outside the
11  scope of your knowledge with respect to the mortality
12  rate of someone in septic shock with a perforated ulcer
13  who had it repaired?
14      A       I wouldn't say it's outside of the --
15  outside of the norm.  We deal with that.
16      Q       Okay.  Is that outside of your scope of
17  practice?
18      A       Dealing with the surgery?  Afterwards?
19  Yes.
20      Q       So your guess with respect to whether he
21  would have -- that it's unlikely that he would have
22  lived at 7:45 a.m., it's mainly just a guess?
23              MR. JACKSON:  Object to form.
24              You can answer.
25              THE WITNESS:  I would say it's not a
```

Page 58

```
 1  guess.  I'd say it's based on clinical
 2  experience.  My clinical experience says someone
 3  in his situation at 7:45, survivability is
 4  unlikely.
 5  BY MR. GARDNER:
 6      Q       Okay.  Tell me about that clinical
 7  experience.  What clinical experience do you have of
 8  seeing someone in septic shock that then had a
 9  perforated ulcer repaired?
10      A       I've seen cases of that in my career.
11  It's only spanning 30 years.
12      Q       Okay.  How many?
13      A       I can't give you a number.
14      Q       Like more than five?
15      A       Yes.
16      Q       All right.  More than ten?
17      A       Yes.
18      Q       Okay.  More than 20?
19      A       Something between 10 and 20, I suspect.
20      Q       Okay.  So within the 30 years that you've
21  been practicing, you've seen between 10 and 20 cases of
22  someone that's in septic shock from a perforated ulcer?
23      A       Yes.
24      Q       And they then had to have it prepared?
25      A       If they can get to the repair.
```

Page 59

```
 1      Q       If they can get to the repair; right?
 2      A       Yes.
 3      Q       And out of those 10 or 20 people, how
 4  many died?
 5      A       At least 90 percent.
 6      Q       90 percent?
 7              And how old were those people?
 8      A       Range in age from mid-40s to 80s.
 9      Q       Okay.  And how about the majority of
10  them?  How old were they?
11      A       Mid-40s to 70.
12      Q       Okay.  Do you know specifically, like,
13  their ages --
14      A       No, I do not.
15      Q       -- of these people?
16      A       No.
17      Q       So out of the 20 people that you've seen
18  who had a perforated ulcer and they were in septic
19  shock, it's your position that 18 of them would have
20  died?
21      A       Correct.
22      Q       18 out of 20?
23      A       Correct.
24      Q       And that's what you've seen in your
25  career?
```

Page 60

```
 1      A       Correct.
 2      Q       But you weren't involved in the surgical
 3  repair at all?
 4      A       No.  I did not -- I was not involved in
 5  the surgical suite.
 6      Q       Okay.  Do you know if those 18 to
 7  20 people that have been in septic shock from a
 8  perforated ulcer had any -- and did not survive, do you
 9  know if they had any comorbidities?
10      A       Likely some did, yes.  Do I know the
11  number of that 18?  No, I don't know how many had
12  comorbidities.  I would imagine some did.
13      Q       Well, there are a lot of factors that go
14  into the mortality rate associated with repairing a
15  perforated ulcer; correct?
16      A       Correct.
17      Q       And some of those factors deal with age;
18  correct?
19      A       Yes.
20      Q       Yes.  Like age increases your mortality
21  rate --
22      A       Correct.
23      Q       -- from a perforated ulcer?
24      A       Increases your mortality rate from any
25  disease.
```

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAT, FACG
May 18, 2023

Page 61

```
 1   Q        Right.  But especially -- we're just
 2   talking about perforated ulcers.  It increases your
 3   mortality rate with respect to that; correct?
 4   A        Correct.
 5   Q        What are some of the other factors?
 6   A        Other comorbid illnesses.
 7   Q        Diabetes?
 8   A        Diabetes.
 9   Q        All right.  Hypertension?
10   A        Yes.
11   Q        Those are the type of things that will
12   increase your mortality rate?
13   A        Yes.
14   Q        All right.  Do you know if Mr. Wingo had
15   diabetes?
16   A        No, I don't believe he did.
17   Q        Okay.  Do you know if he had
18   hypertension?
19   A        No, I don't.
20   Q        Okay.  Did you see any comorbidities
21   listed in his autopsy report?
22   A        No.
23   Q        And Mr. Wingo was also younger than
24   anyone that you've ever seen present with a perforated
25   ulcer and they were in septic shock and had to have it
```

Page 62

```
 1   repaired?
 2   A        How old is Mr. Wingo?
 3   Q        Thirty-six.
 4   A        Okay.  He would be young.
 5   Q        Okay.  Most 36-year-olds who have a
 6   perforated ulcer have a pretty good chance of
 7   survivability?
 8   A        Yes.
 9   Q        What research do you have that would
10   support that even if an ambulance was called at
11   7:45 a.m., the chance that he would have survived septic
12   shock is very low?
13   A        Well, getting -- I would imagine getting
14   him from where he was, getting the ambulance through
15   security, getting the team to where he was at, wheeling
16   him to there, getting him to the center, that's just
17   prolonged time.  When you have someone with a perforated
18   ulcer, you want to get them there as quickly as
19   possible.  It would be an inordinate amount of delay
20   getting him -- getting him -- getting the ambulance to
21   him and then getting him from there out to the hospital.
22   Q        How far was the hospital from the jail?
23   A        I want to say within 5 miles.
24   Q        Okay.  Is that a long distance?
25   A        It can be.
```

Page 63

```
 1   Q        Okay.  They could call the hospital in
 2   advance, couldn't they?
 3   A        I don't know what the procedures are.
 4   Q        Okay.  So you work in a hospital?
 5   A        I work at a hospital, but I don't work at
 6   a prison.
 7   Q        Right.  But you work at a hospital?
 8   A        Yes.
 9   Q        All right.  Have you ever seen someone
10   come into a hospital from an ambulance?
11   A        Absolutely.
12   Q        Have you ever heard of the hospital being
13   contacted in advance before the patient gets there?
14   A        Yes.
15   Q        So that the hospital could do
16   preparation?
17   A        To some extent, depending on what they
18   know.
19   Q        Right.  But they give them that
20   information, and then there's things that they can do?
21   A        There are things that they can do.  In
22   Mr. Wingo's circumstance, I'm not sure how you would --
23   how you would expect the hospital to get a report from
24   the prison saying -- unless he's -- they just found
25   somebody down without a pulse.
```

Page 64

```
 1   Q        Have you ever worked at a prison?
 2   A        No.
 3   Q        Have you ever worked at a jail?
 4   A        No.
 5   Q        All right.  Are you familiar with how the
 6   medical care works within a jail?
 7   A        A little.
 8   Q        Okay.  How so?
 9   A        My father was a correctional officer in
10   New York City.
11   Q        Okay.  So you may have some familiarity.
12   So what's your understanding of how
13   medical care works within a jail, with your father being
14   a correctional officer?
15   A        Well, they have staff, expert staff,
16   usually nurses.  They might have a physician that comes
17   in and does rounds periodically on the patients in the
18   infirmary.  They'll have medical assistants that will
19   also help.
20   Q        But you've never been a physician within
21   a jail?
22   A        No.
23   Q        All right.  You've never managed nurses
24   within a jail?
25   A        No.
```

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

---

Page 65

1    Q    Have you ever been involved in
2  transporting someone from a jail to a hospital?
3    A    No.
4    Q    Have you ever been -- had any
5  communications with paramedics or EMTs that have been
6  involved with transporting someone from a jail to a
7  hospital?
8    A    Yes.
9    Q    What type of communication have you had?
10   A    In Boston when I was a resident in
11 the ER, we actually had -- EMS would call us to alert us
12 that they had picked up somebody and were on their way
13 to our location.
14   Q    Okay.  And when they did that, how did
15 you-all respond to it?
16   A    If they told us what they knew -- for
17 example, it was a gunshot wound to the chest -- then
18 we'd get the trauma bay ready and try to figure out what
19 to do from there.  When the patient showed up, we'd have
20 our cardiac surgeon there; we had a cardiologist there,
21 ER staff, nurses -- all prepared to do whatever was
22 needed based on what they saw.
23   Q    I guess that's the point I'm making, that
24 it's possible for them to call the hospital in advance
25 and tell them what they know about the patient, and then

---

Page 66

1  the hospital can make a decision whether they're going
2  to prepare anything for that person.
3    A    Well, they would be generally prepared.
4  Someone who is found down without a pulse, that's the
5  report that I imagine would have been sent from the
6  prison or the jail to the hospital nearby.
7    Q    Right.  But you don't know what they
8  would have saying to them, though.
9    A    Well, I'm just looking at what the video
10 shows.  The video shows a man who's down and found with
11 no -- with no pulse.
12   Q    Right.  And the only thing I'm saying is,
13 they would have -- they can contact the hospital and
14 give them as much information as possible about the
15 person --
16   A    They could --
17   Q    -- so that the hospital can have an
18 opportunity to prepare for them as however that hospital
19 deems necessary.
20   A    Well, they're just -- you're telling
21 them, Man down, no pulse.  That's all you know.  That's
22 what you got.
23   Q    All right.  So the hospital just wouldn't
24 do anything; they'd just --
25   A    No --

---

Page 67

1    Q    -- sit there?
2    A    -- I'm not saying that.  The hospital --
3  the hospital is going to do what they -- what they
4  prepare for based on what they are told.  They're told
5  that there's a prisoner in jail found down with no
6  pulse.  That's what they're going to deal with.
7    Q    Does it matter if it's a prisoner?
8    A    Well, that's what the jail is calling it.
9  You have to determine whether it's a prisoner or staff.
10   Q    Okay.  Well, people who go to jail,
11 they're not convicted yet.  You understand that; right?
12   A    No, no, of course.
13   Q    You could have a DUI and go to jail --
14   A    Sure.
15   Q    -- right?  And if you have a medical
16 problem, aren't you a patient?
17   A    You're a patient no matter what.  That's
18 right.
19   Q    Okay.  No matter what the circumstances
20 are that you were in jail?
21   A    Correct.
22   Q    Right.  So if the EMTs are contacted,
23 they wouldn't -- do you think that they may have
24 contacted the hospital and said, Hey, we have a patient
25 on the way; or do you think they said, We have a

---

Page 68

1  prisoner on the way?
2    A    They'd say, We have a patient that's
3  coming from --
4    Q    Fair enough.
5    A    -- from the prison.
6    Q    Okay.
7    A    From the jail.
8    Q    Right.  Do you know the difference
9  between a jail and a prison?
10   A    I do.
11   Q    Okay.  You know that most people in jail
12 haven't been convicted of anything?
13   A    That's correct.
14   Q    Right.  They're awaiting their
15 opportunity to go to court?
16   A    That's correct.
17   Q    Right.  So they're presumed to be
18 innocent?
19   A    Correct.
20   Q    Right.  They're just everyday people,
21 just like you and I?
22   A    Correct.
23   Q    And so do you think that may contact them
24 and say:  We have a patient.  We're coming from the jail
25 to see you, and this person is nonresponsive.  We

---

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                          May 18, 2023

**Page 69**

1    suspect there's some abdominal issues.  Is that
2    potentially something that they could say?
3         A     Potentially.
4              MR. JACKSON:  Object to the form.
5    BY MR. GARDNER:
6         Q     Okay.  And then the hospital could decide
7    if they wanted to do something to prepare for the
8    arrival of that patient?
9         A     Correct.  I think that's fair.
10        Q     I mean, that's the only thing I'm trying
11   to say here.  If the hospital did nothing in response to
12   something like that, that wouldn't make sense, would it?
13        A     No.  That's not the case.  What I'm
14   trying to get across is, in Mr. Wingo's particular
15   circumstance, the information that's going to be
16   provided is, We have a person found down at the jail
17   without a pulse.
18        Q     Okay.  Now, you're not a forensic
19   pathologist either --
20        A     No.
21        Q     -- right?  Okay.
22              So all of your beliefs regarding whether
23   Mr. Wingo's survivability rate at 7:45 a.m. is based on
24   if he was actually in septic shock?
25        A     I think he was in septic shock based on

**Page 70**

1    the autopsy that was conducted at the time, yes.
2         Q     Okay.  So it's based on if he was in
3    septic shock?
4         A     Yes.
5         Q     Based on your belief that he was in
6    septic shock?
7         A     Yes.
8         Q     I mean, that's your belief without
9    examining him?
10        A     Correct.
11        Q     Right.  And you believe that he was in
12   septic shock just based off of what you saw in an
13   autopsy that was done on him -- let's see here -- a day
14   or so later?
15        A     Yes.
16        Q     Okay.  When Mr. Wingo was in the
17   hospital, do you know if he was -- after he was
18   pronounced dead, do you know if he was still leaking any
19   peritonitis?
20        A     Usually the body shuts down when someone
21   dies, so I would think you might have production for --
22   production of a little bit of fluid or pus for a few
23   minutes, maybe 30, and then it will stop.
24        Q     So another 30 minutes or so?
25        A     Another 30 minutes.  I think that's

**Page 71**

1    reasonable.
2         Q     So there could have been additional
3    peritonitis within his system after he was actually
4    pronounced dead?
5         A     Very slightly.  I think it would be
6    possible, but it wouldn't contribute.
7         Q     Peritonitis isn't in itself septic shock,
8    though, is it?
9         A     Peritonitis isn't septic shock.
10        Q     Is not?
11        A     Is not.
12        Q     All right.  You said that the autopsy
13   itself is what leads you to believe that he was in
14   septic shock?
15        A     Yes.
16        Q     All right.  What is it about the autopsy
17   that leads you to believe he was in septic shock at
18   7:45 a.m., at that precise time?
19        A     The degree of -- that's when he passed
20   away.
21        Q     How do you know he passed away at
22   7:45 a.m.?
23        A     At least that's what it looks like on
24   the -- I think on the video.  I think that's when he
25   stops moving.

**Page 72**

1         Q     I'm going to respectfully report to you
2    that's not when he stops moving in the video.  In fact,
3    there's been testimony in this case that Mr. Wingo was
4    seen alive and well at about 8:23 a.m.
5              Would that be unusual to you?
6              MR. JACKSON:  Object to the form.
7              You can answer.
8              THE WITNESS:  Say that again.  I'm sorry.
9    BY MR. GARDNER:
10        Q     There has been testimony in this case
11   that Mr. Wingo was seen alive and well at around
12   8:23 a.m.  Would that be unusual to you, for him to be
13   seen alive and well at that time, considering your
14   opinion that he was in septic shock at 7:45?
15              MR. JACKSON:  Same objection.
16              THE WITNESS:  I think he had signs of
17   septic shock, and he could have been seen by a
18   layperson that does not know those signs and
19   thought to be well.  I think that's not -- that's
20   not uncommon.
21   BY MR. GARDNER:
22        Q     Okay.  So you're now saying that he
23   may -- what are signs of septic shock?
24        A     The pain that he was complaining about,
25   the peritonitis that he was complaining about.  His

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

---

**Page 73**

1  inability to maintain a posture.  I think he was lying
2  down at that time.  He couldn't sit up.  He had trouble
3  with balance.
4        Q       Okay.
5        A       Those all could be signs of low blood
6  pressure that would suggest septic shock.
7        Q       Okay.  And so are you saying at the point
8  that he was in balance, he would have been in septic
9  shock?
10       A       Possibly, yes.
11       Q       How long does it take to develop septic
12  shock?
13       A       That depends on the degree of -- the
14  degree of inflammation that you see.  If the
15  inflammation is rapid, it can occur rapidly.  If the
16  inflammation is slow and occurs over a longer interval,
17  it can take longer.
18       Q       What happens with a perforated ulcer?
19  When an ulcer perforates someone's stomach, what
20  happens, like Mr. Wingo's?
21       A       There's a whole series of inflammatory
22  responses that start, because the peritoneum doesn't
23  expect to have anything in there.  And so when you have
24  spillage of gastric contents -- acid, things like
25  that -- very irritating to the stomach.

**Page 74**

1        Q       I just want to talk about that a little
2  bit with you.  All right.  So when someone's ulcer in
3  their stomach perforates like Mr. Wingo's did, right,
4  they then have some inflammatory responses, you said?
5        A       Correct.
6        Q       What does that mean?
7        A       Inflammation.  Inflammation in the area.
8  In the area of the local, locally, as well as
9  potentially a systemic response.
10       Q       Okay.  So we've got inflammation and a
11  systemic response; right?
12       A       Correct.
13       Q       Okay.  Inflammation in the area, what
14  does that look like?
15       A       I'm not sure I understand your question.
16       Q       Well, how would I see inflammation, or
17  how would I know if you have inflammation in the area?
18       A       You would know it based on physical exam.
19  He would have some irritations of the stomach.  And if
20  he had a -- with the perforation that you see, you would
21  actually feel a rigid abdomen, an inflamed abdomen, the
22  abdominal cavity.  So those muscles get really tight.
23  You can actually (indicating) percuss and it sounds like
24  a board, for lack of a better term.
25       Q       Okay.  And so I would be able to

---

**Page 75**

1  determine if someone has inflammation through physical
2  exam?
3        A       Yes.
4        Q       Any other ways I can determine if
5  someone has inflammation?
6        A       Through laboratory tests.
7        Q       Okay.  What type of laboratory tests?
8        A       White blood cell count.
9        Q       Anything else?
10       A       You could look for a whole bunch of
11  inflammatory markers, but those tests you can't get
12  rapidly.
13       Q       Okay.  Like what, what other markers, in
14  a perfect world?
15       A       Interleukins.  But you -- again, those
16  are not -- those are not -- those are not tests that are
17  available rapidly for clinical -- for clinical use.
18       Q       Okay.  Are there any other tests?
19  Outside of physical exam and laboratory tests for white
20  blood test and interleukins, anything else?
21       A       You would do a -- you could do a
22  CAT scan.  You could see inflammation there.
23       Q       Anything else?
24       A       No, nothing else I can think of.
25       Q       So those are the -- so through physical

**Page 76**

1  exam, laboratory tests with white blood count,
2  interleukins, and a CAT scan, would allow me to see
3  inflammation?
4        A       Well, again, you wouldn't get the
5  interleukin values that fast.
6        Q       All right.  So we can strike off
7  interleukins?
8        A       I think so.
9        Q       All right.  So no interleukins.  We got
10  physical exam, laboratory tests with white blood count,
11  and CAT scan, will allow me to see inflammation?
12       A       Correct.
13       Q       All right.  So this is what happens right
14  after someone's ulcer perforates in their stomach; you
15  get inflammation, and there's other systemic issues?
16       A       Correct.
17       Q       What are the systemic issues?
18       A       Low blood pressure, increased heart rate,
19  rapid breathing.  They may assume certain positions to
20  try to minimize the pain.
21       Q       Anything else?
22       A       I think that's -- that's fairly
23  sufficient.
24       Q       All right.  So someone whose ulcer
25  perforates, we have an inflammatory response, as you've

---

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

---

Page 77

1  already described, and then the systemic response, which
2  is low blood pressure, increased heart rate --
3      A      Heart rate.
4      Q      You said increased heart rate.  --
5  difficulty breathing, rapid --
6      A      Rapid breathing.
7      Q      -- rapid breathing, and then positional
8  changes?
9      A      Correct.
10     Q      All right.  When does peritonitis
11 develop, if at all?
12     A      Right then and there.
13     Q      Okay.  So as soon as someone's ulcer
14 perforates, they immediately have peritonitis?
15     A      They have irritation of the peritoneum.
16 That's what you're seeing on your exam.
17     Q      And that's right after it perforates?
18     A      Yes.
19     Q      So within ten minutes after it
20 perforates, you have peritonitis within your system?
21     A      You can.
22     Q      Okay.  Are you in septic shock then?
23     A      Not at that point.
24     Q      Okay.  At what point do you become in
25 septic shock?

---

Page 78

1      A      When you see the lower blood pressures.
2  Blood pressure will continue to decrease.  Heart rate
3  continues to -- continues to elevate.  Respiratory rate
4  changes.  Your exam changes.
5      Q      I want to get this right, though.  You're
6  going fast.  So I -- there -- all right.  So we've got
7  the perforated ulcer.
8      A      Uh-huh.
9      Q      Because I've read the article that you
10 gave me.  Right?  It says if you -- you know, the
11 mortality rate if you repair it within less than
12 24 hours, it's pretty good --
13     A      Correct.
14     Q      -- from onset -- sudden onset.
15     A      Correct.
16     Q      And so if -- you're telling me now that
17 the peritonitis is what tells you that he was in septic
18 shock, and so I'm trying to understand exactly how we
19 know that exactly at 7:45 a.m.
20         MR. JACKSON:  Object to the form.
21         You can answer.
22         THE WITNESS:  What you're saying -- what
23     I believe happened is that he's had this peptic
24     ulcer.  It perforated sometime over the course of
25     the evening.  When it perforated, I don't know.

---

Page 79

1          But it was clearly unrecognized by medical staff
2          and allowed to progress.  And so that's why on
3          the autopsy you have -- the degree of
4          inflammation that you see would suggest that
5          there was a prolonged period of time of
6          inflammation, peritonitis, that leads to
7          developing septic shock.
8  BY MR. GARDNER:
9      Q      Right.  I guess my only point is, you're
10 saying at 7:45 he was in septic shock --
11         MR. JACKSON:  Object to form.
12 BY MR. GARDNER:
13     Q      -- you know, and that's what I'm trying
14 to understand, how you come to that time that he was in
15 septic shock there.
16     A      Well, I think -- at that time I think he
17 was likely in septic shock, but I suspect it may have
18 been -- it may have started earlier that evening.
19     Q      Okay.
20     A      So he had sepsis, and that progressed
21 over the course of the evening.
22     Q      Okay.  And so at what point do you think
23 he started the septic shock?
24     A      Exactly when?
25     Q      Yes.

---

Page 80

1      A      I can't give you -- I can't tell you
2  that.
3      Q      Okay.  Why can't you tell me that?
4      A      Because I don't have the information that
5  I just provided you.
6      Q      But you know that he was at 7:45 -- or at
7  least to a reasonable degree of medical certainty, you
8  said that at 7:45 he was in septic shock?
9      A      I think he was.
10     Q      To a reasonable degree of medical
11 certainty?
12     A      I think so, based on his behavior.
13     Q      Right.  And so at what --
14     A      His observable behavior.
15     Q      All right.  You've looked at all the
16 videos --
17     A      Yes.
18     Q      -- ten hours of video --
19     A      Yes.
20     Q      -- and you watched him throughout the
21 entire night?
22     A      Yes.
23     Q      You watched him in his cell --
24     A      Yes.
25     Q      -- right?

---

Tiffany Wingo, et al, vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                    May 18, 2023

---

Page 81

1    You saw him come into the infirmary?
2        A     Yes.
3        Q     At what point, to a reasonable degree of
4    medical certainty, do you think you observed him in
5    septic shock?
6        A     I think the time where he was in the
7    infirmary with three -- three or four other prisoners,
8    and he collapsed sort of suddenly and had to get picked
9    up.  That's a suggestion that something other is going
10   on, besides a potential perforation.  And so that --
11   that made me worried that something else is going on, on
12   top of what we found on the autopsy, that it's
13   progressing, that things are progressing.  He had this
14   irritation where he was constantly back up and down, and
15   I think that led to him being moved into the single
16   location where he was found.
17       Q     The padded cell?
18       A     I guess.  I don't know if it was padded
19   or not.  But moved there, because his constant movement
20   was doing that.  And then I think in the transfer from
21   there, I believe he collapsed.  And so that was a sign
22   for me that something suggested a progression moving
23   forward.
24       Q     Okay.  So I guess what I'm asking you:
25   So when was the first point that you -- to a reasonable

---

Page 82

1    degree of medical certainty, that you believe that he
2    was in septic shock?
3        A     I was worried about it when I saw him
4    collapse in the -- in that transfer.
5        Q     All right.  Okay.  You were worried about
6    it, but you didn't know if he was in septic shock at
7    that time?
8        A     I didn't know it, but that suggested that
9    whatever was going on with him at that time was
10   progressing.
11       Q     Okay.  But you did not know that when he
12   was being transferred, that he was in septic shock?
13       A     I guess if you look at it from a
14   retrospect of knowing that he had a perforated ulcer,
15   knowing that he had the findings, no, I don't know
16   absolutely, if that's what you're asking me.
17       Q     And that's all I'm asking you.  To a
18   reasonable degree of medical certainty, did you know
19   that he was in septic shock at that time?
20       A     I don't know, because I don't have the
21   information.
22       Q     And I wouldn't expect you to.  But if you
23   did, I would be shocked.  I would want to know how you
24   know.  And that's why I'm asking these questions.
25       A     Well, I think looking at his behavior, it

---

Page 83

1    makes you nervous.  It would make me nervous.
2        Q     We can look at his behavior until we're
3    blue in the face and be nervous, but, at the same time,
4    that doesn't necessarily suggest that we know what's
5    absolutely going on with him medically.  We can suspect
6    something.
7        A     Well, like I said --
8        Q     But we won't know unless certain things
9    were done for him; right?
10       A     Correct.
11       Q     And that's what I'm trying to get to --
12       A     I hear you.
13       Q     -- and understand.  So you don't know if
14   he was in septic shock when he was being transferred?
15       A     No; not absolutely.
16       Q     Okay.  Now, you had said at 7:45 that
17   even if an ambulance was called.  He was still in the
18   infirmary at 7:45.
19       A     Wasn't he in the padded cell then?
20       Q     No.  He was taken to the padded cell at
21   around 7:46 a.m., but he didn't -- he wasn't in there
22   until about 7:50.  He didn't stop moving until around
23   7:57.  But the guards said in their deposition that he
24   was well at 8:23, that they saw him and that he was
25   still alive at 8:23.

---

Page 84

1                    MR. JACKSON:  Object to the form.
2    BY MR. GARDNER:
3        Q     That's what the guards say in their
4    deposition.  So was he in septic shock when the guards
5    saw him at 8:23 and he was still alive?
6        A     Possibly, yes.
7        Q     Okay.  And so what would his
8    survivability rate have been at 8:23 when the guards saw
9    him and they said they saw his chest rise and fall?
10       A     I can't answer that question.
11       Q     No one can, can they?
12       A     I just said no.  At least I can't.
13       Q     I mean, you can't.  No one can, can they?
14   I mean you're an impressive doctor, but you're not God;
15   right?
16       A     No, I'm not God.
17       Q     And neither am I.
18       A     Right.
19       Q     So none of us know what the likelihood of
20   him surviving at that point would have been, do we?
21       A     I think the longer he has inflammation
22   going on, the harder his survival decreases.
23       Q     I agree with that.  I think it becomes
24   more difficult for him to survive after a period of
25   time; right?  We agree; right?  I think Dr. Myers agrees

---

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

---

Page 85

1   with that; correct?
2        A      Correct.
3        Q      That doesn't mean that nothing should be
4   done for him, though, does it?
5        A      I don't think I said that.
6        Q      That's not what I'm saying that you said.
7   I'm not accusing you of saying that.  I'm asking you a
8   question.  That doesn't mean that nothing should be done
9   for him; right?
10       A      Of course not.
11       Q      And that also means that we should do
12  everything possible to try to save his life if we can;
13  right?
14       A      Of course.
15       Q      And that means if we can get him to
16  the OR or to the hospital and if we can call an
17  ambulance, we should do that; right?
18       A      Correct.
19       Q      And if we can get him to the hospital and
20  to an OR and attempt to repair the perforation, that
21  should be done as well; correct?
22       A      Yes.
23       Q      He should never be not attended to
24  medically until it is determined that he is deceased and
25  not salvageable; correct?

---

Page 86

1        A      Correct.
2        Q      And until he is determined that he is not
3   salvageable, there should be everything done possible to
4   save his life; correct?
5        A      Correct.
6        Q      Okay.  Let me see here.  So I got to go
7   back to 7:45, because you said at 7:45 he was in the
8   cell by himself.  And I'm telling you -- I can show you
9   video.  I can pull it up right now if you want me to.
10       A      I believe you.
11       Q      At 7:45, he wasn't in the cell by
12  himself.  Okay?
13       A      Okay.
14       Q      So at 7:45, as you put in this report,
15  was he in septic shock at that time?
16       A      I can't tell you that.
17       Q      All right.  To a reasonable degree of
18  medical certainty, you cannot say that?
19       A      Correct.
20       Q      But I think we all can agree that if
21  someone is in septic shock, that the chances of survival
22  decrease the longer they remain in septic shock?
23       A      Correct.
24       Q      All right.  And I don't think -- no one
25  is saying that it's a sure thing that he was going to

---

Page 87

1   survive; right?  You haven't read any reports that said,
2   Hey, he had a 100 percent chance of survivability?
3        A      No.
4        Q      Because no one knows?
5        A      Correct.
6        Q      Just like you don't know if I'm going to
7   die on the way home today?
8        A      I hope not.
9        Q      Right.  But you don't know; right?  It
10  could happen; right?
11       A      Possibly.
12       Q      And it might not.  And it's the same
13  thing with someone who's experiencing a medical
14  emergency like Mr. Wingo; correct?
15              MR. JACKSON:  Object to the form.
16              You can answer.
17              THE WITNESS:  Say that again.
18  BY MR. GARDNER:
19       Q      It's the same thing when someone is
20  experiencing a medical emergency like Mr. Wingo; we
21  don't know with any certainty whether someone would live
22  or die?
23       A      Yes.  That's correct.
24       Q      But you don't yourself -- I think you
25  told me this already -- have any personal experience in

---

Page 88

1   corrections?
2        A      No.  Just my father.
3        Q      So you don't have any opinions with
4   respect to the guards?
5        A      No.
6        Q      Right.  You wouldn't how to do security
7   at a jail?
8        A      No, not at all.
9        Q      Your fee is $500 an hour; right?
10       A      Yes.
11       Q      Has that always been your fee?
12       A      Inflation.
13       Q      It was lower before?
14       A      Yes.
15       Q      How long has it been 500 an hour?
16       A      Probably about a year or two, year and a
17  half.
18       Q      Okay.  I think -- I've gone over your
19  three opinions.  What time is it?
20              Are there any other opinions you have,
21  outside of the three that are identified in your report?
22       A      No; as I mentioned earlier.
23       Q      Okay.  So this is it?
24       A      This is it.
25       Q      All right.  Now, the gold standard for

---

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

Page 89

1  repairing a perforation -- perforated ulcer is open
2  surgery?
3       A     Yes.  Open or laparoscopic surgery.
4       Q     Open or laparoscopic surgery.  That
5  article was actually open surgery but --
6       A     You try to minimize intervention.  You
7  try to minimize opening up the abdomen, because that
8  just allows for better healing.  But depending on what
9  you -- most surgeons, I think, would look
10  laparoscopically first and then see if they need to open
11  them up.  Because if they could fix it laparoscopically,
12  they'll do that.  That's an easier surgery for the
13  patient and an easier surgery for them.
14       Q     Okay.  I've also -- I've also read an
15  article that said open surgery and laparoscopic surgery
16  pretty much have the same success rates nowadays.
17             Do you know?
18       A     I believe that to be true.  I don't know
19  that exactly.
20       Q     That was another question for a general
21  surgeon?
22       A     Correct.
23       Q     All right.  Do you know what the surgical
24  treatment is for a perforated ulcer?
25       A     I think it depends on where it is.

Page 90

1       Usually it's an oversew.  It can include a truncal
2  vagotomy to try to cut the nerve that supplies the
3  stomach and provides a signal to produce acid.
4       Q     Are you guessing or do you know?
5       A     I know that that's what they do.
6       Q     Okay.
7       A     It depends on what circumstances they do.
8  I mean, it depends on the surgeon, where the ulcer is,
9  and what they see.
10       Q     Okay.  Fair enough.  Do they use
11  something called omental patch?
12       A     Yes.
13       Q     Did I say that right?
14       A     Yes.  Good job.
15       Q     And that's just to plug the hole; they
16  suture the hole?
17       A     Correct.  They take the omentum, which is
18  a strip that covers the abdominal cavity, and apply a
19  patch to it to close the hole.
20       Q     What causes a perforated ulcer?
21       A     The combination of acid and infection.
22  You could also have contributing factors by medications
23  like NSAIDs, or in English, medicines like Motrin,
24  Indocin, Advil, Aleve.  Goodies Powders is popular in
25  the South.

Page 91

1       Q     Uh-huh.
2       A     So all of those decrease blood flow; and
3  in the setting of increased acid as well as infection,
4  it can lead to ulcer formation.
5       Q     Okay.  So like anti-inflammatory drugs?
6       A     Anti-inflammatory drugs.  But it also --
7  but the impact, especially in older individuals, is that
8  it decreases blood flow to vital areas of the stomach,
9  or areas of the stomach that don't get enough blood
10  flow; or their blood flow may be marginal, and then
11  reduce it, ending up with ulcer formation.
12       Q     I had read the autopsy.
13             Did you see the autopsy in this case?
14       A     Yes.
15       Q     Did you see that the medical examiner
16  referenced an article at the end of the autopsy about
17  crack cocaine and its prevalence with respect to
18  ulcers --
19       A     I remember that --
20       Q     -- that component?
21       A     I remember that vaguely.
22       Q     Have you ever seen an article like that
23  before?
24       A     Not to my knowledge.
25       Q     Okay.  Have you ever read that article?

Page 92

1       A     No, I have not.
2       Q     Have you ever seen an autopsy before
3  where they -- have you ever seen an autopsy before?
4       A     Yes.
5       Q     Have you ever seen -- how many times have
6  you seen it before?
7       A     Five.
8       Q     Oh, really?  Were those all in cases that
9  you were experts?
10       A     No.  Actually in cases where I think I
11  was involved as a -- as a physician or as a medical
12  student.
13       Q     Okay.  Have you ever seen them reference
14  an article in an autopsy?
15       A     Yes, they have.
16       Q     Okay.  What would be the purpose of
17  referencing an article in an autopsy?
18       A     To highlight a unique feature that is not
19  usually discussed.
20       Q     Okay.  Is perforation of ulcers --
21  perforated ulcers, is that unusual?
22       A     No.
23       Q     Is it pretty typical?
24       A     No.  Well, it's common.
25       Q     It's common.

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

Page 93

1      A      It's common.
2      Q      And 40 percent of the population, right,
3  can develop an ulcer?
4      A      I don't know if it's that high, but it's
5  high.
6      Q      All right.  What would you say it is?
7      A      Probably with the prevalence of acid-
8  blocking medication fairly easily available through
9  over-the-counter means, it's probably more like 30s,
10  30 percent or so.
11      Q      And out of that 30 percent, some of those
12  people perforate and then they --
13      A      Correct.
14      Q      -- die --
15      A      Correct.
16      Q      -- right?  I mean, it wouldn't be unusual
17  for a medical examiner to see someone with a perforated
18  ulcer, would it?
19      A      No.
20      Q      All right.  This article that he
21  referenced said -- I'm probably going to mess it up --
22  juxta-pyloric --
23      A      Juxta-pyloric.
24      Q      Juxta-pyloric, what does that mean?
25      A      It's near the pylorus, near the opening

Page 94

1  of the stomach into the small intestine.
2      Q      Okay.  So this says:  Juxta-pyloric
3  perforations of gastric ulcers in crack cocaine users
4  has been noted to happen in increased incidents.  The
5  topic is being studied, and a report has been published
6  previously.  The speculated mechanism is ischemia of the
7  enteral mucosa and secondary bacterial infection.
8      A      Okay.
9      Q      Does that assist the reader of
10  Mr. Wingo's autopsy at all in understanding as to what
11  happened to him?
12      A      It could be a contributing factor.
13      Q      What's that?
14      A      The -- if he was -- if it was -- if he
15  had the use of crack cocaine or cocaine of any sort,
16  that's a -- that's a constrictor.  And so that decreases
17  blood flow to parts of the stomach and could make him
18  more sensitive to acid-related -- or acid- and
19  bacterial-related damage, leading to ulcer formation.
20      Q      Cocaine is a contributing factor as
21  well --
22      A      Correct.
23      Q      -- or cocaine usage; right?
24      A      It could be.
25      Q      Is there a difference between crack

Page 95

1  cocaine and regular cocaine?
2      A      I would imagine there is.
3      Q      Okay.
4      A      Intensity, delivery.
5      Q      Marijuana use is a contributing factor,
6  right, to --
7      A      I don't think -- I don't think marijuana
8  use is a contributing factor for ulcers.  It's not a
9  constrictor.
10      Q      How about smoking?
11      A      Smoking, yes.
12      Q      Okay.  So if you smoke marijuana,
13  wouldn't that be a contributing factor?
14      A      I'm talking about tobacco.
15      Q      Only tobacco use --
16      A      Like tobacco use.
17      Q      -- is a -- is a restrictor?
18      A      Correct.
19      Q      Okay.  And then cocaine use?
20      A      Yes.
21      Q      Crack cocaine?
22      A      Yes.
23      Q      Okay.  What other type of drugs?
24      A      Anything else that's a vaso -- any other
25  medication that's a vasoconstrictor.  So, for example,

Page 96

1  you could take something that -- to increase somebody's
2  blood pressure when they're low, and what you're trying
3  to do is constrict things so that the blood flow
4  continues.  If that was taken in an older situation,
5  extra doses.  You see that in -- in senior citizens who
6  forget about their blood pressure medicines.
7      Q      Have you seen any evidence in this case
8  that Mr. Wingo used crack cocaine?
9      A      Not in anything that I've seen.
10      Q      Okay.  Would you know why the medical
11  examiner put an article about crack cocaine in his
12  autopsy when there's been no evidence that he's used
13  crack cocaine?
14      A      I can't speculate on that.
15      Q      Have you ever seen an autopsy before
16  where someone has referenced a drug that someone has
17  never used, in their autopsy?
18      A      I can't say that I have.
19      Q      Have you ever read the Annals of Surgery?
20      A      I have looked at some of the articles.
21  Yes, I know of the journal.
22      Q      Is that an authoritative journal as well?
23      A      Yes.
24      Q      It is?
25      MR. GARDNER:  We're almost done.

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                    May 18, 2023

Page 97

