No. 24-10933-H

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

TIFFANY WINGO, ET AL.,

*Plaintiffs/Appellants,*

v.

BRANSON HARRIS, ET AL.,

*Defendants/Appellees.*

———————————

On Appeal from the United States District Court
for the Northern District of Georgia

Case No. 1:20-cv-03662-VMC
Hon. Victoria M. Calvert, District Judge

———————————

## APPELLANTS' APPENDIX VOLUME III

———————————

Timothy J. Gardner
Georgia Bar No. 115430
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com

June 11, 2024

<u>INDEX OF APPENDIX</u>

<u>Docket/Tab #</u>

<u>Volume I</u>

District Court Docket Sheet ..........................................................................A

Plaintiffs' Complaint ....................................................................................1

Gordon, Harris, and Wilkerson's Answer to Plaintiffs' Complaint ...................... 17

Plaintiffs' Third Amended Complaint… ........................................................…..166

Gordon, Harris, Marshall, McPhee, and Wilkerson's
Answer to Plaintiff's Third Amended Complaint .................................................175

Marshall's Deposition Transcript Excerpts ...................................................... 191-4

<u>Volume II</u>

Harris' Deposition Transcript Excerpts ............................................................ 191-5

Gordon's Deposition Transcript Excerpts ......................................................... 191-6

Wilkerson's Deposition Transcript Excerpts....................................................... 191-7

Dr. Kenneth Vega's Deposition Transcript ....................................................... 191-8

Defendants' Brief in Support of Motion for Summary
Judgment. ...................................................................................................... 196-1

Defendants' Motion to Exclude Testimony of Dr. Brian
Myers and Mark Johnson with Brief in Support....................................................198

Plaintiffs' Response in Opposition to Defendants' Motion to
Exclude Testimony of Dr. Brian Myers and Mark Johnson..................................207

Plaintiffs' Response in Opposition to Defendants' Motion
for Summary Judgment…………………………………………….... ......209

Dr. Brian Myers' Expert Report…………………………………...…………209-27

Volume III

Dr. Brian Myers' Deposition Transcript ............................................................ 211-2

Visser's Deposition Transcript Excerpts ........................................................... 211-3

Womack's Deposition Transcript Excerpts ....................................................... 211-6

Plaintiff's Notice of Filing EME (1 USB)—Exhibit 7: Infirmary
Video View 1; Exhibit 8: Marshall's Internal Affairs Interview
Audio; Exhibit 9: Infirmary Video View 2; Exhibit 11: Marshall
and Wilkerson's Internal Phone Call; Exhibit 12: Marshall
and Harris' Internal Phone Call; Exhibit 18: Corridor Video;
Exhibit 19: Outside Padded Cell Video; Exhibit 20: Inside
Padded Cell Video; Exhibit 22: Vanderbogart's Internal Affairs
Video Interview; and Exhibit 34: Wilkerson' Internal Affairs Video
Interview ............................................................................................................212

Plaintiff's Notice of filing EME (1 USB)—Exhibit 6: Infirmary
Video View 1; Exhibit 7: Infirmary Video View 2; Exhibit 9:
Marshall and Harris' Internal Phone Call; Exhibit 12: Marshall
and Wilkerson's Internal Phone Call; Exhibit 14: Nurse Visser's
Internal Affairs Video Interview; Exhibit 15: Corridor Video;
Exhibit 16: Outside Padded Cell Video; and Exhibit 17: Inside
Padded Cell Video ............................................................................................213

Plaintiffs' Amended Response and Objections to Defendant's
Statement of Undisputed Material Facts to Motion
for Summary Judgment...……………....................................................221

Defendants' Reply Brief to Plaintiff's Response in
Opposition to Defendants' Motion to Exclude
Dr. Brian Myers and Mark Johnson………………………... ..............................223

Defendants' Reply Brief to Plaintiff's Response
in Opposition to Defendants' Motion for Summary Judgment…………………224

Volume IV

Defendants' Response to Plaintiffs' Additional Facts in Opposition
to Defendants' Motion for Summary Judgment………………………...………....225

Order Granting Defendants' Motion for Summary Judgment
and Motion to Exclude Testimony of Dr. Brian Myers, denying
Plaintiffs' Motion for Partial Summary Judgment, and denying
as moot Plaintiffs' Motion to Exclude Defendants' Expert
James C. Upshaw, Downs, M.D. ……………………….................................227

Judgment………………………………………………………………....228

Notice of Appeal……………………………………………………...…230

Certificate of Service…………………………………………………………B

# DOCKET 211-2



Transcript of **Brian S. Myers, M.D., F.A.C.S.**

Monday, March 13, 2023

*Tiffany Wingo, et al., v. Major Branson Harris, et al.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 126648

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE NORTHERN DISTRICT OF GEORGIA

 3                           ATLANTA DIVISION

 4

 5    TIFFANY WINGO as Administrator of the

 6    Estate of KEVIL WINGO, SR., KIEARA

 7    WINGO, as surviving child of KEVIL

 8    WINGO, SR., ANGEL CALLOWAY, as mother

 9    And next friend of ERIKA WINGO, surviving

10    Minor child of KEVIL WINGO, SR., and

11    FATIMA THOMAS, as mother and next of friend

12    Of KEVIL WINGO, JR., surviving minor child of

13    KEVIL WINGO, SR.,

14              Plaintiffs,          CIVIL ACTION FILE NO.

15    Vs                             1:20-CV-03662-VMC

16    MAJOR BRANSON HARRIS, individually,

17    LIEUTENANT CHARLES GORDON, individually,

18    DEPUTY PAUL WILKERSON, individually,

19    DEPUTY BRITTON MCPHEE, individually,

20    DEPUTY LYNDA MARSHALL, individually,

21    JOHN DOES 1-10, and JANE DOES 1-10,

22              Defendants.

23    _____/

24

25
```

Page 2

1        TITLE PAGE CONTINUED
2
3    DEPOSITION OF BRIAN S. MYERS, M.D., FACS
4    DATE:  Monday, March 13, 2023
5    LOCATION:  3100 Cumberland Boulevard
6            Suite 1470
7            Atlanta, Georgia  30339
8    TIME:   10:00 a.m. - 1:36 p.m.
9
10
11
12  REPORTED BY:  TAMIKA M. BURNETTE, RPR, CSR-2870
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                 INDEX
2
3  WITNESS:                       PAGE:
4  BRIAN S. MYERS, FACS
5
6    EXAMINATION BY MR. JACKSON        5
7    EXAMINATION BY MR. GARDNER      111
8    EXAMINATION BY MR. JACKSON      115
9
10            EXHIBITS
11       (Exhibits are attached hereto.)
12
13  EXHIBITS:        DESCRIPTION:       PAGE:
14  EXHIBIT NO. 1      BRIAN MYERS' REPORT    10
15  EXHIBIT NO. 2      CURRICULUM VITAE      15
16  EXHIBIT NO. 3      WINGO004192        43
17  EXHIBIT NO. 4      INVOICES       116
18
19
20
21
22
23
24
25

Page 3

APPEARANCES

1
2
3  FOR THE PLAINTIFFS:
4  GARDNER TRIAL ATTORNEYS
5  BY:  Mr. Timothy J. Gardner, Esquire
6     3100 Cumberland Boulevard
7     Suite 1470
8     Atlanta, Georgia  30339
9     (770) 693-8202
10     TJG@gardentrialattorneys.com
11
12  FOR THE DEFENDANT:
13  FREEMAN MATHIS & GARY, LLP
14  BY:  Mr. Wesley C. Jackson, Esquire
15     100 Galleria Parkway
16     Suite 1600
17     Atlanta, Georgia  30339
18     Wjackson@fmglaw.com
19     (770) 818-0000
20
21
22
23
24
25

Page 5

1              Monday, March 13, 2023
2                 10:00 a.m.
3         *     *     *
4            (Witness sworn.)
5            BRIAN MEYERS,
6    The witness herein, after having been first
7    duly sworn to tell the truth, was examined and
8    testified as follows:
9            MR. JACKSON:  All right.  This will be
10  the deposition of Dr. Brian Myers taken pursuant to
11  notice and agreement of counsel for purposes of
12  discovery.  All objections are reserved except for the
13  form of question and responsiveness of the answer.
14            EXAMINATION
15    Q.  BY MR. JACKSON:  Dr. Myers, if you can please
16  state your full name for the record.
17    A.  Brian Myers.
18    Q.  My name is Wes Jackson, we met just a moment
19  ago.  I'm one of the attorneys representing several Cobb
20  County Sheriff's Office deputies in this lawsuit brought
21  by Mr. Wingo's family against them.
22        Have you ever given a deposition before?
23    A.  I have.
24    Q.  All right.  And I'm sure you know sort of the
25  practical rules that we have for depositions.

Brian S. Myers, M.D., F.A.C.S.                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 4 of 48   Page 3 (6 - 9)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 9 of 180

Page 6

1  Obviously, the court reporter is taking everything down,
2  so all of your answers need to be verbal.  We need to be
3  sure that we don't talk over each other.  That sort of
4  thing, right?
5      A.  Correct.
6      Q.  And if at any point you need to take a break,
7  let me know and we'll be happy to do that.
8      A.  All right.
9          MR. JACKSON:  And you-all, have you-all
10 discussed reading and signing?
11         MR. GARDNER:  We haven't.  Do you want to
12 --
13         THE WITNESS:  It's helpful if I can remain
14 technically sworn in, so I don't have to do a notary if
15 I do the -- do make correction on the errata.  That
16 would be nice.
17     Q.  BY MR. JACKSON:  Meaning, you want to review
18 the --
19     A.  The deposition, make sure all the transcription
20 came through correctly.
21     Q.  While you're sworn in?
22     A.  If it's an issue then I'll just get it
23 notarized.
24     Q.  I don't know if it's an issue.  I have never
25 had anyone ask me that before.

Page 7

1      A.  I've seen some depositions where it's occurred.
2  It's just kind of nice, kind of convenient.
3      Q.  Let's talk off the record about that, but --
4      A.  Sure.
5      Q.  -- it's probably okay.
6          MR. GARDNER:  So we'll read it.
7          MR. JACKSON:  Okay.
8      Q.  BY MR. JACKSON:  What did you do to prepare for
9  today's deposition?
10     A.  I went back through my report.
11     Q.  Did you do anything else?
12     A.  I had a conversation with Mr. Gardner.
13     Q.  Other than your report, did you review any
14 other documents?
15     A.  I did look back through some of the documents
16 after I looked through my report to see if I could find
17 out and confirm what I had said in the report.
18     Q.  Did you find out anything that contradicted
19 anything that was in your report?
20     A.  No, I did not.
21     Q.  What specific documents did you look at when
22 you did that second review on them?
23     A.  They're quite voluminous and I couldn't
24 actually identify exactly which ones.  I just scanned
25 through the ones that I thought might have that

Page 8

1  information in it.
2      Q.  What information was it you were looking for?
3      A.  I wanted to see if there were any vital signs
4  recorded when he was brought out of the isolation cell
5  at the end of the events.
6      Q.  So you're talking, you wanted to see if vitals
7  were recorded after the code blue was called?
8      A.  Correct.
9      Q.  Were they?
10     A.  I could not find any.
11     Q.  Why did you want to know if the vitals had been
12 recorded after he was brought out of the cell?
13     A.  To help me determine if there was still a
14 chance of saving his life at that point.
15     Q.  And how -- how would those vitals have helped
16 you make that determination?
17     A.  As long as you still have some vitals, there
18 was a chance that he could survive.  Once the vitals are
19 gone in this sort of a scenario, there is almost a zero
20 percent chance that he will survive.
21     Q.  And when you say vitals what -- what does that
22 mean?
23     A.  Heart rate, blood pressure, respirations.
24     Q.  So you're saying at the point where -- well,
25 correct me if I'm wrong, are you saying at the point

Page 9

1  where there's no heart rate or no blood pressure or no
2  respiration there's a zero percent chance of surviving?
3      A.  Close to zero.  Yes.
4      Q.  Okay.  And in the absence of those -- of those
5  -- of the vitals, that might have been taken or might
6  not -- we don't know or I don't know -- after the code
7  blue, when he was taken out of the cell.  In the absence
8  of those, that record, if it ever existed, what is your
9  conclusion with respect to his survivability at that
10 point?
11     A.  Say that for me again, please.
12     Q.  In the absence of that record that you were
13 looking for, what is your conclusion with respect to his
14 survivability at that point?
15         MR. GARDNER:  Object to form.
16 Clarification as to what point.
17     Q.  BY MR. JACKSON:  At the point he was taken out
18 of the cell after the code blue.
19     A.  Not knowing if there were vital signs at that
20 point, it's hard to say.  That's what I was trying to
21 figure out.  If there were vital signs at that point,
22 then he still had a chance.
23     Q.  But you don't know?
24     A.  I don't know.
25     Q.  Did you -- were you looking for any other



Page 10

1 information as you prepared for today's deposition to
2 confirm any other details of your report?
3    A. No. That was it.
4    Q. Did you watch any interviews of any jail staff
5 or medical staff or anyone else with respect to this
6 incident in preparation for today?
7    A. I did for my report, but not for today.
8    Q. Okay. And if you watched something for your
9 report, but not for today, that would be indicated in
10 your report, correct?
11    A. Correct.
12    Q. Okay. And just so we're on the same page, I'm
13 going to mark as Exhibit 1, this document.
14       (Exhibit 1 marked for identification.)
15    Q. BY MR. JACKSON: Do you recognize Defendant's
16 Exhibit 1?
17    A. Yes, I do.
18    Q. Is that your report rendered in this matter?
19    A. Yes, it is.
20    Q. In preparation for today's deposition, did you
21 review any legal pleadings such as a complaint --
22    A. No.
23    Q. -- or an answer?
24    A. No.
25    Q. In preparation for today -- again, this is

Page 11

1 distinct from preparation of your report, but in
2 preparation for today, did you watch any of the CCTV
3 reported videos from inside the jail in the days and
4 hours leading up to Mr. Wingo's death?
5    A. No.
6    Q. What's your current address?
7    A. 90 Lee Road, Stockbridge, Georgia 30281.
8    Q. And who lives with you at that address?
9    A. Nobody.
10    Q. What's your date of birth?
11    A. 5/1/65.
12    Q. And where were you born?
13    A. Philadelphia.
14    Q. Is that where you grew up?
15    A. It depends on how you define "grew up".
16    Q. How long did you stay in Philadelphia?
17    A. Until I was five.
18    Q. And where did you go then?
19    A. To Pittsburgh.
20    Q. How long did you live in Pittsburgh.
21    A. Two years, I believe.
22    Q. Where did you go after you moved from
23 Pittsburgh?
24    A. Hudson, Ohio.
25    Q. How long did you live in Hudson, Ohio?

Page 12

1    A. I believe six years.
2    Q. I saw in your CV that you -- you eventually
3 went to the military yourself. Did you grow up in a
4 military family?
5    A. No.
6    Q. Okay. Just moved around a lot?
7    A. Yes.
8    Q. Okay. So -- all right. Where did you go after
9 Hudson, Ohio?
10    A. Charleston, West Virginia.
11    Q. And how long did you live there?
12    A. Let's see. That was until high school, so
13 seven - eight years.
14    Q. So that covers -- the cities we discussed cover
15 your childhood, pretty much?
16    A. Correct.
17    Q. Where did you attend high school?
18    A. George Washington High School in Charleston,
19 West Virginia.
20    Q. You currently live in Stockbridge; what county
21 is that?
22    A. Henry.
23    Q. How long have you lived there?
24    A. Since 1999.
25    Q. Are you married?

Page 13

1    A. No.
2    Q. Do you have any children?
3    A. No.
4    Q. Any grandchildren?
5    A. No.
6    Q. Do you have any relatives over the age of 18 in
7 the Metro Atlanta area?
8    A. No.
9    Q. Are you a part of any civic organization or
10 social group or church?
11    A. No.
12    Q. Okay. I'm just -- I just want to make sure
13 you're not, you know, there's someone who could be on
14 the jury isn't your, you know --
15    A. I don't believe so.
16    Q. Okay. And have you served in the military?
17    A. Yes.
18    Q. What branch were you in?
19    A. Navy Medical Corp.
20    Q. And what years were you in the Navy?
21    A. '95 to 2007.
22    Q. Where were you stationed?
23    A. I was in the reserves so it was not one
24 particular location. It was many locations.
25    Q. What was your rank?



Page 14

1   A. Commander.
2   Q. What were your duties?
3   A. Surgery.
4   Q. Other than performing surgeries, did you have
5 any -- I don't know what you would call them -- maybe
6 command duties. Did you oversee other doctors or other
7 medical staff?
8   A. Not as a reservist, no.
9   Q. Were you -- you're no longer in the reserves?
10   A. Correct.
11   Q. Were you honorably discharged?
12   A. Yes.
13   Q. Thank you for your service.
14   A. You're welcome.
15   Q. Have you -- other than by providing testimony,
16 have you, yourself ever been party to a lawsuit?
17   A. No.
18   Q. Other than in your capacity as -- or to opine
19 on matters of your expertise, surgery or other medical
20 areas of expertise, have you ever given testimony in a
21 lawsuit?
22   A. Please rephrase. Say that again.
23   Q. I guess I'm asking, outside of your capacity as
24 an expert, have you given testimony in a lawsuit?
25   A. No.

Page 15

1   Q. And I -- I don't mean to offend you, but I'm
2 going to ask some questions about criminal history,
3 that's just what we do.
4     Have you ever been charged with a criminal
5 offense?
6   A. No.
7   Q. I'm going to mark a document as Exhibit 2.
8   (Exhibit 2 marked for identification.)
9   Q. BY MR. JACKSON: Doctor, do you recognize
10 Exhibit 2?
11   A. Yes.
12   Q. Is that your CV?
13   A. Yes.
14   Q. And this was produced to us in discovery, does
15 this appear to be a -- on the last page -- page 3 it
16 says updated 9/22/2022?
17   A. Correct.
18   Q. Has there been any updates to your resume or CV
19 since that time?
20   A. (Witness examining document.)
21   I just recently -- I should update this
22 now. Just recently, I have reestablished privileges at
23 Southern Regional.
24   Q. And privileges are admitting privileges?
25   A. Correct.

Page 16

1   Q. So I'm just going to go through you're
2 education, we'll start at the top. You graduated from
3 Ohio State University in 1987, correct?
4   A. Yes.
5   Q. With a degree in bachelor of science with a
6 distinction in zoology. Correct me if I'm wrong, but I
7 assume nothing you learned in your coursework for your
8 bachelor of science and distinction of zoology was
9 brought to bear to form your opinions in this case?
10   A. Other than the fact it provides a basis for my
11 knowledge of biology.
12   Q. Right. So I guess there's a sense to which it
13 was foundational to your medical knowledge, correct?
14   A. Correct.
15   Q. But when you were forming your opinions you
16 weren't reaching back to any specific detail you had
17 learned --
18   A. No.
19   Q. -- in your undergrad. Okay. I take it you had
20 a short summer term at Oxford studying English history
21 in literature?
22   A. Yes.
23   Q. Now, that had no bearing on your opinion, did
24 it?
25   A. No.

Page 17

1   Q. And you achieved your medical doctorate at Ohio
2 State University College of Medicine in Columbus, Ohio,
3 correct?
4   A. Yes.
5   Q. And you were there from 1998 to 1992?
6   A. Yes.
7   Q. During that time, did you begin to focus your
8 interest on surgery or gastroenterology?
9   A. Yes. That's when the interest starts.
10   Q. Okay. And I don't -- I don't know how it
11 works, did you take specific coursework in any medical
12 field that's -- that would have informed your opinions
13 in Exhibit 1?
14   A. For this, no.
15   Q. Okay. And after Ohio State College of
16 Medicine, you went to Temple University in Philadelphia.
17 What -- the term escapes me, what do you call that --
18 the continuing education after your MD?
19   A. Residency.
20   Q. Okay. Residency?
21   A. (Nodding yes.)
22   Q. How long were you at Temple?
23   A. Until 1998.
24   Q. And from 1992 to 1998, was that whole period
25 considered residency or is there further study you can



Page 18

1 do after a residency that you did at Temple?
2     A. That entire period is considered residency.
3 The extra period of study I did was outside of Temple,
4 afterwards.
5     Q. Okay. And then after Temple, you went to
6 Oregon Health Sciences University in Portland, BMAC in
7 Portland, Oregon?
8     A. Yes.
9     Q. We're going back to Temple. It seems you
10 started as a resident and then became a resident in
11 general surgery -- or I guess an intern in general
12 surgery. We'll start there.
13        1992 to 1993, was that part of your
14 residency or does that all predate your residency?
15     A. No, that's all part of the residency. Those
16 are different terms that have fine differences of
17 meaning within medical training.
18     Q. Well, what is an internship for purposes of
19 medical training?
20     A. It's your first year of a residency.
21     Q. Okay.
22     A. Just to help clear that up for you, a
23 urologist, a physician who deals with urologic
24 conditions will do an internship in general surgery
25 before starting his urology residency. That's where the

Page 19

1 words become kind of nuanced in the field.
2     Q. So I take it as -- is it such that each
3 successive step in your career as a resident kind of
4 whittles down your specialty?
5     A. For general surgery, no.
6     Q. Okay.
7     A. For some specialty, yes.
8     Q. Okay. So let's start here -- let's ask this.
9 So what do you consider your specialty as of today?
10     A. General surgery.
11     Q. Okay.
12     A. It sounds like a misnomer, but it's -- that's
13 the terms we're left with, general surgery.
14     Q. What does a general surgery -- what does that
15 practice entail?
16     A. It involves providing surgical services for
17 conditions that range from soft tissues, abdominal wall,
18 conditions in the neck with endocrine and trachea
19 issues. Mostly focused on intra-abdominal contents.
20 Those -- some general surgeons do lung. Historically,
21 it's the surgical specialist -- specialty that's left
22 over after every other subspecialty is peeled off of a
23 particular area of interest in specialization.
24     Q. Okay.
25     A. For instance, neurology, to bring that backup.

Page 20

1 General surgeons used to be the ones who would operate
2 on the kidneys and the bladders and so forth. Well, now
3 that's relegated to the urologists. We don't generally
4 do that unless it's a trauma.
5     Q. This case concerns a gastric ulcer, correct?
6     A. Correct.
7     Q. Okay. What area of medical practice does the
8 treatment and correction of gastric ulcers fall into?
9     A. It depends on the state of the ulcer.
10     Q. Okay.
11     A. And an ulcer, such as in this case, that it
12 perforated, that falls into general surgery.
13     Q. Before perforation, what per view would
14 that fall under?
15     A. That would be under a gastric.
16     Q. Right. Are you a gastric enterologist?
17     A. No. I'm a general surgeon.
18     Q. Okay. But you do -- okay. And, you know, some
19 of these words look similar and I apologize for my
20 ignorance. But you were a gastrointestinal research
21 fellow with Temple?
22     A. Right.
23     Q. All right. So tell me about that.
24     A. That was a year that I was in academic -- in an
25 academic program that wanted people to be more

Page 21

1 productive when it came to publishing, moving people
2 down the academic line. And that year was a year of
3 research where I worked in the lab doing research on --
4 or in gastrointestinal disorders.
5     Q. Okay. Would a -- would a gastric ulcer fall in
6 gastrointestinal research or that field?
7     A. It falls in the general category. Yes.
8     Q. Okay. Aside from your year as a
9 gastrointestinal research fellow at Temple, have you had
10 any other specific training or course of studies as it
11 relates to gastroenterology?
12     A. No.
13     Q. What does a chief resident generally do, which
14 was your position from '97 to '98?
15     A. Within general surgery, that entails you having
16 more administrative and clinical responsibilities.
17     Q. Okay. And I assume there is only one, right?
18     A. No. Not in general surgery.
19     Q. Okay.
20     A. If you were talking about internal medicine,
21 that is commonly the case. But in general surgery if
22 you make it to your final year, you will be called a
23 general surgery chief.
24     Q. Okay. Your time at Temple -- correct me if I'm
25 wrong, I would assume that is where you undertook the



Page 22

1 most training for study that would have informed your --
2 your experience and knowledge with respect to your
3 opinions in this case?
4     A.  That would be the period where I had the
5 informal training.  Correct.
6     Q.  And of course you've had years of experience as
7 a practitioner since then, correct?
8     A.  Correct.
9     Q.  And you've relied on that experience as well?
10    A.  Correct.
11    Q.  What about your fellowship in Oregon, at the
12 Oregon Health Sciences University.  What -- tell me a
13 little about what the fellowship was for and what you
14 did and things along those lines.
15    A.  At that period of time, the surgery was in the
16 beginning stages of adopting minimally invasive
17 techniques for all sorts of procedures.  I was
18 interested in providing that because I thought it was
19 beneficial to the patients to have surgery done through
20 minimally invasive means.  And that fellowship was to
21 help me take all the procedures and skills that I
22 learned at my residency and deem the skills to do it
23 minimally invasively.
24    Q.  Okay.  Did any of your experience or study
25 during the fellowship inform your opinions in this case

Page 23

1 today?
2     A.  Only just built on my knowledge.
3     Q.  Okay.  But there was nothing unique to that
4 fellowship that informed your opinion, that you wouldn't
5 have already learned or known from the course of your
6 study at Temple or from your subsequent years as a
7 practitioner?
8     A.  Only in that it provided me techniques to fix
9 the problem minimally invasively.
10    Q.  Would minimally invasive techniques been
11 consideration for treatment for Mr. Wingo after his
12 ulcer perforated?
13    A.  In my hands, yes.
14    Q.  Okay.  What would be a typical post-rupture
15 minimally invasive technique that you might have
16 employed to treat a perforated ulcer?
17    A.  I make multiple small incisions using a camera
18 and log instruments, I insulate the abdomen with C02,
19 clean out the gastric contents that have spilled, and
20 then repair the hole.  Either sew it closed and do an
21 omentopexy where I suture a layer of fat that exists in
22 the abdomen over top of it to patch it.
23    Q.  All right.
24    A.  That's a general approach.
25    Q.  We'll talk more about that when we talk a

Page 24

1 little bit more about your report and what you discuss
2 is the process for peptic ulcers and gastric ulcer
3 perforation.
4     A.  (Nodding yes.)
5     Q.  For your license, you allowed your license in
6 Pennsylvania, Oregon to expire?
7     A.  Correct.
8     Q.  I take it you don't practice there anymore?
9     A.  I do not.
10    Q.  Okay.  Has your license in Georgia ever lapsed
11 or have there been any gaps in your license to practice
12 in Georgia?
13    A.  No.
14    Q.  And I assume that means it has never been
15 suspended or revoked?
16    A.  Correct.
17    Q.  You're board certified in general surgery by
18 the General American Board of Surgery?
19    A.  Correct.
20    Q.  What does that mean?
21    A.  The board is the accrediting agency for general
22 surgeons and without that accreditation, you are
23 unlikely to be able to find any hospital that will allow
24 you privileges to do surgery there.
25    Q.  So I take it you don't need it to practice

Page 25

1 surgery, but you're not going to be able to do surgeries
2 at most hospitals without it?
3     A.  Correct.
4     Q.  Okay.  Has your certification ever lapsed, your
5 certification for general surgery by the American Board
6 of Surgery?
7     A.  No.
8     Q.  How often do you treat patients with either
9 peptic ulcers or gastric ulcer perforation?
10    A.  I estimate about once a month.
11    Q.  And I know it can be different for different
12 stages but what's the typical treatment you provide or
13 how -- let me go back -- how -- when patients come to
14 you with gastric ulcers, typically, what stage of the
15 ulcer do they have?
16    A.  I get involved when they've perforated.
17    Q.  Okay.  Do you -- have you ever gotten -- as a
18 practice do you -- let me rephrase that.
19        Generally, do you treat patients before the
20 ulcer is perforated?
21    A.  There is no current surgerable treatment for
22 patients who have ulcers that haven't perforated.
23    Q.  So your a surgeon, so your focus is doing the
24 surgery to correct it, correct?
25    A.  Correct.



Brian S. Myers, M.D., F.A.C.S.                                                3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 9 of 48   Page 8 (26 - 29)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 14 of 180

Page 26

1    Q. Treating an ulcer that hasn't perforated,
2  that's in other hands, correct?
3    A. Correct.
4    Q. Would you say that you're an expert on
5  post-perforation treatment of gastric ulcers?
6    A. Yes.
7    Q. Would you say you're an expert on the
8  pre-perforation treatment of gastric ulcers?
9        MR. GARDNER: Object to form.
10       THE WITNESS: It's something I'm extremely
11  knowledgeable about because of what I do. Are there
12  professions out there with more expertise, yes. But I
13  would still consider myself an expert on it. Yes.
14    Q. BY MR. JACKSON: What are the professions with
15  more expertise on gastric ulcers before they perforate?
16    A. Gastroenterologist, would be the only one.
17    Q. And you're not a gastroenterologist?
18    A. That's correct.
19    Q. And you're not presenting yourself as an expert
20  in gastroenterology?
21    A. Correct.
22    Q. For purposes of your opinions formed in this
23  case. What are the areas of expertise that form your
24  opinion?
25    A. General surgery.

Page 27

1    Q. That's the only area of expertise, there are no
2  others that formed your opinion today?
3        MR. GARDNER: Object to form.
4        THE WITNESS: That's what I am and that's
5  what my area of expertise is, is general surgery.
6    Q. BY MR. JACKSON: Right. I'm just -- I want to
7  -- but again, you're not, for instance, bringing expert
8  opinions with respect to gastroenterology for your
9  opinions in this report?
10    A. I am not going to portray myself as a
11  gastroenterologist. That's correct. Yes.
12    Q. Okay.
13    A. But I will clarify, there is overlap on a
14  knowledge basis between a gastrologist and a general
15  surgeon with -- in regards to this particular problem.
16    Q. Okay. What is a gastric ulcer?
17    A. It's a break down of the lining of the gastric
18  -- in the stomach. It allows the gastric contents to
19  start eroding the underlying tissues.
20    Q. And what -- what are the known causes of
21  gastric ulcers?
22    A. Most commonly be nonsteroidal use, followed by
23  smoking -- these are not in any particular order,
24  cocaine use. There is some evidence that stress is
25  responsible for breaking down the barrier. Those are

Page 28

1  the most -- some of the most common ones.
2    Q. What -- are you able to rank those in what
3  might be the most likely cause to the less likely?
4    A. I couldn't rank them at this point in time.
5    Q. Okay. Do you have an opinion on what might
6  have caused Mr. Wingo's ulcer in this case?
7    A. No.
8    Q. You reviewed Mr. Wingo's medical records from
9  the Cobb County Adult Detention Center in preparation of
10  your report?
11    A. I did.
12    Q. And you reviewed the WellStar Kennestone ER
13  records?
14    A. I did.
15    Q. Did you see anything in those records that --
16  that you would consider relevant in determining what the
17  cause of his ulcer might have been?
18       MR. GARDNER: Objection. Form.
19       THE WITNESS: The records reveal risk
20  factors, but they don't reveal the cause.
21    Q. BY MR. JACKSON: Okay. What were the risk
22  factors that they revealed?
23    A. Cocaine use was one of them.
24    Q. Were there any other risk factors that you saw?
25    A. No. I can't remember, at this point, if there

Page 29

1  were any ones beyond that.
2    Q. What -- how does cocaine use contribute to
3  gastric ulcers?
4    A. It's a very aggressive invasive constrictor and
5  you lose blood supply on a microscopic level. That's
6  why people lose the areas of their nose when they snort
7  it or why people have heart attacks because the vessels
8  contract so much that you lose blood supply to that
9  area.
10       MR. GARDNER: I objected to that last
11  question. You can go ahead.
12    Q. BY MR. JACKSON: Specific to gastric ulcers,
13  what would be the mechanism by which cocaine use
14  contributes to the formation of the ulcer?
15    A. There's probably --
16       MR. GARDNER: Objection. You can go ahead.
17       THE WITNESS: There's probably more than
18  one but vaso constriction is probably the most likely
19  cause.
20    Q. BY MR. JACKSON: You're saying vaso --
21    A. Vaso constriction.
22    Q. Okay what's vaso constriction?
23    A. The small blood vessels constrict to the point
24  where they no longer flow.
25    Q. Is there any diagnostic testing that can

Page 30

1 establish what would have caused a patient to develop a
2 gastric ulcer?
3     A. Other than checking for H. Pylori, I can't
4 think of a test that would identify cause. H. Pylori is
5 another cause for gastric ulcers.
6     Q. H. Pylori, that's a --
7     A. Bacteria.
8     Q. How is that typically contracted. Do you know?
9     A. It's ubiquitous, it's very common for people to
10 have it, but not everyone who has H. Pylori develops an
11 ulcer.
12     Q. Once a patient has a gastric ulcer, what
13 contributes to the perforation of the ulcer?
14     A. Sorry --
15     Q. Or, I guess, do you have an opinion -- not do
16 you have an opinion. I'm not asking for an opinion.
17 But to your knowledge, what are the factors that would
18 lead to a gastric perforating?
19     A. It's just progression of the underlying
20 disease.
21     Q. Okay. Can a -- is there any acute injury or
22 other discreet incident that would cause it to rupture?
23     A. No.
24     Q. For a patient who is known to have a gastric
25 ulcer, what treatment options are available -- or are

Page 31

1 there any treatment options that would -- that could be
2 taken to, perhaps, prevent the rupture?
3     A. The medical therapy is for gastric ulcers
4 should be started and continued and then monitored for
5 whether or not they're working.
6     Q. And what are the medical therapies for a
7 gastric ulcer?
8     A. They start with acid suppression medications.
9     Q. Are there any others -- other medical therapies
10 that would --
11     A. That's the mainstay.
12     Q. For a patient who is on acid suppression
13 medications, what -- what's a typical course of
14 treatment?
15     A. That could be better answered by a
16 gastroenterologist.
17     Q. Okay. To your knowledge if a medical -- or
18 excuse me. If a gastric ulcer is not treated, is it a
19 certainty that it will perforate or do they get to a
20 point where they just stay in a continuous state where
21 they're there, but they're not growing or is it -- to a
22 reasonable degree of medical certainty going to
23 perforate?
24     A. There's no way to predict which ones will
25 perforate and which ones won't.

Page 32

1     Q. But is it -- I know I'm not asking the best
2 question but I'm just trying to figure out. Can someone
3 have a gastric ulcer, leave it untreated, and be fine?
4     A. Well, they're going to have the symptoms so
5 they won't be fine, but they may not perforate. That's
6 correct.
7     Q. What are the pre-perforation symptoms of a
8 gastric ulcer?
9     A. There are none, other than the symptoms from
10 the ulcer itself.
11     Q. Other than the symptoms from the ulcer itself?
12     A. Right.
13     Q. What would those be, the symptoms?
14     A. Nausea, bloating, upper abdominal pain, pain
15 that's often improved by eating. Those are the typical
16 ulcer symptoms.
17     Q. Is there any diagnostic testing that can
18 establish exactly when a gastric ulcer ruptures?
19     A. That's established more by the history.
20     Q. What history would establish when a gastric
21 ulcer ruptures?
22     A. It's one of those conditions where we can
23 almost pinpoint the minute in which it does because
24 there is sudden onset of severe abdominal pain that is
25 intractable and cannot be ignored. It's not uncommon

Page 33

1 for a patient to come in and say the pain started at
2 4:32.
3     Q. Okay. We're going to come back to some of
4 that. I went off on a little hair.
5         Going back to your CV, since your -- since
6 completing your fellowship at Oregon Health Services,
7 have you had any other formal training in your area of
8 practice?
9     A. There is CME and there are courses we take at
10 various times to get extra training in certain areas,
11 like, robotic surgery and so forth.
12     Q. How many hours of CME are you required to
13 accomplish a year?
14     A. That changes almost every year depending on
15 what the board's new rules are.
16     Q. And is it the Board of General Surgery or is it
17 the board, that gave you your board certification that
18 assessed your senior requirements?
19     A. Correct. If you want to maintain your board
20 certification you must meet their requirements.
21     Q. I understand it changes every year, but what is
22 it this year?
23     A. I don't know this particular year.
24     Q. It's not December yet, right?
25     A. It's not time for me to recertify and at which



Brian S. Myers, M.D., F.A.C.S.                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 11 of 48
Page 10 (34 - 37)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 16 of 180

Page 34

1 point I will verify what the number is at that time.

2    Q.  Okay.  Has any of your CME coursework to -- any

3 specific CME coursework, that you can recall, inform any

4 of your opinions in Exhibit 1?

5    A.  Other than building my basic knowledge base,

6 no.

7    Q.  Where are you currently employed?

8    A.  Surgery South, PC.

9    Q.  What's your position?

10    A.  Surgeon and CEO.

11    Q.  What are your responsibilities in that capacity

12 -- well, let's start with your responsibilities as a

13 surgeon?

14    A.  To provide surgical services to our patients.

15    Q.  And as CEO, what are your responsibilities?

16    A.  To manage the staff and the practices of

17 business.

18    Q.  Do you have other physicians who work with you

19 or for you at Surgery South?

20    A.  I do.

21    Q.  Now when you say part of your responsibilities

22 as a CEO is to manage staff, would that include the

23 other surgeons or not?

24    A.  Yes.

25    Q.  How many surgeons are employed at Surgery

Page 35

1 South?

2    A.  Five.

3    Q.  What areas of specialty are those five other

4 surgeons?

5    A.  They're all general surgeons.

6    Q.  I may have asked this.  Is there -- can a

7 general surgeon further specialize within general

8 surgery?

9    A.  Yes.

10    Q.  Have you so specialized?

11    A.  In my fellowship as a minimally invasive

12 surgery, that could be considered a subspecialization.

13 I have particular areas of interest, these are not a

14 board certified subspecialty.  For instance, breast

15 surgery could be a subspecialty within general surgery.

16 Endocrine surgery could be a subspecialty within general

17 surgery.  We perform those functions within our group.

18    Q.  What were your interests that you referenced?

19    A.  I have a particular interest in foregut and

20 reflux surgery.

21    Q.  What is the foregut?

22    A.  Esophagus, the stomach, and the duodenum.

23    Q.  So you said the foregut and what was the other

24 area?

25    A.  Reflux which is -- basically it encompasses the

Page 36

1 other organs.

2    Q.  Okay.

3    A.  Gastroesophageal reflux disease.

4    Q.  Would treatment of gastric ulcers be within

5 either of those two interests?

6    A.  Yes.

7    Q.  Okay.  Which one?

8    A.  Foregut surgery.

9    Q.  Okay.  Foregut surgery.  If you were to perform

10 a surgery to correct a perforated ulcer would that fall

11 under the umbrella foregut surgery?

12    A.  That is foregut surgery, yes.

13    Q.  So tell me a little bit more about

14 foregut surgery.  What is that?

15    A.  Simply a general surgeon operating on the

16 esophagus, stomach, or duodenum.  It's a general

17 category.

18    Q.  Esophagus, stomach, or duodenum?

19    A.  Duodenum.

20    Q.  Duodenum?

21    A.  Or duodenum.  Depending on how you want to

22 pronounce that.

23    Q.  What is that?

24    A.  It's the very first portion of your small L,

25 just as it exits the stomach.

Page 37

1    Q.  Okay.  Did you found Surgery South?

2    A.  No.

3    Q.  Okay.  When did you become CEO?

4    A.  Roughly 2016.

5    Q.  Okay.  I have -- I have your CV stating you've

6 been staff surgeon at Surgery South since 1999 and --

7    A.  It's actually on my CV, 2014.  There you go.

8    Q.  Yes.  Okay.  2014, that is when you became CEO?

9    A.  Right.

10    Q.  But you started in 1999 as a staff surgeon?

11    A.  Right.

12    Q.  Did you -- other than CEO and staff surgeon,

13 have you had any other positions at Surgery South?

14    A.  No.

15    Q.  Have you ever been disciplined by a medical

16 board before or -- specifically, the General Surgery

17 Board For The American Board -- well, I guess the

18 American Board of Surgery?

19    A.  No.

20    Q.  And I don't know how it works in the medical

21 context, but is there any mechanism or way for

22 discipline internal to a specific practice group such as

23 Surgery South?

24    A.  No.

25    Q.  Okay.  Have you ever had any -- since you --



Page 38

1 since 1999 have you ever had any periods of
2 unemployment?
3    A.  No.
4    Q.  Other than your CME requirements, do you do any
5 other activities or study to stay current on areas of
6 your expertise?
7    A.  I read when there are articles available.
8    Q.  Do you currently -- are you -- have you
9 published recently?
10    A.  No.  I have not published.
11       MR. GARDNER:  When you get a chance, I want
12 to take a quick break.  I want to check on the air
13 conditioner.
14       MR. JACKSON:  Sure.
15          (Off the record.)
16    Q.  BY MR. JACKSON:  Doctor, I think before the
17 break we were talking about how you stay current on your
18 areas of expertise.  You mentioned you read some
19 articles.  Do you have any teaching positions?
20    A.  No.
21    Q.  Have you ever had teaching positions?
22    A.  Only when I was a resident in fellow.
23    Q.  So you were a clinical instructor in surgery at
24 Temple, instructor in surgery at Oregon Health and
25 Sciences and at VA Medical Center in Portland?

Page 39

1    A.  Those were the only formal teaching positions I
2 had, yes.
3    Q.  Okay.  Have you ever practiced in any other
4 specialty other than general surgery?
5    A.  No.
6    Q.  Have you ever tried to get board certified in
7 any other specialty?
8    A.  No.
9    Q.  I got a few more, kind of along the same lines
10 as the criminal questions, but I don't mean any offense.
11 Have you ever been sued for malpractice?
12    A.  No.
13    Q.  And I believe we asked this about your licenses
14 or privileges, have never been suspended, revoked, or
15 terminated?
16    A.  Correct.
17    Q.  You've had privileges lapse, but that was
18 voluntary?
19    A.  Correct.
20    Q.  What professional associations or affiliations
21 do you maintain?
22    A.  American College of Surgeons and SAGES.
23    Q.  And SAGES, what is that?
24    A.  A society of -- it's on here.
25    Q.  Yes, it is.

Page 40

1    A.  I can't ever remember their acronym.  We just
2 say SAGES.
3    Q.  Is it the Society of American Gastrointestinal
4 Endoscopic Surgeons?
5    A.  There you go.
6    Q.  What is a gastrointestinal endoscopic surgeon?
7    A.  A minimally invasive surgeon that works on the
8 GI tract.
9    Q.  This may be obvious but "endoscopic" does that
10 refer to using a scope?
11    A.  To get the acronym to work they used that word
12 but, yes.  It's a minimally evasive technique.  We use
13 the more common word which is laparoscopic and that
14 wouldn't fit with their acronym.
15    Q.  No.  Okay.  But your saying the Society of
16 American Gastrointestinal Endoscopic Surgeons is a
17 society for surgeons who do minimally invasive
18 gastrointestinal surgery?
19    A.  Yes.  And they give a good conference and have
20 a good journal.
21    Q.  Looking at your publication list, are these
22 listed, I guess, most recent to oldest?
23    A.  Yes.
24    Q.  I guess starting with the original papers --
25    A.  Yes.

Page 41

1    Q.  Okay.  So you haven't published an original
2 paper since 1998?
3    A.  That's correct.
4    Q.  And on the next section, Presentations and
5 Abstracts, is it safe to say you haven't presented since
6 1999?
7    A.  Not formally, no.
8    Q.  And a presentation, that would be to your
9 colleagues?
10    A.  Correct.
11    Q.  Perhaps for a CME or something similar?
12    A.  You don't get a CME for presenting.  You get a
13 CME for listening.  So, no.
14    Q.  No, no.  I'm not saying you would have gotten a
15 CME credit but the doctors listening or your colleagues
16 listening could have applied for CME credit?
17    A.  Correct.
18    Q.  And, you know, there's a process for getting
19 your curriculum and your talk basically approved by an
20 accrediting agency?
21    A.  That's right.
22    Q.  At least for a while in some states, you can
23 get credit for presenting, but it's almost more work
24 than it's worth to get the credits so...
25    A.  The idea is that CME is to increase your

Brian S. Myers, M.D., F.A.C.S.                                3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 13 of 48
Page 12 (42 - 45)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 18 of 180

Page 42

1  knowledge.  If you're teaching, you're not necessarily
2  increasing it, so --
3      Q.  You're telling people what you already know.
4      A.  That's the logic, I guess.
5      Q.  Yes.  What are the requirements for membership
6  in the American College of Surgeons?
7      A.  You have to be in one of the surgical
8  specialties, and board certified, and good standing
9  within the profession and among your peers.
10     Q.  Good standing is that a formal --
11     A.  They do interviews of you and your peers.
12     Q.  Okay.  So I assume you have to give references
13  and things like that?
14     A.  You do.
15     Q.  Have you ever applied for membership for any
16  other professional society organization but failed to
17  qualify?
18     A.  No.
19     Q.  What are the requirements for membership in the
20  Society of American or -- SAGES?
21     A.  I don't know the answer to that.
22     Q.  And you were admitted into SAGES in 1997?
23     A.  Yes.
24     Q.  Is that different than -- how does that society
25  operate differently from the American College of

Page 43

1  Surgeons and, I guess, other board certifying entities?
2      A.  Both are societies that provide education and
3  that's their main focus.  American College tries to
4  provide an extra level of oversight, I guess would be a
5  best word, by doing that process of interviewing and so
6  forth, of your peers, because they grant you the status
7  of fellow in the American College if you do that.  SAGES
8  there is no prestige as it were, for being in that
9  society, where it is with the American college.
10     Q.  With the American College of Surgeons, have you
11  ever held any leadership positions?
12     A.  No.
13     Q.  Have you ever been asked to leave?
14     A.  No.
15     Q.  Based on your CV and our discussions of your
16  publications and presentations, you haven't had any
17  publications or presentations on the areas addressing
18  the issues in this case in the past ten years?
19     A.  That's correct.
20     Q.  All right.  I'll mark this as Exhibit 3.
21         (Exhibit 3 marked for identification.)
22     Q.  BY MR. JACKSON:  Exhibit 3 is a document we
23  received in discovery and this -- this was your -- a
24  list of cases in which you've given testimony; is that
25  correct?

Page 44

1      A.  That is correct.
2      Q.  Okay.  Starting with the most recent case,
3  "Estate of Walter Huddleston versus Regan Bollig."  What
4  type of case was that?
5      A.  (Witness examining document.)
6          I'm sorry to say, I can't remember the
7  specifics of that one.  I can look all these up, if
8  you'd like, after this, and get you that information.
9  But at this point in time, I can't remember the
10  specifics.
11     Q.  Well, we have here listed 1, 2, 3, 4, 5, 6,
12  7 cases in which you gave testimony in a deposition,
13  correct?
14     A.  Yes.
15     Q.  And one case in which you testified at trial?
16     A.  That's correct.
17     Q.  And again, I'm just going by the case name,
18  please correct me if I'm wrong, but most of these appear
19  to be lawsuits against medical doctors or medical
20  treatment centers, correct?
21     A.  These were medical legal, yes.
22     Q.  So is it -- is it safe for me to assume or do I
23  assume incorrectly that most of these are medical
24  malpractice cases?
25     A.  That is correct.

Page 45

1      Q.  Are they all medical malpractice cases?
2      A.  All of these are medical malpractice cases.
3      Q.  Okay.  Do any of these medical malpractice
4  cases concern gastric ulcers?
5      A.  No.
6      Q.  And correct me if I'm wrong, but I assume none
7  of these cases concern the provision of medical care in
8  a corrections setting?
9      A.  That is correct.
10     Q.  Do you market yourself as an expert for
11  purposes of litigation?
12     A.  In malpractice cases, yes.
13     Q.  How do you market yourself?  Do you do that on
14  the Internet or other publications?
15     A.  There is an online directory which I pay an
16  annual fee into.  That's it.
17     Q.  What's the directory called?
18     A.  You asked.  I thought it would be easy to look
19  up.
20     Q.  We'll follow up on that.  That's fine.  We'll
21  talk later about --
22     A.  I apologize for my lapse in memory there.
23     Q.  No problem.  But that's online?
24     A.  SEAK.
25     Q.  SEAK?

Brian S. Myers, M.D., F.A.C.S.                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 14 of 48
                                                                    Page 13 (46 - 49)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 19 of 180

Page 46

1    A. S-E-A-K. It just came to me.
2    Q. So like SEAK dot com?
3    A. No. S-E-A-K. And it's not an acronym for
4  anything, I've asked. It's just their name.
5    Q. And what's your understanding of SEAK's scope
6  of business?
7    A. They are in the business of providing
8  physicians with courses and education on how to function
9  in this capacity, providing medical expert advice and
10 they provide the directory.
11   Q. How long have you advertised yourself as an
12 expert through SEAK?
13   A. I believe 2018 is when I started.
14   Q. Okay. And I have on your list, Exhibit 3,
15 here. Your first case was dated in 2019 and it looks
16 like the case may have been filed in 2016. But that was
17 the first time you've ever testified in the capacity as
18 an expert?
19   A. Yes.
20   Q. Okay.
21   A. Well, the first time I've ever testified as an
22 expert, yes.
23   Q. Okay. Why did you phrase it that way? Is it
24 because you were retained as an expert before testimony
25 in some of these other cases?

Page 47

1    A. Yes. Since 2018, I've been retained, and
2  reviewed documentation, and had conferences, and talked
3  with attorneys. But that's the first time I've
4  testified.
5    Q. When you have listed on Exhibit 3 "date", is
6  that the date of your testimony?
7    A. Correct.
8    Q. Okay. How do you market yourself on SEAK? Or
9  what areas of expertise do you list as your area?
10   A. General surgery.
11   Q. Any others?
12   A. No.
13   Q. So this was Exhibit 3, this only encompasses
14 time for you have been -- where you have given
15 testimony, correct?
16   A. Correct.
17   Q. Okay. There are other cases where you were
18 retained but did not give testimony?
19   A. Correct.
20   Q. About how -- again here we have seven
21 deposition testimonies and one trial for, I guess, eight
22 times that you have testified in the capacity as an
23 expert. How many other times have you been retained as
24 either a consulting expert or in any other capacity as
25 an expert for litigation?

Page 48

1    A. Total is probably around 40.
2    Q. Okay. That would include these cases where
3  you've testified?
4    A. Yes.
5    Q. Other than general surgery, have you ever
6  worked as an expert in any other area of expertise?
7    A. No.
8    Q. And in this case, the only area of expertise
9  that you've been retained to -- offer an opinion about,
10 is that general surgery?
11   A. Right. My knowledge is of general surgery.
12   Q. I'm sorry. I have an associate in another
13 deposition who is calling me, but he's going to have to
14 figure it out.
15         And to be clear, you're not rendering an
16 opinion as to reasonable medical care specific to the
17 corrections context, are you?
18   A. There were no general surgeons involved, so no.
19   Q. Okay. And you're not rendering an opinion
20 about reasonable -- reasonableness of medical care as
21 provided by nursing staff?
22   A. I'm not a nurse. No.
23   Q. Have you ever had any training with respect to
24 security staff obligations to patients in the
25 corrections context?

Page 49

1    A. No.
2    Q. Do you have any experience whatsoever with
3  provisional medical care in the corrections context?
4    A. No.
5    Q. Do you have any training --
6    A. Let me qualify that by saying, I have and still
7  do treat prisoners when they're brought to me. But
8  that's outside the purview of the institution.
9    Q. Okay. So you -- let's talk about that. So
10 when you treat inmates, they're brought to you by the
11 facility that's confining them?
12   A. Correct.
13   Q. Are you -- do you ever make calls to the jail
14 or other prison setting?
15   A. I do not call them. No.
16   Q. I mean, not call -- call but I guess the old
17 fashioned, do you go make -- do you go do examinations
18 in corrections facilities?
19   A. No. They're brought to me.
20   Q. Okay.
21   A. I have been in a correction facility when I was
22 a medical student, as Ohio State University has the
23 contract in the state to provide all care to the prison
24 facilities. And that's my extent of ever being in a
25 prison, was as a medical student but not a practice.



Page 50

1    Q. As a medical student -- when you went as a
2 medical student, did you in fact provide any medical
3 care?
4    A. Examinations.
5    Q. Examinations?
6    A. Nodding yes.
7    Q. What type of examinations did you provide?
8    A. I was -- it was on a general surgery rotation
9 as a medical student. So we were examining these people
10 for hernias at that particular time.
11    Q. So that would have been -- looking at your CV,
12 sometime between 1988 and 1992?
13    A. Correct.
14    Q. Are you able to know more specifically when it
15 would have been?
16    A. '91 to '92. It would be in the second half of
17 resident -- of medical school.
18    Q. And you said you checked inmates for hernias?
19    A. Yes. That was our job when we went out there.
20    Q. Anything more complicated than the turn your
21 head and cough?
22    A. No.
23    Q. And you know what I mean by that, right?
24    A. I do.
25    Q. But you -- you went to the jail to perform

Page 51

1 those services?
2    A. Yes. We actually went to the jail.
3    Q. All right. Were you practicing under the
4 supervision of the -- a licensed medical doctor?
5    A. Yes.
6    Q. Okay. Were you --
7    A. I will also add that Ohio State has a -- for
8 lack of a better word, a jail within the hospital
9 itself. The particular -- you had to go through
10 security at the door and you went inside and that was a
11 jail.
12    Q. So it was a secured location to -- within the
13 hospital to hold --
14    A. Prisoners that were inpatients.
15    Q. Okay. Did you ever treat any of those
16 patients?
17    A. Yes.
18    Q. What treatment did you provide those that were
19 held under security at the hospital?
20    A. There were several rotations that we went
21 through, that -- general surgery being one of them. But
22 I believe when I was on the medical service, we also
23 went in there to see patients as well.
24    Q. Okay. Anything more complicated than checking
25 for hernias or --

Page 52

1    A. No. These were inpatients so there was a wide
2 variety of conditions and medical problems.
3    Q. Okay. So that wasn't just general surgery in
4 that --
5    A. It was -- general surgery was part of it, but
6 they were more complex problems on the inpatients and
7 then on the medical side, it was dealing with medical
8 issues.
9    Q. Okay. But that was during your time as a
10 medical student?
11    A. That's way back when I was a medical student
12 but you asked a question if I had ever.
13    Q. Right. I'm glad you told me. That's really
14 interesting. I don't know if it matters, but I think
15 it's interesting.
16    A. It's not a common situation at medical schools.
17 It just happens to be that Ohio State has a contract
18 with the state to take care of prisoners.
19    Q. And I'm sure the experience was memorable for
20 going to a jail?
21    A. It was different. Yes.
22    Q. I would say even as an attorney, the handful of
23 times that I have been was memorable. It's different
24 context.
25    A. Yes.

Page 53

1    Q. But suffice that to say, your not presenting
2 yourself as an expert in the provision of medical care
3 to confined persons?
4    A. No.
5    Q. Okay. And did any of your experiences, either
6 going to the jail as a medical student at Ohio State or
7 going to the secure inpatient treatment center at the
8 hospital where you -- when you were a medical student,
9 did any of those experience -- experiences bring to bear
10 on the opinions you've rendered in this case?
11    A. No.
12    Q. We talked a little bit about your practice at
13 Surgery South. Do you have any other places of
14 employment other than Surgery South?
15    A. Other than this, no.
16    Q. And by this, you mean giving expert testimony?
17    A. Giving expert testimony. Yes.
18    Q. You've previously been chairman on the
19 Perioperative Governance Counsel for Henry hospital or
20 Piedmont Henry Hospital, as well as the chairman for the
21 Department of Surgery at Piedmont Henry Hospital?
22    A. Yes.
23    Q. I take it you have admission privileges at that
24 hospital?
25    A. I do.

Page 54

1  Q. Okay.  And are you still on those counsels?

2  A. On the two you mentioned, no.  I'm no longer

3  the department chair.

4  Q. Okay.  What about the Medical Executive

5  Counsel?

6  A. I'm still on the MEC, yes.

7  Q. What do you do on the Medical Executive Counsel

8  for the Piedmont Henry Hospital?

9  A. The MEC is the most senior level of medical

10 staff administration that oversees, the medical staff

11 for the hospital.  For instance, the department of

12 surgery falls underneath the MEC and so as departmental

13 chair you would be on the MEC on that.  I am on the MEC

14 now as a counsel member, not being the department chair

15 anymore.  But they oversee every other aspect of the

16 medical staff within the hospital.  Hospitals are

17 divided into the hospital and administration, the

18 nursing care, all the services that the hospital

19 provides and then the medical staff is the other half.

20 That's made up of all the physicians and extended care

21 providers.  Because these are people who are not

22 necessarily employed by the hospital.  And so these two

23 entities work together, hopefully symbiotically, to

24 provide good patient care.  But because this group of

25 individuals is not employed, beholden to the

Page 55

1  administration of the hospital, you need a body in place

2  to help regulate and maintain proper order within the

3  medical staff and how it functions within respect to the

4  hospital.

5  Q. Okay.

6  A. That's what it's for.

7  Q. Are you on retainer currently for any persons

8  or entities?

9  A. I'm on retainer for some other malpractice

10 cases.

11 Q. Okay.  Other than legal malpractices cases, are

12 you on retainer for any --

13 A. No.

14 MR. GARDNER:  You mean medical malpractice

15 case, correct?

16 MR. JACKSON:  Yes.

17 MR. GARDNER:  Okay.

18 MR. JACKSON:  Thank you.

19 Q. BY MR. JACKSON:  What percent of your income is

20 derived from your work as an expert?

21 A. About ten percent.

22 Q. And I believe you previously mentioned that

23 you've either consulted or testified in approximately

24 40 cases?

25 A. That's correct.

Page 56

1  Q. Is it approximate or do you know that to be the

2  number?

3  A. That's approximate.

4  Q. Okay.  What percentage of those 40 cases do you

5  -- are you retained by the plaintiff?

6  A. About 75 percent.

7  Q. And would the remaining 25 percent be for the

8  defendant?

9  A. Correct.

10 Q. These cases listed on your -- the cases for

11 which you've testified on Exhibit 3, are any of these

12 ones where you've represented the defendant?

13 A. The very first one, the trial.

14 Q. That being Angela Townsend versus Jesus Perez?

15 A. Correct.

16 Q. And were the rest for plaintiff's work?

17 A. Correct.

18 Q. On the cases including the -- not limited to

19 the Townsend versus Perez case, what types of cases --

20 or what types of medical issues are you opining on for

21 purposes of the defendant -- or where you have been

22 retained by a defendant?

23 A. Can you ask it again?

24 Q. I'm just trying to see, is there any difference

25 in the area of expertise for the types of issues for

Page 57

1  which you are retained as, you know, for plaintiff's

2  side opposed to defendant's side?

3  A. They're all general surgery issues.

4  Q. Okay.  Has the court ever found you not

5  qualified to testify as an expert?

6  A. No.

7  Q. Have you ever had your testimony stricken?

8  A. No.

9  Q. Have you ever worked with Mr. Gardner before?

10 A. There's one other case, I believe.

11 Q. Is that a pending case?

12 A. I can't remember if it's still open or not.

13       Oftentimes, some of these cases, I give my

14 opinion and I never hear the end result.

15 Q. Right.  When did you give your opinion in that

16 case?

17 A. I don't remember.

18 Q. Do you know -- well, did that case involve the

19 provision of medical care in the corrections context?

20 A. No.

21 Q. In general terms, can you tell me what the

22 issue was you were asked to opine on in that case?

23 A. I can't remember the specifics without looking

24 it up.

25 Q. Do you know what court that case was filed in?



---

Page 58

1   A. I do not.
2       MR. GARDNER: Hey Wes, it was a case we
3   were investigating. We decided not to file the lawsuit
4   or pursue the case. We just asked him to consult on it.
5       MR. JACKSON: Was it in 1983?
6       MR. GARDNER: No. It was a med case.
7   Well, it wasn't a case. He told us it wasn't a case.
8       MR. JACKSON: Understood.
9   Q. BY MR. JACKSON: All right. Going back to
10  Exhibit 1, which is your report. Exhibit 1 contains
11  your opinions in this case, correct?
12  A. Yes.
13  Q. Are these all the opinions you have in this
14  case?
15  A. Yes.
16  Q. And in forming these opinions, the only area of
17  expertise you're relying on is that of a general
18  surgeon?
19  A. Correct.
20  Q. And we've already discussed that you're not
21  providing an opinion with respect to -- or an opinion
22  that is specific to the provision of medical care to
23  inmates in a jail setting?
24  A. That's correct.
25  Q. And you're not providing an opinion on the

Page 59

1   management of correctional facilities?
2   A. Correct.
3   Q. Do you have any opinions on the reasonableness
4   of a layperson relying on a medical judgment of a nurse?
5   A. Ask one more time, please.
6   Q. Do you have -- are you offering any opinions of
7   the reasonableness of a layperson relying on the medical
8   judgement of a nurse?
9   A. No.
10  Q. And I take it you reviewed -- this report is
11  dated December 23rd, 2022.
12  A. Yes.
13  Q. When did you last review it?
14  A. Last night.
15  Q. Is the report still valid?
16  A. Yes. Other than I noticed a typo or two.
17  Q. Okay. I have typos in everything I write, so.
18  In reviewing it last night, did you see anything that
19  you thought needed to be changed, other than the typos,
20  anything that needed to be changed, deleted, or added to
21  the report?
22  A. No.
23  Q. Have you ever prepared any supplemental reports
24  to this report?
25  A. No.

Page 60

1   Q. In this case have you prepared any reports
2   other than this report?
3   A. No.
4   Q. Other than the records listed 1 through 16 on
5   pages 1 and 2, have you reviewed any additional records
6   pertaining to this case since this report?
7   A. No.
8   Q. When were you first contacted with respect to
9   providing expert opinion in this case?
10  A. I don't remember the date, but I can look it up
11  if you'd like.
12  Q. Do you know an approximate year?
13  A. It would be a pure guess.
14  Q. How were you contacted?
15  A. By phone -- or most likely by e-mail.
16  Q. Who contacted you?
17  A. Either Mr. Gardner or one of his
18  representatives.
19  Q. What was conveyed in that initial contact?
20  A. I don't remember the specifics, unfortunately.
21  Q. Did you have any hesitation on providing expert
22  opinion in a case concerning where the legal theories
23  did not pertain to legal -- or medical malpractice but
24  instead are playing for violation of civil rights?
25      MR. GARDNER: Objection to form.

Page 61

1       THE WITNESS: I wasn't asked to provide
2   that. I was asked to provide medical opinions about the
3   medical situation the patient personally went through
4   and I feel qualified for that. So no, it doesn't.
5   Q. BY MR. JACKSON: Okay. Have you ever discussed
6   with Mr. Gardner or anyone at his office the plaintiff's
7   theories of liability?
8   A. No.
9   Q. Have you discussed with defense, theories of
10  liability?
11  A. No.
12  Q. Or I guess we don't really have theories of
13  liability. Defense theories of the case or strategies
14  for the case?
15  A. No.
16  Q. Have you ever discussed with Mr. Gardner or
17  anyone from his firm the value of the case?
18  A. No.
19  Q. What's your understanding of the assignment
20  that Mr. Gardner had for you in this case?
21  A. To provide an explanation for the disease
22  processes that this patient -- this individual
23  experienced, was going through, as well as what standard
24  medical and surgical care would be.
25  Q. This is where I want to be clear, when you're



Page 62

1 talking about what standard of medical care, again,
2 you're not talking about the standard of care for
3 medical provision within the context of a correctional
4 facility?
5     A. No, I'm not.
6     Q. You're talking generally if a patient were to
7 present with these symptoms for say, at your office or
8 at another clinic, what would be typical?
9     A. These patients don't present at the office or
10 the clinic. They present at the ER, but yes.
11     Q. That's fair. But your opinion, my
12 understanding is also to talk about what Mr. Gardner --
13 Mr. Wingo experienced with his ulcer. Just in terms of
14 the biological occurrence of that rupturing and what was
15 going on internally, correct?
16     A. I'm -- I'm going to give my opinion on that.
17 Yes.
18     Q. Okay. All right. And were you able to reach
19 the opinions that you were asked -- were you able to
20 reach an opinion on the subjects you were asked to opine
21 on?
22     A. Yes.
23     Q. When were you first -- when did you first learn
24 that you would be giving testimony in this case as
25 opposed to merely consulting?

Page 63

1     A. A month or two ago. I'd have to look at my
2 records to find exactly when that was.
3     Q. Well, you gave your report December 23rd?
4     A. Yes.
5     Q. When you prepared your report, did you expect
6 to be testifying?
7     A. Not having done this more than four years, I
8 didn't know.
9     Q. Okay. What are your opinions with respect to
10 this case?
11     A. That Mr. Wingo suffered a perforation of a
12 known peptic ulcer and subsequently died.
13     Q. When you say he suffered the perforation of a
14 known peptic ulcer; what do you mean when you say it was
15 known?
16     A. Yes. He had a medical history of peptic ulcer
17 disease.
18     Q. More specifically, known to who?
19     A. Known to the people who were taking care of him
20 at the time. It's in their records. It's documented.
21     Q. And who were the people taking care of him at
22 the time?
23     A. The people in the prison.
24     Q. Is it your opinion that all the people in the
25 Cobb County Adult Detention Center knew of Mr. Wingo's

Page 64

1 medical history?
2     A. No. The people who were reading his records.
3     Q. And who would have those people been?
4     A. I don't have an opinion of that because I don't
5 know.
6     Q. So when you say Mr. Wingo suffered a
7 perforation of a known peptic ulcer, the basis for you
8 saying that it was known is that it was -- the peptic
9 ulcer was noted in his medical history?
10     A. Correct.
11     Q. And do you know, if in fact, anyone at the jail
12 had knowledge of that medical history as noted in the --
13     A. Somebody had knowledge because someone put it
14 in the records.
15     Q. Right. I'm asking -- let me ask it this way:
16 Do you have any knowledge of whether the nonmedical
17 personnel, those being the security officers, had
18 knowledge of the medical history noting that Mr. Wingo
19 had a peptic ulcer?
20     A. That, I don't know.
21     Q. Okay. And you're not rendering an opinion, one
22 way or another, whether in fact they did know he had a
23 peptic ulcer?
24     A. No, I'm not.
25     Q. What materials and information were provided to

Page 65

1 you by counsel to help you form that opinion?
2     A. The ones listed in the report.
3     Q. On pages 1 and 2, numbers 1 through 16?
4     A. Correct.
5     Q. Other than these items, were you given any
6 other information about Mr. Wingo's condition or the
7 events that took place at issue in this case on
8 September of -- late September of 2019?
9     A. No.
10     Q. When were you provided these documents listed 1
11 through 16?
12     A. Not long after I agreed to review the records
13 and I don't remember exactly when that was.
14     Q. You have listed a video and audio files of
15 interviews as number one. And video and audio files
16 with Cobb County officers and maids and infirmary
17 nurses. With respect to the Cobb County officers were
18 those interviews -- interviews taken at the jail or do
19 you know if those were interviews like what we're doing
20 right now, a deposition?
21     A. I don't know the location where they were held
22 and I'm not sure the format either.
23     Q. Okay.
24        MR. GARDNER: It's identified in our
25 disclosure.



Page 66

1    MR. JACKSON:  Right.
2    MR. GARDNER:  The more specific.
3    MR. JACKSON:  The more specific.
4    MR. GARDNER:  Yes.
5    MR. JACKSON:  Right.  I'm just asking if
6 he's reviewed the deposition video or audio.
7    Q.  BY MR. JACKSON:  Okay.  Just describe for me,
8 generally, how you used these items to help form your
9 opinion?
10    A.  I had to sift through all that information to
11 try to find out what his medical conditions were and how
12 he was physically behaving and acting to come to form my
13 complete -- my opinion.
14    Q.  Were there any materials that you would have
15 wanted to review that were not provided to you?
16    A.  I don't know what other videos are out there,
17 so I can't say.
18    Q.  Would you have liked to have seen any medical
19 records that Mr. Wingo had predating his time at the
20 Cobb County Adult Detention Center?
21    A.  Unless it's different from the past medical
22 history that's already in place, that wouldn't have
23 helped me.
24    Q.  The only medical records I see listed for Mr.
25 -- no. Never mind.  Were there any records that you

Page 67

1 asked to review and you were either told that they
2 weren't available or they didn't exist?
3    A.  No.
4    Q.  Have you obtained or reviewed any materials or
5 information from any other source?
6    A.  No.
7    Q.  Have you done any independent research on this
8 incident, perhaps on the Internet or anything else?
9    A.  No.
10    Q.  Have you supplied any information or materials
11 to counsel other than your written report?
12    A.  No.
13    Q.  Is there anything in your report that you
14 thought was relevant to your opinions, but which you
15 excluded from your report?
16    A.  No.
17    Q.  Are there any drafts, prior drafts, of this
18 report?
19    A.  No.
20    Q.  Did you take any notes in the preparation of
21 this report?
22    A.  The notes I did take as I was going through --
23 those are not memos somewhere.  They were all
24 handwritten stuff.
25    Q.  You had handwritten notes from your review of

Page 68

1 these 16 items?
2    A.  I did at the time, but I don't keep those.
3    Q.  Why don't you keep those?
4    A.  I didn't feel them germane as I write my
5 report, I x'd them off as this is the point I wanted to
6 make or this is the information that I needed.
7    Q.  How did you destroy them?
8    A.  Put them in the trash.  There's no identifying
9 information on them.
10    Q.  And when did you destroy those records?
11    A.  Before I finished my report.
12    Q.  Has anyone else ever reviewed the notes that
13 were destroyed?
14    A.  No.
15    Q.  Have you had any correspondence with counsel
16 with respect to the drafting of this report?
17    A.  I believe we communicated via e-mail.
18    Q.  Did you ever give him a -- your initial
19 impressions or anything of that nature before you issued
20 your report?
21    MR. GARDNER:  I'm just going to object to
22 the extent that Federal Rules of Civil Procedure 26B4C
23 don't allow for communications between the expert and
24 the attorney whether oral, written, or electronic to be
25 discoverable.

Page 69

1    MR. JACKSON:  Okay.
2    Q.  BY MR. JACKSON:  Were you requested to make any
3 changes with respect to this report?
4    A.  No.
5    Q.  Are there any -- have you prepared any other
6 materials or information with respect to this case other
7 than this report?
8    A.  No.
9    Q.  So --
10    A.  Ask one more time again.
11    Q.  I was asking if you had prepared any other
12 materials or information?
13    A.  I have not prepared, no.
14    Q.  Okay.  Have you participated in preparation of
15 any other materials?
16    A.  I was shown a graph and pictures --
17    Q.  Okay.
18    A.  -- that Mr. Gardner had created.
19    Q.  And when was that?
20    A.  Months ago.  I can't remember the date.
21    Q.  And why were you shown a graph and pictures?
22    A.  You had questions as to whether or not this was
23 an accurate portrayal of what it would look like from a
24 perforated ulcer.
25    Q.  Was that portrayal accurate?



Brian S. Myers, M.D., F.A.C.S.                                            3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 20 of 48
                                                                    Page 19 (70 - 73)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 25 of 180

Page 70

1    A.  Yes.
2    Q.  Other than the picture you were shown, have you
3  participated in the production of any other -- and other
4  than your report, any other materials or documents with
5  respect to this incident?
6    A.  For this, no.
7    Q.  Are you aware that there's a documentary on
8  this incident in which you've provided opinions?
9    A.  Yes.  Someone did interview me.
10   Q.  Okay.  Who interviewed you for the documentary?
11   A.  I don't know their names.
12   Q.  How did you go about producing that video?
13   A.  They did it through Zoom.
14   Q.  Was Mr. Gardner involved in the production of
15  that video?
16   A.  Not to my knowledge.
17   Q.  Who asked you to participate in the production
18  of the video?
19       MR. GARDNER:  I'm going to object.  It's
20  our position that any interview he had in respect to
21  that settlement video are privileged communications
22  under Rule 26B4C.  And that it does not involve his
23  compensation, facts, or data considered or the things
24  relied upon to form his opinion today.  That being the
25  extent, we object as it's privileged.

Page 71

1        MR. JACKSON:  Well, for the record, it's a
2  video that's in the public domain in which Mr. Myers
3  offers his opinions -- Dr. Myers, so I'm going to
4  continue to ask.
5        MR. GARDNER:  We'll continue to object.
6    Q.  BY MR. JACKSON:  Who asked you to participate
7  in that video?
8    A.  I believe someone from Mr. Gardner's office
9  mentioned it to me, if it was okay if they would contact
10  me.
11   Q.  Were you given the questions in advance?
12   A.  No.
13   Q.  Did you know the subject matter on which you
14  would be discussing before your statements were
15  recorded?
16   A.  I just knew that they wanted to ask me about
17  medical care.
18   Q.  Were you given a copy or were you allowed to
19  review the documentary after it was complete?
20   A.  I wasn't even aware it was done.
21   Q.  Have you ever watched the documentary?
22   A.  No.  I'm -- I wasn't aware until this very
23  moment that it was done.
24   Q.  Well, it's on YouTube.  You should go watch it.
25   A.  I will.

Page 72

1    Q.  Did you ever have any discussions with other
2  experts with respect to that documentary?
3    A.  No.
4    Q.  Did you ever have any discussions with other
5  experts with respect to this case?
6    A.  No.
7    Q.  How long did the interview take in which you
8  were interviewed for purposes of that video?
9    A.  Thirty, forty minutes, I would think.
10   Q.  All right.  I kind of need a break.
11       MR. GARDNER:  You do?
12   Q.  BY MR. JACKSON:  Is that okay?
13   A.  Sure.
14       (Off the record.)
15   Q.  BY MR. JACKSON:  How did you go about -- or
16  tell me about the process you took to review the
17  documents and form your opinions in this matter.
18   A.  The process?
19   Q.  Well, let me ask you this way:  You obviously
20  had materials to review.  Was this the case where you
21  reviewed materials and knew instantly what your opinions
22  would be or did you consult other sources, or think
23  about it, or do any research to help you develop your
24  opinions based on the facts in the record you were
25  provided?

Page 73

1    A.  No, I didn't consult other sources.
2    Q.  Okay.  And by consult other sources, I'm not
3  talking about asking a colleague down the hall what they
4  think.  I'm saying, did you review any, for instance,
5  medical journal articles?
6    A.  No.
7    Q.  So would it be fair to say, your process for
8  drafting this opinion and forming them was, reviewing
9  the records provided and then just drafting this report
10  that is Exhibit 1?
11   A.  Correct.
12   Q.  How long did you spend reviewing the records
13  and preparing your report?
14   A.  To this point in time, prior to the deposition,
15  I think it was 26 hours.
16   Q.  And that's the total amount of time you have
17  spent, I guess, that includes in preparation for today's
18  deposition?
19   A.  That does not include today's deposition.
20   Q.  Okay.  So it doesn't -- what's your method for
21  tracking your work hours?
22   A.  I have a little Excel spreadsheet, and when I
23  start to sit down to start reviewing, I put the time in
24  there, and when I'm done reviewing, I put the end time.
25  And then I end up with the minutes.

---

Page 74

1    Q.  Did you -- do you have a specific time sheet
2  for this case?
3    A.  Yes.  I invoice periodically to the attorneys
4  when that time comes.
5    Q.  Okay.
6    A.  I send them a copy of that.
7    Q.  Do your invoices just -- are they itemized or
8  are they listed as a general amount of time?
9    A.  They got the date and how much time and kind of
10  what I did, if I was reviewing documents or whatever and
11  then the amount of time --
12    Q.  Okay.
13    A.  -- I spent on that day doing that.
14        MR. JACKSON:  Timothy, were those
15  previously produced?
16        MR. GARDNER:  I'm not sure.  I'm not sure.
17  I'm not sure they were requested, but I don't know.  But
18  he just described it for you, right?
19        MR. JACKSON:  Right.  Well, I guess what
20  I'm asking is you had indicated that everything in our
21  subpoena was already previously produced.
22        MR. GARDNER:  Yes.  I'm not sure about the
23  invoices.
24    Q.  BY MR. JACKSON:  How many invoices have you
25  submitted in this case?

Page 75

1    A.  I don't know the exact number.
2    Q.  What is your hourly rate for this case?
3    A.  It's roughly five hundred an hour.
4    Q.  You said roughly five hundred?
5    A.  Roughly.
6    Q.  Does that fluctuate depending on the task or?
7    A.  Correct.  Deposition is 650.
8    Q.  Other than the deposition, what was the hourly
9  rate or rates that you employ --
10    A.  500 an hour.
11    Q.  So the only rate you employed for preparation
12  of your opinion was $500 an hour?
13    A.  Correct.
14    Q.  Excluding today, is it fair to say you've thus
15  invoiced roughly $13,000?
16    A.  Minus today, correct.
17    Q.  In addition to the $13,000, is there any other
18  minimum or retainer that you collect before you begin
19  work?
20    A.  Yes.
21    Q.  What is that?
22    A.  3,000.
23    Q.  And that goes towards the 13?
24    A.  Correct.
25    Q.  For this case other than the 13,000 or

Page 76

1  approximately $13,000, have you invoiced any other
2  amount of money to counsel for work on this matter?
3    A.  No.  That's it.
4    Q.  What's your rate for deposition -- I'm sorry.
5  What is your rate for testimony at trial?
6    A.  7,500 per day, 2,000 extra if it's overnight.
7    Q.  Do you invoice for any particular costs?
8    A.  That's all.  That's inclusive.  I try to keep
9  it simple.
10    Q.  So that wouldn't include travel time, mileage?
11    A.  That's included in that.
12    Q.  That's it?
13    A.  Yes.
14    Q.  Okay.
15        MR. GARDNER:  I'm about to print those
16  invoices out for you now.
17        MR. JACKSON:  Okay.  Thank you.
18    Q.  BY MR. JACKSON:  And I know I may have asked
19  this in another way but just to be clear on it, other
20  than reviewing these materials listed in your -- pages 1
21  and 2 of your report, did you do any other work or
22  obtain any other information before reaching your
23  conclusions?
24    A.  No.
25    Q.  Were there any restrictions or limitations

Page 77

1  placed on you with respect to the work you performed?
2    A.  No.
3    Q.  Would there be any investigation testing or
4  other work you would like to perform in this case?
5    A.  No.
6    Q.  Unless you're called to testify again, is there
7  any work you intend to do -- additional work you intend
8  to do in this case?
9    A.  I don't intend to do any more now unless Dr. --
10  Mr. Gardner asks.
11        MR. GARDNER:  I like doctor.
12    Q.  BY MR. JACKSON:  So having reviewed this case
13  and reached your conclusions, is there anything you can
14  think of that would be beneficial to either test or
15  corroborate your conclusions?
16    A.  No.
17    Q.  Why is that?
18    A.  He's already gone.  There's nothing that has
19  not already been done.  He's had the autopsy.
20    Q.  Right.  And you've read the autopsy report,
21  correct?
22    A.  Yes.
23    Q.  Would it have been beneficial to you to have
24  examined Mr. Wingo -- and I know you weren't retained to
25  do so until well after the time to do so would have



Page 78

1 passed. But in a hypothetical world, would you have
2 been able to refine your opinions had you been able to
3 examine the body?
4    A. After he's passed?
5    Q. Yes.
6    A. No.
7    Q. Why is that?
8    A. The period in which I can provide benefit is
9 when he's still alive, not after he's passed.
10    Q. Right. But you weren't retained to provide
11 benefit --
12    A. No.
13    Q. You were retained to opine on what happened?
14    A. Right.
15    Q. Let me just ask it this way: Do you -- do you
16 have any experience in forensic examinations?
17    A. No.
18    Q. So you would -- you would agree with me that
19 you would defer to the judgment of the medical examiner?
20    A. I would.
21    Q. On page 3, you have a section entitled,
22 Surgical Management of Perforated Gastric Ulcers. And
23 you begin in the operating room -- it says,"once in the
24 operating room." Tell me everything that happens
25 between the perforation of an ulcer and getting up to

Page 79

1 that point where you are in the operating room. For the
2 typical patient?
3    A. Well, obviously I can't tell you everything.
4 But the typical scenario is, someone has a sudden onset
5 of abdominal pain that is severe in nature. As I
6 pointed out before, it's so sudden, so abrupt, most
7 people will be able to tell you what time it happened,
8 down to the minute.
9        This is pain that is so severe that they
10 will often have someone drive them to the hospital,
11 usually an ambulance. Upon presentation to the ER,
12 workup is begun by the emergency room staff and
13 physicians. And that can be very brief, as a simple
14 chest X-ray showing free air where that scenario tells
15 us already we have a perforated bowel. And that's when
16 the general surgery is called to come see the patient.
17 At which point then, an assessment is made,
18 determination if the patient needs surgery and we go to
19 the operating room and operate. If you want, I can
20 break that down further.
21    Q. Yes. We'll go through those. This is very
22 basic sketched out?
23    A. (Nodding yes.)
24    Q. But the stages I have -- or from my
25 understanding is the ulcer perforates. They're driven

Page 80

1 to the hospital either by ambulance or by a friend or a
2 family member.
3    A. Right.
4    Q. At the ER, there's a workup begun which would
5 typically lead to an X-ray. And if the X-ray, you know,
6 sort of evaluating the X-ray indicating there was free
7 air, that would indicate a perforated bowel.
8    A. (Nodding yes.)
9    Q. And you would call a general surgeon.
10    A. (Nodding yes.)
11    Q. At that point what, does the general surgeon
12 do?
13    A. They respond. Come see the patient, do a quick
14 physical, take a quick history, review the workup to
15 that point. Typically, no further workup is needed and
16 the surgeon then mobilizes the OR to take the patient to
17 the OR for emergency surgery. It's all done very
18 expeditiously.
19    Q. Okay. So I'm just trying to time some of this
20 out. Driving to the hospital that varies patient to
21 patient, depends on where they are, right?
22    A. Yes.
23    Q. Once you get to the ER, how long is that, the
24 typical scenario, does that initial workup take?
25        MR. GARDNER: Object to form.

Page 81

1        THE WITNESS: I can only give my general
2 impression as a surgeon from my experience. I'm not an
3 emergency room physician. But in my experience, as a
4 general surgeon, the patient is brought in via
5 ambulance. There's no waiting in the waiting area.
6 They're put immediately into a room. Usually these
7 patients are in extreme pain and often times have vital
8 signs that are showing signs of sepsis. That prompts
9 the emergency room staff to move things along faster.
10        So my general impression is probably within
11 an hour, they'll have an answer. From the moment they
12 walk through the door. It can be faster, it could be
13 slower.
14    Q. BY MR. JACKSON: And what different
15 circumstances would affect how fast or slow it went?
16        MR. GARDNER: Object to form.
17        THE WITNESS: Some patients are not as --
18 it's not as clinically obvious that they are that sick.
19 Some patients are not as cooperative. Sometimes there's
20 issues with consent. Sometimes there are issues getting
21 the X-rays you want and as fast as you want. The techs
22 are doing something else and another patient is having
23 an emergency. A lot of variables are involved.
24    Q. BY MR. JACKSON: And those variables would
25 include tech availability. Availability of a room?



Brian S. Myers, M.D., F.A.C.S.                                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 23 of 48   Page 22 (82 - 85)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 28 of 180

Page 82

1    A. Rooms are going to be available because someone
2 is coming in by ambulance. What will happen is EMS will
3 call ahead, we are bringing in a patient. And that ER
4 is not on diversion, meaning that they are telling you
5 that the ER is full. There are no beds which means the
6 ambulance will divert to the closest hospital where
7 there is an open bed because this patient has to go. It
8 can't go to a waiting area. He has to go right from the
9 ambulance to a room because we have to start the workup
10 immediately.
11    Q. All right. Well, then I guess going back.
12 Before arriving at a hospital, there's one variable that
13 could affect the time between the onset of the
14 perforation and getting on the table for operation. It
15 would be whether or not the nearest hospital has
16 available beds, right?
17    A. (Nodding yes.)
18        MR. GARDNER: Object to speculation.
19    Q. BY MR. JACKSON: And then once they're at the
20 ER, one -- another variable would be whether or not
21 there's a tech available to perform an X-ray?
22    A. Resources. You got to make sure all the
23 resources are available.
24    Q. Okay.
25    A. Sometimes it depends -- today's environment,

Page 83

1 we're stretched. But we prioritize based upon how sick
2 someone is. Someone in this scenario with a perforated
3 ulcer, is very sick, so they get high priority.
4    Q. So after you get your general surgeon -- well,
5 let me ask you, have you ever personally in the ER --
6 been in an ER where someone was brought in and you were
7 asked to -- after you had the X-ray -- do that further
8 inspection before you take them into surgery?
9    A. I'm always going to inspect the patient before
10 I take them to surgery.
11    Q. Of course. Of course. But I'm saying in this
12 particular context in an emergency room?
13    A. I'm not understanding your question.
14    Q. Okay.
15    A. I'm sorry.
16    Q. I'm just trying to ask, you gave me these
17 processes and one of them involved, you know, after the
18 X-ray if there's indication of free air that would be --
19 that would indicate that you had a perforated bowel
20 that's when the general surgeon is called?
21    A. Yes.
22    Q. And my understanding, you have experience being
23 that general surgeon that is being called in at that
24 point, right?
25    A. Correct.

Page 84

1    Q. So tell me how long does your exam -- physical
2 exam, review of the work done, at that point, and review
3 of the patient's history take?
4    A. Couple minutes.
5    Q. Okay. Typically how long does it take you to
6 -- once you are summoned to see a patient to make the
7 determination on whether or not you're going to perform
8 a surgery on them?
9        MR. GARDNER: Objection. Speculation.
10       THE WITNESS: With that scenario, my
11 ability to decide on surgery is a couple of minutes.
12    Q. BY MR. JACKSON: Okay. And then earlier you
13 said this can be done within an hour, to --
14    A. That's the emergency room workup.
15    Q. Okay.
16    A. Not mine.
17    Q. But then your workup is just a couple of
18 minutes?
19    A. A couple of minutes. That's all I need.
20    Q. And then once you have made the determination
21 to perform surgery, how long is it before you've
22 actually -- before you actually do an incision and do
23 the surgery?
24    A. The goal is right to the OR immediately. In
25 reality, it's probably going to take you probably

Page 85

1 20 minutes or more.
2    Q. Okay. You would agree with me that, again,
3 this is not in every case. There's various variables
4 that would affect, you know, how long this whole process
5 takes, correct?
6    A. That's correct.
7    Q. Okay. But you've suggested, at least in a
8 typical case, within an hour and twenty minutes you're
9 under the knife?
10    A. Yes.
11    Q. From getting to the hospital to getting the
12 surgery?
13    A. Yes. Although an ER physician might be able to
14 opine more on how more common time frame is from through
15 the doors to surgeon consult.
16    Q. Okay.
17    A. That's just my general impression.
18    Q. Have you ever -- do you have admitting
19 privileges at any WellStar facility?
20    A. I do not.
21    Q. Okay. And Mr. Wingo in this case was taken to
22 WellStar Kennestone in Cobb County, correct?
23    A. Yes.
24    Q. Have you ever been to WellStar Kennestone?
25    A. Yes.



Brian S. Myers, M.D., F.A.C.S.                                          3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 24 of 48   Page 23 (86 - 89)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 29 of 180

Page 86

1   Q.  Have you ever treated individuals with
2   perforated ulcer at WellStar Kennestone?
3   A.  No.
4   Q.  The process we just described of arriving in
5   ambulance and everything that has to take place before
6   the general surgeon does the operation, have you ever --
7   personally have you ever done that process at Kennestone
8   WellStar?
9   A.  No.
10   Q.  And if there were any -- you would agree with
11   me if there were any variables that were specific to the
12   Kennestone WellStar hospital that might shorten or
13   lengthen this general time frame; you wouldn't have any
14   knowledge or experience of those?
15   A.  I would not have any knowledge of those, no.
16   Q.  All right.  This isn't a medical term but when
17   is a patient out of the woods.  Is it after you do your
18   surgery or during -- the point during the surgery or
19   some point after surgery?
20        MR. GARDNER:  Object to form.
21        THE WITNESS:  That's really variable
22   because it depends on what point in the process I got
23   ahold of the patient.  Every hour that delays from the
24   time of the perforation to the time I can get that hole
25   sealed increases their morbidity and mortality and will

Page 87

1   increase they're length of stay.  So out of the woods,
2   if that's implying when are they out of risk of dying,
3   it's gonna be usually about -- I'll know within a
4   couple of days, after the surgery.
5   Q.  BY MR. JACKSON:  Okay.  So you mention every
6   hour after perforation, the mortality rate is going up?
7   A.  Yes.
8   Q.  Are you aware of or do you know of any academic
9   literature that would put a time frame or a scale on the
10   mortality in terms of hours or time post-perforation?
11   A.  You're going to ask me to quote the document
12   but I have a memory of a document that said around
13   2.5 percent for every hour, it goes up.
14   Q.  So it goes up 2.5 percent every hour?
15   A.  Every hour.  And I don't remember that article.
16   I don't remember which one it was.  This is just from my
17   memory.
18   Q.  Was that an article that you read or consulted
19   in preparation of your report?
20   A.  No.  It's just in my memory.
21   Q.  Do you know when you read that article?
22   A.  No, I don't.
23   Q.  So what would -- based on that baseline, what
24   was the mortality percentage at the -- at T0, moment of
25   perforation?

Page 88

1   A.  That's dependent upon the individuals other
2   comorbidities and their physiological response.  But all
3   comers in someone, like Mr. Wingo, who is otherwise
4   healthy he's got about a 90 percent mortality rate at
5   that point.  So 90 percent chance he's going to survive
6   if he get's proper care.
7   Q.  So that would be a ten percent mortality rate?
8   A.  Yes.  At that point.  In his scenario as
9   opposed to someone who is 80 who has COPD, conditional
10   heart failure, diabetes.  They're going to start with a
11   higher percentage.  But someone who's otherwise healthy,
12   it can be around ten percent at that point in time and
13   then that number will grow.
14   Q.  You had mentioned earlier -- and I think you
15   mentioned in your report -- that cocaine use is at least
16   a contributing cause or possible cause for gastric
17   ulcers.  Would cocaine use have impacted the mortality
18   likelihood for any particular patient?
19   A.  I don't believe so.
20   Q.  Do you know if any academic literature speaks
21   to the effect of cocaine use on mortality for perforated
22   gastric ulcers?
23   A.  I am not.
24   Q.  Going back to the study that you are drawing on
25   memory, stating that mortality goes up 2.5 percent every

Page 89

1   hour without treatment, do you know what journal that
2   might have been published in?
3   A.  Unfortunately, I don't.
4   Q.  Do you know anything about the patient class
5   that was studied in that article?
6   A.  No.  That's actually the only piece of
7   information in that article I remember.
8   Q.  Do you have a copy of that article?
9   A.  No.
10   Q.  Were you relying on that article or your
11   recollection of it when you formed your opinions in this
12   case?
13   A.  No, I was not.
14   Q.  On page 4 of your opinion, you write, "if the
15   gastric perforation is repaired before the physiological
16   response to the spilled gastric contents is too severe
17   then the post-operative recovery is typically uneventful
18   and a person is sent home in five to seven days."  What
19   is too severe?
20   A.  That's a spectrum, I've had patients who felt a
21   very severe response within hours after perforation.
22   I've had patients I've seen who have gone 12 or more
23   hours without a severe reaction.  But in this context, I
24   believe the best way to describe it would be in relation
25   to the vital signs.  Once their blood pressure drops to

Page 90

¹ the point where they are no longer able to profuse their
² tissues, that is a severe reaction.  That is septic
³ shock.  At that point, their mortality goes way up.
⁴     Q.  Okay.  You said some words I didn't understand
⁵ --
⁶     A.  Sorry.
⁷     Q.  So once their blood pressure drops to which
⁸ point?
⁹     A.  To where they can't profuse tissues.  That's
¹⁰ septic shock.
¹¹     Q.  Profuse tissues, what does that mean?
¹²     A.  Your pressure is so low you don't have enough
¹³ pressure to get your blood out to the tissues that you
¹⁴ want to profuse.
¹⁵     Q.  And profuse means just get blood out to a part
¹⁶ of the body?
¹⁷     A.  Yes.  There is blood profusing through my
¹⁸ fingertips right now.  My heart is able to generate
¹⁹ enough pressure to get out through those capillaries and
²⁰ back.
²¹     Q.  Okay.
²²     A.  As my pressure drops, blood can't quite reach
²³ there and it's further and further and that happens on
²⁴ the inside as well.  That's why people who get
²⁵ hypotensive drop their blood pressure, they faint,

Page 91

¹ they're not getting their brain profused.
²     Q.  Okay.  And you said if someone gets to that
³ point where they're in septic shock, they're mortality
⁴ goes up.
⁵     A.  Obviously, it goes up.
⁶     Q.  Are you able to but a percentage on it?
⁷     A.  I couldn't give you a number, unfortunately.
⁸     Q.  Were you able to determine -- and you might
⁹ have this in here, I don't know -- were you able to
¹⁰ determine, from your review of the records, when or if
¹¹ Mr. Wingo got -- or was suffering toxic shock -- or not
¹² toxic -- septic shock?
¹³     A.  Septic shock.
¹⁴     Q.  Yes.
¹⁵     A.  There are a lot of signs, but without vital
¹⁶ signs it's hard to say.
¹⁷     Q.  Okay.  Based on your review of the record, when
¹⁸ was the last his vitals were taken before he went, what
¹⁹ we call, code blue?
²⁰     A.  It's not in my report, I can't remember,
²¹ independently, exactly when that was.  But if my memory
²² serves me, someone made a remark about his vital signs
²³ being normal sometime when he was down in the infirmary.
²⁴ When exactly that was, I don't remember.
²⁵     Q.  Okay.  So he was sent to the infirmary --

Page 92

¹     A.  I didn't see any vital signs in there to base
² that on.
³     Q.  Right.  And on page 4, the last paragraph, "he
⁴ was returned to the infirmary and placed in room eight.
⁵ There was one set of vital signs documented at
⁶ 12:36 a.m. on September 29th, 2019 which were
⁷ unremarkable."
⁸         So are those the vital signs you're
⁹ referring to?
¹⁰     A.  Yes.  The one -- I say, "while the blood
¹¹ pressure at 12:36 was in the low normal range.  It was
¹² significantly lower than the baseline pressure he had
¹³ demonstrated prior to his time in the CCADC.  And his
¹⁴ heart rate was elevated compared to his baseline, as
¹⁵ well, as documented in the previous records -- vital
¹⁶ sign records."  And I don't remember seeing any vital
¹⁷ signs after that --
¹⁸     Q.  Okay.
¹⁹     A.  -- documented.
²⁰     Q.  And without those vital signs you -- you're
²¹ unable to say when he went septic?
²²     A.  I am unable to say when he went in shock.
²³     Q.  Okay.
²⁴     A.  I only have observation of his behavior that
²⁵ would suggest that.

Page 93

¹     Q.  Did you observe any behavior to suggest that he
² was in shock?
³     A.  He appeared to be showing signs of confusion.
⁴ Probably orthostatic hypotension meaning his pressure
⁵ was dropping when he stood up, which again a sign that
⁶ you're not profusing your tissues well enough.  So that
⁷ when you stand up your blood pressure drops.  Usually
⁸ your heart can keep up and keep pumping up to the brain.
⁹ But if you stand up and the pressure drops and it can't
¹⁰ keep up, that's when you get dizzy, you fall and you
¹¹ faint.  And there was signs of him doing that in the
¹² infirmary down there.  He was showing signs of fainting.
¹³     Q.  So the fainting in the infirmary -- is it your
¹⁴ opinion that that could be a possible indicator that he
¹⁵ was in shock at that point?
¹⁶         MR. GARDNER:  Object to form.
¹⁷         THE WITNESS:  Yes.  I believe based upon
¹⁸ those symptoms he was going into shock at that point.
¹⁹ Yes.
²⁰     Q.  BY MR. JACKSON:  Going back to the article you
²¹ were discussing where mortality increased by 2.5 percent
²² an hour after perforation.  Does that rate change once
²³ the patient is in shock?
²⁴     A.  I don't remember if that article stipulated
²⁵ that or not.  I just remember that number each hour.  My



Brian S. Myers, M.D., F.A.C.S.                                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 26 of 48
Page 25 (94 - 97)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 31 of 180

1 personal experience is that the sicker you are -- I
2 don't -- I don't have data to say specifically, but my
3 general impression from my experience is, as you get
4 sicker that rate goes up more exponentially than it does
5 linearly.
6      Q. So to be clear, is there any peer reviewed
7 academic literature that you're aware of that would --
8 that would quantify mortality of a perforated ulcer
9 after -- well, what's the full term -- shock --
10     A. After septic shock.
11     Q. -- after septic shock had begun?
12     A. Not that I'm aware of.  No.
13     Q. But you're saying in your experience it
14 increases -- I think the word you used was exponentially
15 rather than linearly.
16     A. Right.
17     Q. Meaning that the longer you wait, the faster
18 your mortality goes up?
19          MR. GARDNER:  Object to form.
20          THE WITNESS:  That would be an accurate
21 statement, I believe.
22     Q. BY MR. JACKSON:  Inaccurate or accurate?
23     A. Accurate.
24     Q. Okay.  But again, there's -- you have no way to
25 say with any degree of medical certainty what his

1 mortality would have been say at the point of -- at the
2 onset of septic shock or an hour after or two hours
3 after or three hours after?
4      A. No.  I cannot say that.
5      Q. I want to ask on -- well, let's go through
6 here.  Going back to the last paragraph on page 4.
7 Well, actually let's go to the next -- the last
8 paragraph on page 4.  The last sentence you had
9 there,"witnesses related Mr. Wingo said pain was his
10 ulcers and not withdrawal."  Who did those witnesses
11 relate that to?
12     A. I don't remember.
13     Q. Do you know if it was medical staff or jail
14 staff?
15     A. I don't remember.
16     Q. But you wrote, there are reports that he
17 requested to be seen by a doctor and taken to the
18 emergency room.  What reports are you referring to?
19     A. By reports, I mean to say that individuals in
20 these documents I reviewed, relayed that that's what he
21 said.
22     Q. And then final paragraph on page 4, "he was
23 returned to the infirmary and placed in room eight."  We
24 already talked about.  His vitals were taken and you
25 wrote, "while the blood pressure at 12:36 a.m. was in

1 the low normal range it was significantly lower than the
2 baseline blood pressure he demonstrated prior to this
3 time in the CCADC."  Do you recall what his baseline
4 blood pressure was?
5      A. I do not, at this time.
6      Q. What, in your opinion, did that indicate that
7 his blood pressure was lower than his baseline?
8      A. Yes.  All the normals that we quote are
9 basically over a population.  So, you know, we are
10 dealing with an individual here and his individual norm
11 may be higher than, say, what your norm or my norm would
12 be.  So they have -- we have vital signs from when he
13 was not ill.  That's probably his baseline.  That's
14 where he lives.  His body is used to a certain pressure.
15 So while pressure is taken at 12:36, we're still within
16 the population norm.  The amount that they were lower
17 than what he came in with suggests that for him, that
18 was low.
19     Q. Okay.  And if you had seen that -- if you had
20 been  the one to take those vitals, what conclusions
21 would you have drawn about him at that time?
22          MR. GARDNER:  Objection.  Speculation.
23          THE WITNESS:  Well , as a surgeon, I don't
24 make any decisions based upon, purely vital signs alone.
25     Q. BY MR. JACKSON:  Right.

1      A. It's coupled with history and physical.  So if
2 I have the history and physical that I would expect that
3 I would have at that point, he would be going right to
4 the OR right then.
5      Q. Okay.  At 12:36 a.m.?
6      A. Yes.  I would probably not even be going into
7 X-ray on him.  I suspect at that point he probably had
8 what we call a surgical abdomen, we might get a chest
9 X-ray on the way to the OR just to confirm free air.
10 But based upon his history, as a surgeon in my
11 experience, I'm pretty sure I can tell just by my exam
12 and the history that he needs to go to the OR.
13     Q. Okay.  And I believe in another section of your
14 report, we'll call it Mr. Wingo's most likely
15 experience, on page 5.  And on the third paragraph down
16 is when you relate going to the infirmary which is when
17 he would have had his vital's taken.  But before that,
18 for 11:30 p.m. you write that his gastric ulcer
19 perforates in the multipurpose room.  And about halfway
20 through the paragraph you say a good physical exam, at
21 this point would most likely find a rigid abdomen and
22 diffuse tenderness.
23          Can you tell me a little bit more about
24 that and what is going on -- or would be going on in a
25 typical patient with a perforated ulcer?

Brian S. Myers, M.D., F.A.C.S.                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 27 of 48
Page 26 (98 - 101)
USCA11 Case: 24-10933    Document: 31-3    Date Filed: 06/11/2024    Page: 32 of 180

Page 98

1    A.  Rigid abdomen means they're very firm.  You
2  should be able to push into someone's abdomen there's a
3  certain laxity of the abdominal wall and abdominal
4  contents.  Once you get that inflammatory response going
5  the -- whether you intend to or not your muscles
6  contract and then the abdomen becomes very, very firm.
7  And that's kind of what I would say the surgical
8  abdomen, that's kind of what we're talking about here.
9  This is an abdomen that is extremely tender in all
10  locations and pushing on it hurts.  Not just like, oh,
11  it's a sore kind of pain this is a, they really hurt.
12  And it also becomes very firm and that's what I'm
13  referring to there.
14    Q.  Okay.  Did you include this note about what a
15  good physical exam would find at this point, because --
16  would you have expected such an exam to be performed
17  given his condition?
18    A.  No, I wouldn't expect there to be a physician
19  there examining this patient there at that point.
20      MR. GARDNER:  Objection.
21      THE WITNESS:  I'm just pointing out that
22  that's what I expect to find at that point.
23    Q.  Would a nurse be qualified to perform this type
24  of exam?
25      MR. GARDNER:  Objection.  Beyond the scope

Page 99

1  of his expertise for the purpose of this case.
2      THE WITNESS:  In my experience, a nurse can
3  certainly perform this exam.  But you would have to ask
4  a nurse whether or not she would be able to make the
5  conclusion of judgement that I would make.  I don't
6  believe she would.
7    Q.  BY MR. JACKSON:  Okay.  So you don't -- okay.
8  All right.  Going down on the final paragraph of that
9  page, and which describes a drop in blood pressure and
10  this is -- you had already mentioned orthostatic
11  hypotension once before?
12    A.  Yes.
13    Q.  And so if I understand your report correctly,
14  orthostatic hypotensions, where you would -- blood
15  pressure would be normal lying down, but when you stood
16  up, couldn't get it to your head and cause you to faint?
17    A.  (Nodding yes.)
18    Q.  What conclusions did you draw with respect to
19  Mr. Wingo based on observing him faint while in room
20  eight at the infirmary?
21    A.  What conclusions did I draw?
22    Q.  Well, I'm just -- how did -- why did you
23  include a discussion of orthostatic hypotension in this
24  portion of your report?
25    A.  I believe that was most -- the most likely

Page 100

1  reason he was falling down in that jail cell that we
2  seen in the video there.
3    Q.  And today you said that would be the most
4  likely reason, and then I think on the second -- or next
5  to last line of this report you said that that behavior
6  was consistent with orthostatic hypotension.
7      Why do you couch it in such terms that it
8  would be consistent -- or that you believe is the most
9  likely condition that his behavior reflects?
10    A.  There's no other indication or reason here for
11  that behavior at this point.  We know he's not detoxing,
12  which was a concern at the time, and that's not how
13  people usually respond in detox in my experience.  But
14  this is a radical change in his behavior from when he
15  was in the regular population to this point.  And that
16  fainting and confusion all fit with lack of blood flow
17  to the brain.
18    Q.  Can you diagnose orthostatic hypotension by
19  observing someone's behavior alone?
20    A.  No.  You require vital signs for that.
21    Q.  Okay.  Did his vital signs that were taken at
22  12:36 a.m. indicate he was going into or had orthostatic
23  hypotension?
24    A.  No.  They were not taking -- you have to take
25  two sets.  You have to take one laying down and sitting

Page 101

1  down and then take one immediately when they stand up.
2    Q.  So is it fair to say that your statements
3  regarding orthostatic hypotension and that his behavior
4  was consistent with -- that's not a -- that's -- you're
5  belief is that that is the perhaps most plausible
6  explanation for his behavior but it's not -- it's not an
7  actual diagnosis that you were providing?
8      MR. GARDNER:  Object to form.
9      THE WITNESS:  It is not diagnostic.  That
10  is my opinion.
11    Q.  BY MR. JACKSON:  Okay.  On page 6 of your
12  report, you mention that Mr. Wingo -- on the second
13  paragraph -- is given food that morning, which he ate --
14  eats and drinks?
15    A.  I believe he also threw it on his head too.
16    Q.  Excuse me?
17    A.  I believe he also threw it on his head.  I
18  didn't put that in there, but I believe that is what he
19  did as well.
20    Q.  Threw the food on his head?
21    A.  His drink on his head.  He poured his drink on
22  his head.
23    Q.  But -- okay.  So he poured the drink on his
24  head --
25    A.  (Nodding yes.)



Page 102

1    Q.  But it's true you agree that he ate the food he
2  was provided?
3    A.  Yes.
4    Q.  And you had indicated earlier in your report,
5  but also at this point, the eating has at least some
6  interaction with the symptoms of gastric ulcers?
7    A.  For a non-perforated ulcer, yes.
8    Q.  All right.
9    A.  It can dilute the gastric contents enough so
10  that the pain is less.  So people with a gastric ulcer
11  will go and try to eat something or drink something
12  because they get some relief of the pain.  It's not
13  going to work for perforated ulcer, it's going to be the
14  opposite.
15    Q.  And you put in here,"that having lived with a
16  non-perforated ulcer, Mr. Wingo probably noticed in the
17  past that eating and drinking reduced abdominal pain and
18  eats and drinks what is provided to stop the pain.
19  However, now that the ulcer is perforated the eating and
20  drinking does not help?
21    A.  No.  It makes it worse.
22    Q.  Okay.  But it's your opinion that he may have
23  thought that eating would relieve some of his symptoms?
24    A.  That's my sub-position, yes.  That -- it's not
25  -- obviously, I can't tell what he was thinking but

Page 103

1  that's my belief that that was why he was doing it.
2  Someone else was saying that they believed because he
3  was eating and drinking he was okay.  And I'm going to
4  say that it does not necessarily mean that he was okay.
5    Q.  Okay.  And that's your opinion as a medical
6  physician, correct?
7    A.  Correct.
8    Q.  Okay.  So your conclusion, you say,"it's my
9  professional opinion to a reasonable degree of medical
10  certainty that had Kevil Wingo been provided reasonable
11  emergency medical care, he would have most likely
12  survived.
13       Furthermore, it's my opinion the lack of
14       appropriate emergency medical care, resulted in the loss
15  of Kevil Wingo's life."  What are the -- or what are the
16  basis for that opinion?
17    A.  Everything that I've outlined to this point.
18    Q.  What do you mean when you say reasonable
19  emergency medical care?
20    A.  That would be being brought to the emergency
21  room for evaluation by an emergency room physician.
22  Anyone in the community, that's what's going to happen.
23    Q.  And Mr. Wingo was in different parts of the
24  jail, and seen by different people throughout the night,
25  after his ulcer perforated , correct?

Page 104

1    A.  Correct.
2    Q.  At what point would -- well, before I ask that
3  -- reasonable emergency medical care, in your opinion in
4  this case, is that he is taken to the ER?
5    A.  Yes.
6    Q.  Okay.  At what point during the night, after
7  his ulcer perforated, would have been the reasonable
8  time to take him to the ER?
9       MR. GARDNER:  Object to form.
10       THE WITNESS:  In my opinion, right after he
11  started complaining of pain.  That's what a -- a person
12  who is free to do so, will seek out emergency services
13  immediately when that pain hits.  It's that severe.
14    Q.  BY MR. JACKSON:  But you understand -- and
15  you're not opining that Mr. Wingo, as a person confined
16  in a detention center, should have been at liberty to go
17  to an ER as soon as he said, I want to go to the ER; is
18  that your opinion?
19       MR. GARDNER:  Object to form.
20       THE WITNESS:  I am -- my use of the word
21  reasonable is based upon what someone who has the access
22  to emergency medical services would do.  He had an extra
23  layer in between him and an emergency room.  And I
24  believe, in my opinion, that it was reasonable for him
25  to expect he would receive the care at the facility that

Page 105

1  would recognize that it's beyond their ability to care
2  for him and that he needs to go to the emergency room.
3    Q.  BY MR. JACKSON:  Okay.  Who would have
4  recognized whether or not the care that he needed
5  exceeded what could be provided at the infirmary?
6       MR. GARDNER:  Objection.  Beyond the scope.
7    A.  I would assume -- this is an assumption now --
8  that every prison has medical staff on-call or in the
9  facility itself who can make that determination.
10       MR. GARDNER:  Also speculation.
11       THE WITNESS:  Yes.  That's why I said,
12  assume.
13    Q.  BY MR. GARDNER:  Okay.  And you go on to say
14  that if he had received reasonable emergency care, he
15  would most likely have survived.  What do you mean by
16  most likely?
17    A.  Most probably.
18    Q.  Okay.
19    A.  If you get someone to me with vital signs, in
20  the ER, they are most likely going to survive.  So if
21  you can get him to the emergency room with vital signs,
22  he's most likely going to survive.
23    Q.  But most likely, you know, that -- you would
24  agree with me that that denotes a certain probability,
25  correct?



Brian S. Myers, M.D., F.A.C.S.                                        3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 29 of 48   Page 28 (106 - 109)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 34 of 180

Page 106

1   A. Yes.

2   Q. Is that quantifiable?

3   A. I'm just going to have to stick with most
4   probably he would survive because that's just my
5   experience.

6   Q. Would most probable mean greater than --

7   A. Greater than 50 percent.

8   Q. All right. So mortality lower than 50 percent?

9        MR. GARDNER: Object to form.

10   Q. BY MR. JACKSON: No, no, no -- yes. Because if
11   he has a greater --

12   A. Yes.

13   Q. Okay. So lower than 50 percent mortality. But
14   we have discussed earlier that the percentage risk of
15   mortality, whether you can quantify that or not, it
16   increases with each passing hour, correct?

17   A. Correct.

18   Q. Okay. Are you able to say if he ever passed
19   the most likely to survive to most likely would not have
20   survived line, at any point during -- or after his ulcer
21   perforated, but while he was still at the Adult
22   Detention Center?

23   A. All I can say is, the literature says that he
24   probably started at around ten percent mortality. When
25   the vital signs reached the point where he's not going

Page 107

1   to likely survive, I don't know because they are not
2   recorded.

3   Q. And you have no way of putting a time on that
4   based on your review of the record of 16 items listed in
5   Exhibit 1?

6   A. Not without more vital signs, no.

7   Q. When was Mr. Wingo's precise time of death?

8   A. I'd have to look at the records, but I believe
9   it was 9:50 in the morning they declared him in the ER.
10   I didn't put it in my records, in my report.

11   Q. So without vitals taken after 12:36 a.m. -- you
12   understand he was moved from the infirmary to a solitary
13   room around 7:45 a.m., correct?

14   A. Correct.

15   Q. Without vitals being taken at that time, are
16   you able to say with any degree of medical certainty
17   what his survivability would have been at that point if
18   someone called 911?

19   A. I cannot.

20        MR. GARDNER: Object to form.

21        THE WITNESS: I can't.

22   Q. BY MR. JACKSON: Okay. And if you cannot say
23   his survivability at that point, would you agree with me
24   that your opinion that he would have most likely
25   survived if he had been provided reasonable medical

Page 108

1   care, that opinion doesn't apply to analyzing what his
2   likelihood of surviving would have been at 7:45 a.m.?

3        MR. GARDNER: Object to form.

4        THE WITNESS: My statement doesn't bring
5   into the issue of time, so I stand by what I said here.
6   If you want to have me opine on whether or not, at 7:45,
7   if that was reasonable medical care or if he would have
8   survived at that point, I can't say because I don't know
9   what his vitals were at that point.

10   Q. BY JACKSON: And that's the point I'm wondering
11   is, you've said if he were provided reasonable medical
12   care, he would have most likely survived. So my
13   question to you -- or my point, you would agree with me
14   that the decision to provide reasonable medical care
15   which you've opined as going to the ER, that decision
16   could have been made at any point after the ulcer
17   perforated?

18   A. Yes.

19   Q. And I understand that you might not, you know,
20   agree that waiting too long would be reasonable, I
21   understand that, but as a practical matter, you'd agree
22   that someone can pick up the phone and call an ambulance
23   at any point after the ulcer was perforated, correct?

24   A. That's correct.

25   Q. Okay. And your opinion is --

Page 109

1   A. Well, I would assume so.

2   Q. Right. But at some point, is it your opinion
3   that if you -- if you wait too long to call the
4   ambulance at some point the medical care becomes
5   reasonable. If you wait too long to make that call?

6   A. I don't think medical care is unreasonable. I
7   think it may be futile.

8   Q. Okay.

9   A. Once you lose the vital signs, as you saw in
10   the emergency room, you're not going to bring him back.

11   Q. Okay. Well, the point I'm trying to make -- or
12   the point I'm wondering what you think is, the statement
13   that he would have most likely survived. That statement
14   is not equally as true at 11:30 when his ulcer
15   perforated as much as it is at 7:45 a.m. or later; is
16   it?

17        MR. GARDNER: Objection. Mischaracterizes
18   his testimony.

19        THE WITNESS: My statement is true as it
20   is. If you want to change my statement, then we can
21   bring that into the new question. But as I've stated
22   it's true. It doesn't become less truthful. If we want
23   to change how -- how I've defined reasonable, then we
24   can talk about that but as I've stated it, no, that's a
25   true statement. You get him to me with vital signs,

Brian S. Myers, M.D., F.A.C.S.                                    3/13/2023

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 30 of 48
Page 29 (110 - 113)
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 35 of 180

Page 110

1  he's mostly going to survive.  That's my experience.
2  Q.  BY MR. JACKSON:  But based on the record, you
3  can't say --
4  A.  I don't know when the vital signs stopped.
5  Q.  Right.  And you can't say whether or not he
6  would have survived if someone would have called at
7  7:45 a.m.?
8  A.  I can not say that.
9  Q.  Right.  What about at 6:45 a.m.?
10  A.  I don't know what the vitals are.
11  Q.  All right.  What about --
12  A.  He was still moving though so he had some.
13  Q.  What about 5:45 a.m.?
14  A.  Again, still moving but I don't know what the
15  vitals are.
16  Q.  Okay.  So without the vitals and if we're
17  trying to understand what his survivability would had of
18  been had the emergency room been called at any point
19  during that time frame; without the vitals you're unable
20  to say?
21  A.  Yes.  I can just say at this point --
22          MR. GARDNER:  Object to form.  Go ahead.
23          THE WITNESS:  At 11:30 at night his
24  survivability was probably -- was mostly likely ten
25  percent.  His survival in the ER is 100 percent -- or

Page 111

1  his mortality in the ER is 100 percent.  How that
2  percentage moved along time if we were to graph it out,
3  I don't know.
4  Q.  BY MR. JACKSON:  Okay.
5  A.  Not without vitals.
6  Q.  In the course of our conversation today, I may
7  have asked some questions that allowed you to examine
8  the situation from a different perspective or probably
9  make you think about -- possibly make you think about
10  the case in a different way.  In light of our
11  conversation today, is there anything in Exhibit 1, your
12  report, that you would change or amend?
13  A.  Other than the typos, no.
14  Q.  Okay.  Well, those are my questions for you,
15  Dr. Myers.  Mr. Gardner might have some for you.
16          MR. GARDNER:  I do.  Thanks.
17              EXAMINATION
18  Q.  BY MR. GARDNER:
19  Q.  Dr. Myers, I just want to talk to you a little
20  bit about your schedule on a weekly basis.  What is your
21  schedule?
22  A.  It's very fluid, so it's hard to say.
23  Generally Mondays through Fridays, I do elective
24  surgeries.  There's one day in there that I do office,
25  depending on what my call schedule is I may be working

Page 112

1  Saturday and Sundays, as well.  Which may mean I also
2  work during the evenings, during the week, when I'm on
3  call.  That's kind of the general picture.
4  Q.  And are those surgeries that you perform on
5  Monday through Friday typically scheduled?
6  A.  The Monday through Friday ones are typically
7  elective.  The emergency ones can happen at any time.
8  Q.  But the elective ones are typically scheduled
9  for some point Monday through Friday.
10  A.  Correct.
11  Q.  And how far in advance are those typically
12  scheduled?
13  A.  Sometimes up to over a month.
14  Q.  Why does it take so long to get the surgery --
15  why does it take so long to schedule it for a month out?
16  A.  There's a lot of factors involved.  Let's say
17  someone comes to see me for something as simple as what
18  we call biliary colic.  Biliary colic is where sometimes
19  gal stones, very common problem and it's an elective
20  procedure.  They'll see me in the office assuming they
21  have insurance, we then are then -- once they've --
22  we've had our in office discussion about what the
23  problem is and what we are going to recommend.  And they
24  decide they want to proceed with surgery.  Then my
25  office staff has to take that information then and get

Page 113

1  what's called a precertification from the insurance
2  carrier.  That's usually a three to four hour long phone
3  call where they're on hold most of that time, assuming
4  they don't get hung up on and have to call back again.
5  Then once we have that precertification, assuming the
6  person doesn't need what's called clearance, where they
7  have medical issues that need to be approved upon and
8  optimized by a cardiologist or a pulmonologist.  Once we
9  have both the clearance and the precertification, then
10  my staff then has to find an opening in the OR schedule
11  where this patient can be fit in there.  And this
12  particular procedure needs an assistant so we have to
13  coordinate the assistant's schedule with my schedule
14  along with the availability in the OR.  And that could
15  take up to a month sometimes.
16  Q.  So are there a lot of moving parts in order to
17  get someone scheduled for an elective surgery?
18  A.  For an elective procedure, yes.
19  Q.  So is it difficult to cancel a surgery at the
20  last minute?
21  A.  It's easy to cancel but it could be
22  catastrophic for the patient.
23  Q.  And when you say, it can be catastrophic for
24  the patient.  What do you mean by that?
25  A.  Let's say I'm operating on someone who has



Page 114

1 colon cancer, they've mobilized friends and family to
2 come from all across the country to be there while
3 they're in the hospital and while they are recovering.
4 And if I suddenly at the last minute have to cancel
5 their surgery, first of all, all those people who
6 mobilized to be there are going to be out that expense,
7 and when you're operating on someone with cancer they're
8 living every moment from the moment of diagnosis --
9 probably before that, the concern they have cancer.
10 They're going to die from this cancer, it's growing,
11 it's getting bigger, it's causing more problems. And
12 they know the longer you wait to remove the cancer the
13 higher the risk of mortality from the cancer is the
14 spreading. And so they have to live every minute and
15 every day with that, so does their family. So if I have
16 to cancel at the last minute and postpone their surgery,
17 it's really a terrible thing.
18     Q. Would it be catastrophic for you to be called
19 into court -- would it be catastrophic to a patient if
20 you were called into court to have to testify at the
21 last minute and have to cancel your surgery?
22     A. Yes.
23     Q. Are you typically unavailable to go into court
24 Monday through Friday because your performing surgeries?
25     A. If I -- if I'm given enough notice I can take

Page 115

1 that time off as vacation is what I generally do. If
2 I'm not given enough notice that's a problem.
3         MR. GARDNER: That's all the questions I
4 have.
5             EXAMINATION
6     Q. BY MR. JACKSON:
7     Q. How much notice would you need to testify in
8 court?
9     A. At least the month.
10     Q. Okay, those are my questions.
11         MR. GARDNER: All right. Thanks. We're
12 all done. Before we go off the record, I will stay on
13 the record.
14         Wes, I e-mailed you a copy of his invoices
15 just in case you doesn't have them.
16         MR. JACKSON: Can I see them real quick?
17         MR. GARDNER: I just wanted to give you a
18 copy, as well, here at the deposition. It's just three
19 pages.
20         MR. JACKSON: I've got a few dozens more
21 questions. Are we on the record?
22         MR. GARDNER: Yes.
23     Q. BY MR. JACKSON: Well, we will make these as an
24 exhibit?
25         MR. JACKSON: Fair enough you e-mailed them

Page 116

1 to me.
2         MR. GARDNER: Yes, e-mailed them to you as
3 well.
4         (Exhibit 4 marked for identification.)
5     Q. BY MR. JACKSON: All right. I only have one
6 copy. Time, is this in minutes?
7     A. Yes.
8     Q. All right.
9     A. I guess I should make that clear.
10     Q. So you reviewed these documents in January of
11 2020.
12     A. I started reviewing them in January 2020 -- or
13 June.
14     Q. Yes. And this invoice is from July 7th, 2020,
15 page 1 of Exhibit 4.
16     A. (Witness examining document.)
17     Q. This exhibit is from --
18     A. Yes. I didn't know it was a question.
19     Q. What -- on July 3rd, 2020, you wrote that you
20 were writing. What were you writing for 60 minutes?
21     A. I don't remember, specifically.
22     Q. Was it anything that you produced or anything
23 contained in your report in this case?
24     A. I'm going to assume it's this report.
25     Q. Okay. And then conversation for video

Page 117

1 30 minutes, on July 3rd. Is that the YouTube video that
2 we were discussing earlier where you were interviewed
3 via Zoom?
4     A. No. I wouldn't be charging Mr. Gardner for
5 that. That would be probably them talking to me about
6 the case and that they wanted me to -- well, that
7 someone wanted to interview me for a video. That would
8 be my -- the best of my recollection.
9     Q. And then on July 6th, 2020, it just says video,
10 would that be reviewing videos or preparing for the
11 video that you appeared in or something else?
12     A. I don't remember exactly now. Maybe I did bill
13 you for that video. And that's a lot longer than I
14 thought it was if that's 80 minutes or a lot longer than
15 I remember.
16     Q. BY MR. JACKSON: So I have, for these three
17 invoices, a $3,000 retainer, $6,350 in charges less than
18 the retainer. So the total amount charged as of
19 July 7th was $9,350, correct?
20     A. Correct.
21     Q. An extra 500 on June 2021, which brings us to
22 9850. And then on January 2023, 3125, which would be
23 $12,975?
24     A. Yes.
25     Q. Okay.



Page 118

1    A.  It sounds about right, yes.
2    Q.  But that's the January invoice.  Do you know if
3    there's a February invoice?
4    A.  There will be -- there is a small amount still
5    due -- a couple hundred bucks, I think.  From before
6    this, yes.
7    Q.  All right.  Those are my questions.
8         MR. GARDNER:  Nothing further.
9         MR. JACKSON:  Do you have the payment?
10        MR. GARDNER:  We FedEx'd him the payment.
11        THE WITNESS:  They sent it already.
12        MR. GARDNER:  We paid for four hours so
13   we're good, right?
14        THE WITNESS:  Yes.  That's the minimum.
15   I've had a couple depositions go longer than four but
16   not usually.
17        MR. GARDNER:  Yes.  Okay.  Hey, I
18   appreciate your time.  Thank you very much for coming.
19        THE WITNESS:  My pleasure.
20        (Off the record.)
21   (The proceeding were concluded at 1:36 p.m.)
22
23
24
25

Page 119

1              -    -    -
2          CERTIFICATE OF REPORTER
3
4    STATE OF GEORGIA)
5              )
6    COUNTY OF DEKALB)
7
8         I, TAMIKA M. BURNETTE, hereby certify
9    that the foregoing proceedings were taken before me at
10   the time and place therein designated; that a review of
11   the transcript was requested, and that the foregoing
12   pages numbered 1 through 118 are a true and correct
13   record of the aforesaid proceedings.
14        I further certify that I am not a relative,
15   employee, attorney or counsel of any of the parties, nor
16   am I a relative or employee of any of the parties'
17   attorneys or counsel connected with the action, nor am I
18   financially interested in the action.
19
20        DATED this 27th day of March, 2023
21
22
23   _____
24        TAMIKA M. BURNETTE
25   CERTIFIED COURT REPORTER, RPR, CSR-2870

Page 120

1         COURT REPORTER DISCLOSURE
2         Pursuant to Article 10.B of the Rules and
3    Regulations of the Board of Court Reporting of the
4    Judicial Council of Georgia which states:  "Each court
5    reporter shall tender a disclosure form at the time of
6    the taking of the deposition stating the arrangements
7    made for the reporting services of the certified court
8    reporter, by the court reporter's employer, or the
9    referral source for the deposition, with any party to
10   the litigation, counsel to the parties or other entity.
11   Such form shall be attached to the deposition
12   transcript."  I make the following disclosure:
13        I am a Georgia Certified Court Reporter.
14   I am here as a representative of
15   Trustpointe.One/Alderson.  Trustpointe.One/Alderson
16   contacted to provide court reporting services for the
17   deposition.  Trustpointe.One/Alderson will not be taking
18   this deposition under any contract that is prohibited by
19   O.C.G.A. 91128(c).
20        Trustpointe.One/Alderson as no
21   contract/agreement to provide court reporting services
22   with any party to the case, any counsel in the case, or
23   any reporter or reporting agency from whom a referral
24   might have been made to cover this deposition.
25   Trustpointe.One/Alderson will charge its usual and

Page 121

1    customary rates to all parties in the case, and a
2    financial discount will not be given to any party to
3    this litigation.
4         Tamika M. Burnette, RPR, CCR2870
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Notice Date: 03/27/2023

Deposition Date: 3/13/2023

Deponent: Brian S. Myers, M.D., F.A.C.S.

Case Name: Tiffany Wingo, et al.,
            v. Major Branson Harris, et al.

Page:Line            Now Reads                    Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

Brian S. Myers, M.D., F.A.C.S.

3/13/2023
Page 1

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 35 of 48
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 40 of 180

## WORD INDEX

**< $ >**
**$12,975** 117:*23*
**$13,000** 75:*15, 17* 76:*1*
**$3,000** 117:*17*
**$500** 75:*12*
**$6,350** 117:*17*
**$9,350** 117:*19*

**< 1 >**
**1** 4:*14* 10:*13, 14, 16*
17:*13* 34:*4* 44:*11* 58:*10*
60:*4, 5* 65:*3, 10* 73:*10*
76:*20* 107:*5* 111:*11*
116:*15* 119:*12*
**1:20-CV-03662-VMC**
1:*15*
**1:36** 2:*8* 118:*21*
**10** 4:*14*
**10.B** 120:*2*
**10:00** 2:*8* 5:*2*
**100** 3:*15* 110:*25* 111:*1*
**11:30** 97:*18* 109:*14*
110:*23*
**1-10** 1:*21*
**111** 4:*7*
**115** 4:*8*
**116** 4:*17*
**118** 119:*12*
**12** 89:*22*
**12:36** 92:*6, 11* 95:*25*
96:*15* 97:*5* 100:*22*
107:*11*
**13** 2:*4* 5:*1* 75:*23*
**13,000** 75:*25*
**1470** 2:*6* 3:*7*
**15** 4:*15*
**16** 60:*4* 65:*3, 11* 68:*1*
107:*4*
**1600** 3:*16*
**18** 13:*6*
**1983** 58:*5*
**1987** 16:*3*
**1988** 50:*12*
**1992** 17:*5, 24* 18:*13*
50:*12*
**1993** 18:*13*
**1997** 42:*22*
**1998** 17:*5, 23, 24* 41:*2*
**1999** 12:*24* 37:*6, 10*
38:*1* 41:*6*

**< 2 >**
**2** 4:*15* 15:*7, 8, 10* 44:*11*
60:*5* 65:*3* 76:*21*
**2,000** 76:*6*
**2.5** 87:*13, 14* 88:*25*
93:*21*
**20** 85:*1*

**2007** 13:*21*
**2014** 37:*7, 8*
**2016** 37:*4* 46:*16*
**2018** 46:*13* 47:*1*
**2019** 46:*15* 65:*8* 92:*6*
**2020** 116:*11, 12, 14, 19*
117:*9*
**2021** 117:*21*
**2022** 59:*11*
**2023** 2:*4* 5:*1* 117:*22*
119:*20*
**23rd** 59:*11* 63:*3*
**25** 56:*7*
**26** 73:*15*
**26B4C** 68:*22* 70:*22*
**27th** 119:*20*
**29th** 92:*6*

**< 3 >**
**3** 4:*16* 15:*15* 43:*20, 21,
22* 44:*11* 46:*14* 47:*5, 13*
56:*11* 78:*21*
**3,000** 75:*22*
**30** 117:*1*
**30281** 11:*7*
**30339** 2:*7* 3:*8, 17*
**3100** 2:*5* 3:*6*
**3125** 117:*22*
**3rd** 116:*19* 117:*1*

**< 4 >**
**4** 4:*17* 44:*11* 89:*14*
92:*3* 95:*6, 8, 22* 116:*4,
15*
**4:32** 33:*2*
**40** 48:*1* 55:*24* 56:*4*
**43** 4:*16*

**< 5 >**
**5** 4:*6* 44:*11* 97:*15*
**5/1/65** 11:*11*
**5:45** 110:*13*
**50** 106:*7, 8, 13*
**500** 75:*10* 117:*21*

**< 6 >**
**6** 44:*11* 101:*11*
**6:45** 110:*9*
**60** 116:*20*
**650** 75:*7*
**693-8202** 3:*9*
**6th** 117:*9*

**< 7 >**
**7** 44:*12*
**7,500** 76:*6*
**7:45** 107:*13* 108:*2, 6*
109:*15* 110:*7*
**75** 56:*6*
**770** 3:*9, 19*

**7th** 116:*14* 117:*19*

**< 8 >**
**80** 88:*9* 117:*14*
**818-0000** 3:*19*

**< 9 >**
**9/22/2022** 15:*16*
**9:50** 107:*9*
**90** 11:*7* 88:*4, 5*
**91** 50:*16*
**911** 107:*18*
**91128(c** 120:*19*
**92** 50:*16*
**95** 13:*21*
**97** 21:*14*
**98** 21:*14*
**9850** 117:*22*

**< A >**
**a.m** 2:*8* 5:*2* 92:*6* 95:*25*
97:*5* 100:*22* 117:*1, 13*
108:*2* 109:*15* 110:*7, 9,
13*
**abdomen** 23:*18, 22* 97:*8,
21* 98:*1, 2, 6, 8, 9*
**abdominal** 19:*17* 32:*14,
24* 79:*5* 98:*3* 102:*17*
**ability** 84:*11* 105:*1*
**able** 24:*23* 25:*1* 28:*2*
50:*14* 62:*18, 19* 78:*2*
79:*7* 85:*13* 90:*1, 18*
91:*6, 8, 9* 98:*2* 99:*4*
106:*18* 107:*16*
**abrupt** 79:*6*
**absence** 9:*4, 7, 12*
**Abstracts** 41:*5*
**academic** 20:*24, 25* 21:*2*
87:*8* 88:*20* 94:*7*
**access** 104:*21*
**accomplish** 33:*13*
**accreditation** 24:*22*
**accrediting** 24:*21* 41:*20*
**accurate** 69:*23, 25*
94:*20, 22, 23*
**achieved** 17:*1*
**acid** 31:*8, 12*
**acronym** 40:*1, 11, 14*
46:*3*
**acting** 66:*12*
**ACTION** 1:*14* 119:*17,
18*
**activities** 38:*5*
**actual** 101:*7*
**acute** 30:*21*
**add** 51:*7*
**added** 59:*20*
**addition** 75:*17*
**additional** 60:*5* 77:*7*
**address** 11:*6, 8*
**addressing** 43:*17*

**administration** 54:*10, 17*
55:*1*
**administrative** 21:*16*
**Administrator** 1:*5*
**admission** 53:*23*
**admitted** 42:*22*
**admitting** 15:*24* 85:*18*
**adopting** 12:*6*
**Adult** 28:*9* 63:*25* 66:*20*
106:*21*
**advance** 71:*11* 112:*11*
**advertised** 46:*11*
**advice** 46:*9*
**affect** 81:*15* 82:*13* 85:*4*
**affiliations** 39:*20*
**aforesaid** 119:*13*
**age** 13:*6*
**agency** 24:*21* 41:*20*
120:*23*
**aggressive** 29:*4*
**ago** 5:*19* 63:*1* 69:*20*
**agree** 78:*18* 85:*2* 86:*10*
102:*1* 105:*24* 107:*23*
108:*13, 20, 21*
**agreed** 65:*12*
**agreement** 5:*11*
**ahead** 29:*11, 16* 82:*3*
110:*22*
**ahold** 86:*23*
**air** 38:*12* 79:*14* 80:*7*
83:*18* 97:*9*
**alive** 78:*9*
**allow** 24:*23* 68:*23*
**allowed** 24:*5* 71:*18*
111:*7*
**allows** 27:*18*
**ambulance** 79:*11* 80:*1*
81:*5* 82:*2, 6, 9* 86:*5*
108:*22* 109:*4*
**amend** 111:*12*
**American** 24:*18* 25:*5*
37:*17, 18* 39:*22* 40:*3, 16*
42:*6, 20, 25* 43:*3, 7, 9, 10*
**amount** 73:*16* 74:*8, 11*
76:*2* 96:*16* 117:*18*
118:*4*
**analyzing** 108:*1*
**ANGEL** 1:*8*
**Angela** 56:*14*
**annual** 45:*16*
**answer** 5:*13* 10:*23*
42:*21* 81:*11*
**answered** 31:*15*
**answers** 6:*2*
**anymore** 24:*8* 54:*15*
**apologize** 20:*19* 45:*22*
**appear** 15:*15* 44:*18*
**APPEARANCES** 3:*1*
**appeared** 93:*3* 117:*11*
**applied** 41:*16* 42:*15*

**apply** 108:*1*
**appreciate** 118:*18*
**approach** 23:*24*
**appropriate** 103:*14*
**approved** 41:*19* 113:*7*
**approximate** 56:*1, 3*
60:*12*
**approximately** 55:*23*
76:*1*
**area** 13:*7* 19:*23* 20:*7*
27:*1, 5* 29:*9* 33:*7* 35:*24*
47:*9* 48:*6, 8* 56:*25*
58:*16* 81:*5* 82:*8*
**areas** 14:*20* 26:*23* 29:*6*
33:*10* 35:*3, 13* 38:*5, 18*
43:*17* 47:*9*
**arrangements** 120:*6*
**arriving** 82:*12* 86:*4*
**article** 87:*15, 18, 21*
89:*5, 7, 8, 10* 93:*20, 24*
120:*2*
**articles** 38:*7, 19* 73:*5*
**Aside** 21:*8*
**asked** 35:*6* 39:*13* 43:*13*
45:*18* 46:*4* 52:*12* 57:*22*
58:*4* 61:*1, 2* 62:*19, 20*
67:*1* 70:*17* 71:*6* 76:*18*
83:*7* 111:*7*
**asking** 14:*23* 30:*16*
32:*1* 64:*15* 66:*5* 69:*11*
73:*1* 74:*20*
**asks** 77:*10*
**aspect** 54:*15*
**assessed** 33:*18*
**assessment** 79:*17*
**assignment** 61:*19*
**assistant** 113:*12*
**assistant's** 113:*13*
**associate** 48:*12*
**associations** 39:*20*
**assume** 16:*7* 21:*17, 25*
24:*14* 42:*12* 44:*22, 23*
45:*6* 105:*7, 12* 109:*1*
116:*24*
**assuming** 112:*20* 113:*3,
5*
**assumption** 105:*7*
**ate** 101:*13* 102:*1*
**ATLANTA** 1:*3* 2:*7* 3:*8,
17* 13:*7*
**attached** 4:*11* 120:*11*
**attacks** 29:*7*
**attend** 12:*17*
**attorney** 52:*22* 68:*24*
119:*15*
**ATTORNEYS** 3:*4* 5:*19*
47:*3* 74:*3* 119:*17*
**audio** 65:*14, 15* 66:*6*
**autopsy** 77:*19, 20*
**availability** 81:*25* 113:*14*

**available** 30:*25* 38:*7*
67:*2* 82:*1, 16, 21, 23*
**aware** 70:*7* 71:*20, 22*
87:*8* 94:*7, 12*

**< B >**
**bachelor** 16:*5, 8*
**back** 7:*10, 15* 16:*16*
18:*9* 25:*13* 33:*3, 5*
52:*11* 58:*9* 82:*11* 88:*24*
90:*20* 93:*20* 95:*6*
109:*10* 113:*4*
**backup** 19:*25*
**Bacteria** 30:*7*
**barrier** 27:*25*
**base** 34:*5* 92:*1*
**Based** 43:*15* 72:*24* 83:*1*
87:*23* 91:*17* 93:*17*
96:*24* 97:*10* 99:*19*
104:*21* 107:*4* 110:*2*
**baseline** 87:*23* 92:*12, 14*
96:*2, 3, 7, 13*
**basic** 34:*5* 79:*22*
**basically** 35:*25* 41:*19*
96:*9*
**basis** 16:*10* 27:*14* 64:*7*
103:*16* 111:*20*
**bear** 16:*9* 53:*9*
**bearing** 16:*23*
**bed** 82:*7*
**beds** 82:*5, 16*
**beginning** 22:*16*
**begun** 79:*12* 80:*4* 94:*11*
**behaving** 66:*12*
**behavior** 92:*24* 93:*1*
100:*5, 9, 11, 14, 19* 101:*3,
6*
**beholden** 54:*25*
**belief** 101:*5* 103:*1*
**believe** 11:*21* 12:*1*
13:*15* 39:*13* 46:*13*
51:*22* 55:*22* 57:*10*
68:*17* 71:*8* 88:*19* 89:*24*
93:*17* 94:*21* 97:*13* 99:*6,
25* 100:*8* 101:*15, 17, 18*
104:*24* 107:*8*
**believed** 103:*2*
**beneficial** 22:*19* 77:*14,
23*
**benefit** 78:*8, 11*
**best** 32:*1* 43:*5* 89:*24*
117:*8*
**better** 31:*15* 51:*8*
**beyond** 29:*1* 98:*25*
105:*1, 6*
**bigger** 114:*11*
**biliary** 112:*18*
**bill** 117:*12*
**biological** 62:*14*
**biology** 16:*11*
**birth** 11:*10*

**bit** 24:*1* 36:*13* 53:*12*
97:*23* 111:*20*
**bladders** 20:*2*
**bloating** 32:*14*
**blood** 8:*23* 9:*1* 29:*5, 8,
23* 89:*25* 90:*7, 13, 15, 17,
22, 25* 92:*10* 93:*7* 95:*25*
96:*2, 4, 7* 99:*9, 14*
100:*16*
**blue** 8:*7* 9:*7, 18* 91:*19*
**BMAC** 18:*6*
**board** 24:*17, 18, 21* 25:*5*
33:*16, 17, 19* 35:*14*
37:*16, 17, 18* 39:*6* 42:*8*
43:*1* 120:*3*
**board's** 33:*15*
**body** 51:*5* 78:*3* 90:*16*
96:*14*
**Bollig** 44:*3*
**born** 11:*12*
**Boulevard** 2:*5* 3:*6*
**bowel** 79:*15* 80:*7* 83:*19*
**brain** 91:*1* 93:*8* 100:*17*
**branch** 13:*18*
**BRANSON** 1:*16*
**break** 6:*6* 27:*17* 38:*12,
17* 72:*10* 79:*20*
**breaking** 27:*25*
**breast** 35:*14*
**BRIAN** 2:*3* 4:*4, 14* 5:*5,
10, 17*
**brief** 79:*13*
**bring** 19:*25* 53:*9* 108:*4*
109:*10, 21*
**bringing** 27:*7* 82:*3*
**brings** 117:*21*
**BRITTON** 1:*19*
**brought** 5:*20* 8:*4, 12*
16:*9* 49:*7, 10, 19* 81:*4*
83:*6* 103:*20*
**bucks** 118:*5*
**building** 34:*5*
**built** 23:*2*
**BURNETTE** 2:*12* 119:*8,
24* 121:*4*
**business** 34:*17* 46:*6, 7*

**< C >**
**C02** 23:*18*
**call** 14:*5* 17:*17* 49:*15,
16* 80:*9* 82:*3* 91:*19*
97:*8, 14* 108:*22* 109:*3, 5*
111:*25* 112:*3, 18* 113:*3,
4*
**called** 8:*7* 21:*22* 45:*17*
77:*6* 79:*16* 83:*20, 23*
107:*18* 110:*6, 18* 113:*1,
6* 114:*18, 20*
**calling** 48:*13*
**CALLOWAY** 1:*8*

**calls** 49:*13*
**camera** 27:*24*
**cancel** 113:*19, 21* 114:*4,
16, 21*
**cancer** 114:*1, 7, 9, 10, 12,
13*
**capacity** 14:*18, 23* 34:*11*
46:*9, 17* 47:*22, 24*
**capillaries** 90:*19*
**cardiologist** 113:*8*
**care** 45:*7* 48:*16, 20*
49:*3, 23* 50:*3* 52:*18*
53:*2* 54:*18, 20, 24* 57:*19*
58:*22* 61:*24* 62:*1, 2*
63:*19, 21* 71:*17* 88:*6*
103:*11, 14, 19* 104:*3, 25*
105:*1, 4, 14* 108:*1, 7, 12,
14* 109:*4, 6*
**career** 19:*3*
**carrier** 113:*2*
**case** 16:*9* 20:*5, 11*
21:*21* 22:*3, 25* 26:*23*
28:*6* 43:*18* 44:*2, 4, 15,
17* 46:*15, 16* 48:*8* 53:*10*
55:*15* 56:*19* 57:*10, 11,
16, 18, 22, 25* 58:*2, 4, 6, 7,
11, 14* 60:*1, 6, 9, 22*
61:*13, 14, 17, 20* 62:*24*
63:*10* 65:*7* 69:*6* 72:*5,
20* 74:*2, 25* 75:*2, 25*
77:*4, 8, 12* 85:*3, 8, 21*
89:*12* 99:*1* 104:*4*
111:*10* 115:*15* 116:*23*
117:*6* 120:*22* 121:*1*
**cases** 43:*24* 44:*12, 24*
45:*1, 2, 4, 7, 12* 46:*25*
47:*17* 48:*2* 55:*10, 11, 24*
56:*4, 10, 18, 19* 57:*13*
**catastrophic** 113:*22, 23*
114:*18, 19*
**category** 21:*7* 36:*17*
**cause** 28:*3, 17, 20* 29:*19*
30:*4, 5, 22* 88:*16* 99:*16*
**caused** 28:*6* 30:*1*
**causes** 27:*20*
**causing** 114:*11*
**CCADC** 92:*13* 96:*3*
**CCR2870** 121:*4*
**CCTV** 11:*2*
**cell** 8:*4, 17* 9:*7, 18*
100:*1*
**Center** 28:*9* 38:*25* 53:*7*
63:*25* 66:*20* 104:*16*
106:*22*
**centers** 44:*20*
**CEO** 34:*10, 15, 22* 37:*3,
8, 12*
**certain** 33:*10* 96:*14*
98:*3* 105:*24*
**certainly** 99:*3*

Brian S. Myers, M.D., F.A.C.S.

3/13/2023
Page 3

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 37 of 48
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 42 of 180

certainty 31:*19, 22*
94:*25* 103:*10* 107:*16*
CERTIFICATE 119:*2*
certification 25:*4, 5*
33:*17, 20*
certified 24:*17* 35:*14*
39:*6* 42:*8* 119:*25* 120:*7,*
*13*
certify 119:*8, 14*
certifying 43:*1*
chair 54:*3, 13, 14*
chairman 53:*18, 20*
chance 8:*14, 18, 20* 9:*2,*
*22* 38:*11* 88:*5*
change 93:*22* 100:*14*
109:*20, 23* 111:*12*
changed 59:*19, 20*
changes 33:*14, 21* 69:*3*
charge 120:*25*
charged 15:*4* 117:*18*
charges 117:*17*
charging 117:*4*
CHARLES 1:*17*
Charleston 12:*10, 18*
check 38:*12*
checked 50:*18*
checking 30:*3* 51:*24*
chest 79:*14* 97:*8*
chief 21:*13, 23*
child 1:*7, 10, 12*
childhood 12:*15*
children 13:*2*
church 13:*10*
circumstances 81:*15*
cities 12:*14*
civic 13:*9*
CIVIL 1:*14* 60:*24*
68:*22*
Clarification 9:*16*
clarify 27:*13*
class 89:*4*
clean 23:*19*
clear 18:*22* 48:*15* 61:*25*
76:*19* 94:*6* 116:*9*
clearance 113:*6, 9*
clinic 62:*8, 10*
clinical 21:*16* 38:*23*
clinically 81:*18*
Close 9:*3*
closed 23:*20*
closest 82:*6*
CME 33:*9, 12* 34:*2, 3*
38:*4* 41:*11, 12, 13, 15, 16,*
*25*
Cobb 5:*19* 28:*9* 63:*25*
65:*16, 17* 66:*20* 85:*22*
cocaine 27:*24* 28:*23*
29:*2, 13* 88:*15, 17, 21*
code 8:*7* 9:*6, 18* 91:*19*
colic 112:*18*

colleague 73:*3*
colleagues 41:*9, 15*
collect 75:*18*
College 17:*2, 15* 39:*22*
42:*6, 25* 43:*3, 7, 9, 10*
colon 114:*1*
Columbus 17:*2*
com 46:*2*
come 25:*13* 33:*1, 3*
66:*12* 79:*16* 80:*13*
114:*2*
comers 88:*3*
comes 74:*4* 112:*17*
coming 82:*2* 118:*18*
command 14:*6*
Commander 14:*1*
common 28:*1* 30:*9*
40:*13* 52:*16* 85:*14*
112:*19*
commonly 21:*21* 27:*22*
communicated 68:*17*
communications 68:*23*
70:*21*
community 103:*22*
comorbidities 88:*2*
compared 92:*14*
compensation 70:*23*
complaining 104:*11*
complaint 10:*21*
complete 66:*13* 71:*19*
completing 33:*6*
complex 52:*6*
complicated 50:*20* 51:*24*
concern 45:*4, 7* 100:*12*
114:*9*
concerning 60:*22*
concerns 20:*5*
concluded 118:*21*
conclusion 9:*9, 13* 99:*5*
103:*8*
conclusions 76:*23* 77:*13,*
*15* 96:*20* 99:*18, 21*
condition 65:*6* 98:*17*
100:*9*
conditional 88:*9*
conditioner 38:*13*
conditions 18:*24* 19:*17,*
*18* 32:*22* 52:*2* 66:*11*
conference 40:*19*
conferences 47:*2*
confined 53:*3* 104:*15*
confining 49:*11*
confirm 7:*17* 10:*2* 97:*9*
confusion 93:*3* 100:*16*
connected 119:*17*
consent 81:*20*
consider 19:*9* 26:*13*
28:*16*
consideration 23:*11*
considered 17:*25* 18:*2*

35:*12* 70:*23*
consistent 100:*6, 8* 101:*4*
constrict 29:*23*
constriction 29:*18, 21, 22*
constrictor 29:*4*
consult 58:*4* 72:*22* 73:*1,*
*2* 85:*15*
consulted 55:*23* 87:*18*
consulting 47:*24* 62:*25*
contact 60:*19* 71:*9*
contacted 60:*8, 14, 16*
120:*16*
contained 116:*23*
contains 58:*10*
contents 19:*19* 23:*19*
27:*18* 89:*16* 98:*4* 102:*9*
context 37:*21* 48:*17, 25*
49:*3* 52:*24* 57:*19* 62:*3*
83:*12* 89:*23*
continue 71:*4, 5*
CONTINUED 2:*1* 31:*4*
continuing 17:*18*
continuous 31:*20*
contract 29:*8* 49:*23*
52:*17* 98:*6* 120:*18*
contract/agreement
120:*21*
contracted 30:*8*
contradicted 7:*18*
contribute 29:*2*
contributes 29:*14* 30:*13*
contributing 88:*16*
convenient 7:*2*
conversation 7:*12* 111:*6,*
*11* 116:*25*
conveyed 60:*19*
cooperative 81:*19*
coordinate 113:*13*
COPD 88:*9*
copy 71:*18* 74:*6* 89:*8*
115:*14, 18* 116:*6*
Corp 13:*19*
Correct 6:*5* 8:*8, 25*
10:*10, 11* 12:*16* 14:*10*
15:*17, 25* 16:*3, 6, 13, 14*
17:*3* 20:*5, 6* 21:*24* 22:*5,*
*7, 8, 10* 24:*7, 16, 19* 25:*3,*
*24, 25* 26:*2, 3, 18, 21*
27:*11* 32:*6* 33:*19* 36:*10*
39:*16, 19* 41:*3, 10, 17*
43:*19, 25* 44:*1, 13, 16, 18,*
*20, 25* 45:*6, 9* 47:*7, 15,*
*16, 19* 49:*12* 50:*13*
55:*15, 25* 56:*9, 15, 17*
58:*11, 19, 24* 59:*2* 62:*15*
64:*10* 65:*4* 73:*11* 75:*7,*
*13, 16, 24* 77:*21* 83:*25*
85:*5, 6, 22* 103:*6, 7, 25*
104:*1* 105:*25* 106:*16, 17*
107:*13, 14* 108:*23, 24*

112:*10* 117:*19, 20*
119:*12*
correction 6:*15* 20:*8*
49:*21*
correctional 59:*1* 62:*3*
corrections 45:*8* 48:*17,*
*25* 49:*3, 18* 57:*19*
correctly 6:*20* 99:*13*
correspondence 68:*15*
corroborate 77:*15*
costs 76:*7*
couch 100:*7*
cough 50:*21*
Council 120:*4*
counsel 5:*11* 53:*19*
54:*5, 7, 14* 65:*1* 67:*11*
68:*15* 76:*2* 119:*15, 17*
120:*10, 22*
counsels 54:*1*
country 114:*2*
County 5:*20* 12:*20*
28:*9* 63:*25* 65:*16, 17*
66:*20* 85:*22* 119:*6*
Couple 84:*4, 11, 17, 19*
87:*4* 118:*5, 15*
coupled 97:*1*
course 21:*10* 22:*6* 23:*5*
31:*13* 83:*11* 111:*6*
courses 33:*9* 46:*8*
coursework 16:*7* 17:*11*
34:*2, 3*
COURT 1:*1* 6:*1* 57:*4,*
*25* 114:*19, 20, 23* 115:*8*
119:*25* 120:*1, 3, 4, 7, 8,*
*13, 16, 21*
cover 12:*14* 120:*24*
covers 12:*14*
created 69:*18*
credit 41:*15, 16, 23*
credits 41:*24*
criminal 15:*2, 4* 39:*10*
CSR-2870 2:*12* 119:*25*
Cumberland 2:*5* 3:*6*
current 11:*6* 25:*21*
38:*5, 17*
currently 12:*20* 34:*7*
38:*8* 55:*7*
CURRICULUM 4:*15*
41:*19*
customary 121:*1*
CV 12:*2* 15:*12, 18* 33:*5*
37:*5, 7* 43:*15* 50:*11*

< D >
data 70:*23* 94:*2*
DATE 2:*4* 11:*10* 47:*5,*
*6* 60:*10* 69:*20* 74:*9*
dated 46:*15* 59:*11*
119:*20*
day 74:*13* 76:*6* 111:*24*

**114**:*15* **119**:*20*
**days** 11:*3* 87:*4* 89:*18*
**dealing** 52:7 96:*10*
**deals** 18:*23*
**death** 11:*4* 107:7
**December** 33:*24* 59:*11*
63:*3*
**decide** 84:*11* 112:*24*
**decided** 58:*3*
**decision** 108:*14, 15*
**decisions** 96:*24*
**declared** 107:*9*
**deem** 22:*22*
**DEFENDANT** 3:*12*
56:*8, 12, 21, 22*
**Defendants** 1:*22*
**Defendant's** 10:*15* 57:2
**defense** 61:9, *13*
**defer** 78:*19*
**define** 11:*15*
**defined** 109:*23*
**degree** 16:5 31:*22*
94:*25* 103:9 107:*16*
**DEKALB** 119:6
**delays** 86:*23*
**deleted** 59:*20*
**demonstrated** 92:*13* 96:2
**denotes** 105:*24*
**Department** 53:*21* 54:*3,
11, 14*
**departmental** 54:*12*
**dependent** 88:*1*
**depending** 33:*14* 36:*21*
75:6 111:*25*
**depends** 11:*15* 20:9
80:*21* 82:*25* 86:*22*
**DEPOSITION** 2:*3* 5:*10,
22* 6:*19* 7:9 10:*1, 20*
44:*12* 47:*21* 48:*13*
65:*20* 66:6 73:*14, 18, 19*
75:7, 8 76:*4* 115:*18*
120:6, *9, 11, 17, 18, 24*
**depositions** 5:*25* 7:*1*
118:*15*
**deputies** 5:*20*
**DEPUTY** 1:*18, 19, 20*
**derived** 55:*20*
**describe** 66:7 89:*24*
**described** 74:*18* 86:*4*
**describes** 99:*9*
**DESCRIPTION** 4:*13*
**designated** 119:*10*
**destroy** 68:7, *10*
**destroyed** 68:*13*
**detail** 16:*16*
**details** 10:2
**Detention** 28:9 63:*25*
66:*20* 104:*16* 106:*22*
**determination** 8:*16*
79:*18* 84:7, *20* 105:*9*

**determine** 8:*13* 91:*8, 10*
**determining** 28:*16*
**detox** 100:*13*
**detoxing** 100:*11*
**develop** 30:*1* 72:*23*
**develops** 30:*10*
**diabetes** 88:*10*
**diagnose** 100:*18*
**diagnosis** 101:7 114:*8*
**diagnostic** 29:*25* 32:*17*
101:*9*
**die** 114:*10*
**died** 63:*12*
**difference** 56:*24*
**differences** 18:*16*
**different** 15:*25* 31:*11*
42:*24* 52:*21, 23* 66:*21*
81:*14* 103:*23, 24* 111:*8,
10*
**differently** 42:*25*
**difficult** 113:*19*
**diffuse** 97:*22*
**dilute** 102:*9*
**directory** 45:*15, 17*
46:*10*
**discharged** 14:*11*
**discipline** 37:*22*
**disciplined** 37:*15*
**disclosure** 65:*25* 120:*1,
5, 12*
**discount** 121:2
**discoverable** 68:*25*
**discovery** 5:*12* 15:*14*
43:*23*
**discreet** 30:*22*
**discuss** 24:*1*
**discussed** 6:*10* 12:*14*
58:*20* 61:5, *9, 16* 106:*14*
**discussing** 71:*14* 93:*21*
117:*2*
**discussion** 99:*23* 112:*22*
**discussions** 43:*15* 72:*1, 4*
**disease** 30:*20* 36:*3*
61:*21* 63:*17*
**disorders** 21:*4*
**distinct** 11:*1*
**distinction** 16:6, *8*
**DISTRICT** 1:*1, 2*
**diversion** 82:*4*
**divert** 82:6
**divided** 54:*17*
**DIVISION** 1:*3*
**dizzy** 93:*10*
**Doctor** 15:9 38:*16* 51:*4*
77:*11* 95:*17*
**doctorate** 17:*1*
**doctors** 14:6 41:*15*
44:*19*
**document** 10:*13* 15:7,
*20* 43:*22* 44:*5* 87:*11, 12*
116:*16*

**documentary** 70:7, *10*
71:*19, 21* 72:2
**documentation** 47:2
**documented** 63:*20* 92:*5,
15, 19*
**documents** 7:*14, 15, 21*
65:*10* 70:*4* 72:*17* 74:*10*
95:*20* 116:*10*
**doing** 21:*3* 25:*23* 43:*5*
65:*19* 74:*13* 81:*22*
93:*11* 103:*1*
**domain** 71:2
**door** 51:*10* 81:*12*
**doors** 85:*15*
**dot** 46:2
**dozens** 115:*20*
**Dr** 5:*10, 15* 71:*3* 77:*9*
111:*15, 19*
**drafting** 68:*16* 73:8, *9*
**drafts** 67:*17*
**draw** 99:*18, 21*
**drawing** 88:*24*
**drawn** 96:*21*
**drink** 101:*21, 23* 102:*11*
**drinking** 102:*17, 20*
103:*3*
**drinks** 101:*14* 102:*18*
**drive** 79:*10*
**driven** 79:*25*
**Driving** 80:*20*
**drop** 90:*25* 99:*9*
**dropping** 93:*5*
**drops** 89:*25* 90:7, *22*
93:*7, 9*
**due** 118:*5*
**duly** 5:*7*
**duodenum** 35:*22* 36:*16,
18, 19, 20, 21*
**duties** 14:*2, 6*
**dying** 87:*2*

**< E >**
**earlier** 84:*12* 88:*14*
102:*4* 106:*14* 117:2
**easy** 45:*18* 113:*21*
**eat** 102:*11*
**eating** 32:*15* 102:*5, 17,
19, 23* 103:*3*
**eats** 101:*14* 102:*18*
**education** 16:2 17:*18*
43:*2* 46:*8*
**effect** 88:*21*
**eight** 12:*13* 47:*21* 92:*4*
95:*23* 99:*20*
**Either** 23:*20* 25:*8* 36:5
47:*24* 53:5 55:*23* 60:*17*
65:*22* 67:*1* 77:*14* 80:*1*
**elective** 111:*23* 112:7, *8,
19* 113:*17, 18*
**electronic** 68:*24*

**elevated** 92:*14*
**e-mail** 60:*15* 68:*17*
**e-mailed** 115:*14, 25*
116:2
**emergency** 79:*12* 80:*17*
81:*3, 9, 23* 83:*12* 84:*14*
95:*18* 103:*11, 14, 19, 20,
21* 104:*3, 12, 22, 23*
105:*2, 14, 21* 109:*10*
110:*18* 112:7
**employ** 75:*9*
**employed** 23:*16* 34:7, *25*
54:*22, 25* 75:*11*
**employee** 119:*15, 16*
**employer** 120:*8*
**employment** 53:*14*
**EMS** 82:2
**encompasses** 35:*25*
47:*13*
**endocrine** 19:*18* 35:*16*
**Endoscopic** 40:*4, 6, 9, 16*
**English** 16:*20*
**entail** 19:*15*
**entails** 21:*15*
**enterologist** 20:*16*
**entire** 18:2
**entities** 43:*1* 54:*23* 55:8
**entitled** 78:*21*
**entity** 120:*10*
**environment** 82:*25*
**equally** 109:*14*
**ER** 28:*12* 62:*10* 79:*11*
80:*4, 23* 82:*3, 5, 20* 83:5,
6* 85:*13* 104:*4, 8, 17*
105:*20* 107:9 108:*15*
110:*25* 111:*1*
**ERIKA** 1:9
**eroding** 27:*19*
**errata** 6:*15*
**escapes** 17:*17*
**Esophagus** 35:*22* 36:*16,
18*
**Esquire** 3:*5, 14*
**establish** 30:*1* 32:*18, 20*
**established** 32:*19*
**Estate** 1:6 44:*3*
**estimate** 25:*10*
**evaluating** 80:*6*
**evaluation** 103:*21*
**evasive** 40:*12*
**evenings** 112:2
**events** 8:*5* 65:7
**eventually** 12:2
**evidence** 27:*24*
**exact** 75:*1*
**exactly** 7:*24* 32:*18* 63:2
65:*13* 91:*21, 24* 117:*12*
**exam** 84:*1, 2* 97:*11, 20*
98:*15, 16, 24* 99:*3*
**EXAMINATION** 4:*6, 7,
8* 5:*14* 111:*17* 115:*5*



Brian S. Myers, M.D., F.A.C.S.

3/13/2023
Page 5

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 39 of 48
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 44 of 180

examinations 49:*17* 50:*4*, *5*, *7* 78:*16*
examine 78:*3* 111:*7*
examined 5:*7* 77:*24*
examiner 78:*19*
examining 15:*20* 44:*5* 50:*9* 98:*19* 116:*16*
exceeded 105:*5*
Excel 73:*22*
excluded 67:*15*
Excluding 75:*14*
Executive 54:*4*, *7*
EXHIBIT 4:*14*, *15*, *16*, *17* 10:*13*, *14*, *16* 15:*7*, *8*, *10* 17:*13* 34:*4* 43:*20*, *21*, *22* 46:*14* 47:*5*, *13* 56:*11* 58:*10* 73:*10* 107:*5* 111:*11* 115:*24* 116:*4*, *15*, *17*
EXHIBITS 4:*10*, *11*, *13*
exist 67:*2*
existed 9:*8*
exists 23:*21*
exits 36:*25*
expect 63:*5* 97:*2* 98:*18*, *22* 104:*25*
expected 98:*16*
expeditiously 80:*18*
expense 114:*6*
experience 22:*2*, *6*, *9*, *24* 49:*2* 52:*19* 53:*9* 78:*16* 81:*2*, *3* 83:*22* 86:*14* 94:*1*, *3*, *13* 97:*11*, *15* 99:*2* 100:*13* 106:*5* 110:*1*
experienced 61:*23* 62:*13*
experiences 53:*5*, *9*
expert 14:*24* 26:*4*, *7*, *13*, *19* 27:*7* 45:*10* 46:*9*, *12*, *18*, *22*, *24* 47:*23*, *24*, *25* 48:*6* 53:*2*, *16*, *17* 55:*20* 57:*5* 60:*9*, *21* 68:*23*
expertise 14:*19*, *20* 26:*12*, *15*, *23* 27:*1*, *5* 38:*6*, *18* 47:*9* 48:*6*, *8* 56:*25* 58:*17* 99:*1*
experts 72:*2*, *5*
expire 24:*6*
explanation 61:*21* 101:*6*
exponentially 94:*4*, *14*
extended 54:*20*
extent 49:*24* 68:*22* 70:*25*
extra 18:*3* 33:*10* 43:*4* 76:*6* 104:*22* 117:*21*
extreme 81:*7*
extremely 26:*10* 98:*9*

< F >
facilities 49:*18*, *24* 59:*1*

facility 49:*11*, *21* 62:*4* 85:*19* 104:*25* 105:*9*
FACS 2:*3* 4:*4*
fact 16:*10* 50:*2* 64:*11*, *22*
factors 28:*20*, *22*, *24* 30:*17* 112:*16*
facts 70:*23* 72:*24*
failed 42:*16*
failure 88:*10*
faint 90:*25* 93:*11* 99:*16*, *19*
fainting 93:*12*, *13* 100:*16*
fair 62:*11* 73:*7* 75:*14* 101:*2* 115:*25*
fall 20:*8*, *14* 21:*5* 36:*10* 93:*10*
falling 100:*1*
falls 20:*12* 21:*7* 54:*12*
family 5:*21* 12:*4* 80:*2* 114:*1*, *15*
far 112:*11*
fashioned 49:*17*
fast 81:*15*, *21*
faster 81:*9*, *12* 94:*17*
fat 23:*21*
FATIMA 1:*11*
February 118:*3*
Federal 68:*22*
FedEx'd 118:*10*
fee 45:*16*
feel 61:*4* 68:*4*
fellow 20:*21* 21:*9* 38:*22* 43:*7*
fellowship 22:*11*, *13*, *20*, *25* 23:*4* 33:*6* 35:*11*
felt 89:*20*
field 17:*12* 19:*1* 21:*6*
figure 9:*21* 32:*2* 48:*14*
FILE 1:*14* 58:*3*
filed 46:*16* 57:*25*
files 65:*14*, *15*
final 21:*22* 95:*22* 99:*8*
financial 121:*2*
financially 119:*18*
find 7:*16*, *18* 8:*10* 24:*23* 63:*2* 66:*11* 97:*21* 98:*15*, *22* 113:*10*
fine 18:*16* 32:*3*, *5* 45:*20*
fingertips 90:*18*
finished 68:*11*
firm 61:*17* 98:*1*, *6*, *12*
first 5:*6* 18:*20* 36:*24* 46:*15*, *17*, *21* 47:*3* 56:*13* 60:*8* 62:*23* 114:*5*
fit 40:*14* 100:*16* 113:*11*
five 11:*17* 35:*2*, *3* 75:*3*, *4* 89:*18*
fix 23:*8*
flow 29:*24* 100:*16*

fluctuate 75:*6*
fluid 111:*22*
focus 17:*7* 25:*23* 43:*3*
focused 19:*19*
follow 45:*20*
followed 77:*22*
following 120:*12*
follows 5:*8*
food 101:*13*, *20* 102:*1*
foregoing 119:*9*, *11*
foregut 35:*19*, *21*, *23* 36:*8*, *9*, *11*, *12*, *14*
forensic 78:*16*
form 5:*13* 9:*15* 16:*9* 26:*9*, *23* 27:*3* 28:*18* 60:*25* 65:*1* 66:*8*, *12* 70:*24* 72:*17* 80:*25* 81:*16* 86:*20* 93:*16* 94:*19* 101:*8* 104:*9*, *19* 106:*9* 107:*20* 108:*3* 110:*22* 120:*5*, *11*
formal 33:*7* 39:*1* 42:*10*
formally 41:*7*
format 65:*22*
formation 29:*14*
formed 26:*22* 27:*2* 89:*11*
forming 16:*15* 58:*16* 73:*8*
forth 20:*2* 33:*11* 43:*6*
forty 72:*9*
found 37:*1* 57:*4*
foundational 16:*13*
four 63:*7* 113:*2* 118:*12*, *15*
frame 85:*14* 86:*13* 87:*9* 110:*19*
free 79:*14* 80:*6* 83:*18* 97:*9* 104:*12*
FREEMAN 3:*13*
Friday 91:*5*, *6*, *9* 114:*24*
Fridays 111:*23*
friend 1:*9*, *11* 80:*1*
friends 114:*1*
full 5:*16* 82:*5* 94:*9*
function 46:*8*
functions 35:*17* 55:*3*
further 17:*25* 35:*7* 79:*20* 80:*15* 83:*7* 90:*23* 118:*8* 119:*14*
Furthermore 103:*13*
futile 109:*7*

< G >
gal 112:*19*
Galleria 3:*15*
gaps 24:*11*
GARDNER 3:*4*, *5* 4:*7* 6:*11* 7:*6*, *12* 9:*15* 26:*9* 27:*3* 28:*18* 29:*10*, *16* 38:*11* 55:*14*, *17* 57:*9*

58:*2*, *6* 60:*17*, *25* 61:*6*, *16*, *20* 62:*12* 65:*24* 66:*2*, *4* 68:*21* 69:*18* 70:*14*, *19* 71:*5* 72:*11* 74:*16*, *22* 76:*15* 77:*10*, *11* 80:*25* 81:*16* 82:*18* 84:*9* 86:*20* 93:*16* 94:*19* 96:*22* 98:*20*, *25* 101:*8* 104:*9*, *19* 105:*6*, *10*, *13* 106:*9* 107:*20* 108:*3* 109:*17* 110:*22* 111:*15*, *16*, *18* 115:*3*, *11*, *17*, *22* 116:*2* 117:*4* 118:*8*, *10*, *12*, *17*
Gardner's 71:*8*
GARY 3:*13*
gastric 20:*5*, *8*, *15*, *16* 21:*5* 23:*19* 24:*2* 25:*9*, *14* 26:*5*, *8*, *15* 27:*16*, *17*, *18*, *21* 29:*3*, *12* 30:*2*, *5*, *12*, *18*, *24* 31:*3*, *7*, *18* 32:*3*, *8*, *18*, *20* 36:*4* 45:*4* 78:*22* 88:*16*, *22* 89:*15*, *16* 97:*18* 102:*6*, *9*, *10*
Gastroenterologist 26:*16*, *17* 27:*11* 31:*16*
gastroenterology 17:*8* 21:*11* 26:*20* 27:*8*
Gastroesophageal 36:*3*
gastrointestinal 20:*20* 21:*4*, *6*, *9* 40:*3*, *6*, *16*, *18*
gastrologist 27:*14*
general 18:*11*, *24* 19:*5*, *10*, *13*, *14*, *20* 20:*1*, *12*, *17* 21:*7*, *15*, *18*, *21*, *23* 23:*24* 24:*17*, *18*, *21* 25:*5* 26:*25* 27:*5*, *14* 33:*16* 35:*5*, *7*, *15*, *16* 36:*15*, *16* 37:*16* 39:*4* 47:*10* 48:*5*, *10*, *11*, *18* 50:*8* 51:*21* 52:*3*, *5* 57:*3*, *21* 58:*17* 74:*8* 79:*16* 80:*9*, *11* 81:*1*, *4*, *10* 83:*4*, *20*, *23* 85:*17* 86:*6*, *13* 94:*3* 112:*3*
generally 20:*3* 21:*13* 25:*19* 62:*6* 66:*8* 111:*23* 115:*1*
generate 90:*18*
George 12:*18*
GEORGIA 1:*2* 2:*7* 3:*8*, *17* 11:*7* 24:*10*, *12* 119:*4* 120:*4*, *13*
germane 68:*4*
get's 88:*6*
getting 41:*18* 78:*25* 81:*20* 82:*14* 85:*11* 91:*1* 114:*11*
GI 40:*8*
give 40:*19* 42:*12* 47:*18* 57:*13*, *15* 62:*16* 68:*18* 81:*1* 91:*7* 115:*17*

Brian S. Myers, M.D., F.A.C.S.       3/13/2023
Page 6

Case 1:20-cv-03662-VMC Document 211-2 Filed 08/31/23 Page 40 of 48
USCA11 Case: 24-10933 Document: 31-3 Date Filed: 06/11/2024 Page: 45 of 180

**given** 5:22 14:20, 24
43:24 47:14 65:5 71:11,
18 98:17 101:13 114:25
115:2 121:2
**giving** 53:16, 17 62:24
**glad** 52:13
**go** 11:18, 22 12:8 16:1
25:13 29:11, 16 37:7
40:5 49:17 51:9 70:12
71:24 72:15 79:18, 21
82:7, 8 95:5, 7 97:12
102:11 104:16, 17 105:2,
13 110:22 114:23
115:12 118:15
**goal** 84:24
**goes** 75:23 87:13, 14
88:25 90:3 91:4, 5 94:4,
18
**going** 10:13 15:2, 7
16:1 18:9 25:1 27:10
31:22 32:4 33:3, 5
44:17 48:13 52:20 53:6,
7 58:9 61:23 62:15, 16
67:22 68:21 70:19 71:3
82:1, 11 83:9 84:7, 25
87:6, 11 88:5, 10, 24
93:18, 20 95:6 97:3, 6,
16, 24 98:4 99:8 100:22
102:13 103:3, 22 105:20,
22 106:3, 25 108:15
109:10 110:1 112:23
114:6, 10 116:24
**gonna** 87:3
**good** 40:19, 20 42:8, 10
54:24 97:20 98:15
118:13
**GORDON** 1:17
**gotten** 25:17 41:14
**Governance** 53:19
**graduated** 16:2
**grandchildren** 13:4
**grant** 43:6
**graph** 69:16, 21 111:2
**greater** 106:6, 7, 11
**grew** 11:14, 15
**group** 13:10 35:17
37:22 54:24
**grow** 12:3 88:13
**growing** 31:21 114:10
**guess** 14:23 16:12
18:11 30:15 37:17
40:22, 24 42:4 43:1, 4
47:21 49:16 60:13
61:12 73:17 74:19
82:11 116:9

**< H >**
**hair** 33:4
**half** 50:16 54:19
**halfway** 97:19

**hall** 73:3
**handful** 52:22
**hands** 23:13 26:2
**handwritten** 67:24, 25
**happen** 82:2 103:22
112:7
**happened** 78:13 79:7
**happens** 52:17 78:24
90:23
**happy** 6:7
**hard** 9:20 91:16 111:22
**HARRIS** 1:16
**head** 50:21 99:16
101:15, 17, 20, 21, 22, 24
**Health** 18:6 22:12 33:6
38:24
**healthy** 88:4, 11
**hear** 57:14
**Heart** 8:23 9:1 29:7
88:10 90:18 92:14 93:8
**held** 43:11 51:19 65:21
**help** 8:13 18:22 22:21
55:2 65:1 66:8 72:23
102:20
**helped** 8:15 66:23
**helpful** 6:13
**Henry** 12:22 53:19, 20,
21 54:8
**here,"that** 102:15
**hereto** 4:11
**hernias** 50:10, 18 51:25
**hesitation** 60:21
**Hey** 58:2 118:17
**high** 12:12, 17, 18 83:3
**higher** 88:11 96:11
114:13
**Historically** 19:20
**history** 15:2 16:20
32:19, 20 63:16 64:1, 9,
12, 18 66:22 80:14 84:3
97:1, 2, 10, 12
**hits** 104:13
**hold** 51:13 113:3
**hole** 23:20 86:24
**home** 89:18
**honorably** 14:11
**hopefully** 54:23
**hospital** 24:23 51:8, 13,
19 53:8, 19, 20, 21, 24
54:8, 11, 16, 17, 18, 22
55:1, 4 79:10 80:1, 20
82:6, 12, 15 85:11 86:12
114:3
**hospitals** 25:2 54:16
**hour** 75:3, 10, 12 81:11
84:13 85:8 86:23 87:6,
13, 14, 15 89:1 93:22, 25
95:2 106:16 113:2
**hourly** 75:2, 8

**hours** 11:4 33:12 73:15,
21 87:10 89:21, 23 95:2,
3 118:12
**Huddleston** 44:3
**Hudson** 11:24, 25 12:9
**hundred** 75:3, 4 118:5
**hung** 113:4
**hurt** 98:11
**hurts** 98:10
**hypotension** 93:4 99:11,
23 100:6, 18, 23 101:3
**hypotensions** 99:14
**hypotensive** 90:25
**hypothetical** 78:1

**< I >**
**idea** 41:25
**identification** 10:14
15:8 43:21 116:4
**identified** 65:24
**identify** 7:24 30:4
**identifying** 68:8
**ignorance** 20:20
**ignored** 32:25
**ill** 96:13
**immediately** 81:6 82:10
84:24 101:1 104:13
**impacted** 88:17
**implying** 87:2
**impression** 81:2, 10
85:17 94:3
**impressions** 68:19
**improved** 32:15
**Inaccurate** 94:22
**incident** 10:6 30:22
67:8 70:5, 8
**incision** 84:22
**incisions** 23:17
**include** 34:22 48:2
73:19 76:10 81:25
98:14 99:23
**included** 76:11
**includes** 73:17
**including** 56:18
**inclusive** 76:8
**income** 55:19
**incorrectly** 44:23
**increase** 41:25 87:1
**increased** 93:21
**increases** 86:25 94:14
106:16
**increasing** 42:2
**independent** 67:7
**independently** 91:21
**INDEX** 4:1
**indicate** 80:7 83:19
96:6 100:22
**indicated** 10:9 74:20
102:4
**indicating** 80:6

**indication** 83:18 100:10
**indicator** 93:14
**individual** 61:22 96:10
**individually** 1:16, 17, 18,
19, 20
**individuals** 54:25 86:1
88:1 95:19
**infirmary** 65:16 91:23,
25 92:4 93:12, 13 95:23
97:16 99:20 105:5
107:12
**inflammatory** 98:4
**inform** 22:25 34:3
**informal** 22:5
**information** 8:1, 2 10:1
44:8 64:25 65:6 66:10
67:5, 10 68:6, 9 69:6, 12
76:22 89:7 112:25
**informed** 17:12 22:1
23:4
**initial** 60:19 68:18
80:24
**injury** 30:21
**inmates** 49:10 50:18
58:23
**inpatient** 53:7
**inpatients** 51:14 52:1, 6
**inside** 11:3 51:10 90:24
**inspect** 83:9
**inspection** 83:8
**instance** 19:25 27:7
35:14 54:11 73:4
**instantly** 72:21
**institution** 49:8
**instructor** 38:23, 24
**instruments** 23:18
**insulate** 23:18
**insurance** 112:21 113:1
**intend** 77:7, 9 98:5
**interaction** 102:6
**interest** 17:8, 9 19:23
35:13, 19
**interested** 22:18 119:18
**interesting** 52:14, 15
**interests** 35:18 36:5
**intern** 18:11
**internal** 21:20 37:22
**internally** 62:15
**Internet** 45:14 67:8
**internship** 18:18, 24
**interview** 70:9, 20 72:7
117:7
**interviewed** 70:10 72:8
117:2
**interviewing** 43:5
**interviews** 10:4 42:11
65:15, 18, 19
**intra-abdominal** 19:19
**intractable** 32:25
**invasive** 22:16, 20 23:10,

Brian S. Myers, M.D., F.A.C.S.

3/13/2023
Page 7

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 41 of 48
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 46 of 180

*15* 29:*4* 35:*11* 40:*7*, *17*
**invasively** 22:*23* 23:*9*
**investigating** 58:*3*
**investigation** 77:*3*
**invoice** 74:*3* 76:*7*
116:*14* 118:2, *3*
**invoiced** 75:*15* 76:*1*
**INVOICES** 4:*17* 74:*7*,
*23*, *24* 76:*16* 115:*14*
117:*17*
**involve** 57:*18* 70:22
**involved** 25:*16* 48:*18*
70:*14* 81:*23* 83:*17*
112:*16*
**involves** 19:*16*
**isolation** 8:*4*
**issue** 6:22, *24* 57:22
65:7 108:*5*
**issued** 68:*19*
**issues** 19:*19* 43:*18* 52:8
56:*20*, *25* 57:*3* 81:20
113:7
**itemized** 74:7
**items** 65:*5* 66:*8* 68:*1*
107:*4*
**its** 120:*25*

**< J >**
**Jackson** 3:*14* 4:6, *8* 5:*9*,
*15*, *18* 6:*9*, *17* 7:*7*, *8*
9:*17* 10:*15* 15:*9* 26:*14*
27:6 28:*21* 29:*12*, *20*
38:*14*, *16* 43:22 55:*16*,
*18*, *19* 58:*5*, *8*, *9* 61:*5*
66:*1*, *3*, *5*, *7* 69:*1*, *2* 71:*1*,
*6* 72:*12*, *15* 74:*14*, *19*, *24*
76:*17*, *18* 77:*12* 81:*14*,
*24* 82:*19* 84:*12* 87:*5*
93:*20* 94:22 96:*25* 99:7
101:*11* 104:*14* 105:*3*
106:*10* 107:22 108:*10*
110:2 111:*4* 115:*6*, *16*,
*20*, *23*, *25* 116:*5* 117:*16*
118:*9*
**jail** 10:*4* 11:*3* 49:*13*
50:*25* 51:2, *8*, *11* 52:20
53:6 58:*23* 64:*11* 65:*18*
95:*13* 100:*1* 103:*24*
**JANE** 1:*21*
**January** 116:*10*, *12*
117:22 118:2
**Jesus** 56:*14*
**job** 50:*19*
**JOHN** 1:*21*
**journal** 40:*20* 73:*5* 89:*1*
**JR** 1:*12*
**judgement** 59:*8* 99:*5*
**judgment** 59:*4* 78:*19*
**Judicial** 120:*4*
**July** 116:*14*, *19* 117:*1*, *9*,

*19*
**June** 116:*13* 117:*21*
**jury** 13:*14*

**< K >**
**keep** 68:2, *3* 76:8 93:8,
*10*
**Kennestone** 28:*12* 85:22,
*24* 86:2, *7*, *12*
**KEVIL** 1:6, *7*, *10*, *12*, *13*
103:*10*, *15*
**kidneys** 20:2
**KIEARA** 1:6
**kind** 7:2 19:*1*, *3* 39:9
72:*10* 74:9 98:7, *8*, *11*
112:*3*
**knew** 63:*25* 71:*16* 72:*21*
**knife** 85:9
**know** 5:*24* 6:7, *24* 8:*11*
9:6, *23*, *24* 13:*13*, *14*
14:*5* 17:*10* 20:*18* 25:*11*
30:*8* 32:*1* 33:*23* 37:20
41:*18* 42:*3*, *21* 50:*14*, *23*
52:*14* 56:*1* 57:*1*, *18*, *25*
60:*12* 63:*8* 64:*5*, *11*, *20*,
*22* 65:*19*, *21* 66:*16*
70:*11* 71:*13* 74:*17* 75:*1*
76:*18* 77:*24* 80:*5* 83:*17*
85:*4* 87:*3*, *8*, *21* 88:*20*
89:*1*, *4* 91:*9* 95:*13* 96:*9*
100:*11* 105:*23* 107:*1*
108:*8*, *19* 110:*4*, *10*, *14*
111:*3* 114:*12* 116:*18*
118:2
**knowing** 9:*19*
**knowledge** 16:*11*, *13*
22:*2* 23:*2* 27:*14* 30:*17*
31:*17* 34:*5* 42:*1* 48:*11*
64:*12*, *13*, *16*, *18* 70:*16*
86:*14*, *15*
**knowledgeable** 26:*11*
**known** 23:*5* 27:*20*
30:*24* 63:*12*, *14*, *15*, *18*,
*19* 64:*7*, *8*

**< L >**
**lab** 21:*3*
**lack** 51:*8* 100:*16* 103:*13*
**laparoscopic** 40:*13*
**lapse** 39:*17* 45:22
**lapsed** 24:*10* 25:*4*
**late** 65:*8*
**lawsuit** 5:20 14:*16*, *21*,
*24* 58:*3*
**lawsuits** 44:*19*
**laxity** 98:*3*
**layer** 23:*21* 104:*23*
**laying** 100:*25*
**layperson** 59:*4*, *7*
**lead** 30:*18* 80:*5*

**leadership** 43:*11*
**leading** 11:*4*
**learn** 62:*23*
**learned** 16:*7*, *17* 22:22
23:*5*
**leave** 32:*3* 43:*13*
**Lee** 11:*7*
**left** 19:*13*, *21*
**legal** 10:*21* 44:*21* 55:*11*
60:22, *23*
**length** 87:*1*
**lengthen** 86:*13*
**level** 29:*5* 43:*4* 54:*9*
**liability** 61:*7*, *10*, *13*
**liberty** 104:*16*
**license** 24:*5*, *10*, *11*
**licensed** 51:*4*
**licenses** 39:*13*
**LIEUTENANT** 1:*17*
**life** 8:*14* 103:*15*
**light** 111:*10*
**liked** 66:*18*
**likelihood** 88:*18* 108:2
**limitations** 76:25
**limited** 56:*18*
**line** 21:2 100:*5* 106:*20*
**linearly** 94:*5*, *15*
**lines** 22:*14* 39:9
**lining** 27:*17*
**list** 40:*21* 43:*24* 46:*14*
47:*9*
**listed** 40:*22* 44:*11* 47:*5*
56:*10* 60:*4* 65:*2*, *10*, *14*
66:*24* 74:*8* 76:*20* 107:*4*
**listening** 41:*13*, *15*, *16*
**literature** 16:*21* 87:*9*
88:*20* 94:*7* 106:*23*
**litigation** 45:*11* 47:*25*
120:*10* 121:*3*
**little** 22:*13* 24:*1* 33:*4*
36:*13* 53:*12* 73:22
97:*23* 111:*19*
**live** 11:*20*, *25* 12:*11*, *20*
114:*14*
**lived** 12:*23* 102:*15*
**lives** 11:*8* 96:*14*
**living** 114:*8*
**LLP** 3:*13*
**LOCATION** 2:*5* 13:*24*
51:*12* 65:*21*
**locations** 13:*24* 98:*10*
**log** 23:*18*
**logic** 42:*4*
**long** 8:*17* 11:*16*, *20*, *25*
12:*11*, *23* 17:22 46:*11*
65:*12* 72:*7* 73:*12* 80:*23*
84:*1*, *5*, *21* 85:*4* 108:*20*
109:*3*, *5* 112:*14*, *15*
113:2

**longer** 14:*9* 29:*24* 54:2
90:*1* 94:*17* 114:*12*
117:*13*, *14* 118:*15*
**look** 7:*15*, *21* 20:*19*
44:7 45:*18* 60:*10* 63:*1*
69:*23* 107:*8*
**looked** 7:*16*
**looking** 8:2 9:*13*, *25*
40:*21* 50:*11* 57:*23*
**looks** 46:*15*
**lose** 29:*5*, *6*, *8* 109:*9*
**loss** 103:*14*
**lot** 12:6 81:*23* 91:*15*
112:*16* 113:*16* 117:*13*,
*14*
**low** 90:*12* 92:*11* 96:*1*,
*18*
**lower** 92:*12* 96:*1*, *7*, *16*
106:*8*, *13*
**lung** 19:20
**lying** 99:*15*
**LYNDA** 1:2*0*

**< M >**
**M.D** 2:*3*
**maids** 65:*16*
**main** 43:*3*
**mainstay** 31:*11*
**maintain** 33:*19* 39:*21*
55:2
**MAJOR** 1:*16*
**malpractice** 39:*11* 44:*24*
45:*1*, *2*, *3*, *12* 55:*9*, *14*
60:*23*
**malpractices** 55:*11*
**manage** 34:*16*, 22
**management** 59:*1* 78:22
**March** 2:*4* 5:*1* 119:*20*
**mark** 10:*13* 15:*7* 43:*20*
**marked** 10:*14* 15:*8*
43:*21* 116:*4*
**market** 45:*10*, *13* 47:*8*
**married** 12:*25*
**MARSHALL** 1:2*0*
**materials** 64:*25* 66:*14*
67:*4*, *10* 69:*6*, *12*, *15*
70:*4* 72:*20*, *21* 76:*20*
**MATHIS** 3:*13*
**matter** 10:*18* 71:*13*
72:*17* 76:2 108:*21*
**matters** 14:*19* 52:*14*
**MCPHEE** 1:*19*
**MD** 17:*18*
**mean** 8:22 15:*1* 24:2*0*
39:*10* 49:*16* 50:*23*
53:*16* 55:*14* 63:*14*
90:*11* 95:*19* 103:*4*, *18*
105:*15* 106:6 112:*1*
113:2*4*
**Meaning** 6:*17* 18:*17*
82:*4* 93:*4* 94:*17*

Brian S. Myers, M.D., F.A.C.S.                                3/13/2023
Page 8

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 42 of 48
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 47 of 180

**means** 22:*20* 24:*14*
82:*5* 90:*15* 98:*1*
**MEC** 54:*6*, *9*, *12*, *13*
**mechanism** 29:*13* 37:*21*
**med** 58:*6*
**medical** 10:*5* 13:*19*
14:*7*, *19* 16:*13* 17:*1*, *11*
18:*17*, *19* 20:*7* 28:*8*
31:*3*, *6*, *9*, *17*, *22* 37:*15*,
*20* 38:*25* 44:*19*, *21*, *23*
45:*1*, *2*, *3*, *7* 46:*9* 48:*16*,
*20* 49:*3*, *22*, *25* 50:*1*, *2*, *9*,
*17* 51:*4*, *22* 52:*2*, *7*, *10*,
*11*, *16* 53:*2*, *6*, *8* 54:*4*, *7*,
*9*, *10*, *16*, *19* 55:*3*, *14*
56:*20* 57:*19* 58:*22* 59:*4*,
*7* 60:*23* 61:*2*, *3*, *24* 62:*1*,
*3* 63:*16* 64:*1*, *9*, *12*, *18*
66:*11*, *18*, *21*, *24* 71:*17*
73:*5* 78:*19* 86:*16* 94:*25*
95:*13* 103:*5*, *9*, *11*, *14*, *19*
104:*3*, *22* 105:*8* 107:*16*,
*25* 108:*7*, *11*, *14* 109:*4*, *6*
113:*7*
**medications** 31:*8*, *13*
**Medicine** 17:*2*, *16* 21:*20*
**meet** 33:*20*
**member** 54:*14* 80:*2*
**membership** 42:*5*, *15*, *19*
**memorable** 52:*19*, *23*
**memory** 45:*22* 87:*12*, *17*,
*20* 88:*25* 91:*21*
**memos** 67:*23*
**mention** 87:*5* 101:*12*
**mentioned** 38:*18* 54:*2*
55:*22* 71:*9* 88:*14*, *15*
99:*10*
**merely** 62:*25*
**met** 5:*18*
**method** 73:*20*
**Metro** 13:*7*
**MEYERS** 5:*5*
**microscopic** 29:*5*
**mileage** 76:*10*
**military** 12:*3*, *4* 13:*16*
**mind** 66:*25*
**mine** 84:*16*
**minimally** 22:*16*, *20*, *23*
23:*9*, *10*, *15* 35:*11* 40:*7*,
*12*, *17*
**minimum** 75:*18* 118:*14*
**Minor** 1:*10*, *12*
**Minus** 75:*16*
**minute** 32:*23* 79:*8*
113:*20* 114:*4*, *14*, *16*, *21*
**minutes** 72:*9* 73:*25*
84:*4*, *11*, *18*, *19* 85:*1*, *8*
116:*6*, *20* 117:*1*, *14*
**Mischaracterizes** 109:*17*
**misnomer** 19:*12*

**mobilized** 114:*1*, *6*
**mobilizes** 80:*16*
**moment** 5:*18* 71:*23*
81:*11* 87:*24* 114:*8*
**Monday** 2:*4* 5:*1* 112:*5*,
*6*, *9* 114:*24*
**Mondays** 111:*23*
**money** 76:*2*
**monitored** 31:*4*
**month** 25:*10* 63:*1*
112:*13*, *15* 113:*15* 115:*9*
**Months** 69:*20*
**morbidity** 86:*25*
**morning** 101:*13* 107:*9*
**mortality** 86:*25* 87:*6*, *10*,
*24* 88:*4*, *7*, *17*, *21*, *25*
90:*3* 91:*3* 93:*21* 94:*8*,
*18* 95:*1* 106:*8*, *13*, *15*, *24*
111:*1* 114:*13*
**mother** 1:*8*, *11*
**move** 81:*9*
**moved** 11:*22* 12:*6*
107:*12* 111:*2*
**moving** 21:*1* 110:*12*, *14*
113:*16*
**multiple** 23:*17*
**multipurpose** 97:*19*
**muscles** 98:*5*
**MYERS** 2:*3* 4:*4*, *14*
5:*10*, *15*, *17* 71:*2*, *3*
111:*15*, *19*

**< N >**
**name** 5:*16*, *18* 44:*17*
46:*4*
**names** 70:*11*
**nature** 68:*19* 79:*5*
**Nausea** 32:*14*
**Navy** 13:*19*, *20*
**nearest** 82:*15*
**necessarily** 42:*1* 54:*22*
103:*4*
**neck** 19:*18*
**need** 6:*2*, *6* 24:*25* 55:*1*
72:*10* 84:*19* 113:*6*, *7*
115:*7*
**needed** 59:*19*, *20* 68:*6*
80:*15* 105:*4*
**needs** 79:*18* 97:*12*
105:*2* 113:*12*
**neurology** 19:*25*
**never** 6:*24* 24:*14* 39:*14*
57:*14* 66:*25*
**new** 33:*15* 109:*21*
**nice** 6:*16* 7:*2*
**night** 59:*14*, *18* 103:*24*
104:*6* 110:*23*
**Nodding** 17:*21* 24:*4*
50:*6* 79:*23* 80:*8*, *10*
82:*17* 99:*17* 101:*25*

**nonmedical** 64:*16*
**non-perforated** 102:*7*, *16*
**nonsteroidal** 27:*22*
**norm** 96:*10*, *11*, *16*
**normal** 91:*23* 92:*11*
96:*1* 99:*15*
**normals** 96:*8*
**NORTHERN** 1:*2*
**nose** 29:*6*
**notarized** 6:*23*
**notary** 6:*14*
**note** 98:*14*
**noted** 64:*9*, *12*
**notes** 67:*20*, *22*, *25* 68:*12*
**notice** 5:*11* 114:*25*
115:*2*, *7*
**noticed** 59:*16* 102:*16*
**noting** 64:*18*
**nuanced** 19:*1*
**number** 34:*1* 56:*2*
65:*15* 75:*1* 88:*13* 91:*7*
93:*25*
**numbered** 119:*12*
**numbers** 65:*3*
**nurse** 48:*22* 59:*4*, *8*
98:*23* 99:*2*, *4*
**nurses** 65:*17*
**nursing** 48:*21* 54:*18*

**< O >**
**O.C.G.A** 120:*19*
**Object** 9:*15* 26:*9* 27:*3*
68:*21* 70:*19*, *25* 71:*5*
80:*25* 81:*16* 82:*18*
86:*20* 93:*16* 94:*19*
101:*8* 104:*9*, *19* 106:*9*
107:*20* 108:*3* 110:*22*
**objected** 29:*10*
**Objection** 28:*18* 29:*16*
60:*25* 84:*9* 96:*22* 98:*20*,
*25* 105:*6* 109:*17*
**objections** 5:*12*
**obligations** 48:*24*
**observation** 92:*24*
**observe** 93:*1*
**observing** 99:*19* 100:*19*
**obtain** 76:*22*
**obtained** 67:*4*
**obvious** 40:*9* 81:*18*
**Obviously** 6:*1* 72:*19*
79:*3* 91:*5* 102:*25*
**occurred** 7:*1*
**occurrence** 62:*14*
**offend** 15:*1*
**offense** 15:*5* 39:*10*
**offer** 48:*9*
**offering** 59:*6*
**offers** 71:*3*
**Office** 5:*20* 61:*6* 62:*7*, *9*
71:*8* 111:*24* 112:*20*, *22*,

*25*
**officers** 64:*17* 65:*16*, *17*
**Oftentimes** 57:*13*
**oh** 98:*10*
**Ohio** 11:*24*, *25* 12:*9*
16:*3* 17:*1*, *2*, *15* 49:*22*
51:*7* 52:*17* 53:*6*
**okay** 7:*5*, *7* 9:*4* 10:*8*, *12*
12:*6*, *8* 13:*12*, *16* 16:*19*
17:*10*, *15*, *20* 18:*5*, *21*
19:*6*, *8*, *11*, *24* 20:*7*, *10*,
*13*, *18* 21:*5*, *8*, *17*, *19*, *24*
22:*24* 23:*3*, *14* 24:*10*
25:*4*, *17* 27:*12*, *16* 28:*5*,
*21* 29:*22* 30:*21* 31:*17*
33:*3* 34:*2* 36:*2*, *7*, *9*, *13*
37:*1*, *3*, *5*, *8*, *25* 39:*3*
40:*15* 41:*1* 42:*12* 44:*2*
45:*3* 46:*14*, *20*, *23* 47:*8*,
*17* 48:*2*, *19* 49:*9*, *20*
51:*6*, *15*, *24* 52:*3*, *9* 53:*5*
54:*1*, *4* 55:*5*, *11*, *17* 56:*4*
57:*4* 59:*17* 61:*5* 62:*18*
63:*9* 64:*21* 65:*23* 66:*7*
69:*1*, *14*, *17* 70:*10* 71:*9*
72:*12* 73:*2*, *20* 74:*5*, *12*
76:*14*, *17* 80:*19* 82:*24*
83:*14* 84:*5*, *12*, *15* 85:*2*,
*7*, *16*, *21* 87:*5* 90:*4*, *21*
91:*2*, *17*, *25* 92:*18*, *23*
94:*24* 96:*19* 97:*5*, *13*
98:*14* 99:*7* 100:*21*
101:*11*, *23* 102:*22* 103:*3*,
*4*, *5*, *8* 104:*6* 105:*3*, *13*,
*18* 106:*13*, *18* 107:*22*
108:*25* 109:*8*, *11* 110:*16*
111:*4*, *14* 115:*10* 116:*25*
117:*25* 118:*17*
**old** 49:*16*
**oldest** 40:*22*
**omentopexy** 23:*21*
**on-call** 105:*8*
**Once** 8:*18* 25:*10* 30:*12*
80:*23* 82:*19* 84:*6*, *20*
89:*25* 90:*7* 93:*22* 98:*4*
99:*11* 109:*9* 112:*21*
113:*5*, *8*
**ones** 7:*24*, *25* 20:*1* 28:*1*
29:*1* 31:*24*, *25* 56:*12*
65:*2* 112:*6*, *7*, *8*
**online** 45:*15*, *23*
**onset** 32:*24* 79:*4* 82:*13*
95:*2*
**open** 57:*12* 82:*7*
**opening** 113:*10*
**operate** 20:*1* 42:*25*
79:*19*
**operating** 36:*15* 78:*23*,
*24* 79:*1*, *19* 113:*25*
114:*7*
**operation** 82:*14* 86:*6*

opine 14:*18* 57:*22*
62:*20* 78:*13* 85:*14*
108:*6*
opined 108:*15*
opining 56:*20* 104:*15*
opinion 16:*23* 23:*4*
26:*24* 27:*2* 28:*5* 30:*15*,
*16* 48:*9*, *16*, *19* 57:*14*, *15*
58:*21*, *25* 60:*9*, *22* 62:*11*,
*16*, *20* 63:*24* 64:*4*, *21*
65:*1* 66:*9*, *13* 70:*24*
73:*8* 75:*12* 89:*14* 93:*14*
96:*6* 101:*10* 102:*22*
103:*5*, *9*, *13*, *16* 104:*3*, *10*,
*18*, *24* 107:*24* 108:*1*, *25*
109:*2*
opinions 16:*9*, *15* 17:*12*
22:*3*, *25* 26:*22* 27:*8*, *9*
34:*4* 53:*10* 58:*11*, *13*, *16*
59:*3*, *6* 61:*2* 62:*19* 63:*9*
67:*14* 70:*8* 71:*3* 72:*17*,
*21*, *24* 78:*2* 89:*11*
opposed 57:*2* 62:*25*
88:*9*
opposite 102:*14*
optimized 113:*8*
options 30:*25* 31:*1*
oral 68:*24*
order 27:*23* 55:*2*
113:*16*
Oregon 18:*6*, *7* 22:*11*,
*12* 24:*6* 33:*6* 38:*24*
organization 13:*9* 42:*16*
organs 36:*1*
original 40:*24* 41:*1*
orthostatic 93:*4* 99:*10*,
*14*, *23* 100:*6*, *18*, *22*
101:*3*
outlined 103:*17*
outside 14:*23* 18:*3* 49:*8*
overlap 27:*13*
overnight 76:*6*
oversee 14:*6* 54:*15*
oversees 54:*10*
oversight 43:*4*
Oxford 16:*20*

< P >
p.m 2:*8* 97:*18* 118:*21*
PAGE 2:*1* 4:*3*, *13*
10:*12* 15:*15* 78:*21*
89:*14* 92:*3* 95:*6*, *8*, *22*
97:*15* 99:*9* 101:*11*
116:*15*
pages 60:*5* 65:*3* 76:*20*
115:*19* 119:*12*
paid 118:*12*
pain 32:*14*, *24* 33:*1*
79:*5*, *9* 81:*7* 95:*9* 98:*11*
102:*10*, *12*, *17*, *18* 104:*11*,
*13*
paper 41:*2*
papers 40:*24*
paragraph 92:*3* 95:*6*, *8*,
*22* 97:*15*, *20* 99:*8*
101:*13*
Parkway 3:*15*
part 13:*9* 18:*13*, *15*
34:*21* 52:*5* 90:*15*
participate 70:*17* 71:*6*
participated 69:*14* 70:*3*
particular 13:*24* 19:*23*
27:*15*, *23* 33:*23* 35:*13*,
*19* 50:*10* 51:*9* 76:*7*
83:*12* 88:*18* 113:*12*
parties 119:*15*, *16*
120:*10* 121:*1*
parts 103:*23* 113:*16*
party 14:*16* 120:*9*, *22*
121:*2*
passed 78:*1*, *4*, *9* 106:*18*
passing 106:*16*
patch 23:*22*
patient 30:*1*, *12*, *24*
31:*12* 33:*1* 54:*24* 61:*3*,
*22* 62:*6* 79:*2*, *16*, *18*
80:*13*, *16*, *20*, *21* 81:*4*, *22*
82:*3*, *7* 83:*9* 84:*6* 86:*17*,
*23* 88:*18* 89:*4* 93:*23*
97:*25* 98:*19* 113:*11*, *22*,
*24* 114:*19*
patients 22:*19* 25:*8*, *13*,
*19*, *22* 34:*14* 48:*24*
51:*16*, *23* 62:*9* 81:*7*, *17*,
*19* 89:*20*, *22*
patient's 84:*3*
PAUL 1:*18*
pay 45:*15*
payment 118:*9*, *10*
PC 34:*8*
peeled 19:*22*
peer 94:*6*
peers 42:*9*, *11* 43:*6*
pending 57:*11*
Pennsylvania 24:*6*
people 20:*25* 21:*1* 29:*6*,
*7* 30:*9* 42:*3* 50:*9* 54:*21*
63:*19*, *21*, *23*, *24* 64:*2*, *3*
79:*7* 90:*24* 100:*13*
102:*10* 103:*24* 114:*5*
peptic 24:*2* 25:*9* 63:*12*,
*14*, *16* 64:*7*, *8*, *19*, *23*
percent 8:*20* 9:*22* 55:*19*,
*21* 56:*6*, *7* 87:*13*, *14*
88:*4*, *5*, *7*, *12*, *25* 93:*21*
106:*7*, *8*, *13*, *24* 110:*25*
111:*1*
percentage 56:*4* 87:*24*
88:*11* 91:*6* 106:*14*
111:*2*
Perez 56:*14*, *19*
perforate 26:*15* 31:*19*,
*23*, *25* 32:*5*
perforated 20:*12* 23:*12*,
*16* 25:*16*, *20*, *22* 26:*1*
36:*10* 69:*24* 78:*22*
79:*15* 80:*7* 83:*2*, *19*
86:*2* 88:*21* 94:*8* 97:*25*
102:*13*, *19* 103:*25* 104:*7*
106:*21* 108:*17*, *23*
109:*15*
perforates 79:*25* 97:*19*
perforating 30:*18*
perforation 20:*13* 24:*3*
25:*9* 30:*13* 63:*11*, *13*
64:*7* 78:*25* 82:*14* 86:*24*
87:*6*, *25* 89:*15*, *21* 93:*22*
perform 35:*17* 36:*9*
50:*25* 77:*4* 82:*21* 84:*7*,
*21* 98:*23* 99:*3* 112:*4*
performed 77:*1* 98:*16*
performing 14:*4* 114:*24*
period 17:*24* 18:*2*, *3*
22:*4*, *15* 78:*8*
periodically 74:*3*
periods 38:*1*
Perioperative 53:*19*
person 89:*18* 104:*11*, *15*
113:*6*
personal 94:*1*
personally 61:*3* 83:*5*
86:*7*
personnel 64:*17*
persons 53:*3* 55:*7*
perspective 111:*8*
pertain 60:*23*
pertaining 60:*6*
Philadelphia 11:*13*, *16*
17:*16*
phone 60:*15* 108:*22*
113:*2*
phrase 46:*23*
physical 80:*14* 84:*1*
97:*1*, *2*, *20* 98:*15*
physically 66:*12*
physician 18:*23* 81:*3*
85:*13* 98:*18* 103:*6*, *21*
physicians 34:*18* 46:*8*
54:*20* 79:*13*
physiological 88:*2* 89:*15*
pick 108:*22*
picture 70:*2* 112:*3*
pictures 69:*16*, *21*
piece 89:*6*
Piedmont 53:*20*, *21* 54:*8*
pinpoint 32:*23*
Pittsburgh 11:*19*, *20*, *23*
place 55:*1* 65:*7* 66:*22*
86:*5* 119:*10*
placed 77:*1* 92:*4* 95:*23*
places 53:*13*
plaintiff 56:*5*
Plaintiffs 1:*14* 3:*3*
plaintiff's 56:*16* 57:*1*
61:*6*
plausible 101:*5*
playing 60:*24*
pleadings 10:*21*
please 5:*15* 9:*11* 14:*22*
44:*18* 59:*5*
pleasure 118:*19*
point 6:*6* 8:*14*, *24*, *25*
9:*10*, *14*, *16*, *17*, *20*, *21*
28:*4*, *25* 29:*23* 31:*20*
34:*1* 44:*9* 68:*5* 73:*14*
79:*1*, *17* 80:*11*, *15* 83:*24*
84:*2* 86:*18*, *19*, *22* 88:*5*,
*8*, *12* 90:*1*, *3*, *8* 91:*3*
93:*15*, *18* 95:*1* 97:*3*, *7*,
*21* 98:*15*, *19*, *22* 100:*11*,
*15* 102:*5* 103:*17* 104:*2*,
*6* 106:*20*, *25* 107:*17*, *23*
108:*8*, *9*, *10*, *13*, *16*, *23*
109:*2*, *4*, *11*, *12* 110:*18*,
*21* 112:*9*
pointed 79:*6*
pointing 98:*21*
population 96:*9*, *16*
100:*15*
portion 36:*24* 99:*24*
Portland 18:*6*, *7* 38:*25*
portray 27:*10*
portrayal 69:*23*, *25*
position 21:*14* 34:*9*
70:*20*
positions 37:*13* 38:*19*,
*21* 39:*1* 43:*11*
possible 88:*16* 93:*14*
possibly 111:*9*
post-operative 89:*17*
post-perforation 26:*5*
87:*10*
postpone 114:*16*
post-rupture 23:*14*
poured 101:*21*, *23*
practical 5:*25* 108:*21*
practice 19:*15* 20:*7*
24:*8*, *11*, *25* 25:*18* 33:*8*
37:*22* 49:*25* 53:*12*
practiced 39:*3*
practices 34:*16*
practicing 51:*3*
practitioner 22:*7* 23:*7*
precertification 113:*1*, *5*,
*9*
precise 107:*7*
predate 18:*14*
predating 66:*19*
predict 31:*24*
preparation 10:*6*, *20*, *25*
11:*1*, *2* 28:*9* 67:*20*

69:*14* 73:*17* 75:*11*
87:*19*
**prepare** 7:*8*
**prepared** 10:*1* 59:*23*
60:*1* 63:*5* 69:*5, 11, 13*
**preparing** 73:*13* 117:*10*
**pre-perforation** 26:*8*
32:*7*
**present** 62:*7, 9, 10*
**presentation** 41:*8* 79:*11*
**Presentations** 41:*4*
43:*16, 17*
**presented** 41:*5*
**presenting** 26:*19* 41:*12,
23* 53:*1*
**pressure** 8:*23* 9:*1*
89:*25* 90:*7, 12, 13, 19, 22,
25* 92:*11, 12* 93:*4, 7, 9*
95:*25* 96:*2, 4, 7, 14, 15*
99:*9, 15*
**prestige** 43:*8*
**pretty** 12:*15* 97:*11*
**prevent** 31:*2*
**previous** 92:*15*
**previously** 53:*18* 55:*22*
74:*15, 21*
**print** 76:*15*
**prior** 67:*17* 73:*14*
92:*13* 96:*2*
**prioritize** 83:*1*
**priority** 83:*3*
**prison** 49:*14, 23, 25*
63:*23* 105:*8*
**prisoners** 49:*7* 51:*14*
52:*18*
**privileged** 70:*21, 25*
**privileges** 15:*22, 24*
24:*24* 39:*14, 17* 53:*23*
85:*19*
**probability** 105:*24*
**probable** 106:*6*
**probably** 7:*5* 29:*15, 17,
18* 48:*1* 81:*10* 84:*25*
93:*4* 96:*13* 97:*6, 7*
102:*16* 105:*17* 106:*4, 24*
110:*24* 111:*8* 114:*9*
117:*5*
**problem** 23:*9* 27:*15*
45:*23* 112:*19, 23* 115:*2*
**problems** 52:*2, 6* 114:*11*
**Procedure** 68:*22* 112:*20*
113:*12, 18*
**procedures** 22:*17, 21*
**proceed** 112:*24*
**proceeding** 118:*21*
**proceedings** 119:*9, 13*
**process** 24:*2* 41:*18*
43:*5* 72:*16, 18* 73:*7*
85:*4* 86:*4, 7, 22*
**processes** 61:*22* 83:*17*

**produced** 15:*14* 74:*15,
21* 116:*22*
**producing** 70:*12*
**production** 70:*3, 14, 17*
**productive** 21:*1*
**profession** 42:*9*
**professional** 39:*20*
42:*16* 103:*9*
**professions** 26:*12, 14*
**profuse** 90:*1, 9, 11, 14, 15*
**profused** 91:*1*
**profusing** 90:*17* 93:*6*
**program** 20:*25*
**progression** 30:*19*
**prohibited** 120:*18*
**prompts** 81:*8*
**pronounce** 36:*22*
**proper** 55:*2* 88:*6*
**provide** 25:*12* 34:*14*
43:*2, 4* 46:*10* 49:*23*
50:*2, 7* 51:*18* 54:*24*
61:*1, 2, 21* 78:*8, 10*
108:*14* 120:*16, 21*
**provided** 23:*8* 48:*21*
64:*25* 65:*10* 66:*15* 70:*8*
72:*25* 73:*9* 102:*2, 18*
103:*10* 105:*5* 107:*25*
108:*11*
**providers** 54:*21*
**provides** 16:*10* 54:*19*
**providing** 14:*15* 19:*16*
22:*18* 46:*7, 9* 58:*21, 25*
60:*9, 21* 101:*7*
**provision** 45:*7* 53:*2*
57:*19* 58:*22* 62:*3*
**provisional** 49:*3*
**public** 71:*2*
**publication** 40:*21*
**publications** 43:*16, 17*
45:*14*
**published** 38:*9, 10* 41:*1*
89:*2*
**publishing** 21:*1*
**pulmonologist** 113:*8*
**pumping** 93:*8*
**pure** 60:*13*
**purely** 96:*24*
**purpose** 99:*1*
**purposes** 5:*11* 18:*18*
26:*22* 45:*11* 56:*21* 72:*8*
**pursuant** 5:*10* 120:*2*
**pursue** 58:*4*
**purview** 49:*8*
**push** 98:*2*
**pushing** 98:*10*
**put** 64:*13* 68:*8* 73:*23,
24* 81:*6* 87:*9* 101:*18*
102:*15* 107:*10*
**putting** 107:*3*
**Pylori** 30:*3, 4, 6, 10*

**< Q >**
**qualified** 57:*5* 61:*4*
98:*23*
**qualify** 42:*17* 49:*6*
**quantifiable** 106:*2*
**quantify** 94:*8* 106:*15*
**question** 5:*13* 29:*11*
32:*2* 52:*12* 83:*13*
108:*13* 109:*21* 116:*18*
**questions** 15:*2* 39:*10*
69:*22* 71:*11* 111:*7, 14*
115:*3, 10, 21* 118:*7*
**quick** 38:*12* 80:*13, 14*
115:*16*
**quite** 7:*23* 90:*22*
**quote** 87:*11* 96:*8*

**< R >**
**radical** 100:*14*
**range** 19:*17* 92:*11* 96:*1*
**rank** 13:*25* 28:*2, 4*
**rate** 8:*23* 9:*1* 75:*2, 9,
11* 76:*4, 5* 87:*6* 88:*4, 7*
92:*14* 93:*22* 94:*4*
**rates** 75:*9* 121:*1*
**reach** 62:*18, 20* 90:*22*
**reached** 77:*13* 106:*25*
**reaching** 16:*16* 76:*22*
**reaction** 89:*23* 90:*2*
**read** 7:*6* 38:*7, 18* 77:*20*
87:*18, 21*
**reading** 6:*10* 64:*2*
**real** 115:*16*
**reality** 84:*25*
**really** 52:*13* 61:*12*
86:*21* 98:*11* 114:*17*
**reason** 100:*1, 4, 10*
**reasonable** 31:*22* 48:*16,
20* 103:*9, 10, 18* 104:*3, 7,
21, 24* 105:*14* 107:*25*
108:*7, 11, 14, 20* 109:*5,
23*
**reasonableness** 48:*20*
59:*3, 7*
**recall** 34:*3* 96:*3*
**receive** 104:*25*
**received** 43:*23* 105:*14*
**recertify** 33:*25*
**recognize** 10:*15* 15:*9*
105:*1*
**recognized** 105:*4*
**recollection** 89:*11* 117:*8*
**recommend** 112:*23*
**record** 5:*16* 7:*3* 9:*8, 12*
38:*15* 71:*1* 72:*14, 24*
91:*17* 107:*4* 110:*2*
115:*12, 13, 21* 118:*20*
119:*13*
**recorded** 8:*4, 7, 12*
71:*15* 107:*2*

**records** 28:*8, 13, 15, 19*
60:*4, 5* 63:*2, 20* 64:*2, 14*
65:*12* 66:*19, 24, 25*
68:*10* 73:*9, 12* 91:*10*
92:*15, 16* 107:*8, 10*
**recovering** 114:*3*
**recovery** 89:*17*
**reduced** 102:*17*
**reestablished** 15:*22*
**refer** 40:*10*
**referenced** 35:*18*
**references** 42:*12*
**referral** 120:*9, 23*
**referring** 92:*9* 95:*18*
98:*13*
**refine** 78:*2*
**reflects** 100:*9*
**reflux** 35:*20, 25* 36:*3*
**Regan** 44:*3*
**regarding** 101:*3*
**regards** 27:*15*
**Regional** 15:*23*
**regular** 100:*15*
**regulate** 55:*2*
**Regulations** 120:*3*
**relate** 95:*11* 97:*16*
**related** 95:*9*
**relates** 21:*11*
**relation** 89:*24*
**relative** 119:*14, 16*
**relatives** 13:*6*
**relayed** 95:*20*
**relegated** 20:*3*
**relevant** 28:*16* 67:*14*
**relied** 22:*9* 70:*24*
**relief** 102:*12*
**relieve** 102:*23*
**relying** 58:*17* 59:*4, 7*
89:*10*
**remain** 6:*13*
**remaining** 56:*7*
**remark** 91:*22*
**remember** 28:*25* 40:*1*
44:*6, 9* 57:*12, 17, 23*
60:*10, 20* 65:*13* 69:*20*
87:*15, 16* 89:*7* 91:*20, 24*
92:*16* 93:*24, 25* 95:*12,
15* 116:*21* 117:*12, 15*
**remove** 114:*12*
**rendered** 10:*18* 53:*10*
**rendering** 48:*15, 19*
64:*21*
**repair** 23:*20*
**repaired** 89:*15*
**rephrase** 14:*22* 25:*18*
**REPORT** 4:*14* 7:*10, 13,
16, 17, 19* 10:*2, 7, 9, 10,
18* 11:*1* 24:*1* 27:*9*
28:*10* 58:*10* 59:*10, 15,
21, 24* 60:*2, 6* 63:*3, 5*
65:*2* 67:*11, 13, 15, 18, 21*

68:5, *11, 16, 20*  69:3, *7 70:4*  73:9, *13*  76:2*1* 77:20  87:*19*  88:*15* 91:2*0*  97:*14*  99:*13, 24* 100:5  101:*12*  102:4 107:*10*  111:*12*  116:2*3, 24*

**REPORTED**  2:*12*  11:*3* **reporter**  6:*1*  119:2, *25* 120:*1, 5, 8, 13, 23* **reporter's**  120:8 **Reporting**  120:*3, 7, 16, 21, 23* **reports**  59:2*3*  60:*1* 95:*16, 18, 19* **representative**  120:*14* **representatives**  60:*18* **represented**  56:*12* **representing**  5:*19* **requested**  69:2  74:*17* 95:*17*  119:*11* **require**  100:2*0* **required**  33:*12* **requirements**  33:*18, 20* 38:4  42:5, *19* **research**  20:2*0*  21:*3, 6, 9*  67:*7*  72:2*3* **reserved**  5:*12* **reserves**  13:2*3*  14:9 **reservist**  14:8 **Residency**  17:*19, 20, 25* 18:*1, 2, 14, 15, 20, 25* 22:2*2* **resident**  18:*10*  19:*3* 21:*13*  38:2*2*  50:*17* **Resources**  82:2*2, 23* **respect**  9:*9, 13*  10:5 22:2  27:8  48:2*3*  55:*3* 58:2*1*  60:8  63:9  65:*17* 68:*16*  69:*3, 6*  70:*5, 20* 72:2, 5  77:*1*  99:*18* **respiration**  9:2 **respirations**  8:2*3* **respond**  80:*13*  100:*13* **response**  88:2  89:*16, 21* 98:4 **responsibilities**  21:*16* 34:*11, 12, 15, 21* **responsible**  27:2*5* **responsiveness**  5:*13* **rest**  56:*16* **restrictions**  76:2*5* **result**  57:*14* **resulted**  103:*14* **resume**  15:*18* **retained**  46:2*4*  47:*1, 18, 23*  48:9  56:5, *22*  57:*1* 77:2*4*  78:*10, 13* **retainer**  55:*7, 9, 12* 75:*18*  117:*17, 18*

**returned**  92:*4*  95:2*3* **reveal**  28:*19, 20* **revealed**  28:2*2* **review**  6:*17*  7:*13, 22* 10:2*1*  59:*13*  65:*12* 66:*15*  67:*1, 25*  71:*19* 72:*16, 20*  73:4  80:*14* 84:2  91:*10, 17*  107:4 119:*10* **reviewed**  28:8, *12*  47:2 59:*10*  60:5  66:6  67:4 68:*12*  72:2*1*  77:*12*  94:6 95:2*0*  116:*10* **reviewing**  59:*18*  73:8, *12, 23, 24*  74:*10*  76:2*0* 116:*12*  117:*10* **revoked**  24:*15*  39:*14* **right**  5:9, *24*  6:4, 8  12:8 16:*12*  20:*16, 22, 23* 21:*17*  23:2*3*  27:6  32:*12* 33:2*4*  37:9, *11*  41:2*1* 43:2*0*  48:*11*  50:2*3*  51:*3* 52:*13*  57:*15*  58:9  62:*18* 64:*15*  65:2*0*  66:*1, 5* 72:*10*  74:*18, 19*  77:2*0* 78:*10, 14*  80:*3, 21*  82:8, *11, 16*  83:2*4*  84:2*4* 86:*16*  90:*18*  92:*3*  94:*16* 96:2*5*  97:*3, 4*  99:8 102:8  104:*10*  106:8 109:2  110:*5, 9, 11* 115:*11*  116:5, 8  118:*1, 7, 13* **rights**  60:2*4* **rigid**  97:2*1*  98:*1* **risk**  28:*19, 21, 24*  87:2 106:*14*  114:*13* **Road**  11:7 **robotic**  33:*11* **room**  78:2*3, 24*  79:*1, 12, 19*  81:*3, 6, 9, 25*  82:9 83:*12*  84:*14*  92:*4*  95:*18, 23*  97:*19*  99:*19*  103:2*1* 104:2*3*  105:*2, 21*  107:*13* 109:*10*  110:*18* **Rooms**  82:*1* **rotation**  50:8 **rotations**  51:2*0* **Roughly**  37:*4*  75:*3, 4, 5, 15* **RPR**  2:*12*  119:2*5*  121:*4* **Rule**  70:2*2* **rules**  5:2*5*  33:*15*  68:2*2* 120:2 **rupture**  30:2*2*  31:2 **ruptures**  32:*18, 21* **rupturing**  62:*14*

**< S >** **safe**  41:5  44:2*2*

**SAGES**  39:2*2, 23*  40:2 42:2*0, 22*  43:*7* **Saturday**  112:*1* **saving**  8:*14* **saw**  12:2  28:2*4*  109:*9* **say,"it's**  103:8 **saying**  8:2*4, 25*  29:2*0* 40:*15*  41:*14*  49:6  64:8 73:*4*  83:*11*  94:*13*  103:2 **says**  15:*16*  106:2*3*  117:9 **says,"once**  78:2*3* **scale**  87:9 **scanned**  7:2*4* **scenario**  8:*19*  79:*4, 14* 80:2*4*  83:2  84:*10*  88:8 **schedule**  111:2*0, 21, 25* 112:*15*  113:*10, 13* **scheduled**  112:5, *8, 12* 113:*17* **school**  12:*12, 17, 18* 50:*17* **schools**  52:*16* **science**  16:5, *8* **Sciences**  18:6  22:*12* 38:2*5* **scope**  40:*10*  46:5  98:2*5* 105:6 **SEAK**  45:2*4, 25*  46:2, *12*  47:8 **S-E-A-K**  46:*1, 3* **SEAK's**  46:5 **sealed**  86:2*5* **second**  7:2*2*  50:*16* 100:*4*  101:*12* **section**  41:4  78:2*1* 97:*13* **secure**  53:7 **secured**  51:*12* **security**  48:2*4*  51:*10, 19* 64:*17* **see**  7:*16*  8:3, *6*  12:*12* 28:*15*  51:2*3*  56:2*4* 59:*18*  66:2*4*  79:*16* 80:*13*  84:6  92:*1*  112:*17, 20*  115:*16* **seeing**  92:*16* **seek**  104:*12* **seen**  7:*1*  66:*18*  89:2*2* 95:*17*  96:*19*  100:2 103:2*4* **send**  74:6 **senior**  33:*18*  54:9 **sense**  16:*12* **sent**  89:*18*  91:2*5*  118:*11* **sentence**  95:8 **sepsis**  81:8 **September**  65:8  92:6 **septic**  90:2, *10*  91:*3, 12, 13*  92:2*1*  94:*10, 11*  95:2 **served**  13:*16*

**serves**  91:2*2* **service**  14:*13*  51:2*2* **services**  19:*16*  33:6 34:*14*  51:*1*  54:*18* 104:*12, 22*  120:*7, 16, 21* **set**  92:5 **sets**  100:2*5* **setting**  45:8  49:*14*  58:2*3* **settlement**  70:2*1* **seven**  12:*13*  47:2*0*  89:*18* **severe**  32:2*4*  79:5, *9* 89:*16, 19, 21, 23*  90:2 104:*13* **sew**  23:2*0* **sheet**  74:*1* **Sheriff's**  5:2*0* **shock**  90:*3, 10*  91:*3, 11, 12, 13*  92:2*2*  93:2, *15, 18, 23*  94:*9, 10, 11*  95:2 **short**  16:2*0* **shorten**  86:*12* **showing**  79:*14*  81:8 93:*3, 12* **shown**  69:*16, 21*  70:2 **sick**  81:*18*  83:*1, 3* **sicker**  94:*1, 4* **side**  52:7  57:2 **sift**  66:*10* **sign**  92:*16*  93:5 **significantly**  92:*12*  96:*1* **signing**  6:*10* **signs**  8:*3*  9:*19, 21*  81:8 89:2*5*  91:*15, 16, 22*  92:*1, 5, 8, 17, 20*  93:*3, 11, 12* 96:*12, 24*  100:2*0, 21* 105:*19, 21*  106:2*5*  107:6 109:*9, 25*  110:4 **similar**  20:*19*  41:*11* **simple**  76:9  79:*13* 112:*17* **Simply**  36:*15* **sit**  73:2*3* **sitting**  100:2*5* **situation**  52:*16*  61:*3* 111:8 **six**  12:*1* **sketched**  79:2*2* **skills**  22:2*1, 22* **slow**  81:*15* **slower**  81:*13* **small**  23:*17*  29:2*3* 36:2*4*  118:4 **smoking**  27:2*3* **snort**  29:6 **social**  13:*10* **societies**  43:2 **society**  39:2*4*  40:*3, 15, 17*  42:*16, 20, 24*  43:9 **soft**  19:*17* **solitary**  107:*12*

Brian S. Myers, M.D., F.A.C.S.

3/13/2023
Page 12

Case 1:20-cv-03662-VMC   Document 211-2   Filed 08/31/23   Page 46 of 48
USCA11 Case: 24-10933   Document: 31-3   Date Filed: 06/11/2024   Page: 51 of 180

**Somebody** 64:*13*
**someone's** 98:*2* 100:*19*
**soon** 104:*17*
**sore** 98:*11*
**Sorry** 30:*14* 44:*6* 48:*12*
76:*4* 83:*15* 90:*6*
**sort** 5:*24* 6:*3* 8:*19* 80:*6*
**sorts** 22:*17*
**sounds** 19:*12* 118:*1*
**source** 67:*5* 120:*9*
**sources** 72:*22* 73:*1, 2*
**South** 34:*8, 19* 35:*1*
37:*1, 6, 13, 23* 53:*13, 14*
**Southern** 15:*23*
**speaks** 88:*20*
**specialist** 19:*21*
**specialization** 19:*23*
**specialize** 35:*7*
**specialized** 35:*10*
**specialties** 42:*8*
**specialty** 19:*4, 7, 9, 21*
35:*3* 39:*4, 7*
**specific** 7:*21* 16:*16*
17:*11* 21:*10* 29:*12* 34:*3*
37:*22* 48:*16* 58:*22* 66:*2,*
*3* 74:*1* 86:*11*
**specifically** 37:*16* 50:*14*
63:*18* 94:*2* 116:*21*
**specifics** 44:*7, 10* 57:*23*
60:*20*
**spectrum** 89:*20*
**speculation** 82:*18* 84:*9*
96:*22* 105:*10*
**spend** 73:*12*
**spent** 73:*17* 74:*13*
**spilled** 23:*19* 89:*16*
**spreading** 114:*14*
**spreadsheet** 73:*22*
**SR** 1:*6, 8, 10, 13*
**staff** 10:*4, 5* 14:*7* 34:*16,*
22 37:*6, 10, 12* 48:*21, 24*
54:*10, 16, 19* 55:*3* 79:*12*
81:*9* 95:*13, 14* 105:*8*
112:*25* 113:*10*
**stage** 25:*14*
**stages** 22:*16* 25:*12*
79:*24*
**stand** 93:*7, 9* 101:*1*
108:*5*
**standard** 61:*23* 62:*1, 2*
**standing** 42:*8, 10*
**start** 16:*2* 18:*12* 19:*8*
27:*19* 31:*8* 34:*12* 73:*23*
82:*9* 88:*10*
**started** 18:*10* 31:*4* 33:*1*
37:*10* 46:*13* 104:*11*
106:*24* 116:*12*
**starting** 18:*25* 40:*24*
44:*2*
**starts** 17:*9*

**state** 5:*16* 16:*3* 17:*2, 15*
20:*9* 31:*20* 49:*22, 23*
51:*7* 52:*17, 18* 53:*6*
119:*4*
**stated** 109:*21, 24*
**statement** 94:*21* 108:*4*
109:*12, 13, 19, 20, 25*
**statements** 71:*14* 101:*2*
**STATES** 1:*1* 41:*22*
120:*4*
**stating** 37:*5* 88:*25*
120:*6*
**stationed** 13:*22*
**status** 43:*6*
**stay** 11:*16* 31:*20* 38:*5,*
*17* 87:*1* 115:*12*
**step** 19:*3*
**stick** 106:*3*
**stipulated** 93:*24*
**Stockbridge** 11:*7* 12:*20*
**stomach** 27:*18* 35:*22*
36:*16, 18, 25*
**stones** 112:*19*
**stood** 93:*5* 99:*15*
**stop** 102:*18*
**stopped** 110:*4*
**strategies** 61:*13*
**stress** 27:*24*
**stretched** 83:*1*
**stricken** 57:*7*
**student** 49:*22, 25* 50:*1,*
*2, 9* 52:*10, 11* 53:*6, 8*
**studied** 89:*5*
**studies** 21:*10*
**study** 17:*25* 18:*3* 22:*1,*
*24* 23:*6* 38:*5* 88:*24*
**studying** 16:*20*
**stuff** 67:*24*
**subject** 71:*13*
**subjects** 62:*20*
**submitted** 74:*25*
**subpoena** 74:*21*
**sub-position** 102:*24*
**subsequent** 23:*6*
**subsequently** 63:*12*
**subspecialization** 35:*12*
**subspecialty** 19:*22*
35:*14, 15, 16*
**successive** 19:*3*
**sudden** 32:*24* 79:*4, 6*
**suddenly** 114:*4*
**sued** 39:*11*
**suffered** 63:*11, 13* 64:*6*
**suffering** 91:*11*
**suffice** 53:*1*
**suggest** 92:*25* 93:*1*
**suggested** 85:*7*
**suggests** 96:*17*
**Suite** 2:*6* 3:*7, 16*
**summer** 16:*20*

**summoned** 84:*6*
**Sundays** 112:*1*
**supervision** 51:*4*
**supplemental** 59:*23*
**supplied** 67:*10*
**supply** 29:*5, 8*
**suppression** 31:*8, 12*
**sure** 5:*24* 6:*3, 19* 7:*4*
13:*12* 38:*14* 52:*19*
65:*22* 72:*13* 74:*16, 17,*
22 82:*22* 97:*11*
**surgeon** 20:*17* 25:*23*
27:*15* 34:*10, 13* 35:*7*
36:*15* 37:*6, 10, 12* 40:*6,*
*7* 58:*18* 80:*9, 11, 16*
81:*2, 4* 83:*4, 20, 23*
85:*15* 86:*6* 96:*23* 97:*10*
**surgeons** 19:*20* 20:*1*
24:*22* 34:*23, 25* 35:*4, 5*
39:*22* 40:*4, 16, 17* 42:*6*
43:*1, 10* 48:*18*
**surgerable** 25:*21*
**surgeries** 14:*4* 25:*1*
111:*24* 112:*4* 114:*24*
**Surgery** 14:*3, 19* 17:*8*
18:*11, 12, 24* 19:*5, 10, 13,*
*14* 20:*12* 21:*15, 18, 21,*
*23* 22:*15, 19* 24:*17, 18,*
*24* 25:*1, 5, 6, 24* 26:*25*
27:*5* 33:*11, 16* 34:*8, 19,*
*25* 35:*8, 12, 15, 16, 17, 20*
36:*8, 9, 10, 11, 12, 14*
37:*1, 6, 13, 16, 18, 23*
38:*23, 24* 39:*4* 40:*18*
47:*10* 48:*5, 10, 11* 50:*8*
51:*21* 52:*3, 5* 53:*13, 14,*
*21* 54:*12* 57:*3* 79:*16, 18*
80:*17* 83:*8, 10* 84:*8, 11,*
*21, 23* 85:*12* 86:*18, 19*
87:*4* 112:*14, 24* 113:*17,*
*19* 114:*5, 16, 21*
**surgical** 19:*16, 21* 34:*14*
42:*7* 61:*24* 78:*22* 97:*8*
98:*7*
**survivability** 9:*9, 14*
107:*17, 23* 110:*17, 24*
**survival** 110:*25*
**survive** 8:*18, 20* 88:*5*
105:*20, 22* 106:*4, 19*
107:*1* 110:*1*
**survived** 103:*12* 105:*15*
106:*20* 107:*25* 108:*8, 12*
109:*13* 110:*6*
**surviving** 1:*7, 9, 12* 9:*2*
108:*2*
**suspect** 97:*7*
**suspended** 24:*15* 39:*14*
**suture** 23:*21*
**sworn** 5:*4, 7* 6:*14, 21*
**symbiotically** 54:*23*

**symptoms** 32:*4, 7, 9, 11,*
*13, 16* 62:*7* 93:*18* 102:*6,*
*23*

**< T >**
**T0** 87:*24*
**table** 82:*14*
**take** 6:*6* 16:*19* 17:*11*
19:*2* 22:*21* 24:*8, 25*
33:*9* 38:*12* 52:*18* 53:*23*
59:*10* 67:*20, 22* 72:*7*
80:*14, 16, 24* 83:*8, 10*
84:*3, 5, 25* 86:*5* 96:*20*
100:*24, 25* 101:*1* 104:*8*
112:*14, 15, 25* 113:*15*
114:*25*
**taken** 5:*10* 9:*5, 7, 17*
31:*2* 65:*18* 85:*21* 91:*18*
95:*17, 24* 96:*15* 97:*17*
100:*21* 104:*4* 107:*11, 15*
119:*9*
**takes** 85:*5*
**talk** 6:*3* 7:*3* 23:*25*
41:*19* 45:*21* 49:*9* 62:*12*
109:*24* 111:*19*
**talked** 47:*2* 53:*12* 95:*24*
**talking** 8:*6* 21:*20* 38:*17*
62:*1, 2, 6* 73:*3* 98:*8*
117:*5*
**TAMIKA** 2:*12* 119:*8,*
*24* 121:*4*
**task** 75:*6*
**teaching** 38:*19, 21* 39:*1*
42:*1*
**tech** 81:*25* 82:*21*
**technically** 6:*14*
**technique** 23:*15* 40:*12*
**techniques** 22:*17* 23:*8,*
*10*
**techs** 81:*21*
**tell** 5:*7* 20:*23* 22:*12*
36:*13* 57:*21* 72:*16*
78:*24* 79:*3, 7* 84:*1*
97:*11, 23* 102:*25*
**telling** 42:*3* 82:*4*
**tells** 79:*14*
**Temple** 17:*16, 22* 18:*1,*
*3, 5, 9* 20:*21* 21:*9, 24*
23:*6* 38:*24*
**ten** 43:*18* 55:*21* 88:*7,*
*12* 106:*24* 110:*24*
**tender** 98:*9* 120:*5*
**tenderness** 97:*22*
**term** 16:*20* 17:*17* 86:*16*
94:*9*
**terminated** 39:*15*
**terms** 18:*16* 19:*13*
57:*21* 62:*13* 87:*10*
100:*7*
**terrible** 114:*17*
**test** 30:*4* 77:*14*

**testified** 5:8  44:15
46:17, 21  47:4, 22  48:3
55:23  56:11

**testify** 57:5  77:6  114:20
115:7

**testifying** 63:6

**testimonies** 47:21

**testimony** 14:15, 20, 24
43:24  44:12  46:24  47:6,
15, 18  53:16, 17  57:7
62:24  76:5  109:18

**testing** 29:25  32:17  77:3

**Thank** 14:13  55:18
76:17  118:18

**Thanks** 111:16  115:11

**theories** 60:22  61:7, 9,
12, 13

**therapies** 31:6, 9

**therapy** 31:3

**there,"witnesses** 95:9

**thing** 6:4  114:17

**things** 22:14  42:13
70:23  81:9

**think** 30:4  38:16  52:14
72:9, 22  73:4, 15  77:14
88:14  94:14  100:4
109:6, 7, 12  111:9  118:5

**thinking** 102:25

**third** 97:15

**Thirty** 72:9

**THOMAS** 1:11

**thought** 7:25  22:18
45:18  59:19  67:14
102:23  117:14

**three** 95:3  113:2
115:18  117:16

**threw** 101:15, 17, 20

**TIFFANY** 1:5

**TIME** 2:8  15:19  17:7
21:24  22:15  28:4  33:25
34:1  44:9  46:17, 21
47:3, 14  50:10  52:9
59:5  63:20, 22  66:19
68:2  69:10  73:14, 16, 23,
24  74:1, 4, 8, 9, 11  76:10
77:25  79:7  80:19  82:13
85:14  86:13, 24  87:9, 10
88:12  92:13  96:3, 5, 21
100:12  104:8  107:3, 7,
15  108:5  110:19  111:2
112:7  113:3  115:1
116:6  118:18  119:10
120:5

**times** 33:10  47:22, 23
52:23  81:7

**Timothy** 3:5  74:14

**tissues** 19:17  27:19
90:2, 9, 11, 13  93:6

**TITLE** 2:1

**TJG@gardentrialattorney
s.com** 3:10

**today** 10:6, 7, 9, 25  11:2
19:9  23:1  27:2  70:24
75:14, 16  100:3  111:6,
11

**today's** 7:9  10:1, 20
73:17, 19  82:25

**told** 52:13  58:7  67:1

**top** 16:2  23:22

**Total** 48:1  73:16  117:18

**Townsend** 56:14, 19

**toxic** 91:11, 12

**trachea** 19:18

**tracking** 73:21

**tract** 40:8

**training** 18:17, 19  21:10
22:1, 5  33:7, 10  48:23
49:5

**transcript** 119:11  120:12

**transcription** 6:19

**trash** 68:8

**trauma** 20:4

**travel** 76:10

**treat** 23:16  25:8, 19
49:7, 10  51:15

**treated** 31:18  86:1

**Treating** 26:1

**treatment** 20:8  23:11
25:12, 21  26:5, 8  30:25
31:1, 14  36:4  44:20
51:18  53:7  89:1

**TRIAL** 3:4  44:15
47:21  56:13  76:5

**tried** 39:6

**tries** 43:3

**true** 102:1  109:14, 19,
22, 25  119:12

**Trustpointe.One/Alderson**
120:15, 17, 20, 25

**truth** 5:7

**truthful** 109:22

**try** 66:11  76:8  102:11

**trying** 9:20  32:2  56:24
80:19  83:16  109:11
110:17

**turn** 50:20

**twenty** 85:8

**Two** 11:21  36:5  54:2,
22  59:16  63:1  95:2
100:25

**type** 44:4  50:7  98:23

**types** 56:19, 20, 25

**typical** 23:14  25:12
31:13  32:15  62:8  79:2,
4  80:24  85:8  97:25

**typically** 25:14  30:8
80:5, 15  84:5  89:17
112:5, 6, 8, 11  114:23

**typo** 59:16

**typos** 59:17, 19  111:13

**< U >**

**ubiquitous** 30:9

**ulcer** 20:5, 9, 11  21:5
23:12, 16  24:2  25:9, 15,
20  26:1  27:16  28:6, 17
29:14  30:2, 11, 12, 13, 25
31:7, 18  32:3, 8, 10, 11,
16, 18, 21  36:10  62:13
63:12, 14, 16  64:7, 9, 19,
23  69:24  78:25  79:25
83:3  86:2  94:8  97:18,
25  102:7, 10, 13, 16, 19
103:25  104:7  106:20
108:16, 23  109:14

**ulcers** 20:8  24:2  25:9,
14, 22  26:5, 8, 15  27:21
29:3, 12  30:5  31:3  36:4
45:4  78:22  88:17, 22
95:10  102:6

**umbrella** 36:11

**unable** 92:21, 22  110:19

**unavailable** 114:23

**uncommon** 32:25

**undergrad** 16:19

**underlying** 27:19  30:19

**underneath** 34:12

**understand** 33:21  90:4
99:13  104:14  107:12
108:19, 21  110:17

**understanding** 46:5
61:19  62:12  79:25
83:13, 22

**Understood** 58:8

**undertook** 21:25

**unemployment** 38:2

**uneventful** 89:17

**unfortunately** 60:20
89:3  91:7

**unique** 23:3

**UNITED** 1:1

**University** 16:3  17:2, 16
18:6  22:12  49:22

**unreasonable** 109:6

**unremarkable** 92:7

**untreated** 32:3

**update** 15:21

**updated** 15:16

**updates** 15:18

**upper** 32:14

**urologic** 18:23

**urologist** 18:23

**urologists** 20:3

**urology** 18:25

**use** 27:22, 24  28:23
29:2, 13  40:12  88:15, 17,
21  104:20

**usual** 120:25

**usually** 79:11  81:6  87:3
93:7  100:13  113:2

118:16

**< V >**

**VA** 38:25

**vacation** 115:1

**valid** 59:15

**value** 61:17

**variable** 82:12, 20  86:21

**variables** 81:23, 24  85:3
86:11

**varies** 80:20

**variety** 52:2

**various** 33:10  85:3

**vaso** 29:18, 20, 21, 22

**verbal** 6:2

**verify** 34:1

**versus** 44:3  56:14, 19

**vessels** 29:7, 23

**video** 65:14, 15  66:6
70:12, 15, 18, 21  71:2, 7
72:8  100:2  116:25
117:1, 7, 9, 11, 13

**videos** 11:3  66:16
117:10

**view** 20:13

**violation** 60:24

**Virginia** 12:10, 19

**VITAE** 4:15

**vital** 8:3  9:19, 21  81:7
89:25  91:15, 22  92:1, 5,
8, 15, 16, 20  96:12, 24
100:20, 21  105:19, 21
106:25  107:6  109:9, 25
110:4

**vitals** 8:6, 11, 15, 17, 18,
21  9:5  91:18  95:24
96:20  107:11, 15  108:9
110:10, 15, 16, 19  111:5

**vital's** 97:17

**voluminous** 7:23

**voluntary** 39:18

**Vs** 1:15

**< W >**

**wait** 94:17  109:3, 5
114:12

**waiting** 81:5  82:8
108:20

**walk** 81:12

**wall** 19:17  98:3

**Walter** 44:3

**want** 6:11, 17  8:11
13:12  27:6  33:19  36:21
38:11, 12  61:25  79:19
81:21  90:14  95:5
104:17  108:6  109:20, 22
111:19  112:24

**wanted** 8:3, 6  20:25
66:15  68:5  71:16
115:17  117:6, 7

**Washington** 12:*18*
**watch** 10:*4* 11:*2* 71:*24*
**watched** 10:*8* 71:*21*
**way** 31:*24* 37:*21* 46:*23*
52:*11* 64:*15*, *22* 72:*19*
76:*19* 78:*15* 89:*24* 90:*3*
94:*24* 97:*9* 107:*3*
111:*10*
**week** 112:*2*
**weekly** 111:*20*
**welcome** 14:*14*
**well** 8:*24* 18:*18* 20:*2*
22:*9* 32:*4* 34:*12* 37:*17*
44:*11* 46:*21* 51:*23*
53:*20* 57:*18* 58:*7* 61:*23*
63:*3* 71:*1*, *24* 72:*19*
74:*19* 77:*25* 79:*3* 82:*11*
83:*4* 90:*24* 92:*15* 93:*6*
94:*9* 95:*5*, *7* 96:*23*
99:*22* 101:*19* 104:*2*
109:*1*, *11* 111:*14* 112:*1*
115:*18*, *23* 116:*3* 117:*6*
**WellStar** 28:*12* 85:*19*,
*22*, *24* 86:*2*, *8*, *12*
**went** 7:*10* 12:*3* 17:*16*
18:*5* 33:*4* 50:*1*, *19*, *25*
51:*2*, *10*, *20*, *23* 61:*3*
81:*15* 91:*18* 92:*21*, *22*
**we're** 10:*12* 18:*9* 19:*13*
33:*3* 65:*19* 83:*1* 96:*15*
98:*8* 110:*16* 115:*11*
118:*13*
**Wes** 5:*18* 58:*2* 115:*14*
**Wesley** 3:*14*
**West** 12:*10*, *19*
**we've** 58:*20* 112:*22*
**whatsoever** 49:*2*
**whittles** 19:*4*
**wide** 52:*1*
**WILKERSON** 1:*18*
**WINGO** 1:*5*, *6*, *7*, *8*, *9*, *10*,
*12*, *13* 23:*11* 62:*13*
63:*11* 64:*6*, *18* 66:*19*
77:*24* 85:*21* 88:*3* 91:*11*
95:*9* 99:*19* 101:*12*
102:*16* 103:*10*, *23*
104:*15*
**WINGO004192** 4:*16*
**Wingo's** 5:*21* 11:*4* 28:*6*,
*8* 63:*25* 65:*6* 97:*14*
103:*15* 107:*7*
**withdrawal** 95:*10*
**WITNESS** 4:*3* 5:*4*, *6*
6:*13* 15:*20* 26:*10* 27:*4*
28:*19* 29:*17* 44:*5* 61:*1*
81:*1*, *17* 84:*10* 86:*21*
93:*17* 94:*20* 96:*23*
98:*21* 99:*2* 101:*9*
104:*10*, *20* 105:*11*
107:*21* 108:*4* 109:*19*

110:*23* 116:*16* 118:*11*,
*14*, *19*
**witnesses** 95:*10*
**Wjackson@fmglaw.com**
3:*18*
**wondering** 108:*10*
109:*12*
**woods** 86:*17* 87:*1*
**word** 40:*11*, *13* 43:*5*
51:*8* 94:*14* 104:*20*
**words** 19:*1* 20:*19* 90:*4*
**work** 34:*18* 40:*11*
41:*23* 54:*23* 55:*20*
56:*16* 73:*21* 75:*19* 76:*2*,
*21* 77:*1*, *4*, *7* 84:*2*
102:*13* 112:*2*
**worked** 21:*3* 48:*6* 57:*9*
**working** 31:*5* 111:*25*
**works** 17:*11* 37:*20* 40:*7*
**workup** 79:*12* 80:*4*, *14*,
*15*, *24* 82:*9* 84:*14*, *17*
**world** 78:*1*
**worse** 102:*21*
**worth** 41:*24*
**write** 59:*17* 68:*4* 89:*14*
97:*18*
**writing** 116:*20*
**written** 67:*11* 68:*24*
**wrong** 8:*25* 16:*6* 21:*25*
44:*18* 45:*6*
**wrote** 95:*16*, *25* 116:*19*

**< X >**
**x'd** 68:*5*
**X-ray** 79:*14* 80:*5*, *6*
82:*21* 83:*7*, *18* 97:*7*, *9*
**X-rays** 81:*21*

**< Y >**
**year** 18:*20* 20:*24* 21:*2*,
*8*, *22* 33:*13*, *14*, *21*, *22*, *23*
60:*12*
**years** 11:*21* 12:*1*, *13*
13:*20* 22:*6* 23:*6* 43:*18*
63:*7*
**you-all** 6:*9*
**YouTube** 71:*24* 117:*1*

**< Z >**
**zero** 8:*19* 9:*2*, *3*
**zoology** 16:*6*, *8*
**Zoom** 70:*13* 117:*3*

DOCKET 211-3

Case 1:20-cv-03662-VMC   Document 211-3   Filed 08/31/23   Page 1 of 101
Tiffany Wingo, et al. vs Major Branson Harris, et al.
USCA11 Case: 24-10933   Document: 31-3      Date Filed: 06/11/2024   Page: 55 of 180
Nurse Annaleen Visser                                                    May 16, 2023

Page 2

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
                        ATLANTA DIVISION
TIFFANY WINGO as Administrator
of the Estate of KEVIL WINGO,
SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR.,
ANGEL CALLOWAY, as mother and
next friend of ERIKA WINGO,
surviving minor child of KEVIL
WINGO, SR., and FATIMA THOMAS,
as mother and next friend of
KEVIL WINGO, JR., surviving
minor child of KEVIL WINGO, SR.,
       Plaintiffs,
                                  CIVIL ACTION
     vs.                          FILE NO.
                                  1:20-CV-03662-VMC
MAJOR BRANSON HARRIS,
individually, LIEUTENANT
CHARLES GORDON, individually,
DEPUTY PAUL WILKERSON,
individually, DEPUTY BRITTON
MCPHEE, individually, DEPUTY
LYNDA MARSHALL, individually,
JOHN DOES 1-10, and JANE DOES
1-10,
       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~
          VIDEOTAPED DEPOSITION OF
            NURSE ANNALEEN VISSER
                May 16, 2023
                 12:56 p.m.
            191 Peachtree Street
                Suite 2900
              Atlanta, Georgia
  Nicole Limoncelli, RPR, CCR-5799-5142-5014-9888
```

Page 2

```
 1              APPEARANCES OF COUNSEL:
 2  On behalf of the Plaintiffs:
 3      TIMOTHY J. GARDNER, Esquire
        Gardner Trial Attorneys, LLC
 4      3100 Cumberland Boulevard
        Suite 1470
 5      Atlanta, Georgia 30339
        (770) 693-8202
 6      (404) 393-9838 - (facsimile)
        tjg@gardnertrialattorneys.com
 7
 8
 9  On behalf of the Defendants:
10      WESLEY C. JACKSON, Esquire
        Freeman Mathis & Gary, LLP
11      100 Galleria Parkway
        Suite 1600
12      Atlanta, Georgia 30339
        (770) 818-0000
13      (833) 330-3669 - (facsimile)
        wjackson@fmglaw.com
14
15
16  On behalf of Annaleen Visser, RN:
17      JACQUELYN SMITH CLARKE, Esquire
        Hall Booth Smith, P.C.
18      191 Peachtree Street NE
        Suite 2900
19      Atlanta, Georgia 30303
        (404) 954-5000
20      jclarke@hallboothsmith.com
21
22  Also Present:
23      Tony Wicks - Videographer
24               -  -  -  -  -
25
```

Page 3

```
 1             INDEX OF EXAMINATION
 2  WITNESS:  NURSE ANNALEEN VISSER
 3
 4  CROSS-EXAMINATION                      PAGE
 5      By Mr. Jackson                      6
 6
 7  CROSS-EXAMINATION
 8      By Mr. Gardner                     104
 9
10  RECROSS-EXAMINATION
11      By Mr. Jackson                     299
12
13  RECROSS-EXAMINATION
14      By Mr. Gardner                     302
15
16               -  -  -  -  -
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1             INDEX OF EXHIBITS
 2
    DEFENDANTS'
 3  EXHIBITS          DESCRIPTION          PAGE
 4  Exhibit D1        Kevil Deandre Wingo's jail   69
 5                    medical records
 6
 7
 8
 9
    PLAINTIFFS'
10  EXHIBITS          DESCRIPTION          PAGE
11  Exhibit P1        Six videos           163
12
13
14
15  (Original Defendants' Exhibit D1 has been attached to
16  the original transcript.)
17  (Original Plaintiffs' Exhibit P1 has been attached to
18  the original transcript.)
19
20               -  -  -  -  -
21
22
23
24
25
```

Tiffany Wingo, et al, vs Major Branson Harris, et al.
Nurse Annaleen Visser                                                          May 16, 2023

Page 237

1  detoxing, moving from the situation, calm the whole
2  place down.  And when he goes to close obs, he can go
3  there, and when he's calm, bring him back and we can
4  do his vitals, no problem.
5      Q.   And that's because he was still acting right
6  now?
7      A.   That is because?
8      Q.   He was -- he's still acting right now?
9      A.   To me he was still in his acting mode, yes.
10     Q.   Okay.  Did Deputy Marshall ever tell you
11 that she heard Mr. Wingo say that he couldn't breathe
12 while he was laying on the floor?
13     A.   No, I never heard.
14     Q.   Okay.  Would that --
15     A.   I don't know where I was with that -- when
16 that was because he was shouting.
17     Q.   Mm-hmm.
18          Did you ever hear him shout that he couldn't
19 breath?
20     A.   No.
21     Q.   Okay.  If Deputy Marshall had heard him say
22 I can't breath, is that something that you would've
23 liked to have know as a medical provider?
24     A.   Sure, yes.
25     Q.   Would that have affected your assessment of

Page 238

1  him?
2      A.   Probably not because he was yelling.
3      Q.   Okay.
4      A.   You can breath -- you can't not breath and
5  yell.
6      Q.   Mm-hmm.
7           So if you -- if Deputy Marshall had told you
8  that she heard Mr. Wingo say I can't breath, that
9  wouldn't have impact your assessment of him?
10     A.   No, because he was yelling.  He was yelling
11 and acting out, no.
12     Q.   Can someone have difficulty breathing and
13 still talk?
14     A.   Difficulty breathing, yeah, but it won't be
15 a yell.  It won't be a yell, and he was yelling.
16     Q.   Okay.  So when Mr. Wingo was lying on the
17 floor there, he was yelling?
18     A.   He was yelling all the time.
19     Q.   Okay.  So when he was laying on the floor
20 there, he was yelling?
21     A.   Yes.
22     Q.   Okay.  Would you consider Mr. Wingo a
23 medical patient at that time?
24     A.   Sure.  He was detoxing.
25     Q.   Should medical patients be moved to the

Page 239

1  extension?
2      A.   In his situation, yes.  Yes, because he was
3  acting out.  He was causing a disruption in the
4  infirmary.  And that's not good for heart patients,
5  pregnant ladies.  No, not good at all.  You move him
6  away from the situation.  You have to.
7      Q.   If you were to had examined Mr. Wingo at
8  that time, how long would it have taken?
9      A.   If he was calm, he wouldn't have been moved.
10     Q.   Mm-hmm.
11          How long would it have taken to examine him
12 though if you wanted to do it?
13     A.   The machine does the vitals.  Maybe
14 5 minutes.
15     Q.   Okay.  I'm going to play it from 7:40:11.
16 So this is about 9 minutes after Mr. Wingo was outside
17 of his cell.  Would you agree with that?
18     A.   (Perusing.)
19          Sorry?
20     Q.   I was going to play it from 7:40:11.  That's
21 about 9 minutes after Mr. Wingo was outside his cell.
22     A.   Okay.
23     Q.   Would you agree with that?
24     A.   Yes.
25     Q.   Okay.

Page 240

1           (The video was played.)
2  BY MR. GARDNER:
3      Q.   Do you see Sergeant Gordon in that -- in
4  this video here?
5      A.   Yes, he's standing there (perusing).
6      Q.   And Deputy Marshall?
7      A.   Yes (perusing).
8      Q.   Can you see Mr. Wingo?
9      A.   Yes (perusing).
10     Q.   Okay.
11     A.   Mm-hmm.
12     Q.   Do you see him go into the chair there?
13     A.   Yes, I do.
14     Q.   Okay.  Was he handcuffed at that time?
15          I'll stop it at 7:40:30.
16          Was he --
17     A.   I think he's handcuffed, yes.
18     Q.   Okay.  He was handcuffed to you right there?
19     A.   Yeah.
20     Q.   Okay.  I'm just going to go back 10 seconds
21 and play it again for you.
22          (The video was played.)
23          THE WITNESS:  Oh, no, he's not handcuffed.
24 BY MR. GARDNER:
25     Q.   Okay.

DOCKET 211-6

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Tiffany Womack                                                      May 24, 2023

Page 2

                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION

TIFFANY WINGO as Administrator
of the Estate of KEVIL WINGO,
SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR.,
ANGEL CALLOWAY, as mother and
next friend of ERIKA WINGO,
surviving minor child of KEVIL
WINGO, SR., and FATIMA THOMAS,
as mother and next friend of
KEVIL WINGO, JR., surviving
minor child of KEVIL WINGO, Sr.,
        Plaintiffs,           CIVIL ACTION FILE
    vs.                       NO. 1:20-CV-03662-VMC
MAJOR BRANSON HARRIS, individually,
LIEUTENANT  CHARLES GORDON,
individually, DEPUTY PAUL WILKERSON,
individually, DEPUTY BRITTON MCPHEE,
individually, DEPUTY LYNDA MARSHALL,
individually, JOHN DOES 1-10, and JANE
DOES 1-10,
        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
                    DEPOSITION OF
                    TIFFANY WOMACK
                    May 24, 2023
                    10:03 a.m.
                    100 Galleria Parkway
                    Suite 1600
                    Atlanta, Georgia
                    Joel P. Moyer, CCR 2745

---

Page 2

 1                 APPEARANCES OF COUNSEL
 2  On behalf of the Plaintiffs:
 3      TIMOTHY J. GARDNER, Esquire
        Gardner Trial Attorneys, LLC
 4      3100 Cumberland Boulevard
        Suite 1470
 5      Atlanta, Georgia 30339-5939
        (770) 693-8202
 6      tjg@gardnertrialattorneys.com
 7  On behalf of the Defendants Major Branson Harris,
    Lieutenant Charles Gordon, Deputy Paul Wilkerson,
 8  Deputy Britton McPhee, Deputy Lynda Marshall:
 9      WESLEY C. JACKSON, Esquire
        Freeman Mathis & Gary, LLP
10      100 Galleria Parkway
        Suite 1600
11      Atlanta, Georgia 30339
        (770) 818-0000
12      wjackson@fmglaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

 1            INDEX TO EXAMINATIONS
 2  WITNESS:  TIFFANY WOMACK
 3  EXAMINATION                          PAGE
 4  By Mr. Jackson                         4
    By Mr. Gardner                        84
 5
 6
 7                    - - -
 8            INDEX TO EXHIBITS
 9  EXHIBITS                             PAGE
10  Exhibit 1  Medical records, Kevil Deandre   63
               Wingo
11
    Exhibit 2  Audio Recording 191006_002   70
12
13
14
    (Original Exhibit 1 has been attached to the
15
    original transcript.  Exhibit 2 has been retained by
16
    counsel and may be attached at a later date.)
17
18
19
20
21
22
23
24
25

---

Page 4

 1        Deposition of Tiffany Womack
 2            May 24, 2023
 3        (Whereupon the witness was sworn.)
 4        MR. JACKSON:  This will be the
 5  deposition of Tiffany Womack taken pursuant to
 6  notice and agreement of counsel for all purposes
 7  allowed under the Federal Rules of Civil Procedure.
 8  All objections are reserved except to the form of
 9  the question or responsiveness of the answer.
10            TIFFANY WOMACK,
11  having been first duly sworn, was examined and
12  testified as follows:
13            EXAMINATION
14  BY MR. JACKSON:
15      Q    Ms. Womack, could you please state your
16  full name for the record.
17      A    Tiffany Leigh Womack.
18      Q    And I've seen in some documents related
19  to this case that you may also go by Proctor or you
20  did before?
21      A    That was my maiden name.
22      Q    Well, we met a moment ago.  My name's
23  Wes Jackson.  I'm an attorney representing five
24  Cobb County Sheriff's deputies with respect to a
25  lawsuit concerning the death of an inmate at the

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Tiffany Womack
May 24, 2023

---

Page 85

1  where the deputy has overrode the nurse's decision
2  in the infirmary.  And I think you responded you
3  hadn't seen that in the year that you had been
4  there.
5       A       No, sir.  Not as far as a medical
6  emergency, no.
7       Q       Had you ever seen a situation in the
8  year that you had been there where someone was
9  passed out, you know, or lying on the floor in the
10  infirmary and none of the medical providers were
11  attending to the person on the floor?
12      A       No, sir, not -- no.
13      Q       Okay.  Had you ever seen a situation in
14  the infirmary where someone had fainted numerous
15  times or fell to the ground numerous times and what
16  appeared to be involuntarily and no medical
17  providers had ever -- had responded?
18              MR. JACKSON:  Object to form.
19      A       Other than Mr. Wingo, no.
20  BY MR. GARDNER:
21      Q       Okay.  Had you ever had a situation in
22  the year that you had been there at the Cobb County
23  Adult Detention Center where you had a detainee
24  inside one of the infirmary cells asking to go to
25  the hospital and saying that he could not breathe

---

Page 86

1  and sweating and showing signs of nausea and the
2  medical staff not responding?
3       A       Yes, Mr. Wingo.
4       Q       Outside of Mr. Wingo --
5       A       Oh.
6       Q       -- have you ever seen that situation
7  before?
8       A       No, sir.  I mean, people do ask for
9  help and beg, but not to the extent of him, no.
10      Q       Okay.  Have you ever seen a situation
11  outside of Mr. Wingo where you thought that the
12  detainee was having a serious medical issue and
13  medical staff didn't respond?
14      A       No, sir.
15      Q       Okay.  Now, you say that when you saw
16  Mr. Wingo that was early in the morning when you
17  first got there.
18      A       Yes.
19      Q       Correct?
20              And you got there around 6:00 a.m. or
21  so?
22      A       Correct.
23      Q       And as soon as you got there, you say
24  you heard -- you heard Mr. Wingo?
25      A       Correct.

---

Page 87

1       Q       And you could hear him saying that he
2  couldn't breathe?
3       A       Absolutely.
4       Q       And you knew when you got there that he
5  was having some type of issue?
6       A       Correct.
7       Q       When you first got there, were you able
8  to appreciate the seriousness of his issue?
9       A       What do you mean?  I'm sorry.
10      Q       Like I guess did he appear to get worse
11  as you were there?
12      A       To me, he did, yes.
13      Q       Okay.  And when you say he got worse,
14  that's the sweating that you saw?
15      A       Yes, and the falling on the ground.
16      Q       Okay.  And the falling on the ground?
17      A       Correct.
18      Q       And then the yelling that "I can't
19  breathe"?
20      A       Correct.
21      Q       And that appeared to be a serious
22  medical issue to you?
23      A       Yes.
24      Q       Now, I've seen the nurses station.  In
25  fact, I've been out to the Cobb County Adult

---

Page 88

1  Detention Center.  I see the cells kind of along
2  the wall.  And then there's the nurses station.
3  And then where the secretary sits at the counter
4  there, that's almost directly across Cell Number 8;
5  correct?
6       A       Yes.
7       Q       And then to the left of that secretary,
8  the charge nurse's desk?
9       A       Correct.
10      Q       And then right across from that is the
11  security personnel's desk?
12      A       Correct.
13      Q       And that's where Deputy Lyn Marshall
14  would have sat?
15      A       Correct.
16      Q       Right.  When you got there on September
17  29th that morning, Deputy Marshall was in the
18  infirmary?
19      A       Yes, sir.
20      Q       And when you heard Mr. Wingo yelling
21  that he couldn't breathe, was that something that
22  only you could hear, or do you believe that
23  everyone inside that infirmary could possibly hear?
24      A       I believe everyone inside there could
25  hear.

---

Tiffany Wingo, et al. vs Major Branson Harris, et al.
Tiffany Womack                                                    May 24, 2023

---

Page 105

1   back and forth with the times, but he would have
2   been making a round later on that day, and that's
3   when he -- everyone would have been brought on out
4   to do vitals and to see the doctor.
5            And so they wouldn't have seen him in
6   the extension, and so I don't -- again, I don't
7   know why he was moved.
8      Q     Okay.  Have you ever seen the nurses
9   do -- provide medical care in the extension?
10     A     Yes.
11     Q     Okay.  Do they do more medical care in
12  the infirmary as opposed to the extension?
13     A     Absolutely.
14     Q     Okay.
15     A     Just like that little thing that she
16  has there, that's the pill cart.  And those nurses
17  will go out and give meds, administer meds to
18  anybody, no matter where they are.
19     Q     Okay.
20     A     Including the extension.
21     Q     So no matter -- anywhere they are in
22  the jail, they will give them their medicine?
23     A     Correct.
24     Q     But if someone's having ongoing medical
25  issues, are they normally placed in the extension

---

Page 106

1   or the infirmary?
2      A     The infirmary.
3      Q     Okay.
4      A     That's the medical unit, and that's
5   where the doctor will do rounds as if in a
6   hospital.
7      Q     So up until the time that you left to
8   go and do your rounds, did Mr. Wingo appear to be
9   in serious medical distress?
10     A     Absolutely.
11     Q     Did he appear to have some type of
12  serious medical condition?
13     A     He did to me, yes.
14     Q     Okay.  And is that just because you
15  were trained as an EMT, or do you think a layperson
16  would have been able to recognize that level of
17  serious medical distress?
18     A     Yes.  I believe anybody without medical
19  training could tell that he was clearly in
20  distress.
21           MR. GARDNER:  Okay.  I don't have
22  anything else.
23           MR. JACKSON:  Me neither.
24           MR. GARDNER:  All right.  We're done.
25           THE COURT REPORTER:  I'll explain

---

Page 107

1   reading and signing.
2        (Whereupon off-the-record discussions
3        ensued.)
4            THE WITNESS:  I'll waive.
5        (Deposition concluded at 12:05 p.m.)
6        (Pursuant to Rule 30(e) of the Federal Rules
7        of Civil Procedure and/or O.C.G.A.
8        9-11-30(e), signature of the witness has been
9        waived.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 108

1   STATE OF GEORGIA:
2   COUNTY OF FULTON:
3
4       I hereby certify that the foregoing
5       transcript was reported, as stated in the
6       caption, and the questions and answers
7       thereto were reduced to typewriting under my
8       direction; that the foregoing pages represent
9       a true, complete and correct transcript of
10      the evidence given upon said hearing, and I
11      further certify that I am not of kin or
12      counsel to the parties in the case; am not in
13      the employ of counsel for any of said
14      parties; nor am I in any way interested in
15      the result of said case.
16
17
18
19
20
21
22      _____
23      Joel P. Moyer, CCR 2745
24
25

---

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

DOCKET 212

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TIFFANY WINGO as Administrator of the Estate of
KEVIL WINGO, SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR., ERIKA WINGO,
surviving child of KEVIL WINGO, SR., and TERI
FIELDS, ESQ., Conservator of KEVIL WINGO, JR.,
surviving minor child of KEVIL WINGO, Sr.

        Plaintiffs,

v.

MAJOR   BRANSON   HARRIS,   individually,
LIEUTENANT CHARLES GORDON, individually,
DEPUTY   PAUL   WILKERSON,   individually,
DEPUTY LYNDA MARSHALL, individually, JOHN
DOES 1-10, and JANE DOES 1-10,

        Defendants.



**CIVIL ACTION NO.
1:20-CV-03662-VMC**

### PLAINTIFFS' NOTICE OF FILING ELECTRONIC MEDIA
### EXHIBITS FOR PLAINTIFFS' ADDITIONAL FACTS IN OPPOSITION
### TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Tiffany Wingo as Administrator of the Estate of Kevil Wingo,

Sr., Kieara Wingo, as surviving child of Kevil Wingo, Sr., Erika Wingo, surviving

minor child of Kevil Wingo, Sr., and Teri Fields, Esq., Conservator of Kevil Wingo,

Jr., surviving minor child of Kevil Wingo, Sr. by and through their undersigned

counsels of record and manually file the following exhibits that are electronic media

via USB which are referenced in Plaintiffs' Additional Facts in Opposition to Defendants' Motion for Summary Judgment (Doc. 209-1):

1. Exhibit 7: Infirmary Video View 1

2. Exhibit 8: Marshall Internal Affairs Interview Audio

3. Exhibit 9: Infirmary Video View 2

4. Exhibit 11: Lynda Marshall and Paul Wilkerson Internal Phone Call

5. Exhibit 12: Lynda Marshall and Branson Harris Internal Phone Call

6. Exhibit 18: Corridor Video

7. Exhibit 19: Outside Padded Cell Video

8. Exhibit 20: Inside Padded Cell Video

9. Exhibit 22: Vanderbogart Internal Affairs Video Interview

10. Exhibit 34: Paul Wilkerson Internal Affairs Video Interview

This 31st day of August, 2023.

Respectfully submitted,

**GARDNER TRIAL ATTORNEYS, LLC**


/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
(P):  770.693.8202
(F):  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

3

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document

has been prepared in Times New Roman 14, a font and type selection approved by

the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This 31st day of August, 2023.

                              **GARDNER TRIAL ATTORNEYS, LLC**


                              /s/ Timothy J. Gardner
                              **TIMOTHY J. GARDNER**
                              Georgia Bar No. 115430
                              **HENRIETTA G. BROWN**
                              Georgia Bar No. 253547

                              ***Attorneys for Plaintiffs***


3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr.<br><br>          Plaintiffs,<br><br>v.<br><br>MAJOR   BRANSON   HARRIS,   individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY   PAUL   WILKERSON,   individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10,<br><br>          Defendants. | **CIVIL ACTION NO.**<br>**1:20-CV-03662-VMC** |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day electronically submitted **<u>PLAINTIFFS'</u>**

**<u>NOTICE   OF   FILING   ELECTRONIC   MEDIA   EXHIBITS   FOR</u>**

**<u>PLAINTIFFS' ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS'</u>**

**<u>MOTION FOR SUMMARY JUDGMENT</u>** to the Clerk of Court using the

CM/ECF system which will automatically send electronic mail notification of such

filing to the following counsel of record:

Sun S. Choy, Esq.
Wesley C. Jackson, Esq.
Marisa M. Beller, Esq.
Freeman Mathis & Gary, LLP
100 Galleria Pkwy, Suite 1600
Atlanta, GA 30339-5948

H. William Rowling, Jr., Esq.
Lauren S. Bruce, Esq.
Cobb County Attorney's Office
100 Cherokee Street, Suite 350
Marietta, GA 30090

This 31st day of August, 2023.

Respectfully submitted,

**GARDNER TRIAL ATTORNEYS, LLC**

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

*Attorneys for Plaintiffs*

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
(P): 770.693.8202
(F): 404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com



**Electronic Media- Plaintiffs'
Additional Facts in Opposition
To Defendants' Motion For
Summary Judgment**

DOCKET 213

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TIFFANY WINGO as Administrator of the Estate of
KEVIL WINGO, SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR., ERIKA WINGO,
surviving child of KEVIL WINGO, SR., and TERI
FIELDS, ESQ., Conservator of KEVIL WINGO, JR.,
surviving minor child of KEVIL WINGO, Sr.

      Plaintiffs,

v.

MAJOR BRANSON HARRIS, individually,
LIEUTENTANT CHARLES GORDON, individually,
DEPUTY PAUL WILKERSON, individually,
DEPUTY LYNDA MARSHALL, individually, JOHN
DOES 1-10, and JANE DOES 1-10,

      Defendants.

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 01 2023

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**CIVIL ACTION NO.
1:20-CV-03662-VMC**

## PLAINTIFFS' NOTICE OF FILING ELECTRONIC MEDIA EXHIBITS FOR PLAINTIFFS' RESPONSE AND OBJECTIONS TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

COME NOW, Tiffany Wingo as Administrator of the Estate of Kevil Wingo,

Sr., Kieara Wingo, as surviving child of Kevil Wingo, Sr., Erika Wingo, surviving

minor child of Kevil Wingo, Sr., and Teri Fields, Esq., Conservator of Kevil Wingo,

Jr., surviving minor child of Kevil Wingo, Sr. by and through their undersigned

counsels of record and manually file the following exhibits that are electronic media

via USB which are referenced in Plaintiffs' Response and Objections to Defendants'

Statement of Undisputed Material Facts (Doc. 208):

1. Exhibit 6: Infirmary Video View 1

2. Exhibit 7: Infirmary Video View 2

3. Exhibit 9: Lynda Marshall and Branson Harris Internal Phone Call

4. Exhibit 12: Lynda Marshall and Paul Wilkerson Internal Phone Call

5. Exhibit 14: Nurse Visser Internal Affairs Video Interview

6. Exhibit 15: Corridor Video

7. Exhibit 16: Outside Padded Cell Video

8. Exhibit 17: Inside Padded Cell Video

This 31st  day of August, 2023.

Respectfully submitted,

**GARDNER TRIAL ATTORNEYS, LLC**

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

2

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
(P): 770.693.8202
(F): 404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document

has been prepared in Times New Roman 14, a font and type selection approved by

the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This 31st day of August, 2023.

GARDNER TRIAL ATTORNEYS, LLC

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr.<br><br>       Plaintiffs,<br><br>v.<br><br>MAJOR   BRANSON   HARRIS,   individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY   PAUL   WILKERSON,   individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10,<br><br>      Defendants. | **CIVIL ACTION NO. 1:20-CV-03662-VMC** |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted **PLAINTIFFS' NOTICE OF FILING ELECTRONIC MEDIA EXHIBITS FOR PLAINTIFFS' RESPONSE AND OBJECTIONS TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to the following counsel of record:

Sun S. Choy, Esq.
Wesley C. Jackson, Esq.
Marisa M. Beller, Esq.
Freeman Mathis & Gary, LLP
100 Galleria Pkwy, Suite 1600
Atlanta, GA 30339-5948

H. William Rowling, Jr., Esq.
Lauren S. Bruce, Esq.
Cobb County Attorney's Office
100 Cherokee Street, Suite 350
Marietta, GA 30090

This 31st day of August, 2023.

Respectfully submitted,

**GARDNER TRIAL ATTORNEYS, LLC**

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
(P): 770.693.8202
(F): 404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com



Electronic Media- Plaintiffs'
Response and Objection
To Defendants' Statement
Of Undisputed Material Facts

DOCKET 221

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr. <br><br>         Plaintiffs, <br><br> v. <br><br> MAJOR BRANSON HARRIS, individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10, <br><br>         Defendants. | CIVIL ACTION NO. 1:20-CV-03662-VMC |

**PLAINTIFFS' AMENDED RESPONSE AND OBJECTIONS TO
DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS[1]**

1)      On September 23-24, 2019, Cobb County Police Department arrested Kevil Wingo for suspected drug possession of 0.2 grams of cocaine. (Doc. 166, ¶ 22.2)

---

[1] Plaintiffs filed their Amended Response and Objections to Defendants' Statement of Undisputed Material Facts to comply with the formatting required pursuant to The Honorable Victoria M. Calvert's Standing Order and Northern District Court of Georgia Local Rule 56.1(B). Plaintiffs' have not re-attached Exhibits 208-1 through 208-20 but incorporate same by reference. Electronic Media Exhibits referenced herein were previously manually filed with Court as "Plaintiff's Notice of Filing Electronic Media Exhibits for Plaintiffs' Response and Objections to Defendants' Statement of Undisputed Material Facts. (Doc. 213). There have not been any substantive changes.

**RESPONSE:  Admitted.**

2)     He was then booked as a pre-trial detainee at the Cobb County
Adult Detention Center. (Doc. 166, ¶ 23.)

**RESPONSE:  Admitted.**

### *Mr. Wingo is Transferred to the Infirmary*

3)     On September 28, 2019, he began to experience abdominal pain and
sweats. (Doc. 166, ¶ 24.)

**RESPONSE: Mr. Wingo began to experience severe abdominal pain,
sweats, vomiting, nausea and severe pain. (Deposition of Yvette Burton at p.
102:7-10, relevant pages attached as Exhibit 1).**

4)     Around 11:45 p.m. on September 28, 2019, Deputy Quinton
Appleby transported Mr. Wingo to the infirmary. (Appleby Dep. 19:11-20:16.[1])

**RESPONSE:  Admitted.**

5)     At the time, medical staff from WellStar were responsible for the
medical operations of the infirmary, while sheriff's deputies were present for
security. (Allen Dep. 76:8-77:3.[2])

**RESPONSE:  Cobb County Sheriff's Office has ultimate responsibility
to provide medical care to detainees at the CCADC.  Cobb County Sheriff
contracted with a third-party medical provider to provide medical care in
the infirmary at the CCADC. It was the CCSO responsibility to ensure that**

all CCADC received adequate medical care.  (O.C.G.A. § 42–4–4; Estelle v. Gamble, 429 U.S. 97, 104, (1976)).

6)      According to Chief Deputy Shonya Allen, Deputies were trained not to make medical decisions but instead to defer to the medical staff. (Allen Dep. 94:6- 15.)

**RESPONSE: Chief Deputy Sonya Allen testified that the deputies are trained to defer to medical when deciding whether to call an ambulance, but that does not mean that they can allow medical to not provide adequate medical care.**

7)      While he was transporting Mr. Wingo, Mr. Wingo told Deputy Appleby that he had an ulcer. Deputy Appleby relayed this information to the nursing staff in the infirmary. (Appleby Dep. 21:19-22:6, 24:22-25:2.)

**RESPONSE:  Admitted.**

8)      Nurse Yvette Burton was the charge nurse for the night shift in the Cobb County Adult Detention Center in September of 2019. (Burton Dep. 22:13-18.[3])

**RESPONSE:  Admitted.**

9)      Charge Nurse Burton admitted Kevil Wingo into the infirmary around 12:35 a.m. on September 29, 2019. (Burton Dep. 42:7-14.)

**RESPONSE:  Admitted.**

10)   He was complaining of nausea, vomiting, and abdominal discomfort. (Burton Dep. 101:20-24.)

**RESPONSE:  Admitted.**

11)   When Mr. Wingo was first brought to the infirmary, he was heard saying "Lord, help me through this, and I'll never use drugs again." (McPhee Dep. 101:9-11, 147:11-13[4]; see also Burton Dep. 45:6-8; Jones Dep. 32:4-13[5].)

**RESPONSE:  Plaintiffs admit that Deputy McPhee and Nurse Burton testified to this fact.**

12)   Mr. Wingo also said "I'm still detoxing." (Burton dep.48:16-21.)

**RESPONSE:  Defendant's citation does not support this statement.  The medical records state that Mr. Wingo stated "I'm still detoxing" under the subjection section.  The medical records further state that a "Dr. Hindi" admitted Mr. Wingo to the infirmary and developed plan for Mr. Wingo's care. Nurse Burton testified that Dr. Hindi was never called.  (Exhibit 1 Burton Dep. at p. 56:10).**

13)   Charge Nurse Burton believed detoxing to be a common condition among inmates in the infirmary. (Burton Dep. 26:24-27:3.)

**RESPONSE: Nurse Shanna Griffith testified that Detoxing can be fatal and is a serious medical condition that needs to be managed and observed. (Shanna Griffith Dep. p. 38:25, relevant pages attached as Exhibit 2). She also**

- 4 -

testified that if someone is having a serious reaction to detoxing that person would not be sent to the infirmary extension because they would not get the same level of medical care in the infirmary extension as they would in the infirmary. (Exhibit 2, Griffith Dep. at p 84:1-11) Nurse Burton testified that seriously ill detainees should never be placed in the infirmary extension. (Exhibit 1Burton Dep. 99:7-14).

14)     Mr. Wingo was on "withdrawal check," meaning he was on an "opiate detox protocol," which led Charge Nurse to believe "he was still detoxing." (Burton Dep. 45:9-19.)

**RESPONSE:  Admitted.**

15)     Nurse Shanna Griffith was also a nurse working in the infirmary for the night shift. (Griffith Dep. 28:2-15.[6])

**RESPONSE:  Admitted.**

16)     According to Nurse Griffith, after Mr. Wingo was brought down, staff took his vitals. "And then Ms. Yvette [Burton] said that we were going to admit him so he could stay overnight or the rest of the night so that way he could see the doctor in the morning." (Griffith Dep. 42:12-19.)

**RESPONSE:  Plaintiff admits Nurse Burton made this statement.**

17)     Nurse Griffith believed Mr. Wingo was suffering from withdrawal based on his symptoms and his statements that "I'm not ever going to touch that

shit again" and "that this wasn't the first time he had gone through something like this." (Griffith Dep. 44:9-23.)

**RESPONSE: Admitted.**

18)   Mr. Wingo was "very loud" from the moment Deputy McPhee first saw him. (McPhee Dep. 98:11-99:2.)

**RESPONSE: Admitted.**

19)   This behavior was not abnormal for the infirmary, according to Deputy McPhee. (McPhee Dep. 103:3-21, 171:10-22.)

**RESPONSE:   Plaintiff admits that Deputy McPhee made this statement.**

20)   Deputy McPhee understood that Mr. Wingo was brought to the infirmary around 11:52 p.m. for abdominal pains. (McPhee Dep. 143:6-21, 145:7- 12.)

**RESPONSE: Admitted.**

21)   Mr. Wingo made several requests to go to the hospital during the night shift, and Deputy McPhee advised Mr. Wingo that that would be medical's decision. (McPhee Dep. 154:14-22.)

**RESPONSE: Admitted.**

22)   As he attempted to talk with Mr. Wingo about his requests to go to the hospital, Mr. Wingo told Deputy McPhee to "just shut the fuck up and do

what I'm telling you to do." (McPhee Dep. 157:7-18.)

**RESPONSE:  Plaintiff admits that Deputy McPhee made this statement.**

23)    At some point during the night shift, one of Mr. Wingo's cell mates began to complain that he could not sleep because Mr. Wingo was being so loud. (McPhee Dep. 170:6-12.)

**RESPONSE:  Admitted.**

24)    Towards the end of Deputy McPhee's shift, Mr. Wingo complained of having an ulcer, and Deputy McPhee relayed this complaint to the nurses who did not examine Mr. Wingo. (McPhee Dep. 174:1-19.)

**RESPONSE:   Admitted in part, but Mr. Wingo complained of having an ulcer from the moment he was brought to the infirmary and this information was communicated to infirmary staff and the deputy on duty. (Exhibit 3 Quentin Appleby Dep at pgs. 21:19-25, 22:1-2, 24-26).**

25)    Nurse Griffith heard Mr. Wingo's complaints of having an ulcer. (Griffith Dep. 51:15-19.)

**RESPONSE:  Admitted.**

26)    At the time, Nurse Griffith was not aware of the risks of a perforated ulcer or the symptoms that might present if an ulcer is perforated. (Griffith Dep. 52:13-18.)

**RESPONSE: Plaintiffs admit Nurse Griffith surprisingly made this**

statement.

27)    Nurse Griffith recalls that Mr. Wingo only complained of having ulcers once. (Griffith Dep. 53:13-21.)

**RESPONSE: Nurse Griffith could not recall all Mr. Wingo's complaints throughout the evening but did recall at least once he made the statement over the medical distress intercom in listening distance to the deputy that Mr. Wingo complained of an ulcer. (Exhibit 2 Griffith Dep. 52-53).**

28)    When breakfast was served between 4:00 a.m. and 5:30 a.m., Deputy McPhee saw Mr. Wingo eat his breakfast "with gusto," "he got the tray and just started digging into it." (McPhee Dep. 186:20-188:5.)

**RESPONSE:  Plaintiffs admit that Deputy McPhee testified that he saw Mr. Wingo eat his food but he did not watch Mr. Wingo finish the tray.  Dr. Brian Myers testified that eating sometimes calms the pain from ulcers and Mr. Wingo may have eaten fast because he was hoping to relive the pain he had been experiencing throughout the evening. (Exhibit 4, Brian Myers Dep. at pgs. 32:7-16; 102-103).**

29)    Charge Nurse Burton believed Mr. Wingo's ability to eat his breakfast indicated that he could tolerate food. (Burton Dep. 52:1-8.)

**RESPONSE:  Nurse Burton did not testify that she saw Mr. Wingo eat**

his food or be able to tolerate food. She surmised that if someone eats breakfast, she might infer that they were able to tolerate food. She did not evaluate Mr. Wingo's ability to eat his food. (Exhibit 1 Burton Dep. at p. 52:1-11).

30)    Another nurse on night shift, Nurse Jones, believed that "[i]f he was that sick, you wouldn't think he would be able to eat his breakfast, especially if his stomach was hurting." (Jones Dep. 45:3-5.)

**RESPONSE: Plaintiff admits that Licensed Practical Nurse Kelly Jones ("LPN Jones") made that statement. However, it is unsupported by any admissible medical testimony**.

31)    Nurse Griffith believed Mr. Wingo was still in detox at the end of her shift, around 5:40 a.m. (Griffith Dep. 62:5-16.)

**RESPONSE: Plaintiffs admit that Nurse Griffith made this statement.**

### *Infirmary Day Shift*

32)    On the date of the incident, Deputy Marshall began her shift at 6:00

a.m. and was assigned to work in the infirmary. (Marshall Dep. 137:4-10.[7])

**RESPONSE: Admitted.**

33)    Nurse Annaleen Visser was the charge nurse in the infirmary for that shift. (Visser Dep. 15:4-10[8].)

**RESPONSE: Admitted.**

34)   As the Charge Nurse, Nurse Visser had the final say on medical decisions with respect to the inmates in the infirmary. (Visser Dep. 16:1-5, 17:17- 20, 18:5-11.)

**RESPONSE:   Cobb   County   Sheriff's   Office   by   statute   and constitutional authority has the final say on medical treatment detainees in their custody receive.   Nurse Visser may have been authorized to make some medical decisions, but the final responsibility to provide detainees medical care rests with the Cobb County Sheriff's Office. Additionally, there was a physician on call who made final medical decisions.**

35)   When Nurse Visser began her shift, she received a report from the night charge nurse, Yvette Burton, about what had occurred in the jail that evening. Nurse Burton told Nurse Visser about Mr. Wingo: "you've got one inmate here who's disruptive, who's loud, who wants to go to the ER." (Visser Dep. 58:16-24, 60:4-8, 61:16-20.)

**RESPONSE: Nurse Yvette Burton provided Nurse Visser with a shift report when her shift ended but could not recall everything she reported.  She did testify that Mr. Wingo was never loud or aggressive (Exhibit 1 Burton Dep. at pgs. 109-110).**

36)   Nurse Burton did not tell Nurse Visser that Mr. Wingo had been

complaining of abdominal pain. (Visser Dep. 61:6-8.)

**RESPONSE: Nurse Burton testified that she could not recall everything she told Nurse Visser but told her that he needed to see the doctor.   (Exhibit 1 Burton Dep. at pgs. 109-110).**

37)    Based on her conversation with Nurse Burton, Nurse Visser concluded that Mr. Wingo was 37, ing and that Mr. Wingo wanted to find a way to get to the emergency room at the hospital. (Visser Dep. 65:7-19.)

**RESPONSE:  Nurse Visser testified that she believed Mr. Wingo was detoxing and that all inmates wanted to go to the ER.  (Exhibit 5 Annaleen Visser Dep. at p. 65:7-19).**

38)    In her experience, "all detoxing inmates" want to go to the emergency room to receive more comfortable accommodations and privileges, such as a real bed, a television, better meals, and one's own room. They also are more likely to receive opiates to manage their pain at the emergency room. (Visser Dep. 65:20- 66:13, 88:12-13 ("They'll do anything to go to the ER.").)

**RESPONSE:  Plaintiff admits that this is Nurse Visser's misguided opinion unsupported by any medical testimony.**

39)    When taking over the shift, Nurse Visser did not conduct any physical assessment of Mr. Wingo because he was disruptive. She claims that she would have conducted a physical assessment of him if he had calmed down.

(Visser Dep. 63:12- 64:1, 101:6-13.)

**RESPONSE: There is no evidence that Mr. Wingo was disruptive at any time that he was housed in the infirmary. This is Nurse Visser's sole opinion. The video evidence in this case shows that Mr. Wingo was seriously ill and did show signs of someone that was hostile or disruptive. (See Infirmary Video View 1 & 2, attached as Exhibit 6 and 7).**

40)   According to Nurse Visser, his disruptive behavior included yelling, shouting, wanting to go to the ER, banging on the window, and repeatedly "throwing himself on the floor." (Visser Dep. 64:2-6.)

**RESPONSE: The video evidence in this case does not show Mr. Wingo being disruptive. It shows that Mr. Wingo was in severe distress, unable to stand on his own and unable to walk. The video evidence in this case further shows that Mr. Wingo was not "throwing himself on the floor" but involuntarily fainting several times and being ignored by jail staff. (Exhibit 6 &7 Infirmary Video View 1 & 2).**

41)   The infirmary was unusually busy that day, and was full. (Visser Dep. 63:9-11.)

**RESPONSE: Plaintiffs admit that Nurse Visser made this statement but deny any proof of same. The video footage does not show a busy infirmary. In fact it shows the infirmary staff sitting around most of the time**

- 12 -

**surfing the internet and playing solitaire.  (Exhibit 6 Infirmary Video View 1).**

42)     Deputy Marshall was the only deputy assigned to the infirmary at that time. (Marshall Dep. 142:14-19.)

**RESPONSE:  Admitted.**

43)     The deputy from the prior shift, Britton McPhee, told Deputy Marshall that Mr. Wingo had been hollering, stating that he needed to go to the hospital, and had been disruptive. "He said the nurses said he's just detoxing," which is the same thing the nurses had told Deputy Marshall. He also told Deputy Marshall had eaten his breakfast that morning and that he had been getting into to the other inmate's stuff, and to watch the cell "because there was some tension in there." (Marshall Dep. 145:11-19.)

**RESPONSE: Plaintiff admits that Deputy Marshall testified to this statement, but that the video evidence does not show Mr. Wingo being disruptive at anytime during his infirmary housing.  (Exhibit 6 &7 Infirmary Video View1 & 2).**

44)     Deputy Marshall understood that Mr. Wingo was in the infirmary for detox. (Marshall Dep. 138:4.)

**RESPONSE:   Deputy Marshall knew that Mr. Wingo was in the infirmary for detoxing. She also knew that he had repeatedly said throughout**

the morning that he needed to go to the hospital and that he said he couldn't breathe. **(Exhibit 8, Lynda Marshall Dep. at p. 138:1-9)**

45)   Nurse Visser testified that Mr. Wingo's symptoms were typical for detoxing. (Visser Dep. 56:19-57:3.)

**RESPONSE:   Plaintiffs admit that Nurse Visser testified to this statement but that it is not supported by any medical testimony.**

46)   Nurse Visser also believed that Mr. Wingo was being disruptive and was yelling loudly. (Visser Dep. 58:7-12.)

**RESPONSE:   Plaintiffs admit that Nurse Visser believed this fact, but that the video evidence shows that Mr. Wingo was not disruptive and was seriously ill.**

47)   Detox is one of the more common conditions that bring inmates to the jail's infirmary. (Visser Dep. 45:24-46:7.)

**RESPONSE: Admitted.**

48)   Deputy Marshall, over her 27 years of experience at the Sheriff's Office, has frequently seen individuals who were detoxing at the jail. (Marshall Dep. 76:12-17.)

**RESPONSE: Admitted.**

49)   At the time, she did not know or believe that detoxing could be fatal, but she did know that it could lead to seizures "and stuff like that."

(Marshall Dep. 174:9-13.)

**RESPONSE: Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 8 Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious medical issue. (Exhibit 8 Marshall Dep. at 177:9-14).**

50)  Specifically, Deputy Marshall had seen detoxing inmates stumble, slur their words, be unsteady on their feet, and have seizures. (Marshall Dep. 175:14-19.)

**RESPONSE: Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 8 Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious medical issue. (Exhibit 8 Marshall Dep. at 177:9-14).**

51)  Deputy Marshall has also seen detoxing inmates fall to the ground. (Marshall Dep. 176:11-18.)

**RESPONSE: Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can**

**lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 8 Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious medical issue. (Exhibit 8 Marshall Dep. at 177:9-14).**

52)   Deputy Marshall believed it was normal for people who were detoxing to stumble as they walked. (Marshall Dep. 25:7-9.)

**RESPONSE: Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 8 Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious medical issue. (Exhibit 8 Marshall Dep. at 177:9-14).**

53)   Deputy Marshall believed medical personnel would determine whether or not detoxing would amount to "a serious medical issue." (Marshall Dep. 177:3- 8.)

**RESPONSE: Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 8 Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious**

medical issue. **(Exhibit 8 Marshall Dep. at 177:9-14).**

54)     Based on her observations of Mr. Wingo, he appeared to her to be detoxing. (Marshall Dep. 175:8-10.)

**RESPONSE:  Plaintiffs admit Deputy Marshall and Nurse Visser made these statements.**

55)     At the time, Mr. Wingo was housed in Cell 8 of the infirmary. (Marshall Dep. 148:16-19.)

**RESPONSE:  Plaintiffs admit Deputy Marshall and Nurse Visser made these statements.**

56)     Deputy Marshall observed Mr. Wingo holler throughout the morning that he needed to go to the hospital. (Marshall Dep. 138:4-6, 147:10-16.)

**RESPONSE:  Plaintiffs admit Deputy Marshall and Nurse Visser made these statements.**

57)     Nurse Visser heard Mr. Wingo make these same requests. (Visser Dep. 67:10-18.)

**RESPONSE:  Plaintiffs admit Deputy Marshall and Nurse Visser made these statements.**

58)     Nurse Visser told Mr. Wingo that she would examine him once he was calm. (Visser Dep. 67:10-21.)

**RESPONSE:  There is no evidence that Mr. Wingo was not calm.  The**

video evidence shows Mr. Wingo in severe medical distress. (Exhibit 6 &7 Infirmary Videos Views 1 & 2).

59)   Nurse Visser did not immediately evaluate Mr. Wingo because she feared what he might do if she tried to take his vitals while he was upset. (Visser Dep. 67:21-68, 187:22-188:1 ("Can't have that because I don't know—if I open the door, what is he going to do? There's Deputy Marshall and females. There's no male. I don't know what he's going to do. Is he going to attack somebody?"), 236:2-22 (Nurse Visser never thought it was "medically prudent" to have security bring Mr. Wingo to her for an evaluation "Because he was still in his acting mode. I don't know—I don't know what he was going to do.").)

**RESPONSE:  There is no evidence that Mr. Wingo was not calm.  The video evidence shows Mr. Wingo in severe medical distress. (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

60)   Nurse Visser also heard Mr. Wingo complain of stomach pain and cramps, which she believed to be a normal symptom of detox. (Visser Dep. 68:19- 23, 75:5-8.)

**RESPONSE:  Plaintiffs admit that Nurse Visser made this statement, but dispute what she actually believed.**

61)   Ultimately, Nurse Visser did not examine Mr. Wingo because she believed he was "acting out." (Visser Dep. 75:15-18, 76:4-13.)

**RESPONSE: There is no evidence the record that shows Mr. Wingo was "acting out". The video evidence does not support this statement. (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

62) While Nurse Visser saw Mr. Wingo fall several times, she believed he was "throwing himself" on the floor and "faking" these episodes. (Visser Dep. 159:21-160:7, 161:12-18, 167:19-168:9, 169:70-171:5, 200:20-22, 250:1-3, 255:15-24.)

**RESPONSE: The video evidence contradicts these false statements and clearly shows Mr. Wingo's numerous involuntary falls, inability to walk and medical distress. (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

63) Nurse Visser also attributed Mr. Wingo's gait as he walked to "acting out." (Visser Dep. 241:21-242:19.)

**RESPONSE: The video evidence contradicts these false statements and clearly shows Mr. Wingo's numerous involuntary falls, inability to walk and medical distress. (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

64) Despite everything Nurse Visser saw with respect to Mr. Wingo, she did not believe he was suffering from a medical emergency. (Visser Dep. 211:22-23.)

**RESPONSE: The video evidence contradicts these false statements and clearly shows Mr. Wingo's numerous involuntary falls, inability to walk and**

medical distress.  **(Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

65)    Mr. Wingo also told Deputy Marshall that he could not breathe. When Deputy Marshall asked for clarification and more detail from Mr. Wingo, he simply responded that he could not breathe and wanted to go to the hospital. (Marshall Dep. 138:4-17, 149:15-150:5., 242:14-243:5.)

**RESPONSE:  Mr. Wingo did "simply" state he could not breathe. Mr. Wingo informed Deputy Marshall that he could not breathe and needed to go to the hospital.**

66)    Deputy Marshall told the nurses that Mr. Wingo was complaining of breathing troubles, and they told her that Mr. Wingo "was just trying to go to the hospital, he was detoxing, drug seeking, that he was okay." (Marshall Dep. 138:18- 21.)

**RESPONSE:  In contradiction to Deputy Marshall's testimony, Nurse Visser testified that she was never told that Mr. Wingo could not breathe. (Exhibit 5, Visser Dep. at p. 237:10-13).**

67)    Mr. Wingo's complaints of being unable to breathe would not have affected Nurse Visser's assessment of Mr. Wingo "because he was yelling. [...] You can't not breathe and yell. [...] He was yelling and acting out, no." (Visser Dep. 237:25-238:11.)

**RESPONSE:    Plaintiffs admit that Nurse Visser testified to that**

**unfortunate statement.**

68)    While Mr. Wingo can be seen falling in his cell during Deputy Marshall's shift, Deputy Marshall did not see these falls at the time. (Marshall Dep. 157:22-158:6, 161:2-12.)

**RESPONSE:  Deputy Marshall told Major Branson Harris that she had been watching Mr. Wingo and that he did not fall.  (Exhibit 9 Marshall and Harris Internal Phone Call). The video evidence shows Mr. Wingo fainting several times in Deputy Marshall's presence and no one attending to Mr. Wingo.  (Exhibit 6 &7 Infirmary Videos Views 1 & 2 at 7:28 a.m. – 7:33 a.m.).**

69)    At one point, inmates inside the cell with Mr. Wingo advised that there was going to be a fight in that cell. (Marshall Dep. 138:22-25.)

**RESPONSE:   Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one inmate became upset.  Id.**

70)    The nurses also confirmed that the inmates in Cell 8 were about to fight. (Marshall Dep. 162:7-10.)

**RESPONSE:  Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one**

**inmate became upset.  Id.**

71)    According to Nurse Visser, one of the inmates in Cell 8 knocked on the window and said "get this guy out of my bed before there's a fight." (Visser Dep. 64:13-16, 80:23-81:2 ("Get him out of here before there's a fight, before I hit him.").)

**RESPONSE:  Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one inmate became upset.  Id.**

72)    Deputy Marshall saw the inmates in Cell 8 standing up and yelling. (Marshall Dep. 162:12-16.)

**RESPONSE:  Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one inmate became upset.  Id.**

73)    She had also seen Mr. Wingo getting on the other inmate's beds, which was causing part of the trouble. (Marshall Dep. 204:18-25.)

**RESPONSE:  Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one**

inmate became upset.  Id.

74)    Deputy Marshall wanted to take Mr. Wingo out of the cell to make sure the other inmates, who were angry with him, did not hurt him. (Marshall Dep. 231:1- 13.)

**RESPONSE:  Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one inmate became upset.  Id.**

75)    Deputy Marshall proceeded to take Mr. Wingo out of the cell. (Marshall Dep. 138:22-24.)

**RESPONSE:  Plaintiffs admit that Deputy Marshall and Nurse Visser testified to these statements.  The video evidence shows that Mr. Wingo was imbalanced and involuntarily fell on the beds in the cell and at least one inmate became upset.  Id.**

76)    As Deputy Marshall was unlocking the lock, Mr. Wingo can be seen on video falling again, but Deputy Marshall did not see this fall as she was occupied with the lock. (Marshall Dep. 163:12-164:2.)

**RESPONSE:   The video evidence shows Mr. Wingo involuntarily falling to the ground for nine minutes when Deputy Marshall opened the cell door and no one attending to him or his breathing complaints.  (Exhibit 6 &7**

- 23 -

Infirmary Videos Views 1 & 2).

77)     While Mr. Wingo did tell Deputy Marshall that he fell in the shower, she conveyed this information to the nurses. (Marshall Dep. 165:5-23.)

**RESPONSE:   The video evidence shows Mr. Wingo involuntarily falling to the ground for nine minutes when Deputy Marshall opened the cell door and no one attending to him or his breathing complaints.  (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

78)     When Deputy Marshall went to open the door, Mr. Wingo was leaning on the door and went down to the ground. Deputy Marshall did not know if he fell or if he "went down playingly." (Marshall Dep. 138:24-139:3, 168:16-169:3.)

**RESPONSE:   The video evidence shows Mr. Wingo involuntarily falling to the ground for nine minutes when Deputy Marshall opened the cell door and no one attending to him or his breathing complaints.  (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

79)     Deputy Marshall thought he might be "playing" at this time because she felt that he was trying to push his way out of the door, even though he knew she was about to open it. (Marshall Dep. 213:1-6.)

**RESPONSE:   The video evidence shows Mr. Wingo involuntarily falling to the ground for nine minutes when Deputy Marshall opened the cell**

door and no one attending to him or his breathing complaints. **(Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

80)   Deputy Marshall told the nurses that Wingo had fallen and wanted to go to the hospital. (Marshall Dep. 139:4; 170:11-13.) They did not do anything. (Marshall Dep. 170:14-17.)

**RESPONSE:   The video evidence shows Mr. Wingo involuntarily falling to the ground for nine minutes when Deputy Marshall opened the cell door and no one attending to him or his breathing complaints.   (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

### *Major Harris and Lt. Gordon Arrive*

81)   Major Harris and Lt. Gordon were supervising Deputy Marshall that day. (Marshall Dep. 39:20-40:4; Gordon Dep. 59:20-22.[9])

**RESPONSE:  Admitted.**

82)   Lt. Gordon had never previously been trained on how to identify whether an inmate is detoxing. (Gordon Dep. 53:4-10.)

**RESPONSE:  Plaintiff admits that Lt. Gordon made this statement.**

83)   Deputy Marshall called Lt. Gordon down to the infirmary to advise that there was an issue with Mr. Wingo. (Gordon Dep. 64:21-25.)

**RESPONSE:  Admitted.**

84)   When he arrived at the infirmary, he saw Mr. Wingo on the ground.

- 25 -

He asked Mr. Wingo what was wrong, and Mr. Wingo said that someone had tried to hit him. (Gordon Dep. 65:1-6.)

**RESPONSE:  Lt. Gordon stated that he could not really understand what Mr. Wingo was saying. (Exhibit 10 Charles Gordon Dep. at p. 65-66; 83:1-16).**

85)    Mr. Wingo did not tell Lt. Gordon he wanted to go to the hospital. (Gordon Dep. 83:17-20, 95:17-19)

**RESPONSE:  Plaintiffs admit that Lt. Gordon testified that Mr. Wingo did not tell him that he wanted to go to hospital, but video evidence shows that he was present when Deputy Marshall stated that he was making those statements.**

86)    Lt. Gordon asked Deputy Marshall why Mr. Wingo was on the floor, and she told him Mr. Wingo was causing "some type of issue with other inmates in the cell." (Gordon Dep. 80:17-24.)

**RESPONSE:  Admitted.**

87)    Lt. Gordon then asked a nurse what was going on with Mr. Wingo, and the nurse advised that Mr. Wingo "was fine medically." (Gordon Dep. 65:8-13, 87:5- 10, 88:1-2, 89:3-8, 90:4-16, 96:18-22.)

**RESPONSE:  Admitted.**

88)    When asked what he believed "medically okay" to mean, Lt.

Gordon testified: "Like is he in any like distress, medical distress, that he can't—that he needs the next level of medical assistance. Like is he—is he medically fine. I—you know, because that person is in the infirmary, I feel like—I felt like the nurse should tell me if he's medically okay, if he's in any type [of] medical danger." (Gordon Dep. 91:19-92:1.)

**RESPONSE:  Admitted.**

89)    Mr. Wingo did not stand up when Lt. Gordon asked him to, but that was not unusual to Lt. Gordon, because "we have a lot of inmates when we ask them to stand up or do something, they don't comply." (Gordon Dep. 95:2-10.)

**RESPONSE:  Lt. Gordon testified that he did not know if Mr. Wingo could stand or walk on his own when he observed him in the infirmary. (Exhibit 10. Gordon Dep. at p. 122-123). Lt. Gordon further testified that he believed that if he was not holding Mr. Wingo up, he would have fell to the ground.  (Exhibit 10. Gordon Dep. at pgs. 123:1-9; 124:3-7; 126:13-24).**

90)    Lt. Gordon thought Mr. Wingo might have been disoriented, but he did not believe he was in any pain at that time. (Gordon Dep. 82:1-21.)

**RESPONSE:  Admitted.**

91)    Lt. Gordon asked Deputy Marshall to call down watch commander Major Harris to the infirmary so he could assess the situation. (Gordon Dep. 65:16- 20, 100:8-14, 133:10-13.)

**RESPONSE:  Admitted.**

### _Nurse Visser Decides Mr. Wingo Must Be Removed from the Infirmary_

92)    An inmate can be placed in a close observation cell if he has been disorderly or has been fighting with others. (Marshall Dep. 108:19-109:5.)

**RESPONSE: A detainee may only be placed in a padded close observation cell if he is suicidal or showing signs of hurting himself or others. An inmate may not be placed in padded cell for being disorderly.  Lt. Gordon testified it must be a responsible reason to place someone in a padded cell.  It must be either a medical reason or someone is going to hurt themselves. (Exhibit 10 Gordon Dep. at pgs. 148-149; CCSO Close Observation Policy 2-3-07.00 attached as Exhibit 11).**

93)    Deputy Marshall then called her supervisor to let him know what was going on, because she could not put Mr. Wingo back in the cell where the other inmates were threatening to hurt him. (Marshall Dep. 139:4-7; 172:13-15.)

**RESPONSE: Plaintiffs admit that Deputy Marshall testified to this statement.**

94)    She also called Major Harris to explain the situation, and told him that Mr. Wingo was "playing like he was falling" because that was her belief at that time. (Marshall Dep. 212:10-17; 8938-4212_2019-09-29-07-38 INF 2WC[10].)

**RESPONSE:  The video evidence does not show Mr. Wingo playing at**

all while housed in the infirmary.   The video evidence shows a main involuntarily falling and in serious medical distress.   (Exhibit 6 &7 Infirmary Videos Views 1 & 2).

95)   While Mr. Wingo was on the ground, Deputy Marshall did not know if he was faking or "playing around," but the nurses had told her he was "messing around." (Marshall Dep. 180:1-16.)

**RESPONSE:  The video evidence does not show Mr. Wingo playing at all while housed in the infirmary.   The video evidence shows a main involuntarily falling and in serious medical distress.   (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

96)   It never crossed Deputy Marshall's mind at this point that Mr. Wingo might be sick and in need of medical attention—she just thought he was detoxing. (Marshall Dep. 220:13-20.)

**RESPONSE:   Deputy Marshall admitted that detoxing is a serious medical condition. (Exhibit 8 Marshall Dep. at 177:9-14).**

97)   Lt. Gordon asked Deputy Marshall to find out where they could put Mr.

Wingo. (Marshall Dep. 185:7-17.)

**RESPONSE:  Admitted.**

98)   Deputy Marshall then called to Deputy Wilkerson in the infirmary extension to see if he had a pad available. (Marshall Dep. 185:21-186:2.)

**RESPONSE: Admitted.**

99) Deputy Marshall called personnel at the Extension because that would have been the only place where Mr. Wingo could be sent while under close observation. (Marshall Dep. 187:17-24, 227:11-17; <u>see also</u> McPhee Dep. 94:17-25 (explaining infirmary inmates could be housed in the padded cell in the extension "when the infirmary is completely full or if we need to make use of a padded cell.").)

**RESPONSE:   Plaintiff admits that Deputy Marshall made this statement.**

100) Deputy Wilkerson was working in the extension, and Deputy McPhee told him that there was an inmate in the infirmary who was "playing games, trying to go to the hospital," and "bothering the other inmates in the cell." (Wilkerson Dep. 130:11-19[11]; <u>see also</u> 8938-3490_2019-09-29_07-36 INF to EXT.wav.[12])

**RESPONSE:   Deputy Marshall told Deputy Wilkerson that that she had an inmate playing games and trying to go to the hospital.   Deputy Wilkerson responded that was not going to happen.   (Exhibit 12 Marshall and Wilkerson Internal Phone Call).**

101) During this conversation, Deputy Marshall did refer to Mr. Wingo as an "idiot" who was "playing games," but that was because she had been told that

he was detoxing, playing games, drug seeking, and "trying to fenagle his way to the infirmary" by medical personnel. (Marshall Dep. 188:23-189:2, 192:25-193:10.)

**RESPONSE: Deputy Marshall called Mr. Wingo an "idiot" without explanation. Her self-serving reason as to why she called Mr. Wingo an "idiot" is disputed and a question for the jury to decide. The video evidence also shows that Mr. Wingo was not playing games. There is no evidence on the record that Mr. Wingo was drug seeking or attempting to fenagle anything.**

102) Deputy Wilkerson understood Deputy Marshall's use of the word "idiot" to mean "one who's behaving erratically or disturbing the peace, causing problems, playing games." (Wilkerson Dep. 133:22-25.)

**RESPONSE: Deputy Wilkerson's self-serving understanding of Deputy Marshall calling him an idiot, his response to same is in dispute and a question for the jury. There is no evidence in this case that Mr. Wingo was disturbing peace, causing problems or playing games.**

103) Deputy Wilkerson understood "playing games" to refer to an inmate who "would fake medical emergencies just to get staff to respond appropriately." (Wilkerson Dep. 134:1-4.)

**RESPONSE: Deputy Wilkerson's self-serving understanding of Deputy**

**Marshall calling him an idiot, his response to same is in dispute and a question for the jury.  There is no evidence in this case that Mr. Wingo was disturbing peace, causing problems or playing games.**

104)   Deputy Marshall told Deputy Wilkerson that Mr. Wingo was "trying to get to the hospital," and Deputy Wilkerson responded, "that's not going to happen," because, as Deputy Wilkerson explained, "if he was actually playing games and trying to go to the hospital, that pre se is not going to get him to go to the hospital." (Wilkerson Dep. 137:3-6.)

**RESPONSE: Deputy Wilkerson's self-serving understanding of Deputy Marshall calling him an idiot, his response to same is in dispute and a question for the jury.  There is no evidence in this case that Mr. Wingo was disturbing peace, causing problems or playing games.**

105)   Deputy McPhee had also told Deputy Marshall that "he was trying to get to the hospital, that the nurses were saying that he is just detoxing." (Marshall Dep. 193:3-9.)

**RESPONSE:  Detoxing is a serious medical condition.**

106)   When Major Harris arrived, he spoke with Lt. Gordon, who told him what the other inmates in Mr. Wingo's cell had told him, and that he wanted Major Harris to talk to Nurse Visser to make sure he was "medically okay" to move to another location. (Gordon Dep. 134:2-9.)

**RESPONSE:  Lieutenant Gordon testified that he does not recall his conversation with Major Harris and only testified what he believes he might have said but affirmed he does not remember saying any of the statements Defendant's claim he made in this pararagraph.**

107)   When Major Harris came down to the infirmary, Mr. Wingo did not appear to him to be in pain. (Harris Dep. 131:10-15.[13])

**RESPONSE:  The video evidence shows that when Major Harris came down he barely looked at Mr. Wingo.  The video evidence further shows Mr. Wingo to be showing signs of pain and distress.  Mr. Wingo could not stand or walk on his own.  Major Harris also did not ask Mr. Wingo how he was doing.  Major Harris also sated Mr. Wingo was not grimacing, could stand on his own, did not speak to him, he does not know if Mr. Wingo was able to speak, he did not ask Mr. Wingo if he was in pain or if he wanted to go to the hospital or if he had been seen by medical, he did not ask how long he had been having issues.   (Exhibit 13 Harris Dep. at pgs. 131-134; (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

108)   Major Harris then went to speak with Nurse Visser. (Marshall Dep. 222:20-25; Gordon Dep. 138:18-21.)

**RESPONSE:  Admitted.**

109)   Nurse Visser told Major Harris and Lt. Gordon that Mr. Wingo was

- 33 -

detoxing. (Visser Dep. 82:23-83:3.)

**RESPONSE: Nurse Visser also told Major Harris that Mr. Wingo wanted to go to the emergency room.  (Exhibit 13 Harris Dep. at p. 115: 1-4).**

110)   According to Major Harris, Nurse Visser told him Mr. Wingo "was detoxing and he was trying to get to the hospital—he was drug seeking is the term she used—and that he needed to be isolated in a cell by himself." (Harris Dep. 79:18- 23.)

**RESPONSE:  Admitted.**

111)   Major Harris has never been trained on how to identify whether someone is detoxing. (Harris Dep. 81:18-20, 95:3-7.)

**RESPONSE:  Admitted that Major Harris made that statement.**

112)   To Major Harris, "drug seeking" means that Mr. Wingo "was trying to get to the hospital to receive, I'm assuming, some kind of drugs or pain medication or what have you." (Harris Dep.82:17-21.)

**RESPONSE:  Admitted that Major Harris made that statement.**

113)   Major Harris noted that "the infirmary was full. The only padded cell we had there had another inmate inside it. So I asked her, you know, where we should place him as far as medically or otherwise, and she said he needed to be isolated in a cell by himself. And so the only cell I had was the infirmary extension, the isolation cell." (Harris Dep. 79:25-80:6.)

**RESPONSE:  Admitted that Major Harris made that statement.**

114)  Major Harris discussed with Nurse Visser whether he was medically cleared to be moved away from the infirmary, and she told him that Mr. Wingo was. (Harris Dep. 108:19-109:15.)

**RESPONSE:  Admit that he made that statement.  Video evidence shows that he was not.  (Exhibit 6 &7 Infirmary Videos Views 1 & 2).**

115)  Major Harris understood "medically clear" to mean "that the nurses checked him out and that he's cleared as far as medical's concern[ed]." (Harris Dep. 110:7-15.)

**RESPONSE:  Plaintiffs admit Major Harris made this statement but dispute that Mr. Wingo was not in serious medical distress as evidenced by infirmary video.**

116)  Charge Nurse Analeen Visser made the initial decision to place Mr. Wingo in close observation. (Marshall Dep. 139:25-140:8, 185:3-6; Visser Dep. 300:23-25.)

**RESPONSE:  Nurse Visser originally stated that Deputy Marshall made the initial decision to place Mr. Wingo in close observation.  (Exhibit 14 Nurse Visser Internal Affairs Video Interview).  Deputy Marshall testified that she did not know the decision where Mr. Wingo went.  (Exhibit 8 Marshall Dep. p. 140:11-18).**

117)   No defendant or other security officer made the suggestion to Nurse Visser to move Mr. Wingo to the infirmary before she made that decision herself. (Visser Dep. 301:1-23.)

**RESPONSE: Plaintiffs admit that Nurse Visser made the statement she suggested Mr. Wingo be moved but that the final decision as to where to place Mr. Wingo was security.  (Exhibit 5 Visser Dep. at p. 18).**

118)   The decision to send an inmate to a close observation cell would be made by medical staff. (Harris Dep. 60:10-18.)

**RESPONSE:  Nurse Visser stated that the decision to place an inmate in a close observation cell would be made by security.  (Exhibit 5 Visser Dep. at p. 18).**

119)   According to Lt. Gordon, Nurse Visser "was saying she believed he needed to be in—needed to be placed in—on a suicide watch. And I remember that there were not any spaces in the infirmary, so we moved him over to the extension pad." (Gordon Dep. 66:11-16; 100:24-101:6.)

**RESPONSE:  Plaintiff admits Lt. Gordon made the statement asserted.**

120)   Lt. Gordon asked Nurse Visser "at least two times" whether Mr. Wingo was medically clear to go to the extension pad. (Gordon Dep. 108:14-21.)

**RESPONSE:   Plaintiff admits that Lt. Gordon made this statement after asking him about Mr. Wingo falling in front of him multiple times when**

**he was in the infirmary.  No other witness testified that Lt. Gordon ever made**

**this statement.**

121)   The second time he asked Nurse Visser if Mr. Wingo was medically

okay was after Mr. Wingo fell down in front of Lt. Gordon. (Gordon Dep.

113:17- 21.)

**RESPONSE:   Plaintiff admits that Lt. Gordon made this statement**

**after asking him about Mr. Wingo falling in front of him multiple times when**

**he was in the infirmary.  No other witness testified that Lt. Gordon ever made**

**this statement.**

122)   Because Nurse Visser advised Lt. Gordon that Mr. Wingo was

detoxing, he assumed that was Mr. Wingo's medical condition. (Gordon

Dep. 109:15-22.)

**RESPONSE:  Plaintiff admits that Lt. Gordon made this statement.**

123)   Lt. Gordon has not received any training on identifying the

symptoms of detox, its hazards, or whether it constitutes an emergency. (Gordon

Dep. 111:23- 112:18.)

**RESPONSE:  Plaintiff admits that Lt. Gordon made this statement.**

124)    According to Nurse Visser, she made this decision "[b]ecause he

was disruptive. He was loud. He was yelling. And everybody was watching. It was

early Sunday morning, and we have sick people in the infirmary, pregnant ladies

in the infirmary, and it's disruptive, you know, so he had to be moved. And also—also there was going to be a fight." (Visser Dep. 18:25-19:7, 187:20-22 ("You people don't F'ing care. I want to go to the hospital. Open the door, let me out. I want to go to hospital. You don't fucking care." (quoting Mr. Wingo).)

**RESPONSE: Nurse Visser originally stated in an internal affairs interview that she did not know who made the decision to send Mr. Wingo to the padded cell. She further testified in her deposition that she could recommend that a detainee be removed from infirmary and jail makes decision where to house detainee. (Exhibit 5 Visser Dep. at p. 18).**

125)   The three close observation cells in the infirmary were occupied that morning. (Visser Dep. 19:8-25.)

**RESPONSE:  Plaintiff admits that Nurse Visser made this unverified statement.**

126)   According to Nurse Visser, she made the medical decision that Mr. Wingo had to be moved out of his cell, and it was then up to the security staff to determine where to put him. (Visser Dep. 21:17-21; 288:21-24 ("As medical—in his case, I can say he's disruptive and he has to go somewhere."), 291:13-24 (Major Harris could not override Nurse Visser's medical determination that Mr. Wingo had to be removed from the infirmary).)

**RESPONSE:  Plaintiff admits that Nurse Visser made this statement**

but disputes that the Major of the jail cannot override a nurse at the jail.

127)   Lt. Gordon also believes Nurse Visser made the decision to remove Mr. Wingo from the infirmary. (Gordon Dep. 146:20-147:6.)

**RESPONSE:  Lt. Gordon stated that medical told him that Mr. Wingo had to be moved on suicide watch.  There is no evidence in this case that Mr. Wingo was suicidal or attempting to hurt himself.  No one has testified that he attempted to harm himself.  (Exhibit 10 Gordon Dep. at p. 66:10-16).**

128)   The security staff had no other options available to them that morning other than to place Mr. Wingo in the close observation cells in the annex. (Visser Dep. 21:17-22:2; Gordon Dep. 168:24-169:2.)

**RESPONSE: Plaintiff disputes that security staff had no other options that morning other than placing Mr. Wingo in a padded cell.  The essence of Plaintiffs claim against defendants is that they should have provided him adequate medial care and sent him to the hospital.**

129)   In Nurse Visser's medical judgment, Mr. Wingo was cleared to go to the annex. (Visser Dep. 22:8-14.)

**RESPONSE:  Plaintiff admits that Nurse Visser made this misguided statement after failing to examine him.  Mr. Wingo was in obvious medical distress and the security should have made sure that he had medical care. Security did not need a nurse to tell them that Mr. Wingo was in serious**

- 39 -

**medical distress as they could see it themselves.  (Exhibit 6 & 7 Infirmary Video Views 1 and 2, Corridor Video, attached as Exhibit 15Corridor Video, Exhibit 16 Outside Padded Cell Video at 7:48 a.m., Exhibit 17 Inside Padded Cell Video).**

130)   Deputy Marshall did not ask Nurse Visser to send Mr. Wingo to the annex, and Nurse Visser came up with the idea to send him to the annex because the infirmary was full. (Visser Dep. 81:11-16.)

**RESPONSE:  Defendant admits that Nurse Visser made this statement that was not verified by Deputy Marshall.**

131)   Someone asked if the nurses wanted to go ahead and get his vitals before they took Mr. Wingo to the Extension, but Charge Nurse Visser said "no, they don't need to." (Marshall Dep. 226:1-4.)

**RESPONSE:  This statement is out of context.  Medical Tech Tiffany Womack did ask Nurse Visser to check his vitals when Mr. Wingo was asking to go to the hospital. This was prior to Mr. Wingo falling in front of Deputy Marshall, Lt. Gordon and Major Harris.  The discussion regarding checking Mr. Wingo's vitals were not in the context of deciding to take him to the annex.**

132)   Specifically, Lab Tech Tiffany Womack asked if she could take Mr.

Wingo's vitals, but Nurse Visser told her not to. (Visser Dep. 91:15-92:2.)

**RESPONSE:   This statement is out of context.   Medical Tech Tiffany Womack did ask Nurse Visser to check his vitals when Mr. Wingo was asking to go to the hospital. This was prior to Mr. Wingo falling in front of Deputy Marshall, Lt. Gordon and Major Harris.  The discussion regarding checking Mr. Wingo's vitals were not in the context of deciding to take him to the annex.**

133)   Nurse Visser said she did not need to check Mr. Wingo's vitals before sending him to the annex because "[h]is vitals were normal." (Visser Dep. 85:25- 86:12; Womack Dep. 46:15-47:5[14].)

**RESPONSE:   This statement is out of context.   Medical Tech Tiffany Womack did ask Nurse Visser to check his vitals when Mr. Wingo was asking to go to the hospital. This was prior to Mr. Wingo falling in front of Deputy Marshall, Lt. Gordon and Major Harris.  The discussion regarding checking Mr. Wingo's vitals were not in the context of deciding to take him to the annex.**

134)   Nurse Visser also believed she did not need to check Mr. Wingo's vitals because his behavior amounted to "acting out" and "pretending." (Visser Dep. 174:7-14.)

**RESPONSE:   This statement is out of context.   Medical Tech Tiffany Womack did ask Nurse Visser to check his vitals when Mr. Wingo was asking**

**to go to the hospital. This was prior to Mr. Wingo falling in front of Deputy Marshall, Lt. Gordon and Major Harris. The discussion regarding checking Mr. Wingo's vitals were not in the context of deciding to take him to the annex.**

135) Nurse Visser noted that Mr. Wingo was "not following commands, pretending cannot walk, acting out," because "he was pretending he couldn't walk. Jumping up and throwing himself on the floor." (Visser Dep. 87:22-88:3.)

**RESPONSE: This statement is out of context. Medical Tech Tiffany Womack did ask Nurse Visser to check his vitals when Mr. Wingo was asking to go to the hospital. This was prior to Mr. Wingo falling in front of Deputy Marshall, Lt. Gordon and Major Harris. The discussion regarding checking Mr. Wingo's vitals were not in the context of deciding to take him to the annex.**

136) For her part, Ms. Tiffany Womack believed Mr. Wingo was in distress. (Womack Dep. 53:21-54:3.)

**RESPONSE: This statement is out of context. Medical Tech Tiffany Womack did ask Nurse Visser to check his vitals when Mr. Wingo was asking to go to the hospital. This was prior to Mr. Wingo falling in front of Deputy Marshall, Lt. Gordon and Major Harris. The discussion regarding checking Mr. Wingo's vitals were not in the context of deciding to take him to the**

annex.

137)  As Ms. Womack was leaving the infirmary to do her rounds in the other areas of the jail, Mr. Wingo looked at her and said, "You in the blue scrubs, please help me." (Womack Dep. 54:9-14.)

**RESPONSE:  Plaintiff admits that Mr. Wingo told anyone that would listen to help him and that no one did.**

138)  Ms. Womack apologized to Mr. Wingo because she felt like she could not open the door to help him, specifically because there were other males in the cell and she thought it would be a security risk to do so. (Womack Dep. 54:9-55:19.)

**RESPONSE:  Plaintiff admits that Mr. Wingo stated that he wanted help and that he could not breathe.  Tiffany Womack stated that she was told not to help him.  Ms. Womack stated Deputy Marshall told her she would not open the door and Nurse Visser told her that she can't go in.  Tiffany Womack thought it was a security risk to open the door using their emergency system because Deputy Marshall would not open the door and other inmates were in the cell aggravated at Mr. Wingo's condition and were yelling.**

139)  Ms. Womack testified that the other males in the cell with Mr. Wingo were "extremely aggravated" and "yelling as well, telling him to be quiet, just screaming and yelling at him." "They hadn't slept all night apparently. I

- 43 -

guess he had been in there all night as well, so they were just—they were aggravated." (Womack Dep. 55:18-56:5.)

**RESPONSE:  Plaintiff admits that Mr. Wingo stated that he wanted help and that he could not breathe.  Tiffany Womack stated that she was told not to help him.  Ms. Womack stated Deputy Marshall told her she would not open the door and Nurse Visser told her that she can't go in.  Tiffany Womack thought it was a security risk to open the door using their emergency system because Deputy Marshall would not open the door and other inmates were in the cell aggravated at Mr. Wingo's condition and were yelling.**

140)   The other inmates in the cell were so aggravated they were beating on the glass. (Womack Dep. 56:6-10.)

**RESPONSE:  Plaintiff admits that Mr. Wingo stated that he wanted help and that he could not breathe.  Tiffany Womack stated that she was told not to help him.  Ms. Womack stated Deputy Marshall told her she would not open the door and Nurse Visser told her that she can't go in.  Tiffany Womack thought it was a security risk to open the door using their emergency system because Deputy Marshall would not open the door and other inmates were in the cell aggravated at Mr. Wingo's condition and were yelling.**

141)   When Major Harris and Lt. Gordon proceeded to take Mr. Wingo to

the infirmary, he did not appear to Deputy Marshall to be in medical distress. She

believed he was detoxing, based on what she had been told. (Marshall Dep. 233:8-

18.)

**RESPONSE:   Plaintiff admits that Deputy Marshall made this**
**statement, but that the video evidence contradicts this statement as it clearly**
**shows Mr. Wingo in serious medical distress.   Detoxing is a serious medical**
**condition.**

142)   Ms. Womack did not fault Deputy Marshall for relying on Nurse

Visser's judgment. As Ms. Womack explained, Deputy Marshall "has no medical

training whatsoever. And so in this instance, she is going to turn to that charge

nurse and find out what needs to happen, and she would agree with her, I mean,

because she's not going to know any differently. And so in her defense, I mean,

she didn't know what was wrong, and she is going to listen to the nurse." (Womack

Dep. 77:15- 78:10.)

**RESPONSE:   Tiffany Womack is not a security expert or a medical**
**expert in this case.   She is a fact witness.   Whether she faults Marshall for**
**anything is irrelevant.**

### *The Close Observation Form*

143)   Nurse Visser testified that while a close observation form should

have been completed upon transferring Mr. Wingo to the infirmary, it was her

responsibility to have done so. (Visser Dep. 96:24-97:7, 297:4-25, 298:8-23.)

**RESPONSE:  Plaintiff admits that Nurse Visser made this statement in her deposition but stated that Major Harris was responsible for filling out form during internal affairs interview.**

144)   If someone is placed in close observation, the person recommending the placement is to complete a close observation form. (Marshall Dep. 118:8-25.)

**RESPONSE:   The policies and procedures state that security must complete the close observation form.  A padded cell is a close observation cell. Despite this fact, Lt. Marshall also incorrectly stated that a form did not need to necessarily be completed if someone is placed in a padded cell.  (Exhibit 8 Marshall Dep. at pgs. 118-120).**

145)    According to Nurse Burton, when asked who would be responsible for filling out the close observation form, that would be "[t]he person who placed them on close observation, and I believe that usually a nursing staff would sign off on it or they will always do vital signs before they send them to close observation. And I believe the nursing—nursing will sign off on that, depending on the behavior of the inmate." (Burton Dep. 97:4-12.)

**RESPONSE: Nurse Burton testified that she has never had someone placed in a padded cell.  She also testified that it's usually security that fills out the close observation form and in some cases the doctor.   (Exhibit 1**

**Burton Dep. at pgs. 96-98).**

146)   Lt. Gordon agrees that it would have been up to medical to complete the close observation form. (Gordon Dep. 216:14-18.)

**RESPONSE:  Deputy Gordon stated that the watch commander must sign off on the close observation form.  (Exhibit 10 Gordon Dep. at p. 217). Lt. Gordon also stated that it was a violation of Cobb County Sheriff's Office policies and procedures to not complete the form.  (Exhibit 10 Gordon Dep. at p. 218:8-12).**

147)   Major Harris agrees that it would have been up to medical staff to complete the close observation form. (Harris Dep. 230:10-18.)

**RESPONSE:  Major Harris stated that he could not recall if they were using Close Observation Forms.  Deputy Wilkerson confirmed they were using the form at the time of Mr. Wingo's confinement.  (Exhibit 18 Paul Wilkerson Dep. at p. 107:14-25).  He testified contrary to Lt. Gordon, Deputy Marshall, and all others.  Form is placed in a binder and put on deputy desk. The purpose of the form is so people know why detained is in close observations.  (Exhibit 18 Wilkerson Dep. at pgs. 107-110).**

### _Lt. Gordon and Major Harris Escort Mr. Wingo Out of the Infirmary_

148)   When Major Harris and Lt. Gordon began to escort Mr. Wingo out of the infirmary at approximately 7:45 a.m., Mr. Wingo was shaky on his legs, so

they got him a wheelchair. (Gordon Dep. 143:3-12, 154:3-7.)

**RESPONSE:  Mr. Wingo was unable to walk on his own when he was taken to the padded cell.  (Exhibit 10 Gordon Dep. at p. 155:3-25).  Mr. Wingo fell to the ground in front of the wheel chair so they wheeled him to the padded cell.  (Exhibit 6 & 7 Infirmary Video Views 1 & 2, Exhibit 15 Corridor Video and Exhibit 16 Outside Padded Cell Video, Exhibit 10 Gordon Dep. at pgs. 155:3-25; 66:17-25, 126:19-25; 142:19-25).**

149)  Lt. Gordon had asked the medical staff why Mr. Wingo was so imbalanced, and they said he was detoxing, so Lt. Gordon attributed the imbalance to that condition. (Gordon Dep. 154:18-22.)

**RESPONSE:  Plaintiffs admit that Lt. Gordon made this statement.**

150)  Deputy Nasie Mejia was walking towards the infirmary and noticed Lt. Gordon and Major Harris struggling with Mr. Wingo, and he assumed "that they wanted him to go into the wheelchair, and he was being combative and not wanting to stay in the wheelchair," so he stepped in to assist. (Mejia Dep. 13:2-14.[15])

**RESPONSE: Plaintiffs admit that Deputy Mejia made this statement.**

151)  As Deputy Mejia assisted Mr. Wingo into the wheelchair, he perceived that Mr. Wingo did not want to go in the wheelchair "because he was flailing his body forward to try to get out of the wheelchair." (Mejia Dep. 13:19-

24.)

**RESPONSE:  Plaintiffs admit that Deputy Mejia made this statement but the video evidence contradicts it. (Exhibit 15 Corridor Video).**

152)  When the three deputies and Mr. Wingo arrived at the padded cell in the extension, Deputy Mejia instructed Mr. Wingo to take off his clothes so he could be placed in a safety smock, but Mr. Wingo "did' follow the instructions of taking the clothing off, so we had to take [the] clothing off." (Mejia Dep. 15:6-25.)

**RESPONSE:  Plaintiff admits that Deputy Mejia made this statement but video evidence contradicts it.  (Exhibit 16 & 17 Inside and Outside of Padded Cell).**

153)  When Lt. Gordon, Major Harris, and Deputy Mejia placed Mr. Wingo in the padded cell, the fact that three deputies were placing him in a cell indicated to Deputy Wilkerson that Mr. Wingo "could be trouble." (Wilkerson Dep. 148:6-10.)

**RESPONSE:   Plaintiff admits that Deputy Wilkerson made this statement but there is no evidence that Mr. Wingo caused anyone trouble.**

154)  Deputy Wilkerson heard one of the officers tell Mr. Wingo to stop kicking him. (Wilkerson Dep. 156:12-19.)

**RESPONSE: Video evidence does not show Mr. Wingo kicking at anyone (Exhibit 17 Inside of Padded Cell). Major Harris stated he does not know if Mr. Wingo was attempting to kick or not. (Exhibit 13 Harris Dep. at pgs. 179-180).**

155)   As Lt. Gordon was placing Mr. Wingo in the padded cell, he did not believe Mr. Wingo was suffering from a serious medical emergency. (Gordon Dep. 190:3-13.)

**RESPONSE:  Lt. Gordon stated that he doesn't think he remembers believing Mr. Wingo was suffering from a serious medical emergency.  He stated that he was disoriented and he did not believe Mr. Wingo know if he was in jail or not.  (Exhibit 10 Gordon Dep. at pgs. 82:1-21; 169:12-17)**

156)   Deputy Mejia did not perceive Mr. Wingo's behavior to indicate that he was in pain; to Deputy Mejia, he perceived that Mr. Wingo was being combative because he would not stay in the wheelchair after being told to do so. (Mejia Dep. 70:24-71:10.)

**RESPONSE:  There is no evidence in this case that Mr. Wingo was combative.  Deputy Gordon stated that Mr. Wingo was not combative. (Exhibit 10 Gordon Dep. at pgs. 140:12-25; 184:17-25 and Exhibit 13 Harris Dep. at pgs. 180:25 – 181:1-2).**

157)   Specifically, Deputy Mejia believed Mr. Wingo was being

combative based on "the fact that he was moving his body forward quickly, that he was on the floor when I came in, especially with the major and a sergeant being there to assist with moving him. So yeah, just moving his body forward when we're trying to keep him in the wheelchair and moving, flailing his arms, and not following the direction to sit in the wheelchair." (Mejia Dep. 73:21-74:15.)

**RESPONSE:  There is no evidence in this case that Mr. Wingo was combative.   Deputy Gordon stated that Mr. Wingo was not combative. (Exhibit 10 Gordon Dep. at pgs. 140:12-25; 184:17-25 and Exhibit 13 Harris Dep. at pgs. 180:25 – 181:1-2).**

158)  At no time while placing Mr. Wingo in the padded cell was Deputy Mejia concerned about Mr. Wingo's medical condition. (Mejia Dep. 80:10-13.)

**RESPONSE:  Admitted.**

159)  As the officers were placing Mr. Wingo in the padded cell, Major Harris did not believe Mr. Wingo was in pain. (Harris Dep. 179:16-22.)

**RESPONSE:  Major Harris stated he does not know if Mr. Wingo was in pain and does not remember if Mr. Wingo stated he was in pain. (Exhibit 13 Harris Dep. at p. 179:16-20).**

### *Security Rounds in the Extension*

160)  Deputy Wilkerson has not been trained on how to identify if

someone is detoxing, and he believed whether or not detoxing would constitute a "serious medical issue" would be up to medical. (Wilkerson Dep. 94:3-12.)

**RESPONSE:  Plaintiffs admit Deputy Wilkerson made this statement.**

161)  Mr. Wingo did not appear, to Deputy Wilkerson, to be in medical distress when he was in the padded cell because "he was just laying down was all I could tell." (Wilkerson Dep. 153:8-15.)

**RESPONSE:   Video evidence shows Mr. Wingo in padded cell in medical distress.  Video evidence also shows that Mr. Wilkerson did not look in the padded cell Mr. Wingo was housed.  (Exhibit 16 & 17 Video of Inside and Outside of Padded Cell at 8:02a.m., 8:05a.m., 8:12, 8:23 a.m., 8:33 a.m., 8:47 a.m.)**

162)   Deputy Wilkerson acknowledges that he did not look inside the padded cell every time he did a security round. He believes Mr. Wingo was alive and well around 8:12 because he saw movement in the cell through the in-cell camera. (Wilkerson Dep. 181:2-13.)

**RESPONSE:   Deputy Wilkerson testified that Mr. Wingo moved at 8:12 a.m. but acknowledged that he did not look in cell.   (Exhibit 18 Wilkerson dep. at p. 181:5-20). Video evidence also shows that Mr. Wingo was not moving at that time. (Exhibit 17 Inside Padded Cell Video).**

163)  Major Harris also did a security round at Cell 18 of Mr. Wingo

around 8:22 a.m., and he cleared the round because he saw Mr. Wingo's chest rise and fall. (Harris Dep. 200:8-12.)

**RESPONSE:  Video evidence shows Major Harris look in Mr. Wingo's cell at 8:23 a.m..  Video evidence also shows that Mr. Wingo was not moving at this time.  (Exhibit 16 & 17 Outside and Inside Padded Cell Video).**

164)  Deputy Wilkerson was present for this same security round, and he saw Mr. Wingo's chest rise and fall at this time as well. (Wilkerson Dep. 188:4-11.)

**RESPONSE:  Plaintiff acknowledges that Deputy Wilkerson made this statement but that video evidence outside Mr. Wingo's cell shows that it was impossible for Deputy Wilkerson or Major Harris to see Mr. Wingo's chest when they looked at his cell.  Mr. Wingo's body was positioned in a way that his chest could not be seen when someone looked in cell.  (Exhibit 16 & 17 Outside and Inside Padded Cell Video).**

165)  Seeing an inmate breath is sufficient to clear a security check. (Harris Dep. 246:23-25.)

**RESPONSE:  Colonel Sanders disputes that Deputy Wilkerson could have seen Mr. Wingo's chest from where Deputy Wilkerson looked in cell. Colonel Sanders basically said further investigation was required based on Mr. Wingo's positioning in cell and just seeing him in cell breathing alone is**

**not sufficient. (Exhibit 19 Colonel Sanders' Dep. at pgs. 106:21-23, 107:9-25**

**and 108:1; 117:3-16) (Exhibit 11 CCSO's Policy 2-03-07.01).**

166)   While Deputy Wilkerson did not see Mr. Wingo move from the

corner of his cell for several minutes, he was not concerned because he "was

under the impression that he was possibly sleeping, passed out." (Wilkerson Dep.

214:6-10.)

**RESPONSE: Plaintiff admits that Deputy Wilkerson made this**

**statement.**

167)   At no point that morning was Major Harris concerned with

Mr. Wingo's medical condition; he never thought Mr. Wingo was in distress or

was suffering from a medical emergency, and he thought Mr. Wingo was fine.

(Harris Dep. 147:18-20, 204:19-205:3.)

**RESPONSE:  Plaintiff admits that Major Harris made this statement.**

168)   At no point before he eventually opened Mr. Wingo's cell door did

Deputy Wilkerson have any concerns about Mr. Wingo's medical status.

(Wilkerson Dep. 217:25-218:5.)

**RESPONSE:  Admitted.**

169)    Around 8:49 a.m., Deputy White told Deputy Wilkerson to check on

Mr. Wingo. As Deputy Wilkerson entered the cell, he was concerned that Mr.

Wingo

"was possibly in the corner playing a game and possibly could jump up at any minute." (Wilkerson Dep. 201:14-17.)

**RESPONSE: Plaintiff admits that Deputy Wilkerson made this statement.**

170) A code blue was called for Mr. Wingo around 8:52 a.m. (Doc. 166, ¶ 87.)

**RESPONSE: Admitted.**

171) Mr. CCADC staff and infirmary staff responded, and Mr. Wingo ultimately died from a perforated gastric ulcer. (Doc. 166, ¶¶ 88-89.)

**RESPONSE: Admitted.**

172) A subsequent Internal Affairs investigation concluded that "no evidence to support violations of policy and procedure by Sheriff's Office Staff were noted." (IA Report, p. 5.[16])

**RESPONSE: Admitted.**

### *Doctors' Opinions on Causation*

173) Plaintiff's expert Dr. Brian Myers states in his expert report his opinion that, "to a reasonable degree of medical certainty, […] had Kevil Wingo been provided reasonable emergency medical care he would have most likely survived." (Myers Report, p. 6.[17])

**RESPONSE:  Admitted.**

174)  At his deposition, Dr. Myers was unable to say what Mr. Wingo's likelihood of survival would have been if he had received medical care at any point after he was removed from the nurses' immediate vicinity in the infirmary. Specifically, Dr. Myers testified that "If you get someone to me with vital signs, in the ER, they are most likely going to survive. So if you can get him to the emergency room with vital signs, he's most likely going to survive." (Myers Dep. 105:19-22.)

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.**

175)  To Dr. Myers, "most likely going to survive" means a survival chance over 50%. (Myers Dep. 106:6-7.[18])

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed**

**to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.**

176)   However, Dr. Myers acknowledges that Mr. Wingo's survivability decreased (or his chance of mortality increased) with each hour that passed after his perforation without receiving emergency medical care. (Myers Dep. 106:13-17.)

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.**

177)   He also acknowledges that he cannot say if, or when, Mr. Wingo crossed the threshold from "most likely to survive" to "most likely not to survive" had he received emergency medical care at that particular point. (Myers Dep. 106:18-107:6.)

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed**

to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.

178)  Dr. Myers was then forced to concede that he could not state with any degree of medical certainty what Mr. Wingo's survivability would have been if someone had called 911 at 7:45 a.m., the approximate time Mr. Wingo was transferred out of the infirmary, because he does not know what Mr. Wingo's vital signs were at that time. (Myers Dep. 107:11-19.)

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.**

179)  Dr. Myes testified with respect to his survivability opinion,

> My statement doesn't bring into the issue of time, so I stand by what I said here. If you want to have me opine on whether or not, at 7:45, if that was reasonable medical care or if he would have survived at that point, I can't say because I don't know what his vitals were at that point.

(Myers Dep. 108:4-9.)

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time**

- 58 -

**passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.**

180)  Dr. Myers admitted that he could not say with any certainty whether Mr. Wingo would have survived if he was sent to the emergency room at particular times leading up to the moment the code blue was called:

Q. But based on the record, you can't say –

A. I don't know when the vital signs stopped.

Q. Right. And you can't say whether or not he would have survived if someone would have called at 7:45 a.m.?

A. I can not say that.

Q. Right. What about at 6:45 a.m.?

A. I don't know what the vitals are.

Q. All right. What about --

A. He was still moving though so he had some.

Q. What about 5:45 a.m.?

A. Again, still moving but I don't know what the vitals are.

Q. Okay. So without the vitals and if we're trying to understand what his survivability would had of been had the emergency room been called at any point during that time frame; without the vitals you're unable to say?

A. Yes. I can just say at this point --

MR. GARDNER: Object to form. Go ahead.

THE WITNESS: At 11:30 at night his survivability was probably -- was mostly likely ten percent. His survival in the ER is 100 percent – or his mortality in the ER is 100 percent. How that percentage moved along time if we were to graph it out, I don't know.

Q. BY MR. JACKSON: Okay.

A. Not without vitals.

(Myers Dep. 110:2-111:5.).

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive.  If Mr. Wingo was alive he had vitals and he had a chance of survival.**

181)  Two other physicians have opined that it is not possible to know what Mr. Wingo's likelihood of survival would have been had any defendant (or for that matter, the jail nurses) called 911 to have Mr. Wingo taken to the emergency room. As Dr. Keenth Vega opined:

Given the multitude of factors, many of which are unknowable, that contribute to the timing of when a similarly situated patient might die, the likelihood of

- 60 -

his survival at any particular point is not able to be determined. The absence of vital signs in the time period prior to his death makes any such prediction particularly unreliable, as there is no objective medical evidence of when he began to decline.

For example, even if an ambulance was called at or about 7:45 a.m., the chance that he would have survived septic
shock is very low. There is no way to reasonably predict, under those circumstances, if he would have survived.

(Dr. Vega Report p. 3.[19])

**RESPONSE:  Dr. Myers did testify as to the likelihood of survival for Mr. Wingo.  Dr. Myers testified that it started high and diminished as time passed.  He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival.  Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive. If Mr. Wingo was alive he had vitals and he had a chance of survival.**

182)  Likewise, Dr. Jamie Downs opined:

The ongoing and escalating metabolic derangement associated with gastric perforation of unspecified duration and scope reaches a critical threshold in patient homeostasis – that is a "point of no return" beyond which the patient may not be salvageable. At what exact point the patient crosses beyond this critical threshold is unknown and unknowable in real time. Retrospective analysis, with all the missing data points established, allows an artificial construct, not available contemporaneously with actual events. Thus, it cannot be determined, to any reasonable degree of medical

certainty, the likelihood of this subject's survival had he received medical intervention at any specific point in the hours prior to his ultimate death.

(Downs Report, p. 3.[20])

**RESPONSE: Dr. Myers did testify as to the likelihood of survival for Mr. Wingo. Dr. Myers testified that it started high and diminished as time passed. He further testified that as long as Mr. Wingo had vitals (heart rate, blood pressure, temperature) he had a chance of survival. Defendants failed to make sure that Mr. Wingo received medical care but stated that he was alive. If Mr. Wingo was alive he had vitals and he had a chance of survival.**

### _Plaintiffs Settle with the WellStar Defendant_

183)  In their initial complaint, plaintiffs asserted claims against under 42 U.S.C. § 1983 for deliberate indifference against WellStar Health Systems and several WellStar nurses: Charge Nurse Visser, Charge Nurse Burton, Shanna Griffith, Kelly Jones, Samantha Garland, and Shannea Hopkins. (See Doc. 1.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended pleading supersedes the former pleading" such that " 'the original pleading is**

abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See **Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006)** (footnote and citation omitted); **see also Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982)** (citations omitted).

184) Plaintiffs alleged that when Mr. Wingo was brought to the infirmary, neither Nurse Burton, Nurse Griffith, nor Kelly Jones physically examined him or called a physician regarding Mr. Wingo. (Doc. 1, ¶¶ 51-52.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006) (footnote and citation omitted); see also Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982) (citations omitted).**

185) Plaintiffs alleged that Mr. Wingo complained to medical staff of

issues with his ulcer and abdominal pain and asked to go to the hospital. (Doc. 1, ¶¶ 59- 60.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006) (footnote and citation omitted); see also Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982) (citations omitted).**

186)   The alleged that the nurses did not check Mr. Wingo's vitals again after he was initially admitted to the infirmary. (Doc. 1, ¶ 64.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended**

pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See **Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006)** (footnote and citation omitted); **see also Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982)** (citations omitted).

187)   They alleged that Nurse Griffith played cards on her computer, surged the internet, and watched football during the night shift. (Doc. 1, ¶¶ 65-67.)

**RESPONSE:   Claims in Plaintiffs initial unverified Complaint are irrelevant.   Amended Complaints supersede prior Complaints.   Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence.   Defendants have the same burden to prove medical allegations through medical expert testimony as well.    An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006) (footnote and citation omitted); see also Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982) (citations omitted).**

188)   Plaintiffs alleged: Defendants Nurse Annaleen Visser, Nurse Yvette Burton, Nurse Kelly Jones, Nurse Shanna Griffith, Nurse Samantha Garland and Nurse Shannea Hopkins violated Mr. Wingo's constitutional right to receive medical care when he was suffering from a serious medical condition by failing to provide him medical care while he was housed in the infirmary and failing to send him to the hospital after he repeatedly requested same and displayed obvious signs of physical distress." (Doc. 1, ¶ 137.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well.   An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See <u>Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006)</u> (footnote and citation omitted); see also <u>Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982)</u> (citations omitted).**

189)   Plaintiffs also alleged that the nurses violated the standard of care for registered nurses. (Doc. 1, ¶ 153.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See <u>Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006)</u> (footnote and citation omitted); <u>see also</u> <u>Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982)</u> (citations omitted).**

190)   Plaintiffs also sought punitive damages against Nurse Visser on the theory that her actions showed intent, willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which raised the presumption of conscious indifference to the consequences, as well as plaintiff's belief that "Nurse Analeen Visser harbored negative feelings towards Mr. Wingo based on Mr. Wingo being a black male." (Doc. 1, ¶ 203.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with**

medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See **Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006)** (footnote and citation omitted); **see also Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358 (11th Cir. 1982)** (citations omitted).

191) Plaintiffs settled their claims against the WellStar defendants for a confidential amount. (Burton Dep. 35:5-36:2; Griffith Dep. 37:24-38:13; Jones Dep. 28:8-29:2.)

**RESPONSE: Claims in Plaintiffs initial unverified Complaint are irrelevant. Amended Complaints supersede prior Complaints. Furthermore, Plaintiff had to prove any allegations against medical professionals with medical opinion evidence. Defendants have the same burden to prove medical allegations through medical expert testimony as well. An amended pleading supersedes the former pleading" such that " 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' See Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006)** (footnote and citation

omitted); <u>see also</u> **<u>Fritz v. Standard Sec. Life Ins. Co., 676 F.2d 1356, 1358</u>**

**<u>(11th Cir. 1982)</u>** **(citations omitted).**

### *<u>Nurses Burton and Visser are Sanctioned by the Georgia Board of Nursing</u>*

192)  On March 23, 2023, Nurse Burton entered into a Public Consent

Order with the Georgia Board of Nursing, wherein the Board found that Nurse

Burton "failed to check and/or assess the abdomen of K.W.," and that Nurse

Burton's "failure to perform the aforementioned duties fell below the minimal

reasonable standards of acceptable and prevailing nursing practice." (*In re:*

*Yvette Colleen Burton, RN*, 2023-0305, Public Consent Order, ¶¶ 2, 3 (March 23,

2023).[21])

**RESPONSE: Georgia Board of Nursing opinion is irrelevant and**

**inadmissible.   (Fed. Rules of Evidence Rule 403-404).   Plaintiffs were not**

**involved in Administrative proceeding and did not have an opportunity to**

**attend and present evidence.**

193)  On July 5, 2023, the Georgia Board of Nursing rendered a Final

Decision finding that "At the absolute minimum, [Nurse Visser] should

have evaluated K.W.'s mental status, heart, lungs, stomach, vital signs and

palpitated his stomach. However, instead of performing an appropriate

assessment, the Respondent directed that K.W. be removed from the infirmary

and taken to the annex, where she would be unable to assess his condition—even

visually." (*In re: Annaleen Jones Visser*, OSAH Docket No: 2313244-OSAH-PLBD-RN-28-Walker (July 5, 2023) (adopting ALJ's findings of fact, "Initial Decision" ¶ 37).[22])

**RESPONSE: Georgia Board of Nursing opinion is irrelevant and inadmissible.   (Fed. Rules of Evidence Rule 403-404).   Plaintiffs were not involved in Administrative proceeding and did not have an opportunity to attend and present evidence.**

### *CCADC Policies*

194)   CCADC Policy generally outlines the provision of medical care to inmates. (See CCADC Policy 2-06-04.00.[23])

**RESPONSE:  Admitted.**

195)  2-06-04.00  provides:  "Inmates  shall  have  adequate  and  proper access to emergency medical care. Medical staff shall ensure that prompt medical attention  (response)  is  provided  in  situations  deemed  a  medical  emergency." (Policy 2-06- 04.00.)

**RESPONSE:  Admitted.**

196)   The  policy  further  details  that  "Staff  shall  be  observant  and responsive to signs of an emergency medical and mental health situation within the facility," and "The delivery of emergency medical services shall be a top priority, taking precedence over routine duties and responsibilities." (Policy 2-06-

04.01(A) and (B)).

**RESPONSE: Admitted.**

197)  The policy states that "Inmates requiring emergency treatment beyond the facility's resources and capabilities shall be transported to a designated treatment facility or the nearest emergency room." (Policy 2-06-04.01(F).)

**RESPONSE: Admitted.**

198)  Medical staff responsible for "contacting or directing that contact be made to emergency responders (e.g., ambulance) . . ." (Policy 2-06-04.01(M).)

**RESPONSE: Language is incomplete. Policy further states "In emergencies, it may be obvious that an ambulance is needed and should be called by security or medical staff (i.e. significant head injury, extreme loss of blood, attempted suicide and inmate is unresponsive, etc.).**

199)  Deputy Marshall believes an ambulance is called when medical says to do so. (Marshall Dep. 80:22-81:5, 24.)

**RESPONSE:   Plaintiffs admit that Deputy Marshall made that statement.**

200)  Deputy McPhee has only ever known medical staff to call an ambulance. (McPhee Dep. 121:3-25, 123:24-124:6.)

**RESPONSE: Plaintiffs admit that Deputy McPhee made this statement.**

201)  Nurse Burton testified that if security staff wanted to send someone

to the hospital, "they always consult with medical staff." (Burton Dep. 91:1-11.)

**RESPONSE:  Plaintiffs admit that Nurse Burton made this statement.**

202)   The policy also provides: "In non-emergency situations, employees shall abide by the decisions of medical staff as to the appropriate course of treatment for any inmate." (Policy 2-06-04.01(L)(5).)

**RESPONSE:   Language is incomplete.   Policy reads that Staff shall notify infirmary staff when an inmate has obvious signs of injury or illness and request the inmate be transported to infirmary. Employees shall not refuse to seek medical treatment for any inmate requesting emergency care.**

203)   The CCADC Mental Health Care / Close Observation Policy, 2-03-07.00, provides that inmates placed in Close Observation may be placed in the "Infirmary and Infirmary Extension" and "Any padded cell or other approved area[] within specific housing units suited to accommodate the increased monitoring of  inmates." (See CCADC Policy 2-03-07.01(A)(2)(b), (c).[24])

**RESPONSE:  Admitted.**

204)   When an inmate is placed in Close Observation, security staff must conduct observation/security rounds of the inmates in intervals not to exceed 15 minutes. (Policy 2-03-07.01(B)(1)(a).)

**RESPONSE: This is the written policy. The unwritten policy is that security rounds should be conducted every 12 minutes but never to exceed 15**

**minutes.**

205) "Medical, mental health or security personnel may request placement of an inmate into Close Observation for reasons that include, but are not limited to:

> 1. Inmate is exhibiting signs of abnormal behavior (e.g. hearing voices, seeing things that are not there, inability to verbally communicate, etc.);

> a) Observations may be reported by other inmates housed in the same housing unit.

> 2. Inmate is displaying a marked change in behavior occurring over an extended period of time (e.g. refusal of meals, refusing to shower, participate in laundry exchange or recreation time, etc.);

> 3. Inmate refuses to take critical medication (e.g. psychotropic drugs, etc.);

> 4. Inmate speaks of or acts on threats of self-harm or threatens to harm others;

(Policy 2-03-07.01(D).)

**RESPONSE:  Admitted.**

206) "When an inmate is placed in Close Observation, an OMS facility incident report shall be generated *by the staff member(s) making the request*." (Policy 2-03-07.01(E).)

**RESPONSE:  Admitted.**

207) Close Observation forms are to be completed by "any employee . . .

when requesting placement of inmates into Close Observation for various

reasons.". (Policy 2-03-07.01(I)(b).)

**RESPONSE:  Admitted.**

Respectfully submitted, this 28<u>th</u> day of September, 2023.

GARDNER TRIAL ATTORNEYS, LLC

<u>/s/ Timothy J. Gardner</u>
**TIMOTHY J. GARDNER**
Georgia Bar No.  115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for the Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This <u>28th</u> day of September, 2023.

**GARDNER TRIAL ATTORNEYS, LLC**

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TIFFANY WINGO as Administrator of the Estate of
KEVIL WINGO, SR., KIEARA WINGO, as surviving
child of KEVIL WINGO, SR., ERIKA WINGO,
surviving child of KEVIL WINGO, SR., and TERI
FIELDS, ESQ., Conservator of KEVIL WINGO, JR.,
surviving minor child of KEVIL WINGO, Sr.

       Plaintiffs,

v.

MAJOR    BRANSON    HARRIS,    individually,
LIEUTENTANT CHARLES GORDON, individually,
DEPUTY    PAUL    WILKERSON,    individually,
DEPUTY LYNDA MARSHALL, individually, JOHN
DOES 1-10, and JANE DOES 1-10,

       Defendants.

**CIVIL ACTION NO.
1:20-CV-03662-VMC**

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing

**PLAINTIFFS' AMENDED RESPONSE AND OBJECTIONS TO**

**DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS** to

the Clerk of Court using the CM/ECF system which will automatically send

electronic mail notification of such filing to the following counsel of record:

Sun S. Choy, Esq.
Wesley C. Jackson, Esq.
Marisa M. Beller, Esq.
Freeman Mathis & Gary, LLP
100 Galleria Pkwy, Suite 1600

H. William Rowling, Jr., Esq.
Lauren S. Bruce, Esq.
Cobb County Attorney's Office
100 Cherokee Street, Suite 350
Marietta, GA 30090

Atlanta, GA 30339-5948

Respectfully submitted, this <u>28th</u> day of September, 2023.

GARDNER TRIAL ATTORNEYS, LLC

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

DOCKET 223

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIFFANY WINGO as Administrator )
Of the Estate of KEVIL WINGO,     )
SR., *et al.*                           )
                                              )
     Plaintiffs,                         )
                                              )
v.                                          )     CIVIL ACTION FILE NO:
                                              )     1:20-CV-03662-VMC
MAJOR BRANSON                    )
HARRIS, individually, *et al.*        )
                                              )
     Defendants.                        )

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK JOHNSON

COME NOW defendants Lynda Marshall, Branson Harris, Charles Gordon, and Paul Wilkerson and file this reply brief in support of their motion to exclude the opinions of plaintiffs' expert witnesses, Dr. Brian Myers, pursuant to Federal Rule of Evidence 702, and LR 26.2C. For the reasons set forth below, defendants respectfully request that their motion be granted.

## I.    ARGUMENT AND CITATION TO AUTHORITY

**A.    Dr. Myers' testimony is speculative at best and should be excluded.**

Plaintiffs admit that Dr. Meyers does not know when Mr. Wingo would have likely survived if he received medical treatment. (Doc. 207, p. 11.) Despite plaintiffs' contention that Mr. Wingo had a 90% chance of survivability after 11:30

1

p.m., that is not specific enough to show that any of the defendants' actions caused Mr. Wingo's injuries because he cannot say to any reasonable degree of medical certainty that Mr. Wingo would have survived had any particular defendant taken a different course of action during the times they interacted with Mr. Wingo, all of which were *several hours* after 11:30 p.m. (See, e.g., Doc. 196-2 (Def.'s SMF), ¶ 32 (Marshall Dep. 137:4-10, showing that Deputy Marshall, the first defendant to interact with Mr. Wingo, began her shift at 6:00 a.m. the following morning).)  Dr. Meyers cannot provide information in determining survivability or mortality rate of a perforated ulcer because he lacks information as to Mr. Wingo's vital signs during the entirety of each defendants' interaction with Mr. Wingo, and Dr. Meyers admits this information is necessary to reach any conclusion with respect to survivability. (Meyers Dep., 9:19-22, 92:20-22, 100:18-20).

Again, to prevail on a deliberate indifference claim, a plaintiff must show: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between ***that indifference*** and the plaintiff's injury. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009) (emphasis). Further, in considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008). Thus, it stands to reason that for the causation analysis, any facts tending to show causation are irrelevant if they are not

particularized to each individual defendants' interaction with Mr. Wingo. In other words, evidence that Mr. Wingo had a particular chance of survival at a time *before* any of the remaining defendants interacted with him is completely irrelevant to the deliberate indifference or state law claims against defendants.

In short, Dr. Myers's opinion lacks reliability and does not assist the trier of fact in a meaningful way. Mr. Wingo's survivability at 11:30 p.m., more than six hours before any defendant interacted with him, is not relevant to the causation analysis with respect to each defendant. Dr. Myers admits he cannot accurately state what chance of survival Mr. Wingo would have had if he had received certain medical intervention at any point in time when defendants actually interacted with him, and his opinions on causation with respect to these critical time periods are purely speculative. Therefore, this court must exclude testimony from plaintiffs' expert Dr. Meyers from trial or consideration on defendant's motion for summary judgment.

## B.   Mark Johnson's

Plaintiffs contend that Mark Johnson's 3D model is proper demonstrative evidence and that defendants' motion to exclude is premature. However, plaintiffs have only disclosed that Mr. Johnson might form an expert opinion at a later date, when he produces the purported replica. The issues with Mr. Johnson's potential testimony is not that it might include demonstrative exhibits, but that plaintiffs

likely intend to have Mr. Johnson testify that his (yet to be produced) demonstrative *accurately depicts what could have been viewed by defendants Harris and Wilkerson when they conducted security rounds.* If Mr. Johnson's expected testimony touches on the supposed accuracy of his model, including it will then enter the realm of undisclosed expert testimony which should thus be excluded from trial or consideration on defendant's motion for summary judgment.

## II.   <u>CONCLUSION</u>

For the foregoing reasons, these defendants respectfully request that this court exclude from trial or consideration on defendants' motion for summary judgment Dr. Meyer's opinion and Mark Johnson's undisclosed expert opinion.

This 29th day of September, 2023.

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Marisa M. Beller*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
Marisa M. Beller
Georgia Bar No. 845893
Marisa.beller@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway

4

Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK JOHNSON** has been prepared in accordance with Local Rule 5.1(C) (Times New Roman font, 14 point).

This 29th day of September, 2023.

<div align="right">

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
Marisa. M. Beller
Georgia Bar No. 845893
marisa.beller@fmglaw.com
*Attorneys for Defendants*

</div>

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE**

**OPINIONS OF PLAINTIFFS' EXPERTS DR. BRIAN MYERS, AND MARK**

**JOHNSON** to the Clerk of Court using the CM/ECF system which will

automatically send electronic mail notification of such filing to counsel of record

who are CM/ECF participants properly addressed upon:

Timothy J. Gardner & Henrietta G. Brown
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339

This 29th day of September, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Marisa M. Beller*
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
Marisa. M. Beller
Georgia Bar No. 845893
marisa.beller@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

DOCKET 224

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIFFANY WINGO *et al.*,              )
                                      )
          Plaintiffs,                 )
                                      )
v.                                    )        CIVIL ACTION FILE NO:
                                      )        1:20-CV-03662-VMC
MAJOR BRANSON HARRIS, *et al.*,  )
                                      )
          Defendants.                 )

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW defendants Lynda Marshall, Branson Harris, Charles Gordon, and Paul Wilkerson, and file this Reply Brief in Support of their Motion for Summary Judgment (Doc. 196), showing the Court as follows:

## I.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Qualified Immunity Bars Plaintiffs' § 1983 Claim for Deliberate Indifference.

As shown in defendants' initial brief, for plaintiffs to overcome defendants' entitlement to qualified immunity, they must show that: (1) defendants violated Mr. Wingo's constitutional rights; and (2) defendants' conduct was prohibited by clearly established law. Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014). Plaintiffs failed to satisfy this burden.

**1.    Defendants did not violate Mr. Wingo's constitutional rights.**

To prevail on a deliberate indifference claim, a plaintiff must show: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009). In response to defendants' motion for summary judgment, plaintiffs ignore the crux of defendants' argument and evidence that they did not "deliberately" disregard Mr. Wingo' serious medical need: *trained medical staff told them Mr. Wingo's condition was not serious*. Plaintiffs cannot overcome defendants' motion for summary judgment without addressing *how* the nurses' repeated assurances that Mr. Wingo was "just detoxing" and "medically okay" would have colored defendants' subjective impression of his condition.

To prove deliberate indifference, "a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than ***gross*** negligence." Wade v. McDade, 67 F.4th 1363, 1374 (11th Cir. May 22, 2023). Summary judgment will be granted in favor of a defendant unless the plaintiff presents evidence of each element. Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016). Further, in considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).

Courts throughout the Eleventh Circuit have repeatedly held that lay persons working in a jail are not subject to claims of deliberate indifference when they rely on the judgments of medical staff in the jail. "[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." <u>Williams v. Limestone Cnty., Ala.</u>, 198 F. App'x 893, 897 (11th Cir. 2006). "Under our circuit's precedent, when a lay person is accused of deliberate indifference, the plaintiff must 'present[] evidence that her situation was so obviously dire that two lay [officers] must have known that a medical professional had grossly misjudged [the plaintiff's] condition.'" <u>Kuhne v. Fla. Dep't of Corr.</u>, 618 F. App'x 498, 507 (11th Cir. 2015).

> Generally, it is not deliberate indifference for administrative personnel to rely on information and direction provided by qualified medical professionals in carrying out their duties. Unless such an individual could have reasonably deduced that following such medical direction was tangibly wrong and would result in substantive harm to the inmate, the officer should not be subject to liability.

<u>Sherman v. Burleson</u>, No. 3:21CV537/MCR/EMT, 2022 WL 2165995, at *6 (N.D. Fla. Jan. 4, 2022), report and recommendation adopted, 2022 WL 1468523 (N.D. Fla. May 10, 2022); <u>see also</u> <u>Carter v. Butts Cnty. Jail</u>, No. 518CV00423TESCHW, 2020 WL 1882908, at *6 (M.D. Ga. Mar. 18, 2020), report and recommendation adopted, 2020 WL 1876250 (M.D. Ga. Apr. 15, 2020) ("Furthermore, when the plaintiff has received treatment from medical professionals, correctional officers are

entitled to rely on the medical judgments made by those medical professionals."); Thompson v. Gramiak, No. CV 310-062, 2012 WL 1068156, at *5 (S.D. Ga. Jan. 19, 2012), report and recommendation adopted, 2012 WL 1067966 (S.D. Ga. Mar. 29, 2012) ("prison officials who lack specialized medical knowledge do not act with deliberate indifference to the extent that they rely on the advice of medical staff in making decisions that affect a prisoner's conditions of confinement [. . .]").

Given each defendants' reliance on the medical staff's reports that Mr. Wingo was detoxing, plaintiffs cannot show how each defendant was "*deliberately* indifferent" to a serious medical need.  All of the evidence shows that each individual defendants' subjective understanding of Mr. Wingo's condition was determined by the nurses' misdiagnosis that Mr. Wingo was detoxing. (SMF ¶¶ 14, 31, 37, 66, etc.) Thus, Charge Nurses Jones and Visser attributed all of the concerning symptoms they and defendants observed, including his falls, complaints of abdominal pain, and demands to go to the hospital, to "drug seeking" and "playing games," behavior they had seen from similar patients in their decades of experience. (SMF ¶¶ 110, 134, 135.) A security deputy, untrained in medicine, is not "deliberately indifferent" for relying on the medical judgment of a trained professional.

For a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Burnette, 533 F.3d at 1331. Deputy Marshall did not have subjective knowledge of a serious risk posed

by Mr. Wingo's perforated ulcer because she had no knowledge of that condition—she reasonably believed he was detoxing. Deputy McPhee had told her that the nurses attributed Mr. Wingo's condition to detoxing. (Doc. 196-2 ("SMF") ¶ 43.) She subjectively believed Mr. Wingo's condition was simply "detox." (SMF ¶ 34.) When she relayed Mr. Wingo's complaints to the nursing staff, they told her "that Mr. Wingo was just trying to go to the hospital, he was detoxing, drug seeking, **that he was okay**." (SMF ¶ 66.)

Likewise, Lt. Gordon asked Nurse Visser multiple times what was going on with Mr. Wingo, and the charge nurse responded that Mr. Wingo "was fine medically." (SMF ¶ 87.) Because Nurse Visser advised Lt. Gordon that Mr. Wingo was detoxing, he assumed that was the medical condition driving Mr. Wingo's behavior and symptoms. (SMF ¶ 122.) Lt. Gordon also asked medical staff why Mr. Wingo was imbalanced, and they told him Mr. Wingo was detoxing. (SMF ¶ 149.)

Similarly, when Major Harris spoke to Nurse Visser, she told him plaintiff was "detoxing" and that "he was trying to get to the hospital—he was drug seeking is the term she used—and that he needed to be isolated in a cell by himself." (SMF ¶ 109.) She also told Major Harris that he was cleared, from a medical perspective, to be in a cell by himself. (SMF ¶¶ 113-114.)

And just as the other defendants, Deputy Wilkerson was advised that Mr. Wingo's behavior was a symptom of his drug-seeking behavior and that he was

5

"playing games" trying to get to the emergency room—a conclusion by the nursing staff relayed to him by Deputy Marshall. (SMF ¶ 100, 104.)

These facts align perfectly with those in Wilder v. Rockdale County, 1:13-cv-2715-RWS, 2016 WL 11745936 (Sept. 28, 2016). In Wilder, plaintiffs brought claims against jail corrections officers who saw the decedent vomit, "leaning over," "holding his abdomen," stating "that he was experiencing stomach pain," heard him "hollering due to the pain," and believed his pain was a "ten out of ten" while he was housed in the jail's medical unit. Id. at *2-3. The jailers advised the nursing staff, who were also in the medical unit and observed these conditions, who responded that the inmate's "condition did not present a serious malady," "indicated that [the inmate] did not require her immediate attention and that she would deal with [him] when she got a chance," and that the vomiting "really was not an emergency and she would attend to [him] later." Id. *2-3, 18. The inmate later died from "**an ulcerated and perforated duodenum.**" Id. *5 (emphasis added). Based on this evidence, the district court held that the jailers "were entitled to rely on the judgment of the nurses that were there with them in the medical unit" and thus were not deliberately indifferent to the inmate's serious medical needs. Id. *18.[1] Likewise here, how can

---

[1] The order granting summary judgment as to the officers in Wilder was not appealed because the plaintiff reached a settlement with the medical staff and CorrectHealth shortly after the decision was rendered and filed stipulations of dismissal. Wilder v. Pierre, No. 1:13-CV-2715-RWS, 2017 WL 11634368, at *1 (N.D. Ga. Feb. 22,

defendants be expected to second-guess the medical judgment of *multiple* nurses—

who are all just as aware of Mr. Wingo's medical condition and symptoms as the

defendants—when they were repeatedly advised that his condition was not

emergent? While with the benefit of hindsight there is no question that Mr. Wingo's

perforated ulcer was a serious medical condition, defendants could only base their

assessment of his condition on what they personally saw and what the nurses told

them at that time. And the record evidence is that the nurses told defendants Mr.

Wingo was "medically ok" and "just detoxing" and, in the defendants' experience,

his outward behavior was consistent with the nurses' diagnosis. Cf. Lelieve v. Oroso,

846 F. Supp. 2d 1294, 1306 (S.D. Fla. 2012) ("Lelieve has not presented record

evidence demonstrating that his situation was so obviously dire that Belfort must

have known that the JMH medical staff grossly misjudged Lelieve's condition; while

there is little debate that internal bleeding is a dire condition, it could not have been

"obvious" to a lay officer that Lelieve was suffering internal bleeding when the only

external signal Lelieve displayed was a bloody mouth and spitting blood [. . .]." ).

Accordingly, plaintiffs have failed to show that defendants violated Mr.

Wingo's constitutional rights by being deliberately indifferent to a serious medical

need, and they are entitled to summary judgment as a matter of law.

---

2017). As previously shown, plaintiffs in this case have already settled with the
medical defendants responsible for Mr. Wingo's death. (SMF ¶¶ 183-191.)

**2.      Plaintiffs have no evidence of causation.**

Plaintiffs' response to defendants' motion for summary judgment with respect to the causation argument is a misguided attempt at burden-shifting. Plaintiffs argue that because neither their own expert nor defendants' experts can opine the precise point in time at which medical intervention for Mr. Wingo would have become futile, "his chance of survivability should be left to the jury to decide and not determined through summary judgment without evidence that he would have died regardless of the circumstances." (Doc. 209, p. 35.) But it is not defendants' burden to prove on summary judgment that any medical intervention would have been futile—rather, it is plaintiffs' burden to show that medical intervention at *each and every point in time* when each defendant had an opportunity to summon additional medical intervention would have saved Mr. Wingo. Causation is a necessary element in any tort action, including deliberate indifference claims, and it is plaintiffs' burden to come forward with affirmative, non-speculative evidence of causation.

And here, Dr. Myers' purported opinion is pure speculation. He admits he cannot say whether or not Mr. Wingo would have survived at any point in time when he interacted with the defendants. Dr. Myers conceded that he could not state with any degree of medical certainty what Mr. Wingo's survivability would have been if someone had called 911 at 7:45 a.m., the approximate time Mr. Wingo was

transferred to the infirmary extension, because he does not know what Mr. Wingo's vital signs were at that time. (SMF ¶ 178.)

Plaintiff claims that Dr. Myers testified Mr. Wingo could be saved if he was on the operating table with *any* detectible "vitals," and that Mr. Wingo must have had "vitals" up until the time he was last seen moving at 8:23 a.m. (Doc. 209, p. 85.) However, this was not Dr. Myers's testimony, and if it was, it is purely speculative as applied to the practical facts of getting Mr. Wingo out of the infirmary, from the jail, to the hospital, and on the operating table. Again, Dr. Myers could not say with any degree of medical certainty the likelihood that Mr. Wingo would have survived if he received medical intervention at 7:45 a.m., 6:45 a.m., or even 5:45 a.m. (SMF ¶ 180.) He did not testify, as plaintiffs suggest, that because Mr. Wingo was moving at these times, he must have had vitals and therefore more than likely would have survived if given proper medical care. If that was his opinion, that is what he could have said at his deposition. But instead, he testified:

> Q. Okay. So without the vitals and if we're trying to understand what his survivability would had of been had the emergency room been called at any point during that time frame; without the vitals you're unable to say?
>
> A. Yes. I can just say at this point --
>
> MR. GARDNER: Object to form. Go ahead.
>
> THE WITNESS: At 11:30 at night his survivability was probably -- was mostly likely ten percent. His survival in the ER is 100 percent – or his

mortality in the ER is 100 percent. How that percentage moved along time if we were to graph it out, I don't know.

Q. BY MR. JACKSON: Okay.

A. Not without vitals.

(SMF ¶ 180.)

In short, there is no competent evidence to show that transport to the hospital at any point in time when defendants interacted with plaintiff would have prevented Mr. Wingo's death. Without that competent evidence, plaintiffs' theory of causation is nothing but pure speculation, which is insufficient to overcome summary judgment. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). That evidence must be "concrete," not speculative. Id. Without causation, plaintiffs cannot prevail on their § 1983 deliberate indifference claim.

### 3.     Plaintiffs can show no violation of clearly established law.

Even if any defendant violated Mr. Wingo's constitutional rights, they are entitled to qualified immunity unless plaintiffs can show that the violation was "clearly established" at the time of the incident. See Youmans v. Gagnon, 626 F.3d 557 (11th Cir. 2010). It is a plaintiff's burden to overcome qualified immunity by pointing to specific actions of each defendant that violated clearly established law. Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997).

As the Court in <u>Wilder</u> held with respect to cases where jailers relied upon the judgments of medical nursing professionals, the clearly established law analysis "means looking for precedent where non-medical jail employees were alleged to be deliberately indifferent to an inmate's medical needs despite knowing that the inmate was already under medical care." <u>Wilder</u>, 2016 WL 11745936, at *18.

Plaintiffs have not identified a single case that meets these criteria. The only two cases plaintiffs discuss at length—<u>Patel v. Lanier County, Georgia</u> and <u>Foster v. Maloney</u>—obviously have no application to this case for purposes of the "clearly established law" analysis. <u>Patel v. Lanier County, Georgia,</u> 969 F.3d 1173, 1190-91 (2020) is a decision that postdates this September 2019 incident, and cannot be used in the clearly established law analysis. <u>Denno v. Sch. Bd. of Volusia Cnty., Fla.</u>, 218 F.3d 1267, 1271 (11th Cir. 2000) (for the qualified immunity standard, "pre-existing law must clearly establish the alleged constitutional right. Thus, we examine the legal landscape *at the time of the individual defendant's actions*.") Likewise, <u>Foster v. Maloney</u>, 785 F. App'x 810 (11th Cir. Oct. 10, 2019), decided just weeks after the subject incident, cannot define clearly established law for purposes of this case because it was also rendered after the facts of this case and because it is an unpublished decision. <u>J W by & through Tammy Williams v. Birmingham Bd. of Educ.</u>, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018) ("Unpublished cases, however, do

11

not serve as binding precedent, see 11th Cir. R. 36-2, and cannot be relied upon to define clearly established law.").

The remaining cases plaintiffs briefly mention are not cases involving jailers' reliance on the judgments of medical professionals and are thus too abstract to define "clearly established law" under these circumstances. In Danley v. Allen, jailers themselves inflicted the harm on plaintiff (by pepper spraying him) and then refused to let him see the jail nurse—they did not rely on nurses' medical judgment with respect to an unknown ailment, as defendants did here. See 540 F.3d 1298, 1304-05 (11th Cir. 2008). The defendants in McElligott v. Foley were themselves medical professionals working in the jail who failed to properly evaluate an inmate—not jailers who relied on the nursing staff's medical determinations—and this case is thus factually inapposite. See 182 F.3d 1248, 1251-54 (11th Cir. 1999). In Harris v. Coweta County, the plaintiff alleged a sheriff intentionally delayed providing a diagnostic test for plaintiff on a doctor's recommendation, which is factually different from this case, where jailers reasonably relied on the medical staff's recommendations. See 21 F.3d 388, 390 (11th Cir. 1994). Again, the defendants in Howell v. Evans were medical providers, not jailers, and the case concerned the refusal to provide medical care, *not* the failure to override the decisions of medical professionals caring for an inmate, which is at issue here. See 922 F.2d 712, 720 (11th Cir. 1991). And again, Brown v. Hughes concerned correctional officers delay

in providing *any* medical care to an inmate with a broken foot because, contrary to jail policies, no nurse was at the jail that day, and the case did not concern a situation where the inmate was already in the infirmary under a medical professional's care. 894 F.2d 1533, 1536-37 (11th Cir. 1990). In Carswell v. Bay Cty., the court held that a jail administrator could be liable for doing "nothing significant to ensure that [an inmate] received medical attention" when a public defender asked the administrator to ensure his client received the attention, but again, that is far different from this case, where all defendants interacted with plaintiff while he was under the direct medical supervision of nurses in the infirmary. See 854 F.2d 454, 457 (1988). Finally, in Ancata v. Prison Health Services, Inc., the court held that a private contractor for healthcare services in a jail acted with deliberate indifference where it refused to provide medical care to an inmate that its employees knew was necessary unless the plaintiff himself agreed to pay for it. 769 F.2d 700, 704 (1985). Those facts bear no resemblance at all to those at issue here.

As the Supreme Court recently stated, "[i]t is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" City of Tahlequah v. Bond, 142 S.Ct 9, 11 (2021). Plaintiffs have failed to proffer *any* case law that satisfies this standard under the facts of this case. Accordingly, plaintiffs have failed to sustain their burden to overcome qualified

immunity, and defendants are entitled to summary judgment on the deliberate indifference claims.

**B.    State Law Claim Against Paul Wilkerson.**

Plaintiffs have abandoned all of their state law negligence claims except for the claim based on Deputy Wilkerson's alleged failure to complete 15-minute rounds on Mr. Wingo, in violation of Policy 2-03-07.01. (Doc. 209, p. 26-27.)

But once again, even if Deputy Wilkerson had a duty that is properly characterized as ministerial, plaintiffs still cannot recover under a negligence theory because such violation would not have caused any injury to Mr. Wingo. As shown above, plaintiff's own expert, Dr. Myers, could not say with any degree of medical certainty whether Mr. Wingo would have lived if a code blue was called at 7:45 a.m., 6:45 a.m., or even 5:45 a.m.—hours before Deputy Wilkerson allegedly failed to properly conduct his 12 to 15 minute security rounds.

Accordingly, because there is no evidence in the record that any "ministerial" duty, if performed, would have saved Mr. Wingo's life, plaintiffs have no evidence of causation in support of their remaining negligence claim against Deputy Wilkerson, which is subject to summary judgment.

## II.    <u>CONCLUSION</u>

Because plaintiffs failed to show an issue of material fact as to whether defendants were deliberately indifferent to Mr. Wingo's serious medical needs,

whether they are entitled to official immunity, or whether their conduct actually caused Mr. Wingo's death, the defendants are entitled to summary judgment as a matter of law.

Respectfully submitted,

**COBB COUNTY ATTORNEY'S OFFICE**

*/s/ Lauren S. Bruce*
Lauren S. Bruce
*Assistant County Attorney*
Georgia Bar No. 796642
H. William Rowling
*County Attorney*
Georgia Bar No. 617225

100 Cherokee Street, Suite 350
Marietta, GA 30090
770-528-4000 (telephone)
770-528-4010 (facsimile)

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

15

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing **<u>REPLY</u>**

**<u>BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY</u>**

**<u>JUDGMENT</u>** has been prepared in accordance with Local Rule 5.1(C) (Times New

Roman font, 14 point).

This 29th day of September, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing

**<u>REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR</u>**

**<u>SUMMARY JUDGMENT</u>** to the Clerk of Court using the CM/ECF system which

will automatically send electronic mail notification of such filing to counsel of

record who are CM/ECF participants, and mailed a paper copy of same mailed by

the United States Postal Service, first-class, postage prepaid, to parties and counsel

of record who are non-CM/ECF participants, properly addressed upon:

<div align="center">

Timothy J. Gardner & Henrietta G. Brown
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339

</div>

This 29th day of September, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)