**No. 24-10933-H**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

TIFFANY WINGO, ET AL.,

*Plaintiffs/Appellants,*

v.

BRANSON HARRIS, ET AL.,

*Defendants/Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Georgia

Case No. 1:20-cv-03662-VMC
Hon. Victoria M. Calvert, District Judge

_____

**APPELLANTS' APPENDIX VOLUME IV**

_____

Timothy J. Gardner
Georgia Bar No. 115430
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com

June 11, 2024

<u>INDEX OF APPENDIX</u>

<u>Docket/Tab #</u>

<u>Volume I</u>

District Court Docket Sheet ..........................................................................................A

Plaintiffs' Complaint ...................................................................................................1

Gordon, Harris, and Wilkerson's Answer to Plaintiffs' Complaint ...................... 17

Plaintiffs' Third Amended Complaint… ...........................................................…...166

Gordon, Harris, Marshall, McPhee, and Wilkerson's
Answer to Plaintiff's Third Amended Complaint ................................................175

Marshall's Deposition Transcript Excerpts ...................................................... 191-4

<u>Volume II</u>

Harris' Deposition Transcript Excerpts ............................................................ 191-5

Gordon's Deposition Transcript Excerpts ........................................................ 191-6

Wilkerson's Deposition Transcript Excerpts .................................................... 191-7

Dr. Kenneth Vega's Deposition Transcript ...................................................... 191-8

Defendants' Brief in Support of Motion for Summary
Judgment. .......................................................................................................... 196-1

Defendants' Motion to Exclude Testimony of Dr. Brian
Myers and Mark Johnson with Brief in Support...................................................198

Plaintiffs' Response in Opposition to Defendants' Motion to
Exclude Testimony of Dr. Brian Myers and Mark Johnson..................................207

Plaintiffs' Response in Opposition to Defendants' Motion
for Summary Judgment……………………………………………………... ......209

Dr. Brian Myers' Expert Report…………………………………...…………209-27

<u>Volume III</u>

Dr. Brian Myers' Deposition Transcript ............................................................ 211-2

Visser's Deposition Transcript Excerpts ........................................................... 211-3

Womack's Deposition Transcript Excerpts ....................................................... 211-6

Plaintiff's Notice of Filing EME (1 USB)—Exhibit 7: Infirmary
Video View 1; Exhibit 8: Marshall's Internal Affairs Interview
Audio; Exhibit 9: Infirmary Video View 2; Exhibit 11: Marshall
and Wilkerson's Internal Phone Call; Exhibit 12: Marshall
and Harris' Internal Phone Call; Exhibit 18: Corridor Video;
Exhibit 19: Outside Padded Cell Video; Exhibit 20: Inside
Padded Cell Video; Exhibit 22: Vanderbogart's Internal Affairs
Video Interview; and Exhibit 34: Wilkerson' Internal Affairs Video
Interview ...........................................................................................................212

Plaintiff's Notice of filing EME (1 USB)—Exhibit 6: Infirmary
Video View 1; Exhibit 7: Infirmary Video View 2; Exhibit 9:
Marshall and Harris' Internal Phone Call; Exhibit 12: Marshall
and Wilkerson's Internal Phone Call; Exhibit 14: Nurse Visser's
Internal Affairs Video Interview; Exhibit 15: Corridor Video;
Exhibit 16: Outside Padded Cell Video; and Exhibit 17: Inside
Padded Cell Video ............................................................................................213

Plaintiffs' Amended Response and Objections to Defendant's
Statement of Undisputed Material Facts to Motion
for Summary Judgment...……………....................................................................221

Defendants' Reply Brief to Plaintiff's Response in
Opposition to Defendants' Motion to Exclude
Dr. Brian Myers and Mark Johnson………………………... ...............................223

Defendants' Reply Brief to Plaintiff's Response
in Opposition to Defendants' Motion for Summary Judgment.....................224

## Volume IV

Defendants' Response to Plaintiffs' Additional Facts in Opposition
to Defendants' Motion for Summary Judgment……………………...………....225

Order Granting Defendants' Motion for Summary Judgment
and Motion to Exclude Testimony of Dr. Brian Myers, denying
Plaintiffs' Motion for Partial Summary Judgment, and denying
as moot Plaintiffs' Motion to Exclude Defendants' Expert
James C. Upshaw, Downs, M.D. ………………………..................................227

Judgment………………………………………………………………....228

Notice of Appeal………………………………………………………...…230

Certificate of Service…………………………………………………………B

DOCKET 225

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIFFANY WINGO *et al.*,          )
                                 )
    Plaintiffs,              )
                                 )
v.                               )       CIVIL ACTION FILE NO:
                                 )       1:20-CV-03662-VMC
MAJOR BRANSON HARRIS, *et al.*,  )
                                 )
    Defendants.              )

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

COME NOW defendants and file this response to Plaintiffs' Additional Facts in Opposition to Defendants' Motion for Summary Judgment (Doc. 209-1), pursuant to LR 56.1(b)(3).

**1. This case is brought pursuant to 42 U.S.C. § 1983 where Plaintiffs allege Defendants violated Plaintiffs' decedent, Mr. Kevil Wingo's, United States Constitutional right to receive adequate medical care while being detained. Plaintiffs' allege Defendants were deliberately indifferent to Mr. Wingo's serious medical needs resulting in his death at the Cobb County Adult Detention Center (hereinafter referred to as the "CCADC") on September 29, 2019. (Doc. 166). Plaintiffs further allege that Defendants were negligent in failing to follow Cobb County Sheriff's Office's (hereinafter referred to as**

"CCSO") policies and procedures and that this failure led to Mr. Wingo's death. (Doc. 166). Defendants deny all Plaintiffs' allegations. (Doc. 175)

RESPONSE: Defendants object to the Court's consideration of this statement because it is not a statement of fact. It is a statement of the procedural history of the case. The statement is not material to plaintiffs' motion for summary judgment.

## MR. KEVIL WINGO'S INFIRMARY HOUSING

**2. Plaintiffs' decedent, Kevil Wingo, Sr. was booked as a detainee at the Cobb County Adult Detention Center ("CCADC") on September 24, 2019. Four days later, on September 28, 2019, around 11:50 p.m., Mr. Wingo was taken to the infirmary at the CCADC complaining of severe stomach pain, nausea, and vomiting. (Quentin Appleby Deposition, relevant pages attached as Exhibit 1 at pgs. 20:21; 33:22; Yvette Burton Deposition, relevant pages attached as Exhibit 2 at p. 45:6).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**3. Mr. Wingo was taken to the infirmary in a wheelchair. (Exhibit 1, Appleby Dep. at pgs. 26:06; 36:03).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**4. Officer Quentin Appleby took him to the Infirmary. Deputy Appleby stated that he was concerned about Mr. Wingo's medical condition at that time because Mr. Wingo was sweating and the sounds he was making. (Exhibit 1 Appleby Dep at p. 44:2-9).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Appleby is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008). Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper v. Lawrence Cty., 592 F.3d 1227, 1234 (11th Cir. 2010).

**5. Deputy Appleby was also able to appreciate that Mr. Wingo was in pain when he took him to the infirmary. (Exhibit 1 Appleby Dep. at p. 21:19-22).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Appleby is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234.

**6. When he arrived in the Infirmary he fell out of the wheelchair. (Exhibit 1 Appleby Dep. at p. 26:5-7).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Appleby is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234.

**7. Deputy Appleby stated that Mr. Wingo was not faking. (Exhibit 1 Appleby Dep. at p. 26: 11-18). On a scale of 1-10 Deputy Appleby rated Mr. Wingo's pain an 8 at that time. (Exhibit 1 Appleby Dep. at p. 27:10-16). Mr. Wingo told the infirmary staff that he needed to go to the hospital. (Exhibit 1 Appleby Dep. at p. 35:6-14).**

RESPONSE: Defendants object to the portions of this fact concerning Deputy Appleby's assessment of Mr. Wingo's condition because it is not material. Mr. Appleby is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234. As for the statement that Mr. Wingo told infirmary staff that he needed to go to the hospital, defendants concede that the Court can properly consider this fact for purposes of this summary judgment motion.

**8. Mr. Wingo was not combative, yelling at anyone or using offensive language when Deputy Appleby took him down. (Exhibit 1 Appleby Dep. at p. 39:14¬25).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Appleby is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." <u>Burnette</u>, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234.

**9. Mr. Wingo was placed in a cell in the Infirmary with three other detainees. (Britton McPhee Deposition, relevant pages attached as Exhibit 3 at p. 163:07).**

RESPOSNE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**10. Throughout the night and early morning hours of September 28-29, 2019, Mr. Wingo asked both the medical staff and CCSO officers Britton McPhee and Lynda Marshall to go to the hospital. (Exhibit 3, McPhee Dep. at p. 152:19-25; Lynda Marshall Deposition, relevant pages attached as Exhibit 4 at pgs. 138:04-25; 147:24-25; 148:1-6).**

RESPONSE: Defendants object to the Court's consideration of this statement because the respondents' citation does not support the respondents' fact. Mr.

McPhee testified that Mr. Wingo asked medical staff to go to the hospital and that he heard this request, but he did not testify that the request was directed at him. (Ex. D, McPhee Dep. Excerpts, 152:18-24.) Defendants otherwise concede that the cited evidence supports the statement that Mr. Wingo asked medical staff and Ms. Marshall to go to the hospital.

**11. Deputy McPhee testified that Mr. Wingo never exhibited any behavioral changes in that he was very loud from the moment he saw him and pressed the emergency distress button in his cell throughout the evening. (Exhibit 3 McPhee Dep. at p. 98:11-21).**

RESPONSE: Defendants object to this fact because it is not material to the extent it is offered to show the subjective knowledge of any defendant of Mr. Wingo's condition. Mr. McPhee is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234. To the extent the fact tends to show that nursing staff in the infirmary were aware of Mr. Wingo's condition, defendants concede the Court may consider this fact for that purpose on the motion for summary judgment.

**12. Deputy McPhee also testified that Mr. Wingo was quite vocal throughout the evening, asking to go to the hospital. (Exhibit 3 McPhee Dep. at pgs. 156:19-21; 157:16-18).**

RESPONSE: Defendants object to this fact because it is not material to the extent it is offered to show the subjective knowledge of any defendant of Mr. Wingo's condition. Mr. McPhee is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234. To the extent the fact tends to show that nursing staff in the infirmary were aware of Mr. Wingo's condition, defendants concede the Court may consider this fact for that purpose on the motion for summary judgment.

**13. Major Branson Harris, the watch commander and highest ranking official in the jail on shift at the time, was made aware that Mr. Wingo wanted to go to the hospital. (Branson Harris Deposition, relevant pages attached as Exhibit 5 at p. 79:21).**

RESPONSE: In its full context, Major Harris testified that Nurse Visser "told me he was detoxing and he was trying to get to the hospital—he was drug seeking is the term that she used—and that he needed to be isolated in a cell by himself."

- 7 -

(Harris Dep. 79:18-23.) Defendants concede the Court may consider this fact in its full context for purposes of this summary judgment motion.

**14. Lab Technician Tiffany Womack began her shift in the CCADC infirmary at 6:00 a.m. and testified that Mr. Wingo became worse as she was there and was sweating, falling to the ground and saying he could not breathe. (Tiffany Womack Deposition at p. 87:7-22, relevant pages attached as Exhibit 6). Deputy Marshall also heard a few times Mr. Wingo hollering that he could not breathe and wanted to go to the hospital and she responded if you are speaking you are breathing, but did not provide him any medical aid. (Exhibit 4 Marshall Dep. at p. 138, 147, 149-150). Mr. Wingo had been hollering that he could not breathe for at least an hour and a half before Deputy Marshall opened his cell door. (Exhibit 4 Marshall Dep. at p. 150:13-25).**

RESPONSE: Defendants object to this fact because the respondents' evidence does not support the respondents' fact. Deputy Marshall testified that Mr. Wingo told her he could not breath and needed to go to the hospital, but the cited evidence does not establish that Deputy Marshall "did not provide him any medical aid." In fact, she "turned and told the nurses" what Mr. Wingo told her, and they told her "he was detoxing, drug seeking, that he was okay." (Marshall Dep. 138:16-21, 149:19-150:5.)

**15. Tiffany Womack testified that up until the time she did her rounds prior to Mr. Wingo being sent to the Infirmary Extension he appeared to be in serious medical distress and that a lay person or anyone without medical training could clearly see that he was in medical distress. (Exhibit 6 Womack Dep. at p. 106:7-20).**

RESPONSE: Ms. Womack also testified that a lay person in defendants' position is "going to turn to that charge nurse and find out what needs to happen, and she would agree with her, I mean, because she's not going to know any differently. And so in [Deputy Marshall's] defense, I mean, she didn't know what was wrong, and she is going to listen to the nurse." (Womack Dep. 78:2-10.) Otherwise, defendants concede the Court may consider this fact in its full context for purposes of this summary judgment motion.

**16. The following morning of September 29, 2019, between 7:27 a.m. and 7:32 a.m. Mr. Wingo is seen in the presence of Deputy Marshall fainting or losing his balance at least three times. (Exhibit 2 Marshall Dep. at pgs. 158-163; Infirmary Jail Video View 1 attached as Exhibit 6; Deputy Marshall Internal Affairs Interview attached as Exhibit 7).**

RESPONSE: Defendants object to this fact because it is not material to the extent it is offered to show Deputy Marshall's subjective knowledge Mr. Wingo's condition. Whether Mr. Wingo fell "in the presence of Deputy Marshall" is

irrelevant in this case if she did not see the fall—and she testified she had not. (Marshall Dep. 157:22-158:6, 161:2-12.) "Each individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234. To the extent the fact tends to show that nursing staff in the infirmary were aware of Mr. Wingo's condition, defendants concede the Court may consider this fact for that purpose on the motion for summary judgment.

**17. After Mr. Wingo fainted or lost his balance the third time, Deputy Marshall opened Mr. Wingo's cell door and he fell to the ground in front of the cell. (Exhibit 2 Marshall Dep. at p. 169:01-03; Exhibit 8 Infirmary Video View 2 at 7:28 a.m.).**

RESPONSE: Defendants object to this fact because it is not material to the extent it is offered to show Deputy Marshall's subjective knowledge Mr. Wingo's condition. Whether Mr. Wingo fell to the ground in front of the cell, Deputy Marshall did not know if he fell or if he "went down playingly." (Marshall Dep. 138:24-139:3, 168:16-169:3.) "Each individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234. To the extent the fact tends to show that nursing staff in the infirmary were aware of Mr. Wingo's condition, defendants concede the Court may consider this fact for that purpose on the motion for summary judgment.

**18. Lieutenant Gordon, who supervised security personnel in the infirmary, arrived when Mr. Wingo was on the floor in front of his cell. (Charles Gordon Deposition, relevant pages attached as Exhibit 9 at pgs. 64:20-25; 65:1-6 and Exhibit 8 Infirmary Video at 7:31 a.m.).**

RESPOSNE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**19. Mr. Wingo was on the floor in front of his cell for nine minutes in the presence of Deputy Marshall and Lt. Gordon. (Exhibit 4 Marshall Dep. at pgs. 214:11-25; 215:1; Exhibit 10 Gordon Dep at pgs. 101:25; 102:1-25; Exhibit 7 Infirmary Video View 1 and Exhibit 9 Infirmary Video View 2 at 7:31 a.m. through 7:41 a.m.). Lt. Gordon stated that he saw Mr. Wingo fall over several times while he was on the floor but did not have medical attend to him. (Exhibit 10 Gordon Dep. at pgs. 103-104, 107-108, 113-116). He said that Mr. Wingo falling over was concerning to him, but he did not have medical evaluate him. (Exhibit 10 Gordon Dep. at p. 115:12-25).**

RESPONSE: Defendants object to this fact because the respondents' evidence does not support the respondents' fact. Lt. Gordon saw Mr. Wingo fall, but the cited evidence does not establish that Lt. Gordon "did not have medical attend to him." They were already in the infirmary, and Lt. Gordon asked the charge nurse multiple times if Mr. Wingo was "medically clear." (Gordon Dep. 108:11-15.)

**20. Neither Deputy Marshall nor Sergeant Gordon had any of the nonparty medical providers attend to Mr. Wingo nor did they attend to Mr. Wingo or call an ambulance for him. (Exhibit 6 Infirmary Video View 1 and Exhibit 8 Infirmary Video View 2).**

RESPOSNE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion, when considered in the context that Mr. Wingo was already in the infirmary receiving medical care from the nurses at this point.