```
 1                  (Off the record from 3:01 p.m. to
 2          3:02 p.m.)
 3   BY MR. GARDNER:
 4          Q        Are medical examiners or forensic
 5   pathologists able to diagnose ulcers?
 6          A        I guess they diagnose it when they do
 7   their -- do the autopsy of the stomach.  They notice the
 8   hole in the stomach.  So I would imagine so.
 9          Q        Okay.  Are they typically involved in the
10   treatment and management of ulcers?
11          A        No, they are not.
12          Q        Okay.  Are they ever involved in the
13   repair of a perforated ulcer?
14          A        Not to my knowledge.
15          Q        Do forensic pathologists or medical
16   examiners typically see the patient who has a perforated
17   ulcer when they're alive?
18          A        Don't think so.
19          Q        Okay.  Do you consider yourself an expert
20   in the treatment of a perforated ulcer?
21          A        I serve as a consultant to surgeons in
22   helping manage the medical issues with regard to the
23   patients after repair of a perforated ulcer.
24          Q        Right.  So you're a consultant to
25   surgeons?
```

Page 98

```
 1          A        Correct.
 2          Q        Would you consider a surgeon to be an
 3   expert in the treatment of a perforated ulcer?
 4          A        Acutely, yes.
 5          Q        Okay.  And so would you consider yourself
 6   to also be an expert in the treatment of a perforated
 7   ulcer?
 8          A        I can diagnose them.  I don't repair
 9   them.
10          Q        Okay.  So you would not be an expert in
11   the treatment of a perforated ulcer?
12          A        I'm trying to understand the definition
13   when you say "treatment."  Because if I find it, I'm
14   treating the patient, and then I'm sending them to my
15   colleague to repair.  So do I do the repair?  No.  Do I
16   help treat them afterwards?  Yes.
17          Q        Would you consider yourself an expert in
18   the repair --
19          A        No.
20          Q        -- of a perforated ulcer?
21          A        No.  Excuse me.  No.
22          Q        Do you know Dr. Myers?
23          A        I do not.
24          Q        You didn't say you were critical of
25   anything in his deposition, did you?
```

Page 99

```
 1          A        That's correct.  I was not critical of
 2   anything.
 3          Q        Or his report?
 4          A        Correct.
 5          Q        I think he said the same of you.
 6          A        Okay.  Nice to know.
 7          Q        You never met him before?
 8          A        Never met him.
 9          Q        Well, I don't remember if he said that or
10   not, to be honest with you.
11                   Let's talk about your invoice a little
12   bit.  Where is that?  I think it's on the last page.  It
13   says between 3/27 and 5/16 you had phone calls with
14   Dr. Nudelman totaling one hour.
15                   Do you know what those calls were about?
16          A        Preparation of the report, whether I had
17   any problems with the media to review.
18          Q        It said reviewing emails.
19          A        Well, emails, he's asking me questions,
20   whether I have any issues with the documentation; what's
21   my progress going forward.
22          Q        So Dr. Nudelman sent you emails?
23          A        Correct.
24          Q        And you respond to the emails?
25          A        Correct.
```

Page 100

```
 1          Q        How many emails?
 2          A        I don't know the number.  I would say
 3   less than ten.
 4          Q        What was the point of those emails?
 5          A        I think the status of where I was in the
 6   review.
 7          Q        And you still have those emails?
 8          A        Likely so, yes.
 9          Q        We asked for copies of them.  Do you know
10   why those weren't produced to us?
11               MR. JACKSON:  Object to the form.
12   BY MR. GARDNER:
13          Q        Do you know why those weren't produced?
14          A        I have no idea.
15          Q        Okay.  Did anyone ever tell you that we
16   asked for copies of those emails?
17               MR. JACKSON:  Object to the form.
18               THE WITNESS:  I don't -- I don't remember
19          being told that until just now.
20   BY MR. GARDNER:
21          Q        Okay.  Do you know that we asked for
22   copies of those emails?
23               MR. JACKSON:  Object to the form.  Just
24          so we're on the same page, is that in the
25          subpoena or --
```

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

Page 101

1          MR. GARDNER:  Yeah, it's in the subpoena.
2          MR. JACKSON:  Okay.  Which number?
3          MR. GARDNER:  I don't think I have the
4      subpoena with me right now.  We can pull it up,
5      though.
6   BY MR. GARDNER:
7          Q      What would you have to do to go find
8   those emails?
9          A      Go back to my computer, bring them up,
10  and give them to you.
11         Q      How long would it take you to do that?
12         A      An hour.
13         Q      Okay.  Is that something you could
14  produce to Mr. Jackson?
15         A      Sure.
16         Q      And then send over to me?
17         A      Sure.
18         Q      We will reserve our right to re-depose
19  you if necessary based off of those emails.
20         MR. GARDNER:  And you guys can --
21         MR. JACKSON:  We'll just insert an
22      objection to that, but we'll take it up.
23  BY MR. GARDNER:
24         Q      On 4/8/23, it looks you had another phone
25  call with Dr. Nudelman and Mr. Jackson.

Page 102

1          What's Dr. Nudelman's role in this case?
2          A      My understanding is that he searched for
3   an expert to review the case and served as an
4   intermediate.
5          Q      He's not an -- was he an attorney for
6   anyone in this case?
7          A      Not to my knowledge.
8          Q      What was that phone call about on
9   April 8th, 2023?
10         A      What I had reviewed.
11         Q      Okay.  What did you tell him?  It lasted
12  half an hour.
13         A      Went over -- I don't have any notes
14  regarding that, if you're -- if that's what you're
15  asking.  But I think we had a conversation about what
16  was found, what happened over time with Mr. Wingo in
17  the time in the jail, and what my thoughts were going
18  forward.
19         Q      And all of your thoughts going forward,
20  is that in your report?
21         A      Yes.
22         Q      Okay.  Are there any other materials that
23  you are anticipating you'll review in this case?
24         A      I do not believe so.
25         Q      Okay.  To write the report, it took less

Page 103

1   than an hour?
2          A      Yeah.  I think it was fairly -- fairly
3   straightforward actually.
4          Q      Okay.  Do most of the reports take less
5   than an hour to do?
6          A      No.
7          Q      Why was this one so short?
8          A      I think it was so straightforward, that
9   it was easy for me to put it together.
10         Q      Okay.  What was so straightforward about
11  this report?
12         A      The circumstance leading to Mr. Wingo's,
13  I think, demise.  The review of the videos and autopsy
14  report made it, I think, very easy for me to put
15  something together.
16         Q      The medical literature that you gave me,
17  is that the only literature that you reviewed?
18         A      Yes.
19         Q      Did you look at any other outside
20  sources?
21         A      Such as?
22         Q      Anything.  Any other books?
23         A      No.
24         Q      Videos, seminars?
25         A      No.

Page 104

1          Q      Okay.  So no other outside sources, other
2   than that article that you produced to us?
3          A      Correct.
4          Q      Okay.  Did you have everything you needed
5   to render your opinions?
6          A      Yes.
7          Q      Now, I think you said you testified three
8   times before as an expert?
9          A      I've given depositions three times as an
10  expert.
11         Q      Okay.  How many times have you been asked
12  to review cases?
13         A      Twelve, total.
14         Q      Has that primarily been for the plaintiff
15  or for the defense?
16         A      A little bit of both.
17         Q      Okay.  And do you keep a case list --
18         A      Yes, I do.
19         Q      -- of every time you've been asked to be
20  involved in a case?
21         A      Yes.
22         MR. GARDNER:  Did you produce that to me?
23         MR. JACKSON:  I don't believe we produced
24      a case list.
25         MR. GARDNER:  Because I think you said it

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                    May 18, 2023

---

Page 105

```
 1        was his first time.
 2                MR. JACKSON:  Well, I mean, I may have
 3        been mistaken on that.  That was my assumption --
 4        not my assumption; my understanding.
 5                MR. GARDNER:  That's what the expert
 6        disclosure says.
 7                MR. JACKSON:  The rules requiring a case
 8        list going how far back?
 9                MR. GARDNER:  I think it's five years.
10                MR. JACKSON:  That might have been the
11        issue, but there might have been a
12        misunderstanding.  If so, let's explore if I
13        need to get you something.
14   BY MR. GARDNER:
15        Q     It's not going to change much.  I don't
16   think it's --
17        A     No.  It's --
18        Q     Just like with your emails, I don't think
19   it's going to cause you to have to come back here, to be
20   honest with you.  The same thing.  I think you've told
21   me everything you know.
22        A     I think it's -- since -- if you go back
23   five years, that's 2018.  I think it's -- this would be
24   the third case in five years.
25        Q     That you've testified in?
```

---

Page 106

```
 1        A     Correct.
 2        Q     Did you get copies of those depositions?
 3        A     I'd have to look back at my records.
 4        Q     Uh-huh.  You may, because it seems like
 5   you keep a lot.
 6        A     We keep a lot of paper.  When you're a
 7   researcher, you keep a lot of paper.
 8        Q     So you may have copies of those
 9   depositions?
10        A     I may have copies.  Now, one of those
11   depositions was, of course, in my defense.
12        Q     Okay.
13        A     So the other one, the other --
14        Q     How long ago was that case for your
15   defense?
16        A     In 2020.
17        Q     What was the issue involved in that case?
18        A     Please don't laugh.
19        Q     No.
20        A     Someone says I paralyzed them after a
21   colonoscopy that was normal.
22        Q     Okay.  I don't know anything about that
23   stuff, so fair enough.  Okay.  Were they paralyzed?
24        A     No.  They said they were paralyzed, but
25   myself, the anesthesiologist, and the institution were
```

---

Page 107

```
 1   all thought to be not libel by a jury of my peers in
 2   Oklahoma.
 3        Q     Oh, wow.  That actually went to trial?
 4        A     Yes, it did.
 5        Q     So you never testified in federal court
 6   before?
 7        A     No.
 8        Q     This is your first time?
 9        A     Yes.
10                MR. GARDNER:  I don't think I have
11        anything else.  I think I've covered my outline.
12        Do you got any questions?
13                MR. JACKSON:  No questions.
14                MR. GARDNER:  Before we finish, give me a
15        moment and just let me check my exhibits.
16                (Off the record from 3:13 p.m. to
17        3:14 p.m.)
18                (Plaintiffs' Exhibit 4 was marked for
19        identification.)
20   BY MR. GARDNER:
21        Q     Let me show you what I've marked as
22   Plaintiffs' Exhibit 4.  Does that picture accurately
23   describe the different anatomy in a normal abdominal --
24        A     In a normal abdominal cavity?
25        Q     Yeah.
```

---

Page 108

```
 1        A     Yes.
 2        Q     Okay.  Anything you would change about
 3   this diagram?
 4        A     I'd make the stomach a little bigger and
 5   bring it closer to the liver.
 6        Q     Okay.
 7        A     But other than that, I mean, it's a
 8   reasonable representation.
 9        Q     It's a reasonable illustration --
10        A     Yes.
11        Q     -- of the -- okay.
12                (Plaintiffs' Exhibit 5 was marked for
13        identification.)
14   BY MR. GARDNER:
15        Q     I'll show you what I've marked as
16   Plaintiffs' Exhibit 5.  Does that illustration there
17   show a perforated ulcer with peritonitis?
18        A     Yes.
19        Q     Okay.  Is there anything that you would
20   change about this illustration?
21        A     No.
22        Q     Okay.  Is this a reasonable illustration
23   of what occurred with Mr. Wingo?
24        A     Yes.  Based on the autopsy report, yes.
25        ///
```

---

Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 28 of 42

Tiffany Wingo, et al. vs Major Branson Harris, et al.
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 79 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

Page 109

1        (Plaintiffs' Exhibit 6 and Exhibit 7 were
2   marked for identification.)
3   BY MR. GARDNER:
4        Q     And I think I know the answers to your
5   questions about Number 6 and Number 7.  Do those
6   illustrations properly show the surgical treatment of an
7   acute gastric ulcer perforation?
8        A     I can't comment on that because I don't
9   do the operation.
10       Q     Okay.  That would be outside of the scope
11  of your expertise?
12       A     Yes.
13       Q     Okay.
14       A     But they're nice pictures.
15       Q     Thanks.
16       A     I wouldn't mind for them for teaching
17  purposes actually.
18       MR. GARDNER:  All right.  I think we are
19  off the record and we are done.
20       (The deposition concluded at 3:17 p.m.)
21       (Pursuant to the Rule 30(e) of the
22  Federal Rules of Civil Procedure, and/or O.C.G.A.
23  9-11-30(e), signature of the witness has been
24  reserved.)
25

Page 110

1   DISCLOSURE OF NO CONTRACT
2
3        I, Danny Newman, Certified Court
     Reporter, do hereby disclose pursuant to
4   Article 10.B of the Rules and Regulations of
     the Board of Court Reporting of the Judicial
5   Council of Georgia that I am a Certified
     Court Reporter; Elizabeth Gallo Court
6   Reporting was contacted by the party taking
     the deposition to provide court reporting
7   services for this deposition; Elizabeth Gallo
     Court Reporting will not be taking this
8   deposition under any contract that is
     prohibited by O.C.G.A. 15-14-37(a) and (b) or
9   Article 7C of the Board; and I am not
     disqualified for a relationship of interest
10  under the provisions of O.C.G.A. 9-11-28(c).
11       There is no contract to provide reporting
     services between myself or any person with
12  whom I have a principal and agency
     relationship nor any attorney at law in this
13  action, party to this action, party having a
     financial interest in this action, or agent
14  for an attorney at law in this action, party
     to this action, or party having a financial
15  interest in the action.  Any and all
     financial arrangements beyond Elizabeth Gallo
16  Court Reporting's usual and customary rates
     have been disclosed and offered to all
17  parties.
18
          This, the 26th day of May, 2023.
19
20
21
22
23
          Danny Newman
24        Certified Court Reporter
          Certificate No.
25        5074-6421-0028-9536

Page 111

1   CERTIFICATE
2   CLARKE COUNTY:
3   GEORGIA:
4        The foregoing proceedings were taken down
5   by me as a Certified Court Reporter in the
6   State of Georgia, and the questions and
7   answers thereto were reduced to typewriting
8   by me, personally.  I hereby certify that
9   pages 1 through 109, inclusive, to the best
10  of my ability, comprise a complete and
11  correct transcript of said proceedings.  I
12  further certify that I am neither kin nor
13  counsel, nor am I a relative or employee or
14  attorney for any party, and nor am I in any
15  way interested in the outcome of said case.
16       This, the 26th day of May, 2023.
17
18
19
20
21
22        DANNY NEWMAN, CVR,
          CCR-5074-6421-0028-
23        9536
24
25

Page 113

1   CASE:  Tiffany Wingo, et al. vs Major Branson Harris, et al.
2   NAME OF WITNESS:    Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
3        The preceding deposition was taken
4   in the matter, on the date and at the time and
5   place set out on the title page hereof.
6        It was requested that the deposition
7   be taken by the reporter and that same be
8   reduced to typewritten form.
9        It was agreed by and between counsel
10  and the parties that the deponent will read and
11  sign the transcript of said deposition. Said jurat
12  is to be returned, within 30 days after the transcript
13  is made available, to the following address:
14        Elizabeth Gallo Court Reporting, LLC
15        2900 Chamblee Tucker Road
16        Building 13, First Floor
17        Atlanta, Georgia 30341
18  If an errata is executed and returned
19  to EGCR within the 30 days allocated by law,
20  the executed errata will be sent to the taking
21  attorney for filing with the original transcript.
22  Should an executed errata not be forwarded from
23  EGCR to the taking attorney for filing, the
24  deposition was not reviewed and signed by the
25  deponent within 30 days.

Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 29 of 42
Tiffany Wingo, et al. vs Major Branson Harris, et al.
USCA11 Case: 24-10633   Document: 31-2   Date Filed: 06/11/2024   Page: 80 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                May 18, 2023

Page 114

```
 1    NAME OF CASE:     Tiffany Wingo, et al. vs Major Branson Harris, et al.
      DATE OF DEPOSITION: 05/18/2023
 2    NAME OF WITNESS:    Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
 3    EGCR JOB NO.:    99741
 4              CERTIFICATE
 5         Before me this day personally
      appeared KENNETH J. VEGA, MD, MHA, FACP, AGAF, FACG, who, being duly
 6    sworn, states that the foregoing transcript of
      his/her deposition, taken in the matter, on
 7    the date and at the time and place set out on
      the title page hereof, constitutes a true and
 8    accurate transcript of said deposition.
 9    _____
10                   KENNETH J. VEGA, MD, MHA, FACP, AGAF, FACG
11         SUBSCRIBED and SWORN to before me
12    this _____ day of _____ 20____.
13    in the jurisdiction aforesaid.
14
      _____    _____
15    My Commission Expires      Notary Public
16    STATE OF _____
17    COUNTY/CITY OF _____
18
19         []  No changes made to the Errata Sheet;
20    therefore, I am returning only this signed,
21    notarized certificate.
22         []  I am returning this signed,
23    notarized certificate and Errata Sheet with
24    changes noted.
25
```

Page 115

```
 1            Errata Sheet
 2    NAME OF CASE:     Tiffany Wingo, et al. vs Major Branson Harris, et al.
 3    DATE OF DEPOSITION: 05/18/2023
 4    NAME OF WITNESS:    Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
 5    Reason Codes:  1. To clarify the record
 6                   2. To correct transcription errors
 7                   3. Other
 8    _____
 9    Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
12    From _____ to _____
13    Page _____ Line _____ Reason _____
14    From _____ to _____
15    Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
18    From _____ to _____
19    Page _____ Line _____ Reason _____
20    From _____ to _____
21    Page _____ Line _____ Reason _____
22    From _____ to _____
23
24    SIGNATURE:_____DATE:_____
25         Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
```

Page 116