**21. CCSO personnel removed Mr. Wingo from the Infirmary where he was showing signs of serious medical distress to the point where Lieutenant Gordon testified, he did not think Mr. Wingo even knew where he was. (Exhibit 9 Gordon Dep. at pgs. 169:12-17; 82:1-25; 83:1-7; and Exhibit 8 Infirmary Video View 2 at 7:46 a.m.).**

RESPONSE: The respondents' citation does not support the stated fact. Lt. Gordon testified that he "did not know" whether Mr. Wingo knew where he was, not that he "did not think" Mr. Wingo was in such a state. (Gordon Dep. 169:12-17.) He further testified that he did not believe Mr. Wingo was in pain (Id. 82:8-10.) None of the cited evidence establishes that Mr. Wingo was "showing signs of serious medical distress."

**22. The officers removed Mr. Wingo from the infirmary and took him to an isolated padded cell because they claim that he was "messing around", "playing games" or "suicidal". (Exhibit 4 Marshall Dep. at pgs. 18:5-11; 186:9-11; Exhibit 9 Gordon Dep. at pgs. 164:8-13; 176:20-24; 188:17-19; Exhibit 10 Marshall and Wilkerson Internal Phone Call; and Exhibit 11 Marshall and Harris Internal Phone Call).**

RESPONSE: The stated fact is wrong and is directly refuted with the following evidence: it was the WellStar staff who told Deputy Marshall that Mr. Wingo was "messing around." (Marshall Dep. 180:1-16.) Charge Nurse Analeen Visser made the initial decision to place Mr. Wingo in close observation. (Id. 139:25-140:8, 185:3-6: Visser Dep. 300:23-25.) No defendant or other security officer suggested to Nurse Visser to move Mr. Wingo to the infirmary before she made that decision herself. (Visser Dep. 301:1-23.) The decision to send an inmate to a close observation cell would be made by medical staff. (Harris Dep. 60:10-18.)

**23. Defendant Deputy Marshall sought to move Mr. Wingo to an isolated padded cell calling him an "idiot" and saying that he was "playing games". (Id.)**

RESPONSE: The stated fact is wrong and is directly refuted with the evidence cited in response to SMF 22 above, showing that it was Nurse Visser who decided to move Mr. Wingo from the infirmary.

**24. Deputy Marshall contacted Major Harris and told him that Mr. Wingo was messing around and needed to be moved to a padded cell. (Exhibit 11 Marshall and Harris Internal Phone Call).**

RESPONSE: The stated fact is wrong and is directly refuted with the evidence cited in response to SMF 22 above, showing that it was Nurse Visser who decided to move Mr. Wingo from the infirmary.

**25. Major Harris responded that if Mr. Wingo "is detoxing" then he should be in the infirmary, but that he would come down. (Exhibit 5 Harris Dep. at pgs. 93:19-25; 94:1-25; Exhibit 11 Marshall and Harris Internal Phone Call).**

RESPOSNE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**26. Deputy Marshall knew that detoxing was a medical condition, and that people can have adverse reactions from detoxing that can lead to medical emergencies as identified in CCSO policies and procedures and that detoxing needed to be watched. (Exhibit 4 Marshall Dep. at p. 174:2-22). Deputy Marshall also testified that she knew detoxing could be a serious medical issue. (Exhibit 4 Marshall Dep. at 178:4-14).**

RESPONSE: Defendants object to respondents' fact because it is not relevant. Mr. Wingo died from a perforated ulcer, not detoxing.

- 14 -

**27. Major Harris testified that in 2019 he knew that someone could die from detoxing. (Exhibit 5 Harris dep. at p. 95:8-10).**

RESPONSE: Defendants object to respondents' fact because it is not relevant. Mr. Wingo died from a perforated ulcer, not detoxing.

**28. Lt. Charles Gordon knew that if someone was detoxing medical needed to see them. (Exhibit 10 Gordon Dep. at p. 112:19-25).**

RESPONSE: Defendants object to respondents' fact because it is not relevant. Mr. Wingo died from a perforated ulcer, not detoxing.

**29. Paul Wilkerson knew that people could die from detoxing as other security personnel at the jail told him that. (Wilkerson Dep. at p. 95:12-15, relevant pages attached as Exhibit 13).**

RESPONSE: Defendants object to respondents' fact because it is not relevant. Mr. Wingo died from a perforated ulcer, not detoxing.

**30. Deputy Nasie Mejia, who helped place Mr. Wingo in the padded cell, was taught at the CCADC that detoxing was a medical condition. (Nasie Mejia Deposition at p. 56:1-6, relevant pages attached as Exhibit 14). He also understood that someone could die from detoxing. (Exhibit 14 Mejia dep at p. 56:7-14). He learned this at the CCADC. Id. He understood that detoxing could lead to a medical emergency. (Exhibit 14 Mejia Dep. at p. 57:16-25).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Mejia is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." <u>Burnette</u>, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234.

**31. Chief Deputy Allen, the second highest ranking official at the Cobb County Sheriff's Office also knew that detoxing is a medical condition that can lead to a serious medical issue. (Sonya Allen Deposition at p. 152:21-25 – 153:1-13, relevant pages attached as Exhibit 15).**

RESPONSE: Defendants object to this fact because it is not material. Chief Deputy Allen is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." <u>Burnette</u>, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234.

**32. Deputy Marshall then contacted Deputy Paul Wilkerson and told him that she had an idiot over there playing games who wanted to go to the hospital and asked if any padded cells were available in the area where he worked. (Exhibit 4 Marshall Dep. at p. 186:9-25; Paul Wilkerson Deposition, relevant pages attached as Exhibit 12 at p. 133:10-25; Exhibit 10 Marshall and Wilkerson Internal Phone Call).**

- 16 -

RESPONSE: Defendants note that during this conversation, Deputy Marshall did refer to Mr. Wingo as an "idiot" who was "playing games," but that was because she had been told that he was detoxing, playing games, drug seeking, and "trying to fenagle his way to the infirmary" by medical personnel. (Marshall Dep. 188:23-189:2, 192:25-193:10.). Defendants otherwise concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**33. Deputy Wilkerson responded to Marshall stating Mr. Wingo wanted to go to the hospital with "that's not going to happen" and told her he had a padded cell available for him. (Exhibit 12 Wilkerson Dep. at pgs. 136:23-35; 137:1-6; and Exhibit 10 Marshall and Wilkerson Internal Phone Call).**

RESPONSE: Defendants note that Deputy Wilkerson explained, "if he was actually playing games and trying to go to the hospital, that pre se is not going to get him to go to the hospital." (Wilkerson Dep. 137:3-6.) Defendants otherwise concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**34. After nine minutes on the ground, Sergeant Gordon grabbed Mr. Wingo by his collar and escorted him to chairs in the Infirmary. (Exhibit 9 Gordon Dep. at pgs. 126:22-25; 127:1-7; and Exhibit 8 Infirmary Video View 2 at 7:46 a.m.).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion..

**35. Sergeant Gordon grabbed Mr. Wingo by his collar because he believed that Mr. Wingo was too unstable to walk on his own and thus needed to be held by his collar so that he did not fall while being escorted. (Id.)**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**36. Chief Deputy Sonya Allen testified that if the deputies and seargents knew that Mr. Wingo could not walk on his own and was disoriented and didn't know where he was that would be concerning. (Exhibit 15 Allen Dep. at pgs. 172:25-173:125).**

RESPONSE: Defendants object to this fact because it is not material. Chief Deputy Allen is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234.

**37. Sergeant Gordon placed Mr. Wingo in a chair in the Infirmary and then again did not ask for any medical personnel to attend to Mr. Wingo. (Exhibit 10 Gordon Dep. at pgs. 126:22-25; 127:1-7; and Exhibit 9 Infirmary Video View 2 at 7:46 a.m.).**

RESPONSE: Defendants object to respondents' fact because it is not supported by the cited evidence, which does not establish that Deputy Gordon did not ask for medical personnel to attend to Mr. Wingo.

**38. Major Harris arrived at the infirmary and spoke with a nurse who stated that Mr. Wingo was detoxing, trying to get to the hospital, drug seeking and needed to be isolated. (Exhibit 5 Harris Dep. at p. 79:17-23).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion. Further responding, the cited testimony shows that the Nurse making this decision was Charge Nurse Visser.

**39. Major Harris also did not see Mr. Wingo being loud, disruptive, acting out, belligerent or trying to harm himself. (Deposition of Harris at pgs. 117:3-6; 130:17-25; 131:1).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

<u>Mr. Wingo Taken to Padded Cell</u>

**40. Padded cells are reserved for individuals who are exhibiting signs of self-harm or are a threat to others. (Exhibit 10 Gordon Dep. at p. 149:1-16; CCSO Close Observation Policy 2-3-07.00 attached as Exhibit 16).**

RESPONSE: Defendants object to the Court's consideration of this statement because the respondents' citation does not support the respondents' fact. Policy 2-03-07.00 speaks for itself, and provides that Close Observation housing may included "any padded cell or other approved areas within specific housing units" (Ex. P, 2-03-07.01(A)(2)(c)), and that:

> Medical, mental health or security personnel may request placement of an inmate into Close Observation for reasons that include, **but are not limited to:**
>
>     1. Inmate is exhibiting signs of abnormal behavior (e.g. hearing voices, seeing things that are not there, inability to verbally communicate, etc.);
>
>     a) Observations may be reported by other inmates housed in the same housing unit.
>
>     2. Inmate is displaying a marked change in behavior occurring over an extended period of time (e.g. refusal of meals, refusing to shower, participate in laundry exchange or recreation time, etc.);
>
>     3. Inmate refuses to take critical medication (e.g. psychotropic drugs, etc.);
>
>     4. Inmate speaks of or acts on threats of self-harm or threatens to harm others;

(Id., Policy 2-03-07.01(D) (emphasis added).) Accordingly, the reasons for placing an inmate in a padded cell are not limited solely to exhibiting signs of self-harm or threat to others.

**41. Deputy McPhee testified that the only time he has heard of housing inmates who are having medical issues be housed in the infirmary extension was when there was extreme overflow or if they needed to make use of a padded cell. (Exhibit 3 McPhee Dep. p. 94:17-25). Deputy McPhee testified that detainees are placed in close observation cells usually because there is a threat of self-harm or they need to be more closely observed but usually there is a threat of self-harm. (Exhibit 3 McPhee Dep. at p. 97:7-21).**

RESPONSE: Defendants object to this fact because it is not material. Mr. McPhee is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." <u>Burnette</u>, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234. Furthermore, plaintiffs have abandoned their state-law claims based on purported violations of this policy, which speaks for itself.

**42. Sgt Guy Vanderbogart worked at the CCADC for 12 years and in that time had never seen someone placed in a close observation cell that did not threaten to hurt themselves. (Guy Vanderbogart Deposition at pgs. 53:25-54:1-5, relevant pages attached as Exhibit 17). Padded cell used if someone tries to hurt themselves or a little bit out of control. (Exhibit 17 Vanderbogart Dep. at p. 20:12-18).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Vanderbogart is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234. Furthermore, plaintiffs have abandoned their state-law claims based on purported violations of this policy, which speaks for itself.

**43. A deputy or sergeant could not make the decision to place someone in a padded cell. (Exhibit 17 Vanderbogart Dep. at p. 21-22).**

RESPONSE: Defendants object to this fact because it is not material. Nurse Visser made the decision to place Mr. Wingo in a padded cell. Furthermore, plaintiffs have abandoned their state-law claims based on purported violations of this policy.

**44. Watch Commander signed the Close Observation Form approving placement in padded cell. (Exhibit 17 Vanderbogart Dep. at p. 24:11-14). This form is usually completed within 10-15 minutes after placing someone in a padded cell. (Exhibit 17 Vanderbogart Dep. at p. 24-25). The purpose of the form and placing it by deputy is so that the deputy knows why detainee in there. (Exhibit 17 Vanderbogart Dep. at p. 26:7-16).**

RESPONSE: Defendants object to this fact because it is not material. Nurse Visser testified it was her responsibility to complete the Close Observation form. (Visser Dep. 96:24-97:7, 297:4-25, 298:8-23.) Furthermore, plaintiffs have abandoned their state-law claims based on purported violations of this policy.

**45. Deputy Mejia testified that a detainee cannot be placed in a padded cell unless assessed by medical and their vitals are taken. (Exhibit 14 Mejia Dep. at pgs. 64:24-25 – 65:1-25).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Mejia is not a defendant in this matter. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette, 533 F.3d at 1331. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234. Furthermore, plaintiffs have abandoned their state-law claims based on purported violations of this policy, which speaks for itself.

**46. After seeing Mr. Wingo, Major Harris with the assistance of Lieutenant Gordon handcuffed Mr. Wingo and escorted to a padded cell outside the infirmary in another area of the jail referred to as the Infirmary Extension. (Exhibit 9 Gordon Dep. at 139-140; Exhibit 8 Infirmary Video at 7:45 a.m.).**

RESPONSE: Defendants note that Lt. Gordon testified these events occurred after Major Harris spoke with Nurse Visser. Otherwise, defendants concede the Court can consider this fact on the motion for summary judgment.

**47. Mr. Wingo was not assessed by medical and his vitals were not taken. (Exhibit 7 & 9 Infirmary Video Views 1 & 2).**

RESPONSE: For additional context, Ms. Womack asked if the nurses wanted to go ahead and get his vitals before they took Mr. Wingo to the Extension, but Charge Nurse Visser said "no, they don't need to." (Marshall Dep. 226:1-4; Visser Dep. 91:15-92:2.)) Otherwise, defendants concede the Court can consider this fact on the motion for summary judgment.

**48. Mr. Wingo was losing his balance while walking and having difficulty walking. (Exhibit 9 Gordon Dep. at pgs. 143:3-6; 154:1-7; Exhibit 8 Infirmary Video View 2 at 7:46 a.m.; and Corridor Video, attached as Exhibit 14 at 7:46 a.m.)**

RESPONSE: For additional context, Lt. Gordon had asked the medical staff why Mr. Wingo was so imbalanced, and they said he was detoxing, so Lt. Gordon attributed the imbalance to that condition. (Gordon Dep. 154:18-22.) Otherwise, defendants concede the Court can consider this fact on the motion for summary judgment.

**49. Major Harris then decided to wheel Mr. Wingo to the padded cell because he was having difficulty walking. (Id.; Exhibit 5 Harris Dep. at pgs. 154:12- 25; 155:1-4).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**50. Deputy Marshall was jolly and laughing as Mr. Wingo was being taken to the padded cell. (Exhibit 7 Infirmary Video View 2 at 7:45:30 – 7:46:45). Deputy Marshall saw Mr. Wingo placed in a wheelchair because in her opinion it looked like his knee sort of buckled. (Exhibit 4 Marshall Dep. at p. 223-224). Deputy Marshall could not tell if Mr. Wingo was walking at a normal pace because she does not know what his normal pace was. (Exhibit 4 Marshall Dep. at p. 223-224).**

RESPONSE: Defendants object to the Court's consideration of this statement because the statement of fact is not material to defendants' motion for summary judgment.

**51. Mr. Wingo fell to the ground in front of the wheelchair when Major Harris brought the wheelchair. (Exhibit 5 Harris Dep. at p. 156:11-21; Exhibit 9 Gordon Dep. at pgs. 158:24-25; 159:1-7; and Exhibit 14 Corridor Video at 7:46:01 a.m.).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**52. Sergeant Gordon and Major Harris, with the assistance of another deputy, then picked Mr. Wingo off the ground and placed him in the wheelchair. (Exhibit 9 Gordon Dep. at pgs. 159:25 –160:1-2; Exhibit 5 Harris Dep. at p. 157:10-12; and Exhibit 14 Corridor Video at 7:46 a.m.).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**53. Mr. Wingo sat in the wheelchair and did not speak. (Exhibit 9 Gordon Dep. at p. 160:6-9; Exhibit 5 Harris Dep. at p. 159:5-7; Exhibit 14 Corridor Video at 7:46 a.m.).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**54. Despite the wheelchair being equipped with footrests,Mr. Wingo was wheeled to the padded cell with his foot dragging on the ground and making no sounds. (Id.; Exhibit 5 Harris Dep. at p. 173:5-19; Exhibit 14 Corridor Video at 7:46 a.m.; and Video of Outside of Padded Cell, attached as Exhibit 15 at 7:48 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the statement of fact is not material to defendants' motion for summary judgment.

**55. Mr. Wingo was then wheeled into the padded cell. (Exhibit 5 Harris Dep. at pgs. 170:23-25; 171:1-25; 172:1-7; Exhibit 9 Gordon Dep. at pgs. 171:17-18; Exhibit 15 Outside Padded Cell Video at 7:48 a.m.).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**56. Sergeant Gordon and Major Harris, with the assistance of another officer took Mr. Wingo out of his wheelchair and put him on the ground in the padded cell. (Exhibit 9 Gordon Dep. at p. 173:7-12; Video of Inside Padded Cell attached as Exhibit 16 at 7:48 a.m.).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**57. Mr. Wingo was not fighting or causing a disturbance. (Exhibit 5 Harris Dep. at p. 179-180; and Exhibit 16 Inside padded cell at 7:48 a.m. – 7:50:04 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the statement of fact is not material to defendants' motion for summary judgment.