```
 1            Errata Sheet
 2    NAME OF CASE:     Tiffany Wingo, et al. vs Major Branson Harris, et al.
 3    DATE OF DEPOSITION: 05/18/2023
 4    NAME OF WITNESS:    Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
 5    Reason Codes:  1. To clarify the record
 6                   2. To correct transcription errors
 7                   3. Other
 8    _____
 9    Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
12    From _____ to _____
13    Page _____ Line _____ Reason _____
14    From _____ to _____
15    Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
18    From _____ to _____
19    Page _____ Line _____ Reason _____
20    From _____ to _____
21    Page _____ Line _____ Reason _____
22    From _____ to _____
23
24    SIGNATURE:_____DATE:_____
25         Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
```

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

| | | | |
|---|---|---|---|
| **Exhibits** | **2020** 106:16 | **50** 40:25 41:3 | **abdominal** 28:6 36:16, 17 41:18 46:10,17 49:1, 2 50:10 69:1 74:22 90:18 107:23,24 |
| **Plaintiff's Exhibit 1** 3:0 11:19,23 17:16 | **2022** 4:17 19:20 20:9,12 | **500** 88:15 | |
| | **2023** 21:21 102:9 | **5015** 10:18 | **ability** 16:14 |
| **Plaintiff's Exhibit 2** 3:0 18:21,25 | **209** 11:7 | | **absence** 47:7 |
| | **20th** 21:21 | **6** | **absolutely** 17:7 37:1 53:12 63:11 82:16 83:5, 15 |
| **Plaintiff's Exhibit 3** 3:0 32:25 33:1 | **21** 20:6 | **6** 109:1,5 | |
| **Plaintiff's Exhibit 4** 3:0 107:18,22 | **23** 21:18 | | **abstract** 12:11,23,24 31:17 32:15 |
| | **24** 29:4,5 78:12 | **7** | |
| **Plaintiff's Exhibit 5** 3:0 108:12,16 | **2500** 40:7 | **7** 109:1,5 | **abstracts** 12:21 13:4,7 31:16 32:17 |
| **Plaintiff's Exhibit 6** 3:0 109:1 | **3** | **70** 59:11 | **accepted** 34:13 |
| | **3** 32:25 33:1 | **745** 52:18 | **accommodate** 7:14 |
| **Plaintiff's Exhibit 7** 3:0 109:1 | **3/27** 99:13 | **7:45** 47:14 52:23 53:11, 16,25 54:18,21,23,24 55:3,6,16,19 57:22 58:3 62:11 69:23 71:18,22 72:14 78:19 79:10 80:6, 8 83:16,18 86:7,11,14 | **accurate** 36:25 |
| **Exhibit Binder** 3:0 | **30** 58:11,20 70:23,24,25 93:10,11 | | **accurately** 107:22 |
| **$** | **30(e)** 109:21 | | **accusing** 85:7 |
| | **30907** 10:19 | | **acid** 73:24 90:3,21 91:3 |
| **$500** 88:9 | **30s** 93:9 | **7:46** 83:21 | **acid-** 93:7 94:18 |
| **1** | **36-year-olds** 62:5 | **7:50** 83:22 | **acid-blocking** 40:24 |
| | **3:01** 97:1 | **7:57** 83:23 | **acid-related** 94:18 |
| **1** 11:19,23 17:16 | **3:02** 97:2 | | **acumen** 53:19 |
| **10** 10:21 51:14,16 52:15 58:19,21 59:3 | **3:13** 107:16 | **8** | **acute** 109:7 |
| **100** 87:2 | **3:14** 107:17 | **80s** 59:8 | **Acutely** 98:4 |
| **12** 10:21 | **3:17** 109:20 | **8:23** 72:4,12 83:24,25 84:5,8 | **add** 31:20 |
| **120** 29:21 | **4** | **8th** 21:21 102:9 | **added** 12:10,15 |
| **120-day** 29:25 | **4** 107:18,22 | | **addition** 17:21 |
| **18** 59:19,22 60:6,11 | **4/12/2022** 19:10 | **9** | **additional** 71:2 |
| **1998** 37:13,14 | **4/8/23** 101:24 | **9-11-30(e)** 109:23 | **address** 10:13,16 |
| **2** | **40** 93:2 | **9/2/2022** 20:3 | **adjunct** 44:11 |
| | **5** | **90** 29:20 59:5,6 | **administration** 4:13 12:3,8,9 |
| **2** 18:21,25 | **5** 11:25 51:14,16 52:12, 14 62:23 108:12,16 | **9:26** 55:12 | **advance** 63:2,13 65:24 |
| **20** 58:18,19,21 59:3,17, 22 60:7 | **5/16** 99:13 | **A** | **adverse** 50:20 |
| **2018** 11:4 23:24 24:1 105:23 | **5/16/23** 21:20 | **a.m.** 47:14 52:18,23 53:25 54:18 57:22 62:11 69:23 71:18,22 72:4,12 78:19 83:21 | **advice** 28:1 |
| | | | **Advil** 90:24 |
| **2019** 45:17 | | **abdomen** 74:21 89:7 | **AGAF** 4:1 |
| | | | **age** 40:25 59:8 60:17,20 |



Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG

May 18, 2023

**ages** 59:13

**agree** 84:23,25 86:20

**agrees** 84:25

**ahead** 11:14 17:13 22:4

**air** 41:18

**alarm** 36:3

**alert** 65:11

**Aleve** 90:24

**alive** 72:4,11,13 83:25
84:5 97:17

**allowed** 79:2

**ambulance** 47:13
52:18 62:10,14,20
63:10 83:17 85:17

**amount** 62:19

**anatomy** 107:23

**and/or** 109:22

**anesthesia** 25:13

**anesthesiologist**
106:25

**Annals** 96:19

**answers** 4:24 5:6
109:4

**anti-inflammatory**
91:5,6

**anticipating** 102:23

**anytime** 7:12

**apply** 90:18

**appointments** 23:4
24:3

**appropriately** 36:5
51:14

**April** 11:4 19:20,22
21:21 22:2 23:25 24:1
102:9

**area** 14:18 41:20 74:7,
8,13,17

**areas** 91:8,9

**Arkansas** 8:17,23

**arrival** 69:8

**article** 32:23 33:4,7,14
34:17,18 35:13 44:5
51:13 78:9 89:5,15
91:16,22,25 92:14,17
93:20 96:11 104:2

**articles** 6:12 30:3,4
96:20

**assessment** 38:13

**assist** 45:18 46:1 94:9

**assistants** 64:18

**assume** 41:1 76:19

**assumed** 46:13

**assumption** 105:3,4

**Atlanta** 14:18

**Atlantic** 11:7

**attempt** 85:20

**attempted** 43:21

**attended** 85:23

**attorney** 102:5

**audible** 4:25

**audio/visual** 20:6

**August** 11:1 20:9,12

**authoritative** 33:21
34:14 96:22

**autopsy** 16:24 48:6,12,
17 52:24 53:1,3,8,20
54:6,19,20 56:17 61:21
70:1,13 71:12,16 79:3
81:12 91:12,13,16 92:2,
3,14,17 94:10 96:12,15,
17 97:7 103:13 108:24

**awaiting** 68:14

**aware** 36:3 43:1 52:2

---

**B**

**back** 36:4 81:14 86:7
101:9 105:8,19,22
106:3

**background** 6:10,16

**bacteria** 39:4

**bacterial** 94:7

**bacterial-related**
94:19

**bad** 40:15

**balance** 73:3,8

**based** 28:7 37:8 52:24,
25 53:20 54:6,19 58:1
65:22 67:4 69:23,25
70:2,5,12 74:18 80:12
101:19 108:24

**basically** 5:13

**basis** 38:10

**bay** 65:18

**Beach** 11:8

**began** 47:10 50:12

**beginning** 12:16 19:21

**behavior** 53:20 80:12,
14 82:25 83:2

**belief** 70:5,8

**beliefs** 69:22

**big** 12:15

**bigger** 108:4

**biopsies** 40:21

**bit** 6:9 15:9 70:22 74:2
99:12 104:16

**bleeding** 39:2

**blocking** 93:8

**blood** 48:13,14,18,19,
20 50:11 51:20 54:15
73:5 75:8,20 76:1,10,18
77:2 78:1,2 91:2,8,9,10
94:17 96:2,3,6

**blue** 15:7 83:3

**board** 74:24

**body** 39:5 55:9 70:20

**books** 30:25 103:22

**boots** 29:20

**Boston** 65:10

**break** 7:13,14,16

**breaks** 7:11

**breathing** 76:19 77:5,
6,7

**bacterial-related**

**bring** 101:9 108:5

**bunch** 22:22 75:10

---

**C**

**call** 20:11 28:15 29:19
42:2,6 63:1 65:11,24
85:16 101:25 102:8

**called** 28:24 29:20
42:25 47:13 52:18
62:10 83:17 90:11

**calling** 67:8

**calls** 99:13,15

**Candice** 9:25

**capacity** 8:7

**cardiac** 51:22 65:20

**cardiologist** 65:20

**care** 28:10,11 29:18
64:6,13

**career** 23:12 58:10
59:25

**case** 6:2,5,17 9:7,17
11:24 12:25 14:9,23
15:13,15 16:3,7 19:3,13
30:11 33:6,8 34:21
35:3,14 46:9 47:20
48:11 69:13 72:3,10
91:13 96:7 102:1,3,6,23
104:17,20,24 105:7,24
106:14,17

**cased** 8:15

**cases** 58:10,21 92:8,10
104:12

**CAT** 41:20 75:22 76:2,
11

**cavity** 41:19 48:13 49:1
74:22 90:18 107:24

**cell** 75:8 80:23 81:17
83:19,20 86:8,11

**center** 16:24 62:16

**certainty** 53:24 54:3,9,
18 80:7,11 81:4 82:1,18
86:18 87:21

**chance** 23:11 28:8 32:7
47:14 52:19 55:18 62:6,



**Elizabeth Gallo**
COURT REPORTING, LLC

2

Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 32 of 42
Tiffany Wingo, et al, vs Major Branson Harris, et al,
USCA11 Case: 24-10633   Document: 31-2   Date Filed: 06/11/2024   Page: 83 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                   May 18, 2023

11 87:2

**chances** 86:21

**change** 105:15 108:2, 20

**changed** 50:10

**chapter** 30:25 31:1,3

**charge** 19:6

**check** 107:15

**checked** 54:15

**checklist** 7:21

**chest** 65:17 84:9

**circumstance** 42:1 48:15 56:15,16 63:22 69:15 103:12

**circumstances** 43:1 46:14 47:16 67:19 90:7

**citizens** 96:5

**City** 15:18 64:10

**Civil** 109:22

**clarify** 49:15

**clinical** 53:19 56:14 58:1,2,6,7 75:17

**close** 42:17 43:4 44:4 90:19

**closed** 42:23

**closer** 108:5

**cocaine** 91:17 94:3,15, 20,23 95:1,19,21 96:8, 11,13

**collapse** 82:4

**collapsed** 81:8,21

**colleague** 98:15

**colleagues** 30:21

**college** 13:21 23:21

**colon** 9:14

**colonoscopy** 106:21

**Colorado** 13:13 14:4

**combination** 90:21

**comfortable** 54:11,13, 14

**comment** 109:8

**common** 92:24,25 93:1

**communication** 65:9

**communications** 65:5

**community** 34:14

**comorbid** 61:6

**comorbidities** 51:25 52:2 60:9,12 61:20

**complaining** 72:24,25

**complaints** 46:13

**completed** 18:3

**complications** 46:20 48:2

**component** 91:20

**computer** 22:10 101:9

**concluded** 109:20

**condition** 46:2

**conducted** 70:1

**confirm** 39:7

**confirmed** 40:18

**Congressional** 10:18

**constant** 81:19

**constantly** 81:14

**constrict** 96:3

**constrictor** 94:16 95:9

**consultant** 97:21,24

**consulting** 27:23

**contact** 18:15 28:9,14, 19 29:13 42:13,15 66:13 68:23

**contacted** 15:10 19:13 63:13 67:22,24

**contacts** 15:2

**contents** 48:12 73:24

**continue** 6:15 7:17 78:2

**continues** 78:3 96:4

**contract** 37:6

**contribute** 47:4 50:5 71:6

**contributing** 90:22 94:12,20 95:5,8,13

**controlled** 51:23

**conversation** 15:21 38:9 102:15

**conversations** 16:8 18:2

**convicted** 67:11 68:12

**coordinated** 9:24

**copies** 100:9,16,22 106:2,8,10

**correct** 4:18 5:14 8:8, 14 9:20 10:12,15 11:13 12:22 13:10,17 14:7,14, 16,20,25 15:8 17:3,10, 14,15,20 18:13 19:11 20:10,13,16,19 21:2 22:1,3 23:20,23 24:2 25:19 26:9 29:2,24 30:1,14,17 31:2 32:1,10 35:8 37:3 38:21 39:6,17 41:9 42:12,14 45:8 46:24 47:11,18 49:9 52:1,16 53:5 54:1 55:14 56:1 59:21,23 60:1,15, 16,18,22 61:3,4 67:21 68:13,16,19,22 69:9 70:10 74:5,12 76:12,16 77:9 78:13,15 83:10 85:1,2,18,21,25 86:1,4, 5,19,23 87:5,14,23 89:22 90:17 93:13,15 94:22 95:18 98:1 99:1, 4,23,25 104:3 106:1

**correctional** 64:9,14

**corrections** 88:1

**counsel** 20:12

**count** 48:14 50:12 51:1 75:8 76:1,10

**country** 6:13

**couple** 4:20 23:13 55:15

**court** 5:17 7:1 9:8 26:14 68:15 107:5

**covered** 7:22 107:11

**covers** 90:18

**crack** 91:17 94:3,15,25 95:21 96:8,11,13

**created** 5:10

**critical** 49:11,21,25 98:24 99:1

**CT** 41:13,16

**curious** 43:24

**current** 37:5,7

**cut** 90:2

**CV** 4:14 10:14 11:10,11, 12,25 12:10,13 13:5,8, 11 22:5,17 36:25 37:2

## D

**damage** 94:19

**data** 31:20 32:8,9,11, 12,13 53:7

**date** 11:12 18:16,20 19:25 20:22

**dates** 16:10

**day** 43:5,6 70:13

**day-to-day** 38:4

**days** 5:11 19:15 29:20, 21

**dead** 55:12 70:18 71:4

**deadline** 12:16

**deal** 13:8 26:21 30:4, 12,18,19 31:3,13 32:17 44:6 57:15 60:17 67:6

**Dealing** 57:18

**death** 46:23 47:8 48:4

**deceased** 85:24

**decide** 5:16,21,22 13:1 41:22 42:2 43:2 69:6

**decision** 66:1

**declared** 55:12

**decline** 47:10



Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 33 of 42
Tiffany Wingo, et al, vs Major Branson Harris, et al.
USCA11 Case: 24-10633   Document: 31-2   Date Filed: 06/11/2024   Page: 84 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                          May 18, 2023

decrease 78:2 86:22 91:2

decreases 84:22 91:8 94:16

deduce 54:21

deems 66:19

defendant 8:10,11,12

defendants' 11:23

defense 20:12 104:15 106:11,15

defer 57:1

definition 98:12

degree 53:23 54:3,9, 17,22 71:19 73:13,14 79:3 80:7,10 81:3 82:1, 18 86:17

delay 62:19

delivery 95:4

demise 103:13

depending 31:18 40:16 63:17 89:8

depends 28:16 40:12 51:9,18 73:13 89:25 90:7,8

deposition 5:10 6:3 7:17,24 11:18 18:5 49:17 50:1 83:23 84:4 98:25 109:20

depositions 104:9 106:2,9,11

describe 107:23

detail 15:16

details 9:5

determine 39:15 67:9 75:1,4

determined 47:6 50:7 85:24 86:2

develop 39:4 73:11 77:11 93:3

developed 46:20 48:1

developing 79:7

development 55:10

diabetes 51:23 61:7,8, 15

diagnose 97:5,6 98:8

diagram 108:3

diaphragm 41:19

die 47:5 50:6,18 87:7,22 93:14

died 15:17 55:25 56:7, 13 59:4,20

dies 55:10 70:21

difference 49:16 68:8 94:25

difficult 7:1 84:24

difficulty 77:5

disclosure 11:24 105:6

discover 42:19

discuss 38:7

discussed 35:7,10 92:19

disease 51:22,23 60:25

distance 62:24

distress 46:17

doctor 45:1 84:14

document 34:7

documentation 99:20

documents 9:25 16:15 18:25 19:9,24

doses 96:5

draft 21:11,17

draw 50:11

drew 50:11

Drive 10:18 11:7

driving 40:12

drug 52:4,5 96:16

drugs 91:5,6 95:23

dual 10:5

DUI 67:13

duly 4:2

duty 28:23 29:15

___

**E**

earlier 40:22 79:18 88:22

easier 5:8 89:12,13

easily 93:8

easy 31:19 103:9,14

editorials 31:7

educated 38:9 53:17, 18

education 22:22

educational 31:13

elevate 78:3

elevated 48:14

email 18:19

emails 99:18,19,22,24 100:1,4,7,16,22 101:8, 19 105:18

emergency 28:13 87:14,20

emergent 43:7

EMS 65:11

EMTS 65:5 67:22

end 5:10,21,23 12:16 19:22 52:11 91:16

ending 91:11

endoscope 40:13

endoscopic 36:2 39:13,23

endoscopically 24:21, 24

endoscopy 39:9,14, 15,24,25 40:4,13 41:1,8

English 90:23

enlisted 29:12

enteral 94:7

entire 80:21

environment 29:19

episode 39:2

ER 28:6,12 65:11,21

ERCP 9:15

errors 5:13

esophagus 25:2,4

essentially 6:5 29:21 32:14

evening 78:25 79:18, 21

everyday 35:15 68:20

evidence 47:9 48:11 96:7,12

evolving 46:22 48:3

exact 31:22

exam 28:7,16,18 41:12 50:10 51:1 74:18 75:2, 19 76:1,10 77:16 78:4

EXAMINATION 4:4

examined 4:2

examiner 91:15 93:17 96:11

examiners 97:4,16

examining 54:14 70:9

exams 46:15

Excuse 98:21

exhibit 11:18,19,23 17:16 18:21,25 32:25 33:1 107:18,22 108:12, 16 109:1

exhibits 107:15

expect 52:9 53:8 63:23 73:23 82:22

experience 56:15,18, 21 58:2,7 87:25

experiences 27:22

experiencing 87:13,20

expert 8:7,13,16 9:7,17 11:24 14:12 15:4 64:15 97:19 98:3,6,10,17 102:3 104:8,10 105:5

expertise 109:11



Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG

May 18, 2023

**experts** 92:9

**explain** 11:10 40:19 42:20

**explore** 105:12

**expressed** 31:22

**extensive** 22:6

**extent** 15:21 63:17

**extra** 96:5

**extremely** 36:8

---

**F**

**f-o-r-e-g-u-t** 26:16

**face** 83:3

**FACG** 4:1

**facility** 46:12

**FACP** 4:1

**fact** 27:13 46:1 48:17 72:2

**factor** 94:12,20 95:5,8, 13

**factors** 47:3 50:4 60:13,17 61:5 90:22

**fair** 7:8 15:14 16:16 26:22 30:23 68:4 69:9 90:10 106:23

**fairly** 40:6 52:9 53:6 76:22 93:8 103:2

**fall** 84:9

**familiar** 8:3,23 30:6 64:5

**familiarity** 64:11

**fast** 51:5 76:5 78:6

**father** 64:9,13 88:2

**feature** 92:18

**features** 36:3

**federal** 107:5 109:22

**federally** 37:9

**fee** 19:9 88:9,11

**feel** 36:6 54:11 74:21

**feeling** 36:11 54:16

**feels** 25:20

**fellows** 24:8

**figure** 65:18

**file** 19:9

**find** 33:10 34:17 40:16 98:13 101:7

**findings** 28:7 36:2 53:20 56:17 82:15

**fine** 4:22 22:15

**finish** 21:4,6 40:14 107:14

**fix** 89:11

**Florida** 10:11,13 11:8,9 13:12 14:2

**flow** 91:2,8,10 94:17 96:3

**fluid** 70:22

**foregut** 26:12,16

**forensic** 69:18 97:4,15

**forget** 96:6

**form** 57:23 69:4 72:6 78:20 79:11 84:1 87:15 100:11,17,23

**formation** 91:4,11 94:19

**forward** 32:13 42:2 81:23 99:21 102:18,19

**found** 15:6 52:12 63:24 66:4,10 67:5 69:16 81:12,16 102:16

**fourth** 8:21

**free** 41:18

**Freedom** 29:17

**front** 18:16,20

**fully** 6:22 7:4,5,6,7

**funded** 37:9,15

**funding** 37:6

---

**G**

**GARDNER** 4:5 5:20,24 6:1 10:3 11:21 18:23 21:9 26:17 33:3 49:20 58:5 69:5 72:9,21 79:8, 12 84:2 87:18 96:25 97:3 100:12,20 101:1,3, 6,20,23 104:22,25 105:5,9,14 107:10,14, 20 108:14 109:3,18

**gastric** 24:19 25:7 44:13 48:2 73:24 94:3 109:7

**Gastroduodenal** 34:6

**gastroenterologist** 27:23 45:22,25

**gastroenterologists** 33:24

**gastroenterology** 24:8 34:1

**gastrointestinal** 34:4 38:19 39:5

**gave** 4:19 52:11 78:10 103:16

**general** 26:10,11 28:15,20 33:24 49:5 57:1 89:20

**generally** 24:13 48:20 51:10 66:3

**Georgia** 10:11,16,19, 23 11:3,6 13:13 14:6,15 23:22

**gestures** 5:3

**GI** 26:11

**give** 10:21 16:10 20:22 31:21 38:12 40:24 46:16 56:8,9 58:13 63:19 66:14 80:1 101:10 107:14

**God** 84:14,16

**Godfather** 23:16

**gold** 39:11 88:25

**golden** 39:10

---

**good** 13:3 14:8 18:1 22:20 45:1 62:6 78:12 90:14

**Goodies** 90:24

**graduated** 12:3

**graduation** 12:7 22:13

**grammatical-type** 5:13

**grant** 37:5,20

**great** 20:8 33:14 36:23

**greater** 41:3

**ground** 29:20

**guards** 83:23 84:3,4,8 88:4

**guess** 5:20 9:13 35:22 37:15 38:3 45:21 53:18 57:20,22 58:1 65:23 79:9 81:18,24 82:13 97:6

**guessing** 90:4

**gunshot** 65:17

**guys** 5:20 101:20

---

**H**

**half** 20:14 88:17 102:12

**happen** 55:7 87:10 94:4

**happened** 45:19 50:11 78:23 94:11 102:16

**he'll** 22:15

**head** 5:2 20:1 25:10

**heal** 44:15

**healed** 41:3

**healing** 40:24 89:8

**health** 4:12 12:3

**healthcare** 12:8,9

**healthy** 51:20

**hear** 83:12

**heard** 45:7 63:12



Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                    May 18, 2023

| | | | |
|---|---|---|---|
| **heart** 48:21 76:18 77:2, 3,4 78:2 | **ignore** 46:14 | 74:4 75:11 76:25 | **involve** 13:5 22:23 24:4 31:8 37:18,24 |
| **helping** 97:22 | **illnesses** 51:19 61:6 | **Inflation** 88:12 | **involved** 8:24 9:7 14:9 15:18 27:17 28:9 33:8 37:21 41:21 42:11 43:19 45:11,15 60:2,4 65:1,6 92:11 97:9,12 104:20 106:17 |
| **helps** 41:22 | **illustration** 108:9,16, 20,22 | **inform** 38:10 | |
| **Hey** 38:13 67:24 87:2 | **illustrations** 109:6 | **information** 16:19,21 34:20 45:25 48:22 50:22,23,24 63:20 66:14 69:15 80:4 82:21 | |
| **high** 48:21 51:20 93:4,5 | **imagine** 15:18 19:21 21:18 60:12 62:13 66:5 95:2 97:8 | | |
| **higher** 51:21,24 | | | **involving** 9:17 |
| **highlight** 92:18 | **imaging** 41:12 | **Informing** 35:18 | **Iraq** 29:13 |
| **hint** 46:16 | **immediately** 28:19 43:19 77:14 | **initially** 41:17 | **Iraqi** 29:16 |
| **hole** 42:17,21 43:4 44:4 90:15,16,19 97:8 | **impact** 91:7 | **initiating** 37:9 | **irritating** 73:25 |
| | | **innocent** 68:18 | **irritation** 77:15 81:14 |
| **home** 10:5 29:21 87:7 | **important** 4:24 | **inordinate** 62:19 | **irritations** 74:19 |
| **homes** 10:7,9 | **impressive** 6:10 84:14 | **insert** 101:21 | **ischemia** 94:6 |
| **hone** 41:20 | **inability** 73:1 | **inside** 25:4 | **issue** 38:19,25 105:11 106:17 |
| **honest** 99:10 105:20 | **incarcerated** 15:17 | **inspected** 48:13 | |
| **hope** 87:8 | **incidents** 94:4 | **instance** 39:2 | **issues** 6:17 34:5 69:1 76:15,17 97:22 99:20 |
| **horribly** 6:3 | **include** 90:1 | **institution** 106:25 | **items** 20:6 |
| **hospital** 27:18 35:25 36:8 56:7 62:21,22 63:1,4,5,7,10,12,15,23 65:2,7,24 66:1,6,13,17, 18,23 67:2,3,24 69:6,11 70:17 85:16,19 | **included** 13:5,8 46:21 48:3 | **Intensity** 95:4 | |
| | **increase** 61:12 96:1 | **intention** 23:19 | **J** |
| | **increased** 76:18 77:2,4 91:3 94:4 | **interested** 15:12 | **Jackson** 5:16,22 9:24 21:3,8 49:15,19 57:23 69:4 72:6,15 78:20 79:11 84:1 87:15 100:11,17,23 101:2,14, 21,25 104:23 105:2,7, 10 107:13 |
| | | **interesting** 13:1 | |
| **hour** 88:9,15 99:14 101:12 102:12 103:1,5 | **increases** 60:20,24 61:2 | **interleukin** 76:5 | |
| **hours** 20:15 55:15 78:12 80:18 | **indicating** 74:23 | **interleukins** 75:15,20 76:2,7,9 | |
| **huh-uh** 5:4 | **indications** 32:13 | **intermediate** 102:4 | **jail** 62:22 64:3,6,13,21, 24 65:2,6 66:6 67:5,8, 10,13,20 68:7,9,11,24 69:16 88:7 102:17 |
| **huh-uhs** 4:20 | **individuals** 91:7 | **interpret** 32:8 | |
| **hundred** 22:20 | **Indocin** 90:24 | **interpretation** 32:6 | |
| **hypertension** 61:9,18 | **industry-sponsored** 37:8 | **interrupt** 7:2,3 | **Jersey** 13:12,19 |
| | | **interval** 73:16 | **job** 90:14 |
| **I** | **infection** 40:21,22,23 48:8,9 90:21 91:3 94:7 | **intervention** 52:13,14 89:6 | **journal** 33:15 34:8,9,10 96:21,22 |
| | | **interventions** 51:5 | **journals** 30:3 |
| **idea** 51:4 100:14 | **infirmary** 64:18 81:1,7 83:18 | **intestinal** 26:11 | **July** 20:9 |
| **identification** 11:20 18:22 33:2 107:19 108:13 109:2 | **inflamed** 74:21 | **intestine** 94:1 | **June** 12:17 |
| | **inflammation** 49:1 73:14,15,16 74:7,10,13, 16,17 75:1,5,22 76:3, 11,15 79:4,6 84:21 | **investigating** 37:9 | **jury** 107:1 |
| **identified** 17:1,9 21:1 88:21 | | **invoice** 20:3,14 21:1,20 99:11 | **juxta-pyloric** 93:22,23, 24 94:2 |
| **identify** 48:9,10,16 | **inflammatory** 73:21 | **invoices** 19:2 | |



Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

## K

**Kansas** 23:14

**Kenneth** 4:1,8

**Kevil** 45:15

**kids** 22:11

**kind** 6:8,16 23:19 26:14
48:17

**knew** 14:24 48:6 50:22,
23 65:16

**knowing** 50:9 82:14,15

**knowledge** 26:2 34:20,
23,24 38:12 57:11
91:24 97:14 102:7

## L

**laboratory** 75:6,7,19
76:1,10

**lack** 38:12 74:24

**laparoscopic** 45:3
89:3,4,15

**laparoscopically**
89:10,11

**lasted** 102:11

**laugh** 106:18

**law** 32:6

**layperson** 72:18

**lead** 91:4

**leading** 94:19 103:12

**leads** 71:13,17 79:6

**leaking** 70:18

**lectures** 37:23

**led** 46:14,22 48:3 81:15

**legalese** 26:20

**libel** 107:1

**life** 85:12 86:4

**likelihood** 47:5 50:6
51:3 84:19,22

**list** 104:17,24 105:8

**listed** 61:21

**literature** 103:16,17

**live** 11:5 13:15,18,23
56:17 87:21

**lived** 6:10 10:22,25
13:12 55:25 56:3,13
57:22

**liver** 108:5

**local** 74:8

**locally** 74:8

**location** 65:13 81:16

**locations** 13:14,16

**long** 6:4 10:25 19:18,23
29:3 31:16 37:12 40:10
62:24 73:11 88:15
101:11 106:14

**longer** 40:17 73:16,17
84:21 86:22

**looked** 17:23 22:20
35:2 80:15 96:20

**lost** 26:20

**lot** 5:8 6:4,10,11,12
30:20 31:20 60:13
106:5,6,7

**loud** 4:25

**low** 40:6 47:15 52:9,20
62:12 73:5 76:18 77:2
96:2

**lower** 48:20 51:21
52:11 78:1 88:13

**lung** 51:22

**lying** 73:1

## M

**made** 21:14 42:25
81:11 103:14

**maintain** 73:1

**majority** 59:9

**make** 5:6 11:17 28:2
34:19 41:2 66:1 69:12
83:1 94:17 108:4

**makes** 5:8 6:25 47:8

83:1

**making** 65:23

**malignancy** 41:6

**man** 55:9 66:10,21

**manage** 24:20 36:5
41:23 43:25 44:7,8
97:22

**managed** 27:8 64:23

**management** 23:1
28:2 34:3,4,25 35:2,14,
20,21 37:24 38:23,24,
25 39:1 97:10

**March** 19:22 21:18,24

**marginal** 91:10

**Marietta** 14:17

**marijuana** 95:5,7,12

**mark** 32:24

**marked** 11:19,22
18:21,25 33:1 107:18,
21 108:12,15 109:2

**markers** 75:11,13

**Martinez** 10:18

**master's** 4:12 12:3,8

**materials** 17:8 20:17
102:22

**matter** 67:7,17,19

**MD** 4:1,8

**meaning** 4:25 24:22
55:24

**means** 50:9 85:11,15
93:9

**mechanism** 94:6

**media** 99:17

**medical** 6:17 16:24
23:21 24:8,11 27:5,6
29:17 44:16 46:11 47:9
53:24 54:3,9,17 64:6,
13,18 67:15 79:1 80:7,
10 81:4 82:1,18 86:18
87:13,20 91:15 92:11
93:17 96:10 97:4,15,22
103:16

**medically** 24:21,22
44:6 83:5 85:24

**medication** 28:2 40:24
44:7,9,14 93:8 95:25

**medications** 24:23,24
43:25 90:22

**medicines** 90:23 96:6

**meeting** 12:15

**meetings** 13:2 35:5,7,
10,13

**mentioned** 34:3 40:22
50:24 88:22

**mess** 93:21

**met** 99:7,8

**Mexico** 13:12,25

**MHA** 4:1,10,12

**mid-40s** 59:8,11

**miles** 10:21 62:23

**mind** 17:11 109:16

**minimize** 76:20 89:6,7

**minutes** 40:13 70:23,
24,25 77:19

**missing** 22:13

**mistaken** 105:3

**mistakes** 5:8

**misunderstanding**
105:12

**Mitchell** 14:19

**modalities** 45:5

**moment** 4:19 38:2
107:15

**monthly** 29:15

**morning** 55:13

**mortality** 30:15 51:7,
10,16,22 52:7,15 57:2,
7,11 60:14,20,24 61:3,
12 78:11

**Motrin** 90:23

**move** 23:12

**moved** 48:23 81:15,19



Tiffany Wingo, et al, vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG

May 18, 2023

**movement** 81:19

**moving** 71:25 72:2 81:22 83:22

**mucosa** 94:7

**multiple** 10:7 48:10

**multitude** 47:3 50:4

**muscles** 74:22

**Myers** 84:25 98:22

**Myers'** 49:3

**N**

**national** 13:2 35:5,7, 10,12

**naturally** 20:18

**nearby** 66:6

**necessarily** 38:17 83:4

**needed** 16:17 29:17 65:22 104:4

**nerve** 90:2

**nervous** 83:1,3

**nice** 99:6 109:14

**night** 80:21

**nod** 5:2

**nonetheless** 5:4 6:15

**nonresponsive** 68:25

**norm** 57:15

**normal** 40:13 106:21 107:23,24

**noted** 94:4

**notes** 102:13

**notice** 36:4 97:7

**nowadays** 89:16

**NSAIDS** 90:23

**Nudelman** 14:13,19,21 18:3,14 19:5 99:14,22 101:25

**Nudelman's** 102:1

**number** 31:22 52:11 56:8,9 58:13 60:11

100:2 101:2 109:5

**nurses** 64:16,23 65:21

**nursing** 46:11

**O**

**O.C.G.A.** 109:22

**Object** 57:23 69:4 72:6 78:20 79:11 84:1 87:15 100:11,17,23

**objection** 72:15 101:22

**objective** 47:9

**observable** 80:14

**observed** 81:4

**occasions** 16:6

**occur** 73:15

**occurred** 108:23

**occurs** 73:16

**Oceanwalk** 11:7

**odd** 56:6

**offensive** 5:5

**offer** 18:9 23:16

**officer** 64:9,14

**Oklahoma** 13:13 14:2 107:2

**older** 91:7 96:4

**omental** 90:11

**omentum** 90:17

**ongoing** 54:23

**onset** 78:14

**open** 45:2 89:1,3,4,5, 10,15

**opening** 89:7 93:25

**operating** 57:7

**operation** 28:10 29:16 38:13 42:8 44:15 109:9

**operator** 40:12

**opinion** 6:6 46:19 47:2, 10,12 48:1 49:8,9 50:3 52:17,20 72:14

**opinions** 6:4 18:9 32:11 46:6,9,25 47:19, 22 88:3,19,20 104:5

**opportunity** 5:11 23:9 24:20 66:18 68:15

**options** 35:18,19 38:5, 8

**order** 34:19

**organs** 49:2

**original** 30:2

**outline** 107:11

**outstanding** 37:11

**over-the-counter** 93:9

**oversew** 90:1

**P**

**p.m.** 97:1,2 107:16,17 109:20

**padded** 81:17,18 83:19,20

**pages** 17:14

**pain** 28:6 36:7,16,17 46:10 72:24 76:20

**painful** 25:9 36:8

**paper** 106:6,7

**paralyzed** 106:20,23, 24

**paramedics** 65:5

**parenting** 22:11

**part** 15:1 17:16 35:15 38:3 44:16

**parts** 94:17

**passed** 45:17 71:19,21

**passing** 53:21

**patch** 90:11,19

**pathologist** 69:19

**pathologists** 97:5,15

**patient** 27:8 42:18,25 47:5 50:6 63:13 65:19, 25 67:16,17,24 68:2,24

69:8 89:13 97:16 98:14

**patient's** 28:16

**patients** 27:14 28:5 35:18 38:7,15 64:17 97:23

**peer** 34:15

**peer-reviewed** 31:12

**peers** 107:1

**pending** 7:15

**people** 29:18 40:25 48:20 59:3,7,15,17 60:7 67:10 68:11,20 93:12

**peptic** 78:23

**percent** 41:3 51:14,16 52:12,15 59:5,6 87:2 93:2,10,11

**percuss** 74:23

**perfect** 75:14

**perfectly** 4:22

**perforate** 24:20 93:12

**perforated** 8:24 9:17 13:5,9 15:19 22:24 23:2 24:4,7,16 25:23 26:5, 23,25 27:4,9,14,19 28:7,8,14 30:4,13,16 31:4,8,10,13 32:18,20 35:2,15 36:11,12,15 37:18,21,24,25 38:5 39:16,20,22 41:8,11 42:4 43:15,18,22 44:1, 7,8,13,17 45:16,22 46:21 48:2 51:8,16 56:23 57:3,8,12 58:9,22 59:18 60:8,15,23 61:2, 24 62:6,17 73:18 78:7, 24,25 82:14 89:1,24 90:20 92:21 93:17 97:13,16,20,23 98:3,6, 11,20 108:17

**perforates** 26:7 73:19 74:3 76:14,25 77:14,17, 20

**perforating** 36:1

**perforation** 8:25 9:7, 13,14,15 39:25 40:5 41:23 42:5,10,19,22



Case 1:20-cv-03662-VMC   Document 191-8   Filed 07/11/23   Page 38 of 42
Tiffany Wingo, et al, vs Major Branson Harris, et al,
USCA11 Case: 24-10663   Document 24-2   Date Filed: 06/11/2024   Page: 89 of 214
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                        May 18, 2023

74:20 81:10 85:20 89:1
92:20 109:7

**perforations** 34:6 94:3

**perform** 46:14

**performed** 56:22

**period** 47:7 79:5 84:24

**periodically** 35:9
64:17

**peritoneal** 48:12

**peritoneum** 73:22
77:15

**peritonitis** 46:21 48:3,
25 53:2,4 54:22 55:5,11
70:19 71:3,7,9 72:25
77:10,14,20 78:17 79:6
108:17

**person** 15:16 66:2,15
68:25 69:16

**personal** 87:25

**personnel** 29:17,18

**pertinent** 33:5

**pharmaceuticals**
24:22

**phone** 18:11 20:11
99:13 101:24 102:8

**physical** 41:12 46:15
74:18 75:1,19,25 76:10

**physician** 14:12 28:13
41:24 64:16,20 92:11

**physicians** 15:2

**picked** 65:12 81:8

**picture** 107:22

**pictures** 109:14

**place** 23:5,12

**places** 6:11 23:8

**plaintiff** 104:14

**plaintiffs'** 11:19,23
17:16 18:21,25 32:24
33:1 107:18,22 108:12,
16 109:1

**plug** 90:15

**point** 42:16 47:6 50:7
54:5 65:23 73:7 77:23,
24 79:9,22 81:3,25
84:20 100:4

**poorly** 51:23

**popular** 90:24

**population** 93:2

**position** 57:6 59:19

**positional** 77:7

**positions** 76:19

**possibly** 9:1 36:13
50:22 56:2 73:10 84:6
87:11

**post-** 27:17

**postoperative** 28:11

**posture** 73:1

**potential** 81:10

**potentially** 40:1 46:16
69:2,3 74:9

**Powders** 90:24

**practice** 35:15 38:4
57:17

**practicing** 58:21

**precise** 71:18

**predict** 47:16 54:4

**prediction** 47:8

**preparation** 63:16
99:16

**prepare** 66:2,18 67:4
69:7

**prepared** 21:20,25
58:24 65:21 66:3

**present** 61:24

**presentation** 12:25

**presented** 13:2

**presenting** 24:16

**pressure** 48:21 51:20
73:6 76:18 77:2 78:2
96:2,6

**pressures** 78:1

**presumed** 68:17

**pretty** 5:17 6:10 7:23
15:20 28:19 30:6 40:8
49:8 62:6 78:12 89:16
92:23

**prevalence** 91:17 93:7

**previously** 94:6

**primarily** 104:14

**primary** 44:12

**prior** 28:5,10 47:7

**prison** 63:6,24 64:1
66:6 68:5,9

**prisoner** 67:5,7,9 68:1

**prisoners** 81:7

**probability** 56:6

**problem** 25:21 67:16

**problems** 99:17

**procedure** 25:16
109:22

**procedures** 40:7 63:3

**proceeding** 5:18

**process** 8:4

**produce** 32:23 33:4
90:3 101:14 104:22

**produced** 100:10,13
104:2,23

**production** 44:14
70:21,22

**progress** 23:11 79:2
99:21

**progressed** 79:20

**progressing** 81:13
82:10

**progression** 81:22

**project** 31:19

**prolonged** 62:17 79:5

**pronounced** 70:18
71:4

**properly** 5:7 109:6

**protocols** 37:10

**provide** 16:22 28:1

**provided** 16:15,19 17:8
19:1 44:6 69:16 80:5

**publication** 31:13

**publications** 12:11

**published** 31:6 94:5

**pull** 86:9 101:4

**pulling** 35:13

**pulse** 63:25 66:4,11,21
67:6 69:17

**purpose** 92:16

**purposes** 109:17

**pursuant** 109:21

**purview** 26:8

**pus** 70:22

**put** 22:10 25:1,2 86:14
96:11 103:9,14

**pylorus** 93:25

---

## Q

**question** 6:22,23,24
7:3,4,5,7,15,16 18:20
21:4 31:7,23 45:20
74:15 84:10 85:8 89:20

**questions** 4:25 6:20,21
11:11 16:14 82:24
99:19 107:12,13 109:5

**quick** 22:5

**quickly** 43:2,13 62:18

---

## R

**Range** 59:8

**rapid** 73:15 76:19 77:5,
6,7

**rapidly** 73:15 75:12,17

**rare** 53:6

**rate** 48:21 51:7,11,16,
21,23 52:8,15 57:2,7,12
60:14,21,24 61:3,12
69:23 76:18 77:2,3,4
78:2,3,11 84:8



Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                   May 18, 2023

| | | | |
|---|---|---|---|
| **rates** 30:15 89:16 | **remain** 86:22 | **Respiratory** 78:3 | **Sam** 28:24 |
| **re-ask** 11:11 | **remedy** 51:6 | **respond** 6:21,22,23 7:16 65:15 99:24 | **save** 30:9 85:12 86:4 |
| **re-depose** 101:18 | **remember** 8:20,25 9:2 21:3 49:24 50:2 91:19, 21 99:9 100:18 | **response** 19:1 69:11 74:9,11 76:25 77:1 | **scan** 41:16,20 75:22 76:2,11 |
| **reached** 14:10,11,22 | | | **Scandinavian** 33:15 34:9 |
| **read** 32:24 33:7 49:3 78:9 87:1 89:14 91:12, 25 96:19 | **render** 104:5 | **responses** 73:22 74:4 | **scans** 41:13 |
| | **repair** 13:9 25:23,25 26:4,25 28:3 30:12 31:4,10 32:20 43:21 58:25 59:1 60:3 78:11 85:20 97:13,23 98:8,15, 18 | **responsive** 7:7 | **school** 27:6 |
| **reader** 94:9 | | **restrictor** 95:17 | **science** 45:1 |
| **ready** 65:18 | | **retained** 9:16 19:18,19, 23 35:3 | **scientific** 31:6 |
| **real** 22:5,8 | | **retainer** 19:9 | **scope** 25:1 26:1 57:11, 16 109:10 |
| **realm** 51:13 | | **retrospect** 82:14 | **scoping** 39:21 |
| **reason** 7:12,13 23:7,12 | **repaired** 26:22 27:4,9, 15 45:23 51:8 57:13 58:9 62:1 | **review** 5:12 16:14,17, 18,20 18:3,7 19:9,24 99:17 100:6 102:3,23 103:13 104:12 | **searched** 102:2 |
| **reasonable** 53:23 54:3,9,17 71:1 80:7,10 81:3,25 82:18 86:17 108:8,9,22 | | | **secondary** 94:7 |
| | **repairing** 60:14 89:1 | | **security** 62:15 88:6 |
| | **report** 6:5 12:25 16:24 17:2,9,11,19 18:12 21:10,11,17,21 48:6 49:3,12,17,22 53:3,8 54:19,20 61:21 63:23 66:5 72:1 86:14 88:21 94:5 99:3,16 102:20,25 103:11,14 108:24 | **reviewed** 16:23 17:18, 19 20:5,18,23 34:15 102:10 103:17 | **seminars** 103:24 |
| **recall** 9:6 15:22 16:8 | | **reviewing** 15:12 34:20 35:14 99:18 | **send** 10:4 101:16 |
| **recently** 4:16 | | **reviews** 31:6 | **sending** 98:14 |
| **recognize** 24:15 35:24 | | **revised** 21:21 | **senior** 96:5 |
| **record** 4:7 5:7,18 97:1 107:16 109:19 | | **revisions** 21:13 | **sense** 69:12 |
| | **reporter** 5:17 7:1 26:14 | **rigid** 74:21 | **sensitive** 94:18 |
| **recordings** 20:6 | **reports** 87:1 103:4 | **rise** 84:9 | **sepsis** 46:22 48:3,5,7, 11,16,20 79:20 |
| **records** 16:24 17:18,19 106:3 | **representation** 108:8 | **risk** 40:4,6 | **September** 45:17 |