**58. Mr. Wingo was placed face down on a toilet grate in the padded cell and removed of his clothes by Sergeant Gordon in the presence of Major Harris. (Exhibit 5 Harris Dep. at p. 179:1-9; and Exhibit 16 Inside Padded Cell Video at 7:48 a.m. through 7:50 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the statement of fact is not material to defendants' motion for summary judgment.

**59. Major Harris then dropped a safety smock on Mr. Wingo's back and left his cell. (Exhibit 5 Harris Dep. at pgs. 181:19-25;182:1-8; and Exhibit 16 Inside Padded Cell Video at 7 :49 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the statement of fact is not material to defendants' motion for summary judgment.

**60. Lt. Gordon returned to Infirmary and sat down at desk speaking to nurses. (Exhibit 7 Infirmary Video View 1 at 7:56 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the statement of fact is not material to defendants' motion for summary judgment.

**61. Deputy Marshall then made movements against the wall where Mr. Wingo originally fell and pretended as though she was stumbling to the ground and laughing. (Exhibit 7 Infirmary video View 1 at 7:57:24 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the cited evidence does not support the statement of fact. It cannot be determined from the cited video what Deputy Marshall's intentions were with respect to her movement. She denied she was pretending to fall or mocking Mr. Wingo. (Marshall Dep. 236:6-237:24.) Regardless of her intentions, the statement is not material to defendants' motion for summary judgment.

**62. Mr. Wingo appeared disoriented and confused in the padded cell. (Exhibit 16 Inside Padded Cell Video at 7 :49 a.m. through 7:57 a.m.).**

RESPONSE: Defendants object to the Court's consideration of this statement because the fact is not material to defendants' motion for summary judgment, insofar as it does not state or allege which of the defendants, if any, were aware of this purported fact. "Each individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234.

**63. Major Harris testified that Mr. Wingo appeared fine throughout his contact with Mr. Wingo. (Exhibit 5 Harris Dep. at p. 204-205). He also stated that Mr. Wingo never appeared to be in distress, and he was not concerned about Mr. Wingo. (Exhibit 5 Harris Dep. at p. 147, 205).**

- 29 -

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**64. Major Harris stated that he was the highest ranking official in the jail at the time and that he could only send Mr. Wingo to the emergency room if medical said it was ok, regardless of Mr. Wingo's condition. (Exhibit 5 Harris Dep. at p. 205¬206). He also stated that if had had went to the cell and saw Mr. Wingo was dead and medical said to not call an ambulance he would not have the authority to call an ambulance and would not have called one. (Exhibit 5 Harris Dep. at pgs. 205-206). Major Harris stated that if medical does not provide medical care then there is nothing he can do. (Exhibit 5 Harris Dep. at p. 214).**

RESPONSE: Defendant objects to this statement on the grounds that the cited evidence does not support plaintiffs' facts. Major Harris went on to testify that if medical decides not to treat someone in need of medical care, "I'm not medically trained, so I can't say if they do or they don't. That's why I have medical there." (Harris Dep. 214:22-215:4.)

**65. After a few minutes of what appeared to be involuntary movements by Mr. Wingo he was able to move to the corner of the padded cell where he sat. (Id.)**

RESPONSE: Defendant objects to this statement on the grounds that the cited evidence does not support plaintiffs' facts. The cited portions of Major Harris's deposition make no mention of any involuntary movements by Mr. Wingo.

**66. He then made a few more of what appeared to be involuntary movements and from the video evidence in this case does not appear to have moved again. (Id.)**

RESPONSE: Defendant objects to this statement on the grounds that the cited evidence does not support plaintiffs' facts. The cited portions of Major Harris's deposition make no mention of any involuntary movements by Mr. Wingo.

**67. Deputy Wilkerson assisted Lieutenant Gordon and Major Harris place Mr. Wingo in the padded cell and saw his condition when he was placed in the cell. (Exhibit 13, Wilkerson Dep. at p. 157; Exhibit 19 Outside Padded Cell Video at 7:47).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

## SECURITY CHECKS

**68. Colonel David Sanders, CCADC Detention Division Commander, the highest ranking official in the detention center, created a policy that required jail staff to conduct security rounds on close observation cells every 12 minutes**

to ensure rounds do not exceed 15 minutes. (**Exhibit 21 Colonel Sanders' Dep. at pgs. 37:6-25, 38:1, and 41:6-16**).

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**69. In September 2019, all security staff were told to perform security rounds every 12 minutes in close observation cells. (Exhibit 13 Deputy Wilkerson's Dep. at pgs. 63:4-25 and 64:3-8) and (Exhibit 5 Major Harris' Dep. at pgs. 61:1-4, 61:20-25 and 62:1-3; Exhibit 17 Vanderbogart Dep. at p. 55:11-25).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**70.   CCSO had established policies and procedures on how security rounds on close observations cell should be conducted. (Exhibit 16 CCSO Policy 2-03-07.00).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**71.   Cobb County Sheriff Office Policy 2-03-07.01 states, in relevant part:**

**(1)    Inmates in this custody status shall be housed in authorized areas of the facility and have frequent and random observations/security rounds conducted at intervals not to exceed fifteen (15) minutes.**

**(2)    Observation/security rounds may be conducted more frequently as directed, in writing, by a Detention supervisor or healthcare provider.**

**(3)    An unobstructed visual check of the inmate is required to ensure the inmate's presence and physical well-being.**

**(4)    A dedicated log shall be maintained in order to document the monitoring of the inmate by security staff. The log shall include the name of the staff member observing the inmate and shall indicate the time of each observation/security round performed.**

**(Exhibit 16 Policy 2-03-07.01).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment, which consists of citations to Policy 2-03-07.01(B)(1)(a), (B)(2)(a)(i), (B)(2)(B), and (B)(1)(b).

**72.    A security round means that the deputy looks inside the cell, makes sure the detainees are alive and well and there are no issues, and then you scan the security bar. (Exhibit 17 Vanderbogart Dep. at p. 52:8-12; Exhibit 13 Deputy Wilkerson's Dep. at p. 127:16-22).**

RESPONSE: Defendants state that the jails written policies speak for themselves, and state: "An unobstructed visual check of the inmate is required to ensure the inmate's presence and physical well-being." Policy 2-03-07.01(B)(2)(b).

**73.   Mr. Wingo was housed in the infirmary extension—Close Observation Level II. (Exhibit 21 Colonel Sanders' Dep. at pgs. 21:1-4; 19:13-25 and 20:1-24).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**74.   Deputy Wilkerson was responsible for doing security checks on Mr. Wingo every 12-15 minutes to make sure that he was alive and well. (Exhibit 13 Wilkerson Dep. at p. 62:1-25 and 63:1-25, 64:1-22).**

RESPONSE: Defendant objects to this fact because the cited evidence does not support the stated fact. The cited evidence does not state that Deputy Wilkerson was to "make sure that he was alive and well." The cited evidence states that Deputy Wilkerson was to conduct security checks on Mr. Wingo every 12 minutes. A security check requires the following: "An unobstructed visual check of the inmate is required to ensure the inmate's presence and physical well-being." Policy 2-03-07.01(B)(2)(b).

**75.   Deputy Wilkerson did his first security check at 8:02:20 and Mr. Wingo had not moved from when he was in a corner at 7:57 when he appeared**

to make his last movement. **(Exhibit 19 & 20 Video of Inside and Outside Padded Cell). Deputy Wilkerson did not look in Mr Wingo's cell. (Id.)**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**76.     Deputy Wilkerson did his second security check at 8:05:38 and Mr. Wingo had not moved from where he was earlier. (Exhibit 19 & 20 Video of Inside and Outside Padded Cell). Deputy Wilkerson did not look in Mr. Wingo's cell. (Id.)**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**77.     Deputy Wilkerson did his third security check at 8:12 and Mr. Wingo had not moved. (Exhibit 19 & 20 Video of Inside and Outside Padded Cell). Deputy Wilkerson did not look in Mr. Wingo's cell.**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**78.     Deputy Wilkerson did another security check at 8:23:40 when Major Harris did a security check on Mr. Wingo. (Exhibit 19 & 20 Video of Inside and Outside Padded Cell).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

79.     **Both Major Harris and Deputy Wilkerson both testified that they saw Mr. Wingo chest rise and fall at this time despite the video showing the contrary and despite it being impossible for them to see Mr. Wingo's chest based on where they were positioned outside Mr. Wingo's cell. (Exhibit 19 & 20 Video of Inside and Outside Padded Cell; Exhibit 5 Harris Dep. at p. 199).**

RESPONSE: Defendants object to this fact because the cited evidence does not support the respondents' fact, insofar as it does not show that it was "impossible for them to see MR. Wingo's chest based on where they were positioned outside the cell."

80.     **Deputy Harris stated that if an inmate was not moving during a security round the deputy should try to get an audible response. (Exhibit 5 Harris Dep. at p. 77).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

81.     **Despite the video evidence showing Mr. Wingo not moving at 8:23 a.m., neither Major Harris nor Deputy Wilkerson opened his cell and investigated further.**

RESPONSE: Defendants object to this fact because the cited evidence does not support the respondents' fact, insofar as it does not show that defendants did not

see Mr. Wingo moving at that time. Major Harris testified that he believed he saw Mr. Wingo's chest rise and fall at this time. (Harris Dep. 198:9-14; 200:8-12.)

**82.      Deputy Wilkerson did another security check at 8:33:20 when Sgt. Guy Vanderbogart looked inside Mr. Wingo's cell. Sgt. Vanderbogart saw Mr. Wingo in his cell in what he described as an awkward position and Deputy Wilkerson told Sergeant Vanderbogart that he had been watching Mr. Wingo and that he had been moving and was okay. (Exhibit 19 & 20 Video of Inside and Outside Padded Cell; Exhibit 17 Vanderbogart Dep. at p. 37:1-9; 40:16-20; Exhibit 22 Vanderbogart Internal Affairs Video Interview). Mr. Wingo had not moved since 7:58 a.m. (Id.)**

RESPONSE: Defendants object to this fact because the cited evidence does not support the respondents' fact, insofar as it does not establish that Mr. Wingo had not moved since 7:58 a.m. Major Harris testified that he believed he saw Mr. Wingo's chest rise and fall at 8:23 a.m.. (Harris Dep. 198:9-14; 200:8-12.)

**83.      Sgt. Vanderbogart testified that it would have been impossible for Major Harris to see Mr. Wingo's chest when he did his security round at 8:23 a.m. (Exhibit 17 Vanderbogart Dep. at p. 66:3-10).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Vanderbogart is not a defendant in this matter, and what he believes he could have seen from his perspective through the window is not relevant as to the defendants.

Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234. Furthermore, plaintiffs have abandoned their state law negligence claim against Major Harris for his purported failure to complete security rounds.

**84.    Sgt. Vanderbogart also testified that Major Harris and Deputy Wilkerson probably could not see Mr. Wingo's chest when they did their security round at 8:23 (Exhibit 17 Vanderbogart Dep. at p. 67:7-15).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Vanderbogart is not a defendant in this matter, and what he believes he could have seen from his perspective through the window is not relevant as to the defendants. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." <u>Harper</u>, 592 F.3d at 1234. Furthermore, plaintiffs have abandoned their state law negligence claim against Major Harris for his purported failure to complete security rounds. Additionally, the cited material does not support the respondents' stated fact. Mr. Vanderbogart, when asked if Major Harris and Deputy Wilkerson would have been able to see Mr. Wingo's chest, testified: "I'm not sure."

**85.    Deputy Vanderbogart looked in the cell three times and could not see Mr. Wingo's chest. He asked Deputy Wilkerson about Mr. Wingo and**

**Deputy Wilkerson said he had been moving. (Exhibit 17 Vanderbogart Dep. at p. 70:1-25 – 71:1-7).**

RESPONSE: Defendants object to this fact because it is not material. Mr. Vanderbogart is not a defendant in this matter, and what he believes he could have seen from his perspective through the window is not relevant as to the defendants. Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Harper, 592 F.3d at 1234.

**86.   Vanderbogart looked inside Mr. Wingo's padded cell in the same window that Major Harris and Deputy Wilkerson looked into Mr. Wingo's cell and stated that he was not able to see Mr. Wingo's chest area (Exhibit 17 Vanderbogart Dep. at p.39:9-11).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**87.   Deputy Wilkerson did another security check on Mr. Wingo at 8:48:00 a.m., looked inside Mr. Wingo's cell, saw him in the same position that he had been in for almost an hour and left Mr. Wingo's cell without any further investigation. (Exhibit 19 Outside Padded Cell Video at 8:48 a.m.).**

RESPONSE: Defendants object to this fact because the cited evidence does not support the respondents' fact. The video does not establish whether or not Wilkerson left the cell "without any further investigation."

**88.     Deputy Wilkerson did not open Mr. Wingo's cell or attempt to get his attention. (Id.)**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**89.     Colonel Sanders testified that he should have attempted to get Mr. Wingo's attention at that time. (Exhibit 21 Colonel Sanders' Dep. at pgs. 106:21-23, 107:9-25 and 108:1).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**90.     Deputy Wilkerson was called back to Mr. Wingo's cell again by Deputy Randy White deputy at 8:49:07 and was told to open the door and check on Mr. Wingo. (Randy White Deposition at p. 50:7-25, 51:1-4, relevant pages attached as Exhibit 23).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**91.     At that time, Deputy Wilkerson discovered that Mr. Wingo was nonresponsive. (Exhibit 19 Outside Padded Cell Video at 8:50 a.m.).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

92.     **The video shows Deputy Wilkerson walking at a casual pace after he discovered Mr. Wingo non-responsive so that he could get gloves. (Exhibit 19 Outside Padded Cell Video at 8:50:15 a.m.).**

RESPONSE: Defendants object to the characterization of Deputy Wilkerson's pace as "casual," as the video cannot ascribe such description to his gait, but defendants otherwise concede that the Court can consider the fact that Deputy Wilkerson got gloves on the motion for summary judgment.

93.     **After Deputy Wilkerson retrieved gloves a couple minutes later, Deputy Wilkerson touched Mr. Wingo. (Exhibit 19 Outside Padded Cell Video at 8:51:38).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

94.     **Another Deputy then came and attempted life saving measures on Mr. Wingo. (Exhibit 19 Outside Padded Cell Video at 8:52:33).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

95.     **Wilkerson did not call a code himself but another deputy did. (Exhibit 13 Wilkerson Dep at p. 202:12-14).**

RESPONSE: Defendants concede the Court can consider this fact on the motion for summary judgment.

**96.     After numerous failed mandatory close observation security checks Mr. Wingo was eventually found unresponsive in his cell about an hour after being placed there. (Exhibit 19 Outside Padded Cell Video at 8:50 a.m.; Exhibit 13 Wilkerson Dep. at p. 199:8-25).**

RESPONSE: Defendants object to this fact because the cited evidence does not support the respondents' fact. The video does not establish whether or not the security checks were "failed."

**97.     Lieutenant Charles Gordon, Colonel David Sanders, Defendant Major Branson Harris, and Chief Deputy Sheriff Sonya Allen admitted that Defendant Wilkerson violated CCSO's policy and procedure in conducting security rounds on Mr. Wingo's close observation cell.**

RESPONSE: Defendants object to the Court's consideration of this fact because it is not supported by any citation to the record.

**98.     Lieutenant Gordan testified:**

**Q. Okay. We're now looking at DVS 188, infirmary extension HC 16, 17 and 18. It's 8:02:10, and this would after you left the cell; correct?**

**A.     Yes.**

**Q. And at 8:02:19, is that Deputy Wilkerson?**

**A.     Yes.**

**Q. And is he doing a security check right there?**

**A. Yes.**

**Q. And is that the proper way to do a security check?**

**A. It is not.**

**(Exhibit 10 Lieutenant Gordon's Dep. at 205:2-18).**

**Q. Would Deputy Wilkerson's -- would Deputy Wilkerson's performance of that security round at 8:02 have been in violation of Cobb County Sheriff's Office policies and procedures.**

**A. Yes.**

**(Exhibit 10 Lieutenant Gordon's Dep. at 207:19-23).**

**Q. It's now 8:05:36. Deputy Wilkerson is approaching the cell. He scans it. It's now 8:05:42, and he scans 17. Did you see Deputy Wilkerson look inside Mr. Wingo's cell when he scanned the cell at 8:05:32?**

**A. I did not.**

**Q. Okay. Was that in violation of Cobb County's policies and procedures as to how you conduct a security round?**

**A. Yes.**

**(Exhibit 10 Lieutenant Gordon's Dep. at 209:10-19).**

RESPONSE: Defendants concede that this was Lt. Gordon's testimony.