| **reduce** 44:14 91:11 | **requiring** 105:7 | **role** 27:21 102:1 | **septic** 46:22 47:14 48:4 52:19,22 53:5,8,11,15, 21,24 54:4,7,18 56:23 57:3,8,12 58:8,22 59:18 60:7 61:25 62:11 69:24, 25 70:3,6,12 71:7,9,14, 17 72:14,17,23 73:6,8, 11 77:22,25 78:17 79:7, 10,15,17,23 80:8 81:5 82:2,6,12,19 83:14 84:4 86:15,21,22 |
| **reenlist** 29:8 | **research** 12:24 22:23 23:3 30:2,3 31:24 32:5 37:7,9,15,18,20 62:9 | **room** 28:13 | |
| **refer** 33:17 34:10 38:9 | | **rotation** 29:19 | |
| **reference** 92:13 | **researcher** 106:7 | **Roughly** 18:18 | |
| **referenced** 47:23 91:16 93:21 96:16 | **reserve** 29:17 101:18 | **rounds** 64:17 | |
| | **reserved** 109:24 | **rude** 5:5 | |
| **referencing** 92:17 | **Reserves** 29:1,6,11 | **rule** 39:10 109:21 | **series** 73:21 |
| **referred** 30:3 | **Reservist** 29:16 | **rules** 105:7 109:22 | **serve** 97:21 |
| **refuse** 23:16 | **residences** 10:6 | | **served** 6:13 102:3 |
| **regard** 18:4 97:22 | **resident** 65:10 | **S** | **service** 15:18 |
| **registry** 15:1 | **residents** 24:9 | | **set** 46:13 |
| **regular** 95:1 | | **safe** 40:8 | |
| **related** 16:3 46:17 | **respect** 15:4 26:4 35:20 49:9 57:2,11,20 61:3 88:4 91:17 | **salvageable** 85:25 86:3 | |
| **relation** 18:6 19:3 35:13 | | | |
| | **respectfully** 72:1 | | |



Tiffany Wingo, et al. vs Major Branson Harris, et al.
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG

May 18, 2023

**setting** 52:13 91:3

**severe** 28:19 48:23

**shakes** 25:10

**shock** 46:22 47:15 48:4 52:19,22 53:5,9,11,15, 22,24 54:4,7,18 56:24 57:4,8,12 58:8,22 59:19 60:7 61:25 62:12 69:24, 25 70:3,6,12 71:7,9,14, 17 72:14,17,23 73:6,9, 12 77:22,25 78:18 79:7, 10,15,17,23 80:8 81:5 82:2,6,12,19 83:14 84:4 86:15,21,22

**shocked** 82:23

**short** 103:7

**show** 18:24 22:12 29:14 86:8 107:21 108:15,17 109:6

**showed** 28:18 65:19

**showing** 11:22

**shown** 11:25

**shows** 28:17 32:12 66:10

**shuts** 55:9 70:20

**sign** 81:21

**signal** 90:3

**signature** 109:23

**signs** 24:16 35:24 36:14 47:7 48:19 50:10 51:1 72:16,18,23 73:5

**similarly** 47:4 50:5

**simple-rule** 31:22

**sincerely** 6:13

**single** 81:15

**sir** 18:17 20:1

**sit** 67:1 73:2

**situated** 47:4 50:5

**situation** 45:15 51:6 56:17 58:3 96:4

**six-year-old's** 22:13

**skip** 22:21

**slightly** 71:5

**slow** 73:16

**small** 15:16 94:1

**smoke** 95:12

**smoking** 95:10,11

**somebody's** 96:1

**someone's** 73:19 74:2 76:14 77:13

**sort** 37:16,17 41:20 48:21 81:8 94:15

**sounds** 25:9 74:23

**sources** 103:20 104:1

**South** 11:7 90:25

**spanning** 58:11

**specialist** 42:10

**specifically** 16:9 59:12

**speculate** 96:14

**speculated** 94:6

**spillage** 73:24

**spoke** 19:5

**staff** 46:11,12 64:15 65:21 67:9 79:1

**standard** 39:11 88:25

**start** 40:14 54:23,25 73:22

**started** 26:20 54:24 55:2,6 79:18,23

**state** 4:6 48:24

**states** 8:21 10:8

**status** 100:5

**stay** 15:17 23:19

**step** 42:4

**steps** 26:10

**stomach** 25:5,6,8 36:7 42:22 73:19,25 74:3,19 76:14 90:3 91:8,9 94:1, 17 97:7,8 108:4

**stomach-acid** 44:14

**stop** 70:23 83:22

**stops** 71:25 72:2

**straight** 36:8

**straightforward** 103:3,8,10

**strike** 19:19 76:6

**strip** 90:18

**structures** 49:2

**student** 27:5 92:12

**students** 24:11

**studied** 94:5

**stuff** 17:24 106:23

**subject** 34:3

**submission** 12:16

**submissions** 12:11

**subpoena** 9:22 19:1 100:25 101:1,4

**success** 89:16

**sudden** 36:7,17 78:14

**suddenly** 81:8

**sufficient** 76:23

**suggest** 36:2 53:19 73:6 79:4 83:4

**suggested** 81:22 82:8

**suggestion** 81:9

**suite** 60:5

**summary** 12:24

**summer** 29:15

**supplies** 90:2

**support** 62:10

**supporting** 49:2

**surgeon** 25:24 26:10, 11,12,15 27:15 28:9,15, 20 38:10,11 42:6,13,15, 24,25 43:6,19,23 45:4, 24 49:6 55:21 57:2 65:20 89:21 90:8 98:2

**surgeons** 28:1 89:9 97:21,25

**surgery** 33:15 34:9 44:13,18 45:2,3 56:22

**stops** 57:3,18 89:2,3,4,5,12, 13,15 96:19

**surgical** 13:9 34:25 35:2,14 38:4 56:18,19 60:2,5 89:23 109:6

**surgically** 27:18

**surprised** 43:1

**survivability** 51:3 58:3 62:7 69:23 84:8 87:2

**survival** 47:5 50:6 84:22 86:21

**survive** 60:8 84:24 87:1

**survived** 47:14,17 50:15,21 52:19 54:5 55:19 62:11

**surviving** 84:20

**suspect** 32:4 38:19 54:24 58:19 69:1 79:17 83:5

**suspected** 28:13 52:5

**suture** 90:16

**sworn** 4:2

**system** 71:3 77:20

**systemic** 48:8,9 74:9, 11 76:15,17 77:1

---

**T**

**talk** 6:9,15,17 15:9,23 16:6 47:25 74:1 99:11

**talked** 16:5,13

**talking** 9:13 25:7,8 26:20 54:16 61:2 95:14

**taught** 23:4

**teach** 23:8 24:7,12,13, 15 25:22

**teaching** 23:4 24:3,4 109:16

**team** 62:15

**telephone** 18:2

**telling** 66:20 78:16 86:8



Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG
May 18, 2023

**tells** 78:17

**ten** 5:11 12:20,21 20:14
58:16 77:19 80:18
100:3

**term** 74:24

**terminology** 26:19

**test** 50:11 54:15 75:20

**testified** 4:2 9:8 104:7
105:25 107:5

**testifying** 9:6,10 15:4

**testimony** 9:12 45:18
49:17 50:1 72:3,10

**tests** 48:14,18,19 75:6,
7,11,16,18,19 76:1,10

**Texas** 8:18,23,24

**theater** 29:20

**therapy** 44:12

**thing** 7:15 66:12 69:10
86:25 87:13,19 105:20

**things** 6:12 11:10 17:1
44:15 46:15 48:21
61:11 63:20,21 73:24
81:13 83:8 96:3

**Thirty-six** 62:3

**thought** 72:19 107:1

**thoughts** 102:17,19

**tight** 74:22

**till** 40:14

**time** 7:2 9:19 19:6,12,
16 20:24 22:8,9 25:14
29:3 30:9 33:18,25
34:10,11 35:1 37:13
42:24 47:7 52:12 54:25
55:23 62:17 70:1 71:18
72:13 73:2 79:5,14,16
81:6 82:7,9,19 83:3
84:25 86:15 88:19
102:16,17 104:19 105:1
107:8

**times** 6:13 8:1,5,13
15:24 16:1,10 22:21
38:3 92:5 104:8,9,11

**timing** 18:4 47:4 50:5

**tobacco** 95:14,15,16

**today** 4:23 22:13 45:14
87:7

**told** 7:10 16:17 38:2
65:16 67:4 87:25
100:19 105:20

**top** 19:25 81:12

**topic** 35:6,9 94:5

**total** 20:6 104:13

**totaling** 99:14

**touch** 17:12

**touching** 54:16

**tours** 28:23 29:22,25

**track** 22:6

**transcript** 5:9,12,14
7:5,6

**transfer** 81:20 82:4

**transferred** 82:12
83:14

**transporting** 65:2,6

**trauma** 65:18

**treat** 35:22 40:23 43:22
98:16

**treated** 51:14,17

**treating** 98:14

**treatment** 23:1 43:15
89:24 97:10,20 98:3,6,
11,13 109:6

**trial** 107:3

**trier** 46:1

**trouble** 73:2

**true** 13:20 23:6 36:25
44:23 89:18

**truncal** 90:1

**Twelve** 104:13

**type** 8:24 9:7 16:21
34:23 38:16,18 39:4
45:2 61:11 65:9 75:7
95:23

**types** 5:17

**typical** 92:23

**typically** 97:9,16

___

**U**

**uh-huh** 4:15 5:4 17:25
30:8 32:16 33:11 36:18
41:14 78:8 91:1 106:4

**uh-huhs** 4:20

**ulcer** 9:17 13:9 15:19
24:17,19 25:23 26:5,7,
23 27:1,4,9,19 28:8,14
30:13 32:21 35:2,15,20,
21,23 36:1,11,15 37:25
38:5,16,20,23 39:8,16,
22 40:19,20 41:2,6 42:4
43:15,18,22 44:7,8,13,
17 45:16,22 48:2 51:8,
16 56:23 57:3,8,12
58:9,22 59:18 60:8,15,
23 61:25 62:6,18 73:18,
19 74:2 76:14,24 77:13
78:7,24 82:14 89:1,24
90:8,20 91:4,11 93:3,18
94:19 97:13,17,20,23
98:3,7,11,20 108:17
109:7

**ulceration** 46:18

**ulcers** 13:5 22:24 23:2
24:4,7 25:7 27:14 30:4,
16 31:4,8,10,14 32:18
37:18,21,24 38:25 39:1,
4 40:25 44:1 46:21 61:2
91:18 92:20,21 94:3
95:8 97:5,10

**ultimately** 45:23 46:22
48:4

**Uncle** 28:24

**uncommon** 72:20

**understand** 5:2,3
22:22 26:18 27:10
45:20,24 46:3 49:16
67:11 74:15 78:18
79:14 83:13 98:12

**understanding** 6:6
33:25 34:2 39:3 44:25
45:19 46:1 64:12 94:10
102:2 105:4

**understood** 4:22

**unique** 92:18

**unknowable** 47:3
50:4,19

**unrecognized** 79:1

**unreliable** 47:8

**unsedated** 25:16

**unusual** 72:5,12 92:21
93:16

**up-to-date** 12:1 34:20,
23

**update** 22:8 34:24

**updating** 12:19

**upper** 26:11

**urgently** 42:23

**usage** 94:23

**users** 94:3

___

**V**

**vagotomy** 90:2

**vaguely** 91:21

**values** 76:5

**varies** 31:21

**vaso** 95:24

**vasoconstrictor**
95:25

**Vega** 4:1,8

**video** 66:9,10 71:24
72:2 80:18 86:9

**videos** 16:23 80:16
103:13,24

**vital** 47:7 48:19 50:9
51:1 91:8

**vitals** 54:15

**volunteer** 28:22

**volunteered** 29:5

___

**W**

**wait** 6:21,23


Elizabeth Gallo
COURT REPORTING, LLC

Tiffany Wingo, et al, vs Major Branson Harris, et al,
Kenneth J. Vega, MD, MHA, FACP, AGAF, FACG                                May 18, 2023

**waive** 5:15

**wanted** 69:7

**watched** 80:20,23

**ways** 45:1 48:10,16
75:4

**weeks** 41:2

**wheeling** 62:15

**white** 48:14 50:12 51:1
75:8,19 76:1,10

**widely** 34:13

**Wingo** 45:15,22 46:20
52:3,8 61:14,23 62:2
70:16 72:3,11 87:14,20
96:8 102:16 108:23

**Wingo's** 48:11 63:22
69:14,23 73:20 74:3
94:10 103:12

**work** 27:24 37:8 63:4,5,
7

**worked** 13:14 64:1,3

**works** 64:6,13

**world** 75:14

**worried** 36:1 41:6
81:11 82:3,5

**worsen** 40:2,3

**wound** 65:17

**wow** 12:21 25:18 29:22
30:22 107:3

**write** 31:17 32:5,9,12
102:25

**writing** 32:2

**written** 6:12 30:20

---

X

---

**x-ray** 41:17

**x-rays** 41:15

---

Y

---

**year** 11:2 35:4 88:16

**years** 11:1 23:14 29:4,5

30:20 58:11,20 105:9,
23,24

**York** 13:12,22,23 64:10

**you-all** 16:6 65:15

**young** 62:4

**younger** 61:23

---



13                   www.GeorgiaReporting.com/Schedule
                                            404.389.1155

DOCKET 196-1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIFFANY WINGO as Administrator )
Of the Estate of KEVIL WINGO, )
SR., KIEARA WINGO, as surviving )
Child of KEVIL WINGO, SR., )
ANGEL CALLOWAY, as mother )
and next friend of ERIKA WINGO, )
surviving minor child of KEVIL )
WINGO, SR., and FATIMA )
THOMAS, as mother and next friend )
Of KEVIL WINGO, JR., surviving )
Minor child of KEVIL WINGO, SR. )
                                  )
      Plaintiffs, )
                                    )
v.                               )     CIVIL ACTION FILE NO:
                                    )     1:20-CV-03662-VMC
MAJOR BRANSON )
HARRIS, individually, )
LIEUTENANT CHARLES )
GORDON, individually, DEPUTY )
PAUL WILKERSON, individually, )
and DEPUTY LYNDAMARSHALL, )
individually, )
                                    )
      Defendants. )

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

COME NOW defendants Lynda Marshall, Branson Harris, Charles Gordon, and Paul Wilkerson, and file this Memorandum of Law in Support of their Motion for Summary Judgment, showing the Court as follows:

## I.   __INTRODUCTION__

This is a civil rights action filed pursuant to 42 U.S.C. § 1983 and state law by plaintiffs, who claim their family member, Kevil Wingo, Sr. wrongfully died in the Cobb County Adult Detention Center ("CCADC") in September 2019. In the initial complaint, plaintiffs sought wrongful death damages from WellStar Health Systems, Inc. and six nurses of WellStar that provided the medical services at CCADC and Harris, Gordon and Wilkerson. (Doc. 1.) Following a settlement with the WellStar defendants, which resulted in their dismissal, plaintiff's added defendant Lynda Marshall.[1] (Doc. 61.)

Now, in their operative complaint (Doc. 166), plaintiffs seek to hold these four remaining Sheriff's deputies liable for the medical malpractice they had previously alleged against the WellStar defendants. Specifically, they claim these defendants were "deliberately indifferent" to Mr. Wingo's serious medical need, even though it was the WellStar defendants who failed to examine and attend to Mr. Wingo before they told defendants that Mr. Wingo was "just detoxing" and "medically okay." Likewise, they claim these defendants violated certain jail policies, many of which actually apply to the medical staff and not the security staff.

---

[1] Plaintiffs had also added defendants Craig Owens, Sonya Allen, and Britton McPhee, who have since been dismissed.

Defendants were not "deliberately" indifferent to any serious medical need because, as the record evidence shows, they had no knowledge that Mr. Wingo actually had a serious medical need. Likewise, they cannot be liable for the medical staff's failure to follow jail policies. Finally, all of plaintiffs' claims against all remaining defendants fail for the simple reason that there is no medical evidence in the record establishing the critical element of causation. For these reasons, defendants are entitled to summary judgment on all of plaintiff's claims.

## II.   ARGUMENT AND CITATION OF AUTHORITY[2]

### A.   Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure states, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although the party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, the moving party is not required to negate his opponent's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rather, the moving party discharges his burden by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an

---

[2] Defendants incorporate by reference their Statement of Material Facts ("SMF"), filed contemporaneously herewith.

essential element of] the nonmoving party's case." Id. at 325. Indeed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." Id. at 323. Once such a showing is made, the burden of production shifts to plaintiffs, who must adduce specific facts showing that there is a genuine issue for trial. Id. at 324; see also Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996). Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof." Celotex, 477 U.S. at 323.

## B.   Qualified Immunity Bars Plaintiffs' § 1983 Claim for Deliberate Indifference.

Qualified immunity "shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known." Mullenix v. Luna, 136 S.Ct. 305, 308 (2015). Significantly, the immunity is "from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 525 (1985). As such, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991).

To claim qualified immunity, defendants must first show that they were performing a discretionary function. Barnes v. Zaccari, 669 F.3d 1295, 1303 (11th Cir. 2012). Here, plaintiffs allege that defendants were acting under color of law and

within the course and scope of their employment with the Sheriff's Office at all times relevant to the allegations in the complaint. (Doc. 166, ¶¶ 4-14.) Therefore, there is no dispute that defendants were acting within their discretionary authority. Plaintiffs, in turn, bear the burden of demonstrating that defendants are not entitled to qualified immunity. Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004). To meet his burden, plaintiffs must show that: (1) defendants violated Mr. Wingo's constitutional rights; and (2) defendants' conduct was prohibited by clearly established law. Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014). Plaintiffs cannot sustain this burden.

### 1.      Defendants did not violate Mr. Wingo's constitutional rights.

Plaintiffs allege these defendants were deliberately indifferent to Mr. Wingo's serious medical needs, thereby causing his death. (Doc. 166, Count I.) A "deliberate indifference" claim is subject to the same analysis whether a plaintiff proceeds under the Eighth or Fourteenth Amendments.[3] See Hamm v. DeKalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985). To prevail on a deliberate indifference claim, a plaintiff must

---

[3] A pretrial detainee's rights with respect to conditions of confinement flow from the Fourteenth Amendment, whereas a convicted prisoner's claims fall under the Eighth Amendment. Lancaster v. Monroe Cnty., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997); Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). Here, Mr. Wingo was a pretrial detainee at the Cobb County Adult Detention Center (Doc. 166, ¶¶ 22-23), so his claim for deliberate indifference arises under the Fourteenth Amendment.

show: (1) a serious medical need;[4] (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306-07 (11th Cir. 2009). Because plaintiffs cannot meet their burden to show deliberate indifference or causation, their claims fail as a matter of law.

> ### a.    *No deliberate indifference where officers reasonably relied on medical professionals' determination that Mr. Wingo was "just detoxing."*

While Mr. Wingo's perforated ulcer would constitute a "serious medical need," plaintiffs cannot prevail on their § 1983 claims against each defendant without establishing that each defendant acted with *deliberate indifference* to that serious medical need. "An official acts with deliberate indifference when that official **knows** that an inmate is in serious need of medical care but fails or refuses to obtain proper treatment." <u>Burley v. Upton</u>, 257 F. App'x 207, 210 (11th Cir. 2007) (emphasis added). To prove deliberate indifference, "a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded

---

[4] A serious medical need is "one that, if left unattended poses a substantial risk of serious harm." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). In hindsight, we now know that Mr. Wingo had suffered a perforated ulcer, which is a serious medical need if properly diagnosed. These defendants, however, did not have the benefit of hindsight.

that risk, and (3) acted with more than ***gross*** negligence." <u>Wade v. McDade</u>, 67 F.4th 1363, 1374 (11th Cir. May 22, 2023) (emphasis in original). "An inadvertent failure to provide adequate medical care does not give rise to an Eighth Amendment claim." <u>Faulkner</u>, 523 F. App'x at 700; <u>Burley</u>, 257 F. App'x at 210. The "more than gross negligence" standard is "'the equivalent of recklessly disregarding' a substantial risk of serious harm to the inmate." <u>Wade</u>, 67 F.4th at 1375. Even a "partial disregard" of an officer's training does not "satisfy that high standard." <u>Id.</u> Summary judgment will be granted in favor of a defendant unless the plaintiff presents evidence of each of these elements. <u>Melton v. Abston</u>, 841 F.3d 1207, 1223 (11th Cir. 2016).

Further, in considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Burnette v. Taylor</u>, 533 F.3d 1325, 1331 (11th Cir. 2008). Since a finding of deliberate indifference requires a finding of the defendant's subjective knowledge of the relevant risk, a genuine issue of material fact exists "only if the record contains evidence, albeit circumstantial, of such subjective awareness." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation and internal quotation marks omitted). "No liability arises under the Constitution for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . . .'" <u>Burnette</u>, 533 F.3d at 1331 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S. Ct. 1970, 1979

(1994)). As such, "the subjective knowledge of one [official] cannot be imputed to other [officials]." <u>Mann</u>, 588 F.3d at 1307.

While it is uncontested that Mr. Wingo's medical condition, a perforated ulcer, was indeed serious, there is no evidence in the record establishing that any one defendant was subjectively aware of that condition or the risk that it posed. All of the evidence shows that each individual defendants' subjective understanding of Mr. Wingo's condition was determined by the infirmary's top-ranking medical professionals' misdiagnosis that Mr. Wingo was simply detoxing. (SMF ¶¶ 14, 31, 37, 66, etc.) Thus, Charge Nurses Jones and Visser attributed all of the concerning symptoms they and defendants observed, including his falls, complaints of abdominal pain, and demands to go to the hospital, to "drug seeking" and "playing games," behavior they had typically seen from similar patients in their decades of experience. (SMF ¶¶ 110, 134, 135.) Each defendants' reasonable deference to the Charge Nurses' diagnosis colored his or her subjective conclusions about Mr. Wingo's behavior, falls, and apparent condition. Furthermore, while the Charge Nurses' medical diagnosis of Mr. Wingo is suspect from a professional standpoint[5],

[5] Indeed, on July 3, 2023, the Georgia Board of Nursing found that Nurse Visser's care of Mr. Wingo "fell below minimal standards of acceptable care and prevailing nursing practice" and placed her on probation for one year. (SMF ¶ 193.) Likewise, Nurse Burton entered into a public consent order with the Georgia Board of Nursing, in which the Board found that Nurse Burton "failed to assess patient K.W. in a

it was not unreasonable for the deputies to rely on that diagnosis and communicate it amongst themselves. Simply put, a security deputy, untrained in medicine, cannot be said to have been "deliberately indifferent" for relying on the medical judgment of a trained professional.

A recent published decision from the Eleventh Circuit Court of Appeals is on-point. In Ireland v. Prummell, the estate of an inmate brought claims against officers on allegations that they disregarded the risk that the decedent might suffer from delirium tremens seizures as a result of his chronic alcoholism. 53 F.4th 1274, 1295-96 (11th Cir. Nov. 14, 2022). However, the estate could not identify "any facts suggesting that the officers 'had been exposed to information concerning the risk' of Ireland's condition and 'thus 'must have known' about it,' such that we can infer that they had 'actual knowledge of the risk.'" Id. at 1296. The Eleventh Circuit affirmed the district court's entry of summary judgment for the defendant-officers on this absence of evidence.

Likewise here, there is no evidence in the record that any defendant had actual knowledge of Mr. Wingo's perforated ulcer or the attendant life-threatening risks

---

systematic organized manner. Specifically, respondent failed to check/and/or assess the abdomen of K.W., who was admitted to the Cobb County Detention Center infirmary for complaints of nausea, vomiting, and stomach ulcer. (SMF ¶ 192.) Plaintiffs have already recovered from the WellStar defendants for these shortcomings.

associated with that condition. Indeed, *nobody* at the jail knew of these risks. While the jail nurses arguably knew that Mr. Wingo had an ulcer (SMF ¶ 7), there is no evidence that they knew it had perforated. But as to the defendant security officers, there is no evidence that any of them knew that Mr. Wingo had an ulcer or that it had perforated. And even if there was such evidence that the officers knew of these conditions, there is not even a hint of evidence in the record suggesting that they would have appreciated the risk that the condition posed to Mr. Wingo. Without evidence that the defendants subjectively knew of Mr. Wingo's serious medical condition and appreciated the risk that it posed, plaintiffs cannot establish that the officers deliberately disregarded that risk.

### b. *Individualized facts for each defendant.*

Again, in considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Burnette, 533 F.3d at 1331. In addition to the general analysis above, defendants show here particularized facts from the record indicating how each defendant lacked a subjective knowledge of a serious risk of harm to Mr. Wingo.

### i. *Deputy Lynda Marshall*

Deputy Marshall did not have subjective knowledge of a serious risk posed by Mr. Wingo's perforated ulcer because she had no knowledge of that condition—

she reasonably believed he was detoxing. When Deputy Marshall began her shift, she was informed by Deputy McPhee that the nurses had said Mr. Wingo was "just detoxing." The nurses told her the same thing. (SMF ¶ 43.) She subjectively believed Mr. Wingo's condition was simply "detox." (SMF ¶ 34.) Over her 27 years of experience at the jail, Deputy Marshall had seen detoxing inmates exhibit similar symptoms as those presented by Mr. Wingo. (SMF ¶¶ 48, 52, 50, 51.) In her experience, she did not believe "detoxing" to be a life-threatening condition. (SMF ¶ 49.)

While she did hear Mr. Wingo say he was having breathing problems, Deputy Marshall did not subjectively conclude there was any serious risk associated with such problems because (1) Mr. Wingo was yelling loudly, and thus was demonstrably able to breathe; and (2) she relayed his complaints to the nursing staff who told her "that Mr. Wingo was just trying to go to the hospital, he was detoxing, drug seeking, that he was okay." (SMF ¶ 66.) It never crossed Deputy Marshall's mind that Mr. Wingo might be sick and in need of additional medical attention—she just thought he was detoxing. (SMF ¶ 96.) Even as Mr. Wingo was taken out of the infirmary, he did not appear to Deputy Marshall to be in any medical distress. (SMF ¶ 141.)

11

## ii.     *Lt. Charles Gordon*

Lt. Gordon[6] also had no specialized training to identify whether an inmate was undergoing detox. (SMF ¶ 82.) When Lt. Gordon arrived at the infirmary and found Mr. Wingo on the ground, he asked Mr. Wingo what was wrong, and Mr. Wingo responded that "someone had tried to hit him." (SMF ¶ 84.) He did not complain to Lt. Gordon about his ulcers or abdominal pain. Lt. Gordon asked Nurse Visser multiple times what was going on with Mr. Wingo, and the charge nurse responded that Mr. Wingo "was fine medically." (SMF ¶ 87.) Because Nurse Visser advised Lt. Gordon that Mr. Wingo was detoxing, he assumed that was, in fact, the medical condition driving Mr. Wingo's behavior and symptoms. (SMF ¶ 122.) Lt. Gordon also asked medical staff why Mr. Wingo was imbalanced, and they told him Mr. Wingo was detoxing. (SMF ¶ 149.) Even as Lt. Gordon was placing Mr. Wingo in the close observation cell, he did not believe Mr. Wingo was suffering from a serious medical emergency. (SMF ¶ 155.)

## iii.     *Major Branson Harris*

As with the other defendants, Major Harris has never been trained on how to identify whether someone is detoxing. (SMF ¶ 111.) Major Harris first became

---

[6] Lt. Gordon has been promoted to Lieutenant since this incident. At the time, he was a Sergeant and may be referred to as such in some relevant records.

12

aware of the situation with Mr. Wingo when Deputy Marshall called to advise that Mr. Wingo was "playing like he was falling." (SMF ¶ 94) When Major Harris came down to the infirmary, Mr. Wingo did not appear to him to be in pain. (SMF ¶ 107.) When Major Harris spoke to Nurse Visser, she told him plaintiff was "detoxing" and that "he was trying to get to the hospital—he was drug seeking is the term she used— and that he needed to be isolated in a cell by himself." (SMF ¶ 109.) She also told Major Harris that he was cleared, from a medical perspective, to be in a cell by himself. (SMF ¶¶ 113-114.)

As the officers were placing Mr. Wingo in the padded cell, Major Harris did not believe Mr. Wingo was in pain. (SMF ¶ 159.) At no point that morning was Major Harris concerned with Mr. Wingo's medical condition; he never thought Mr. Wingo was in distress or was suffering from a medical emergency, and he thought Mr. Wingo was fine. (SMF ¶ 167.)

### iv.     *Deputy Paul Wilkerson*

Just as the other defendants, Deputy Wilkerson was advised that Mr. Wingo's behavior was a symptom of his drug-seeking behavior and that he was "playing games" trying to get to the emergency room. (SMF ¶ 100, 104.) Likewise, Deputy Wilkerson has not been trained on how to identify if someone is detoxing, and he

believed whether detoxing would constitute a "serious medical issue" would be a question left to medical staff. (SMF ¶ 160.)

Mr. Wingo did not appear, to Deputy Wilkerson, to be in medical distress when he was in the padded cell because "he was just laying down was all I could tell." (SMF ¶ 161.) Even when Deputy Wilkerson was aware that Mr. Wingo had been in the same position in the cell for several minutes, he was not subjectively concerned with Mr. Wingo's well being because he assumed Mr. Wingo was sleeping. (SMF ¶ 166.) At no point before he eventually opened Mr. Wingo's cell door did Deputy Wilkerson have any concerns about Mr. Wingo's medical status. (SMF ¶ 168.)

### c.   *Defendants reasonably relied on the Nurses' determination.*

In conclusion, the record evidence establishes that none of the individual defendants had a subjective knowledge of Mr. Wingo's serious medical condition. Unlike an acute head injury, profuse bleeding, or any number of other serious injuries that any layman would recognize as being serious, Mr. Wingo's perforated ulcer was hidden from sight and unknown to laymen such as defendants.[7] The

---

[7] See Dr. Downs Expert Report, p. 2 ("Peritonitis and gastric perforation are serious medical issues. These may present with signs and symptoms suggesting the diagnosis to an experienced clinician. Such findings may not be familiar to non-medical personnel.").

Georgia Board of Nursing concluded that Charge Nurse Burton might have detected this condition if she had done a proper abdominal inspection of Mr. Wingo. (SMF ¶ 192.) She did not. Instead, she noted her belief that Mr. Wingo was simply detoxing. Even if the nurses' judgments were improper from a professional nursing perspective, it was still appropriate and reasonable for the security staff to rely on those judgments. Lab technician Tiffany Womack's observations with respect to Deputy Marshall are equally appropriate for all defendants: Deputy Marshall "has no medical training whatsoever. And so in this instance, she is going to turn to that charge nurse and find out what needs to happen, and she would agree with her, I mean, because she's not going to know any differently. And so in her defense, I mean, she didn't know what was wrong, and she is going to listen to the nurse." (SMF ¶ 142.) None of the defendants knew what was wrong—none of them had a subjective understanding of the serious medical need Mr. Wingo was facing—and they all reasonably relied on the nurses' medical decisions.

## 2. Plaintiffs have no evidence of causation.

Plaintiffs assert that these defendants' actions, or failure to act, caused Mr. Wingo's death. However, the record is devoid of any competent medical evidence to support the notion that had these defendants done anything differently, Mr. Wingo

would have survived. Plaintiffs improperly rely on speculation and the *ipse dixit* conclusion of Dr. Myers.

Dr. Myers states in his expert report his opinion that, "to a reasonable degree of medical certainty, […] had Kevil Wingo been provided reasonable emergency medical care he would have most likely survived." (SMF ¶ 173.) However, this opinion does not help plaintiffs establish their deliberate indifference claims against **each** of the defendants because Dr. Myers did not opine as to *when* the receipt of such medical care would have allowed Mr. Wingo to survive "to a reasonable degree of medical certainty." Indeed, at his deposition, Dr. Myers was unable to say what Mr. Wingo's likelihood of survival would have been if he had received medical care at any point after he was removed from the nurses' immediate vicinity in the infirmary. Specifically, Dr. Myers testified that "If you get someone to me with vital signs, in the ER, they are most likely going to survive. So if you can get him to the emergency room with vital signs, he's most likely going to survive." (SMF ¶ 174.) To Dr. Myers, "most likely going to survive" means a survival chance over 50%. (SMF ¶ 175.) However, Dr. Myers acknowledges that Mr. Wingo's survivability decreased (or his chance of mortality increased) with each hour that passed after his perforation without receiving emergency medical care. (SMF ¶ 176.) He also acknowledges that he cannot say if, or when, Mr. Wingo crossed the threshold from

16

"most likely to survive" to "most likely not to survive" had he received emergency medical care at that particular point. (SMF ¶ 177.) Dr. Myers was then forced to concede that he could not state with any degree of medical certainty what Mr. Wingo's survivability would have been if someone had called 911 at 7:45 a.m., the approximate time Mr. Wingo was transferred out of the infirmary, because he does not know what Mr. Wingo's vital signs were at that time. (SMF ¶ 178.) Dr. Myers testified with respect to his survivability opinion,

> My statement doesn't bring into the issue of time, so I stand by what I said here. If you want to have me opine on whether or not, at 7:45, if that was reasonable medical care or if he would have survived at that point, I can't say because I don't know what his vitals were at that point.

(SMF ¶ 179.) Dr. Myers admitted that he could not say with any certainty whether Mr. Wingo would have survived if he was sent to the emergency room at particular times leading up to the moment the code blue was called:

> Q. But based on the record, you can't say –
>
> A. I don't know when the vital signs stopped.
>
> Q. Right. And you can't say whether or not he would have survived if someone would have called at 7:45 a.m.?
>
> A. I can not say that.
>
> Q. Right. What about at 6:45 a.m.?
>
> A. I don't know what the vitals are.

17

Q. All right. What about --

A. He was still moving though so he had some.

Q. What about 5:45 a.m.?

A. Again, still moving but I don't know what the vitals are.

Q. Okay. So without the vitals and if we're trying to understand what his survivability would had of been had the emergency room been called at any point during that time frame; without the vitals you're unable to say?

A. Yes. I can just say at this point --

    MR. GARDNER: Object to form. Go ahead.

    THE WITNESS: At 11:30 at night his survivability was probably -- was mostly likely ten percent. His survival in the ER is 100 percent – or his mortality in the ER is 100 percent. How that percentage moved along time if we were to graph it out, I don't know.

Q. BY MR. JACKSON: Okay.

A. Not without vitals.

(SMF ¶ 180.)

Thus, Dr. Myers's opinion that Mr. Wingo most likely would have survived if he had received emergency medical care simply is not specific enough to show that any individual defendant's actions caused Mr. Wingo's injuries because he cannot opine *when* emergency medical care would have actually made a difference.

In other words, Dr. Myers cannot say to any degree of medical certainty that Mr. Wingo *would have survived* had any defendant called 911 at the beginning of Deputy Marshall's shift, or when she let Mr. Wingo out of his cell in the infirmary, or when Lt. Gordon and Major Harris escorted him out of the infirmary, or when they left him in the padded cell, or at any one of the multiple security rounds documented by Deputy Wilkerson. Thus, his opinion does not establish a critical element of plaintiffs' § 1983 claim with respect to any defendant: causation.

Indeed, two other physicians have opined that it is not possible to know what Mr. Wingo's likelihood of survival would have been had any defendant (or for that matter, the jail nurses) called 911 to have Mr. Wingo taken to the emergency room. As Dr. Keenth Vega opined:

> Given the multitude of factors, many of which are unknowable, that contribute to the timing of when a similarly situated patient might die, the likelihood of his survival at any particular point is not able to be determined. The absence of vital signs in the time period prior to his death makes any such prediction particularly unreliable, as there is no objective medical evidence of when he began to decline.
>
> For example, even if an ambulance was called at or about 7:45 a.m., the chance that he would have survived septic shock is very low. There is no way to reasonably predict, under those circumstances, if he would have survived.

(SMF ¶ 181.)

19

Likewise, Dr. Jamie Downs opined:

> The ongoing and escalating metabolic derangement associated with gastric perforation of unspecified duration and scope reaches a critical threshold in patient homeostasis – that is a "point of no return" beyond which the patient may not be salvageable. At what exact point the patient crosses beyond this critical threshold is unknown and unknowable in real time. Retrospective analysis, with all the missing data points established, allows an artificial construct, not available contemporaneously with actual events. Thus, it cannot be determined, to any reasonable degree of medical certainty, the likelihood of this subject's survival had he received medical intervention at any specific point in the hours prior to his ultimate death.

(SMF ¶ 182.)

In short, Dr. Vega and Dr. Downs opined in their expert reports what Dr. Myers was forced to concede at his deposition: we simply cannot know whether Mr. Wingo would have survived if he had received emergency medical care at any point when the remaining defendants had interactions with him. Thus, there is no competent evidence to show that transport to the hospital would have prevented Mr. Wingo's death. Without causation, plaintiffs cannot prevail on their § 1983 deliberate indifference claim.

### 3.   Plaintiffs can show no violation of clearly established law.

Even if any defendant violated Mr. Wingo's constitutional rights, they are entitled to qualified immunity unless plaintiffs can show that the violation was

"clearly established" at the time of the incident. See Youmans v. Gagnon, 626 F.3d

557 (11th Cir. 2010) (medical indifference claim where court found it was not clear

from preexisting law that all objectively reasonable policemen would have known

actions established a constitutional violation). It is a plaintiff's burden to overcome

qualified immunity by pointing to specific actions of each defendant that violated

clearly established law. Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997) ("Once

an officer or official has raised the defense of qualified immunity, the burden of

persuasion as to that issue is on the plaintiff."). "This burden is not easily discharged:

That qualified immunity protects government actors is the usual rule; only in

exceptional cases will government actors have no shield against claims made against

them in their individual capacities." Jones v. Ward, 514 F. App'x 843, 846-47 (11th

Cir. 2013).

The Eleventh Circuit has held "many times" that "if case law, in factual terms,

has not staked out a bright line, qualified immunity almost always protects the

defendant." Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000). A

"plaintiff cannot rely on general, conclusory allegations or broad legal truisms to

show that a right is clearly established." Kelly v. Curtis, 21 F.3d 1544, 1550 (11th

Cir. 1994); White v. Pauly, 137 S. Ct. 548, 552 (2017) (reiterating the longstanding

principle that clearly established law should not be defined at a high level of

generality and must be particularized to the facts of the case). As the Supreme Court recently stated, "[i]t is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" City of Tahlequah v. Bond, 142 S.Ct 9, 11 (2021). The law can be clearly established for qualified immunity purposes only by decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Georgia Supreme Court. Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 823 n. 4 (11th Cir. 1997).

As the Eleventh Circuit has noted in its application of the "clearly established law" analysis to deliberate indifference claims, "judicial precedents are tied to particularized facts, and [m]inor variations between cases may prove critical. Thus, district courts are obliged to analyze carefully whether preexisting law dictates, that is, truly compels, the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." Wade v. United States, 13 F.4th 1217, 1229–30 (11th Cir. 2021) (citations and quotations omitted).

Thus, to overcome defendants' entitlement to qualified immunity, plaintiffs must come forward with case law showing that officers violate constitutional rights when the fail to provide emergency medical care to inmates under circumstances

similar to those faced by these defendants. Specifically, the relevant facts of such precedent must include the following elements faced by defendants here:

- Defendants were not aware of an acute injury or emergent medical condition;

- The defendants believed the symptoms they observed (complaints of stomach, pain, unsteadiness on feet, falling over) were consistent with a non-emergent medical condition that the routinely encountered in their particular environment (e.g., detoxing inmates);

- The defendants who did not have any medical training themselves witnessed these symptoms in a medical setting with multiple medical professionals present; and these professionals were also aware of these conditions and declined to provide further medical assistance, i.e., send Mr. Wingo to the E.R. against the medical professional's judgment;

- The medical professionals on the scene specifically told the defendants that the inmate was not having a serious medical episode and did not need additional medical treatment.

Thus, if plaintiffs cannot come forward with a published case from the United States Supreme Court, the Georgia Supreme Court, or the Eleventh Circuit Court of Appeals that establishes that the officer's conduct violates a constitutional right, the defendants are entitled to qualified immunity.

**C.      Official Immunity Bars Plaintiffs' State Law Claims.**

Count II of plaintiff's complaint alleges a state law claim of "negligence" against all defendants. Specifically, plaintiffs allege defendants were negligent in failing to perform certain ministerial duties.[8] These "ministerial" duties, according to plaintiff, include:

- Failure to provide "medical care" (Doc. 166, ¶ 112);

- Failure to provide access to proper emergency medical care pursuant to Policy 2-06-04.00 (id. ¶ 115);

- Failing to be "observant and responsive to signs of an emergency medical situation," pursuant to Policy 2-06-04.01 (id. ¶ 116);

- Failing to prioritize delivery of emergency medical services pursuant to Policy 2-06-04.01 (id. ¶ 117);

- Failing to "provide that inmates requiring emergency treatment beyond the facility's resources and capabilities [] be transported to a designated treatment facility or the nearest emergency room" pursuant to Policy 2-3-07.01 (id. ¶ 119);

---

[8] Plaintiffs' complaint does not allege that defendants violated discretionary duties or that they acted with actual malice. (See generally Doc. 166.)

24

- Failure to complete a Close Observation Form in violation of Policy 2-03-07.01;

- Deputy Wilkerson failed to complete 15-minute rounds on Mr. Wingo, in violation of Policy 2-03-07.01.

Defendants are entitled to official immunity on these claims because, for the most part, the duties plaintiffs have couched as "ministerial" are actually "discretionary," and plaintiffs have not asserted that defendants acted with actual malice. Furthermore, to the extent any defendants violated a ministerial duty, plaintiffs have failed to show that such violation caused Mr. Wingo's death.

"The doctrine of official immunity . . . offers public officers and employees limited protection from suit in their personal capacity." Cameron v. Lang, 274 Ga. 122, 123, 549 S.E.2d 341, 344 (2001). Whether a government official is entitled to official immunity is a question of law for the court to decide. Todd v. Brooks, 292 Ga. App. 329, 330, 665 S.E.2d 11, 12 (2008). When immunity applies, a complaint must be dismissed for lack of subject matter jurisdiction. Bd. of Regents of Univ. Sys. of Georgia v. Frost, 233 Ga. App. 692, 694, 505 S.E.2d 236, 239 (1998).

Under this doctrine, "a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an

intent to injure." <u>Golden v. Vickery</u>, 285 Ga. App. 216, 217, 645 S.E.2d 695, 696

(2007).

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

<u>Smith v. Bulloch County Bd. of Commrs.</u>, 261 Ga. App. 667, 669, 583 S.E.2d 475,

477 (2003). With respect to providing medical care to inmates, "the determination

of what medical treatment to provide is an act of discretion subject to official

immunity." <u>Graham v. Cobb Cnty.</u>, 316 Ga. App. 738, 743, 730 S.E.2d 439, 443–44

(2012).

In the context of official immunity, "actual malice requires a deliberate

intention to do wrong and denotes express malice or malice in fact." <u>Selvy v.</u>

<u>Morrison</u>, 292 Ga. App. 702, 704, 665 S.E.2d 401, 404-05 (2008) (quoting <u>Adams</u>

<u>v. Hazelwood</u>, 271 Ga. 414, 414-15, 520 S.E.2d 896 (1999)). "Actual malice does

not include implied malice, or the reckless disregard for the rights and safety of

others." *Id.* at 704, 665 S.E.2d at 405. "A deliberate intention to do wrong such as to

constitute the actual malice necessary to overcome official immunity must be the

intent to cause the harm suffered by the plaintiff[ ]." <u>Id.</u> (quoting <u>Murphy v. Bajjani</u>,

282 Ga. 197, 203, 647 S.E.2d 54 (2007)). Bare allegations and conclusions are insufficient to establish such intent; indeed, Georgia courts have emphasized that simply sprinkling the complaint with allegations of "malice" and the like does not suffice to strip an official of his official immunity, without some specific factual support for such allegations. See Davis v. Dublin City Bd. of Ed., 219 Ga. App. 121, 122, 464 S.E.2d 251, 252 (1995); Truelove v. Wilson, 159 Ga. App. 906, 908, 285 S.E.2d 556, 558 (1985).

### 1. Provision of medical care to inmates is a discretionary, not ministerial, duty.

While plaintiffs allege that providing medical care is a "ministerial duty," the Georgia Court of Appeals has shown that the analysis is more nuanced: "the determination of what medical treatment to provide is an act of discretion subject to official immunity." Graham, 316 Ga. App. at 742-43, 730 S.E.2d at 443-444. An examination of the actual policies plaintiffs claim defendants violated show that those policies either do not impose a duty on the defendants or, if they did, the policy was not "simple, absolute, and definite" enough to constitute a ministerial duty, as opposed to a discretionary one.

a.     **Alleged Failure to provide access to proper emergency medical care pursuant to Policy 2-06-04.00.**

Policy 2-06-04.00 states: "Inmates shall have adequate and proper access to emergency medical care. *Medical staff* shall ensure that prompt medical attention (response) is provided in situations deemed a medical emergency." (SMF ¶ 195.) The policy further details that "Staff shall be observant and responsive to signs of an emergency medical and mental health situation within the facility," and "The delivery of emergency medical services shall be a top priority, taking precedence over routine duties and responsibilities." (SMF ¶ 196). The policy states that "Inmates requiring emergency treatment beyond the facility's resources and capabilities shall be transported to a designated treatment facility or the nearest emergency room." (SMF ¶ 197.) However, this responsibility is borne by medical staff, who are responsible for "contacting or directing that contact be made to emergency responders (e.g., ambulance) . . ." (SMF ¶ 198.)

With respect to the official immunity analysis, plaintiffs cannot argue, as they have tried to allege in their complaint, that this policy creates a ministerial duty that the defendants failed to perform. First, even though this policy may be a written policy, that does not automatically mean it creates a ministerial duty. Even a cursory review of these "duties" show that they are not "simple, absolute, and definite," but instead "call[] for the exercise of personal deliberation and judgment, which in turn

28

entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Bulloch County, 261 Ga. App. at 669, 583 S.E.2d at 477. Second, if this policy does create a definite duty on anyone, it is on medical staff—not defendants, who are security staff.

For example, the Policy Statement provides: "Inmates shall have adequate and proper access to emergency medical care. *Medical staff* shall ensure that prompt medical attention (response) is provided in situations deemed a medical emergency." What is "proper" emergency medical care, in a given circumstance? Is emergency medical care required for a cold? A papercut? A black eye? A minor contusion? Vomiting? Stumbling? Bleeding? The fact that one can only answer this question by "examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed" means this policy directive is a discretionary duty.

Furthermore, *who* is to perform the duty? The Policy Statement plainly states that "Medical Staff shall ensure that prompt medical attention (response) is provided in situations deemed a medical emergency." Plaintiffs have settled their claims with the medical staff already, and these defendants are not medical staff. And while

plaintiffs take issue with defendants' "failure" to call the ambulance, that was decidedly medical staff's responsibility under the policy. (SMF ¶ 198.[9])

Accordingly, policy 2-06-04.00 does not establish any ministerial duty on defendants, and plaintiffs have not shown that they violated any portion of this policy with actual malice.

### b.   Alleged failure to follow close observation protocols pursuant to Policy 2-03-07.00.

Plaintiffs allege that defendants put Mr. Wingo in Close Observation in violation of the Jail's policies. An examination of the policies shows that this is not the case.

Plaintiffs allege that defendants placed Mr. Wingo in Close Observation when he was not displaying any of the conditions that warrant close observation. Plaintiffs are incorrect for two reasons. First, defendants did not make the decision to place plaintiff in Close Observation—that was Nurse Visser's decision. (SMF ¶ 116.) No defendant or other security officer made the suggestion to Nurse Visser to move Mr. Wingo to the annex before she made that decision herself. (SMF ¶ 117.)

---

[9] A subsection of this policy states: "In emergencies, it may be obvious that an ambulance is needed and should be called by security or medical staff (i.e. significant head injury, extreme loss of blood, attempted suicide and the inmate is unresponsive, etc.") (2-06-04.01(M)). None of the conditions listed apply here, and determining whether Mr. Wingo's condition was one that could be included in the terminal "etc." would certainly be an act of discretion.

Second, while plaintiffs claim Mr. Wingo was not exhibiting any of the behavior listed in Policy 2-03-07.01(D)(1)-(4), they ignore the fact that these four behaviors are not exhaustive of the reasons to place an inmate in Close Observation. "Medical, mental health or security personnel may request placement of an inmate into Close Observation for reasons that include, ***but are not limited to***," those four reasons listed in the policy. According to Nurse Visser, she made this decision "[b]ecause he was disruptive. He was loud. He was yelling. And everybody was watching. It was early Sunday morning, and we have sick people in the infirmary, pregnant ladies in the infirmary, and it's disruptive, you know, so he had to be moved. And also—also there was going to be a fight." (SMF ¶ 124 ("You people don't F'ing care. I want to go to the hospital. Open the door, let me out. I want to go to hospital. You don't fucking care." (quoting Mr. Wingo).) If "abnormal behavior," "marked change in behavior," and "speak[ing] of or act[ing] on threats of self-harm or threat[s] to harm others" justify placement in Close Observation, being disruptive and instigating a fight is akin to such behavior that could reasonably warrant placement in Close Observation. In any event, determining what type of behavior would warrant placement in Close Observation in addition to the non-exhaustive list in Policy 2-03-07.01(D)(1)-(4) certainly requires discretion.

31

Third, plaintiffs take issue with the fact that neither an OMS facility incident report nor a Close Observation form were completed. But these duties fall on the person making the request—Nurse Visser. (<u>See</u> 2-03-07.01(E) ("When an inmate is placed in Close Observation, an OMS facility incident report shall be generated *by the staff member(s) making the request*."); 2-03-07.01(I)(b) (Close Observation form to be completed by "any employee . . . when requesting placement of inmates into Close Observation for various reasons.").) (SMF ¶ 206.)

Accordingly, none of the named defendants violated any "ministerial" duty with respect to Mr. Wingo.

## 2. Even if a ministerial duty was negligently performed, such negligence did not cause Mr. Wingo's injuries.

Even if any of the defendants violated a duty that is properly characterized as ministerial, plaintiffs still cannot recover under a negligence theory because such violations would not have caused any injury to Mr. Wingo for several reasons.

First, as argued above, there is no competent medical evidence in the record to suggest that Mr. Wingo, to a reasonable degree of medical certainty, might have survived if emergency measures were taken when these purported ministerial duties arose. Specifically, there is no evidence in the record that Mr. Wingo would have survived if emergency steps were taken the moment the Close Observation or OMS forms would have been completed upon transferring Mr. Wingo to the extension.

Furthermore, there is no evidence in the record to suggest that Mr. Wingo might have survived if Deputy Wilkerson performed his rounds with greater care. The unfortunate reality is that no expert has said—and no expert can say—whether or not Mr. Wingo's condition had deteriorated past the point of no return when any of these duties arose. Accordingly, plaintiffs' state law negligence claims fail for the same reason as their § 1983 claims.

Second, there is no evidence in the record that any defendant's performance of a purported ministerial duty would have actually led either that defendant or another defendant or other jail employee to take some action that would have led to life-saving medical care for Mr. Wingo. For instance, even if Deputies Marshall, Harris, or Gordon were required to fill out the Close Observation form (they were not), the information put on that form would likely have been exactly what Deputy Marshall had already communicated to Deputy Wilkerson—that Mr. Wingo was detoxing and he needed to be in close observation because he was having trouble with other inmates. (SMF ¶¶ 100-104.) Thus, completion of the close observation form would not have led to any different outcome in this matter.

Accordingly, because there is no evidence in the record that any of these "ministerial" duties, if performed, would have saved Mr. Wingo's life, plaintiffs

have no evidence of causation in support of their negligence claims, which are subject to summary judgment.

### III.   <u>CONCLUSION</u>

Mr. Wingo's death was truly tragic. He suffered a life-threatening condition in a jail setting where he could not take himself to the hospital. Unfortunately, none of the defendants were subjectively aware of that condition or the risk of harm that it posed. They all subjectively and reasonably believed Mr. Wingo was undergoing a less serious case of withdrawal and detox. This belief was reasonable because that is exactly what they were told by the medical professionals who were entrusted to evaluate and attend to the medical needs of Cobb County inmates. Because plaintiffs failed to show an issue of material fact as to whether defendants were deliberately indifferent to Mr. Wingo's serious medical needs, whether they are entitled to official immunity, or whether their conduct actually caused Mr. Wingo's death, the defendants are entitled to summary judgment as a matter of law.

Respectfully submitted,

**COBB COUNTY ATTORNEY'S OFFICE**

*/s/ Lauren S. Bruce*
Lauren S. Bruce
*Assistant County Attorney*
Georgia Bar No. 796642
H. William Rowling
*County Attorney*

34

Georgia Bar No. 617225

100 Cherokee Street, Suite 350
Marietta, GA 30090
770-528-4000 (telephone)
770-528-4010 (facsimile)

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION</u>**

**<u>FOR SUMMARY JUDGMENT</u>** has been prepared in accordance with Local Rule

5.1(C) (Times New Roman font, 14 point).

This 12th day of July, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing **<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants, and mailed a paper copy of same mailed by the United States Postal Service, first-class, postage prepaid, to parties and counsel of record who are non-CM/ECF participants, properly addressed upon:

Timothy J. Gardner & Henrietta G. Brown
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

DOCKET 198

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIFFANY WINGO as Administrator )
Of the Estate of KEVIL WINGO, )
SR., KIEARA WINGO, as surviving )
Child of KEVIL WINGO, SR., )
ANGEL CALLOWAY, as mother )
and next friend of ERIKA WINGO, )
surviving minor child of KEVIL )
WINGO, SR., and FATIMA )
THOMAS, as mother and next friend )
Of KEVIL WINGO, JR., surviving )
Minor child of KEVIL WINGO, SR. )
)
     Plaintiffs, )
)
v. )     CIVIL ACTION FILE NO:
)     1:20-CV-03662-VMC
MAJOR BRANSON )
HARRIS, individually, )
LIEUTENANT CHARLES )
GORDON, individually, DEPUTY )
PAUL WILKERSON, individually, )
and DEPUTY LYNDAMARSHALL, )
individually, )
)
     Defendants. )

## MOTION TO EXLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK JOHNSON AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

COME NOW defendants Lynda Marshall, Branson Harris, Charles Gordon, and Paul Wilkerson, and respectfully move the Court to exclude the opinions of

1

plaintiffs' expert witnesses, Dr. Brian Myers and Mark Johnson, pursuant to
Federal Rule of Evidence 702, the Supreme Court's decisions in <u>Daubert v.
Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co. v.
Carmichael</u>, 526 U.S. 137 (1999), Fed. R. Civ. P. 26(a)(2)(B), 26(a)(2)(C), and LR
26.2C, NDGa. In support of the instant motion, defendants rely on this
incorporated memorandum of law in support and the complete record in the above-
styled case. For the reasons set forth below, defendants respectfully request that
their motion be granted.

## I.   <u>INTRODUCTION</u>

This is a civil rights action filed pursuant to 42 U.S.C. § 1983 and state law
by plaintiffs, who claim their family member, Kevil Wingo, Sr. wrongfully died in
the Cobb County Adult Detention Center ("CCADC") in September 2019.
Defendants anticipate plaintiffs will rely on the testimony of their expert Dr. Brian
Myers in an effort to avoid summary judgment. The Court should exclude Dr.
Myers's testimonies as unreliable and irrelevant.

Furthermore, plaintiffs have retained Mark Johnson to create a replica of the
CCADC Jail Extension and Cell 18. While Mr. Johnson reports that his replica will
be "accurate," the replica has not been disclosed to defendants who therefore are

unable to discover or test whether the methods by which he created the replica are

reliable and accurate.

Accordingly, defendants move to exclude the testimony of plaintiffs' experts

Dr. Myers and Mr. Johnson.

## II.   ARGUMENT AND CITATION TO AUTHORITY

### A.   Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony.

This rule states:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in the
> form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

F.R.E. 702. The district court is obligated to act as a gatekeeper to the admission of

expert testimony. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

Thus, the district court generally engages in a three-part inquiry derived from Rule

702 to determine the admissibility of expert testimony. <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340-41 (11th Cir. 2003). Specifically, the district court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Quiet Tech. DC-8, Inc.</u>, 326 F.3d at 1340-41 (citing <u>City of Tuscaloosa v. Harcros Chemicals, Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)). The same standard applies to all expert testimony, including testimony regarding scientific, technical, and other specialized matters. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).

Furthermore, in addition to satisfying these elements, the testimony must also meet the other applicable rules of evidence, including the test for relevance. <u>See</u> F.R.E. 704.

## B.   Dr. Myers' Opinions Are Not The Product of Reliable Principles and Methods Because They Solely Rely on *Ipse Dixit*

Plaintiffs assert that these defendants' actions, or failure to act, caused Mr. Wingo's death. That said, the record lacks competent medical evidence to support the notion that had these defendants done anything differently, Mr. Wingo would

have survived. Plaintiffs improperly rely on speculation and the *ipse dixit* conclusion of Dr. Myers.

Federal Rule of Evidence 702 requires the expert's opinions to come from reliable principles and methods and that the expert has applied those principles and methods reliably to the facts of the case. When an expert's "factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (quoting Daubert, 509 U.S. at 592). As the United States Supreme Court has stated, "knowledge connotes more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. "Time and credentials in a field alone do not create a sufficient basis for testimony; an expert must provide a specific explanation of his or her methods and reasoning to ensure his or her conclusions rest upon a reliable basis." Spears v. Cooper, N. 1:07-cv-58, 2008 WL 5552336 (E.D. Tenn., Nov. 17, 2008).

When evaluating the reliability of expert opinion, the trial judge must assess whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. U.S. v. Frazier, 387 F.3d 1244, 1261-62 (11th Cir. 2004). Speculation and

unproven data do not make for a reliable methodology. Clarke v. Schofield, 632 F. Supp. 2d 1350, 1362 (M.D. Ga. 2009). An expert opinion that is "wholly speculative or conjectural is without foundation [and] has no probative value. Speculation and conjecture by an expert is still speculation and conjecture and will not support a verdict." Whiteside v. Decker, Hallman, Barber & Briggs, P.C., 310 Ga. App. 16, 19 (2011) (internal citations omitted); see also Hawkins v. OB-GYN Assoc., P.A., 290 Ga. App. 892, 896 (2008).

Courts have recognized "over and over that an expert's *ipse dixit* is inadmissible. "'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" Wendler & Ezra, P.C. v. American Int'l Grp., 521 F.3d 790, 791 (7th Cir. 2008) (citations omitted); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Dr. Myers states in his expert report his opinion that "to a reasonable degree of medical certainty, […] had Kevil Wingo been provided reasonable emergency medical care, he would have most likely survived." (Doc. 196-20, p. 6.) However, at his deposition, Dr. Myers could not say what Mr. Wingo's likelihood of survival would have been if he had received medical care at any point after he was removed

6

from the nurses' immediate vicinity in the infirmary, or even in the hours *before* Mr. Wingo was moved. Dr. Myers testified that "if you get someone to me with vital signs, in the ER, they are most likely going to survive. So if you can get him to the emergency room with vital signs, he's most likely going to survive." (Doc. 196-21, Myers Dep. 105:19-22.) To Dr. Myers, "most likely going to survive" means a survival chance of over 50%. (Id. at 106:6-7.)

However, Dr. Myers acknowledges that Mr. Wingo's survivability decreased (or his chance of mortality increased) with each passing hour after his perforation without receiving emergency medical care. (Id. at 106:13-17.) He also acknowledges that he cannot say if or when Mr. Wingo crossed the threshold from "most likely to survive" to "most likely not to survive" had he received emergency medical care at that particular point. (Id. at 106:18-107:6.) Dr. Myers was forced to concede that he could not state with any degree of medical certainty what Mr. Wingo's survivability would have been if someone had called 911 at 7:45 a.m., the approximate time Mr. Wingo was transferred out of the infirmary because he does not know what Mr. Wingo's vital signs were then. (Id. at 107:11-19.) Dr. Myers testified about his survivability opinion,

> My statement doesn't bring into the issue of time, so I
> stand by what I said here. If you want to have me opine
> on whether or not, at 7:45, that was reasonable medical

7

> care, or he would have survived at that point, I can't say
> because I don't know what his vitals were at that point.

(Id. at 108:4-9.) Dr. Myers admitted that he could not say with any certainty whether Mr. Wingo would have survived if he was sent to the emergency room at particular times leading up to the moment the code blue was called:

Q. But based on the record, you can't say–

A. I don't know when the vital signs stopped.

Q. Right. And you can't say whether or not he would have survived if someone would have called at 7:45 a.m.?

A. I can not say that.

Q. Right. What about at 6:45 a.m.?

A. I don't know what the vitals are.

Q. All right. What about–

A. He was still moving, though, so he had some.

Q. What about 5:45 a.m.?