**99.    Colonel David Sanders testified:**

**Q. Let's talk again about Deputy Wilkerson's violation of policies and procedures or whether he violated policies and procedures because I thought we had already established that based off of -- the only thing that you could have saw, that he had violated the policies and procedures.**

**A. Yeah. I think you're right. So if I seem to have waffled on that, I apologize. But, yes, based on what I saw today, it appears to me there were some policy violations.**

**(Exhibit 21 Colonel Sanders' Dep. at 260:5-14).**

RESPONSE: Defendants concede this was Colonel Sanders's testimony.

**100. Major Branson Harris testified:**

**Q. It is now 8:02:26, and that's the time that Deputy Wilkerson had walked outside of Mr. Wingo's cell and scanned his device, correct?**

**A. Yes.**

**Q. And from you watching Deputy Wilkerson walk outside that cell and scan the device, do you know if Deputy Wilkerson could have seen him in his cell as he was positioned there in the right corner?**

**A. No.**

**Q. So he could not have seen him?**

**A. No.**

- 44 -

Q. Okay. And would that be in violation of Cobb County Sheriff's Office policy and procedure that Deputy Wilkerson failed to observe Mr. Wingo in the close observation cell during that security round?

A. Yes.

(Exhibit 5 Major Harris' Dep. at 192:5-22).

Q. So you've now seen Deputy Wilkerson's second security check at 8:05:30. Did you see Deputy Wilkerson look inside the cell?

A. No.

Q. Okay. Would he have been able to see Mr. Wingo in the way that he walked past the cell?

A. No.

Q. Okay. And would Deputy Wilkerson's failure to look inside the cell to make sure Mr. Wingo was moving be a violation of Cobb County Sheriff's Office policy and procedure?

A. Yes.

Q. At 8:12:27, do you see Deputy Wilkerson in the video?

A. Yes.

Q. And at 8:12:30, did Deputy Wilkerson just do another security check?

A. Yes.

Q. Did you see him look inside the cell?

**A. No.**

**Q. And that was Deputy Wilkerson's third security round check; correct?**

**A. Yes.**

**Q. And would that be in violation of Cobb County Sheriff's Office policy and procedure for Deputy Wilkerson to have failed to look inside the cell to make sure that Mr. Wingo was moving and well at that time?**

**A. Yes.**

**(Exhibit 5 Major Harris' Dep. at pgs. 194:5-16, 194:19-25, 195:1 and 195:6-14.)**

RESPONSE: Defendants concede this was Major Harris's testimony.

**101. Chief Deputy Sonya Allen testified:**

**Q. Right. And so did Deputy Wilkerson do his security rounds in the correct way?**

**A. From what I was told, he visually check via the monitor and then confirmed it with the scanner.**

**Q. And he confirmed through the monitors that – well, what did they tell you that he confirmed through the monitors before he did his security rounds?**

**A. I don't remember. I just remember as to the rounds that's what he said he did, and to me that was inappropriate.**

**Q. Okay. So that was a violation of Cobb County policy and procedure?**

**A. In the way that I viewed the policy, yes. But when I was --went back and looked at the policy, it says "unobstructed visual check." And everyone, to me, knows that you go do a round by looking in the cell block, but I believe when this was drafted, I don't even think we had monitors at the desk of the officers.**

**Q. Right. Was that how you-all trained deputies to do security rounds, was to physically look inside the cells?**

**A. Yes –**

**Q. So did Deputy Wilkerson violate the policy even though -¬even if it arguably wasn't written?**

**A. Yes.**

**Q. Okay. Should Deputy Wilkerson have looked inside --physically looked inside the cell during every security round?**

**A. Yes.**

**(Exhibit 15 Chief Deputy Allen's Dep. at pgs. 106:18-22,108:5-24 and 109:10-17).**

RESPONSE: Defendants concede this was Chief Deputy Allen's testimony.

**102.   Defendant Wilkerson also admitted that he failed to look in Mr. Wingo's cell during security rounds in violation of CCSO's Policy 2-03-07.01. (Exhibit 13 Deputy Wilkerson's Dep. at pgs. 177:3-16, 181:2-4 and 183:5-11).**

RESPONSE: Defendants concede this was Deputy Wilkerson's testimony.

**103.    Furthermore, Defendant Wilkerson violated CCSO's policies and procedures when he failed to check on the physical well of Mr. Wingo to make sure he was alive and well. Colonel Sanders testified:**

**Q. So at 8:01:50, does Mr. Wingo appear to be moving at all.**

**A. No sir.**

**Q. Okay. So at 8:01:50 when you look at the camera going into the -- Mr. Wingo's cell, he does not look well?**

**A. He looks like he could be asleep, but it -- the position he is in, I would want more confidence as to whether he's well. So to clarify my statement, I don't know that he looks unwell, but he doesn't look comfortable. And this is something if I were doing the security round, I would investigate further.**

**Q. Okay. Would you expect your deputies that worked under you to investigate further if they saw an inmate in this position?**

**A. Yes, sir.**

**Q. Okay. And that's because you want them to check on his well-being to make sure he's well.**

**A. Correct.**

**(Exhibit 21 Colonel Sanders' Dep. at pgs. 106:21-23, 107:9-25 and 108:1).**

Q. And so I'm going to play it from 8:01 through 8:03. Okay? A. Okay.

Q. Now, during that minute and ten seconds or so, did you see Mr. Wingo move at all?

A. No, sir.

Q. All right. Now, a moment ago I showed you Deputy Wilkerson do his security round during this time period; correct?

A. Correct.

Q. And I think we've established that you said with 99 percent certainty you don't believe that he could have seen Mr. Wingo's torso as he was positioned there.

A. Correct.

Q. All right. You didn't see Mr. Wingo move during that time period, did you?

A. I did not.

Q. All right. You didn't see his foot move or anything?

A. No, sir. I did not.

Q. All right. And this would have been the same thing that Deputy Wilkerson had saw if he was looking at the camera, correct?

A. Should be, yes, sir.

Q. So based off of Deputy Wilkerson's security round where you were 99 percent sure that he could not see Mr. Wingo and based off this camera footage of 18A at this -- during that time period, could Deputy Wilkerson have seen that Mr. Wingo was well?

A. No.

Q. All right. So based off the fact that Deputy Wilkerson --you're 99 percent sure that he could not have seen Mr. Wingo inside the cell and based off of what you've seen in this video in 18A of Mr. Wingo's position, was Deputy Wilkerson's security round in compliance with Cobb County Sheriff's Office policies and procedures?

A. Based on what I've seen, I would say no.

(Exhibit 21 Colonel Sanders' Dep. at pgs. 108:3-8, 109:20-25, 110:1—25 and 111:1-4).

Q. Okay. We know that Deputy Wilkerson did another security round at the -- during the 8:05 time frame; correct?

A. Correct.

Q. And you saw him do that security round; correct?

A. Yes, sir.

Q. So based off of Mr. Wingo's positioning inside the cell, the video observation that Deputy Wilkerson would have also had access to, and

based off of you seeing him do that security round, was Deputy

Wilkerson's security round at this time in compliance with Cobb County

Sheriff's Office policy and procedure?

A. I do not believe so.

(Exhibit 21 Colonel Sanders' Dep. at 112:7-21).

Q. Okay. Now, a moment ago I showed you Deputy Wilkerson's security

round of him at that time period around 8:12. Do you remember that?

A. Yes, sir, I do.

Q. Okay. And you were 99 percent sure that he couldn't have seen Mr.

Wingo from the way that he did that security round; correct?

A. Correct.

Q. And the only other way that he could have been able to have seen Mr.

Wingo during that time period was to see the same video you just looked

at; right?

A. Correct.

Q. And that's the video where Mr. Wingo looks unwell. A. Correct.

Q. Right? So based off this video that Deputy Wilkerson would have had

access to where Mr. Wingo looks unwell and that security round that he

just performed where you're 99 percent he could not have seen Mr.

Wingo's -- 99 percent sure he could not have seen Mr. Wingo, did he

conduct that security round in compliance with Cobb County Sheriff's Office policy and procedure?

A. It's my opinion, no, he should have investigated further. (Exhibit 21 Colonel Sanders' Dep. at pgs. 114:5-25 and 115:1-6).

Q. So when Deputy Wilkerson first did his security round, you would have expected him to investigate further by trying to get Mr. Wing's attention and, if he couldn't do that, by radioing for someone else and then propping the door to try to get his attention in some fashion?

A. Yes, sir.

Q. And if he was unable to get his attention, would you expect him to have called a code blue at that time.

A. If he's unable to get his attention through the door, I expect him to open the door and reach in to touch him and, if he's nonresponsive, call a code blue.

(Exhibit 21 Colonel Sanders' Dep. at 117:3-16).

Q. All right. So if Wilkerson had Mr. Wingo unresponsive and not responding to his knock when he did the security round, should that have taken priority over any routine duty or responsibility that he had at that time?

- 52 -

A. If he looked at Mr. Wingo and observed that his -- there was no signs that he was breathing, then that should have been his top priority. And he should respond immediately unless there was a threat -- a life-threatening situation to him, which I did not see in this case.

Q. Right. And having not seen that, he should have responded immediately at that time?

A. I believe he should have.

Q. And the fact that he didn't, is that a violation of Cobb County Sheriff's Office policy and procedure?

A. From what I've seen, I would say yes.

Q. So Deputy Wilkerson left at 8:48:13; correct?

A. Yes, sir.

Q. I'll go play it from there. Deputy Wilkerson returned at 8:49:06; correct?

A. Correct.

(Exhibit 21 Colonel Sanders' Dep. at pgs. 126:12-25, 127:1-4 and 127:10-16.)

104.   The Cobb County Medical Examiner concluded that Mr. Wingo's cause of death was complications of perforated gastric ulcer with peritonitis. (Cobb County Medical Examiner's Report at page 1, attached hereto as Exhibit 24).

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

## EXPERT TESTIMONY

**105.   On December 19, 2022, Plaintiffs formally disclosed their experts in this case including law (1.) Law Enforcement Expert Former Travis County (Austin) Sheriff Margo Fraiser and (2.) General Surgeon Brian Myers. (Doc. 134).**

RESPONSE: Defendants object to this statement because it is not a statement of fact. It is a statement of the procedural posture of the case.

## DR. BRIAN MYERS

**106.   Dr. Myers will proffer the opinions (1.) "[T]o a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would most likely survived." (2) "[T]he lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life." (Dr. Myers' Expert Report attached as Exhibit 25).**

RESPONSE: Defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198).

**107.   Dr. Myers obtained his medical degree at Ohio State University College of Medicine in 1992. (Dr. Myers' Dep. at p. 17:1-4, relevant pages attached as Exhibit 26). He attended residency at Temple University from 1992 to 1998. (Exhibit 26, Dr. Myers' Dep. at p.17:15-23). During his tenure at Temple University, he was a gastrointestinal research fellow. (Exhibit 26, Dr. Myers' Dep. at p. 21:18-22). He is board certified in general surgery by the General American Board of Surgery. (Exhibit 26, Dr. Myers' Dep. at p. 24:17-19). Dr. Myers is currently employed at Surgery South, PC as a surgeon and CEO. (Exhibit 26, Dr. Myers' Dep. at p. 34:7-10). His responsibilities are to perform surgeries and manage the staff that includes five general surgeons and practices of the business. (Exhibit 26, Dr. Myers' Dep. at pgs. 34:11-17, 34:21-25 and 35:1-2).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198).

**108.   Dr. Myers is an expert on post-perforation treatment of gastric ulcers. (Exhibit 26, Dr. Myers' Dep. at p. 26:4-6). His opinions in this case are drawn from his expertise in post-perforation treatment of ulcers as a general**

surgeon. **(Exhibit 26, Dr. Myers' Dep. at p. 26:4-25). Since residency, Dr. Myers' specialty has been general surgery. (Exhibit 26, Dr. Myers' Dep. at pgs. 17:7-9 and 19:2-10). General surgeons treat and correct perforated ulcers or gastric ulcers. (Exhibit 26, Dr. Myers' Dep. p. 20:7-12). In contrast, a gastroenterologist treats ulcers before perforation. (Exhibit 26, Dr. Myers' Dep. p. 20:13-16).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198).

**109. Dr. Myers treats patients with peptic or gastric ulcers approximately once a month. (Exhibit 26, Dr. Myers' Dep. at p. 25:8-10). All of Dr. Myers' patients come to him for surgical treatment after the ulcer has perforated. (Exhibit 26, Dr. Myers' Dep. at p. 25:11-16). There is currently no surgical treatment for patients who have ulcers that have not perforated. (Exhibit 26, Dr. Myers' Dep. at p. 25:19-22).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to

Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198).

**110.   Dr. Myers' expert opinion is as long as Mr. Wingo had vitals he most likely would have survived:**

**Q. Okay. And you go on to say that if he had received reasonable emergency care, he would most likely have survived. What do you mean by most likely?**

**A. Most probably.**

**Q. Okay.**

**A. If you get someone to me with vital signs, in the ER, they are most likely going to survive. So if you can him to the emergency room with vital signs, he's most likely going to survive.**

**Q. But most likely, you know, that-- you would agree with me that that denotes a certain probability, correct?**

**A. Yes.**

**Q. Is that quantifiable?**

**A. I'm just going to have to stick with most probably he would survive because that's just my experience.**

**Q. Would most probable mean greater than –**

**A. Greater than 50 percent.**

**(Exhibit 26, Dr. Myers' Dep. at pgs. 105:13-25 and 106:1-7).**

**Q. Okay. So lower than 50 percent mortality. But we have discussed earlier that the percentage risk of mortality, whether you can quantify that or not, it increases with each passing hour, correct?**

**A. Correct.**

**Q. Okay. Are you able to say if he ever passed the most likely to survive to most likely would not have survived line, at any point during -- or after his ulcer perforated, but while he was still at the Adult Detention Center.**

**A. All I can say is, the literature says that he probably started at around ten percent mortality. When the vital signs reached the point where he's not going to likely survive, I don't know because they are not recorded.**

**(Exhibit 26, Dr. Myers' Dep. at pgs. 106:13-25 and 107: 1-2).**

RESPONSE: Defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198). Furthermore, on further examination, Dr. Myers conceded that he could not state the likelihood that Mr. Wingo would survive with medical intervention at any given time, to any reasonable degree of medical certainty:

Q. Okay. So without the vitals and if we're trying to understand what his survivability would had of been had the emergency room been called at any point during that time frame; without the vitals you're unable to say?

A. Yes. I can just say at this point --

MR. GARDNER: Object to form. Go ahead.

THE WITNESS: At 11:30 at night his survivability was probably -- was mostly likely ten percent. His survival in the ER is 100 percent – or his mortality in the ER is 100 percent. How that percentage moved along time if we were to graph it out, I don't know.

Q. BY MR. JACKSON: Okay.

A. Not without vitals.

(Dr. Myers Dep. 110:16-111:5.)

**111. Dr. Myers also testified that Mr. Wingo's vitals were taken at 12:36 a.m. on September 29, 2019. (Exhibit 26 Dr. Myers' Dep. at pgs. 95:24-25 and 96:1-18).**

RESPONSE: Defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198).

**112.   Dr Myers testified that vitals are heart rate, blood pressure and respirations and if Mr. Wingo had vitals there was a chance he could survive. (Exhibit 26 Dr. Myers' Dep. at pg. 8:15-23).**

RESPONSE: Defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Experts Dr. Brian Myers, and Mark Johnson and Incorporated Memorandum of Law in Support (Doc. 198). Furthermore, on further examination, Dr. Myers conceded that he could not state the likelihood that Mr. Wingo would survive with medical intervention at any given time, to any reasonable degree of medical certainty, as outlined in response to Paragraph 110 above.

**DR. KENNETH VEGA**

**113.   On April 22, 2023, Defendants disclosed two experts: (1.) Gastroenterologist Dr. Kenneth J. Vega, M.D. and (2.) Forensic Pathologist Dr. James C. Upshaw Downs, M.D. (Docs. 162 and 163, Dr. Vega Expert Report Attached as Exhibit 27, and Dr. Downs' Expert Report attached as Exhibit 28).**

RESPONSE: Defendants object to this statement because it is not a statement of fact. It is a statement of the procedural posture of the case.

**114.   Dr. Kenneth J. Vega offered three opinions:**

**a. "Mr. Wingo had developed complications from his perforated gastric ulcer that included peritonitis and an evolving sepsis, that led to septic shock and ultimately his death."**

**b. "Given the multitude of factors, many of which are unknowable, that contribute to the timing of when a similarly situated patient might die, the likelihood of his survival at any particular point is not able to be determined. The absence of vital signs in the time period prior to his death makes any such prediction particularly unreliable, as there is no objective medical evidence of when he began to decline."**

**c. "For example, even if an ambulance was called at or about 7:45 a.m., the chance that he would have survived septic shock is very low. There is no way to reasonably predict, under those circumstances, if he would have survived.**

**(Dr. Vega Expert Report at Page 3, attached as Exhibit 27).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**DR. UPSHAW DOWNS**

**115.   Defendants' expert Dr. Upshaw Downs offered the opinion that: "Retrospective determination of the definite ultimate outcome of this case is not possible based upon the available information. It is not medically reasonable to**

say that this particular subject would have lived or died or at what point that critical life or death threshold was breeched." (Dr. Downs' Expert Report at Page 2, attached as Exhibit 28).