A. Again, still moving, but I don't know what the vitals are.

Q. Okay. So without the vitals, and if we're trying to understand what his survivability would have been had the emergency room been called at any point during that time frame, without the vitals, you're unable to say?

A. Yes. I can just say at this point–

 MR. GARDNER: Object to form. Go ahead.

8

THE WITNESS: At 11:30 at night, his survivability was probably—was mostly likely ten percent. His survival in the ER is 100 percent–or his mortality in the ER is 100 percent. How that percentage moved over time if we were to graph it out, I don't know.

Q. BY MR. JACKSON: Okay.

A. Not without vitals.

(Id. at 110:2-111:5.)

Thus, Dr. Myers's opinion that Mr. Wingo most likely would have survived if he had received emergency medical care simply is not specific enough to show that any individual defendant's actions caused Mr. Wingo's injuries because he cannot opine *when* emergency medical care would have made a difference. In other words, Dr. Myers cannot say to any degree of medical certainty that Mr. Wingo *would have survived* had any defendant called 911 at the beginning of Deputy Marshall's shift or when she let Mr. Wingo out of his cell in the infirmary or when Lieutenant Gordon and Major Harris escorted him out of the infirmary, or when they left him in the padded cell, or at any one of the multiple security rounds documented by Deputy Wilkerson.

Indeed, "such vague and imprecise opinions are often excluded by trial courts, and their exclusion is regularly affirmed by the Eleventh Circuit." Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1355 (M.D. Ga. 2007) (citing

McDowell v. Brown, 392 F.3d 1283, 1299, 1301 (11th Cir. 2004)) (characterizing expert's testimony as "too vague" and noting that "[a] mere guess that earlier treatment would either have improved [the plaintiff's] condition or rendered it the same simply fails the tests for expert opinion"); Frazier, 387 F.3d at 1266 (characterizing the expert's testimony as "imprecise" and "unspecific," and noting that, in light of such imprecision, the jury "could not readily determine whether the 'expectation' [alluded to by the expert] was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility").

In short, Dr. Myers's opinion lacks reliability and fails to assist the trier in acting in a meaningful way. Therefore, this court must exclude testimony from plaintiffs' expert Dr. Meyers.

## C. Mark Johnson's Opinions and 3D Demonstrative Model Must Be Excluded.

Plaintiffs would like to use a 3D model of the window in the door of Mr. Wingo's cell at the Cobb County Jail at trial. This demonstrative "model" will be created by plaintiffs' expert Mark Johnson using data and images obtained on December 15, 2022. The Supreme Court has clarified that Daubert's gatekeeping function applies to scientific, technical, or other specialized knowledge. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

10

The 3D model does not help the trier of fact and is not properly admissible as "demonstrative evidence" under well-established Eleventh Circuit precedent. "[E]xpert testimony may be admissible if it concerns matters that are beyond the understanding of the average layperson; in contrast, proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. Cook *ex rel*. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1107 (11th Cir. 2005)(citing Fed.R. Evid. 702).

The party offering the evidence bears the burden of demonstrating that it was made under circumstances and conditions substantially similar to those attending the alleged occurrence. Burchfield v. CSX Transp., Inc., 636 F.3d 1330, 1336 (11th Cir. 2011) (citing Barnes v. Gen. Motor Corp., 547 F.2d 275, 277–78 (5th Cir.1977)). To be admissible, demonstrative evidence must "be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed" and should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." United States v. Gaskell, 985 F.2d 1056, 1060 (11th Cir.1993) (quotation omitted) (citing Fed.R. Evid. 403). The Eleventh Circuit defined substantially similar conditions as "sufficiently similar so

11

as to provide a fair comparison" because "demonstrative exhibits tend to leave a particularly potent image in the jurors' minds." Id. (quoting Jackson v. Fletcher, 647 F.2d 1020, 1027 (10th Cir. 1981)).

Mark Johnson of Visual Law Group specializes in developing forensic evaluations to create visualization and 3D interactive tools for analyzing spatial relationships, lines of sight, and visual occlusions. (Mark Johnson Report, p. 1.[1]) Mr. Johnson performed laser scans of Mr. Wingo's cell and cell block at the Cobb County Jail with a tripod-based Leica RTC360 on December 15, 2022. (Id., pp. 4-5.) Plaintiffs expect Mr. Johnson, a visual scanner, to provide testimony that he:

> used laser scanning and photogrammetry to produce an accurate and complete 3D replica of the infirmary extension pad/cell 18 and a kinematic accurate model of the jail guard doing a security round of cell 18. The foundation for the 3D replica was obtained from a site inspection at Cobb County Adult Detention Center conducted on December 15, 2022, and a review of video footage of the infirmary and inside/outside of the infirmary extension pad/cell 18 for September 29, 2019.

(Doc. 176, p. 5.)

---

[1] Mark Johnson's Report is attached hereto as "Exhibit A." The report contains images and renderings of scans taken on December 15, 2022 in the CCADC. The parties have agreed to keep such images and renderings confidential in light of the security risk they could pose. Accordingly, those images are redacted from this filing.

Plaintiffs stated Mr. Johnson would create a 3D model where "a viewer will be able to ascertain accurate views into the cell from any desired position" and "photogrammetric references for the jail personnel as documented in the CCTV footage to determine what could and could not be seen from those positions at the times documented on the CCTV[2] time code." (Johnson Report, p. 5.) Plaintiffs' expert Margo Frasier is expected to use this 3D model as part of her testimony at trial. (Johnson Report, p. 3.)

The problem with Mr. Johnson's report and opinion is that plaintiffs have refused to produce in discovery the purported "replica" which Mr. Johnson claims will be "accurate and complete." It is one thing to create a visual demonstrative aide that will help the trier of fact visualize what might have happened in the padded cell and its vicinity. It is something else altogether to create a 3D model that purports to tell the jurors "what could and could not be seen" from specific vantage points. Defendants anticipate plaintiffs intend to use this model to question Major Harris's and Deputy Wilkerson's testimonies that they could see Mr. Wingo's chest rise and fall from their vantage point of looking through the window of Cell 18 when performing security rounds. However, without having disclosed this replica in discovery, defendants have no way of testing whether Mr. Johnson's

---

[2] This is the September 29, 2019, CCTV footage from the Cobb County Jail.

replica is, in fact, "accurate," as he claims it will be, or whether he has reliably applied the data from the December 2022 scans and photographs to the creation of the "replica."

In effect, plaintiffs have only disclosed that Mr. Johnson might form an expert opinion at a later date, when he produces the purported replica. But that amounts to an undisclosed expert opinion, and should thus be excluded from trial or consideration on defendant's motion for summary judgment.

## III.   <u>CONCLUSION</u>

While Dr. Myers opines that Mr. Wingo would most likely have lived if defendants had performed emergency medical care, his deposition testimony reveals that such opinion is *ipse dixit* and speculation at best. Additionally, Mr. Johnson purports to be able to create an accurate model of what defendants could have seen in the padded cell, but he has not produced to defendants that model and they have no way of testing whether he reliably applied principles and methods in transforming the raw data into a visual replica. Accordingly, the opinions of both experts should be excluded from consideration of any parties' motion for summary judgment and from trial.

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com

*/s/ Marisa M. Beller*
Marisa M. Beller
Georgia Bar No. 845893
Marisa.beller@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing **MOTION TO EXLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK JOHNSON AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT** has been prepared in accordance with Local Rule 5.1(C) (Times New Roman font, 14 point).

This 12th day of July, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing **<u>MOTION TO EXLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK JOHNSON AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT</u>** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants, and mailed a paper copy of same mailed by the United States Postal Service, first-class, postage prepaid, to parties and counsel of record who are non-CM/ECF participants, properly addressed upon:

Timothy J. Gardner & Henrietta G. Brown
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

17

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

DOCKET 207

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr.<br><br>        Plaintiffs,<br><br>v.<br><br>MAJOR BRANSON HARRIS, individually, LIEUTENANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY BRITTON MCPHEE, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10,<br><br>        Defendants. | CIVIL ACTION NO. 1:20-CV-03662-VMC |

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK JOHNSON

Plaintiffs file this response in opposition to Defendants' Motion to Exclude

Opinions of Plaintiffs' Experts Dr. Brian Myers and Mark Johnson (Doc. 198) and

state as follows:

## I.    INTRODUCTION

Plaintiffs brought this case against Defendants pursuant to 42 U.S.C. § 1983 for violating Mr. Kevil Wingo's United States Constitutional right to receive adequate medical care while being detained at Cobb County Adult Detention Center (hereinafter referred to as "CCADC"). Plaintiffs allege Defendants were deliberately indifferent to Mr. Wingo's serious medical needs resulting in his death at CCADC on September 29, 2019. (Doc. 166). Plaintiffs further allege that Defendants were negligent in failing to follow Cobb County Sheriff's Office's (hereinafter referred to as "CCSO") policies and procedures and that this failure led to Mr. Wingo's death. (Doc. 166).

On December 19, 2022, Plaintiffs formally disclosed General Surgeon Brian Myers (hereinafter referred to as "Dr. Myers") (Doc. 134). Dr. Myers will proffer the opinions (1.) "[T]o a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would most likely survived." (2) "[T]he lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life." (Dr. Myers' Expert Report attached hereto as Exhibit A at p. 6).

Dr. Myers' opinions are reliable and relevant as they are:

(1.) Based on his training, education, and experience as a general surgeon who is familiar with the surgical practices relating to the care and treatment of patients with perforated ulcers. (Exhibit A, Dr. Myers' Expert Report at p. 1).

(2.) Providing medical testimony to assist the jury in understanding the survivability and mortality of a patient presenting in an emergency room with a perforated ulcer.

(3.) Assisting the jury in determining the likelihood of Mr. Wingo surviving a perforated ulcer if he had received reasonable medical treatment while being detained at CCADC.

## II.   <u>STANDARD FOR EXPERT OPINION ADMISSIBILITY</u>

Judges are the gatekeepers in determining the admissibility of expert testimony. Fed. R. Evid. 702; <u>see also</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999); <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 597 (1993). The party seeking to introduce the expert at trial bears the burden of establishing his qualifications, reliability, and helpfulness. <u>See</u> <u>Knepfle v. J-Tech Corp.</u>, 48 F.4th 1282, 1294 (11th Cir. 2022); <u>see also</u> <u>Moore v. Intuitive Surgical, Inc.</u>, 995 F.3d 839, 851 (11th Cir. 2021).

The Eleven Circuit has established three elements encompassing the requirements of <u>Daubert</u> and Rule 702 to determine if an expert is qualified.

(1) First, "the expert must be qualified to testify competently regarding the matter he or she intends to address."  <u>See</u> <u>Tuscaloosa v. Harcros Chemicals, Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998); <u>see also</u> <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004).

(2) Second, the "methodology used must be reliable as determined by a <u>Daubert</u> inquiry." <u>Id</u>. and

(3) Third, the "testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." <u>Id</u>.

An expert may be qualified "by knowledge, skill, training, or education. <u>See Hendrix ex rel. G.P. v. Evenflo Co.</u>, 609 F.3d 1183, 1193 (11th Cir. 2010). In determining qualifications, the court will examine the expert's education and experience, and ask whether the witness' intended testimony is sufficiently within his or her area of expertise. <u>See Frazier</u>, 387 F.3d at 1261; <u>see also Everett v. Georgia-Pacific Corp.</u>, 949 F. Supp. 856, 857 ("a physician must at minimum, possess some specialized knowledge about the field in which he is to testify").

The Supreme Court in <u>Daubert</u> set out a list of factors to assist the court in determining the reliability of an expert's testimony. <u>See Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 597 (1993); <u>see also United States v. Brown</u>, 415 F.3d 1257, 1267 (11th Cir. 2005). These factors are (1) whether the expert's opinion can be (and has been tested); (2) whether the expert's theory has been subjected to peer review and publication; (3) what the expert's theory or opinion's known or potential rate of error is, and whether standards controlling its operation exists, and (4) whether the expert's opinion or theory is generally accepted in the field. <u>Id</u>.

If the expert's testimony solely relies on experience, then the expert must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Id. at 1261; See, Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009).

When scrutinizing the reliability and relevancy of expert testimony, there is a delicate balance between The Court's role as gatekeeper and the jury's role as the ultimate factfinder. See Frazier, 387 F.3d at 1272. It is well settled law that the Court's gatekeeper's role "is not intended to supplant the adversary system or the role of the jury." See Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001).

The third element requires that the expert opinion assist and be helpful to the trier of fact in deciding the issues in the case. Expert testimony is admissible when it concerns matters that are beyond the understanding of the average lay person. See Frazier, 387 F.3d at 1262.

Dr. Myers satisfies all of Rule 702 and Daubert's requirements.

## III.   DR. MYERS' EXPERT OPINION IN THIS CASE IS ADMISSIBLE UNDER DAUBERT AND FED. R. EVID. 702.

Dr. Myers obtained his medical degree at Ohio State University College of Medicine in 1992. (Dr. Myers' Dep. attached hereto as Exhibit B at p. 17:1-4). He attended residency at Temple University from 1992 to 1998. (Exhibit B, Dr. Myers' Dep. at p.17:15-23). During his tenure at Temple University, he was a gastrointestinal

research fellow. (Exhibit B, Dr. Myers' Dep. at p. 21:18-22). He is board certified in

general surgery by the General American Board of Surgery. (Exhibit B, Dr. Myers'

Dep. at p. 24:17-19). Dr. Myers is currently employed at Surgery South, PC as a

surgeon and CEO. (Exhibit B, Dr. Myers' Dep. at p. 34:7-10). His responsibilities are

to perform surgeries and manage the staff that includes five general surgeons and

practices of the business. (Exhibit B, Dr. Myers' Dep. at pgs. 34:11-17, 34:21-25 and

35:1-2).

Dr. Myers is an expert on post-perforation treatment of gastric ulcers. (Exhibit

B, Dr. Myers' Dep. at p. 26:4-6). His opinions in this case are drawn from his

expertise in post-perforation treatment of ulcers as a general surgeon. (Exhibit B, Dr.

Myers' Dep. at p. 26:4-25).  Since residency, Dr. Myers' specialty has been general

surgery. (Exhibit B, Dr. Myers' Dep. at pgs. 17:7-9 and 19:2-10). General surgeons

treat and correct perforated ulcers or gastric ulcers. (Exhibit B, Dr. Myers' Dep. p.

20:7-12). In contrast, a gastroenterologist treats ulcers before perforation. (Exhibit B,

Dr. Myers' Dep. p. 20:13-16).

Dr. Myers treats patients with peptic or gastric ulcers approximately once a

month. (Exhibit B, Dr. Myers' Dep. at p. 25:8-10). All of Dr. Myers' patients come to

him for surgical treatment after the ulcer has perforated. (Exhibit B, Dr. Myers' Dep.

at p. 25:11-16). There is currently no surgical treatment for patients who have ulcers

that have not perforated. (Exhibit B, Dr. Myers' Dep. at p. 25:19-22).

In formulating his opinion, Dr. Myers reviewed a litany of materials to include but not limited to videos/audio files of interview of CCSO officers, inmates, and infirmary nurses; video surveillance of Mr. Wingo in infirmary and pad cell 18; Mr. Wingo medical records from CCADC, Wellstar Kennestone Hospital and Cobb County EMS dispatch and prehospital care report; Cobb County Medical Examiner's case file; and CCSO's report and incident investigation report. (Exhibit A, Dr. Myers' Expert Report at p. 1 and 2).

Dr. Myers' opinions are unequivocal, not speculative, and provided to a degree of reasonable medical certainty and/or probability which are admissible as reliable and relevant testimony. See Griffin v. Coffee County, 623 F. Supp. 3d 1365, 1382 (S.D. Ga 2022) (testimony on the probability of an event assists the trier the fact). His opinions are not just because he says so or as Defendant miscategorized as "ipse dixit." (Doc. 198 at 5). This very scenario of Mr. Wingo's medical condition of perforated ulcer is the same scenario of how patients arrive to Dr. Myers. (Exhibit B, Dr. Myers' Dep. at pg. 25:8-16). Dr. Myers' surgical experience makes his opinions on survivability and mortality more than reliable.

Dr. Myers' testimony:

Q. Okay. And you go on to say that if he had received reasonable emergency care, he would most likely have survived. What do you mean by most likely?
A. Most probably.
Q. Okay.

A. If you get someone to me with vital signs, in the ER, they are most likely going to survive. So if you can him to the emergency room with vital signs, he's most likely going to survive.

Q. But most likely, you know, that-- you would agree with me that that denotes a certain probability, correct?

A. Yes.

Q. Is that quantifiable?

A. I'm just going to have to stick with most probably he would survive because that's just my experience.

Q. Would most probable mean greater than –

A. Greater than 50 percent.

(Exhibit B, Dr. Myers' Dep. at pgs. 105:13-25 and 106:1-7).

Q. Okay. So lower than 50 percent mortality. But we have discussed earlier that the percentage risk of mortality, whether you can quantify that or not, it increases with each passing hour, correct?

A. Correct.

Q. Okay. Are you able to say if he ever passed the most likely to survive to most likely would not have survived line, at any point during -- or after his ulcer perforated, but while he was still at the Adult Detention Center.

A. All I can say is, the literature says that he probably started at around ten percent mortality. When the vital signs reached the point where he's not going to likely survive, I don't know because they are not recorded.

(Exhibit B, Dr. Myers' Dep. at pgs. 106:13-25 and 107:1-2).

Dr. Myers also testified that Mr. Wingo's vitals were taken at 12:36 a.m. on September 29, 2019. (Exhibit B, Dr. Myers' Dep. at pgs. 95:24-25 and 96:1-18). Having these vitals documented along with Dr. Myers' surgical experience repairing perforated ulcers lead to his unequivocal testimony that (1.) at 11:30 at night, Mr. Wingo's gastric ulcer perforated in the multipurpose room and (2.) Mr. Wingo, with

no comorbidities, had a 90 percent chance of survival or 10 percent mortality. (Exhibit B, Dr. Myers' Dep. at pgs. 88:1-13, 97:17-22, 109:11-25, 110:1-25 and 111:1-3).

Defendants do not challenge Dr. Myers' qualifications under Rule 702 or Daubert. Nonetheless, Dr. Myers is qualified, and his opinions are reliable, relevant, and helpful to assist the jury in determining the issues in this case.

## A. **Reliability**

Dr. Myers' opinions on survivability and mortality are reliable and relevant. His opinions are based on his knowledge, experience, and review of Mr. Wingo's medical records and video surveillance from CCADC. As a general surgeon, Dr. Myers has conducted many surgeries on patients who present to him after perforation of an ulcer.

Defendants contend that Dr. Myers is unable to state the exact time—hour and minute— Mr. Wingo would have survived if he had received medical care because Dr. Myers does know what Mr. Wingo's vital signs were at that specific time. (Doc. 198 at 7-8). Notably, Defendants' very own expert, Dr. Vega, states the exact same thing. (Dr. Vega's Dep. attached hereto as Exhibit C at p. 50:3-19). Dr. Vega did agree that Mr. Wingo having no comorbidities listed in his autopsy report and at age 36 would have a good chance of surviving a perforated ulcer. (Exhibit C, Dr. Vega's Dep. at pgs. 61:1-25 and 62:1-8).

However, Dr. Vega goes even further to state that "…absence of vital signs in the time period prior to his death makes any such prediction particularly unreliable, as

there is no objective medical evidence of when he began to decline." (Exhibit C, Dr. Vega's Dep. at pg. 47:2-11). Essentially, Defendants take issue with Dr. Myers' testimony because it competes against Dr. Vega's, a gastroenterologist, testimony that is typically handled through cross-examination at trial. See Maiz, 253 F.3d at 666 ("vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence").

The cases cited by Defendants are plainly distinguishable from this instant case. In Bowers, the Court excluded the causation testimony of treating physician after determining that the proposed testimony was too vague to assist the jury in deciding proximate cause. See Bowers v. Norfolk So. Corp., 537 F. Supp. 2d 1343 (M.D. Ga. 2007). The treating physician's causation testimony was replete with qualifiers such as "may", "guess", "tend", "sounded like" and/or "may have". The Court concluded the treating physician's use of the qualifiers "may" did not logically advance a material aspect of Plaintiff case in proving proximate cause of Plaintiff's back injury.

Similarly, the expert's opinion in McDowell v Brown, 392 F.3d 1283 (11th Cir. 2004) is distinguishable from Dr. Myers' opinion. In McDowell, the Eleventh Circuit held that an expert could not testify to a vague "the earlier, the better" theory regarding treatment of a spinal abscess. Id. The expert based his opinion on his common sense and a universal axiom that expedited treatment is preferred to delayed

treatment. Id. The expert's theory was determined to lack testing and peer review. The Eleventh Circuit explained that the notion of early treatment is well within the common knowledge of an average juror.

Here, Dr. Myers' testimony is based on his experience as a general surgeon. His testimony is more specific and stated to a degree of medical probability that Mr. Wingo's would have more than likely survived had he received emergency medical treatment. While Dr. Myers cannot precisely state at a specific time and minute without vitals Mr. Wingo's likelihood of survival, this is true of any expert testimony given in this case. However, Dr. Myers' testimony on Mr. Wingo's survivability percentage after 11:30 p.m. is specific enough to provide a solid basis for the jury to examine each Defendants' action, or lack thereof, throughout the night and until Mr. Wingo was pronounced dead. Unlike the expert in McDowell, Dr. Myers' conclusions are outside the common knowledge of an average juror. Accordingly, Dr. Myers' opinions are admissible as reliable and relevant.

**B.  Helpfulness**

Dr. Myers' opinions are relevant and will assist the jury in deciding the issue of causation for Plaintiffs' deliberate indifference and state law negligence claims against Defendants. Fed. R. Evid. 401. Dr. Myers will provide expert testimony that Mr. Wingo would have more than likely survived his perforated ulcer had he received emergency medical care. Dr. Myers' testimony is not qualified with a "may" or

"possible" but **reasonable degree of medical certainty.** (Dr. Myers' Expert Report attached hereto as Exhibit A at p. 6). Furthermore, Dr. Myers' opinions are helpful as they assist the jury in determining the survivability and mortality rate of perforated ulcer which goes beyond a lay jurors' general understanding, and these opinions certainly cannot be argued during closing by Plaintiff without expert evidence.

**IV.**   **Plaintiff's Site Inspection Visual Consultant Mark Johnson**

Out of an abundance of caution, on December 19, 2022, Plaintiff also identified Mark Johnson (hereinafter referred to as "Mr. Johnson"), a visual scanner technician. Mr. Johnson was not disclosed as an expert witness but identified as a consultant. Plaintiffs' Counsel communicated the same to Counsels for Defendants via email on April 6, 2023.

On December 15, 2022, the parties coordinated a site inspection of CCADC. The purpose of the site inspection was to allow Mr. Johnson to conduct a 3D laser scanning of infirmary extension pad/cell 18—close observation padded cell that housed Mr. Wingo at his time of death. The fullest extent of testimony from Mr. Johnson, if any, would be to provide foundational testimony to admit any demonstrative aids at trial from the site inspection. Defendants now seek to exclude Mark Johnson as "expert" witness.

Defendants Motion to Exclude Mark Johnson improper, futile, and incorrect procedure to challenge the admissibility of demonstrative aids that may or may not be

presented at trial. The question of admissibility turns on the purpose of the demonstrative evidence and the goal of the attorney who prepares and uses it. Defendants' issues with the admissibility or accuracy of demonstrative evidence that have yet to be presented are premature at this juncture.

## V.   **CONCLUSION**

Dr. Myers' opinions in this case are reliable, relevant, and helpful to assist the jury under Daubert and Rule 702 because he (1.) applied his experience as a general surgeon who is familiar with the surgical practices relating to the care and treatment of patients with perforated ulcers and (2.) provided medical testimony that will help the jury understand the survivability and mortality of a patient presenting in an emergency room with a perforated ulcer. Lastly, his testimony would assist the jury in determining the likelihood of Mr. Wingo surviving a perforated ulcer if he had received reasonable medical treatment while being detained at CCADC.

In addition, Mr. Johnson is not an expert witness but a consultant. Thus, Daubert and Rule 702 are not applicable to Mr. Johnson. For the foregoing reasons, this Court should deny Defendants' Motion to Exclude Opinions of Dr. Brian Myers and Mark Johnson.

Respectfully submitted, this  30th  day of August, 2023.

**GARDNER TRIAL ATTORNEYS, LLC**


/s/ Henrietta G. Brown
**TIMOTHY J. GARDNER**
Georgia Bar No.  115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

*Attorneys for the Plaintiffs*

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

    This __30th__ day of August, 2023.

                          **GARDNER TRIAL ATTORNEYS, LLC**

                          /s/ Henrietta G. Brown
                          **TIMOTHY J. GARDNER**
                          Georgia Bar No. 115430
                          **HENRIETTA G. BROWN**
                          Georgia Bar No. 253547

                          ***Attorneys for Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TIFFANY WINGO as Administrator of the Estate of
KEVIL WINGO, SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR., ERIKA WINGO,
surviving child of KEVIL WINGO, SR., and TERI
FIELDS, ESQ., Conservator of KEVIL WINGO, JR.,
surviving minor child of KEVIL WINGO, Sr.

      Plaintiffs,

v.

MAJOR    BRANSON    HARRIS,    individually,
LIEUTENTANT CHARLES GORDON, individually,
DEPUTY   PAUL   WILKERSON,   individually,
DEPUTY   BRITTON   MCPHEE,   individually,
DEPUTY LYNDA MARSHALL, individually, JOHN
DOES 1-10, and JANE DOES 1-10,

      Defendants.

**CIVIL ACTION NO.
1:20-CV-03662-VMC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing

**<u>PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO
EXCLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS,
AND MARK JOHNSON</u>** to the Clerk of Court using the CM/ECF system which

will automatically send electronic mail notification of such filing to the following

counsel of record:

Sun S. Choy, Esq.           H. William Rowling, Jr., Esq.
Wesley C. Jackson, Esq.      Lauren S. Bruce, Esq.

Marisa M. Beller, Esq.                          Cobb County Attorney's Office
Freeman Mathis & Gary, LLP                      100 Cherokee Street, Suite 350
100 Galleria Pkwy, Suite 1600                   Marietta, GA 30090
Atlanta, GA 30339-5948


      Respectfully submitted, this <u>30th</u> day of August, 2023.


                **GARDNER TRIAL ATTORNEYS, LLC**


                <u>/s/ Henrietta G. Brown</u>
                **TIMOTHY J. GARDNER**
                Georgia Bar No. 115430
                **HENRIETTA G. BROWN**
                Georgia Bar No. 253547


                ***Attorneys for Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

DOCKET 209

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr.

        Plaintiffs,

v.

MAJOR BRANSON HARRIS, individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10,

        Defendants.

**CIVIL ACTION NO. 1:20-CV-03662-VMC**

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs in the above-styled case file this Brief in response to Defendants' Motion for Summary Judgment and state as follows:

## I.    INTRODUCTION

This case is brought pursuant to 42 U.S.C. § 1983 where Plaintiffs allege Defendants violated Plaintiffs' decedent, Mr. Kevil Wingo's, United States Constitutional right to receive adequate medical care while being detained. Plaintiffs allege Defendants were deliberately indifferent to Mr. Wingo's serious medical

1

needs resulting in his death at the Cobb County Adult Detention Center (hereinafter referred to as the "CCADC") on September 29, 2019. (Doc. 166).  Plaintiffs further allege that Defendants were negligent in failing to follow Cobb County Sheriff's Office's (hereinafter referred to as "CCSO") policies and procedures and that this failure to perform certain ministerial acts led to Mr. Wingo's death.  (Doc. 166). Defendants deny all Plaintiffs' allegations. (Doc. 175).

This action was originally filed in September 2020 and since that time numerous Defendants have been dismissed from this case, including certain medical providers.  (Docs. 1, 59, 192)[1]. The dismissed defendants were dismissed either because they resolved the issues in the case against them or after discovery of relevant information the facts warranted dismissal of the defendants at that time. The evidence in this case strongly illustrates that the four remaining defendants violated Mr. Wingo's clearly established constitutional right to receive adequate medical care in that they knew Mr. Wingo had a serious medical need; were deliberately indifferent to Mr. Wingo's serious medical need; were negligent in performing ministerial tasks; and that their deliberate indifference and/or negligence caused Mr. Wingo's untimely death at 36 years of age.

---

[1] Defendants state that current Sheriff Craig Owens was once a Defendant in this action, but that is not the case.  (Defendants' MSJ Footnote 1, Page 2). Former Sheriff Neil Warren was once a defendant in this case but was dismissed with Chief Deputy Sonya Allen after her deposition.