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**116.   Dr. Vega did agree that Mr. Wingo having no comorbidities listed in his autopsy report and at age 36 would have a good chance of surviving a perforated ulcer. (Dr. Vega's Dep. at pgs. 61:1-25 and 62:1-8, relevant pages attached as Exhibit 29).**

RESPONSE: Defendants object to the court's consideration of this fact because it is not material to the motion for summary judgment. Dr. Vega was speaking of Mr. Wingo's chance of survival in general, and was not speaking to his chances of survival had he received certain medical interventions at any point in time when defendants interacted with him.

## FORMER TRAVIS COUNTY SHERRIF MARGO FRAISER

**117.   Plaintiffs' correctional expert Margo Frasier has extensive qualifications and 47 years of experience in law enforcement and corrections. (Exhibit 30, Ms. Frasier's Expert Report at pgs. 1-3) (Ms. Frasier's CV attached hereto as Exhibit 31). Ms. Frasier is a criminal justice consultant and expert. (Fraiser Dep. at p. 32-33, relevant pages attached as Exhibit 32). She has served**

**as the subject matter expert in law enforcement and corrections for Special Litigation Section of the United States Department of Justice in Franklin County, Ohio, Suffolk County, New York, Alamance County, North Carolina, Hampton Roads, Virginia, State of Georgia, Cumberland County, New Jersey and Maricopa County, Arizona. (Exhibit31, Ms. Frasier's CV).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Frasier and Incorporated Memorandum of Law in Support (Doc. 197).

**118.   As a former Sheriff of Travis County (Austin) Texas, she was head of the agency that employed over 1,300 employees. (Id.). In her role as Chief Law Enforcement Officer and Chief Corrections Officer, she was responsible for supervising the jail and law enforcement officers patrolling, investigating, and enforcing criminal laws in Travis County, Texas. (Exhibit 30 Ms. Frasier's Expert Report at pgs. 1-3, Exhibit 32 Fraiser Dep. at p. 24-34). Prior to taking office as Sheriff, she gained practical corrections experience as a deputy who then rose to captain at Travis County Sheriff's Office, (Exhibit 32 Ms. Frasier's Dep. at pgs. 24:13-25 and 25:1-15).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Frasier and Incorporated Memorandum of Law in Support (Doc. 197).

**119.  Ms. Frasier's correctional experience goes beyond the detention center and into the classroom setting. She has taught criminal law, criminal investigation, professionalism, and legal aspects of corrections and criminal justice management at Sam Houston State University. (Exhibit 32 Ms. Frasier's Dep. at p. 31:1-25). As Assistant Professor at Saint Edwards University, she taught basic law enforcement and correction classes. (Exhibit 32 Ms. Frasier's Dep. at p. 30:6-20).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Frasier and Incorporated Memorandum of Law in Support (Doc. 197).

**120.  Moreover, Ms. Frasier serves as a court appointed monitor in Orleans Parish, Louisiana and Bernalillo County, New Mexico where she oversees the supervision of inmates, duty to protect inmates and internal affairs**

pursuant to the provisions of Consent Judgment. (Exhibit 32 Fraiser Dep at 36-37).

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Fraiser and Incorporated Memorandum of Law in Support (Doc. 197).

**121.   Margo Fraiser's expertise comes from her experience and understanding of accepted correctional practice, safety and supervision of inmates which includes the obligations of security staff to make sure that inmates are provided for and have access to emergency medical care. (Exhibit 32 Fraiser Dep. at p. 51:2-12).**

RESPONSE: Defendants object to this statement of fact because it is not material. Furthermore, defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Fraiser and Incorporated Memorandum of Law in Support (Doc. 197).

**122.   Ms. Frasier's proposed opinions are (1.) what an objectively reasonable correction officer had an obligation to do (2.) that no reasonable correction officer or employee in Defendants' position could have concluded,**

based on the circumstances, that there was no duty to act, protect or provide adequate medical care to a detainee; (3.) defendants actions and/or omissions in violating CCSO's policies and procedures regarding adequate medical care, evaluation of threat level and medical condition before placement in padded cell, completion of forms, observation, monitoring, and properly conducting security rounds. (Exhibit 30, Ms. Frasier's Expert Report at pgs. 9-11 Exhibit 32 Fraiser Dep. at p. 128-130, 160-16, 162-175, 176).

RESPONSE: Defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Frasier and Incorporated Memorandum of Law in Support (Doc. 197).

**123.   Dr. Fraiser opines that Mr. Wingo should have been put in an ambulance and seen by a doctor. (Exhibit 32 Fraiser Dep. at p. 93, 98).**

RESPONSE: Defendants object to this statement on the grounds that it is not admissible expert testimony for the reasons argued in defendants' Motion to Exclude Opinions of Plaintiffs' Expert Margo L. Frasier and Incorporated Memorandum of Law in Support (Doc. 197).

**124.   Nurse Visser did not provide Mr. Wingo with any Medical care. As a nurse she is not qualified to make medical decisions. Nurse Visser's job is to document a patient's position, take vitals and communicate with physician that**

- 66 -

**makes medical decisions. There was a physician on call for Nurse Visser to call but no one made sure she called the physician. (Exhibit 2 Burton Dep. at pgs 23-25).**

RESOPNSE: Defendants object to the Court's consideration of this fact because the cited evidence does not support plaintiffs' stated fact. These portions of Nurse Burton's deposition testimony do not speak at all to Nurse Visser's qualifications to make medical decisions, or whether the care she provided would amount to "medical care," or whether she provided any medical care at all.

**125.   Nurse Visser never went to medical school. She Cannot diagnose patients or prescribe medications. (Nurse Annaleen Visser Deposition at pgs. 149-150, relevant pages attached as Exhibit 33. Nurse Visser did not reach out to the physician on call. (Exhibit 33 Visser Dep. at p. 216:1-10).**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**126.   Major Harris, the highest ranking official in the jail, did not know whether the charge nurse was the highest person in the infirmary when he went down to the infirmary. (Exhibit 5 Harris Dep. at p. 215:23-25).**

RESPONSE: Defendants object to this fact on the grounds that it is not material. Regardless of who was the "highest person in the infirmary" when he went

down to the infirmary, the charge nurse was the highest-ranking medical staff member for him to address.

**127.   Deputy Wilkerson originally told Internal Affairs that Mr. Wingo was in the center of his cell during his security rounds and that he looked in. (Exhibit 34 Deputy Wilkerson Internal Affairs Interview). The video at this time clearly shows that Mr. Wingo was in the same position in the corner for every security check.**

RESPONSE: Defendants concede that the Court can properly consider the evidence cited in this paragraph for purposes of this summary judgment motion.

**128.   Deputy Wilkerson testified that he did not have any concerns about Mr. Wingo's medical condition until they started life saving measures. (Exhibit 13 Wilkerson dep at pgs. 217-218). Deputy Wilkerson stated that when he first opened Mr. Wingo's door and saw Mr. Wingo not moving he was not concerned about Mr. Wingo's welfare at that time and did not move with haste. He stated that he was not concerned that he was alive at that time but did not make that final determination. (Exhibit 13 Wilkerson Dep. at p. 200). Deputy Wilkerson said the reason he went to get gloves after finding Mr. Wingo unresponsive is because he was "somewhat concerned". (Exhibit 13 Wilkerson dep at pgs. 199-200). Deputy Wilkerson did not think that finding Mr. Wingo unresponsive was an emergency at that time. Instead, he thought that Mr. Wingo was in a corner**

playing a game and could jump up at any minute. **(Exhibit 13 Wilkerson Dep.
at p. 201:8-17).**

RESPONSE: Defendants object to this fact because the cited evidence does
not support the respondents' statement. Deputy Wilkerson did not testify that he "did
not have any concerns" until deputies began life-saving measures; he testified that
when he first touched Mr. Wingo *before* life saving measures had begun, he believed
Mr. Wingo might be undergoing a "serious medical issue" and "possibly … could
be on [his] deathbed maybe." (Wilkerson Dep. 217:1-14.) Additionally, Deputy
Wilkerson did not testify that he was not concerned about Mr. Wingo's welfare; he
specifically testified that he was concerned as to whether Mr. Wingo was alive when
he opened the door. (Id. 200:1-4.) Furthermore, Deputy Wilkerson testified that he
retrieved gloves "for [his] own safety as well as [Mr. Wingo's]." (Id. 199:15-19.)

        **COBB COUNTY ATTORNEY'S OFFICE**

        Lauren S. Bruce
        *Assistant County Attorney*
        Georgia Bar No. 796642
        H. William Rowling
        *County Attorney*
        Georgia Bar No. 617225

100 Cherokee Street, Suite 350
Marietta, GA 30090
770-528-4000 (telephone)

770-528-4010 (facsimile)

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing

**<u>DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF</u>**

**<u>MATERIAL FACTS</u>** has been prepared in accordance with Local Rule 5.1(C)

(Times New Roman font, 14 point).

This 29th day of September, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing **<u>DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS</u>** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants, and mailed a paper copy of same mailed by the United States Postal Service, first-class, postage prepaid, to parties and counsel of record who are non-CM/ECF participants, properly addressed upon:

Timothy J. Gardner & Henrietta G. Brown
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339

This 29th day of September, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Wesley C. Jackson*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

DOCKET 227

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, Sr., KIEARA WINGO, as surviving child of KEVIL WINGO, Sr., ANGEL CALLOWAY, as mother and next friend of ERIKA WINGO, surviving minor child of KEVIL WINGO, Sr., and FATIMA THOMAS, as mother and next friend of KEVIL WINGO, Jr., surviving minor child of KEVIL WINGO, Sr., <br><br> Plaintiffs, <br><br> v. <br><br> MAJOR BRANSON HARRIS, individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY BRITTON MCPHEE, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10, <br><br> Defendants. | Civil Action No. 1:20-cv-03662-VMC |

## ORDER

This matter is before the Court on cross-motions for summary judgment.

(Pls.' Mot. Partial Sum. J., Doc. 190; Defs.' Mot. Sum. J., Doc. 196). Also before the

Court are several motions to exclude expert testimony:

- Plaintiffs' Motion to Exclude Defendants' Expert James C. Upshaw Downs, M.D. (Doc. 188);

- Defendants' Motion to Exclude Testimony of Margo L. Frasier, J.D. (Doc. 197); and

- Defendants' Motion to Exclude Testimony of Dr. Brian Myers and Mark Johnson (Doc. 198).

For the reasons below, the Court will grant Defendants' Motion to Exclude the testimony of Dr. Meyers, grant Defendants' Motion for Summary Judgment, deny Plaintiffs' Motion for Partial Summary, and deny the remaining motions as moot.

## Background

Sometime between September 23 and 24, 2019, Cobb County Police Department arrested Kevil Wingo for suspected drug possession of 0.2 grams of cocaine. (Doc. 221 ¶ 1). He was then booked as a pretrial detainee at the Cobb County Adult Detention Center. (*Id.* ¶ 2). On September 28, 2019, Mr. Wingo began to experience abdominal pain and sweats as well as nausea and vomiting. (*Id.* ¶ 3; Doc. 225 ¶ 2).[1] Around 11:45 p.m. on September 28, 2019, Deputy Quinton

---

[1] Several of Plaintiffs' responses to Defendants' Statement of Material Facts improperly seek to elaborate on rather than contradict or admit factual statements. The Court deems these statements admitted for lack of a proper response. Plaintiffs may elaborate on the factual basis for their theory of the case in their own Statement of Material Facts in support of their Motion for Summary Judgment or in their Statement of Additional Material Facts in opposition to Defendants' Motion. The Court also deems admitted Plaintiffs' responses if they are argumentative (e.g., Doc. 225 ¶¶ 6, 26), attempt to only admit the existence of a sworn statement without providing any impeaching evidence (e.g., *id.* ¶¶ 11, 22), or generally state that video evidence contradicts testimony without providing a

Appleby transported Mr. Wingo to the infirmary. (Doc. 221 ¶ 4). At the time, medical staff from WellStar were responsible for the medical operations of the infirmary, while sheriff's deputies were present for security, though as Plaintiffs point out, the Sheriff maintains ultimate statutory responsibility to furnish detainees with medical care. (*Id.* ¶ 5); O.C.G.A. § 42-4-4. According to Chief Deputy Shonya Allen, Deputies were trained not to make medical decisions but instead to defer to the medical staff. (Doc. 221 ¶ 6).

While he was transporting Mr. Wingo, Mr. Wingo told Deputy Appleby that he had an ulcer. (*Id.* ¶ 7). Deputy Appleby relayed this information to the nursing staff in the infirmary. (*Id.*). Nurse Yvette Burton was the charge nurse for the night shift in the Cobb County Adult Detention Center in September 2019. (*Id.* ¶ 8). Charge Nurse Burton admitted Mr. Wingo into the infirmary around 12:35 a.m. on September 29, 2019. (*Id.* ¶ 9). Mr. Wingo was complaining of nausea, vomiting, and abdominal discomfort. (*Id.* ¶ 10). When Mr. Wingo was first brought to the infirmary, Deputy Britton McPhee and Nurse Burton testified to hearing him say "Lord, help me through this, and I'll never use drugs again." (*Id.* ¶ 11).

---

citation to a specific timestamp (e.g., *id.* ¶¶ 39–44, 46). The foregoing is not an exhaustive list; if a fact below is cited without any qualification by citation to Plaintiffs' response to Defendants' Statement of Material Facts, the Court has deemed the fact admitted for these reasons.

Charge Nurse Burton believed detoxing to be a common condition among inmates in the infirmary (*Id.* ¶ 13). Mr. Wingo was on "withdrawal check," meaning he was on an "opiate detox protocol," which led Charge Nurse Burton to believe "he was still detoxing." (*Id.* ¶ 14). According to Nurse Shanna Griffith, another nurse working in the infirmary for the night shift, after Mr. Wingo was brought down, staff took his vitals. (*Id.* ¶¶ 15–16). She stated that "Ms. Yvette [Burton] said that we were going to admit him so he could stay overnight or the rest of the night so that way he could see the doctor in the morning." (*Id.* ¶ 16). Nurse Griffith believed Mr. Wingo was suffering from withdrawal based on his symptoms and his statements that "I'm not ever going to touch that shit again" and "that this wasn't the first time he had gone through something like this." (*Id.* ¶ 17).

Mr. Wingo was "very loud" from the moment Deputy McPhee first saw him. (*Id.* ¶ 18). According to Deputy McPhee, this behavior was not abnormal for the infirmary. (*Id.* ¶ 19). Deputy McPhee understood that Mr. Wingo was brought to the infirmary around 11:52 p.m. for abdominal pains. (*Id.* ¶ 20). Mr. Wingo made several requests to go to the hospital during the night shift, and Deputy McPhee advised Mr. Wingo that would be medical's decision. (*Id.* ¶ 21). As he tried to talk with Mr. Wingo about his requests to go to the hospital, Deputy McPhee testified that Mr. Wingo told Deputy McPhee to "just shut the fuck up and do what I'm

telling you to do." (*Id.* ¶ 22). Sometime during the night shift, one of Mr. Wingo's cell mates began to complain that he could not sleep because Mr. Wingo was being so loud. (*Id.* ¶ 23). Towards the end of Deputy McPhee's shift, Mr. Wingo complained of having an ulcer, and Deputy McPhee relayed this complaint to the nurses who did not examine Mr. Wingo. (*Id.* ¶ 24).

Nurse Griffith heard Mr. Wingo's complaints of having an ulcer, but stated that she was unaware of the risks of a perforated ulcer or the symptoms that might present if an ulcer is perforated. (*Id.* ¶ 25–26). When breakfast was served between 4:00 a.m. and 5:30 a.m., Deputy McPhee saw Mr. Wingo eat his breakfast "with gusto," and that "he got the tray and just started digging into it." (*Id.* ¶ 28). Nurse Griffith believed Mr. Wingo was still in detox at the end of her shift, around 5:40 a.m. (*Id.* ¶ 31).

On the date of the incident, Deputy Lynda Marshall began her shift at 6:00 a.m. and was assigned to work in the infirmary. (*Id.* ¶ 32). Nurse Annaleen Visser was the charge nurse in the infirmary for that shift. (*Id.* ¶ 33). Nurse Burton provided some communication with Nurse Visser about Mr. Wingo, but the parties dispute the extent and contents of that communication. Nurse Visser testified that she believed Mr. Wingo was detoxing and that all inmates wanted to go to the ER. (*Id.* ¶ 37). In her experience, "all detoxing inmates" want to go to the emergency room to receive more comfortable accommodations and privileges,

such as a real bed, a television, better meals, and one's own room. (*Id.* ¶ 38). She believed that they also are more likely to receive opiates to manage their pain at the emergency room. (*Id.*). When taking over the shift, Nurse Visser did not conduct any physical assessment, but the parties dispute whether it was because Mr. Wingo was disruptive. (*Id.* ¶ 39).