Plaintiffs incorporate by reference Plaintiffs' Additional Facts in Opposition to Defendants' Motion for Summary Judgment (hereinafter referred to as "PAF").

## II.  ARGUMENT & CITATION OF AUTHORITY

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(a). Genuine disputes of fact exist when the evidence is such that a reasonable jury could render a verdict for the non-movant. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). Factual Issues are considered genuine when they have a real basis in the record. Id.

To prevail on summary judgment when the non-moving party has the burden of proof at trial on the claim asserted, the moving party is not required to support its motion with affidavits or other similar materials negating the opponents claim but must show that there is an absence of evidence to support the non-moving party's claim/defense. See U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991). The non-moving party must then show through relevant and rebuttal evidence beyond the pleadings that there is a disputed fact that precludes summary judgment as a matter of law. See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1315 (11th Cir. 2011). In considering a motion for summary judgment the Court must view all evidence and draw all reasonable inferences in the

best light most favorable to the non-moving party. See Hinson v. Bias, 927 F.3d 1103, 1115 (11th Cir. 2002).

**B. Defendants Violated Mr. Kevil Wingo's Constitutional Right To Receive Adequate Medical Care While Detained At The CCADC.**

The evidence in this case illustrates that Defendants violated 42 U.S.C. § 1983 which was originally enacted as part of the Civil Rights Act of 1871. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 166 (1970). Congress originally passed the Civil Rights Act of 1871 to enforce the provisions of the Fourteenth Amendment of the United States Constitution which became known as the Ku Klux Klan Act. Id. The Act was designed to protect African Americans from Klan violence during Reconstruction, giving those deprived of a constitutional right by someone acting under color of law the right to seek relief in court. Id. This latter part of the Act was codified in 42 U.S.C. § 1983.

The State has a constitutional obligation under the Eighth and Fourteenth Amendments to provide adequate medical care to those it has incarcerated. See Estelle v. Gamble, 429 U.S. 97, 104, (1976). A pretrial detainee must rely on jail authorities to treat his medical needs and if they fail to do so then his needs would not be met. Id. at 103. In addition, O.C.G.A. § 42–4–4 states that it is the duty of the sheriff and his deputies to provide prisoners with medical aid.

The Supreme Court has interpreted the Eighth Amendment to prohibit "deliberate indifference to serious medical needs of prisoners." See West v.

4

Atkins, 487 U.S. 42, 44, (1988), quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976).

The Eleventh Circuit has analyzed the rights of pre-trial detainees under the Due

Process Clause of the Fourteenth Amendment and has found that pre-trial detainee

claims under the Fourteenth Amendment are subject to the same scrutiny as if they

are brought under the Eighth Amendment. See Mann v. Taser Int'l, Inc., 588 F.3d

1291, 1306 (11th Cir. 2009); see also Goebert v. Lee County, 510 F.3d 1312, 1326

(11th Cir. 2007).

To prove deliberate indifference in violation of a pre-trial detainee's right to

adequate medical care, the detainee must show that: (1) he had a serious medical

need; (2) the jail official or medical provider acted with deliberate indifference to

his serious medical need; and (3) injury was caused by the official's wrongful

conduct. See Goebert v. Lee County, 510 F.3d 1312 (11th Cir. 2007); see also

Farrow v. West, 320 F.3d 1235 (11th Cir. 2003). Deliberate indifference requires:

(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by

conduct that is more than mere negligence. Id. "Conduct that is more than mere

negligence includes grossly inadequate care, administering easier but less effective

treatment, treatment that is so cursory as to amount to no medical care at all, and, in

certain situations, delaying necessary medical treatment." See Estelle v. Gamble,

429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); see also Tolbert v. Eyman, 434

F.2d 625, 626 (9th Cir.1970); <u>Rutledge v. Alabama,</u> 724 F. App'x 731, 735 (11th Cir. 2018); <u>Davies v. Israel</u>, 342 F. Supp. 3d 1302, 1308 (S.D. Fla. 2018).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. <u>See</u> <u>Mann v Taser Intern., Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009). Alternatively, a serious medical need is determined by whether a delay in treating the need worsens the condition. <u>Id</u>. Under either test, the medical need must be one that, if left untreated, poses a substantial risk of serious harm. <u>Id</u>.; <u>see also</u> <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994) ("alternative test states a medical need is sufficiently serious if a delay in treatment worsens the condition."), overruled in part on other grounds by <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).

Each of the Defendants in this case was deliberately indifferent to Mr. Wingo's obvious, dire, and serious medical need and disregarded their constitutional responsibilities.

### i.   **Deputy Lynda Marshall**

Deputy Marshall was aware that throughout the night and early morning hours of September 28-29, 2019, Mr. Wingo asked both the medical staff and CCSO officers to go to the hospital.  (Exhibit 3 to PAF, McPhee Dep. at p. 152:19-25; Exhibit 4 PAF, Marshall Dep. at pgs. 138:04-25; 147:24-25; 148:1-6). Deputy

Marshall heard Mr. Wingo holler a few times that he could not breathe and wanted to go to the hospital, and she responded if you are speaking you are breathing but did not provide him any medical aid. (Exhibit 4 to PAF Marshall Dep. at p. 138, 147, 149-150).  Mr. Wingo had been hollering that he could not breathe for at least an hour and a half before Deputy Marshall opened his cell door and Mr. Wingo fell to the ground at around 7:30 a.m. (Exhibit 4 to PAF Marshall Dep. at p. 150:13-25; Exhibit 7 to PAF Infirmary Video View 1).

The morning of September 29, 2019, between 7:27 a.m. and 7:32 a.m. Mr. Wingo is seen in the presence of Deputy Marshall fainting or losing his balance at least three times. (Exhibit 4 to PAF Marshall Dep. at pgs. 158-163; Exhibit 7 to PAF Infirmary Jail Video View 1; Exhibit 8 to PAF, Deputy Marshall Internal Affairs Interview). After Mr. Wingo fainted or lost his balance the third time, Deputy Marshall opened Mr. Wingo's cell door and he fell to the ground in front of the cell. (Exhibit 4 to PAF Marshall Dep. at p. 169:01-03; Exhibit 9 to PAF Infirmary Video View 2 at 7:28 a.m.). Defendant Deputy Marshall then sought to move Mr. Wingo to an isolated padded cell calling him an "idiot" and saying that he was "playing games". (Id.; Exhibit 11 to PAF Marshall and Wilkerson Internal Phone Call; Exhibit 12 to PAF, Marshall and Harris Internal Phone call.)  Deputy Marshall contacted Major Harris and told him that she had been watching Mr. Wingo who claimed that he was falling but that he was messing around and needed to be moved to a padded

cell.  (Exhibit 12 to PAF Marshall and Harris Internal Phone Call). There is no evidence in this case, that Mr. Wingo was messing around, playing games, being aggressive, combative, or disruptive.

Deputy Marshall, Lieutenant Gordon, Major Harris, and Deputy Wilkerson were familiar with the criteria for placement of an Individual in a padded cell. Deputy Marshall understood that the padded close observation cells were reserved for individuals who met certain criteria under CCSO Policy 3-03-07.00 Mental Health/Close Observation.  Mr. Wingo did not fit the criteria to be placed in a padded cell and yet these defendants all moved to place him a padded cell and/or placed him there.  (Exhibit 16 to PAF, Close Observation Policy).

Deputy Marshall, Lieutenant Gordon, Major Harris and Paul Wilkerson defend their actions by stating that they understood Mr. Wingo was just detoxing. Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 4 to PAF Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious medical issue. (Exhibit 4 to PAF Marshall Dep. at 178:4-14).  Major Harris testified that in 2019 he knew that someone could die from detoxing.  (Exhibit 5 PAF Harris dep. at p. 95:8-10).  Lt. Charles Gordon knew that if someone was detoxing medical needed to see them.  (Exhibit 10 PAF

Gordon Dep. at p. 112:19-25). Paul Wilkerson knew that people could die from detoxing as other security personnel at the jail told him that. (Exhibit 13 PAF Wilkerson Dep. at p. 95:12-15).

Deputy Marshall was jolly and laughing as Mr. Wingo was being taken to the padded cell. (Exhibit 7 PAF Infirmary Video View 2 at 7:45:30 – 7:46:45). After Mr. Wingo was placed in the padded cell, Lieutenant Gordon returned to the Infirmary. (Exhibit 7 to PAF, Infirmary Video View 1 at 7:56 a.m.) Deputy Marshall then made movements against the wall where Mr. Wingo originally fell and pretended as though she was stumbling to the ground and laughing. (Exhibit 7 to PAF Infirmary video View 1 at 7:57:24 a.m.).

### ii.   **Lieutenant Charles Gordon**

Lieutenant Gordon, who supervised security personnel in the infirmary, arrived when Mr. Wingo was on the floor in front of his cell. (Exhibit 10 to PAF Gordon Dep. at pgs. 64:20-25; 65:1-6 and Exhibit 9 Infirmary Video at 7:31 a.m.). Mr. Wingo was on the floor in front of his cell for nine minutes in the presence of Deputy Marshall and Lt. Gordon. (Exhibit 4 to PAF Marshall Dep. at pgs. 214:11-25; 215:1; Exhibit 10 PAF Gordon Dep at pgs. 101:25; 102:1-25; Exhibit 7 PAF Infirmary Video View 1 and Exhibit 9 PAF Infirmary Video View 2 at 7:31 a.m. through 7:41 a.m.).   Neither Deputy Marshall nor Sergeant Gordon had any of the medical providers attend to Mr. Wingo nor did they attend to Mr. Wingo themselves

or call an ambulance for him. (Exhibit 7 Infirmary Video View 1 and Exhibit 9 Infirmary Video View 2).

Lt. Gordon stated that he saw Mr. Wingo fall over several times while he was on the floor but did not have medical attend to him. (Exhibit 10 PAF Gordon Dep. at pgs. 103-104, 107-108, 113-116). He said that Mr. Wingo falling over was concerning to him, but he did not have medical evaluate him. (Exhibit 10 PAF Gordon Dep. at p. 115:12-25).

After nine minutes on the ground, Sergeant Gordon grabbed Mr. Wingo by his collar and escorted him to chairs in the Infirmary. (Exhibit 10 PAF Gordon Dep. at pgs. 126:22-25; 127:1-7; and Exhibit 9 PAF Infirmary Video View 2 at 7:46 a.m.). Sergeant Gordon grabbed Mr. Wingo by his collar because he believed that Mr. Wingo was too unstable to walk on his own and thus needed to be held by his collar so that he did not fall while being escorted. (Id.) Sergeant Gordon placed Mr. Wingo in a chair in the Infirmary and then again did not ask for any medical personnel to attend to Mr. Wingo. (Exhibit 10 PAF Gordon Dep. at pgs. 126:22-25; 127:1-7; and Exhibit 9 Infirmary Video View 2 at 7:46 a.m.).

Lieutenant Gordon testified that he did not think Mr. Wingo even knew where he was. (Exhibit 10 PAF Gordon Dep. at pgs. 169:12-17; 82:1-25; 83:1-7; and Exhibit 9 PAF Infirmary Video View 2 at 7:46 a.m.). Chief Deputy Sonya Allen testified that if the deputies and sergeants knew that Mr. Wingo could not walk on

his own and was disoriented and didn't know where he was that would be concerning.  (Exhibit 15 PAF Allen Dep. at pgs. 172:25-173:1-25).

Mr. Wingo was losing his balance while walking and having difficulty walking. (Exhibit 10 PAF Gordon Dep. at pgs. 143:3-6; 154:1-7; Exhibit 9 PAF Infirmary Video View 2 at 7:46 a.m.; and Exhibit 18 PAF Corridor Video at 7:46 a.m.).  Deputy Marshall could not tell if Mr. Wingo was walking at a normal pace because she did not know what his normal pace was. (Exhibit 4 PAF Marshall Dep. at p. 223-224).  Mr. Wingo was unsteady, so Lieutenant Gordon grabbed Mr. Wingo by his handcuffs to escort him to the padded cell. (Exhibit 7 PAF Infirmary Video View 1 at 7:46 a.m.).  Major Harris then grabbed a wheelchair for Mr. Wingo and Mr. Wingo fell in front of the wheelchair. (Exhibit 18 PAF Corridor Video 7:48 a.m.).  Lt. Gordon, Major Harris and Deputy Mejia then used their collective effort to put Mr. Wingo in the wheelchair and wheel him to the padded cell dragging his foot the entire time (Id.).  Deputy Marshall saw Mr. Wingo placed in a wheelchair and opined that it looked like his knee sort of buckled.  (Exhibit 4 PAF Marshall Dep. at p. 223-224).

Mr. Wingo did not walk into the padded cell but was wheeled in the padded cell.  Lt. Gordon watched him wheeled into the padded cell and assisted in stripping Mr. Wingo of his clothes.  (Exhibit 19 & 20 PAF Inside and Outside of Padded Cell). Mr. Wingo was unable to get out of the wheelchair on his own and/or take his clothes

off.  (Exhibit 20 PAF Inside Padded Cell).  Mr. Wingo's body appeared almost lifeless.  (Id.) Nonetheless, Lt. Gordon did not call for an ambulance, have medical evaluate him or do anything for Mr. Wingo medically.  About eight minutes after Lt. Gordon left Mr. Wingo in the padded cell, Mr. Wingo appears to take his last movement until he is discovered about an hour later. (Id.)

### iii.   **Major Branson Harris**

Major Branson Harris, the watch commander and highest ranking official in the jail on shift at the time, was made aware that Mr. Wingo wanted to go to the hospital.  (Exhibit 5 PAF Harris Dep. at p. 79:21).  Lynda Marshall called Major Harris to have Mr. Wingo removed from the infirmary and said he was just detoxing. (Exhibit 12 PAF Marshall and Harris Internal Phone Call). Major Harris responded that if Mr. Wingo "is detoxing" then he should be in the infirmary, but that he would come down.  (Exhibit 5 PAF Harris Dep. at pgs. 93:19-25; 94:1-25; Exhibit 12 PAF Marshall and Harris Internal Phone Call).    Major Harris testified that in 2019 he knew that someone could die from detoxing.  (Exhibit 5 Harris dep. at p. 95:8-10). Major Harris arrived at the infirmary and spoke with a nurse who stated that Mr. Wingo was detoxing, trying to get to the hospital, drug seeking and needed to be isolated. (Exhibit 5 Harris Dep. at p. 79:17-23). There is no evidence in this case that Mr. Wingo ever asked any jail or medical staff for any drugs.

Major Harris also did not see Mr. Wingo being loud, disruptive, acting out, belligerent or trying to harm himself. (Exhibit 5 PAF Harris Dep. at pgs. 117:3-6; 130:17-25; 131:1).

Major Harris also was aware of the criteria to place someone in a padded a cell. Mr. Wingo's behavior did not meet that criterion. Nonetheless, Major Harris decided to wheel Mr. Wingo to the padded cell because he was having difficulty walking. (Id.; Exhibit 5 PAF Harris Dep. at pgs. 154:12-25; 155:1-4). Sgt Guy Vanderbogart worked at the CCADC for 12 years and in that time had never seen someone placed in a close observation cell that did not threaten to hurt themselves. (Exhibit 17 PAF Vanderbogart Dep. at pgs. 53:25-54:1-5). The padded cell is used if someone tries to hurt themselves or is a little bit out of control. (Exhibit 17 PAF Vanderbogart Dep. at p. 20:12-18).

A deputy or sergeant could not make the decision to place someone in a padded cell. (Exhibit 17 PAF Vanderbogart Dep. at p. 21-22). The Watch Commander, Major Harris at the time, had to sign off on the Close Observation Form and approve placement in the padded cell. (Exhibit 17 PAF Vanderbogart Dep. at p. 24:11-14). This form is usually completed within 10-15 minutes after placing someone in a padded cell. (Exhibit 17 PAF Vanderbogart Dep. at p. 24-25). The purpose of the form and placing it by deputy is so that the deputy knows why detainee in there. (Exhibit 17 PAF Vanderbogart Dep. at p. 26:7-16).

Deputy Mejia testified that a detainee cannot be placed in a padded cell unless assessed by medical and their vitals are taken.  (Exhibit 14 PAF Mejia Dep. at p. 64:24-25 – 65:1-25).  Mr. Wingo was not assessed by medical, and his vitals were not taken.  (Exhibit 7 & 9 PAF Infirmary Video Views 1 & 2).

Mr. Wingo fell to the ground in front of the wheelchair when Major Harris brought the wheelchair. (Exhibit 5 PAF Harris Dep. at p. 156:11-21; Exhibit 10 PAF Gordon Dep. at pgs. 158:24-25; 159:1-7; and Exhibit 18 PAF Corridor Video at 7:46:01 a.m.).  Sergeant Gordon and Major Harris, with the assistance of Deputy Nasie Mejia, then picked Mr. Wingo off the ground and placed him in the wheelchair. (Exhibit 10 PAF Gordon Dep. at pgs. 159:25 –160:1-2; Exhibit 5 PAF Harris Dep. at p. 157:10-12; and Exhibit 18 PAF Corridor Video at 7:46 a.m.). Mr. Wingo sat in the wheelchair and did not speak.  (Exhibit 10 PAF Gordon Dep. at p. 160:6-9; Exhibit 5 Harris Dep. at p. 159:5-7; Exhibit 18 PAF Corridor Video at 7:46 a.m.). Despite the wheelchair being equipped with footrests, Mr. Wingo was wheeled to the padded cell with his foot dragging on the ground and making no sounds.  (Id.; Exhibit 5 PAF Harris Dep. at p. 173:5-19; Exhibit 18 PAF Corridor Video at 7:46 a.m.; and Video of Outside of Padded Cell, attached as Exhibit 19 at 7:48 a.m.).

Sergeant Gordon and Major Harris, with the assistance of Deputy Nasie Mejia took Mr. Wingo out of his wheelchair and put him on the ground in the padded cell.

(Exhibit 10 PAF Gordon Dep. at p. 173:7-12; video of Inside Padded Cell Exhibit 20 PAF at 7:48 a.m.). Mr. Wingo was not fighting or causing a disturbance. (Exhibit 5 PAF Harris Dep. at p. 179-180; and Exhibit 20 PAF Inside padded cell at 7:48 a.m. – 7:50:04 a.m.).  Mr. Wingo was placed face down on a toilet grate in the padded cell and removed of his clothes by Sergeant Gordon in the presence of Major Harris. (Exhibit 5 PAF Harris Dep. at pgs. 174-175, 179:1-9; and Exhibit 20 PAF Inside Padded Cell Video at 7:48 a.m. through 7:50 a.m.). Major Harris then dropped a safety smock on Mr. Wingo's back and left his cell.  (Exhibit 5 PAF Harris Dep. at pgs. 181:19-25; 182:1-8; and Exhibit 20 PAF Inside Padded Cell Video at 7:49 a.m.). Mr. Wingo appeared almost lifeless and unconscious at that time.  (Exhibit 20 PAF Video of Inside of Padded Cell).

Major Harris returned to Mr. Wingo's cell for a security check at 8:23 a.m. (Exhibit 19 & 20 PAF Video of Inside and Outside Padded Cell). Major Harris looked in Mr. Wingo's cell and Mr. Wingo was in the corner of the cell in an awkward position at that time.  (Id.) Mr. Wingo appears to have not moved for at least 25 minutes. Id.  Nonetheless, Major Harris completed his security check and left Mr. Wingo's cell now claiming in deposition testimony for the first time that he saw Mr. Wingo's chest rise and fall.  (Exhibit 19 & 20 PAF Video of Inside and Outside Padded Cell; Exhibit 5 Harris Dep. at p. 199).  Sgt. Vanderbogart stated that he would not have been able to see his chest from where Major Harris was positioned

as he had looked in that cell from the exact same position. (Exhibit 17 PAF Vanderbogart Dep. at p. 39:9-11, 66:3-10,70:1-25 – 71:1-7.). Colonel Sanders says that Mr. Wingo's position in the cell required more investigation into his condition at that time. (Exhibit 21 PAF Colonel Sanders' Dep. at pgs. 106:21-23, 107:9-25 and 108:1).

Major Harris testified that Mr. Wingo appeared fine throughout his contact with him. (Exhibit 5 PAF Harris Dep. at p. 204-205). He stated that Mr. Wingo never appeared to be in distress, and he was not concerned about Mr. Wingo. (Exhibit 5 PAF Harris Dep. at p. 147, 205). Major Harris unbelievably stated that he was the highest ranking official in the jail at the time and that he could only send Mr. Wingo to the emergency room if medical said it was ok, regardless of Mr. Wingo's condition. (Exhibit 5 PAF Harris Dep. at p. 205-206). He also shockingly stated that if he had gone to the cell and saw Mr. Wingo was dead and medical said to not call an ambulance, he would not have the authority to call an ambulance and would not have called one. (Exhibit 5 PAF Harris Dep. at p. 205-206). Major Harris stated that if medical does not provide medical care then there is nothing he can do. (Exhibit 5 PAF Harris Dep. at p. 214). Major Harris' statements on his authority as the highest ranking official in the jail defies common sense and are unconscionable.

iv.   **Deputy Paul Wilkerson**

After contacting Major Harris, Deputy Marshall then contacted Deputy Paul Wilkerson and told him that she had an "idiot" over there playing games who wanted to go to the hospital and asked if any padded cells were available in the area where he worked. (Exhibit 4 PAF Marshall Dep. at p. 186:9-25; Exhibit 13 PAF Wilkerson Dep. at p. 133:10-25; Exhibit 11 PAF Marshall and Wilkerson Internal Phone Call). Deputy Wilkerson responded to Marshall stating Mr. Wingo wanted to go to the hospital with "that's not going to happen" and told her he had a padded cell available for him.  (Exhibit 13 PAF Wilkerson Dep. at pgs. 136:23-35; 137:1-6; and Exhibit 11 PAF Marshall and Wilkerson Internal Phone Call). Paul Wilkerson believed that Mr. Wingo was "detoxing" and knew that people could die from detoxing as other security personnel at the jail told him that.  (Exhibit 13 PAF Wilkerson Dep. at p. 95:12-15).

Deputy Wilkerson assisted Lieutenant Gordon and Major Harris place Mr. Wingo in the padded cell and saw his condition when he was placed in the cell. (Exhibit 13 PAF, Wilkerson Dep. at p. 157; Exhibit 19 PAF Outside Padded Cell Video at 7:47). Deputy Wilkerson placed two cups of water in the cell while Mr. Wingo was being placed in the cell and his clothes removed.  Deputy Wilkerson was responsible for doing security rounds on Mr. Wingo's padded cell after he was placed there.

17

Colonel David Sanders, CCADC Detention Division Commander, the highest ranking official in the detention center, created a policy that required jail staff to conduct security rounds on close observation cells every 12 minutes to ensure rounds do not exceed 15 minutes. (Exhibit 21 PAF Colonel Sanders' Dep. at pgs. 37:6-25, 38:1, and 41:6-16). In September 2019, all security staff were told to perform security rounds every 12 minutes in close observation cells. (Exhibit 13 PAF Deputy Wilkerson's Dep. at pgs. 63:4-25 and 64:3-8) and (Exhibit 5 PAF Major Harris' Dep. at pgs. 61:1-4, 61:20-25 and 62:1-3; Exhibit 17 PAF Vanderbogart Dep. at p. 55:11-25).

CCSO had established policies and procedures on how security rounds on close observations cell should be conducted. (Exhibit 16 PAF CCSO Policy 2-03-07.00). A security round means that the deputy looks inside the cell, makes sure the detainees are alive and well and there are no issues, and then you scan the security bar.  (Exhibit 17 PAF Vanderbogart Dep. at p. 52:8-12).

Despite Mr. Wingo being placed on close observation, Deputy Wilkerson did not conduct proper security rounds in that he failed to look in Mr. Wingo's cell. Deputy Wilkerson did his first security check at 8:02:20 and Mr. Wingo had not moved from when he was in a corner at 7:57 when he appeared to make his last movement.  (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell). Deputy Wilkerson did not look in Mr Wingo's cell. (Id.) Deputy Wilkerson did his

second security check at 8:05:38 and Mr. Wingo had not moved from where he was earlier. (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell). Deputy Wilkerson did not look in Mr. Wingo's cell. (Id.) Deputy Wilkerson did his third security check at 8:12 and Mr. Wingo had not moved. (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell). Deputy Wilkerson did not look in Mr. Wingo's cell on any of these security rounds when it was obvious from video camera footage that Mr. Wingo was in serious medical distress.

Deputy Wilkerson did another security check at 8:23:40 when Major Harris did a security check on Mr. Wingo. (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell). Both Major Harris and Deputy Wilkerson both testified that they saw Mr. Wingo chest rise and fall at this time despite the video showing the contrary and despite it being impossible for them to see Mr. Wingo's chest based on where they were positioned outside Mr. Wingo's cell. (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell; Exhibit 5 PAF Harris Dep. at p. 199; Exhibit 17 PAF Vanderbogart Dep. at p. 66:3-10).

Deputy Harris stated that if an inmate was not moving during a security round the deputy should try to get an audible response. (Exhibit 5 PAF Harris Dep. at p. 77). Despite the video evidence showing Mr. Wingo not moving at 8:23 a.m., neither Major Harris nor Deputy Wilkerson opened his cell and investigated further.

Deputy Wilkerson did another security check at 8:33:20 when Sgt. Guy Vanderbogart looked inside Mr. Wingo's cell. Sgt. Vanderbogart saw Mr. Wingo in his cell in what he described as an awkward position and Deputy Wilkerson told Sergeant Vanderbogart that he had been watching Mr. Wingo and that he had been moving and was okay. (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell; Exhibit 17 PAF Vanderbogart Dep. at p. 37:1-9; 40:16-20; Exhibit 22 PAF Vanderbogart Internal Affairs Video Interview). Mr. Wingo had not moved since 7:58 a.m. and Deputy Wilkerson did not look in his cell during security rounds. In fact, Deputy Wilkerson originally told Internal Affairs that Mr. Wingo was in the center of his cell during his security rounds and that he looked in. (Exhibit 34 PAF Deputy Wilkerson Internal Affairs Interview). The video evidence clearly shows that Mr. Wingo was in the same position in the corner for every security check and Deputy Wilkerson never saw Mr. Wingo alive and well. (Exhibits 19 and 20 PAF Inside and Outside of Padded cell).

Deputy Wilkerson did another security check on Mr. Wingo at 8:48:00 a.m., looked inside Mr. Wingo's cell, saw him in the same position that he had been in for almost an hour and left Mr. Wingo's cell without any further investigation. (Exhibit 19 PAF Outside Padded Cell Video at 8:48 a.m.). Deputy Wilkerson did not open Mr. Wingo's cell or attempt to get his attention. (Id.) Deputy Wilkerson was called back to Mr. Wingo's cell again by Deputy Randy White deputy at 8:49:07 and was

told to open the door and check on Mr. Wingo.  (Exhibit 23 PAF White Dep. at p. 50:7-25, 51:1-4). At that time, Deputy Wilkerson discovered that Mr. Wingo was nonresponsive.  (Exhibit 19 PAF Outside Padded Cell Video at 8:50 a.m.).

The video shows Deputy Wilkerson walking at a casual pace after he discovered Mr. Wingo non-responsive so that he could get gloves.  (Exhibit 19 PAF Outside Padded Cell Video at 8:50:15 a.m.). After Deputy Wilkerson retrieved gloves a couple minutes later, Deputy Wilkerson touched Mr. Wingo.  (Exhibit 19 PAF Outside Padded Cell Video at 8:51:38). Another Deputy then came and attempted life saving measures on Mr. Wingo.  (Exhibit 19 PAF Outside Padded Cell Video at 8:52:33).  Wilkerson did not call a code himself, but another deputy did.  (Exhibit 13 PAF Wilkerson Dep at p. 202:12-14).

Deputy Wilkerson testified that he did not have any concerns about Mr. Wingo's medical condition until they started life saving measures. (Exhibit 13 PAF Wilkerson dep at pgs. 217-218).  Deputy Wilkerson stated that when he first opened Mr. Wingo's door and saw Mr. Wingo not moving, he was not concerned about Mr. Wingo's welfare at that time and did not move with haste.  He stated that he was not concerned that he was alive at that time but did not make that final determination. (Exhibit 13 PAF Wilkerson Dep. at p. 200).  Deputy Wilkerson said the reason he went to get gloves after finding Mr. Wingo unresponsive is because he was "somewhat concerned".  (Exhibit 13 PAF Wilkerson dep at pgs. 199-200).  Deputy

Wilkerson did not think that finding Mr. Wingo unresponsive was an emergency at that time. Instead, he thought that Mr. Wingo was in a corner playing a game and could jump up at any minute. (Exhibit 13 PAF Wilkerson Dep. at p. 201:8-17).

In Defendants' brief they defend their actions by largely creating their own narrative as to the events and provide numerous self-serving statements that are unequivocally challenged and disputed through the evidence in this case. In Patel the Eleventh Circuit Court stated that:

> we expect lawyers and litigants wo appear before us to account for procedural posture and settled stands of appellate review. A party who prevails on a motion to dismiss or a summary judgment motion is certainly free to alert us to his disagreement with his opponent's factual recitation. But when it comes to arguing the merits, he should not – may not- rely on his own factual story. Rather, he should – must- accept his opponent's story and convince us that he is nonetheless entitled to prevail as a matter of law.

Patel v. Lanier County Georgia, 969 F.3d 1173, Footnote 1 (2020).

Defendants claims that they did not know Mr. Wingo died from a perforated ulcer are irrelevant and skew the standard of what they needed to know. Defendants knew that Mr. Wingo was in obvious, dire, and serious medical distress and did nothing about it. Lab Tech Womack said a lay person could see something seriously wrong with Mr. Wingo because he was sweating, falling to the ground, and saying he could not breathe. (Exhibit 6 PAF Womack Dep. at p. 87:7-22). It was Defendants' constitutional responsibility to make sure that Mr. Wingo received adequate medical care. Their attempts to plead ignorance to his serious medical

needs despite the overwhelming evidence should fall on deaf ears. The video evidence in this case amplifies the adage "a picture speaks a thousand words." Viewing the record in the light most favorable to Plaintiffs in this case, there is sufficient evidence that Mr. Wingo had a serious medical need and Defendants were deliberately indifferent to same.

## C. Defendants Violated Mr. Wingo's Clearly Established Constitutional Right To Receive Adequate Medical Care And Are Not Entitled To A Quality Immunity Defense.

Qualified immunity protects government officials sued in their individual capacities from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See 42 U.S.C. § 1983; <u>Melton v. Abston</u>, 841 F.3d 1207, 1220-1221 (11th Cir. 2016) quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009); <u>see</u> <u>also</u> <u>Belcher v. City of Foley</u>, 30 F.3d 1390, 1396 (11th Cir. 1994).  Qualified Immunity does not protect an official who knew or reasonably should have known that the action he took would violate the constitution.  <u>See</u> <u>Melton</u>, 841 F.3d at 1220-1221 (11th Cir. 2016) *quoting* <u>Holmes v. Kucynda</u>, 321 F.3d 1069, 1077 (11th Cir. 2003).

Whether a right is clearly established, for purposes of qualified immunity, depends on whether the right violated is one about which a reasonable person would have known. The Court looks to the binding precedent set forth in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state (Georgia,

here) to decide whether a right is clearly established. See Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir. 2009). Clearly established rights that were violated do not necessarily require a controlling case that is identical to the subject case.  See Melton v. Abston, 841 F.3d 1207, 1221 (11th Circuit 2016).

Eleventh Circuit precedent illustrates that the right to receive medical care has been clearly established.  See Patel v. Lanier County Georgia, 969 F.3d 1173, 1190-1191 (2020); see also Foster v. Maloney,  785 Fed Appx 810 (11th Circuit 2019); Danley v. Allen, 540 F.3d 1298, 1313 (11th Cir. 2008) ("when jailers are aware of serious medical needs they may not ignore or provide grossly inadequate care"; McElligott v. Foley, 182 F.3d 1248, 1255–59 (11th Cir. 1999) (Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances); Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir.1994) (It was clearly established that knowledge of the need for medical care and intentional refusal to provide the care constituted deliberate indifference); Howell v. Evans, 922 F.2d 712, 720 (11th Cir. 1991) (law was clearly established that refusal to provide or a delay in providing medical treatment constitutes deliberate indifference and violates the prisoner's eighth amendment rights); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam) (delay in treating inmate's broken foot, no matter how brief, could render defendants liable for deliberate infliction of pain); see also Carswell v. Bay Cty., 854 F.2d 454, 457 (11th