Deputy Marshall was the only deputy assigned to the infirmary at that time. (*Id.* ¶ 42). The deputy from the prior shift, Deputy McPhee, told Deputy Marshall that Mr. Wingo had been hollering, stating that he needed to go to the hospital, and had been disruptive, though the parties dispute whether this was so. (*Id.* ¶ 43). Deputy McPhee apparently also relayed to Deputy Marshall that the nurses said Mr. Wingo was detoxing. (*Id.*). The parties agree that detox is one of the more common conditions that bring inmates to the jail's infirmary, and Deputy Marshall, over her 27 years of experience at the Sheriff's Office, has often seen individuals who were detoxing at the jail. (*Id.* ¶¶ 47–48). Based on her observations of Mr. Wingo, he appeared to her to be detoxing. (*Id.* ¶ 54).

At the time, Mr. Wingo was housed in Cell 8 of the infirmary. (*Id.* ¶ 55). Between 7:27 a.m. and 7:32 a.m. on September 29, Mr. Wingo was seen in the presence of Deputy Marshall fainting or losing his balance at least three times.

(Doc. 225 ¶ 16).[2] Deputy Marshall observed Mr. Wingo holler throughout the morning that he needed to go to the hospital. (Doc. 221 ¶ 56). Nurse Visser heard Mr. Wingo make these same requests. (*Id.* ¶ 57). Nurse Visser also heard Mr. Wingo complain of stomach pain and cramps, which she believed to be a normal symptom of detox. (*Id.* ¶ 60). Nurse Visser ultimately did not examine Mr. Wingo, but the parties dispute whether it was due to Mr. Wingo's own conduct.

Mr. Wingo also told Deputy Marshall that he could not breathe. (*Id.* ¶ 65). When Deputy Marshall asked for clarification and more detail from Mr. Wingo, he simply responded that he could not breathe and wanted to go to the hospital. (*Id.*). Deputy Marshall told the nurses that Mr. Wingo was complaining of breathing troubles, and they told her that Mr. Wingo "was just trying to go to the hospital, he was detoxing, drug seeking, that he was okay." (*Id.* ¶ 66). Nurse Visser stated that she was never told that Mr. Wingo could not breathe, but she testified that even if she had been so told, it would not have affected her assessment of Mr. Wingo "because he was yelling. […] You can't not breathe and yell. […] He was yelling and acting out." (*Id.* ¶ 67).

---

[2] Defendants lodged several materiality objections to video evidence to the extent that it does not demonstrate the individual Defendants' knowledge, but such evidence is probative of their knowledge and the Court is required to view the evidence in the light most favorable for, and draw all inferences in favor of, the non-moving party.

After some amount of fracas among cellmates based on Mr. Wingo's unusual behavior, Deputy Marshall proceeded to take Mr. Wingo out of the cell. (*Id.* ¶ 75). Mr. Wingo told Deputy Marshall that he fell in the shower and she conveyed this information to the nurses. (*Id.* ¶ 77). After Mr. Wingo fainted or lost his balance three times, Deputy Marshall opened Mr. Wingo's cell door and he fell to the ground in front of the cell. (Doc. 225 ¶ 17). Deputy Marshall told the nurses that Mr. Wingo had fallen and wanted to go to the hospital; they did nothing. (Doc. 221 ¶ 80).

Major Bronson Harris and Lieutenant Charles Gordon[3] were supervising Deputy Marshall that day. (*Id.* ¶ 81). Lt. Gordon had never previously been trained on how to identify whether an inmate is detoxing. (*Id.* ¶ 82). Deputy Marshall called Lt. Gordon down to the infirmary to advise that there was an issue with Mr. Wingo. (*Id.* ¶ 83). When he arrived at the infirmary, he saw Mr. Wingo on the ground. (*Id.* ¶ 84). The parties dispute the substance of his conversation with Mr. Wingo. Lt. Gordon asked Deputy Marshall why Mr. Wingo was on the floor, and she told him Mr. Wingo was causing "some type of issue with other inmates in the cell." (*Id.* ¶ 86). Lt. Gordon then asked a nurse what was going on with Mr. Wingo, and the nurse advised that Mr. Wingo "was fine medically." (*Id.* ¶ 87). Mr. Wingo

---

[3] Lt. Gordon has been promoted to Lieutenant since this incident. At the time, he was a Sergeant and may be called such in some relevant records. (Doc. 196-1 at 12).

did not stand up when Lt. Gordon asked him to, and Lt. Gordon thought Mr.

Wingo might have been disoriented, but he did not believe he was in any pain at

that time. (*Id.* ¶ 89–90). Lt. Gordon asked Deputy Marshall to call down watch

commander Major Harris to the infirmary so he could assess the situation. (*Id.* ¶

91).

For reasons that the parties dispute, Deputy Marshall then called her

supervisor to let him know what was going on, because she could not put Mr.

Wingo back in the cell where the other inmates were threatening to hurt him. (*Id.*

¶ 93). Lt. Gordon asked Deputy Marshall to find out where they could put Mr.

Wingo. (*Id.* ¶ 97). Deputy Marshall then called to Deputy Paul Wilkerson in the

infirmary extension to see if he had a pad available. (*Id.* ¶ 98). Deputy Marshall

called personnel at the extension because that would have been the only other

place in the detention center where Mr. Wingo could be sent while under close

observation. (*Id.* ¶ 99).

Deputy Wilkerson was working in the extension, and Deputy McPhee told

him that there was an inmate in the infirmary who was "playing games, trying to

go to the hospital," and "bothering the other inmates in the cell." (*Id.* ¶ 100).

Deputy Marshall referred to Mr. Wingo as an "idiot" during the call. (*Id.* ¶ 101).

Deputy Marshall told Deputy Wilkerson that Mr. Wingo was "trying to get to the

hospital," and Deputy Wilkerson responded, "that's not going to happen." (*Id.* ¶ 104).

After nine minutes on the ground, Lt. Gordon grabbed Mr. Wingo by his collar and escorted him to chairs in the Infirmary. (Doc. 225 ¶ 34). Lt. Gordon grabbed Mr. Wingo by his collar because he believed that Mr. Wingo was too unstable to walk on his own and thus needed to be held by his collar so that he did not fall while being escorted. (*Id.* ¶ 35). Major Harris arrived at the infirmary; he did not see Mr. Wingo being loud, disruptive, acting out, belligerent or trying to harm himself. (*Id.* ¶ 39). Major Harris went to speak with Nurse Visser. (Doc. 221 ¶ 108).[4] Nurse Visser told Major Harris and Lt. Gordon that Mr. Wingo was detoxing. (*Id.* ¶ 109). According to Major Harris, Nurse Visser told him Mr. Wingo "was detoxing and he was trying to get to the hospital—he was drug seeking is the term she used—and that he needed to be isolated in a cell by himself." (*Id.* ¶ 110). Major Harris testified that he has never been trained on how to identify whether someone is detoxing. (*Id.* ¶ 111). Major Harris testified that at the time

> the infirmary was full. The only padded cell we had there had another inmate inside it. So I asked her, you know, where we should place him as far as medically or otherwise, and she said he needed to be isolated in a cell

---

[4] Plaintiffs also allege that Major Harris spoke with a nurse (likely Nurse Visser) who stated that Mr. Wingo was detoxing, trying to get to the hospital, drug seeking and needed to be isolated. (Doc. 225 ¶ 38). The Court assumes both parties are referring to the same discussion.

> by himself. And so the only cell I had was the infirmary
> extension, the isolation cell.

(*Id.* ¶ 113). Nurse Visser also testified that the three close observation cells in the infirmary were occupied that morning. (*Id.* ¶ 125). Major Harris discussed with Nurse Visser whether he was medically cleared to be moved away from the infirmary, and she told him that Mr. Wingo was. (*Id.* ¶ 114).

Lt. Gordon also testified that he asked Nurse Visser "at least two times" whether Mr. Wingo was medically clear to go to the extension pad. (*Id.* ¶ 121). He added that the second time he asked Nurse Visser if Mr. Wingo was medically okay was after Mr. Wingo fell in front of him. (*Id.* ¶ 121). Lt. Gordon has not received any training on identifying the symptoms of detox, its hazards, or whether it constitutes an emergency. (*Id.* ¶ 123). The parties dispute who had the authority to make the call to move Mr. Wingo out of the infirmary, but Mr. Wingo was moved to one of the close observation cells in the extension. (*See id.* ¶ 128). And in Nurse Visser's judgment, Mr. Wingo was cleared to go to the extension. (*Id.* ¶ 129). Sometime during this process, Medical Tech Tiffany Womack observed that Mr. Wingo was in distress and asked to check Mr. Wingo's vitals, and Nurse Visser told her not to. (*Id.* ¶¶ 130–40).

When Major Harris and Lt. Gordon began to escort Mr. Wingo out of the infirmary at about 7:45 a.m., Mr. Wingo was shaky on his legs, so they got him a wheelchair. (*Id.* ¶ 148). Mr. Wingo fell to the ground in front of the wheelchair

when Major Harris brought the wheelchair. (Doc. 225 ¶ 51). Lt. Gordon had asked the medical staff why Mr. Wingo was so imbalanced, and they said he was detoxing, so Lt. Gordon attributed the imbalance to that condition. (Doc. 221 ¶ 149). Deputy Nasie Mejia was walking towards the infirmary and noticed Lt. Gordon and Major Harris struggling with Mr. Wingo, and he assumed "that they wanted him to go into the wheelchair, and he was being combative and not wanting to stay in the wheelchair," so he stepped in to assist. (*Id.* ¶ 150). As Deputy Mejia assisted Mr. Wingo into the wheelchair, he perceived that Mr. Wingo did not want to go in the wheelchair "because he was flailing his body forward to try to get out of the wheelchair." (*Id.* ¶ 151). When the three deputies and Mr. Wingo arrived at the padded cell in the extension, Deputy Mejia instructed Mr. Wingo to take off his clothes so he could be placed in a safety smock, but Mr. Wingo "did[n't] follow the instructions of taking the clothing off, so we had to take [the] clothing off." (*Id.* ¶ 152). The parties dispute the extent to which Mr. Wingo was combative during this process.

Plaintiffs also contend that some or all of the foregoing accounts by the CCADC staff are contradicted by the video evidence. Plaintiffs contend the video shows that Deputy Marshall was jolly and laughing as Mr. Wingo was being taken to the padded cell. (Doc. 225 ¶ 50). Sergeant Gordon and Major Harris, helped by another officer took Mr. Wingo out of his wheelchair and put him on the ground

12

in the padded cell. (*Id.* ¶ 56). Mr. Wingo was not fighting or causing a disturbance. (*Id.* ¶ 57).[5] Mr. Wingo was placed face down on a toilet grate in the padded cell and removed of his clothes by Sergeant Gordon in the presence of Major Harris. (*Id.* ¶ 58). Major Harris then dropped a safety smock on Mr. Wingo's back and left his cell. (*Id.* ¶ 59). Lt. Gordon returned to Infirmary and sat down at the desk and was speaking to nurses. (*Id.* ¶ 60). Plaintiffs contend that the video then shows Deputy Marshall making movements against the wall where Mr. Wingo originally fell and pretending as though she was stumbling to the ground and laughing, which Defendants dispute. (*Id.* ¶ 61).

Meanwhile, Mr. Wingo did not appear, to Deputy Wilkerson, to be in medical distress when he was in the padded cell because "he was just laying down was all I could tell." (Doc. 221 ¶ 161). Deputy Wilkerson has not been trained on how to identify if someone is detoxing, and he believed whether detoxing would constitute a "serious medical issue" would be up to medical. (*Id.* ¶ 160). Deputy Wilkerson acknowledges that he did not look inside the padded cell every time he did a security round. (*Id.* ¶ 162). He believed Mr. Wingo was alive and well around 8:12 because he saw movement in the cell through the in-cell camera, but the surveillance video of the cell does not seem to show any movement after about

---

[5] Defendants' objections to this and the next several statements from Plaintiffs' Statement of Additional Material Facts are overruled for the reasons given in note 2, supra.

7:57 or so when Mr. Wingo appeared to make his last movement. (*Id.*; Doc. 225 ¶ 75). Major Harris also did a security round at Cell 18 of Mr. Wingo around 8:22 a.m., and he cleared the round because he contended he saw Mr. Wingo's chest rise and fall. (Doc. 221 ¶ 163). Deputy Wilkerson was present for this same security round, and he also contended he saw Mr. Wingo's chest rise and fall at this time as well. (*Id.* ¶ 164). While Deputy Wilkerson did not see Mr. Wingo move from the corner of his cell for several minutes, he was not concerned because he "was under the impression that he was possibly sleeping, passed out." (*Id.* ¶ 166). At no point that morning was Major Harris concerned with Mr. Wingo's medical condition; he never thought Mr. Wingo was in distress or was suffering from a medical emergency, and he thought Mr. Wingo was fine. (*Id.* ¶ 167). Likewise, at no point before he eventually opened Mr. Wingo's cell door did Deputy Wilkerson have any concerns about Mr. Wingo's medical status. (*Id.* ¶ 168). Around 8:49 a.m., Deputy Randy White told Deputy Wilkerson to check on Mr. Wingo. (*Id.* ¶ 169). As Deputy Wilkerson entered the cell, he was concerned that Mr. Wingo "was possibly in the corner playing a game and possibly could jump up at any minute." (*Id.*). A code blue was called for Mr. Wingo around 8:52 a.m. (*Id.* ¶ 170). CCADC staff and infirmary staff responded, and Mr. Wingo ultimately died from a perforated gastric ulcer. (*Id.* ¶ 171).

## Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden

of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

On cross-motions for summary judgment, "[t]he standard of review. . . does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Loiseau v. Thompson, O'Brien, Kemp & Nasuti, P.C.*, 499 F. Supp. 3d 1212, 1219 (N.D. Ga. 2020) (quoting *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Cross-motions may . . . be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* (citing *U.S.*

*ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013)).

## Discussion

The Court first takes up Plaintiffs' civil rights claims and then considers their State law claims. For the reasons below, Defendants are entitled to judgment on both sets of claims.

## I.    Civil Rights Claims

The Court begins with Plaintiffs' claims under 42 U.S.C. § 1983 for violating Mr. Wingo's constitutional rights. As detailed below, the Court finds that these claims are barred by qualified immunity.

### A.    Applicable Law

As the Court noted in its prior Order (Doc. 98), the Fourteenth Amendment prohibits cruel and unusual punishment to pretrial detainees under the same standards as the Eighth Amendment. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). "Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). To state a claim for deliberate indifference, a plaintiff must allege (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3)

causation between that indifference and the plaintiff's injury. *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016).

As to the second element, to establish deliberate indifference, a plaintiff must ultimately show (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. *Id.* at 1223; *Hoffer*, 973 F.3d at 1270.[6] "Each individual Defendant must be judged separately and on the basis of what that person knows." *Melton*, 841 F.3d at 1224 (alterations omitted).

If the allegations of a constitutional violation are against a supervisor, that supervisor cannot be held personally liable under Section 1983 on a theory of respondeat superior. *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (citing *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 691 (1978)). Rather, in addition to showing an underlying violation by a subordinate, a claim against an individual supervisor must arise from the supervisor's personal participation in the alleged constitutional violation or from a causal connection between the actions of the

---

[6] In *Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023), *vacated* (11th Cir. Oct. 11, 2023), a panel of the Eleventh Circuit purported to resolve a split between competing Eleventh Circuit opinions on whether the mens rea standard for deliberate indifference was "more than mere negligence" or "more than gross negligence," citing the prior panel precedent rule. *Wade*, 67 F.4th at 1373. The Eleventh Circuit has vacated *Wade* and is rehearing the case en banc. So the Court will continue to rely on pre-*Wade* caselaw referring to the "more than mere negligence standard." The Court does not consider the difference between those standards dispositive here.

supervising official and the alleged constitutional deprivation. *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)). To show a causal connection, a plaintiff must demonstrate:

> 1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Id.* (quoting *Cottone*, 326 F.3d at 1360).

That said, even where a plaintiff has shown a constitutional violation, the doctrine of qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Officials are shielded "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Cottone*, 326 F.3d at 1357. Once the government official has satisfied this initial burden, the burden shifts to the plaintiff to satisfy a two-part test establishing "that the defendant committed a constitutional violation and that the law governing the circumstances was already

clearly established at the time of the violation." *Youmans v. Gagnon*, 626 F.3d 557,

562 (11th Cir. 2010). Courts are "permitted to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand." *Pearson

v. Callahan*, 555 U.S. 223, 236 (2009).