Cir. 1988) (holding that the failure to provide medical care in the face of a known, serious medical need constitutes deliberate indifference); see also Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) ("Knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.)

In Foster, 785 Fed Appx 810, the Eleventh Circuit found that Plaintiff plead a clearly established violation of her constitutional right to receive medical care regardless of whether deputies claim medical professionals were involved in her care.  In Foster, Plaintiff alleged that she was falling out, disoriented, experiencing slurred speech, limited control of her body, an inability to ambulate without assistance, shaking and sweating.  Id. at 816.  The Court found Plaintiff had presented sufficient claims that, if true, established her situation was so obviously dire that correctional officers may be held liable regardless of whether medical personnel are also aware of the situation.  Id. at 816.  The Court found that Plaintiff's right to receive medical care in the situation alleged was a clearly established violation of her constitutional right to receive medical care.  Id.

In Patel v. Lanier County Georgia, 969 F.3d 11731190-1191, the Eleventh Circuit found that a pretrial detainee's clearly established constitutional right to receive medical care was violated where the detainee suffered a heat stroke while being transported.  In Patel, the detainee presented evidence that he was being

transported in a van that was very hot and the deputy was aware that he had fallen out to the point of applying sternum rubs to his chest to alert him.  By the time the detainee arrived at the facility he needed an ambulance, and the deputy finally provided him with one.  The court denied the deputies motion for summary judgment finding that the detainee's condition was obvious to a lay person and his right to receive medical care in a timely fashion was violated.   Id.

There is more than sufficient evidence in this case that each Defendant violated Mr. Wingo's constitutional right to receive adequate medical care while detained at CCADC and that right has been clearly established for some time.  As in Foster and Patel and other cases referenced above, Mr. Wingo had a serious medical need that was obvious and dire, and the Defendants failed to respond.  Defendants' arguments that they relied on one irrational nurse's position are nonsensical considering Mr. Wingo's condition at the time.  Defendants should have required Mr. Wingo to receive actual medical care and if the medical staff had refused to provide that care and/or unable to provide that care he should have been immediately sent to the emergency room.  Such actions would have saved his young life.

### D. Defendant Deputy Paul Wilkerson Is Not Entitled To Official Immunity On Plaintiffs' State Law Negligence Claim.[2]

---

[2] Plaintiffs abandon their State law negligence claims that Defendants failed to follow policy on providing emergency medical care and completion of Close Observation Forms.  Defendants conduct in not complying with these policies does, however, show each Defendants' deliberate indifference to Mr. Wingo and Plaintiffs

Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or act performed with malice or an intent to injure. See McDowell v. Smith, 285 Ga. 592, 593 (2009). A ministerial act is commonly one that is "simple, absolute, and definite, arising under the conditions admitted or proved to exist, and requiring merely the executive of a specific duty." See Hicks v. McGee, 289 Ga. 573, 575 (2011).

Evidence sufficient to establish a ministerial duty may include "written policy, an unwritten policy, a supervisor's directive, or a statute." See Wyno v. Lowndes County, 305 Ga. 523, 527-528 (2019). Also, "while the act of establishing a policy in the first place is discretionary, the acts of following established policies…are ministerial tasks." See Carter v. Glenn, 249 Ga. App 414, 417 (2001).

A public officer or employee may be sued individually for (1) ministerial acts negligently performed or (2) acts performed with malice or intent to injure. Grammens v. Dollar, 287 Ga. 618, 697 (2010). Whether a duty is ministerial or discretionary turns on the character of the specified act itself. Mann, 588 F.3d at 1309. A ministerial act is commonly one described as an act that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. Jobling v. Shelton, 334 Ga. App. 483, 487

---

do not abandon that argument.  Plaintiffs' State law negligence claim against Deputy Wilkerson **solely** for failing to properly conduct security rounds is not abandoned.

(2015). Ministerial acts, unlike discretionary acts, do not require an exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. Id.

CCSO had established policies and procedures on how security rounds on close observations cells should be conducted. (Exhibit 16 PAF CCSO Policy 2-03-07.00). Security rounds were to be conducted on close observation cells every 12 minutes but to not exceed 15 minutes. (Exhibit 21 PAF Colonel Sanders' Dep. at pgs. 37:6-25, 38:1, and 41:6-16).  A security round means that the deputy **looks** inside the cell, makes sure the detainees are alive and well and there are no issues, and then you scan the security bar.  (Exhibit 17 PAF Vanderbogart Dep. at p. 52:8-12; Exhibit 13 PAF Deputy Wilkerson's Dep. at p. 127:16-22).  Close Observation Policy 2-03-07.01 states that an unobstructed visual check of the inmate is required to ensure the inmate's presence and physical well-being.  Colonel Sanders stated that if a detainee was in Mr. Wingo's position, then further investigation was required to make sure he was alive and well. (Exhibit 21 PAF Colonel Sanders' Dep. at pgs. 114:5-25 and 115:1-6).

Georgia courts have held that detention officers have a ministerial duty to follow established policies of inspecting and monitoring detainees. See Harvey v. Nichols, 260 Ga.App. 187, 192 (2003), disapproved of on other grounds by City of

Richmond Hill v. Maia, 301 Ga. 257, 261 (2017); Brantley v. Jones, 363 Ga.App. 466, 475 (2022); see also, Clark v. Prison Health Services, Inc., 257 Ga.App. 787, 793 (2002) (holding that inspecting the cells in the unit according to the prescribed schedule…required merely the implementation of clear and certain duties, not the exercise of personal judgment).

Defendant Wilkerson had a clear, absolute, and definite ministerial duty to conduct 12-to-15-minute increment security rounds with an unobstructed visual check on Mr. Wingo in his close observation cell to make sure he was alive and well. This required Deputy Wilkerson to physically look into Mr Wingo's cell and inspect to make sure that Mr. Wingo was alive and well.  Deputy Wilkerson failed to look into Mr. Wingo's cell on numerous occasions and failed to make sure that Mr. Wingo was alive and well.  As such, he violated his clear and absolute duty to conduct a security round.  Deputy Wilkerson scanning Mr. Wingo's cell without conducting a security round was in violation of Cobb County Sheriff's Office Policies and Procedures.

Cobb County Sheriff's Office Command Staff including Lieutenant Charles Gordon, Colonel David Sanders, Major Branson Harris, and Chief Deputy Sheriff Sonya Allen all admitted that Defendant Wilkerson violated CCSO's policy and procedure in conducting security rounds on Mr. Wingo's close observation cell. (Exhibit 10 PAF Lieutenant Gordon's Dep. at 205:2-18, 207:19-23, 209:10-19).

(Exhibit 21 PAF Colonel Sanders' Dep. at 260:5-14) (Exhibit 5 PAF Major Harris' Dep. at 192:5-22, 194:5-16, 194:19-25, 195:1 and 195:6-14) (Exhibit 15 PAF Chief Deputy Allen's Dep. at pgs. 106:18-22,108:5-24 and 109:10-17).   Defendant Wilkerson himself admitted that he failed to look in Mr. Wingo's cell during security rounds in violation of CCSO's Policy 2-03-07.01. (Exhibit 13 PAF Deputy Wilkerson's Dep. at pgs. 177:3-16, 181:2-4 and 183:5-11).

Defendant Wilkerson also violated CCSO's policies and procedures when he failed to check the physical wellbeing of Mr. Wingo to make sure he was alive and well. (Exhibit 21 PAF Colonel Sanders' Dep. at pgs. 106:21-23, 107:9-25 and 108:1, 108:3-8, 109:20-25, 110:1—25 and 111:1-4, 112:7-21, 114:5-25 and 115:1-6, 126:12-25, 127:1-4 and 127:10-16.)

There is an insurmountable amount of evidence including video and deposition testimony that demonstrates Defendant Wilkerson violated CCSO's policies and procedures when he failed to conduct an unobstructed visual check of Mr. Wingo during his security rounds to ensure Mr. Wingo was alive and well. It is unequivocal at this point that Deputy Wilkerson was negligent and Defendants do not have any evidence to the contrary.   In fact, Defendants do not make any arguments in their brief that Defendant Paul Wilkerson was not negligent.

**E. Defendants' Violation of Mr. Wingo's Constitutional Rights And/Or Negligence Unequivocally Caused Mr. Wingo's Death.**

Plaintiffs have presented more than sufficient evidence that Mr. Wingo's could have survived if Defendants had not been deliberately indifferent to his serious medical needs. The Cobb County Medical Examiner concluded that Mr. Wingo died of complications from a perforated gastric ulcer with peritonitis. (Exhibit 24 PAF Cobb County Medical Examiner's Report at page 1). As Defendants stated, Plaintiffs have disclosed Dr. Brian Myers, a general surgeon who routinely repairs perforated gastric ulcers. Dr. Myers will proffer the opinions (1.) "[T]o a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would have most likely survived." (2) "[T]he lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life." (Exhibit 25 PAF Dr. Myers' Expert Report).

Dr. Myers is an expert on post-perforation treatment of gastric ulcers. (Exhibit 26 PAF, Dr. Myers' Dep. at p. 26:4-6). Dr. Myers obtained his medical degree at Ohio State University College of Medicine in 1992. (Exhibit 26 PAF Dr. Myers' Dep. at p. 17:1-4). He completed his residency at Temple University where he was also a gastrointestinal research fellow, and he is board certified in general surgery. (Exhibit 26 PAF Dr. Myers' Dep. at p.17:15-23, 21:18-22, 24:17-19).

Dr. Myers' opinions in this case are drawn from his expertise in post-perforation treatment of ulcers as a general surgeon. (Exhibit 26 PAF Dr. Myers' Dep. at p. 26:4-25). Since residency, Dr. Myers' specialty has been general surgery.

(Exhibit 26 PAF Dr. Myers' Dep. at pgs. 17:7-9 and 19:2-10). General surgeons treat and correct perforated ulcers or gastric ulcers. (Exhibit 26 PAF Dr. Myers' Dep. p. 20:7-12). In contrast, a gastroenterologist treats ulcers before perforation. (Exhibit 26 PAF Dr. Myers' Dep. p. 20:13-16).

Dr. Myers treats patients with peptic or gastric ulcers approximately once a month. (Exhibit 26 PAF Dr. Myers' Dep. at p. 25:8-10). All of Dr. Myers' patients come to him for surgical treatment after the ulcer has perforated. (Exhibit 26 PAF Dr. Myers' Dep. at p. 25:11-16). Dr. Myers' expert opinion is as long as Mr. Wingo had vitals, he most likely would have survived. (Exhibit 26 PAF Dr. Myers' Dep. at pgs. 105:13-25 and 106:1-7). (Exhibit 26, Dr. Myers' Dep. at pgs. 106:13-25 and 107: 1-2). Dr Myers testified that vitals are heart rate, blood pressure and respiration and if Mr. Wingo had vitals there was a chance he could survive. (Exhibit 26 PAF Dr. Myers' Dep. at pg. 8:15-23).

Dr. Myers' opines that had Mr. Wingo arrived at the hospital with vitals he likely would have survived:

Dr. Myers' testimony:

Q. Okay. And you go on to say that if he had received reasonable emergency care, he would most likely have survived. What do you mean by most likely?
A. Most probably.
Q. Okay.
A. If you get someone to me with vital signs, in the ER, they are most likely going to survive. So if you can him to the emergency room with vital signs, he's most likely going to survive.

Q. But most likely, you know, that-- you would agree with me that that denotes a certain probability, correct?
A. Yes.
Q. Is that quantifiable?
A. I'm just going to have to stick with most probably he would survive because that's just my experience.
Q. Would most probable mean greater than –
A. Greater than 50 percent.

(Exhibit 26 PAF Dr. Myers' Dep. at pgs. 105:13-25 and 106:1-7).

Defendants' expert, Dr. Vega, states the exact same thing as Dr. Myers. (Exhibit 29 PAF Dr. Vega's Dep. at p. 50:3-19). Dr. Vega agreed that Mr. Wingo having no comorbidities listed in his autopsy report and at age 36 would have a good chance of surviving a perforated ulcer. (Exhibit 29 PAF Dr. Vega's Dep. at pgs. 61:1-25 and 62:1-8).

Dr. Myers says as long as vitals present, he would have survived. (Exhibit 26 PAF Dr. Myers' Dep. at pgs. 105:13-25 and 106:1-7). That is causation. Defendants object to this opinion on causation because Dr. Myers could not say what Mr. Wingo's vitals were up until the moment he was found non-responsive. That is Defendants own doing. The only reason that Mr. Wingo's vitals could not be assessed is because Defendants did nothing to make sure that he was evaluated medically. Defendants now want the benefit of their deliberate indifference to argue essentially that Plaintiffs can't prove Defendants killed him because Defendants did not have him medically evaluated. It defies logic.

33

Dr. Myers can say unequivocally that if Mr. Wingo had vitals he likely would have survived.  Mr. Wingo had vitals at least until the time he could last be seen alive.  Deputy Wilkerson and Major Harris claim that they saw him alive at 8:23 a.m.  (Exhibits 19 & 20 PAF Video of Inside and Outside Padded Cell; Exhibit 5 Harris Dep. at p. 199).  As such, Mr. Wingo had a chance of survival at least until that point.  At 8:33 a.m. Deputy Wilkerson told Sgt. Vanderbogart that Mr. Wingo was okay and moving.  (Exhibit 17 PAF Vanderbogart Dep. at p. 70:1-25 – 71:1-7).  That evidence suggests he also had vitals at that time.  As such, Mr. Wingo had a chance of survival when he was wrongfully placed in the padded cell through Deputy Wilkerson's multiple failed security rounds.

Defendants also argue that Plaintiffs cannot prove that Deputy Wilkerson would have done anything different had he properly conducted security rounds.  Unfortunately for Defendants, that is not the standard to prove causation.  Plaintiffs must prove that Defendants inactions caused Mr. Wingo's death and Plaintiffs have unequivocally proven that.  Plaintiffs, nor the jury, should speculate how things would have probably not have changed if Defendants were not deliberately indifferent and negligent. Causation is a question for the jury, and they should be allowed to make that determination.

Defendants have not presented any evidence that Mr. Wingo would have died regardless of what was done for him.  Defendants disclosed two experts: 1.  Dr.

Kenneth Vega, a gastroenterologist and 2. Dr. Upshaw Downs, a forensic pathologist.  Neither of these physicians opine that Mr. Wingo would have died regardless of any of the security personnel's actions.  As such, Mr. Wingo's chance of survivability should be left to the jury to decide and not determined through summary judgment without evidence that he would have died regardless of the circumstances.

### III.   <u>CONCLUSION</u>

This Court should deny Defendants' Motion for Summary Judgment and allow this case to proceed to trial on the merits.

Respectfully submitted this <u>31st</u> day of August, 2023.

**GARDNER TRIAL ATTORNEYS, LLC**


/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No.  115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for the Plaintiff***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This  31st   day of August, 2023.

**GARDNER TRIAL ATTORNEYS, LLC**

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr. <br><br> Plaintiffs, <br><br> v. <br><br> MAJOR BRANSON HARRIS, individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10, <br><br> Defendants. | **CIVIL ACTION NO. 1:20-CV-03662-VMC** |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR**

**SUMMARY JUDGMENT** to the Clerk of Court using the CM/ECF system which

will automatically send electronic mail notification of such filing to the following

counsel of record:

Sun S. Choy, Esq.                     H. William Rowling, Jr., Esq.
Wesley C. Jackson, Esq.          Lauren S. Bruce, Esq.
Marisa M. Beller, Esq.              Cobb County Attorney's Office
Freeman Mathis & Gary, LLP     100 Cherokee Street, Suite 350
100 Galleria Pkwy, Suite 1600   Marietta, GA 30090

Atlanta, GA 30339-5948


Respectfully submitted, this <u>31st</u> day of August, 2023.


       **GARDNER TRIAL ATTORNEYS, LLC**


       <u>/s/ Timothy J. Gardner     </u>
       **TIMOTHY J. GARDNER**
       Georgia Bar No. 115430
       **HENRIETTA G. BROWN**
       Georgia Bar No. 253547


       ***Attorneys for Plaintiffs***

3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

DOCKET 209-27

## Brian S. Myers, MD, FACS

90 Lee Road, Stockbridge, GA 30281 (C) 770-354-9059

December 23, 2022

Timothy Gardner
Attorney At Law
Gardner Trial Attorneys
3100 Cumberland Blvd; Suite 1470
Atlanta, GA 30339

RE: Kevil Wingo

Dear Mr. Gardner:

I, Brian Myers, MD, FACS, am a licensed physician, Board Certified in General Surgery. I currently practice in the area of surgery applicable to this case. I am familiar with the current standard of care for surgical practices relating to issues of care and treatment of patients with perforated gastric ulcers as occurred with Kevil Wingo. By virtue of my training, education and experience in the same field since 1999, I can provide expert opinion on the pathophysiology, presentation and evaluation, surgical treatments and outcomes of gastric ulcers. I am attaching a copy of my current curriculum vitae as Attachment 1.

The opinions I express in this report are based on the analysis of information and materials provided to me electronically to date and are summarized below:

1. Video and Audio files of interviews with Cobb County officers, inmates and infirmary nurses
2. Video from surveillance cameras of infirmary, pad cell 18 and hallways
3. Medical records for Kevil Wingo from Cobb County Adult Detention Center
4. Wellstar Kennestone Hospital Records from ER visit on 9/29/19
5. Cobb County Medical Examiner's report and autopsy photographs
6. Cobb County Medical Examiner's Case file
7. Kevil Wingo Death Certificate
8. Audio Phone conversations of infirmary staff
9. Roster of medical personnel on duty 9/28/19 and 9/29/19
10. Investigative photographs of the detention center and ER
11. Marietta Daily Journal 11/20/19 article Cobb sheriff: Inmates receive quality health care

2

12. Marietta Daily Journal 12/9/19 article Sheriff defends jail lockdown conditions after inmate complaints
13. Cobb County EMS Dispatch report
14. Cobb County EMS Prehospital Care Report
15. Cobb County Sheriff's office report
16. Incident Investigation Report

A list of all testimonies I have provided in the past 4 years is attached as Attachment 2. I am compensated for my time at a rate of roughly $500 per hour. My compensation is not dependent on the results of my analysis or the outcome of this litigation.

---

**PERFORATED GASTRIC ULCERS**

---

I. PEPTIC ULCER DISEASE LEADING TO GASTRIC (STOMACH) ULCER PERFORATION

The stomach contains acidic digestive fluids in order to break down food. It has protective mechanisms lining its internal surface to keep from digesting itself. An ulcer forms in the stomach when these protective mechanisms fail permitting an ulcer to form in the lining of the stomach. If left untreated the digestive fluids continue to enlarge and deepen the ulcer until it either erodes through a blood vessel or perforates the wall of the stomach. If the ulcer ruptures a blood vessel, the patient will vomit blood profusely. If the ulcer perforates the stomach wall, the patient will have sudden severe abdominal pain.

Common causes of gastric ulcers are chronic nonsteroidal medication use (i.e. aspirin products), a bacteria called Helicobacter pylori (H. pylori), smoking and cocaine use. Nonperforated gastric ulcers commonly cause mild to moderate dull upper abdominal pain, nausea, and the feeling of being bloated. Pain can sometimes be improved by eating as it dilutes the acid in the stomach and the pain can often be improved by reducing the acid in the stomach with acid-reducing medication.

Once diagnosed treatment is tailored to the cause of the ulcer. To stop the breakdown of the protective mechanisms in the stomach, patients are advised to stop all nonsteroidal medications, to stop smoking and/or using cocaine. If tests come back positive for H. pylori, then antibiotics are used to eliminate the bacteria. In addition to all the measures to remove the cause of the ulcer, acid-reducing medication is used to decrease the acidity in the stomach so the ulcer can heal.

Once an ulcer perforates the stomach, the gastric acid and digestive fluid escape into the abdominal cavity and start digesting those unprotected tissues causing peritonitis (inflammation of the abdominal cavity). Peritonitis is essentially a chemical burn of the abdominal cavity (outer surfaces of stomach, bowel, colon, liver, spleen, diaphragm and abdominal wall). This causes instant severe diffuse abdominal pain and tenderness upon palpation often accompanied by nausea and vomiting.

Case 1:20-cv-03662-VMC   Document 209-27   Filed 08/31/23   Page 3 of 6
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 211 of 214

3

## II. PHYSIOLOGIC RESPONSE TO GASTRIC PERFORATION

A diagnosed or suspected gastric perforation is a surgical emergency because a perforated stomach is life threatening.

In the rare situation when a patient is not having any symptoms (no pain, normal vital signs and normal blood tests) and the gastric perforation is contained (as documented by radiographic study), nonoperative management can be considered. When a patient presents with signs or symptoms of continued soilage from a noncontained gastric perforation (persistent abdominal pain or tenderness, abnormal vital signs and/or abnormal blood tests) then emergency surgical intervention is necessary.

If the leaking of gastric fluids is not treated, these caustic fluids cause a cascade of physiologic inflammatory processes throughout the body, culminating in septic shock, multi-organ system failure, and death.

## III. SURGICAL MANAGEMENT OF PERFORATED GASTRIC ULCER

Once in the operating room the surgeon will clean the abdominal cavity of all digestive fluids to stop further destruction of the tissues. The hole in the stomach is closed. In rare situations the hole it too large to close, then resection of part of the stomach may be necessary.

## IV. TYPICAL SCENARIO OF A PERSON WITH A PERFORATED GASTRIC ULCER

The person has a sudden onset of upper abdominal pain which rapidly progresses to diffuse abdominal pain. This pain is so severe and sudden they will often collapse into a fetal position. This is often quickly followed by nausea and vomiting. This pain persists and the person will seek medical care as the pain is too severe to ignore. The person is usually brought to an emergency room by emergency medical services instead of transporting themselves as they get sick quickly and are in too much pain to drive.

Once in the emergency room the person is evaluated by the emergency room physician. If there is a suspicion of gastric perforation because of the presentation and a known history of PUD and/or risk factors, then radiographic studies will be ordered STAT which could be a chest x-ray to look for air outside of the gastrointestinal tract, which is called free air. More commonly a CT Scan is done to look for free air. While a CT Scan takes longer to get results, it is more sensitive to picking up free air and provides more information. Once free air is demonstrated the surgeon is promptly notified. The surgeon performs his own rapid history and physical, reviews the studies and recommends emergency surgery. The person is taken to the OR and the perforation is repaired.

4

If the gastric perforation is repaired before the physiologic response to the spilled gastric contents is too severe, then the postoperative recovery is typically uneventful and the person is sent home in 5-7 days. If the person is medically fragile (over 65 years old and with a lot of medical conditions) and/or the perforation isn't caught early, then the person may have a prolonged hospital course for weeks to months. With appropriate medical and surgical care, the mortality rate is around 10% for anyone under 65 years old, like Mr. Wingo.

**BRIEF SUMMARY OF EVENTS: September 24, 2019 to September 29, 2019**

Based on my review of the information in the documents, records, interviews, audio and video the following is the summary of events.

Kevil Wingo was incarcerated at the Cobb County Adult Detention Center (CCADC) on September 24, 2019. In preliminary screening the staff document a known medical history of peptic ulcer disease, myalgia, tobacco, cocaine and heroin use. It was documented he admitted to taking cocaine 24-72 hours prior to his arrival the CCADC. It was determined he should be observed in the infirmary for possible withdrawal. No notable health related events are documented during that period. As he was not showing any signs of opiate withdrawal after approximately three days of observation in the infirmary, he was deemed healthy enough to leave the infirmary and return to the general population of the detention center.

On September 28, 2019 at around 11:30pm in the CCADC multipurpose room Mr. Wingo developed sudden onset of severe abdominal pain with vomiting and profuse sweating. Witnesses state he fell to the floor screaming in pain and crying. There are no written records of an abdominal exam, but there is a verbal report the waist chains hurt his abdomen suggesting there was tenderness. Witnesses related Mr. Wingo said the pain was his ulcers and not withdrawal. There are reports that he requested to be seen by a doctor and taken to the emergency room.

He was returned to the infirmary and placed in room 8. There was one set of vital signs documented at 12:36am on September 29, 2019 which were unremarkable. However, while the blood pressure at 12:36am was in the low normal range, it was significantly lower than the baseline blood pressure he demonstrated prior to this time in the CCADC. His heart rate was elevated compared to his apparent baseline as documented in previous vital sign records. He received Mylanta at around 3:00am. He was agitated throughout the night and appearing confused. He was seen moving around the room and falling. The other men in room 8 became agitated by his behavior. In order to avoid conflict he was moved to solitary room 18 at around 7:45am. Surveillance camera in room 18 showed him moving around on the floor and occasionally making purposeless movements. Movement ceased around 8:00am. He was discovered without any appreciable pulse around 8:50am and a code was started.

Case 1:20-cv-03662-VMC   Document 209-27   Filed 08/31/23   Page 5 of 6
USCA11 Case: 24-10933   Document: 31-2   Date Filed: 06/11/2024   Page: 213 of 214

5

Emergency Medical Services were notified, he was intubated and CPR was continued during transported to the Wellstar Kennestone Hospital Emergency room, where upon arrival his heart was noted to be in pulseless ventricular fibrillation on the monitor (his heart was not pumping blood). Subcutaneous emphysema (air under the skin) of the chest was found on exam bringing into the differential possible pneumothoraxes (collapsed lungs). Bilateral thoracostomies (holes in the chest) were performed and when no air was expressed no chest tubes were placed. The emergency room staff declared dead at 9:52am on September, 2019.

The Medical Examiner performed an autopsy and discovered a large amount of pus in the abdomen and scrotum with a large (1cm) perforated gastric ulcer with peritonitis. These findings were determined to be the cause of Mr. Wingo's death.

## KEVIL WINGO'S MOST LIKELY EXPERIENCE

With a high degree of medical certainty, the process Kevil Wingo experienced was as follows.

On September 28th, 2019 at around 11:30pm while in the multipurpose room his gastric ulcer perforates. This results in sudden severe abdominal pain and is why he drops to the floor, curls up and screams for help. The degree of pain is severe enough his autonomic nervous system kicks in and causes profuse sweating. A good physical exam at this point will most likely find a rigid abdomen and diffuse tenderness. The pain noted from waist chains suggests tenderness is present. Breathing rate will increase and become shallow, extremities will get cold and clammy as the body starts to shunt blood centrally to the vital organs.

He is transferred to the infirmary. The pain continues while more gastric acid spills from the hole in his stomach into his abdominal cavity. The inflammatory response in his abdominal cavity and organs which begins at 11:30pm on September 28th, 2019 progresses. White blood cells start flooding the abdominal cavity in response to the peritonitis resulting in the release of more chemicals (inflammatory mediators) which enhance the inflammatory response even further. The white blood cells mix with abdominal and gastric fluid to form the 1700cc of pus found on autopsy.

This process continues to cause diffuse severe abdominal pain, nausea, and vomiting. As blood flow is shunted to his essential organs to try to preserve those vital structures, his heart rate slowly increases from his baseline to keep up with the demand. His blood vessels dilate, resulting in a drop in blood pressure. This drop in blood pressure will cause orthostatic static hypotension. Orthostatic hypotension is where the blood pressure is in the normal range when sitting or lying down, but when standing up dizziness develops from lack of blood flow to the brain. When severe orthostatic hypotension can cause fainting. Mr. Wingo demonstrates behavior consistent with orthostatic hypotension repeatedly through the night while in room 8 when he staggers and falls down after standing up.

6

As time progresses the peritonitis inflames the under surface of the diaphragm. It becomes painful to breath which produces the sensation of difficulty breathing. He will start shallow breathing to compensate. Eventually the lining of the lungs starts to swell with fluid and it becomes even more difficult to breath. These physiologic processes are the cause of Mr. Wingo's complaint of shortness of breath. If that process continues, then eventually the inflammatory response will impair his lung's ability to get oxygen into the blood stream so much he will become hypoxic (low oxygen levels).

Mr. Wingo is given food in the morning on September 29th, 2019. He eats the food and drink. CCADC staff make statements they believe his eating and drinking means he is okay. Having lived with a nonperforated ulcer Mr. Wingo probably noticed in the past that eating and drinking reduced abdominal pain and he eats and drinks what is provided to try to stop the pain. However, now that the ulcer is perforated, the eating and drinking does not help the pain.

The lack of adequate blood flow from hypotension (low blood pressure) and lack of oxygen (hypoxia) to the brain will start to cause periods of worsening confusion and disorientation. Behavior consistent with confusion and disorientation was seen while in room 8 and continued in isolation room 18. Once the hypoxia and hypotension are severe enough, the lack of oxygen and blood flow to the heart will cause the heart to stop contracting resulting in death.

**CONCLUSION**

It is my professional opinion, to a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would have most likely survived. Furthermore, it is my opinion the lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life.

I reserve the right to add to, amend, or alter this report as new information is discovered, as new or additional records become available, or as new opinions are formulated.

Respectfully submitted,

Brian S. Myers, MD, FACS