### B.    Application to the Facts

In the Court's prior Order denying Defendants' motion to dismiss on

qualified immunity grounds, the Court described the law on deliberate

indifference as "blackletter":

> The law regarding deliberate indifference is blackletter at
> this point. *Danley v. Allen*, 540 F.3d 1298, 1313 (11th Cir.
> 2008) ("Our earlier deliberate indifference decisions have
> stated that when jailers are aware of serious medical
> needs they may not ignore them or provide grossly
> inadequate care."), overruled on other grounds as
> recognized by *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir.
> 2010); *see also, e.g., Carswell v. Bay Cty.*, 854 F.2d 454, 457
> (11th Cir. 1988) (holding that the failure to provide
> medical care in the face of a known, serious medical need
> constitutes deliberate indifference); *Ancata v. Prison
> Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)
> ("[K]nowledge of the need for medical care and
> intentional refusal to provide that care has consistently
> been held to surpass negligence and constitute deliberate
> indifference."). Eleventh   Circuit   "precedent
> contemplates liability for non-medical correctional
> officials where they fail to take any action beyond
> informing medical personnel in the face of a plainly dire
> medical situation." *Foster v. Maloney*, 785 F. App'x 810,
> 817 (11th Cir. 2019) (citing *Townsend v. Jefferson Cty.*, 601
> F.3d 1152, 1159 (11th Cir. 2010)).

(Doc. 98 at 23–24). But as the result of factual development, the Court now faces a substantially different record than before, making qualified immunity a much closer question.[7] The Court therefore starts by canvassing the relevant precedent which was clearly established on the date of the alleged violation in 2019.

In *Townsend v. Jefferson County*, 601 F.3d 1152, 1154 (11th Cir. 2010), the Eleventh Circuit considered a claim of alleged deliberate indifference to a pretrial detainee's miscarriage while in detention. In that case, two deputies spoke with the detainee who told them she was not feeling well and was "bleeding, vomiting, and suffering abdominal pain." *Id.* at 1155. The nurse visited the detainee and told the detainee that "she was overreacting and needed to calm down." *Id.* The nurse "recognized that [the detainee] needed further examination, but that because [her] condition was not an emergency, she told [the detainee] that she would return in about 90 minutes when she finished administering medication." *Id.* Both deputies knew that the nurse visited the detainee and heard the nurse advise the detainee that she would return. *Id.* at 1155–56. The detainee testified that "'an hour or two' later, after she failed to 'calm down,' she was taken away from the other inmates and placed in a separate consultation room where she could talk to [the nurse]."

---

[7] There appears to be no dispute that Defendants were acting under color of law and were acting within their discretionary authority for the purpose of the qualified immunity analysis. (Doc. 196-1 at 5). There is also no dispute that Mr. Wingo's medical condition, a perforated ulcer, was serious. (*Id.* at 9).

*Id.* at 1156. But the nurse returned the detainee to her cell, where she again told one of the deputies she did not feel well. *Id.* The deputy spoke with the nurse after she met with the detainee, and the nurse told the deputy that she did not think that the detainee's condition was an emergency, but that she would consult a doctor. *Id.* The detainee's condition then deteriorated and ultimately resulted in a miscarriage. *Id.*

The Eleventh Circuit reversed the district court's denial of qualified immunity to the deputies. In doing so, the court noted that "[b]oth deputies were aware that [the nurse] had determined that [the detainee's] condition was not an emergency." *Id.* at 1158. The court also wrote that it was "undisputed that [the deputies] told [the nurse] about [the detainee's] complaints, knew that [the nurse] visited [the detainee] while she was conducting a 'pill pass,' and 'heard [the nurse] advise [the detainee] that she would see her after her pill pass duties.'" *Id.* Finally, the court wrote that it was "also undisputed that [one of the deputies] spoke with [the nurse] after [the nurse] saw [the detainee]" and that "the nurse told [the deputy] that [the detainee's] condition was not an emergency, but that [she] would consult a doctor." *Id.* In light of that evidence, the Eleventh Circuit found that "no reasonable jury could conclude that either [deputy] knew that [the detainee's] situation was an emergency," explaining that one deputy "had been told by a medical professional that [the detainee] was not presenting an emergency," and

the other "knew that a medical professional had spoken with [the detainee] and determined that [she] could wait several hours for further evaluation." *Id.* at 1159. The Eleventh Circuit left open the possibility, however, that another case could present facts showing that a detainee's "situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged [the detainee's] condition" or that the deputies must have known that the nurse had ignored the detainee's serious medical need because she, for example, "had previously exhibited deliberate indifference in carrying out [her] responsibilities." *Id.* (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004); *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir.1995); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir.1989)).

The Eleventh Circuit picked up on this thread in *Foster v. Maloney*, 785 F. App'x 810, 812 (11th Cir. 2019).[8] That case involved an allegation that a detainee "did not receive adequate treatment for various health issues stemming from methadone withdrawal," leading to "permanent neurological deficits and cortical

---

[8] Defendants argue that *Foster*, which was unpublished and issued a few weeks after the incident here, cannot define clearly established law for qualified immunity purposes. (Doc. 224 at 11–12). But *Foster* did not purport to establish new law; it recognized that as of April 2014 (when the violation in that case occurred), it was already clearly established that the Eleventh Circuit's "precedent contemplate[d] liability for non-medical correctional officials where they fail to take any action beyond informing medical personnel in the face of a plainly dire medical situation." 785 F. App'x at 817 (citing *Townsend*, 601 F.3d at 1159). This determination of the established state of the law at the time of the violation in that case is thus strong persuasive authority on the state of law at the time of the violation here.

blindness." *Id.* at 812, 814. In that case, the detainee exhibited elevated blood pressure as well as slurred speech, tongue-biting, and limited control of her body. *Id.* at 813. About two weeks later, she was seen in the clinic, given ibuprofen, and put on a blood-pressure "watch" for three days. *Id.* But within a day or so, her condition became "desperate" and she "began having strokes and seizures as a result of her untreated high blood pressure," and "was temporarily moved to a medical cell, where she was observed to be lethargic and slurring her words." *Id.* But "[r]ather than provide her with comfort or adequate medical care, the correctional officers and nurses on duty 'harassed and ridiculed' [her] and 'watched [her] deteriorate.'" *Id.* That same day, she was hospitalized, and remained there for three weeks. *Id.*

The detainee "alleged her medical condition over the three days during which the correctional officers were on duty was so obvious that even a lay person—like the correctional officers—would have recognized that she was not receiving adequate treatment." *Id.* at 815. On appeal from a denial of qualified immunity, "the correctional officers argu[ed] they lacked the medical expertise to comprehend the alleged severity of [the detainee's] condition and simply deferred to the judgment of the medical personnel on staff," but the Eleventh Circuit rejected that argument. *Id.* at 816. The court, citing *Townsend*, explained that while "[i]t is generally true that a lay correctional officer cannot be liable for medical

staff's diagnostic decisions or be expected to second guess those decisions in most circumstances . . . we have acknowledged that an inmate or prisoner's medical situation may in some cases be so obviously dire that correctional officers may be held liable regardless of whether medical personnel are also aware of the situation." *Id.* (citing *Townsend*, 601 F.3d at 1159). The court found that

> [t]he factual allegations, as discussed above, paint a picture of a person suffering from and exhibiting extremely concerning symptoms such that her situation was "obviously dire." Whether the correctional officers possessed the medical expertise to specifically diagnose the cause of [the detainee's] symptoms, they were able to observe the seriousness of her condition. Assuming all of [the detainee's] allegations are true, as we must at the motion to dismiss stage, the failure of the correctional officers, in the face of [her] obviously dire condition, to personally take any action beyond informing medical personnel would constitute deliberate indifference to [her] serious medical needs.

*Id.* at 816–17. Finally, the court held that qualified immunity did not bar a claim for deliberate indifference under those facts because *Townsend* clearly established the law on that point. *Id.* at 817.

Most recently, the Eleventh Circuit considered whether a "deputy sheriff's [2016] decision to place a pretrial detainee in an unventilated, un-air-conditioned transport van on a hot autumn day . . . [and subsequent] ignoring [of] the detainee's resulting distress — which included unconsciousness, shaking, profuse sweating, and labored breathing . . . exhibit[ed] deliberate indifference to a serious

medical need." *Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1178 (11th Cir. 2020). While

that case did not involve any medical personnel, the evidence of the seriousness

of the detainee's medical needs is probative. There, the detainee was

> "lying unconscious on the floor of the van" and
> "breathing very fast," that no fan or air conditioning was
> running, and that the back of the van was "very hot." . . .
> [E]ven after [the] Deputy . . . roused [the detainee],
> placed him back on a bench, and began driving, [the
> detainee] didn't open his eyes, continued to
> hyperventilate, and "appeared to be unconscious." . . .
> [O]n the way to Lanier County, [the detainee] again fell
> to the floor of the van, that he was still unconscious, . . .
> [and] he was hyperventilating, and that he had mucus
> running from his nose and mouth.

*Id.* at 1189. In reversing the district court's grant of qualified immunity, the court

noted that "[a]lthough we haven't identified any controlling case with closely

analogous facts, we think 'the novel facts of the situation' are obviously governed

by a 'broader, clearly established principle.'" *Id.* at 1190 (citing *J W by & through

Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018)).

The court wrote:

> This broad principle has put all law-enforcement officials
> on notice that if they actually know about a condition
> that poses a substantial risk of serious harm and yet do
> *nothing* to address it, they violate the Constitution. No
> more notice was necessary because "the assumed
> circumstances here are stark and simple, and the
> [preexisting] decisional language . . . obviously and
> clearly applies." . . . This is not a case in which a law-
> enforcement officer provided inadequate aid, the
> reasonableness of which can be fairly disputed. Here, at

> least on the facts as we must take them, [the] Deputy . . .
> provided no timely aid—he was confronted with a
> serious medical need and did *nothing*. Because we have
> made clear that such complete abdication in the face of a
> known serious need is unconstitutional, [the] Deputy . . .
> is not entitled to qualified immunity.

*Id.* at 1190–91 (11th Cir. 2020) (citations omitted). In a footnote, the court observed

that dicta in prior cases suggested that a finding of deliberate indifference

necessarily precludes qualified immunity because "prison officials who

deliberately ignore the serious medical needs of inmates cannot claim that it was

not apparent to a reasonable person that such actions violated the law." *Id.* at 1191

n.11 (quoting *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994),

*overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)). While the

court noted that later decisions "have reserved the question whether prior

decisional law must clearly establish that the specific medical issue complained

of . . . counts as a serious medical need," the court did embrace the broader notion

that doing nothing in response to a serious need is unlikely to be protected by

qualified immunity:

> We think it unlikely that an officer will be able to avail
> himself of qualified immunity where, as here, the
> evidence allows the inference that he was aware of *and
> flatly ignored* a serious risk of harm requiring medical
> attention just because our prior case law didn't put him
> on notice of that risk. Because a serious medical need is,
> by definition, one that has been diagnosed as needing
> treatment or one that would be obvious to lay people, no
> officer can be unfairly surprised to learn that he violated

> the Constitution by flatly ignoring it. We leave open the question whether an officer who takes inadequate measures to treat a dangerous condition may be entitled to qualified immunity where previous case law didn't put him on notice that his response was deficient.

*Id.*

The Court thinks that this latter observation distills the dilemma of this case. Precedent is clearly established in this circuit that a lay officer cannot simply ignore a detainee's serious medical need, and a lay officer is charged with knowledge of such a need in the presence of certain "obvious" symptoms such as strokes, seizures, lethargy, and slurring words, *see Foster*, 785 F. App'x at 813, 815, or lack of consciousness and hyperventilation, *see Patel*, 969 F.3d at 1178. *See also, e.g., Ravan v. Talton*, No. 21-11036, 2023 WL 2238853, at *9 (11th Cir. Feb. 27, 2023) ("Any reasonable official would know that, if a detainee with bleeding sores all over his body asks for a medical-treatment form, he or she cannot deny the detainee access to medical care."). And where it is evident that a detainee is "exhibiting extremely concerning symptoms such that her situation was 'obviously dire,'" particularly when such symptoms continue for a long time, "the failure of the correctional officers, . . . personally take any action beyond informing medical personnel would constitute deliberate indifference." *Foster*, 785 F. App'x at 816–17; *see also Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of

the medical need and the reason for the delay. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference. . . . Delayed treatment for injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are obvious serious medical needs, may also give rise to constitutional claims. . . .") (citations omitted).

But where there is a lack of clearly established law on a "specific medical issue complained of" such that reasonable minds could disagree on the evident seriousness of the condition, or when "an officer . . . takes inadequate measures to treat a dangerous condition," *Patel*, 969 F.3d at 1191 n.11, qualified immunity may be available. Thus, where, as here, symptoms displayed were consistent with a critically serious medical need but were also consistent with a more routine, less critical situation such as detoxing, an officer does not act unreasonably by seeking input from, and relying on, a medical professional who has not given the officer any reason to doubt the veracity of her medical assessment.[9] *Nicholson v. Ga. Dep't of Human Res.*, 918 F.2d 145, 147 (11th Cir. 1990) ("Application of this standard requires the court to conduct its review through the eyes of an objective,

---

[9] Plaintiff points to evidence that various defendants knew that detoxing could be life-threatening, (Doc. 209 at 8–9), but that does not establish that detoxing is *always* life threatening or that observation by detention center nursing personnel rather than hospitalization is insufficient in all such cases.

reasonable government official: could a reasonable official have believed his or her actions to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred?").

The Court views the record in the light most favorable to Plaintiffs such that the Court assumes that Mr. Wingo was showing signs of pain and distress rather than malingering or misbehavior. Even so, the Court concludes that Plaintiff has not presented any evidence that Defendants did not, at all relevant times, sincerely believe the nurses' grossly wrong evaluation that Mr. Wingo was not in any imminent danger despite such symptoms.[10] *Cf. Kuhne v. Fla. Dep't of Corr.*, 618 F. App'x 498, 507 n.55 (11th Cir. 2015) ("*Townsend* favorably cited *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004), which held that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.") (citing *Townsend*,

---

[10] (*See* Doc. 221 ¶¶ 66 (Deputy Marshall told the nurses that Mr. Wingo was complaining of breathing troubles, and they told her that Mr. Wingo "was just trying to go to the hospital, he was detoxing, drug seeking, that he was okay.), 87 (Lt. Gordon then asked a nurse what was going on with Mr. Wingo, and the nurse advised that Mr. Wingo "was fine medically."), 109–10 (Nurse Visser told Major Harris and Lt. Gordon that Mr. Wingo was detoxing. According to Major Harris, Nurse Visser told him Mr. Wingo "was detoxing and he was trying to get to the hospital—he was drug seeking is the term she used—and that he needed to be isolated in a cell by himself."), 114 ("Major Harris discussed with Nurse Visser whether he was medically cleared to be moved away from the infirmary, and she told him that Mr. Wingo was.")).

601 F.3d at 1159). The medical professionals here did not live up to their responsibilities, and it is tragic that this may have led to Mr. Wingo's death. The Court can understand the anger and sadness Plaintiffs must feel in light of the evidence that Defendants did not treat Mr. Wingo warmly in his final moments, but in light of the specific symptoms exhibited by Mr. Wingo over the course of only about a day, combined with the lay prison officials' reliance on the medical evaluations of the detention center's nursing staff, there was no clearly established law requiring Defendants to order the detention center's nursing staff to provide medical care or to hospitalize Mr. Wingo against the advice of the detention center's nursing staff. Thus, the Court finds that Defendants are entitled to qualified immunity on Plaintiffs' civil rights claims.

## II.   State Law Claims

Plaintiffs abandoned their State law negligence claims that Defendants failed to follow policy on providing emergency medical care and completion of Close Observation Forms. (Doc. 209 at 26 n.2). But Plaintiffs' State law negligence claim against Deputy Wilkerson solely for failing to properly conduct security rounds is not abandoned. (*Id.* at 27 n.2). First, the Court examines whether this claim is barred by Georgia's official immunity doctrine. Next, the Court considers the parties' arguments about causation, which will entail consideration of Defendants' Motion to Exclude Testimony of Dr. Brian Myers (Doc. 198). Because

the Court finds that Defendants are entitled to summary judgment on causation grounds, the Court does not reach Plaintiffs' argument in their cross-motion for summary judgment regarding apportionment of fault as to this claim.

## A.   Official Immunity

Official immunity protects law-enforcement officers performing "official functions" from liability unless "they act with actual malice or with actual intent to cause injury."  Ga. Const. art. I, § 2, ¶ IX(d). As with qualified immunity, the applicability of official immunity is a threshold issue. *See Cameron v. Lang*, 549 S.E.2d 341, 344-45 (Ga. 2001). First, the Court must examine whether Deputy Wilkerson's conduct constituted "discretionary action[] taken within the scope of his official authority," rather than a ministerial act. *Gates v. Khokhar*, 884 F.3d 1290, 1304 (11th Cir. 2018) (alteration adopted) (quoting *Lang*, 549 S.E.2d at 344). If a discretionary act, Deputy Wilkerson is entitled to official immunity unless a reasonable trier of fact could find he acted with actual malice or intent to cause injury. *See Woodard v. Laurens Cnty.*, 456 S.E.2d 581, 583 (Ga. 1995); *Gilbert v. Richardson*, 452 S.E.2d 476, 482–83 (Ga. 1994). Official immunity does not, however, extend to ministerial acts negligently performed. *Harden v. Clarke Cnty. Bd. of Educ.*, 631 S.E.2d 741, 743 (Ga. Ct. App. 2006). The Georgia Court of Appeals has explained the difference between discretionary and ministerial acts:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted

> or proved to exist, and requiring merely the execution of
> a specific duty. A discretionary act, however, calls for the
> exercise of personal deliberation and judgment, which in
> turn entails examining the facts, reaching reasoned
> conclusions, and acting on them in a way not specifically
> directed.

*Hicks v. McGee*, 642 S.E.2d 379, 382 (Ga. Ct. App. 2007) (quoting *Joyce v. Van Arsdale*, 395 S.E.2d 275 (Ga. Ct. App. 1990), *superseded by statute in part on other grounds*, *Nw. Ga. Reg'l Hosp. v. Wilkins*, 469 S.E.2d 786, 788 (Ga. Ct. App. 1996)). Georgia courts are clear that a determination of whether a public agent's acts are ministerial or discretionary "is dependent upon the facts of the individual case, particularly such fact or facts as specifically relevant to the official act or omission from which liability arises." *Daley v. Clark*, 638 S.E.2d 376, 380 (Ga. Ct. App. 2006) (quoting *Meagher v. Quick*, 594 S.E.2d 182 (Ga. Ct. App. 2003)).

Georgia courts have held that where jails have "established policies and procedures which governed the surveillance of inmates" such that "prisoners were to be observed on a regular basis, . . . 'the acts of following established policies of inspecting and monitoring are ministerial tasks.'" *Harvey v. Nichols*, 581 S.E.2d 272, 277 (Ga. Ct. App. 2003), *disapproved of on other grounds by City of Richmond Hill v. Maia*, 800 S.E.2d 573 (Ga. 2017) (quoting *Carter v. Glenn*, 548 S.E.2d 110, 113 (Ga. Ct. App. 2001)). Plaintiffs point to CCSO's policies and procedures on inspections and argue that Deputy Wilkerson "had a clear, absolute, and definite ministerial duty to conduct 12-to-15-minute increment security rounds

with an unobstructed visual check on Mr. Wingo in his close observation cell to make sure he was alive and well." (Doc. 209 at 28–29). The Court agrees, and finds that official immunity does not bar Plaintiffs' negligence claims against Deputy Wilkerson. The Court next considers whether any alleged breach of duty by Deputy Wilkerson caused Mr. Wingo's death.

### B.   Causation

Under Georgia law, a negligence claim contains four essential elements: "[A] duty, a breach of that duty, causation, and damages." *Jones v. Wal-Mart Assocs., Inc.*, No. 1:19-CV-03705-SDG, 2021 WL 243285, at *3 (N.D. Ga. Jan. 25, 2021) (quoting *Collins v. Athens Orthopedic Clinic, P.A.*, 837 S.E.2d 310, 312 (Ga. 2019)). As to the causation element, in most simple negligence cases, "the general rule is that a plaintiff 'need not produce expert evidence on causation.'" *Id.* (quoting *Cowart v. Widener*, 697 S.E.2d 779 (Ga. 2010)).

But "expert evidence is required where a 'medical question' involving truly specialized medical knowledge (rather than the sort of medical knowledge that is within common understanding and experience) is needed to establish a causal link between the defendant's conduct and the plaintiff's injury." *Cowart*, 697 S.E.2d at 781 (citations omitted). There appears to be no dispute that this case is the type of simple negligence case that entails a medical question. *See id.* at 786–87 (requiring expert evidence where "the plaintiffs allege that [the defendant] failed to secure

medical assistance in time to stop the internal bleeding from killing [the plaintiff].”). Plaintiffs have disclosed Dr. Brian Myers to offer causation testimony, and Defendants have moved to exclude his testimony. Defendants' motion to exclude may therefore be dispositive to the causation issue, and the Court will turn to that motion next.

### C.   Motion to Exclude Dr. Myers

According to Plaintiffs, Dr. Myers will proffer these expert opinions:

> (1.) “[T]o a reasonable degree of medical certainty, that had Kevil Wingo been provided reasonable emergency medical care he would have most likely survived.”
>
> (2) “[T]he lack of appropriate emergency medical care resulted the loss of Kevil Wingo's life.”

(Doc. 209 at 31). In turn, Defendants seek to exclude the testimony of Dr. Myers under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594, 597 (1993). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles
> and methods to the facts of the case.

In *Daubert*, the Supreme Court recognized that Rule 702 provides "a gatekeeping role for the judge," but also emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." 509 U.S. at 594, 597. It explained that "the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," but also that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596–97 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

As the Eleventh Circuit has recognized, "[i]n discussing this rule [702], the Advisory Committee Notes state that, after *Daubert*, 'the rejection of expert testimony is the exception rather than the rule.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (citing Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments). "Indeed, even when 'a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable. The amendment is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.'" *Id.*

The Eleventh Circuit has "distilled the expert admissibility inquiry into the following three factors":

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* at 850–51 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). That court has "also noted that, while 'there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them.'" *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

Defendants contend that Dr. Myers's opinion fails to meet the second factor because his opinion on causation is not sufficiently reliable. Specifically, Defendants argue that, at his deposition,

> Dr. Myers was forced to concede that he could not state with any degree of medical certainty what Mr. Wingo's survivability would have been if someone had called 911 at 7:45 a.m., the approximate time Mr. Wingo was transferred out of the infirmary because he does not know what Mr. Wingo's vital signs were then.

(Doc. 198 at 7) (citing Deposition of Brian S. Myers, M.D. dated March 13, 2023

("Myers Dep.," Doc. 200-1) at 107:11-19).

In response, Plaintiffs concede that while Dr. Myers "cannot precisely state

at a specific time and minute without vitals Mr. Wingo's likelihood of survival,"

they allege that there is a sufficient basis for a reliable causation opinion based on

Dr. Myers's testimony about his survivability from earlier that morning.

Specifically, he testified that:

> Mr. Wingo's vitals were taken at 12:36 a.m. on September
> 29, 2019. . . . Having these vitals documented along with
> Dr. Myers' surgical experience repairing perforated
> ulcers lead to his unequivocal testimony that (1.) at 11:30
> at night, Mr. Wingo's gastric ulcer perforated in the
> multipurpose room and (2.) Mr. Wingo, with no
> comorbidities, had a 90 percent chance of survival or 10
> percent mortality.

(Doc. 207 at 8–9, 10) (citing Myers Dep. at 88:1-13, 95:24-25, 96:1-18, 97:17-22,

109:11-25, 110:1-25 and 111:1-3). Plaintiffs also argue that since "Dr. Myers can say

unequivocally that if Mr. Wingo had vitals he likely would have survived," and

that because "Mr. Wingo had vitals at least until the time . . . Deputy Wilkerson

and Major Harris claim that they saw him alive at 8:23 a.m." the Court can infer

that "Mr. Wingo had a chance of survival at least until that point." (Doc. 209 at 34).

But that is precisely the sort of inference that the Court cannot draw on summary

judgment in a state law negligence case involving medical questions. *See Cowart*,

697 S.E.2d at 790 ("A jury could not rely on its common sense and experience to

38

answer these causation questions . . . . Indeed, the only arguably expert evidence on the issue weighed *against* causation, as Cowart's treating physician admitted that he could *not* say if Cowart would have survived had he been taken to an emergency room. . . . As the trial court properly concluded, speculation is not enough.").[11]

Finally, Plaintiffs argue that the only reason that Dr. Myers "could not say what Mr. Wingo's vitals were up until the moment he was found non-responsive" was "because Defendants did nothing to make sure that he was evaluated medically." (Doc. 209 at 33). That may be so, but "[u]nder Georgia law, 'medical testimony stated only in terms of a 'possible' cause *may* be sufficient when supplemented by probative non-expert testimony on causation,'" and Plaintiffs provided no such testimony. *Blackman v. Zelinski*, No. 1:19-CV-04483-LMM, 2022 WL 3336461, at *4 (N.D. Ga. Jan. 21, 2022) (quoting *Rodrigues v. Ga.-Pac. Corp.*, 661 S.E.2d 141, 143 (Ga. App. 2008)). The Court recognizes the burden of proving causation in cases involving specialized medical questions can be harsh, but the Georgia Supreme Court recognized that burden as a natural counterbalance to

---

[11] As in *Cowart*, there appears to be general agreement among all the experts here that no survivability determination can be made at the time of Mr. Wingo's transfer to Deputy Wilkerson's care. 697 S.E.2d at 790. This agreement indicates a lack of material disputed facts such that summary judgment would be appropriate even if the Court were to deny Defendants' motion to exclude.

"the broad responsibility that Georgia law places on tortfeasors for the consequences of a breach of a legal duty." *Cowart*, 697 S.E.2d at 784.

In sum, because Dr. Myers could not say with any degree of medical certainty whether Mr. Wingo would have survived had he been hospitalized after being transferred to Deputy Wilkerson's supervision, his opinion is insufficiently reliable and the Court must exclude his opinion with respect to Plaintiffs' negligence claim.[12] Absent any other expert causation evidence, the Court must also grant Defendants' Motion for Summary Judgment as to this count as well.

## Conclusion

For the above reasons, it is

**ORDERED** that Defendants' Motion to Exclude Testimony of Dr. Brian Myers and Mark Johnson (Doc. 198) is **GRANTED IN PART** as to the testimony of Dr. Myers and **DENIED AS MOOT IN PART** as to the testimony of Mr. Johnson. It is

**FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 190) is **DENIED** and Defendants' Cross-Motion for Summary Judgment (Doc. 196) is **GRANTED**. It is

---

[12] The Court only makes this determination as to Plaintiffs' State law claims. The Court expresses no opinion on whether, if the Court erred in determining the other Defendants are entitled qualified immunity, Dr. Myers's opinion would be reliable or helpful as to the actions of other Defendants at other points in time between September 28 and 29.

**FURTHER ORDERED** that Plaintiffs' Motion to Exclude Defendants' Expert James C. Upshaw Downs, M.D. (Doc. 188) and Defendants' Motion to Exclude Testimony of Margo L. Frasier, J.D. (Doc. 197) are **DENIED AS MOOT.**

The Clerk is directed to enter judgment for Defendants and against Plaintiffs and to close the case.

**SO ORDERED** this 26th day of February, 2024.

_____
Victoria Marie Calvert
United States District Judge

DOCKET 228

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, Sr., et al. <br> Plaintiffs, <br><br> vs. <br><br> MAJOR BRANSON HARRIS, individually, et al. <br> Defendants. | CIVIL ACTION FILE <br><br> NO. 1:20-cv-03662-VMC |

## J U D G M E N T

This action having come before the court, Honorable Victoria M. Calvert, United States District Judge, for consideration of Defendants' Motion for Summary Judgment, and the court having granted said motion, it is

**Ordered and Adjudged** that the plaintiffs take nothing; that the defendants recover their costs of this action, and the action be, and the same hereby is, **dismissed**.

Dated at Atlanta, Georgia, this 27th day of February, 2024.

KEVIN P. WEIMER
CLERK OF COURT

By:   s/J. Underwood
Deputy Clerk

Prepared, Filed, and Entered
in the Clerk's Office
February 27, 2024
Kevin P. Weimer
Clerk of Court

By:    s/J. Underwood
Deputy Clerk

DOCKET 230

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

<table>
<tr>
<td>
TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr.<br><br>
     Plaintiffs,<br><br>
v.<br><br>
MAJOR BRANSON HARRIS, individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10,<br><br>
     Defendants.
</td>
<td>
CIVIL ACTION NO.<br>1:20-CV-03662-VMC
</td>
</tr>
</table>

## ALL PLAINTIFFS' NOTICE OF APPEAL

Notice is hereby given that Plaintiffs Tiffany Wingo as Administrator of the Estate of Kevil Wingo, Sr., Kieara Wingo, as surviving child of Kevil Wingo, Sr., Erika Wingo, surviving child of Kevil Wingo, Sr., and Teri Fields, Esq., Conservator of Kevil Wingo, Jr., surviving minor child of Kevil Wingo, Sr. appeals to the United States Court of Appeals for the Eleventh Circuit from the United States District Court for the Northern District of Georgia's Order entered on

February 26, 2024 (Doc. 227) by Judge Victoria M. Calvert and Final Judgment entered on February 27, 2024 (Doc. 228).  All Plaintiffs appeal the District Court granting Defendants' Motion for Summary Judgment (Doc. 196); granting Defendants' Motion to Exclude Testimony of Dr. Brian Myers (Doc. 198); denying Plaintiffs' Motion for Partial Summary Judgment (Doc. 190); and denying as moot Plaintiffs' Motion to Exclude Defendants' Expert James C. Upshaw, Downs, M.D. (Doc. 188).

Plaintiffs request the clerk of the Northern District of Georgia to transmit to the United States Court of Appeals for the Eleventh Circuit all physical, manual, and electronic media exhibits filed in this action including all manually filed electronic media in support of (1) Plaintiffs' Statement of Undisputed Material Facts for Motion for Partial Summary Judgment on Defendants' Apportionment of Fault to Nonparties Defense (Doc. 190-1); (2) Plaintiffs' Brief in Support of Motion for Partial Summary Judgment on Defendants' Apportionment of Fault to Nonparties Defense (Doc. 190-2); (3) Plaintiffs' Response and Objections to Defendants' Statement of Undisputed Material Facts (Doc. 208); and (4) Plaintiffs' Additional Facts in Opposition to Defendants' Motion for Summary Judgment (Doc. 209-1). Plaintiffs respectfully request that the clerk of the Northern District of Georgia notify Plaintiffs if Plaintiffs need to do anything to transport the physical, manual

and/or electronic media exhibits to the United States Court of Appeals for the

Eleventh Circuit.

Respectfully submitted this 25th day of March, 2024.

**GARDNER TRIAL ATTORNEYS, LLC**


/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No.  115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for the Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This 25th day of March, 2024.

GARDNER TRIAL ATTORNEYS, LLC

/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

*Attorneys for Plaintiffs*

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ERIKA WINGO, surviving child of KEVIL WINGO, SR., and TERI FIELDS, ESQ., Conservator of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr.<br><br>      Plaintiffs,<br><br>v.<br><br>MAJOR BRANSON HARRIS, individually, LIEUTENTANT CHARLES GORDON, individually, DEPUTY PAUL WILKERSON, individually, DEPUTY LYNDA MARSHALL, individually, JOHN DOES 1-10, and JANE DOES 1-10,<br><br>      Defendants. | CIVIL ACTION NO. 1:20-CV-03662-VMC |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing

**<u>ALL PLAINTIFFS' NOTICE OF APPEAL</u>** to the Clerk of Court using the

CM/ECF system which will automatically send electronic mail notification of such

filing to the following counsel of record:

| | |
|---|---|
| Sun S. Choy, Esq. | H. William Rowling, Jr., Esq. |
| Wesley C. Jackson, Esq. | Lauren S. Bruce, Esq. |
| Marisa M. Beller, Esq. | Cobb County Attorney's Office |
| Freeman Mathis & Gary, LLP | 100 Cherokee Street, Suite 350 |

100 Galleria Pkwy, Suite 1600              Marietta, GA 30090
Atlanta, GA 30339-5948


        Respectfully submitted, this  25ᵗʰ  day of March, 2024.


                              **GARDNER TRIAL ATTORNEYS, LLC**


                              /s/ Timothy J. Gardner
                              **TIMOTHY J. GARDNER**
                              Georgia Bar No. 115430
                              **HENRIETTA G. BROWN**
                              Georgia Bar No. 253547

                              ***Attorneys for Plaintiffs***

3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

CERTIFICATE
OF SERVICE/
TAB B

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have served the foregoing Appellants' Appendix by electronically filing with CM/ECF system, which will automatically electronically serve counsel of record who are registered users of the Court's electronic filing system.

Sun S. Choy                            Lauren S. Bruce
Wesley C. Jackson                      H. William Rowling, Jr.
Marisa M. Beller                       Cobb County Attorney's Office
Freeman Mathis & Gary, LLP             100 Cherokee Street, Suite 350
100 Galleria Parkway, Suite 1600       Marietta, Georgia 30090
Atlanta, Georgia 30339

Respectfully submitted this <u>11th</u> day of June, 2024.


/s/ Timothy J. Gardner
Timothy J. Gardner
Georgia Bar No. 115430

Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, Georgia 30339
Phone: 770-693-8202
tjg@gardnertrialattorneys.com